**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| STEPHEN LAROQUE, ANTHONY CUOMO, JOHN NIX, KLAY NORTHRUP, LEE RAYNOR, and KINSTON CITIZENS FOR NON-PARTISAN VOTING, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| ERIC H. HOLDER, JR. ATTORNEY GENERAL OF THE UNITED STATES | ) ) ) ) |
| Defendant. | ) ) |

Civ. No.: 1:10-CV-00561-JDB

_____

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**
**[ORAL ARGUMENT REQUESTED]**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7, Plaintiffs Stephen LaRoque, Anthony Cuomo, John Nix, Klay Northrup, Lee Raynor, and Kinston Citizens for Non-Partisan Voting ("Plaintiffs") respectfully move this Court for entry of an Order granting summary judgment to Plaintiffs on the entirety of the claims in their complaint. Specifically, Plaintiffs move for summary judgment on: (1) their claim that Section 5 of the Voting Rights Act of 1965, as reauthorized and amended in 2006, *see* 42 U.S.C. § 1973c ("Section 5"), unconstitutionally exceeds Congress' authority to enforce the Reconstruction Amendments to the Constitution; and (2) their claim that Section 5 violates the equal protection guarantees of the Fifth and Fourteenth Amendments to the Constitution.

In support of this Motion, Plaintiffs are filing herewith a Memorandum of Points and Authorities and a Statement of Material Facts, as well as attaching nine supporting Exhibits, five Declarations by the individual plaintiffs, and a Proposed Order. Plaintiff also request oral argument on this Motion.

For the reasons provided in the supporting Memorandum, Plaintiffs contend that there is no genuine disputed issue as to any material fact and that they are entitled to judgment as a matter of law on both constitutional claims. Consequently, Plaintiffs respectfully pray that this Court grant summary

judgment to Plaintiffs, declare that the 2006 extension and expansion of Section 5 was unconstitutional, and enjoin the Attorney General from enforcing Section 5.

August 18, 2010

Respectfully submitted,

/s/ Michael A. Carvin

_____
Michael A. Carvin (D.C. Bar No. 366784)
Noel J. Francisco (D.C. Bar No. 464752)
Hashim M. Mooppan (D.C. Bar No. 981758)
David J. Strandness (D.C. Bar No. 987194)
JONES DAY
51 Louisiana Ave. NW
Washington D.C.  20001
(202) 879-3939

Michael E. Rosman (D.C. Bar No. 454002)
Michelle A. Scott (D.C. Bar No. 489097)
CENTER FOR INDIVIDUAL RIGHTS
1233 20th St. NW, Suite 300
Washington D.C.  20036
(202) 833-8400

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| STEPHEN LAROQUE, ANTHONY CUOMO, JOHN NIX, KLAY NORTHRUP, LEE RAYNOR, and KINSTON CITIZENS FOR NON-PARTISAN VOTING, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| ERIC H. HOLDER, JR. ATTORNEY GENERAL OF THE UNITED STATES | ) ) ) ) |
| Defendant. | ) ) |

Civ. No.: 1:10-CV-00561-JDB

_____

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
### [ORAL ARGUMENT REQUESTED]

Michael A. Carvin (D.C. Bar No. 366784)
Noel J. Francisco (D.C. Bar No. 464752)
Hashim M. Mooppan (D.C. Bar No. 981758)
David J. Strandness (D.C. Bar No. 987194)
JONES DAY
51 Louisiana Ave. NW
Washington D.C.  20001
(202) 879-3939

Michael E. Rosman (D.C. Bar No. 454002)
Michelle A. Scott (D.C. Bar No. 489097)
CENTER FOR INDIVIDUAL RIGHTS
1233 20th St. NW, Suite 300
Washington D.C.  20036
(202) 833-8400

_Attorneys for Plaintiffs_

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................iii

INTRODUCTION ...............................................................................................................1

BACKGROUND .................................................................................................................2

    A.    The Evolution Of Section 5 ..................................................................................2

    B.    Kinston's Nonpartisan-Elections Referendum.....................................................7

ARGUMENT .......................................................................................................................8

I.    CONGRESSIONAL ENFORCEMENT LEGISLATION UNDER THE RECONSTRUCTION AMENDMENTS MUST BE APPROPRIATELY TAILORED TO PREVENTING OR REMEDYING A CONSTITUTIONAL VIOLATION ..........................8

II.    THE 2006 CONGRESS' IMPOSITION OF A PRECLEARANCE REQUIREMENT ON THE COVERED JURISDICTIONS LACKS ANY RATIONAL RELATIONSHIP TO PREVENTING OR REMEDYING INTENTIONAL DISCRIMINATION ..............................13

    A.    Section 5's Preclearance Requirement Originally Served As An Extraordinary Remedy Targeted At Jurisdictions Engaged In An Unrelenting Campaign Of Intentional Discrimination That Defied Redress Under Section 2...................................14

    B.    The 2006 Extension of Section 5's Preclearance Requirement No Longer Rationally Targets Intentional Discrimination That Defies Redress Under Section 2 ................17

        1.    Section 5's Preclearance Procedure Is No Longer Needed...............................17

        2.    Section 5's Coverage Formula Is Now Irrational ...............................................21

III.    THE 2006 CONGRESS' SUBSTANTIVE STANDARD FOR PRECLEARANCE LACKS ANY RATIONAL RELATIONSHIP TO PREVENTING OR REMEDYING INTENTIONAL DISCRIMINATION ..........................................................................25

    A.    Section 5's Preclearance Standard Originally Focused On The Types Of Backsliding Changes That Would Undermine Section 2's Enforcement, Rather Than Fixating Exclusively On Minority Electoral Success ...........................................25

        1.    The Old Section 5's Retrogression Limitation ..................................................27

        2.    The Old Section 5's "Totality Of The Circumstances" Test For Determining The Existence Of Retrogression ......................................................30

    B.    The 2006 Expansion Of Section 5's Preclearance Standard Eviscerated The Limitations That The Supreme Court Repeatedly Had Suggested Are Constitutionally Essential ..............................................................................37

        1.    The New Section 5's "Ability To Elect" Mandate .............................................38

        2.    The New Section 5's "Discriminatory Purpose" Prong......................................41

    C.    The 2006 Expansion Of Section 5 No Longer Rationally Targets The Type Of Backsliding Changes That Would Undermine Section 2's Enforcement ........................42

IV.    SECTION 5, AS AMENDED IN 2006, VIOLATES THE EQUAL PROTECTION
       GUARANTEES OF THE FIFTH AND FOURTEENTH AMENDMENTS ................................44

CONCLUSION....................................................................................................................................45

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abrams v. Johnson,*
521 U.S. 74 (1997) ........................................................................................................ 32

*Adarand Constructors, Inc. v. Pena,*
515 U.S. 200 (1995) ............................................................................................ 12, 44, 45

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ........................................................................................................ 8

*Bartlett v. Strickland,*
129 S. Ct. 1231 (2009) ........................................................................... 32, 33, 35, 45

*Bd. of Trustees of the Univ. of Ala. v. Garrett,*
531 U.S. 356 (2001) .............................................................................................. 10, 11, 12

*Beer v. United States,*
425 U.S. 130 (1976) ................................................................................................... 4, 15

*Chisom v. Roemer,*
501 U.S. 380 (1991) .................................................................................................. 32, 33

*City of Boerne v. Flores,*
521 U.S. 507 (1997) ............................................................................................... *passim*

*City of Mobile v. Bolden,*
446 U.S. 55 (1980) ........................................................................................ 3, 11, 18, 23

*City of Rome v. United States,*
446 U.S. 156 (1980) .............................................................................................. *passim*

*Easley v. Cromartie,*
532 U.S. 234 (2001) ..................................................................................................... 28

*Employment Div. v. Smith,*
494 U.S. 872 (1990) ........................................................................................................ 9

*Florida Prepaid Postsecondary Education Expense Bd. v. College Savings Bank,*
527 U.S. 627 (1999) .................................................................................................... 9, 10

*Furnco Constr. Corp. v. Waters,*
438 U.S. 567 (1978) ..................................................................................................... 33

*Georgia v. Ashcroft,*
539 U.S. 461 (2003) .............................................................................................. *passim*

*Georgia v. United States,*
411 U.S. 526 (1973) ........................................................................................................ 5

*Grutter v. Bollinger*,
   539 U.S. 306 (2003) .................................................................................... 2, 37, 45

*Holder v. Hall*,
   512 U.S. 874 (1994) .......................................................................................... 17

*\*Johnson v. De Grandy*,
   512 U.S. 997 (1994) ........................................................................... 3, 32, 34, 41

*Johnson v. Miller*,
   929 F. Supp. 1529 (S.D. Ga. 1996) (per curiam) ............................................ 28

*Johnson v. Transp. Agency*,
   480 U.S. 616 (1987) .......................................................................................... 31

*Katzenbach v. Morgan*,
   384 U.S. 641 (1966) .......................................................................................... 12

*Kimel v. Fla. Bd. of Regents*,
   528 U.S. 62 (2000) ................................................................................... 8, 10, 43

*\*League of United Latin Am. Citizens v. Perry*,
   548 U.S. 399 (2006) ("*LULAC*") ............................................................... *passim*

*\*Lopez v. Monterey County*,
   525 U.S. 266 (1999) .................................................................................. *passim*

*\*Miller v. Johnson*,
   515 U.S. 900 (1995) .................................................................................. *passim*

*Miss. Univ. for Women v. Hogan*,
   458 U.S. 718 (1982) .......................................................................................... 12

*Nev. Dep't of Human Res. v. Hibbs*,
   538 U.S. 721 (2002) .................................................................................... 10, 12

*\*Nw. Austin Mun. Util. Dist. No. 1 v. Holder*,
   129 S. Ct. 2504 (2009) ............................................................................. *passim*

*Oregon v. Mitchell*,
   400 U.S. 112 (1970) .......................................................................................... 12

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
   551 U.S. 701 (2007) ("*PICS*") .................................................................. 2, 37, 45

*Presley v. Etowah County Comm'n*,
   502 U.S. 491 (1992) .......................................................................................... 14

*\*Reno v. Bossier Parish Sch. Bd.*,
   520 U.S. 471 (1997) ("*Bossier I*") ........................................................... *passim*

*Reno v. Bossier Parish Sch. Bd.,
    528 U.S. 320 (2000) ("*Bossier II*") .................................................. passim

Ricci v. DeStefano,
    129 S. Ct. 2658 (2009) ................................................................. 31

Shaw v. Hunt,
    517 U.S. 899 (1996) ("*Shaw II*") .................................................. 29

Shaw v. Reno,
    509 U.S. 630 (1993) ("*Shaw I*") ........................................ 29, 35, 45

*South Carolina v. Katzenbach,
    383 U.S. 301 (1966) ................................................................ passim

Tennessee v. Lane,
    541 U.S. 509 (2004) ............................................................... 10, 43

*Thornburg v. Gingles,
    478 U.S. 30 (1986) ................................................................... passim

United States v. Georgia,
    546 U.S. 151 (2006) .................................................................... 8

United States v. Hays,
    515 U.S. 737 (1995) ................................................................... 45

United States v. Morrison,
    529 U.S. 598 (2000) ................................................................... 21

Wards Cove Packing Co. v. Atonio,
    490 U.S. 642 (1989) ................................................................... 31

Watson v. Fort Worth Bank & Trust,
    487 U.S. 977 (1988) ................................................................... 31

Winslow v. FERC,
    587 F.3d 1133 (D.C. Cir. 2009) ..................................................... 11

Wygant v. Jackson Bd. of Educ.,
    476 U.S. 267 (1986) ................................................................... 45

## CONSTITUTIONAL AND STATUTORY PROVISIONS

U.S. Const., Amendment 14 ................................................................. 2, 8

U.S. Const., Amendment 15 ................................................................. 2, 8

*42 U.S.C. § 1973 ....................................................................... 3, 31, 32

42 U.S.C. § 1973 note, Findings ............................................................ 20

42 U.S.C. § 1973b .................................................................................................... 4, 5, 21

*42 U.S.C. § 1973c ................................................................................................... *passim*

42 U.S.C. § 1983 ............................................................................................................. 8

Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and
    Amendments Act of 2006, Pub. L. No. 109-246, 120 Stat. 577 (2006) ................................... 5

Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq.* ................................ 9

Voting Rights Act of 1965 ("VRA"), 42 U.S.C. § 1973 *et seq.* .................................................. 3

**RULES AND REGULATORY AUTHORITIES**

Fed. R. Civ. P. 56 ........................................................................................................ 8

28 C.F.R. Pt. 51 App. ..................................................................................................... 7

U.S. Dep't of Justice, Civil Rights Division, Section 5 Objection Determinations,
    http://www.justice.gov/crt/voting/sec_5/obj_activ.php .......................................................... 20

**LEGISLATIVE AUTHORITIES**

*H.R. Rep. No. 109-478 (2006) ......................................................................................... *passim*

S. Rep. No. 97-417 (1982) ......................................................................................... 28, 32, 33

*S. Rep. No. 109-295 (2006) .......................................................................................... *passim*

152 Cong. Rec. H5179 (daily ed. July 13, 2006) ....................................................................... 22

*The Continuing Need for Section 5 Pre-Clearance, Hearing Before the S. Comm. on the
    Judiciary*, 109th Cong. (2006) ..................................................................................... 24

*To Examine the Impact and Effectiveness of the Voting Rights Act, Hearing Before the Subcomm.
    on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. (2005) ................................... 25

*Understanding the Benefits & Costs of Section 5 Pre-Clearance, Hearing Before the Subcomm.
    on the Judiciary*, 109th Cong. (2006) ("*Benefits & Costs*") .............................................. 20, 24

2 *Voting Rights Act:  Evidence of Continued Need, Hearing Before the Subcomm. on the
    Constitution of the H. Comm. on the Judiciary*, 109th Cong. (2006) ("*Evidence of
    Continued Need*") ................................................................................................ 19, 20, 24

**OTHER AUTHORITIES**

Edward Blum, *An Assessment of Voting Rights Progress in North Carolina* (American Enterprise
    Institute, 2006) ("*AEI N.C.*") ................................................................................. 19, 20

Edward Blum & Lauren Campbell, *Assessment of Voting Rights Progress in Jurisdictions Covered Under Section Five of the Voting Rights Act* (American Enterprise Institute, 2006) ("*AEI C.J.*") ................................................................................................................ 20, 24

Ellen Katz *et al.*, *Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982* (Voting Rights Initiative, Univ. of Mich. Law Sch., 2005) ............ 25

Ellen Katz & The Voting Rights Initiative, *VRI Database Master List* (2006), http://sitemaker.umich.edu/votingrights/files/masterlist.xls ................................................................. 24

Nathaniel Persily, *The Promise and Pitfalls of the New Voting Rights Act*, 117 Yale L.J. 174 (2007) .......................................................................................................................................... 21

Richard H. Pildes, *The Future of Voting Rights Policy: From Anti-Discrimination to the Right to Vote*, 49 How. L.J. 741 (2006) ...................................................................................................... 25

Franita Tolson, *Increasing the Quantity and the Quality of the African-American Vote:  Lessons for 2008 and Beyond*, 10 Berkley J. Afr.-Am. L. & Pol'y 313 (2008) ................................................. 39

## INTRODUCTION

In 2006, Congress reauthorized and amended Section 5 of the Voting Rights Act of 1965, which requires certain covered States and political subdivisions to seek federal preapproval of any proposed change to their election procedures. *See* 42 U.S.C. § 1973c. Specifically, Congress: (1) *refused to update* the election data from the 1960's and 1970's that determines which jurisdictions are subject to the preclearance requirement, *see Nw. Austin Mun. Util. Dist. No. 1 v. Holder*, 129 S. Ct. 2504, 2509-10 (2009); (2) *extended the life* of the requirement for those jurisdictions for another 25 years, *see id.* at 2510; and (3) *expanded the scope* of the requirement by abrogating two Supreme Court decisions that had narrowly construed the statutory grounds for denying preclearance, *see* H.R. Rep. No. 109-478, at 93-94 (2006); *see also* 42 U.S.C. § 1973c(b)-(d). Although Congress insisted that its reincarnation of Section 5's preclearance requirement nonetheless remained an appropriate means of enforcing the ban on intentional racial voting discrimination contained in the Reconstruction Amendments to the Constitution, the Supreme Court soon warned that the new Section 5's "preclearance requirements and … coverage formula raise serious constitutional questions." *See Nw. Austin*, 129 S. Ct. at 2513.

Shortly thereafter, the Justice Department refused to preclear a nonpartisan-elections referendum that had been enacted by the voters of Kinston, North Carolina. Plaintiffs here are candidates and voters who will benefit from nonpartisan elections in Kinston as well as proponents of the referendum whose efforts were nullified. They raise two claims challenging the constitutionality of Section 5.

*First*, Plaintiffs contend that the 2006 version of Section 5 exceeds Congress' power to enact appropriate legislation to enforce the Reconstruction Amendments, because the "current burdens" imposed by the extraordinary preclearance mechanism cannot "be justified by current needs." *See id.* at 2512. The particular "evil that § 5 [was originally] meant to address," *id.*, was "flagrant disenfranchisement" in certain jurisdictions that could not be redressed through traditional litigation, *see id.* at 2509-10. But, as the Supreme Court strongly suggested in *Northwest Austin*, those "conditions … have unquestionably improved" in the covered jurisdictions and, to the extent such "evils" currently exist at all, they plainly are "no longer … concentrated in the jurisdictions singled out for preclearance" over

three decades ago. *See id.* at 2511-12. Moreover, these "constitutional concerns" with the preclearance *procedure* are compounded by the fact that the newly expanded *substantive standard* for preclearance—which requires drastically greater "considerations of race" by federal and state authorities assessing electoral changes—exacerbates the "tension" between Section 5 and the Constitution's mandate for race-neutrality with respect to electoral decision-making. *See id.* at 2512.

*Second*, and closely related to the last point, Plaintiffs contend that the 2006 version of Section 5 violates the equal protection guarantees of the Fifth and Fourteenth Amendments. The manner in which Congress expanded the preclearance standard rendered "[r]ace … the predominant factor" in electoral decisionmaking, *see id.*, even though there was no valid justification for doing so. As explained at length below, the new Section 5 impermissibly imposes a rigid quota floor on past minority electoral success and permits the Justice Department to coerce covered jurisdictions to increase future minority electoral success. Such "'outright racial balancing'" is, of course, "'patently unconstitutional.'" *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 730 (2007) ("*PICS*") (plurality opinion) (quoting *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003)). Indeed, the Supreme Court had warned of the constitutional problems in its pre-2006 decisions rejecting such interpretations of Section 5, yet Congress nevertheless abrogated those decisions and adopted a constitutionally defective preclearance standard.

This Court thus should grant summary judgment to Plaintiffs, declare that the 2006 extension and expansion of Section 5 was unconstitutional, and enjoin the Attorney General from enforcing Section 5.

## BACKGROUND

### A.      The Evolution Of Section 5

1.      "[U]nder the Fourteenth or Fifteenth Amendment," a voting practice that is racially neutral on its face is unconstitutional if, and only if, it was adopted by a "State or political subdivision act[ing] with a discriminatory purpose." *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481-82 (1997) ("*Bossier I*"). Those Amendments also grant Congress the authority "to enforce" their proscriptions on intentional discrimination "by appropriate legislation." U.S. Const., amends. 14 § 5, 15 § 2. After a century of exercising that authority through half-measures that were unsuccessful in vindicating the rights

of racial minorities in the former Confederacy, Congress enacted the Voting Rights Act of 1965 ("VRA"),

42 U.S.C. § 1973 *et seq.*, to attack the problem head-on. *See Nw. Austin*, 129 S. Ct. at 2508-09.

The VRA's most straightforward weapon for preventing or remedying intentional racial voting

discrimination is Section 2, which "operates nationwide" and enables the Justice Department or private

plaintiffs to bring suit against "any 'standard, practice, or procedure' that 'results in a denial or

abridgment of the right of any citizen of the United States to vote on account of race or color.'" *Id.* at

2509 (quoting 42 U.S.C. § 1973(a)).  Section 2 requires a demonstration that, "based on the totality of the

circumstances," minorities "have less opportunity than other[s] … to participate in the political process

and to elect representatives of their choice." *Johnson v. De Grandy*, 512 U.S. 997, 1010 (1994) (quoting

42 U.S.C. § 1973(b)).  This "results" test does not require an express finding that the challenged voting

practice was adopted with an unconstitutional discriminatory intent, as was required under the original

version of Section 2, because Congress in 1982 concluded that such a requirement "place[d] an

inordinately difficult burden of proof on plaintiffs" and failed to eradicate neutral voting practices that

"perpetuated the effects of past purposeful discrimination." *See Thornburg v. Gingles*, 478 U.S. 30, 44 &

n.9 (1986) (internal quotation marks omitted); *see also City of Mobile v. Bolden*, 446 U.S. 55, 60-63

(1980) (plurality opinion).  Nevertheless, the Supreme Court has interpreted Section 2's "results" test in

myriad ways that prevent it from losing all connection to intentional discrimination and becoming simply

an electoral entitlement program for minorities.  Most importantly, the Court repeatedly has emphasized

that the only "right" under Section 2 "is equality of opportunity, not a guarantee of electoral success for

minority-preferred candidates." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 428 (2006)

("*LULAC*") (quoting *De Grandy*, 512 U.S. at 1014 n.11); *see also infra* at 31-33.

2.      Section 5 of the VRA goes far beyond the relatively modest "results" test of Section 2.  It

preemptively "suspend[s] all changes in state election procedure[s]" in certain covered jurisdictions "until

[the changes are] submitted to and approved by a three-judge Federal District Court in Washington,

D.C.[] or the Attorney General," who must be convinced that the change lacks both the "purpose" and the

"effect" of "denying or abridging the right to vote on account of race or color." *Nw. Austin*, 129 S. Ct. at

2509 (citing 42 U.S.C. § 1973c(a)).  Section 5 was intended to "bolster[]" Section 2 as well as Section 4, which directly outlawed the "literacy tests and similar voting qualifications" that had been "the most powerful tools of black disenfranchisement in the covered areas."  *See id.* (citing 42 U.S.C. § 1973b(a)-(d)).  Specifically, Section 5 served as a preemptive "response to a common practice in some jurisdictions of staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down."  *Beer v. United States*, 425 U.S. 130, 140 (1976).  It thus "was directed at preventing [the] particular set of invidious practices that had the effect of undoing or defeating the rights recently won by nonwhite voters."  *Miller v. Johnson*, 515 U.S. 900, 925 (1995) (internal quotation marks omitted).  In short, Section 5 "impose[d] very different duties" on covered jurisdictions because it "combat[ed] different evils."  *Bossier I*, 520 U.S. at 477; *see also infra* at Part II.A.

But the 1965 Congress, undoubtedly cognizant of the "substantial federalism costs" imposed by Section 5's "intrusion into sensitive areas of state and local policymaking," carefully tailored the novel provision to the "dire" and "exceptional" circumstances that had necessitated "legislative measures not otherwise appropriate."  *See Nw. Austin*, 129 S. Ct. at 2510, 2511 (internal quotation marks omitted).  Most notably, Section 5 was designed to be "confine[d] … to [the] areas of flagrant disenfranchisement" that were likely to be "creative in contriving new rules to continue violating the [Constitution] in the face of adverse … decrees" under Sections 2 or 4.  *See id.* at 2509 (internal quotation marks omitted).  Its preclearance obligation thus "applied … only to [jurisdictions] that had used a … test or device [as a voting qualification] in November 1964, … had less than 50% voter registration or turnout in the 1964 Presidential election," and could not satisfy a "bailout" standard that mitigated potential overbreadth.  *See id.*  Moreover, even for such bastions of discrimination, Section 5 was a "temporary provision[] … expected to be in effect for only five years."  *Id.* at 2510.  Finally, consistent with Congress' "limited substantive goal" of preventing "backsliding" by intransigent jurisdictions, Section 5 gave federal authorities limited grounds for finding that a proposed change would "deny[] or abridg[e] the right to vote on account of race or color."  *See Georgia v. Ashcroft*, 539 U.S. 461, 466, 477 (2003).  Preclearance could be denied *only* if the proposed change had the purpose or effect of causing "a *retrogression* in the position

of racial minorities with respect to their effective exercise of the electoral franchise," as determined by "*all the relevant circumstances*, such as the ability of minority voters to elect their candidate of choice, the extent of the minority group's opportunity to participate in the political process, and the feasibility of creating a nonretrogressive plan." *Id.* at 477, 479 (emphases added); *see also Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 328-29, 335-36 (2000) ("*Bossier II*"); *infra* at Part III.A.

As thus limited, the Supreme Court held that Section 5 was appropriate enforcement legislation under the Reconstruction Amendments.  Specifically, the Court upheld the original 1965 version against a facial constitutional challenge, *South Carolina v. Katzenbach*, 383 U.S. 301, 323-35 (1966), rejected similar attacks on the 1970 five-year reauthorization and the 1975 seven-year reauthorization, *Georgia v. United States*, 411 U.S. 526, 535 (1973); *City of Rome v. United States*, 446 U.S. 156, 173-83 (1980), and denied a narrow as-applied challenge to the 1982 twenty-five-year reauthorization, *Lopez v. Monterey County*, 525 U.S. 266, 282-85 (1999).  *See Nw. Austin*, 129 S. Ct. at 2510; *see also infra* at 15-16, 18.[1]

3.     In 2006, 41 years after Section 5 was originally enacted, Congress reauthorized the "temporary" measure for a fourth time.  *See* Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L. No. 109-246, 120 Stat. 577 (2006).  By that point, the voting data selected to target "exceptional conditions" in "areas of flagrant disenfranchisement," *Nw. Austin*, 129 S. Ct. at 2509-10, was 34 to 42 years old.  And, as the *Northwest Austin* Court strongly suggested, those "conditions … ha[d] unquestionably improved" in the covered jurisdictions and, to the extent their remnants lingered, they were "no longer … concentrated in the jurisdictions singled out for preclearance" over three decades ago.  *See id.* at 2511-12; *see also infra* at Part II.B.  Congress nonetheless declined to alter or update the coverage formula, while extending *another 25 years* of Section 5 preclearance on the covered jurisdictions.  *See Nw. Austin*, 129 S. Ct. at 2509-10.

Furthermore, for the *first time* since Section 5 was enacted in 1965, Congress *expanded* the *substantive scope* of federal authorities' power to deny preclearance of a submitted change, in two

---

[1] Those reauthorizations kept the same substantive standard and coverage formula, but added jurisdictions that failed to satisfy the formula in 1968 or 1972.  *See Nw. Austin*, 129 S. Ct. at 2510; *see also* 42 U.S.C. §§ 1973b(b), 1973c(a).

significant ways. *First*, Congress required the denial of preclearance *whenever* the change "ha[s] the effect of diminishing the ability of [minority] citizens … to elect their preferred candidates of choice." 42 U.S.C. § 1973c(b); *see also id.* § 1973c(d). By barring *any reduction* to the current level of minority electoral *success*, this amendment eliminated Section 5's totality-of-the-circumstances inquiry into whether the submitted change *unjustifiably* reduced minorities' *overall* equal electoral *participation*. *See Ashcroft*, 539 U.S. at 479-85; *see also infra* at Parts III.A.2, III.B.1. *Second*, Congress required the denial of preclearance *whenever* federal authorities find "any discriminatory purpose" to exist. 42 U.S.C. § 1973c(c). By eliminating Section 5's limitation to *retrogressive* purpose, this amendment exposed to objection even changes that *increased* minority electoral success, based on the Justice Department's characterization of the change as "discriminatory" for failing to *maximize* or otherwise *insufficiently increase* minority electoral success. *See Bossier II*, 528 U.S. at 335-36; *Miller*, 515 U.S. at 923-27; *see also infra* at Parts III.A.1, III.B.2. Indeed, Congress was crystal clear that it was "reject[ing]" the Supreme Court's interpretations of Section 5 in *Ashcroft* and *Bossier II*, *see* H.R. Rep. No. 109-478, at 93-94, notwithstanding repeated warnings that the Justice Department's contrary interpretations raised serious constitutional concerns, *see, e.g.*, *Miller*, 515 U.S. at 926-27; *Bossier II*, 528 U.S. at 336; *Ashcroft*, 539 U.S. at 491 (Kennedy, J., concurring); *see also Nw. Austin*, 129 S. Ct. at 2512 (identifying the "tension" between broad interpretations of Section 5 and the Constitution's mandate of race neutrality).

The 2006 reincarnation of Section 5 is thus an entirely different creature than its predecessors. By forbidding holistic evaluation of minority electoral participation, fixating on minority electoral success, and authorizing the rejection of even non-backsliding changes, Congress ensured that preclearance will be denied for *any* change that *reduces* minorities' group-based power to win elections *or* that *increases* such power *less* than a hypothetical change preferred by the Justice Department. In short, the new Section 5 encourages and mandates *race-based decision-making* that has no meaningful connection whatsoever to preventing or remedying *intentional* discrimination, let alone intentional discrimination that cannot be redressed under Section 2. And making matters infinitely worse, Congress selected the jurisdictions subject to such intrusive and offensive federal superintendence based on voting

data that is *three or four decades old* and that therefore sheds no light at all on what jurisdictions, if any, currently warrant additional remedies to supplement Section 2.

A challenge was immediately brought to the "appropriateness" of the 2006 version of Section 5 as "enforcement" legislation under the Reconstruction Amendments, but the Supreme Court decided the case on statutory grounds that obviated the need to resolve the constitutional issue. *See Nw. Austin*, 129 S. Ct. at 2508, 2513-17.  Before the Court did so, however, it discussed at length the types of "concerns" about the 2006 enactment highlighted above, which it concluded "raise[d] serious constitutional questions" about Section 5's "preclearance requirements and … coverage formula." *See id.* at 2511-13.

**B.      Kinston's Nonpartisan-Elections Referendum**

In November of 2008, voters in the City of Kinston, North Carolina, adopted a referendum that would have provided for nonpartisan municipal elections.  *See* Plaintiffs' Statement of Material Facts ("SMF") ¶ 1.  Nonpartisan elections are likewise used by 532 out of 541 cities in North Carolina. *Id.* ¶ 2. The Kinston referendum received roughly 64% of the vote.  *Id.* ¶ 3.  The proponents of the referendum successfully argued that, because Kinston's electorate was overwhelmingly Democratic, nonpartisan elections would open the political system to a broader range of views.  *Id.* ¶¶ 4, 5.  Notably, blacks constituted approximately 64.6% of Kinston's registered voters, and the referendum passed in 5 of the 7 precincts in Kinston where blacks were a majority of voters.  *Id.* ¶¶ 6, 7.

Kinston, however, is subject to Section 5 preclearance, because it is located in Lenoir County, which is a covered political subdivision based on election results from 1964.  *See* 28 C.F.R. Pt. 51 App.; *Nw. Austin*, 129 S. Ct. at 2511.  And, even though blacks were a super-majority of registered voters and supported the nonpartisan-elections referendum, the Justice Department denied preclearance.  SMF ¶ 8. Its sole basis for doing so was "that the elimination of party affiliation on the ballot will likely reduce the ability of blacks to elect candidates of choice."  *Id.* ¶ 9.  It reasoned that, "given a change [to] non-partisan elections, black preferred candidates will receive fewer white cross-over votes," because they could no longer depend on "either [an] appeal to [Democratic] party loyalty or the ability [of Democratic voters] to vote a straight [party-line] ticket."  *Id.* ¶ 10.

**ARGUMENT**

Plaintiffs contend that Section 5, and its nullification of Kinston's nonpartisan-elections referendum, is unconstitutional for two related reasons:  (1) the 2006 version of Section 5 exceeds Congress' authority to enforce the Reconstruction Amendments' prohibition on intentional racial voting discrimination; and (2) the 2006 version of Section 5 violates the equal protection guarantees of the Fifth and Fourteenth Amendments.  Because "there is no genuine issue as to any material fact" and Plaintiffs are "entitled to judgment as a matter of law" on both claims, this Court should grant summary judgment in their favor.  *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## I.  CONGRESSIONAL ENFORCEMENT LEGISLATION UNDER THE RECONSTRUCTION AMENDMENTS MUST BE APPROPRIATELY TAILORED TO PREVENTING OR REMEDYING A CONSTITUTIONAL VIOLATION

A.      As noted, the Fourteenth and Fifteenth Amendments confer upon Congress the authority "to enforce" their provisions "by appropriate legislation."  U.S. Const., amends. 14 § 5, 15 § 2.  That authority obviously encompasses the creation of "remedies against the States for *actual* violations" of the Reconstruction Amendments.  *United States v. Georgia*, 546 U.S. 151, 158 (2006); *see also, e.g.*, 42 U.S.C. § 1983.  But Congress' enforcement "power is not confined to the enactment of legislation that merely parrots the precise wording" of the rights guaranteed by those amendments.  *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 81 (2000).  It also "includes the authority both to remedy and to deter violations of [the] rights guaranteed … by prohibiting a *somewhat broader* swath of conduct, … which is not itself forbidden by the [constitutional] text."  *Id.* (emphasis added).  The availability of such *prophylactic* legislation, however, presents a constant risk that Congress will go beyond "enforc[ing] a constitutional right" and "chang[e] what the right is" altogether.  *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997).  In order to police "the distinction [that] exists and must be observed" "between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law," the Supreme Court has held that "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end."  *Id.* at 519-20.

*Boerne* is both the leading case explicating this constitutional principle and a particularly apt

illustration of its application.  There, in reaction to the Supreme Court's holding in *Employment Division v. Smith*, 494 U.S. 872 (1990), that neutral laws of general applicability satisfy the First Amendment even when they substantially burden religious exercise, Congress had enacted the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, which subjected all such laws to a strict-scrutiny test.  *See Boerne*, 521 U.S. at 512-16.  Although Congress justified RFRA as a prophylactic Fourteenth Amendment enforcement measure that "avoid[ed] the difficulty of proving" that a seemingly neutral state law actually had "the unconstitutional object of targeting religious beliefs and practices," *id.* at 529, the Supreme Court held that "RFRA [was] so out of proportion to [that] supposed remedial [and] preventive object that it [could not] be understood as responsive to, or designed to prevent, unconstitutional behavior," *id.* at 532.  The Court concluded that there was no "reason to believe that many of the laws affected by [RFRA] ha[d] a significant likelihood of being unconstitutional," in light of (1) RFRA's "[s]weeping coverage," which "displac[ed] laws and prohibit[ed] official actions, … regardless of subject matter," "at every level of government," and (2) its "legislative record," which "lack[ed] examples of modern instances of generally applicable laws passed because of religious bigotry." *See id.* at 530-35.  "Simply put, RFRA [was] not designed to identify and counteract state laws likely to be unconstitutional because of their treatment of religion," *id.* at 534-35, and therefore it "appear[ed] … to attempt a substantive change in constitutional protections," *id.* at 532.

Since *Boerne*, the Supreme Court has repeatedly and consistently applied its "congruence and proportionality" test when judging whether a Congressional law is authorized as prophylactic enforcement of the Reconstruction Amendments.  In several cases, the legislation could not be justified because it was not needed to remedy or prevent the narrower constitutional violation.  For example, in *Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank*, 527 U.S. 627 (1999), the Court invalidated Congress' imposition of monetary liability on States for "all kinds of possible patent infringement," because there was insufficient evidence that such a sweeping remedy was needed to redress the far narrower subset of patent infringement that constitutes an *unconstitutional* deprivation of property without due process—namely, *intentional* infringement by the State where state-law remedies

are *inadequate*.  *See id.* at 637-48.  Likewise, in *Kimel*, the Court invalidated Congress' imposition of monetary liability on States for age discrimination in employment, because there was insufficient evidence of the need for the statute's "broad restriction on the use of age as a discriminating factor, [which] prohibit[ed] substantially more state employment decisions and practices than would likely be held unconstitutional under the applicable equal protection, rational basis standard."  *See* 528 U.S. at 80-91; *see also Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 365-74 (2001).

To be sure, the *Boerne* test does not foreclose "reasonably prophylactic legislation" occasioned by "[d]ifficult and intractable problems … requir[ing] powerful remedies."  *Kimel*, 528 U.S. at 88.  For example, in *Tennessee v. Lane*, 541 U.S. 509 (2004),  the Court held that the "the *Boerne* inquiry" sanctioned Congress' imposition of monetary liability on States that fail to reasonably accommodate disabled individuals seeking access to their courts.  *See id.* at 517, 522, 533-34.  The Court emphasized the "limited" nature of the "reasonable modification[]" mandate imposed by the federal law at issue, which did "not require States to employ any and all means to make judicial services accessible to persons with disabilities," such as where accommodation would "impose an undue financial or administrative burden, threaten historic preservation interests, or effect a fundamental alteration in the nature of the service."  *See id.* at 531-33.  The Court concluded that this relatively modest prophylaxis was justified in light of "the sheer volume of evidence demonstrating the nature and extent of unconstitutional discrimination against persons with disabilities in the provision of public services" and the "considerable evidence of the shortcomings of previous legislative responses."  *See id.* at 522-31; *see also Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721 (2002).

In sum, while the results have varied, the judicial analysis remains constant:  courts reviewing putatively prophylactic laws under the Reconstruction Amendments must determine if there is "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end," or if instead the law at issue effectively "expands [constitutional] rights" because it "is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior."  *Boerne*, 521 U.S. at 520, 527-28, 532.

B.     In *Northwest Austin*, however, the Government contended that Section 5 need not satisfy *Boerne*'s "congruence and proportionality" test *at all*.  It argued that *Boerne* and its progeny all involved the validity of enforcement legislation under the *Fourteenth* Amendment, whereas *South Carolina* and *Rome* purportedly applied a mere rationality standard to Section 5 because it was a *Fifteenth* Amendment enforcement law.  *See Nw. Austin*, 129 S. Ct. at 2512-13.  That argument fails for three separate reasons.

*First*, as a threshold matter, any purported distinction between the standards governing enforcement legislation under the Fourteenth and Fifteenth Amendments is irrelevant, because this Court cannot uphold Section 5 *exclusively* under the auspices of the latter.  Although the Supreme Court in passing has sometimes described the VRA as enforcing the Fifteenth Amendment without also mentioning the Fourteenth Amendment, *see, e.g.*, *id.* at 2508-09, in cases where the Court has squarely focused on the *differences* in scope of each Amendment, it has strongly suggested that the Fifteenth Amendment is limited to prohibiting impairment of the right to *cast a vote at all*, whereas the Fourteenth Amendment is what restricts vote *dilution* of the sort covered by Section 5 and allegedly caused by Kinston's nonpartisan-elections referendum, *see Mobile*, 446 U.S. at 65 (plurality opinion); *Bossier II*, 528 U.S. at 334 n.3; *see also Rome*, 446 U.S. at 207 n.1 (Rehnquist, J., dissenting).  Such "carefully considered language of the Supreme Court … generally must be treated as authoritative" by this Court.  *Winslow v. FERC*, 587 F.3d 1133, 1135 (D.C. Cir. 2009).  Thus, since Section 5 can be upheld here, if at all, only as *Fourteenth* Amendment enforcement legislation, this Court must apply the *Boerne* test.

*Second*, in any event, the "virtually identical" enforcement provisions of the Fourteenth and Fifteenth Amendments, *Garrett*, 531 U.S. at 373 n.8, are obviously not amenable to, and have not been judged by, different standards.  *See Boerne*, 521 U.S. at 518 (describing the two as "parallel power[s]"); *accord Rome*, 446 U.S. at 208 n.1 (Rehnquist, J., dissenting); *Lopez*, 525 U.S. at 294 n.6 (Thomas, J., dissenting).  Although *South Carolina* and *Rome* did not use the precise term "congruent and proportional," they perfectly exemplified that approach, upholding Section 5 because less drastic methods of redressing unconstitutional racial discrimination would be *ineffective* in certain jurisdictions with a *serious, then-recent, and unrelenting history* of such action.  *See infra* at 15-16.  Accordingly, the

11

Supreme Court heavily relied upon those cases when formulating the "congruence and proportionality" test, *see Boerne*, 521 U.S. at 518-19, 525-27, 530-33, as well as when later applying it, *see Garrett*, 531 U.S. at 373, including when *upholding* the prophylactic law at issue, *see Hibbs*, 538 U.S. at 736-38. Moreover, the *rationale* of *Boerne*—that the "congruence and proportionality" test "must be observed" to prevent Congress' "power 'to enforce'" the Fourteenth Amendment from "becom[ing] substantive in operation and effect," 521 U.S. at 519-20—*directly* applies to what the *Boerne* Court *simultaneously* described as "Congress' parallel power to enforce the provisions of the Fifteenth Amendment," *id.* at 518.

*Third*, wholly apart from *Boerne*, the decisions in *South Carolina* and *Rome* are inherently inapposite where the challenged congressional law *threatens* the Reconstruction Amendments' *race-neutral* guarantees by mandating or encouraging *race-preferential* activity that injures *non-minorities*. Needless to say, the test used for laws that prophylactically "enforce" the nondiscrimination rights of minorities without impairing the rights of non-minorities—such as a ban on literacy tests—is far more deferential than the judicial scrutiny given to laws that prophylactically "help" minorities by treating non-minorities unequally—such as a "goal" of proportional legislative representation for minority-preferred candidates. *See, e.g.*, *Katzenbach v. Morgan*, 384 U.S. 641, 651 & n.10 (1966) ("Congress' power … to adopt[] measures to enforce the guarantees" of the Reconstruction Amendments does not "grant[] [it the] power to restrict, abrogate, or dilute these guarantees" in a manner that is not "consistent with the letter and spirit of the constitution." (internal quotation marks omitted)); *Oregon v. Mitchell*, 400 U.S. 112, 128 (1970) (opinion of Black, J.) ("Congress has no power under the enforcement sections to undercut the [Reconstruction] amendments' guarantees of personal equality and freedom from discrimination."); *see also Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 732 (1982); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 226-27, 235-36 (1995).  And here, the 2006 amendments to Section 5 fall into the latter category, for they converted the preclearance requirement into a mandate for race-based preferences and decision-making, by forbidding *any reduction* in minority electoral success and by giving the Justice Department a powerful weapon to *coerce increases* in minority electoral success.  *See infra* at Parts III.A-B.  At a minimum, *South Carolina* and *Rome* are inapposite since neither adjudicated a claim that Section

5 was double-edged "enforcement" legislation.

C.     In any event, as the Supreme Court observed in *Northwest Austin*, Section 5's "preclearance requirements and its coverage formula raise serious constitutional questions under *either*" *Boerne*'s "congruence and proportionality" test *or* the supposedly more deferential "rationality" test of *South Carolina* and *Rome*.   129 S. Ct. at 2513 (emphasis added).   In fact, as shown below, the 2006 version of Section 5 can be understood *only* as an illegitimate attempt to "expand[] [constitutional] rights" of minorities in covered jurisdictions, for it "is so out of proportion to a supposed remedial or preventive object," *Boerne*, 521 U.S. at 527-28, 532, that "Congress could [not] rationally have concluded that … [the changes preempted pose] the risk of purposeful discrimination," *Rome*, 446 U.S. at 177.

## II.     THE 2006 CONGRESS' IMPOSITION OF A PRECLEARANCE REQUIREMENT ON THE COVERED JURISDICTIONS LACKS ANY RATIONAL RELATIONSHIP TO PREVENTING OR REMEDYING INTENTIONAL DISCRIMINATION

The new Section 5 impermissibly goes beyond "enforcing" the Constitution's ban on intentionally discriminatory voting practices, because (1) the extension of the extraordinary preclearance mechanism is not plausibly tailored to ferreting out intentional discrimination that is difficult to reach through traditional litigation, and (2) the expanded preclearance standard provides minorities with preferential electoral advantages that have no plausible connection to redressing intentional discrimination, let alone intentional discrimination defying traditional remedies.   In sum, the *procedural* preclearance requirement is unconstitutional due to the dramatic changes in the covered jurisdictions and the *substantive* preclearance standard is unconstitutional due to the dramatic changes to that standard.

The constitutional defect in extending the preclearance procedure, discussed in this Part, is obvious and has already been noted by the Supreme Court.   Section 5 "imposes current burdens and must be justified by current needs."   *Nw. Austin*, 129 S. Ct. at 2512.   Yet, while Section 5 originally "bolster[ed]" Section 2 due to "exceptional conditions" in the covered jurisdictions that threatened to render the latter remedy ineffective, *see id.* at 2509-10, it is crystal clear, as the Court strongly suggested, that those "conditions … have unquestionably improved" and that whatever "evil[s]" currently exist are "no longer … concentrated in the jurisdictions singled out for preclearance," *see id.* at 2511-12.   In short,

there is no conceivable justification for continuing to burden the covered jurisdictions—and *only* those jurisdictions—with Section 5's intrusive preclearance obligation.

> **A.    Section 5's Preclearance Requirement Originally Served As An Extraordinary Remedy Targeted At Jurisdictions Engaged In An Unrelenting Campaign Of Intentional Discrimination That Defied Redress Under Section 2**

Section 5 obviously goes beyond the Reconstruction Amendments' ban on discriminatory voting procedures because it presumptively bans "*all* changes to state election law—however innocuous." *Id.* at 2511.  That is, it invalidates state voting policies that are not even potentially or arguably discriminatory, unless the covered jurisdiction takes affirmative steps to undo that ban by disproving the policy's presumed guilt in front of federal authorities in Washington, D.C.  *See id.*  This wholesale preemption of state law until the State proves its innocence is an "extraordinary burden-shifting procedure[]" that reverses the normal presumption applicable in Anglo-American jurisprudence.  *See Bossier II*, 528 U.S. at 335.  It is also "an extraordinary departure from the traditional course of relations between the States and the Federal Government."  *See Presley v. Etowah County Comm'n*, 502 U.S. 491, 500-01 (1992); *see also Lopez*, 525 U.S. at 282 (Section 5 "imposes substantial 'federalism costs'" by "authoriz[ing] federal intrusion into sensitive areas of state and local policymaking" (quoting *Miller*, 515 U.S. at 926)).

The question, then, is whether the 2006 Congress had a legitimate basis for denying citizens of selected jurisdictions the most basic attributes of self-governance through this extraordinary presumptive ban on all new voting practices.  Needless to say, the mere continued existence of some voting discrimination in those jurisdictions does not provide an adequate predicate for Section 5's unique preclearance requirement.  Although such a showing would justify a prohibition against *voting discrimination*, such as Section 2, Section 5 is unlike Section 2 and all other civil rights laws in that it does not prohibit *discriminatory* measures.  Rather, it presumptively prohibits *all* voting changes unless and until the jurisdiction proves they are not discriminatory.  And it is the need for *this* "extraordinary burden-shifting procedure[]," *Bossier II*, 528 U.S. at 335, that must be justified.

For example, the justification burden for federal laws prohibiting racial discrimination in public employment or religious discrimination in local zoning is far less than would be needed for federal laws

that required all State and local governments to suspend all employment and zoning decisions unless and until they had convinced federal officials (or D.C. district courts) that those decisions are free of any discriminatory racial or religious "effect."  Even more obviously, the burden would be exponentially more difficult to satisfy if that public employment or zoning "preclearance" requirement were added *on top of* another law, like Section 2, prophylactically banning any discriminatory "result" in those contexts.  The only preventative or remedial purpose even conceivably served by such broad preclearance laws would be to reach discrimination not effectively dealt with by the basic laws banning such discrimination.  And, in fact, that is the *only* justification that has been accepted to establish Section 5's legitimacy.

The Supreme Court has held that the specific supplemental function of Section 5 was to prevent evasive "backsliding" by covered jurisdictions as part of an effort to undo the gains achieved by Section 2 and other normal voting litigation.  *See Bossier II*, 528 U.S. at 320.  Such extraordinary supplemental procedures to prevent backsliding were justified because they were needed to stop the "common practice … of staying one step ahead of federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down."  *Bossier I*, 520 U.S. at 477 (quoting *Beer*, 425 U.S. at 140).  The justification for Section 5's preclearance requirement, then, was not that discrimination existed, but that some political subdivisions engaged in such pervasive discrimination and such evasive tactics that traditional "case-by-case litigation was inadequate" to remedy them.  *South Carolina*, 383 U.S. at 328.

In *South Carolina*, the Supreme Court heavily emphasized that Section 5 was justified by the covered jurisdictions' "unremitting and ingenious defiance of the Constitution."  *Id.* at 309.  In particular, "case-by-case litigation was inadequate to combat widespread and persistent discrimination in voting" due to "the obstructionist tactics invariably encountered in these lawsuits," including, most notably, "the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees."  *Id.* at 328, 335.  The effect of these nefarious evasive efforts was clear:  in Alabama, Louisiana, and Mississippi, for example, "registration of voting-age whites ran roughly 50 percentage points or more ahead of [black] registration."  *Id.* at 313.  In the "areas where voting discrimination ha[d] been most flagrant," it was undeniable that "the unsuccessful

remedies … [of] the past [had] to be replaced by sterner and more elaborate measures in order to satisfy the clear commands of the [Reconstruction] Amendment[s]." *Id.* at 309, 315. In short, the Court upheld Section 5 as an "uncommon exercise of congressional power," because it "recognized that *exceptional conditions* can justify legislative measures *not otherwise appropriate*" and that Congress had enacted Section 5 "[u]nder the *compulsion* of these *unique* circumstances." *Id.* at 334-35 (emphases added).

Likewise, when the Court in *Rome* addressed the 1975 reauthorization of Section 5 for another seven years, it emphasized that Congress' limited extension of the 10-year-old provision was following in the wake of a "century of obstruction" that still burdened minority voting rights. *See* 446 U.S. at 180-82. There was a real risk that even the limited "progress" that had been achieved thus far would have been "destroyed through new procedures and techniques" if Congress were "to remove th[e] preclearance protections." *Id.* at 181. After all, even then, a "[s]ignificant disparity persisted between the percentages of whites and [blacks] registered in at least several of the covered jurisdictions." *Id.* at 180. And relatedly, no black elected officials "held statewide office," "most held only relatively minor positions," and "their number in the state legislatures fell far short of being representative of the number of [blacks] residing in the covered jurisdictions." *Id.* at 180-81. The Court therefore deemed "unsurprising and unassailable" "Congress' considered determination" in 1975 that "a 7-year extension … was *necessary* to preserve … limited and fragile achievements … and to promote further amelioration of voting discrimination." *Id.* at 182 (emphasis added; internal quotation marks omitted).

Consistent with *South Carolina* and *Rome*, the Supreme Court has repeatedly reaffirmed that, because the function of Section 5 was solely to supplement and protect the nondiscrimination gains achieved by Section 2, Section 5 "prevent[ed] nothing but backsliding." *Bossier II*, 528 U.S. at 335; *accord Ashcroft*, 539 U.S. at 477 ("Section 5 … has [the] limited substantive goal … [of] insur[ing] that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise."); *Miller*, 515 U.S. at 925 ("Section 5 was directed at preventing a particular set of invidious practices that had the effect of undoing or defeating the rights recently won by nonwhite voters." (internal quotation marks omitted)). Thus,

Section 5 had a more "limited purpose" and "combat[ted] different evils" than Section 2. *Bossier I*, 520 U.S. at 477; *accord Holder v. Hall*, 512 U.S. 874, 883 (1994) (plurality opinion) (the two sections "differ in … purpose"); *Ashcroft*, 539 U.S. at 478 ("[T]he § 2 inquiry differs in significant respects from a § 5 inquiry."). Indeed, unlike Section 2, Section 5 was not even designed to directly eliminate unconstitutionally *discriminatory* voting *laws*, but only *retrogressive* voting *changes*. *See Ashcroft*, 539 U.S. at 477 ("[A] voting change with a discriminatory but nonretrogressive purpose or effect does not violate § 5[,] … *no matter how unconstitutional it may be*." (quoting *Bossier II*, 528 U.S. at 336)).

For these reasons, the mere possibility or existence of intentional discrimination is not, and has never been, sufficient justification for Section 5's extraordinary burden-shifting preclearance requirement. "The appropriateness of remedial measures must be considered in light of the evil presented," for "[s]trong measures appropriate to address one harm may be an unwarranted response to another, lesser one." *Boerne*, 521 U.S. at 530. And, as explained, the only legitimate and accepted justification for Section 5 is the "evil" of intentional discrimination that *escapes the reach of Section 2*—as existed in 1965 and 1975, when the strong medicine of Section 5 preclearance was *necessary* to redress intentional discrimination in the covered jurisdictions because Section 2 lawsuits would be *inadequate* due to those jurisdictions' *then-recent* history of *unrelenting evasion* of federal anti-discrimination mandates.

**B.  The 2006 Extension of Section 5's Preclearance Requirement No Longer Rationally Targets Intentional Discrimination That Defies Redress Under Section 2**

The preclearance requirement is no longer appropriate as a supplemental anti-backsliding provision. *First*, the covered jurisdictions no longer pose a meaningful threat of intentional discrimination that evades Section 2. *Second*, there is no meaningful difference between the covered and non-covered jurisdictions in this regard (or in any other).

**1.  Section 5's Preclearance Procedure Is No Longer Needed**

The need for Section 5's "extraordinary burden-shifting procedure[]" has vanished. *Bossier II*, 528 U.S. at 335. The dramatic expansion of Section 2 in 1982 to prohibit discriminatory "results" rendered case-by-case adjudication far less burdensome and far more effective for voting-rights plaintiffs.

And even more obviously, the sea change in covered jurisdictions since the 1960's and 1970's has eliminated any rational argument that preclearance is needed to achieve voting equality.

a.      Section 2 is now far more effective for voting-rights plaintiffs.  Prior to 1982, Section 2, like the Fourteenth and Fifteenth Amendments, prohibited only intentional discrimination.  *See Mobile*, 446 U.S. at 60-63 (plurality opinion); *Bossier I*, 520 U.S. at 481-82.  In 1982, Congress significantly expanded Section 2 to proscribe any action with a discriminatory "result," even if not motivated by a discriminatory purpose.  *See Gingles*, 478 U.S. at 43-44.  Congress did so because proving discriminatory purpose "place[d] an 'inordinately difficult' burden of proof on plaintiffs" and failed to eradicate neutral voting practices that "perpetuate[d] the effects of past purposeful discrimination."  *Id.* at 44 & n.9.  Since Congress eliminated both the "inordinately difficult burden" that rendered case-by-case adjudication ineffective in extirpating discrimination as well as the lingering "effects of past purposeful discrimination," *id.*, and since Section 2 has been an obvious "success" in practice, *Nw. Austin*, 129 S. Ct. at 2511, there is no "gap" in the traditional enforcement procedures, or any unremedied voting discrimination, that needs to be "cured" by Section 5's extraordinary procedures.

Notably in this regard, the Supreme Court never squarely decided the constitutionality of Section 5 after Section 2 was expanded in 1982.  Although *Lopez* rejected a narrow as-applied challenge to the required preclearance of laws enacted *at the state level* by covered political subdivisions *in non-covered States*, a facial challenge was neither pressed nor passed upon in that case (or any other post-1982 case).  *See* 525 U.S. at 282-85.  Consequently, the Court also never had the occasion to decide whether the 1982 reauthorization of Section 5 was justified in light of the types of discrimination that existed at the time, which, as we now show, is a fundamental flaw with the 2006 reauthorization.

b.      Conditions in covered jurisdictions no longer justify Section 5.  There is no support in the congressional record or findings for the proposition that covered jurisdictions continue to have such a deep-seeded pattern of discrimination and effective resistance to traditional litigation that preclearance is needed to supplement the prophylactic ban of Section 2.  In fact, no finding of recalcitrant evasion is possible because, as the Supreme Court accurately summarized the undisputed legislative record,

"[b]latantly discriminatory evasions of federal decrees are rare." *Nw. Austin*, 129 S. Ct. at 2511.

Even if the question is the more general one of whether covered jurisdictions engage in an entrenched pattern of voting discrimination that is somewhat difficult to combat through traditional adjudication measures, Section 5 still cannot be justified as legitimate "enforcement" legislation. In 1965, "unconstitutional discrimination was rampant" in covered jurisdictions, but "we are now a very different Nation." *Id.* at 2511, 2516. "[T]he days of grandfather clauses, property qualifications, good character tests, and the requirement that registrants understand or interpret certain matter … are gone." *Id*. at 2525 (Thomas, J., concurring in the judgment in part and dissenting in part) (internal quotation marks omitted). And, as we now show, the legislative record of "current statistical evidence confirms that the emergency that prompted the enactment of § 5 has long since passed." *Id.*

**Turnout and Registration:** At the time Congress enacted the VRA, the average registration rate for black voters was only 29.3% in the seven original covered jurisdictions. S. Rep. No. 109-295, at 26 (2006) (views of Sen. Cornyn & Coburn). In fact, "registration of voting-age whites ran roughly 50 percentage points or more ahead of [black registration]" in several covered States. *Nw. Austin*, 129 S. Ct. at 2525 (Thomas, J., concurring in the judgment in part and dissenting in part). In North Carolina specifically, 46.8% of eligible non-whites were registered to vote, whereas 96.8% of whites were registered. *See* 2 *Voting Rights Act: Evidence of Continued Need, Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. (2006) ("*Evidence of Continued Need*") at 2355 (submitting Edward Blum, *An Assessment of Voting Rights Progress in North Carolina* (American Enterprise Institute, 2006) ("*AEI N.C.*") at 4).

By 2004, in contrast, the voter registration rate among blacks in covered jurisdictions was over 68.1%, S. Rep. No. 109-295, at 26 (views of Sen. Cornyn & Coburn), and "[v]oter turnout and registration rates [between blacks and whites in covered jurisdictions] … approach[ed] parity," *Nw. Austin*, 129 S. Ct. at 2511; *see also* H.R. Rep. No. 109-478, at 12-13. In five covered States, registration and turnout was *higher* for blacks than whites in 2004, and in Louisiana and South Carolina, the gap between black and white voters was lower than the national average. S. Rep. No. 109-295, at 11.

Likewise, in North Carolina, black registration was higher than white registration (70.4% versus 69.4%), and black turnout was higher than white turnout (63.1% versus 58.1%). *Id.*

**Minority Elected Officials:** "[M]inority candidates [now] hold office at unprecedented levels." *Nw. Austin*, 129 S. Ct. at 2511. In the originally covered States, the number of minorities serving in elected office has increased over 1,000% since 1965. *See* H.R. Rep. No. 109-478, at 18. While there were only 40 black elected officials in North Carolina in 1969, the State elected almost 500 black officers in 2001. *See* 2 *Evidence of Continued Need* at 2374 (submitting *AEI N.C.* at 23).

**Section 5 Objections:** "[T]he number and nature of [Section 5] objections interposed by the Attorney General," *Rome*, 446 U.S. at 181, further demonstrate that Section 5 is no longer warranted.

• Only 753 objections nationwide were interposed between 1982 and 2005. H.R. Rep. No. 109-478, at 22. This amounts to only .70% of the total number of submissions filed. *See Understanding the Benefits & Costs of Section 5 Pre-Clearance, Hearing Before the S. Comm. on the Judiciary*, 109th Cong. (2006) ("*Benefits & Costs*") at 159 (submission of Edward Blum & Lauren Campbell, *Assessment of Voting Rights Progress in Jurisdictions Covered Under Section Five of the Voting Rights Act* (American Enterprise Institute, 2006) ("*AEI C.J.*") at 10).

• Many of these objections were based on interpretations of Section 5 that were subsequently rejected by the Supreme Court. S. Rep. No. 109-295, at 28 (views of Sen. Cornyn & Coburn).

• Furthermore, the rate of objections has dramatically decreased. *Id.* at 27-28. In fact, the objection rate for submissions filed between 1965 and 1970 was over 25 times higher than the objection rate for submissions filed between 1996 and 2005. *See Benefits & Costs* at 159 (submission of *AEI C.J.* at 10).

• Even the absolute number of objections has diminished. S. Rep. No. 109-295, at 27 (views of Sen. Cornyn & Coburn). Nationwide, 399 objections were interposed during the 1980's, 366 during the 1990's, and only 44 during the 2000's; in North Carolina, 34 objections were interposed during the 1980's, 13 during the 1990's, and only 4 during the 2000's. H.R. Rep. No. 109-478, at 22; U.S. Dep't of Justice, Civil Rights Division, Section 5 Objection Determinations, http://www.justice.gov/crt/voting/sec_5/obj_activ.php (last visited Aug. 13, 2010).

**Section 2 Violations:** Congress claimed "the continued filing of [Section 2] cases that originated in covered jurisdictions," 42 U.S.C. § 1973 note, Findings (4(C)), justified the need for preclearance. Yet, according to Congress itself, there were only *six* published cases between 1982 and 2006 that ended in a court ruling or consent decree finding that a covered jurisdiction had committed *unconstitutional* discrimination against minority voters. S. Rep. No. 109-295, at 13, 65-68. There were an *equal* number of cases involving such discrimination against *white* voters. *Id.* This "low number of court-identified

cases of constitutional violations in the covered jurisdictions represents a data vacuum."   Nathaniel Persily, *The Promise and Pitfalls of the New Voting Rights Act*, 117 Yale L.J. 174, 202 (2007).

**Racially Polarized Voting:**   Given this absence of any real evidence, Congress insisted that the existence of racially polarized voting in covered jurisdictions was the "clearest and strongest evidence" of the continued need for Section 5.   H.R. Rep. No. 109-478, at 34.   But such bloc voting is not even state action, let alone "evidence of unconstitutional discrimination."   *See Nw. Austin*, 129 S. Ct. at 2526 (Thomas, J., concurring in the judgment in part and dissenting in part).

### 2.   Section 5's Coverage Formula Is Now Irrational

Moreover, whatever "evil[s]" may linger "in the jurisdictions singled out for preclearance," such evils are "no longer … concentrated" in those jurisdictions, and so Section 5's "departure from the fundamental principle of equal sovereignty" cannot be justified.   *See Nw. Austin*, 129 S. Ct. at 2512 (opinion of the Court); *see also United States v. Morrison*, 529 U.S. 598, 626-27 (2000) (invalidating putative federal enforcement legislation in part because law was insufficiently tailored to those States for which prophylaxis was appropriate).   Indeed, apparently recognizing that any remotely *current* data could not reasonably establish that covered jurisdictions either are recalcitrant actors or engage in materially unusual levels of discrimination, Congress purposefully blinded itself to such relevant data when determining which political subdivisions would be subject to Section 5's suspension of local self-governance.   Specifically, the 2006 Congress continued to use election results that were *34* to *42* years old—*i.e.*, from the 1964, 1968, and 1972 elections—as the basis for denying citizens of previously covered jurisdictions the ability to establish voting procedures absent federal approval.   *See* 42 U.S.C. §§ 1973b(b), 1973c(a); *supra* at 4-5 & n.1.   The fact that the 2006 Congress did not even attempt to identify which jurisdictions in recent times have engaged in unusual levels of voting discrimination, much less at a level requiring the extraordinary preclearance burden, is sufficient, standing alone, to demonstrate Section 5's invalidity.   Section 5's preclearance burden would obviously not be rational or congruent if it had been imposed on States east of the Mississippi River, but not on those to the west.   The 2006 Congress' mindless perpetuation of the preclearance regime based on ancient election data is no

more rational or indicative of where entrenched voting discrimination exists.

To be sure, Congress suggested that there were *some* differences between covered and non-covered jurisdictions. *See, e.g.*, H.R. Rep. No. 109-478, at 53. But any such assertion is both inherently inadequate and manifestly incorrect.

a.      While "distinctions" between States "can be justified in some cases" where Congress identifies "*local* evils which have … appeared," this "requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets." *Nw. Austin*, 129 S. Ct. at 2512 (quoting, with emphasis, *South Carolina*, 383 U.S. at 328-29). Here, the "problem" being "targeted" is at least entrenched discrimination (if not recalcitrant evasion), yet Congress did not even attempt to show that Section 5's "disparate geographic coverage" was tailored to those jurisdictions manifesting such a problem. Unlike in 1965, Congress made no effort to devise a formula to identify the "most flagrant" discriminators, and did not even make any finding that the covered jurisdictions fell within that category in 2006. *South Carolina*, 383 U.S. at 315. Since Congress did not even attempt to separate the flagrant violators needing preclearance from jurisdictions that did not, it inherently failed to make any "showing" that Section 5's "disparate geographic coverage" is based on, or "sufficiently related to," the problem it was purportedly trying to solve. *Nw. Austin*, 129 S. Ct. at 2512. Indeed, the preclearance burden imposed on covered jurisdictions is inherently gratuitous, because Congress decided that such burdens are not needed for other jurisdictions that, so far as current data is concerned, are materially indistinguishable.

This is particularly true since the 50% registration-or-turnout formula that Congress previously endorsed as identifying the jurisdictions requiring preclearance, *see supra* at 4, *refutes* the notion that the jurisdictions covered in 2006 are the "most flagrant" violators. If coverage in 2006 had been based on an application of that formula to data from the elections in 2000 and 2004, *all* of the States previously covered in full would no longer be covered and Hawaii would be the only state entirely covered. *See* 152 Cong. Rec. H5179 (daily ed. July 13, 2006) (Rep. Norwood). Similarly, below the state level, applying that formula to updated data would have caused a substantially different set of counties and townships to be covered (and not covered). *See* S. Rep. No. 109-295, at 33, 36-53 (views of Sen. Cornyn & Coburn).

It is, of course, no answer that the covered jurisdictions disproportionately discriminated 30 or 40 years ago. As *Northwest Austin* emphasized, because "the Act imposes current burdens, [it] must be justified by current needs." 129 S. Ct. at 2512. Here, covered jurisdictions have been subjected to preclearance burdens based on election data that was already 42 years old at the time of the 2006 reauthorization and that will be 67 years old when the reauthorization lapses in 2031. Surely the 1965 Congress could not have justified identification of covered jurisdictions based on the 1924 election between Coolidge and Davis 41 years earlier or the 1900 election between McKinley and Bryan 65 years earlier. Indeed, it is beyond reasonable dispute that only a vanishingly small percentage of the actual perpetrators of flagrant discrimination in 1964 will even be alive in 2031.

*Boerne* itself said that the major reason that the "legislative record" for RFRA was inadequate— "[i]n contrast to the record which confronted Congress and the Judiciary in the voting rights cases"—was that it "lack[ed] examples of *modern* instances of generally applicable laws passed because of religious bigotry," since it included no examples of such laws "occurring in the past *40 years*." 521 U.S. at 530 (emphasis added). And, more generally, *Mobile* makes clear that past discrimination is not some sort of "original sin" authorizing remedies years later. 446 U.S. at 74 (plurality opinion). In short, since Congress did not even purport to impose preclearance on jurisdictions that had been determined, under any data of remotely relevant vintage, to pose the greatest threat of unconstitutional discrimination (much less a threat not easily remedied by Section 2), the 2006 extension of Section 5 "cannot be understood as responsive to, or designed to prevent, unconstitutional" voting discrimination. *Boerne*, 521 U.S. at 532.

b.      In all events, even if Congress' affirmative disavowal of a coverage formula reasonably designed to identify jurisdictions requiring preclearance did not inherently invalidate Section 5's "disparate geographic coverage," *Nw. Austin*, 129 S. Ct. at 2512, any *de novo* review establishes the absence of a sound basis for treating the covered jurisdictions as materially different. As *Northwest Austin* noted, "the evidence that is in the record suggests that there is more similarity than difference" between covered and non-covered jurisdictions. *Id.* Indeed, as detailed below, Congress' own legislative record contains *no* remotely contemporaneous evidence of voting discrimination in covered jurisdictions

that *materially* distinguishes them from non-covered jurisdictions.

**Registration and Turnout Rates:**  The 2004 data on these critical indicators vividly illustrates the lack of justification for treating covered and non-covered jurisdictions differently in 2006.

• First, the black registration rate was actually higher in covered jurisdictions than non-covered jurisdictions (68.1% versus 62.2%), and the average black turnout rates were identical in covered and non-covered jurisdictions (60%).  S. Rep. No. 109-295, at 26 (views of Sen. Cornyn & Coburn).

• Likewise, in North Carolina, black registration was higher than the national average (70.4% versus 64.3.%), and the same was true of black turnout (63.1% versus 56.1%).  *Id.* at 11 (Report).

• Moreover, "the racial gap in voter registration and turnout [was] lower in the States originally covered by § 5 than it [was] nationwide."  *Nw. Austin*, 129 S. Ct. at 2512 (citing *AEI C.J.* at 3-6).

• Similarly, in North Carolina, black registration rates were 1% higher than white registration rates, whereas, nationwide, whites registered at a rate 3.6% higher than blacks.  S. Rep. No. 109-295, at 11.  And black turnout was 5% higher than white turnout in North Carolina, whereas, nationwide, whites voted at a rate 4.2% higher than blacks.  *Id.*

**Minority Elected Officials:**  Minorities' success in winning elections in covered jurisdictions further illustrates the lack of justification for treating covered and non-covered jurisdictions differently.

• The percentage of black elected officials was higher in covered States than in non-covered States in 2000, even when the former's higher black population was taken into consideration.  *See Benefits & Costs* at 153, 157 (submission of *AEI C.J.* at 4, 8).

• In North Carolina specifically, blacks were 20% of the voting population and held 8.56% of elected offices in 2000.  In contrast, blacks were 11.4% of the voting population nationwide and held only 1.76% of elected offices.  *Id.* at 157 (submission of *AEI C.J.* at 8).

**Section 2 Violations:**  No meaningful jurisdictional difference exists in this regard either.

• Congress identified slightly more Section 2 cases with judicial findings of liability in non-covered jurisdictions compared to covered jurisdictions between 1982 and 2006 (40 versus 39), and an identical number of Section 2 cases finding *unconstitutional* discrimination against minority voters (6 versus 6).  S. Rep. No. 109-295, at 13, 65, 76.

• Moreover, these numbers were indistinguishable even though blacks disproportionately live in covered jurisdictions.  *See The Continuing Need for Section 5 Pre-Clearance, Hearing Before the S. Comm. on the Judiciary*, 109th Cong. (2006) at 157 n.1 (submission of Ronald Keith Gaddie).

• In North Carolina specifically, Congress identified only two reported cases, between 1982 and 2006, finding violations of Section 2.  Both originated in non-covered counties.  S. Rep. No. 109-295, at 80; *see also* Ellen Katz & The Voting Rights Initiative, *VRI Database Master List* (2006), http://sitemaker.umich.edu/votingrights/files/masterlist.xls (last visited Aug. 13, 2010).

**Racially Polarized Voting:**  Even aside from the irrelevance of such evidence, the legislative

record reveals comparable levels of polarized voting in covered and non-covered jurisdictions.  *See* Richard H. Pildes, *The Future of Voting Rights Policy: From Anti-Discrimination to the Right to Vote*, 49 How. L.J. 741, 752-53 (2006).  Most notably, between 1982 and 2005, there were more Section 2 cases finding legally significant levels of racially polarized voting in non-covered jurisdictions (47) than in covered ones (44).  *See To Examine the Impact and Effectiveness of the Voting Rights Act, Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. (2005) at 981 (submitting Ellen Katz *et al.*, *Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982* (Voting Rights Initiative, Univ. of Mich. Law Sch., 2005) at 15).

In sum, there is no "current need[]" that can "justif[y]" either the "current burdens" of Section 5 preclearance or the "disparate geographic coverage" of the jurisdictions that the 2006 Congress arbitrarily selected to bear those burdens.  *See Nw. Austin*, 129 S. Ct. at 2512.

## III.   THE 2006 CONGRESS' SUBSTANTIVE STANDARD FOR PRECLEARANCE LACKS ANY RATIONAL RELATIONSHIP TO PREVENTING OR REMEDYING INTENTIONAL DISCRIMINATION

The 2006 Congress eviscerated the constitutionally requisite nexus between Section 5 and "enforcement" of the Reconstruction Amendments, not just by *extending* the life of the preclearance requirement without revisiting the coverage formula, but also by *expanding* the substantive grounds for denial of preclearance.  Whereas the old Section 5 preclearance standard trained on retrogressive changes that implicated Section 5's anti-backsliding role, and otherwise preserved the flexibility of citizens in covered jurisdictions to choose their own electoral systems, the new preclearance standard transforms Section 5 into a rigid race-preferential statute that mandates and coerces minority electoral success through 2031.  Even if *continuation* of Section 5's flexible no-retrogression principle would have been permissible, the 2006 amendments' imposition of a racially discriminatory duty on local governments cannot possibly be justified as enforcing the Constitution's nondiscrimination mandate.

### A.   Section 5's Preclearance Standard Originally Focused On The Types Of Backsliding Changes That Would Undermine Section 2's Enforcement, Rather Than Fixating Exclusively On Minority Electoral Success

As discussed above, *see supra* at Part II.A, the specific "evil" that previously justified the

"[s]trong measure[]" of Section 5's preclearance requirement, *Boerne*, 521 U.S. at 530, was the threat that enforcement of Section 2 would be thwarted by the constant "backsliding" of recalcitrant jurisdictions, *Bossier II*, 528 U.S. at 320.   Consequently, as we demonstrate at length below, the 1965 Congress carefully crafted Section 5's substantive preclearance standard in a manner consistent with its "limited substantive goal" of preventing such backsliding.  *Ashcroft*, 539 U.S. at 477.

*First*, Congress authorized the extraordinary remedy of preclearance denial *only* where a voting change had the "purpose" or "effect" of causing a *retrogression* in the equal voting rights of minorities when compared to the *status quo*, regardless of whether the adoption of a non-backsliding change could nevertheless be described as discriminatory if compared instead to a hypothetical alternative that would have been better for minorities.  *Bossier II*, 528 U.S. at 333-36; *Bossier I*, 520 U.S. at 476-80.  This retrogression standard lessened the intrusion on local autonomy, because it prevented a covered jurisdiction only from adopting a *more* discriminatory alternative than the election procedure that the jurisdiction *itself* had previously deemed best.  It thereby left the jurisdiction free to choose *any* non-retrogressive alternative without regard to the Justice Department's preferred alternative.

*Second*, for purposes of determining the existence of retrogression, Congress adopted a "totality of the circumstances" analysis that was *holistic and flexible*.  *See Ashcroft*, 539 U.S. at 479-85.  This approach, like the similar approach mandated under Section 2's "results" test, focused on protecting equality of electoral opportunity for minorities.  This helped to avoid the creation of a rigid quota floor for past minority electoral success and to ensure that any prohibited backsliding was of the sort likely to have been unconstitutionally malicious, rather than constitutionally benign.

In sum, through these two related constraints—which focused the preclearance inquiry, not on minority electoral success *per se*, but on the types of invidious backsliding that necessitated Section 5—Congress preserved some of "the authority of the States to allocate their political power as they s[aw] fit," *Boerne*, 521 U.S. at 527, reduced the "'substantial' federalism costs [of] the preclearance procedure," *Bossier II*, 528 U.S. at 336 (quoting *Lopez*, 525 U.S. at 282), and avoided "command[ing] that States engage in presumptively unconstitutional race-based" preferences for minorities, *Miller*, 515 U.S. at 927.

### 1.      The Old Section 5's Retrogression Limitation

In accord with Section 5's supplemental anti-backsliding function, both the "effect" and "purpose" prongs were limited to retrogression.  And those restrictions reduced the federalism costs imposed on the citizens of covered jurisdictions by the preclearance requirement and prevented the Justice Department from converting Section 5 into a tool for coercing increased minority electoral success.

a.      Most obviously, the retrogression limitation decreased the compliance burdens on covered jurisdictions and increased their autonomy to structure local elections.  In general, Section 5 imposes "the difficult burden" of "prov[ing] a negative," namely, "proving the *absence* of [the prohibited] purpose and effect."  *Bossier I*, 520 U.S. at 480.  But restricting the inquiry to retrogression significantly eased the onus on covered jurisdictions:  proving that a voting change lacked a retrogressive effect only "require[d] a comparison of [the] jurisdiction's new voting plan with its existing plan," *id.* at 478, whereas proving the absence of a discriminatorily dilutive effect would have "impose[d] a demonstrably greater burden" by "necessitat[ing]" a comparison with "a hypothetical, undiluted plan" selected from among the countless possible ways to structure election practices, *id.* at 480, 484.  In other words, because the "benchmark" for the retrogression inquiry was the extant and readily identifiable status quo, it was relatively simpler for covered jurisdictions to adopt a change that they could prove would not result in backsliding, *see id.* at 480, as they were relieved of the far more "complex undertaking" of proving that the change would not be worse than some possible alternative, *see Bossier II*, 528 U.S. at 332.  Consequently, the covered jurisdictions retained more of their right to engage in local self-governance under a retrogression standard, since their options at the preclearance stage were constrained only by the status quo, not by hypothetical alternatives that were more favorable to minorities.

Of particular importance here, the general benefits from the retrogression standard were even greater in the specific context of Section 5's "purpose" prong.  To prove the absence of retrogressive purpose, the covered jurisdiction had the discrete and relatively "trivial" task of confirming it was not an "incompetent retrogressor" that had haplessly adopted a change that did not backslide from the status quo. *See Bossier II*, 528 U.S. at 331-32.  But to prove the absence of a discriminatory purpose, the covered

jurisdiction would have had the "demonstrably greater burden," *Bossier I*, 520 U.S. at 484, of proving that its failure to select "a hypothetical, undiluted plan" was race neutral rather than intentionally discriminatory, *Bossier II*, 528 U.S. at 336.   Yet Congress itself has sternly warned that it is "inordinately difficult" to ascertain a discriminatory "purpose" in the adoption of election changes, which typically presents varied interests of myriad legislators selecting among countless proposed plans.   *See Gingles*, 478 U.S. at 44; S. Rep. No. 97-417, 36-37 (1982); *see also, e.g.*, *Easley v. Cromartie*, 532 U.S. 234 (2001) (struggling to disentangle racial and political purposes).   And so it would have been all the more "inordinately difficult" to "prov[e] the *absence* of discriminatory purpose" in such circumstances.   *See Bossier I*, 520 U.S. at 480.   Thus, requiring jurisdictions to disprove discriminatory purpose would, as the Court held in *Bossier II*, "exacerbate the 'substantial' federalism costs that the preclearance procedure already exact[ed], … perhaps to the extent of raising concerns about § 5's constitutionality."   528 U.S. at 336 (quoting *Lopez*, 525 U.S. at 282, and citing *Miller*, 515 U.S. at 926-27).

Perhaps more important, requiring jurisdictions to disprove "discriminatory purpose" would have greatly expanded the Justice Department's power.   In "the typical … situation" where a change must be made before an imminent election, it "is rarely practical" to seek preclearance "via a declaratory judgment[] from" an impartial three-judge panel of this Court, and so the only preclearance decision-maker realistically available is the Justice Department.   *See Johnson v. Miller*, 929 F. Supp. 1529, 1532 n.5 (S.D. Ga. 1996) (per curiam).   Given the well-recognized difficulty of proving the absence of a discriminatory motive, a results-oriented Justice Department would have had virtually unbridled discretion to deem "discriminatory" the failure to adopt any alternative change it preferred.   And, as we now show, that is precisely what happened during the pre-*Bossier II* period when the Justice Department erroneously claimed it had the authority to deny preclearance on "discriminatory" purpose grounds.

b.   Specifically, the Justice Department had used the essentially unfettered "discriminatory purpose" power to unconstitutionally *coerce* covered jurisdictions into *increasing* or even *maximizing* minority electoral success, until *Bossier II* foreclosed that practice by holding that Section 5 was limited to retrogression.   Indeed, the *Bossier II* Court pointedly indicated its desire to avoid that precise

constitutional problem by citing *Miller* as its support for the proposition that a "discriminatory purpose" prong would "rais[e] concerns about § 5's constitutionality." *See* 528 U.S. at 336.

As *Miller* had observed, before *Bossier II*, the Justice Department frequently objected on "discriminatory purpose" grounds in order to compel the adoption of racially gerrymandered changes that enhanced minority electoral success, even going so far at times as to adopt a "policy of maximizing majority-black districts" and "accept[ing] nothing less than abject surrender to its maximization agenda." *See* 515 U.S. at 917, 924-27. And it did so notwithstanding the fact that such race-conscious decision-making is itself highly constitutionally suspect. *See id.* at 914; *see also Shaw v. Reno*, 509 U.S. 630, 642-49 (1993) ("*Shaw I*"). For example, in *Miller*, the Justice Department claimed that Georgia's "refusal … to create a third majority-minority district" reflected a discriminatory purpose, even though creating that third district would have required sacrificing "all reasonable standards of compactness and contiguity" when drawing district lines. *See* 515 U.S. at 919, 923-24. Consequently, Georgia was forced to adopt a "[g]eographic[] … monstrosity" "connecting the black neighborhoods of metropolitan Atlanta and the poor black populace of coastal Chatham County." *Id.* at 908-09. Similarly, in *Shaw v. Hunt*, 517 U.S. 899 (1996) ("*Shaw II*"), the Justice Department objected to a redistricting plan, "alleging that North Carolina, for pretextual reasons, did not create a second majority-minority district," even though the second district was contrary to the neutral principles of "keep[ing] precincts whole" and "avoid[ing] dividing counties into more than two districts." *Id.* at 912. Again, North Carolina was therefore forced to create a second district that "w[ound] in snakelike fashion" for l60 miles, often "no wider than the Interstate-85 corridor," "until it [had] gobble[d] in enough enclaves of black neighborhoods." *Id.* at 903.

As *Miller* explained, the Justice Department's "policy" of increasing minority electoral success "seem[ed] quite far removed from" the anti-backsliding "purpose of § 5." 515 U.S. at 926. To the contrary, "the Justice Department's implicit command that States engage in [such] presumptively unconstitutional race-based [decisionmaking] br[ought] [Section 5] … into tension with the Fourteenth Amendment['s]" nondiscrimination mandate. *Id.* at 927. Accordingly, *Bossier II* later confirmed that, because "§ 5 prevents nothing but backsliding," the 1965 Congress had never actually authorized denial

of preclearance on "discriminatory purpose" grounds, thus avoiding the "exacerabate[d] … federalism costs" and "concerns about … constitutionality" that such a power presented.  528 U.S. at 335-36.

    **2.**    **The Old Section 5's "Totality Of The Circumstances" Test For Determining The Existence Of Retrogression**

Not only was Section 5 originally limited to retrogression, but the analysis of whether a voting change had a retrogressive effect was carefully designed to target problematic backsliding of minority voting rights, without either limiting unduly the autonomy of citizens in covered jurisdictions to structure their electoral regimes or providing minorities with preferential electoral advantages.   In particular, *Ashcroft* held that Congress had imposed a "totality of the circumstances" test for assessing retrogressive "effects," modeled on Section 2's "results" test, that helped avoid the creation of a rigid quota floor for minority electoral success.  Such a floor, of course, plainly would have had no relationship to redressing intentional discrimination, let alone the invidious forms of backsliding that necessitated Section 5.

    a.    Before considering *Ashcroft*'s construction of Section 5 in detail, it is important to emphasize at the outset the fundamental reasons why it was necessary that Section 5 contain such a holistic and flexible retrogressive "effects" test.  Those reasons flow from the two general constitutional concerns that are raised whenever Congress "enforces" a constitutional ban on *intentional* discrimination by enacting a statutory ban on *facially neutral* laws that merely have a *disparate effect*.

    *First*, although such prophylactic "effects" tests can be a legitimate method of ferreting out facially neutral laws where "the risk of purposeful discrimination" is high but proving that motive would be "inordinately difficult," *see Rome*, 446 U.S. at 177; *Gingles*, 478 U.S. at 44, such tests must always be carefully scrutinized to ensure that they actually operate in that fashion.  For there is the constant risk that Congress instead is simply "attempt[ing] a substantive change in constitutional protections" that would eliminate the underlying "discriminatory purpose" requirement altogether.  *See Boerne*, 521 U.S. at 532; *Bossier I*, 520 U.S. at 481-82.  In scrutinizing an "effects" test, there is a direct relationship between the breadth of the defenses available and the validity of such a test:  as the test permits more ways in which a facially neutral practice can be justified on neutral grounds, the neutral practices that cannot be so

justified "have [an increasingly] significant likelihood of being unconstitutional," and vice versa.  *See Boerne*, 521 U.S. at 532; *Ricci v. DeStefano*, 129 S. Ct. 2658, 2682 (2009) (Scalia, J., concurring).

*Second*, especially careful scrutiny is needed where prophylactic "effects" tests *also* affirmatively threaten the rights of non-minorities.  Namely, in some circumstances, an overly demanding or rigid "effects" test will not only go beyond prophylactically eliminating intentional discrimination against minorities, but will become a "powerful engine of … discrimination" against *non-minorities*.  *See Johnson v. Transp. Agency*, 480 U.S. 616, 676-77 (1987) (Scalia, J., dissenting); *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 652 (1989) (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 992-94 & n.2 (1988) (plurality opinion)); *Ricci*, 129 S. Ct. at 2682 (Scalia, J., concurring).  To be clear, not all "effects" tests carry this additional risk:  for example, "effects" prohibitions that eliminate *barriers* to *individuals casting* a vote—such as the literacy-test bans upheld in *Morgan* and *Oregon*—do not adversely affect non-minorities, because they *expand* opportunities for *all* voters, minority and non-minority alike.  *See supra* at 12.  But "effects" test do have a double-edged nature in the voting-rights context when they are instead utilized to invalidate voting practices with a *dilutive* impact on a *group*'s collective ability to *elect* its preferred candidates.  Because the number of winning candidates is fixed by the size of the relevant government body, electoral success is necessarily a *zero-sum game*.  Accordingly, a prohibition on diminishing one group's ability to elect its preferred candidates necessarily creates a *floor* below which that group's representation may not fall as well as a corresponding *ceiling* on other groups' representation.  For this reason, as discussed below, the Supreme Court has often warned that interpreting the VRA to require excessive considerations of race or to provide minorities with electoral advantages would raise serious constitutional concerns, by bringing the VRA into tension with the Fourteenth Amendment's mandate of racially neutral treatment.

b.      Section 2 is an apt example of how Congress crafted, and the Supreme Court construed, an "effects" test holistically and flexibly, thus helping to target Section 2 at facially neutral practices that are likely to be intentionally discriminatory and to avoid conferring electoral advantages on minorities.

Cognizant of the risk that Section 2's "results" test for vote-dilution claims, *see* 42 U.S.C. § 1973,

could be misinterpreted to support minority-based favoritism, the Supreme Court has repeatedly stressed that the test does not mandate "electoral advantage," "electoral success," "proportional representation," or electoral "maximiz[ation]" for minority groups.  *See Bartlett v. Strickland*, 129 S. Ct. 1231, 1246 (2009) (plurality opinion); *LULAC*, 548 U.S. at 428; *Gingles*, 478 U.S. at 96-97 (O'Connor, J., concurring in the judgment) (citing S. Rep. No. 97-417, at 193-94); *De Grandy*, 512 U.S. at 1016-17.  Rather, the "ultimate right of § 2 is *equality of opportunity*," *LULAC*, 548 U.S. at 428 (emphasis added), reflecting the statutory command that "political processes" must be "*equally* open to participation" and cannot provide "*less* opportunity" for minorities, 42 U.S.C. § 1973(b) (emphases added).  Indeed, for this reason, even an *unequal* ability to elect representatives is not by itself an illegal "result," because Section 2 plaintiffs must show that minorities "have less opportunity than others to participate in the political process *and* to elect representatives of their choice."  *Chisom v. Roemer*, 501 U.S. 380, 397 (1991) (internal quotation marks omitted); *accord De Grandy*, 512 U.S. at 1010 (quoting 42 U.S.C. § 1973(b)).

Consistent with this broad focus on "equality of opportunity," Section 2 requires a "fact-intensive" inquiry into "the totality of the circumstances," including the "tenuous[ness]" or strength of the "policy underlying the … contested practice."  *Gingles*, 478 U.S. at 45-46 (citing S. Rep. No. 97-417, at 29); *see also* 42 U.S.C. § 1973(b).  And the Supreme Court has "structure[d] … the statute's 'totality of circumstances' test," *De Grandy*, 512 U.S. at 1010, in ways that help to avoid conferring electoral advantages on minorities and instead to target the test at facially neutral practices that subject minorities to disparate treatment and are likely to be intentionally discriminatory.

*First*, the Court has adopted basic screening requirements that narrow Section 2's focus to practices that reflect a high potential for intentional discrimination.  Specifically, plaintiffs bringing a vote-dilution claim that seeks to redraw district lines must prove, as a *threshold* requirement, that there is a "geographically compact," *Abrams v. Johnson*, 521 U.S. 74, 91 (1997), minority community that could constitute a majority of the voting-age population, *Bartlett*, 129 S. Ct. at 1241-43 (plurality opinion), in a district that adheres to "traditional districting principles[,] such as maintaining communities of interest and traditional boundaries," *Abrams*, 521 U.S. at 92; *LULAC*, 548 U.S. at 433.  By satisfying these

preconditions, Section 2 plaintiffs essentially establish a *prima facie* case that they have been subjected to adverse disparate treatment.  A race-neutral line-drawer would presumably draw a "minority" district that is compact and complies with traditional districting principles such as political boundaries and communities of interest, just as such districts are routinely drawn for non-minority groups.  Consequently, once the "prima facie" elements are satisfied, the legislature's failure to create such an intuitively obvious district is an "action[] … from which one can infer, if [it] remain[s] unexplained, that it is more likely than not that [the] action[] … [was] discriminatory." *Cf. Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 576 (1978).  The threshold requirements thus focus on whether minorities are receiving *equal* treatment, while denying them *preferential* treatment: *i.e.*, they prevent the forced creation of a district that is favorable to a minority group when such a district would not be formed for other groups under traditional districting principles.  *See Bartlett*, 129 S. Ct. at 1246-47 (plurality opinion).

*Second*, even once Section 2 plaintiffs have satisfied the threshold requirements, the Section 2 defendant can justify its seemingly disparate treatment under the "totality of the circumstances" analysis, essentially *rebutting* the inference of discriminatory motive and/or demonstrating that the minorities were seeking an electoral *advantage* rather than political *equality*.  For example, the defendant could show that there was a strong "policy underlying [its] … contested" decision not to create the majority-minority district at issue.  *See Gingles*, 478 U.S. at 45-46 (citing S. Rep. No. 97-417, at 29).  Or it could show that, despite any inequality in the minorities' ability to *elect* their preferred representative, they retained an *equal* "opportunity … to participate in the political process." *See Chisom*, 501 U.S. at 397.  By thus interpreting Section 2 to guarantee only overall minority political equality, the Supreme Court helped ensure that Section 2 does not impermissibly go beyond "enforcing" the Reconstruction Amendment's nondiscrimination guarantees and become a threat to the nondiscrimination rights of non-minorities.

c.      Although Section 2 and Section 5 necessarily differ to the extent that Section 2 compares a jurisdiction's existing plan with a "hypothetical, undiluted plan" provided by plaintiffs whereas Section 5 only compares a new plan to the "jurisdiction's existing plan," *see Ashcroft*, 539 U.S. at 478-79, the Supreme Court in *Ashcroft* made clear that the same type of holistic and flexible approach for determining

"dilution" under Section 2's "results" test was required when determining "retrogression" under the original Section 5's "effects" test. Specifically, the *Ashcroft* Court held that, just as "*in the § 2 context*, a court or the Department of Justice should assess the totality of circumstances in determining retrogression under § 5." *See id.* at 484 (emphasis added); *see also id.* at 479-85 (primarily relying on *Gingles* and *De Grandy*, which were Section 2 cases, when expounding how the "totality of circumstances" test applied for purposes of the Section 5 retrogression standard). Consequently, preclearance authorities were instructed that, as in the Section 2 context, "[i]n assessing the totality of the circumstances, [they] should not focus solely on the comparative ability of a minority group to elect a candidate of its choice," but instead had to "examin[e] … all the relevant circumstances." *Id.* at 479-80. And, as with Section 2, the most important other relevant circumstances were "the extent of the minority group's opportunity to participate in the political process[] and the feasibility of creating a nonretrogressive plan." *Id.*

Moreover, in applying the "totality of the circumstances" approach, the *Ashcroft* Court avoided preferential treatment of minority voters and increased covered jurisdictions' flexibility in structuring their electoral systems where their decisions did not implicate intentional discrimination.

*First*, with respect to the *election* of minority-preferred candidates, *Ashcroft* afforded covered jurisdictions significant *discretion* in how to draw district lines and choose among competing theories of representation. Specifically, rather than forcing the jurisdictions to maintain "a small[] number of safe majority-minority districts," *Ashcroft* gave them the option to "spread[] out minority voters over a greater number of districts" where such voters were a numerical minority but "may have [had] the opportunity to elect a candidate of their choice … by creating coalitions [with nonminority] voters." *Id.* at 480-81. To be sure, eliminating such "safe" majority-minority districts—where "the election of a minority group's preferred candidate" was "virtually guarantee[d]"—increased the "risk that the minority group's preferred candidate may lose" and the "risk [of] fewer minority representatives." *Id.* at 481, 483. But, conversely, creating "coalition" districts also decreased "the risks [of] isolating minority voters from the rest of the State[] and … narrowing [their] political influence to only a fraction of political districts." *Id.* at 481. *Ashcroft* held that "Section 5 g[ave] States the flexibility to choose one theory of effective representation

over the other," even if that choice somewhat diminished minorities' past electoral successes.  *Id.* at 482.

That deferential view of retrogression was fully consistent with Section 5's limited supplemental function of preempting invidious backsliding while leaving covered jurisdictions with autonomy to structure their electoral regimes without having to provide minorities preferential advantages.  The mere fact that federal authorities disagreed with a covered jurisdiction's "hard choice[]" on the "complex" question of how to preserve minority electoral success, *see id.* at 480, did not even remotely suggest that there was a "risk of purposeful discrimination" underlying the jurisdiction's contrary decision, *Rome*, 446 U.S. at 177.  To the contrary, since minorities only enjoy a constitutional right to *equal* opportunity, they, like all other groups, were "not immune from the obligation to pull, haul, and trade to find common political ground."  *Ashcroft*, 539 U.S. at 481 (quoting *DeGrandy*, 512 U.S. at 1020).  Indeed, inducing minority voters to engage in riskier competitive elections that necessitated political alliances was a "virtue … not to be slighted in applying a statute meant to hasten the waning of racism in American politics."  *Id.* On the other hand, had Section 5 "entrench[ed] majority-minority districts by statutory command," that would have raised obvious "constitutional concerns."  *Bartlett*, 129 S. Ct. at 1248 (plurality opinion); *see also Ashcroft*, 539 U.S. at 491 (Kennedy, J., concurring).  Specifically, preserving majority-minority districts frequently triggers strict scrutiny because it requires gerrymandering minority voters into "district[s] obviously … created solely to effectuate the perceived common interests of one racial group." *Shaw I*, 509 U.S. at 648; *see also Ashcroft*, 539 U.S. at 481 (citing *Shaw I*, 509 U.S. at 648-50).

*Second*, and equally important, *Ashcroft* emphasized that an increased ability for minorities "to participate in" and "influence" the "political process" was a "highly relevant factor in [the] retrogression inquiry," which could offset an indisputable reduction in minorities' raw power "to win[] elections."  539 U.S. at 482.  After all, the "power to influence the political process is not limited to winning elections," since minorities can influence even a candidate who is "elected without decisive minority support."  *Id*. Accordingly, no retrogression occurred under a new plan that would elect "fewer minority representatives" or had more districts "where minority voters may not be able to elect a candidate of choice," *if* the covered jurisdiction "increase[d] the number of representatives sympathetic to the interests

of minority voters." *Id.* at 482-83.  In addition, even if the diminution in electable districts was *not* offset by districts where minorities could "influence" sympathetic representatives, "[m]aintaining or increasing legislative positions of power for minority voters' representatives of choice, while not dispositive by itself, c[ould] show the lack of retrogressive effect under § 5," since "[t]he ability to exert more control over [the lawmaking] process is at the core of exercising political power." *Id.* at 483-84.

Thus, *Ashcroft* enhanced local autonomy and decreased the pressure to preserve minorities' electoral success levels by broadly looking at political and legislative participation, rather than myopically focusing on whether minority-supported candidates win elections.  Indeed, because there are myriad ways of ensuring equality of opportunity, it would have turned Section 5's redress against intentional discrimination completely on its head to federally mandate the preservation of the absolute number of officials *elected* by minorities, even when minorities themselves agreed that they would be better served by having *influence* over a greater number of powerful officials who were sympathetic to their concerns. For this reason, *Ashcroft* also held it to be "significant" to the retrogression inquiry whether the proposed change had the "support" of the minority community.  *Id.* at 484.

*Third*, and perhaps most important, *Ashcroft* held that—however minority political power was measured—the Section 5 retrogression inquiry required consideration of "the *feasibility* of creating a non-retrogressive plan."  *See id.* at 479 (emphasis added).  In other words, Section 5 did not force covered jurisdictions to preserve minority political power without regard to whether that would require subordinating sufficiently important state interests, such as traditional districting principles or good-government electoral reforms.  To take an obvious example, if an urban majority-minority district lost sizeable numbers of minority voters due to suburban housing integration, federal authorities could not conclude that the need to avoid retrogression compelled continuation of that district.

Once more, *Ashcroft*'s lenient standard for "retrogression" accorded with Section 5's role as a limited bulwark against invidious backsliding, as opposed to a minority entitlement scheme.  If it was not feasible to preserve a minority district under neutral principles, then the decision to eliminate it simply suggested fidelity to those non-racial principles, not intentional discrimination.  Conversely, requiring

jurisdictions to "subordinate[] traditional race-neutral districting principles" to prevent minority retrogression, *Miller*, 515 U.S. at 916, would grant minorities a preferential entitlement.  Far from redressing intentional discrimination, such "'outright racial balancing' [would be a] 'patently unconstitutional'" federal mandate.  *See PICS*, 551 U.S. at 729-31 (plurality opinion) (quoting *Grutter*, 539 U.S. at 330).  Thus, *Ashcroft*'s rejection of such a rule reaffirmed *Miller*'s message that Section 5 should not be construed to command racially preferential decisionmaking as a means of achieving minority political success, for that would bring it into conflict with the Constitution's *race-neutral* mandate.  *See Miller*, 515 U.S. at 926-27; *see also Ashcroft*, 539 U.S. at 491 (Kennedy, J., concurring).

In sum, to help keep Section 5 from expanding beyond its supplemental anti-backsliding role and from conferring preferential advantages on minority voters, the *Ashcroft* Court adopted Section 2's "totality of the circumstances" approach when analyzing retrogression under Section 5.  That holistic and flexible approach did not mandate preservation of minorities' ability to elect *über alles*, but instead allowed electoral diminution if preservation was not "feasible" under traditional governance principles or if equality could be achieved through other forms of political participation.  Notably, Justice Kennedy's concurring opinion was even more explicit about the necessity of avoiding any interpretation of Section 5 that required race-based efforts to preserve minority voting strength:  "Race cannot be the predominant factor in redistricting [or other electoral decisionmaking] … [y]et considerations of race that would doom a redistricting plan [or election practice] under the Fourteenth Amendment or § 2 seem to be what saves it under § 5."  *Ashcroft*, 539 U.S. at 491.  And *Northwest Austin* quoted his concurrence when describing the "constitutional concerns" created by the "tension" between an expansive Section 5 and the nondiscrimination mandate of Section 2 and the Reconstruction Amendments.  129 S. Ct. at 2512.

**B.    The 2006 Expansion Of Section 5's Preclearance Standard Eviscerated The Limitations That The Supreme Court Repeatedly Had Suggested Are Constitutionally Essential**

The 2006 Congress "reject[ed]" the Supreme Court's decisions in *Ashcroft* and *Bossier II*.  *See* H.R. Rep. No. 109-478, at 93-94.  Accordingly, the new Section 5 flatly prohibits "diminishing [minorities'] ability … to elect their preferred candidates of choice," 42 U.S.C. § 1973c(b); *see also id.*

§ 1973c(d), thereby imposing the rigid quota floor that the majority opinion in *Ashcroft* had carefully avoided creating and that the concurrence had all but declared unconstitutional.  And the new Section 5 additionally authorizes the denial of preclearance based on a finding of "any discriminatory purpose," *id.* § 1973c(c), thereby granting the Justice Department the tool for coercing increases in minority electoral success that *Bossier II* (and *Miller* before it) had expressly warned was constitutionally problematic.

### 1.	The New Section 5's "Ability To Elect" Mandate

The 2006 Congress adopted a preferential entitlement, flatly prohibiting the "diminish[ment]" of minorities' "ability … to elect their preferred candidates of choice," *id.* § 1973c(b), because it viewed *Ashcroft*'s flexible, Section-2-like interpretation of the retrogressive effects standard as completely wrong-headed.  More than forty years after Section 5 was enacted, Congress, unlike the *Ashcroft* Court, was absolutely unwilling to "permit[] [covered jurisdictions] to break up districts where minorities form a clear majority of voters and replace them with vague concepts such as influence, coalition, and opportunity."  S. Rep. No. 109-295, at 19-20.  Congress believed that "spread[ing] minority voters" out of majority-minority districts in such a fashion would "turn[] Section 5 on its head" and "turn black and other minority voters into second class voters," so it transformed the retrogression standard into an inflexible prohibition against any diminution in minorities' ability to elect the candidates of their choice.  H.R. Rep. No. 109-478, at 69-70 (internal quotation marks omitted).  Now, therefore, "the relevant analysis" is nothing more than "a comparison between the minority community's ability to elect their genuinely preferred candidate of choice before and after a voting change."  *Id.* at 71.  Unlike the old Section 5 "effects" standard and the Section 2 "results" test, this new standard is an unabashed, unbounded, and unyielding *quota floor* on past minority electoral success.

*First*, the "ability to elect" standard makes no pretense of providing "*equality* of opportunity," instead openly decreeing a "*guarantee* of electoral success for minority-preferred candidates."  *LULAC*, 548 U.S. at 428 (emphases added).  Minority groups in covered jurisdictions now have a *federal entitlement* that the level of electoral success that they possessed in 2006 cannot be "diminish[ed]" by voting changes until 2031.  42 U.S.C. § 1973c(b).  And, of course, that floor on the level of minority

electoral success is necessarily a ceiling on non-minorities' electoral success. *See supra* at 31.

*Second*, as a result, Section 5 will now mandate far more race-based decisionmaking than it ever did before. Most obviously, every existing majority-minority district in the covered jurisdictions must be preserved until 2031. Since such districts "virtually guarantee the election of a minority group's preferred candidate," *Ashcroft*, 539 U.S. at 481—indeed, such districts are so completely uncompetitive that general elections are a mere formality, *see* Franita Tolson, *Increasing the Quantity and the Quality of the African-American Vote: Lessons for 2008 and Beyond*, 10 Berkley J. Afr.-Am. L. & Pol'y 313, 336, 339-41 (2008)—shifting to even a marginally competitive "coalition" district where the outcome is not a foregone conclusion would, by definition, "diminish[] the ability" of the minority group "to elect [its] preferred candidates of choice," 42 U.S.C. § 1973c(b). As noted above, the 2006 legislative history vividly confirms Congress' abhorrence of dismantling these districts.

Additionally, the new Section 5 will require the preservation of every existing "coalition" or "influence" district in the covered jurisdictions. Although merely reducing the minority population in such districts had *never* been found to cause retrogression under the pre-2006 version of Section 5, *compare, e.g.*, *LULAC*, 548 U.S. at 446-47 (plurality opinion); *with id.* at 478-80 (Stevens, J., concurring in part and dissenting in part), reducing the minority population in such districts will now indisputably "diminish[] the ability" of the remaining minorities "to elect their preferred candidates of choice," 42 U.S.C. § 1973c(b). After all, racial minorities in such districts "can play a substantial or decisive role in the electoral process" and can at least sometimes, if not "always[,] elect the candidate of their choice," even if they cannot *guarantee* it in every election. *See Ashcroft*, 539 U.S. at 488-89. Since reducing the minority populations in such districts would reduce minority-preferred candidates' chances of winning (from, say, 25% to virtually nil), that would obviously "diminish" minorities' "ability to elect."

Consequently, the Section 5 inquiry and the Justice Department's power will be greatly expanded. Districts with minority voting-age populations from 20% to 30% can function as "coalition" or "influence" districts in the right circumstances. *See id*; *LULAC*, 548 U.S. at 443-46 (plurality opinion). For example, in *LULAC*, it was the "unanimous opinion of the staff attorneys in the Voting Section of the

Justice Department," as well as of Justice Stevens, that a district with a 25.7% black citizen voting-age population was a district where "blacks had the ability to elect candidates of their choice," such that Texas' failure to "offset[] [its] loss … with another district where black voters had a similar opportunity … was retrogressive" under Section 5.  *See* 548 U.S. at 443 (plurality opinion); *id.* at 479-81 (Stevens, J., concurring in part and dissenting in part).  Since the new Section 5 has embraced this "ability to elect" view of retrogression, virtually all districts, even with relatively small minority populations, will be subject to Justice Department scrutiny, thereby "unnecessarily infus[ing] race into virtually every redistricting, raising serious constitutional questions."  *See id.* at 446 (plurality opinion) (citing *Ashcroft*, 539 U.S. at 491 (Kennedy, J., concurring)).

*Third*, the draconian nature of the new quota floor on minority electoral success is exacerbated by Congress' uncompromising refusal to provide *any* defense or justification, no matter how compelling, that would authorize a covered jurisdiction to bend the quota.  To the contrary, the "diminish[] the ability … to elect" standard, 42 U.S.C. § 1973c(b), unambiguously eliminated *Ashcroft*'s "feasibility" inquiry.  This was a conscious decision.  *See* H.R. Rep. No. 109-478, at 71 ("Congress explicitly *rejects* all that logically follows from [*Ashcroft*]'s statement that … the comparative ability of a minority group to elect a candidate of its choice … cannot be dispositive."); *see also supra* at 38.  Thus, for example, covered jurisdictions must *wholly abandon* traditional districting principles, *see Miller*, 515 U.S. at 919, if that is what it takes to preserve a majority-minority district that has been weakened by natural demographic shifts, such as residential integration or suburban migration.  Likewise, as this case illustrates, even if there are compelling reasons to depoliticize the judiciary by switching to nonpartisan judicial elections, those reasons will be irrelevant if the switch is found to diminish minorities' ability to elect.  Perhaps most perversely of all, the number of minority-preferred officials elected must be unthinkingly preserved even if it is *undisputed* by the *minority community itself* that the benefit to its overall political interests from having greater *influence* in more districts drastically outweighs the cost of having fewer districts where it can guarantee the election of its preferred candidate.  *See Ashcroft*, 539 U.S. at 480-84.  Indeed, this automatic preservation is required even if a minority group is statistically *over-represented* in a

covered jurisdiction, because, under the new Section 5, unlike Section 2, the existence of "proportional representation" is wholly *irrelevant* to whether the group's "ability … to elect" has been "diminish[ed]." *Compare* 42 U.S.C. § 1973c(b), *with De Grandy*, 512 U.S. at 1020-24.

In sum, by abrogating *Ashcroft*, the new "ability to elect" requirement *increases* the extent to which "[r]ace … [is] the predominant factor" in electoral decisionmaking "under § 5." *Ashcroft*, 539 U.S. at 491 (Kennedy, J., concurring).  More specifically, the 2006 amendments create a "scheme in which the Department of Justice is permitted or directed to encourage or ratify a course of unconstitutional conduct in order to find compliance with a statutory directive." *Id.*  Yet, even before the 2006 amendments, this aspect of Section 5 was viewed as "a fundamental flaw" by Justice Kennedy, *id.*, and, notably, the Supreme Court in *Northwest Austin* expressly emphasized that alleged defect, *see* 129 S. Ct. at 2512.

### 2.        The New Section 5's "Discriminatory Purpose" Prong

The 2006 Congress additionally eliminated Section 5's critical focus on *retrogressive* changes, abrogating *Bossier II* and enabling the denial of preclearance where "any discriminatory purpose" is found.  *See* 42 U.S.C. § 1973c(c).  In so doing, it blithely "exacerbate[d] the 'substantial' federalism costs that the preclearance procedure already exacts," apparently indifferent as "to the extent" that its amendment "rais[ed] concerns about § 5's constitutionality."  *See Bossier II*, 528 U.S. at 336.

Moreover, given the Justice Department's infamous enforcement history when purporting to object on "discriminatory purpose" grounds, Congress certainly knew that it was unleashing the Justice Department to once again *coerce* covered jurisdictions into *increasing*, or even *maximizing*, minority electoral success.  *See supra* at 28-30.  Likewise, this Court should "entertain little doubt that the Department of Justice … [will] routinely attempt to avail [itself] of this new[ly] [available] reason for denying preclearance" in the manner that it did before (*absent* statutory authorization no less).  *See Bossier I*, 520 U.S. at 477 (internal quotation marks omitted).  Consequently, for example, covered jurisdictions will not just have to maintain existing majority-minority, coalition, and influence districts under the new "ability to elect" standard, *see supra* at 39-40, but they will be pressured into creating additional such districts because of the new "discriminatory purpose" prong.

At a minimum, under the new "discriminatory purpose" prong, the "Department of Justice is *permitted*" to "encourage or ratify a course of unconstitutional conduct in order to find compliance with a statutory directive," *Ashcroft*, 539 U.S. at 491 (Kennedy, J., concurring) (emphasis added), so it too contains the "fundamental flaw" of which Justice Kennedy warned in his *Ashcroft* concurrence, *see id.*, which was specifically cited in *Northwest Austin*, *see* 129 S. Ct. at 2512.

### C.   The 2006 Expansion Of Section 5 No Longer Rationally Targets The Type Of Backsliding Changes That Would Undermine Section 2's Enforcement

The foregoing shows that the abrogation of *Ashcroft* and *Bossier II* by the 2006 amendments transformed Section 5 into a race-based electoral regime which plainly is not a rational means, let alone a congruent and proportional way, to "enforce" the Constitution's ban on intentional discrimination.

*First*, the mere fact that Congress *expanded* Section 5's substantive burdens *in 2006*, standing alone, demonstrates the invalidity of the new Section 5.  The "appropriateness of remedial measures must be considered in light of the evil presented," *Boerne*, 521 U.S. at 530 (citing *South Carolina*, 383 U.S. at 308), and the evil presented now is but a shadow of that extant in the 1960's South, *see supra* at Part II.B.1.  Thus, *broadening* the scope of the statute beyond retrogression and *increasing* the showing needed to establish non-retrogression is, almost by definition, an "unwarranted response" to any lingering discrimination, *Boerne*, 521 U.S. at 530 (citing *South Carolina*, 383 U.S. at 334).  This is particularly true because the 2006 Congress did not, and could not reasonably, assert that some unconstitutional discrimination somehow escaped redress under the old "retrogression" substantive standard.

*Second*, regardless of whether the 2006 amendments expanded the prior preclearance standard, they ban changes that do not "have a significant likelihood of being unconstitutional," *id.* at 532, or give rise to a meaningful "risk of purposeful discrimination," *Rome*, 446 U.S. at 177.  *See supra* at Parts III.A-B.  Indeed, the 2006 "Congress could [not] rationally have concluded that … [it was redressing] intentional racial discrimination" when it amended the standard, *Rome*, 446 U.S. at 177, because the revised standard is "so out of proportion to [that] supposed remedial [and] preventative object," *Boerne*, 521 U.S. at 532.  Instead, the new Section 5 can only be understood "to attempt a substantive change in

constitutional protections" for minorities in the covered jurisdictions, *id.*, and thereby to "attack[] evils not comprehended by the" Constitution, *South Carolina*, 383 U.S. at 326.

In fact, the 2006 amendments to Section 5 bear a striking similarity to RFRA, which was invalidated in *Boerne*. As in *Boerne*, Congress believed that the Supreme Court had afforded a group inadequate protection against violations of their constitutional rights. *Compare Boerne*, 521 U.S. at 512-16, *with supra* at 38. As in *Boerne*, Congress responded by conferring sweeping new protections on that group. *Compare Boerne*, 521 U.S. at 532-35, *with supra* at Parts III.A-B. And, as in *Boerne*, there is no "reason to believe that many of the [state and local] laws affected … have a significant likelihood of being unconstitutional," in light of (1) the federal law's "[s]weeping coverage," which "displac[es] laws and prohibit[s] official actions, … regardless of subject matter," "at every level of government," and (2) its "legislative record," which "lacks examples of modern instances of [the relevant] laws passed because of [unconstitutional] bigotry." *Compare Boerne*, 521 U.S. at 530-35, *with supra* at Parts II.B.1, III.B. "Simply put, [neither] RFRA [nor the 2006 amendments to Section 5] [were] … designed to identify and counteract state laws likely to be unconstitutional." *Boerne*, 521 U.S. at 534.

To put the matter differently, the new Section 5 cannot plausibly be deemed "reasonably prophylactic legislation" that "prohibit[s] a somewhat broader swath of conduct" than is proscribed by the Constitution. *See Kimel*, 528 U.S. at 81, 88. In stark contrast, for example, to the modest "reasonable modification" mandate upheld in *Lane*, the 2006 amendments will force covered jurisdictions "to employ any and all means" to preserve and increase minority electoral success, regardless of whether doing so would "impose an undue … burden, threaten historic … interests, or effect a fundamental alteration in the nature of the" voting practice at issue. *Compare* 541 U.S. at 531-33, *with supra* at Part III.B.

*Third*, the *only* significant restriction on the new Section 5 is its limited geographic scope, but, as discussed, there is no constitutionally adequate basis for that "disparate geographic coverage." *See Nw. Austin*, 129 S.Ct. at 2512; *supra* at Part II.B.2. Moreover, the *Northwest Austin* Court's extant "constitutional concerns" that the preclearance standard appeared to violate the Equal Protection rights of the citizens in covered jurisdictions were *exacerbated* by the fact that "this tension … must persist in

covered jurisdictions and not elsewhere."  129 S. Ct. at 2512.

*Finally*, the foregoing defects are vividly illustrated by the Justice Department's application of the new Section 5 to Kinston's nonpartisan-elections referendum.  *See supra* at 7.  Faithfully following the blinkered approach mandated by the 2006 amendments, the Justice Department denied preclearance based *exclusively* on its prediction that the absence of partisan affiliation would harm the electoral prospects of the black community's candidate of choice, due to a diminution of cross-over votes from white Democrats.  It was no obstacle to its conclusion that blacks constituted almost two-thirds of all registered voters and that the referendum passed in 5 of the 7 precincts where blacks were a majority of voters.  It also gave no consideration to whether the black community would be better off politically if the referendum, as was its intended goal, opened the political system to a broader range of views.  And it similarly gave no weight to the collective judgment of Kinston's voters that nonpartisan municipal elections would improve the quality of their local government, a judgment shared by 532 of the 541 cities in North Carolina.  In sum, the use of an unyielding quota floor under Section 5 to preempt Kinston's nonpartisan-elections referendum cannot possibly be deemed an "appropriate" means of "enforcing" the Reconstruction Amendments' nondiscrimination mandate.

## IV.  SECTION 5, AS AMENDED IN 2006, VIOLATES THE EQUAL PROTECTION GUARANTEES OF THE FIFTH AND FOURTEENTH AMENDMENTS

The new Section 5 preclearance standard unconstitutionally subjects the citizens of covered jurisdictions to disparate treatment on the basis of their race.  Under the 2006 amendments, Section 5 now requires a rigid quota floor on past minority electoral success and authorizes the Justice Department to coerce covered jurisdictions to increase future minority electoral success.  *See supra* at Part III.B.

This triggers strict scrutiny for two reasons.  *First*, electoral laws designed to provide benefits to minorities at the expense of non-minorities obviously necessitate the most searching judicial review to ensure that the differential treatment of non-minorities is compatible with the constitutional guarantee of equal protection.  *See Adarand*, 515 U.S. at 226-27, 235-36; *Miller*, 515 U.S. at 913.  *Second*, electoral laws designed "solely to effectuate the perceived common interests of one racial group" impose a "type of

racial classification" that creates "representational harms" for *all* citizens subject to the law, because "elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole," which "threaten[s] to stigmatize individuals by reason of their membership in [the] racial group and to incite racial hostility." *United States v. Hays*, 515 U.S. 737, 744 (1995) (citing *Shaw I*, 509 U.S. at 643, 648).

And, of course, the "'outright racial balancing'" perpetrated by the new Section 5 cannot possibly survive strict scrutiny, because the Supreme Court has repeatedly deemed such balancing "'patently unconstitutional.'" *PICS*, 551 U.S. at 730 (plurality opinion) (quoting *Grutter*, 539 U.S. at 330); *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267 (1986). Indeed, the Supreme Court had warned that the interpretations of Section 5 that Congress adopted in 2006 were constitutionally problematic, yet Congress failed to heed those warnings. *See Ashcroft*, 539 U.S. at 491 (Kennedy, J., concurring); *Bossier II*, 528 U.S. at 336; *Miller*, 515 U.S. at 926-27; *cf. Bartlett*, 129 S. Ct. at 1247 (plurality opinion) (warning against "unnecessarily infus[ing] race into virtually every" electoral decision).

Once again, the preemption of Kinston's nonpartisan-elections referendum vividly illustrates the constitutional defects in the amended Section 5. The Justice Department nullified a good-government practice that is used in virtually every other city in North Carolina, even though blacks are a super-majority of registered voters in Kinston and supported nonpartisan elections, simply because it predicted that such elections were likely to reduce the ability of minority-preferred candidates to obtain cross-over votes from white Democrats. *See supra* at 7. If the situation were reversed—and a federal law preempted a local election practice based solely on a finding that it was likely to reduce the ability of white voters to elect their preferred candidates—the unconstitutionality of that federally imposed preference would be undisputed. And, of course, such preferential treatment does not become permissible when minorities are the putative beneficiaries. *See Grutter*, 539 U.S. at 330; *Adarand*, 515 U.S. at 226-27.

## CONCLUSION

This Court should grant summary judgment to Plaintiffs, declare that the 2006 extension and expansion of Section 5 was unconstitutional, and enjoin the Attorney General from enforcing Section 5.

August 18, 2010

Respectfully submitted,

/s/ Michael A. Carvin

_____

Michael A. Carvin (D.C. Bar No. 366784)
Noel J. Francisco (D.C. Bar No. 464752)
Hashim M. Mooppan (D.C. Bar No. 981758)
David J. Strandness (D.C. Bar No. 987194)
JONES DAY
51 Louisiana Ave. NW
Washington D.C.  20001
(202) 879-3939

Michael E. Rosman (D.C. Bar No. 454002)
Michelle A. Scott (D.C. Bar No. 489097)
CENTER FOR INDIVIDUAL RIGHTS
1233 20th St. NW, Suite 300
Washington D.C.  20036
(202) 833-8400

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| STEPHEN LAROQUE, ANTHONY CUOMO, JOHN NIX, KLAY NORTHRUP, LEE RAYNOR, and KINSTON CITIZENS FOR NON-PARTISAN VOTING,<br><br>       Plaintiffs,<br><br>       v.<br><br>ERIC H. HOLDER, JR. ATTORNEY GENERAL OF THE UNITED STATES<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civ. No.: 1:10-CV-00561-JDB |

_____

**STATEMENT OF MATERIAL FACTS IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7(h), Plaintiffs submit the following statement of material facts as to which they contend there is no genuine disputed issue.

**<u>Material Facts About Kinston's Nonpartisan-Elections Referendum</u>**

1.     In November of 2008, voters in the City of Kinston, North Carolina, adopted a referendum that would have amended the city charter to provide for nonpartisan municipal elections. *See* North Carolina State Board of Elections, Sample Ballot, Lenoir County, North Carolina, Nov. 4, 2008, www.sboe.state.nc.us/getdocument.aspx?ID=782 (last visited Aug. 13, 2010) (Exhibit A); Lenoir County Board of Elections, 2008 General Election, Official Results, City of Kinston Charter Amendment, http://results.enr.clarityelections.com/NC/Lenoir/7991/14086/en/summary.html (last visited Aug. 13, 2010) (Exhibit B); Chris Lavender, *Kinston OK's Nonpartisan Vote*, Kinston Free Press, Nov. 5, 2008, http://www.kinston.com/common/printer/view.php?db=kfpress&id=50795 (last visited Aug. 13, 2010) (Exhibit C).

2.     Nonpartisan elections are used by 532 out of 541 cities in North Carolina. *See* Robert P. Joyce, *Elections, 2007*, at 4, *in* County and Municipal Government in North Carolina (David M.

Lawrence ed., UNC-Chapel Hill Sch. of Gov., 2007), http://www.sog.unc.edu/pubs/cmg/ (last visited Aug. 13, 2010) (Exhibit D).

3.      The Kinston referendum received roughly 64% of the vote.  *See* Exhibit B.

4.      Kinston's electorate is "overwhelmingly Democratic."  *See* Letter from Loretta King, Acting Assistant Attorney General, Civil Rights Division, U.S. Dep't of Justice, to James P. Cauley III, Kinston City Attorney at 2 (Aug. 17, 2009), http://www.justice.gov/crt/voting/sec_5/pdfs/1_081709.pdf (last visited Aug. 13, 2010) (Exhibit E).

5.      Proponents of the referendum argued that a nonpartisan elections would open the political system to a broader range of views.  *See* Hilary Greene, Letter to the Editor, *Nonpartisan Elections In Kinston Will Help City Be Progressive*, Kinston Free Press, Oct. 24, 2008, http://www.kinston.com/ common/printer/view.php?db=kfpress&id=50544 (last visited Aug. 13, 2010) (Exhibit F); Stephen LaRoque, Letter to the Editor, *Sign Bipartisan Petition on Election Day*, Kinston Free Press, May 3, 2008, http://www.kinston.com/common/printer/view.php?db=kfpress&id=46233 (last visited Aug. 13, 2010) (Exhibit G).

6.      Blacks constituted approximately 64.6% of Kinston's registered voters at the time of the referendum.  Exhibit E at 1.

7.      The referendum passed in 5 of the 7 precincts in Kinston where blacks were a majority of voters.  *See* Lenoir County Board of Elections, 2008 General Election, Official Results, Detail XLS, Precinct Level Details For Election Results, at Sheet 41, http://results.enr.clarityelections.com/NC/Lenoir/ 7991/14086/en/reports.html (last visited Aug. 13, 2010) (Exhibit H); Facsimile from Lenoir County Board of Elections to Michelle Scott, Associate Counsel, Center for Individual Rights (Aug. 12, 2010) (containing VR Statistics by Precinct) (Exhibit I).

8.      The Justice Department denied preclearance for Kinston's nonpartisan-elections referendum in a letter dated August 17, 2009.  *See* Exhibit E.

9.      The Justice Department's sole basis for objecting was "that the elimination of party affiliation on the ballot will likely reduce the ability of blacks to elect candidates of choice."  *Id.* at 2.

10.     It reasoned that, "given a change [to] non-partisan elections, black preferred candidates will receive fewer white cross-over votes," because they could no longer depend on "either [an] appeal to [Democratic] party loyalty or the ability [of Democratic voters] to vote a straight [party-line] ticket." *Id.*

### Material Facts About Section 5's Legislative Record

11.     The legislative record reveals that, when Congress originally enacted Section 5 as part of the Voting Rights Act of 1965, "unconstitutional discrimination was rampant" in covered jurisdictions. *See Nw. Austin Municipal Util. Dist. No. 1 v. Holder*, 129 S. Ct. 2504, 2511 (2009).

12.     The legislative record reveals that, in 1965, the average registration rate for black voters was only 29.3% in the seven original covered jurisdictions.  S. Rep. No. 109-295, at 26 (2006) (views of Sen. Cornyn & Coburn).

13.     The legislative record reveals that, in 1965, "registration of voting-age whites ran roughly 50 percentage points or more ahead of [black registration]" in several covered States.  *See Nw. Austin*, 129 S. Ct. at 2525 (Thomas, J., concurring in the judgment in part and dissenting in part).

14.     The legislative record reveals that, in North Carolina in 1965, 46.8% of eligible non-whites were registered to vote, whereas 96.8% of whites were registered.  *See* 2 *Voting Rights Act: Evidence of Continued Need, Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. (2006) ("*Evidence of Continued Need*") at 2355 (submitting Edward Blum, *An Assessment of Voting Rights Progress in North Carolina* (American Enterprise Institute, 2006) ("*AEI N.C.*") at 4).

15.     The legislative record reveals that, when Congress extended and expanded Section 5 in 2006, "[b]latantly discriminatory evasions of federal decrees [had become] rare."  *See Nw. Austin*, 129 S. Ct. at 2511.

16.     The legislative record reveals that, in 2004, the voter registration rate among blacks in covered jurisdictions was over 68.1%, S. Rep. No. 109-295, at 26 (views of Sen. Cornyn & Coburn), and "[v]oter turnout and registration rates [between blacks and whites in covered jurisdictions] … approach[ed] parity," *see Nw. Austin*, 129 S. Ct. at 2511; *see also* H.R. Rep. No. 109-478, at 12-13

(2006).

17.     The legislative record reveals that in five covered States, registration and turnout was higher for blacks than whites in 2004, and in Louisiana and South Carolina, the gap between black and white voters was lower than the national average.  S. Rep. No. 109-295, at 11.

18.     The legislative record reveals that in North Carolina in 2004, black registration was higher than white registration (70.4% versus 69.4%), and black turnout was higher than white turnout (63.1% versus 58.1%).  *Id.*

19.     The legislative record reveals that "minority candidates [now] hold office at unprecedented levels."  *See Nw. Austin*, 129 S. Ct. at 2511.

20.     The legislative record reveals that, in the originally covered States, the number of minorities serving in elected office has increased over 1,000% since 1965.  *See* H.R. Rep. No. 109-478, at 18.

21.     The legislative record reveals that, while there were only 40 black elected officials in North Carolina in 1969, the State elected almost 500 black officers in 2001.  *See* 2 *Evidence of Continued Need* at 2374 (submitting *AEI N.C.* at 23).

22.     The legislative record reveals that only 753 objections nationwide were interposed between 1982 and 2005.  H.R. Rep. No. 109-478, at 22.

23.     The legislative record reveals that these 753 objections amount to only .70% of the total number of submissions filed.  *See Understanding the Benefits & Costs of Section 5 Pre-Clearance, Hearing Before the S. Comm. on the Judiciary*, 109th Cong. (2006) ("*Benefits & Costs*") at 159 (submission of Edward Blum & Lauren Campbell, *Assessment of Voting Rights Progress in Jurisdictions Covered Under Section Five of the Voting Rights Act* (American Enterprise Institute, 2006) ("*AEI C.J.*") at 10).

24.     The legislative record reveals that many of these objections were based on interpretations of Section 5 that were subsequently rejected by the Supreme Court.  S. Rep. No. 109-295, at 28 (views of Sen. Cornyn & Coburn).

25.     The legislative record reveals that the rate of objections has dramatically decreased.  *Id.* at 27-28.

26.     The legislative record reveals that the objection rate for submissions filed between 1965 and 1970 was over 25 times higher than the objection rate for submissions filed between 1996 and 2005. *See Benefits & Costs* at 159 (submission of *AEI C.J.* at 10).

27.     The legislative record reveals that the absolute number of objections has diminished over the past three decades.  S. Rep. No. 109-295, at 27 (views of Sen. Cornyn & Coburn).

28.     The legislative record reveals that, nationwide, 399 objections were interposed during the 1980's, 366 during the 1990's, and only 44 during the 2000's.  In North Carolina, 34 objections were interposed during the 1980's, 13 during the 1990's, and only 4 during the 2000's.  H.R. Rep. No. 109-478, at 22; U.S. Dep't of Justice, Civil Rights Division, Section 5 Objection Determinations, http://www.justice.gov/crt/voting/sec_5/obj_activ.php.

29.     The legislative record reveals only six published cases between 1982 and 2006 that ended in a court ruling or consent decree finding that a covered jurisdiction had committed unconstitutional discrimination against minority voters, and an equal number of cases involving such discrimination against white voters.  S. Rep. No. 109-295, at 13, 65-68.

30.     The legislative record reveals that, if Section 5 coverage in 2006 had been based on an application of the Section 5 coverage formula to data from the elections in 2000 and 2004, all of the States previously covered in full would no longer be covered and Hawaii would be the only state entirely covered.  *See* 152 Cong. Rec. H5179 (daily ed. July 13, 2006) (Rep. Norwood).

31.     The legislative record reveals that, if Section 5 coverage in 2006 had been based on an application of the Section 5 coverage formula to data from the elections in 2000 and 2004, a substantially different set of counties and townships would be covered (and not covered).  *See* S. Rep. No. 109-295, at 33, 36-53 (views of Sen. Cornyn & Coburn).

32.     The legislative record "suggests that there is more similarity than difference" between covered and non-covered jurisdictions.  *Nw. Austin*, 129 S. Ct. at 2512.

5

33.     The legislative record reveals that, in 2004, the black registration rate was actually higher in covered jurisdictions than non-covered jurisdictions (68.1% versus 62.2%).  S. Rep. No. 109-295, at 26 (views of Sen. Cornyn & Coburn).

34.     The legislative record reveals that, in 2004, the average black turnout rates were identical in covered and non-covered jurisdictions (60%).  *Id.*

35.     The legislative record reveals that, in North Carolina in 2004, black registration was higher than the national average (70.4% versus 64.3.%).  *Id.* at 11 (Report).

36.     The legislative record reveals that, in North Carolina in 2004, black turnout was higher than the national average (63.1% versus 56.1%).  *Id.*

37.     The legislative record reveals that, in 2004, "the racial gap in voter registration and turnout [was] lower in the States originally covered by § 5 than it is nationwide."  *See Nw. Austin*, 129 S. Ct. at 2512 (citing *AEI C.J.* at 3-6).

38.     The legislative record reveals that, in North Carolina in 2004, black registration rates were 1% higher than white registration rates, whereas, nationwide, whites registered at a rate 3.6% higher than blacks.  S. Rep. No. 109-295, at 11.

39.     The legislative record reveals that, in North Carolina in 2004, black turnout was 5% higher than white turnout in North Carolina, whereas, nationwide, whites voted at a rate 4.2% higher than blacks.  *Id.*

40.     The legislative record reveals that the percentage of black elected officials was higher in covered States than in non-covered States in 2000, even when the former's higher black population was taken into consideration.  *See Benefits & Costs* at 153, 157 (submission of *AEI C.J.* at 4, 8).

41.     The legislative record reveals that, in North Carolina, blacks were 20% of the voting population and held 8.56% of elected offices in 2000.  In contrast, blacks were 11.4% of the voting population nationwide and held only 1.76% of elected offices.  *Id.* at 157 (submission of *AEI C.J.* at 8).

42.     The legislative record reveals there were slightly more Section 2 cases with judicial findings of liability in non-covered jurisdictions compared to covered jurisdictions between 1982 and

6

2006 (40 versus 39), and an identical number of Section 2 cases finding *unconstitutional* discrimination against minority voters (6 versus 6).  S. Rep. No. 109-295, at 13, 65, 76.  And this was so, even though the legislative record reveals that blacks disproportionately live in covered jurisdictions.  *See The Continuing Need for Section 5 Pre-Clearance, Hearing Before the S. Comm. on the Judiciary*, 109th Cong. (2006) at 157 n.1 (submission of Ronald Keith Gaddie).

43.     The legislative record reveals only two reported cases in North Carolina, between 1982 and 2006, finding violations of Section 2.  Both originated in non-covered counties.  *See* S. Rep. No. 109-295, at 80; *see also* Ellen Katz & The Voting Rights Initiative, *VRI Database Master List* (2006), http://sitemaker.umich.edu/votingrights/files/masterlist.xls (last visited Aug. 13, 2006).

44.     The legislative record reveals that, between 1982 and 2005, there were more Section 2 cases finding legally significant levels of racially polarized voting in non-covered jurisdictions (47) than in covered ones (44).  *See To Examine the Impact and Effectiveness of the Voting Rights Act, Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. (2005) at 981 (submitting Ellen Katz *et al.*, *Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982* (Voting Rights Initiative, Univ. of Mich. Law Sch., 2005) at 15).

August 18, 2010                                  Respectfully submitted,

                                                 /s/ Michael A. Carvin
                                                 _____
                                                 Michael A. Carvin (D.C. Bar No. 366784)
                                                 Noel J. Francisco (D.C. Bar No. 464752)
                                                 Hashim M. Mooppan (D.C. Bar No. 981758)
                                                 David J. Strandness (D.C. Bar No. 987194)
                                                 JONES DAY
                                                 51 Louisiana Ave. NW
                                                 Washington D.C.  20001
                                                 (202) 879-3939

                                                 Michael E. Rosman (D.C. Bar No. 454002)
                                                 Michelle A. Scott (D.C. Bar No. 489097)
                                                 CENTER FOR INDIVIDUAL RIGHTS
                                                 1233 20th St. NW, Suite 300
                                                 Washington D.C.  20036
                                                 (202) 833-8400

                                                 *Attorneys for Plaintiffs*