**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| STEPHEN LAROQUE, ANTHONY CUOMO, JOHN NIX, KLAY NORTHRUP, LEE RAYNOR, and KINSTON CITIZENS FOR NON-PARTISAN VOTING, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. No.: 1:10-CV-00561-JDB |
| ERIC H. HOLDER, JR. ATTORNEY GENERAL OF THE UNITED STATES | ) ) ) ) | |
| Defendant. | ) | |

_____

**EXHIBIT D:  ROBERT P. JOYCE, *ELECTIONS, 2007 in* COUNTY AND MUNICIPAL
GOVERNMENT IN NORTH CAROLINA
(DAVID M. LAWRENCE ED., UNC-CHAPEL HILL SCH. OF GOV., 2007)**

# ARTICLE 23
# Elections

by Robert P. Joyce

Kinds of Elections Authorized / 2
Election of Candidates to Office / 2
  Partisan Primaries and Elections / 2
  Nonpartisan Elections / 3
    Types of Nonpartisan Elections / 3
  City Council and Mayor Elections / 4
    Types of City Elections / 4
      Partisan Elections / 4
      Nonpartisan Plurality Elections / 4
      Nonpartisan Primary and Elections / 4
      Nonpartisan Elections and Runoffs / 4
  School Board Elections / 4
  Judicial Elections / 5
Special Elections / 5
  Calling Special Elections / 5
  Limits on Calling Special Elections / 6
Registration and Voting / 6
  Qualifications for Voting / 6
Voter Registration / 6
Absentee Ballots / 7
Voting Equipment / 7
The State Board of Elections / 7
  Selection and Organization / 7
  Duties / 8
County Boards of Elections / 8
  Duties / 8
  Directors of Elections / 8
  Other Employees / 9
  Precinct and Registration Officials / 9
  County Boards Conducting City Elections / 10
  County Board Budget / 10
Campaign Finance Regulation / 10
The Role of Federal Law in North Carolina Elections / 11
  Changes in Voter Registration / 11
  "Preclearance" of Election Changes / 12
  Shift from At-Large to District Elections / 12
Additional Resources / 13

COUNTY BOARDS OF ELECTIONS conduct all elections in North Carolina.[1] They conduct the elections for federal, state, county, and city offices. They conduct statewide referendums and local referendums. They conduct elections for special districts, such as school administrative units, sanitary districts, and fire districts.

---

1. There is an exception for the municipal elections in Morganton. That one city, by act of the General Assembly, conducts its elections for mayor and city council through a municipal board of elections.

ISBN 978-1-56011-520-5. This article was last updated in 2006. © 2007 School of Government. The University of North Carolina at Chapel Hill. This work is copyrighted and subject to "fair use" as permitted by federal copyright law. No portion of this publication may be reproduced or transmitted in any form or by any means—including but not limited to copying, distributing, selling, or using commercially—without the express written permission of the publisher. Commercial distribution by third parties is prohibited. Prohibited distribution includes, but is not limited to, posting, e-mailing, faxing, archiving in a public database, installing on intranets or servers, and redistributing via a computer network or in printed form. Unauthorized use or reproduction may result in legal action against the unauthorized user.

© 2007 UNC–Chapel Hill School of Government. Do not duplicate.

County boards maintain voter registration records, determine the eligibility of applicants for registration, establish precincts and voting places, select and purchase voting equipment, publish the notices associated with an election, employ election day precinct workers, oversee election day activities, canvass the returns, declare the election results, issue certificates of election to the winners, and hold hearings on challenges to voters and on election protests.

The county board of elections must act within the regulations and directions of the State Board of Elections, and almost all of the county board's actions are subject to review by the state board.

With one large exception and one small exception, the operating costs of elections are paid through appropriations from the county commissioners. That large exception consists of city elections. Cities must reimburse counties for the costs incurred by the county board of elections in conducting city elections. In addition, a small portion of expenses related to statewide elections is paid from state funds.

According to figures compiled by the State Board of Elections, as of March 2006 there were 5,448,139 registered voters in North Carolina (almost exactly a million more than April 1998), of whom 45.9 percent were registered as Democrats (52.7 percent in 1998), 34.7 percent were registered as Republicans (33.9 percent in 1998), and 19.4 percent were unaffiliated (13.4 percent in 1998). Of the registered voters, 76.4 percent were white (79.28 percent in 1998), 20.1 percent were African American (18.8 percent in 1998), less than 1 percent were American Indian, and the remainder were other or undesignated.

## Kinds of Elections Authorized

The General Statutes authorize two kinds of elections: (1) elections of candidates to office and (2) certain specified special elections. A special election is any kind of referendum on any question other than electing a candidate to office. The range of special elections is limited. See the discussion of special elections below.

## Election of Candidates to Office

Elections in which the voters choose individuals to fill public offices are the most common kinds of elections. While elections for municipal offices—mayors and city councils—are held in odd-numbered years (2007, 2009, and so on), elections for just about all other offices are held in even-numbered years (2008, 2010, and so forth). The even-numbered years include federal offices (president and vice-president, U.S. Senate and House of Representatives), state executive offices (governor and council of state), state legislative offices (N.C. Senate and House of Representatives), judicial offices (justices and judges of the N.C. Supreme Court, N.C. Court of Appeals, superior court, and district court; clerks of superior court; and district attorneys), and county offices (county commissioners, registers of deeds, sheriffs, and soil and water conservation commissioners). Most school board elections are held in even-numbered years, but a few are held in odd-numbered years. Elections for sanitary district governing board members (where such districts exist) are held in odd-numbered years.

The general election schedule is found at G.S. 163-1.

### Partisan Primaries and Elections

Most federal, state, and county elections to fill offices are conducted on a partisan basis. Candidates are nominated by political parties and run under their labels. Two parties—the Democratic and the Republican—have traditionally and consistently met the statutory definition of a political party: their candidates for governor or president have in each election polled at least 10 percent of the total vote cast in the state for governor or president. The nominees of these parties are chosen by the voters through primary elections held before the general election. The winner in the primary election is the nominee of his or her party and appears on the ballot in the general election. If no candidate for nomination receives at least 40 percent of the vote (plus one vote)—a total termed a *substantial plurality*—in a particular primary, the candidate who finishes second may request a second primary, just between those two candidates. The winner of the second primary is the nominee. Voters affiliated with a particular party are eligible to vote in that party's primary. In addition, a party may permit voting in its primary by registered voters who are not affiliated with any party. That choice is made on an election-by-election basis. Counties bear the costs of primaries, as they do for other elections. The statutes governing primary elections are found at G.S. 163-104 through -119.

© 2007 UNC–Chapel Hill School of Government. Do not duplicate.

A new political party may be formed through the circulation of a petition, signed by registered voters equal to at least 2 percent of the number who voted in the most recent general election for governor. For the first election after it is recognized by the State Board of Elections, the new party chooses its nominees at a party convention, not by a primary election, and is entitled to have those nominees on the ballot for federal, state, and local offices. If the party fails to poll at least 10 percent of the vote for governor or president, its recognition is terminated, and it must go through the petition procedure again. The Libertarian Party went through this recognition and termination cycle a couple of times in the last decades of the twentieth century and the first decade of this century. The statutes governing political parties are found at G.S. 163-96 through -99.

An individual who wishes to run in a partisan election as an unaffiliated candidate may do so (if he or she is registered as unaffiliated) through the circulation of a petition. For state offices, the petition must be signed by registered voters equal to at least 2 percent of the number who voted in the most recent general election for governor. For county or district offices, the petition must be signed by at least 4 percent of the registered voters of the district. The statutes governing the candidacy of unaffiliated candidates are found at G.S. 163-122 and -123.

## Nonpartisan Elections

While most elections to fill offices are conducted on a partisan basis, three kinds of elections to office are conducted by a nonpartisan method.[2] The first kind consists of most elections to municipal office—mayor and city council. A few North Carolina cities do, in fact, have partisan elections. These are conducted like state and county partisan elections. The overwhelming majority of municipalities, however, have nonpartisan elections. The second kind of nonpartisan elections consists of elections of judges. School board elections are the third kind of nonpartisan elections. Most school board elections are nonpartisan, but a few are partisan.

In a nonpartisan election, there is, of course, no nomination of candidates in a partisan primary. All candidates stand for election without party identification. Candidates are at liberty to identify themselves by party if they wish, and parties are free to endorse candidates if they wish. What is nonpartisan is the way the election officials conduct the election, not necessarily the way candidates and parties conduct the campaign.

### *Types of Nonpartisan Elections*

*Nonpartisan plurality elections.* There is only one vote, on general election day. Whoever receives the most votes wins, even if no one gets a majority. If several candidates are seeking one seat, the highest vote getter wins. If two or more seats are being contested as a group (as in an at-large council election) and there are more candidates than open seats, then the number of candidates equal to the number of open seats, who receive the highest number of votes are elected.

*Nonpartisan primary and elections.* On the fourth Tuesday before general election day, a vote is taken to narrow the field to two candidates for each position to be filled (or if several seats are being filled as a group, to narrow the field to twice as many candidates as there are seats open). If only one or two candidates file for a single seat (or if fewer than twice as many candidates file for two or more seats open as a group), then the candidates who have filed are declared nominated, and no primary is held. If a primary is held, however, then the two candidates receiving the highest number of votes for a single office are declared nominated (even if one of them receives a majority and the second-place finisher receives a minority), and twice the number of candidates as there are seats in a group election are declared nominated. The election is then held on general election day, with the highest vote getters winning.

*Nonpartisan elections and runoffs.* There is an election on general election day only if a runoff is necessary. On the fourth Tuesday before general election day, an election is held among all candidates. A candidate receiving a majority (which in elections for more than one seat voted on as a group, is calculated by dividing the total vote cast for all candidates by the number of seats and then by two) wins. If no candidate receives a majority, the highest vote getter is declared elected unless the second-highest vote getter requests a runoff by noon on Monday following the election. The runoff is then between those two. In multiple-seat group elections, candidates with a majority win.[3] If too few gain majorities to fill all seats, then the highest vote getters without majorities, equal to the number of remaining seats to be

---

2. In addition to those three, elections for sanitary district governing board members are also held on a nonpartisan basis.

3. It is possible in a group election for more candidates to receive a majority than there are open seats. In that case the candidates receiving the greatest number of votes, equal to the number of open seats, are elected.

© 2007 UNC–Chapel Hill School of Government. Do not duplicate.

filled, are declared elected unless the next-highest vote getters equal in number to those remaining seats (or some of them) demand a runoff. The runoff is then between the highest non-majority-vote getters and the candidates demanding a runoff.

## City Council and Mayor Elections

Under the uniform municipal elections law (G.S. Chapter 163, Subchapter IX), a city may elect its governing board and mayor[4] by one of four methods: partisan elections, nonpartisan plurality elections, nonpartisan primary and elections, and nonpartisan elections and runoffs. Under all four methods, candidates file for election between noon on the first Friday in July and noon on the first Friday in August. General election day is Tuesday after the first Monday in November in odd-numbered years. Under the first three methods there is always an election on that day; under the fourth method there may not be.

### Types of City Elections

*Partisan Elections*

Of the 541 cities in North Carolina, only 9 use partisan elections.[5] Those 9 include Charlotte and Winston-Salem, however, which between them encompass about 850,000 citizens, or a tenth of the state's population. The smallest city with partisan elections is Murphy, with a population of about 1,500.

In cities with partisan elections, candidates file to run for party nomination in primary elections held on the sixth Tuesday before the November general election. A second primary, if necessary, is held on the third Tuesday before the general election. On general election day, the nominees of the parties appear on the ballot. In addition, candidates may appear on the ballot as unaffiliated through a petition signed by 4 percent of the voters in the city. The results of partisan municipal elections are determined just as the results of partisan state and county elections are.

*Nonpartisan Plurality Elections*

Currently, 480 of North Carolina's 541 cities use nonpartisan plurality elections, the simplest of the four methods.[6]

*Nonpartisan Primary and Elections*

Only twenty-four cities use nonpartisan primary and elections, but that number includes Asheville, Burlington, Durham, Fayetteville, Goldsboro, Greensboro, Hickory, and High Point, which together encompass another 850,000 people, another tenth of the state's citizens.[7]

*Nonpartisan Elections and Runoffs*

The twenty-eight cities using the nonpartisan election and runoff method include Cary, Raleigh, Rocky Mount, and Wilmington, which together have a population well in excess of a half million. There is an election on general election day only if a runoff is necessary.

The statutes governing municipal elections are found at G.S. 163-279 through -306.

## School Board Elections

In North Carolina, there are 115 school administrative units, one for each of the 100 counties and 15 additional units, usually referred to as "city" school units. These 15 "city" school units are not part of city government, are typically not coterminous with city boundaries, and function with the same powers and authority as the county school units. At one

---

4.   Under G.S. 160-101(8), a city may choose to have its mayor selected by the council from among the membership of the counsel, rather than elected by the voters.

5.   *See generally* Lawrence, *Forms of Government*.

6.   *Ibid.*

7.   *Ibid.*

© 2007 UNC–Chapel Hill School of Government. Do not duplicate.

time there were many more city school units, but over time the number has been reduced as these units have merged with county units. The most recent merger, in 2005, of the Cleveland County, Shelby city, and Kings Mountain city units reduced the statewide number of units from 117 to the current 115.

Each of the 115 school administrative units is governed by a local board of education, typically called the "school board." In three instances—Asheville, Lexington, and Thomasville—the members of the board of education are appointed rather than elected. In the remaining 112 units, board members are elected. Of those 112, 15 are elected on a partisan basis, and the remainder on a nonpartisan basis. As with city elections, described above, nonpartisan school board elections involve a mix of the nonpartisan election methods—simple plurality, primary and election, and election and runoff.

The general law calls for nonpartisan elections to be held in even-numbered years at the time of the partisan primaries held that year; that is, according to the general law, school board members are to be elected in May. The statute also provides that newly elected school board members are to take their office in December. Thus the statute creates a half-year gap between the time a member is elected and the time he or she takes office. A significant number of school boards have secured local acts of the General Assembly to address this problem. In some instances, the local act moves the school board elections to odd-numbered years. That addresses the problem because odd-numbered years are the years for municipal elections, with primaries and general elections in the fall, closer to the December office-taking. In other instances, the local act keeps the nonpartisan school board election in the even-numbered years, but moves it to the November general election date from the May primary election date.

The statutory provision for school board elections is found at G.S. 115C-37.

## Judicial Elections

In 1996, the General Assembly enacted Article 25 of G.S. Chapter 163, changing superior court judge elections from partisan to nonpartisan, effective with the 1998 elections. In 2001 it did the same thing for district court judge elections. And in 2002, effective with the 2004 elections, it did likewise for elections of judges to the North Carolina Supreme Court and the North Carolina Court of Appeals. Now, all judges are elected on a nonpartisan basis, using the primary and election method described above with respect to city elections.

## Special Elections

Special elections are all elections other than those in which voters elect candidates to office. They may be statewide issues, such as the ratification of an amendment to the North Carolina Constitution or a statewide bond referendum. More commonly they are local ballot questions, such as local bond referendums, alcoholic beverage control (ABC) elections, fire-district and sanitary-district elections, and referendums on restructuring city or county government (such as changing the number of board members or moving from at-large to district elections).

### Calling Special Elections

Special elections are called in a variety of ways, almost all of which are set by state law. One very common kind of special election—ABC referendums—for instance, may be called as a result of a petition drive, or at the request of the governing board of a city or county (see G.S. 18B-601). Similarly, referendums on changing the structure of city government (such as increasing or decreasing the number of members of the city council) may be called through a petition or by resolution of the city council itself. Corresponding referendums on changing the structure of county government (which are much less common) may be called only by the commissioners.

Bond referendums are perhaps the most common kind of special election. Most new general obligation bond issuances must be approved by the voters. Those referendums are most commonly called by the governing board that is issuing the bonds.

Numerous other kinds of special elections are authorized by the general statutes, but seldom used. For instance, county commissioners may call a referendum to authorize the levying of property taxes above the normal limit of $1.50 per $100 valuation [G.S. 153A-149(e)] or a special supplemental school tax (G.S. 115C-501).

© 2007 UNC–Chapel Hill School of Government. Do not duplicate.

In general, special elections may be held at any time, though certain time limitations may apply. For instance, ABC elections may not be held on general election day in even-numbered years [G.S. 18B-601(f)]. Usually, for the convenience of voters and to keep expense to a minimum, special elections are scheduled at the same time as regular elections.

### Limits on Calling Special Elections

County officials sometimes want to have a "special referendum" or "straw vote" on a controversial issue. Generally speaking, they may not. Only elections specifically authorized by state statute or by local act of the General Assembly may be held. As then-justice Sam Ervin of the North Carolina Supreme Court said, in *Tucker v. A.B.C. Board*, "There is no inherent power in any government body to hold an election for any purpose. In consequence, an election held without affirmative constitutional or statutory authority is a nullity, no matter how fairly and honestly it may be conducted."[8] If a county wishes to have a vote on where to locate the landfill or a city wishes to have a vote on whether to create a beautification district, it must receive authorization from the General Assembly in the form of a local act. Without the authorization, the vote simply may not be held.

In some states, citizens may, by a petition drive, force an election on the issue of recalling an elected official from office (a recall election) or adopting or repealing a particular ordinance (initiative and referendum). There are no such provisions in the North Carolina General Statutes. A handful of cities have such provisions by virtue of local acts of the General Assembly. No North Carolina counties have them.[9]

## Registration and Voting

To vote in any election in North Carolina, a person must be qualified to vote and must be registered.

### Qualifications for Voting

To be qualified to vote, a person must be a U.S. citizen, must be at least eighteen years old by the time of the election (a person who is seventeen at the time of the primary but will be eighteen by the time of the general election may vote in the primary), must have resided for thirty days in the state and in the precinct in which he or she wishes to vote, and must not be a convicted felon (or must have had citizenship rights restored). The requirement of residence is sometimes confusing. Residence means more than living in a place. To reside in a place means to make it one's home (to plan to continue to live there, not just to stay there temporarily). For most people, it is easy to tell what place is home. For some others, however, including workers in temporary jobs and college students, what place is the residence may be more difficult. The statutes governing voter registration are found at G.S. 163-54 through -90.3.

The North Carolina Constitution contains (in Article VI) two other qualifications for voting that are no longer enforced because they have been held to violate the U.S.Constitution. One provides that a person must have resided in the state for one year before registering to vote. The other requires that to register, a person must "be able to read and write any section of the Constitution in the English language."[10]

### Voter Registration

North Carolina employs permanent voter registration. Citizens need register only once to vote in all elections. Voters remain registered and eligible to vote unless they move out of the county, die, or are convicted of a felony. Applications to register to vote may be submitted to the county board of elections by mail or through a driver's license office or public assistance office. A person may apply to register at any time during the year but must do so

---

  8. 240 N.C. 177, 180 (1954).

  9. For more information, see "Initiative, Referendum, and Recall in North Carolina," by David M. Lawrence, in *Popular Government* 63 (Fall 1997): 8–18.

  10. Another provision of the North Carolina Constitution that has been held to be unconstitutional and so is not enforced disqualifies from office "any person who denies the being of Almighty God."

© 2007 UNC–Chapel Hill School of Government. Do not duplicate.

by the twenty-fifth day before an election in order to vote in that particular election. An individual who registers after the deadline may not vote until the next election after the upcoming one. This provision is designed to give the board of elections time to bring its records up to date and prepare for the election. A person who moves from one county to another must reregister, but one who relocates within the county need only notify the board of elections of the change of address.

When citizens apply to register to vote, they indicate the party with which they wish to affiliate or indicate that they wish to be listed on the registration rolls as unaffiliated.

Counties with more than 6,500 registered voters must keep the elections board office open during regular business hours five days a week. In those with fewer voters, the office must be open for at least three days each week. Citizens need not go to the board office to apply to register, however. Anyone may submit a registration application by mail or at certain government offices, including drivers' license and employment security offices.

See the section "The Role of Federal Law in North Carolina Elections" later in the article for a discussion of changes in the state's voter registration practices that respond to changes in federal law.

### Absentee Ballots

Absentee voting is available in all federal, state, and county elections. It is permitted in city elections if the city council adopts a resolution calling for it at least sixty days before an election. That choice remains in effect for future elections until the council rescinds it by resolution adopted sixty days before an election.

### Voting Equipment

For decades, North Carolina county boards of elections had the choice of five types of voting systems: traditional hand-counted paper ballots, mechanical lever machines, punch-card ballot machines, optical-scan paper ballots counted by electronic tabulators, and direct-record electronic machines (commonly called "DREs" and usually requiring the voter to touch a video screen). In actions taken in 2001 and 2003, in the aftermath of the well-known difficulties experienced in Florida in 2000, the General Assembly outlawed the future use of punch-card and lever machines, reducing the North Carolina options to three.

Then in the 2004 elections in Carteret County, a DRE failed to record the votes of more than 4,000 voters, a failure that cast the results of the statewide Commissioner of Agriculture race into doubt. Spurred by the Carteret problem, the General Assembly in 2005 passed sweeping legislation that (1) centralized all approvals for voting machines in the hands of the state board, limiting the range of choices of county elections boards and (2) required that all machines, even DREs, produce a written record of each ballot cast. As a result of these changes, there is now much greater uniformity of voting equipment in North Carolina than has ever previously been the case.

## The State Board of Elections

By statute, the State Board of Elections has "general supervision over the primaries and elections in this State." That provision, found in G.S. 163-22, sets the framework for the administration of elections in North Carolina: the state board has general supervisory power, and the county boards conduct the elections. The statutes setting out the powers and structure of the state board are found at G.S. 163-19 through -28.

### Selection and Organization

The five members of the State Board of Elections are appointed by the governor in the spring following his or her election—that is, in 2005, 2009, 2013, and so on. No more than three members of the state board may belong to the same party. Naturally, the three-member majority is always from the governor's party.

The board's office, in Raleigh, is headed by a full-time executive director.

© 2007 UNC–Chapel Hill School of Government. Do not duplicate.

### Duties

The State Board of Elections has overall responsibility for elections. It appoints all county election board members, conducts training sessions for them and for the county directors of elections, decides what kinds of voting equipment may be used, instructs county boards on what kinds of records to maintain, tells them how ballots should be printed, hears protests concerning the conduct of elections, and performs various other duties to see that elections run smoothly and properly throughout the state.

A chief duty of the state board involves challenges to the way in which particular elections have been conducted. Sometimes called "election protests" and sometimes called "election contests," challenges are usually first heard by the county board of elections and are then appealed, if the protester is not satisfied, to the state board. The state board may also investigate the conduct of elections on its own. As part of an investigation, it may take control of local election records. When convinced that irregularities have affected the outcome, the board may invalidate an election anywhere in the state and order a new election. It may also remove any local election official who has acted improperly.

## County Boards of Elections

Each of the 100 counties has a three-member board of elections appointed by the state board from names submitted by the state chairs of the Democratic and Republican parties. No more than two members may belong to the same party. Because the state board is appointed by the governor, the majority on each county board is also from the governor's party. Elected officials, candidates and their close relatives, campaign managers and treasurers, and political-party officials may not serve on a county board.

County board members serve two-year terms; the appointments are made in the summer of odd-numbered years. The board chooses one of its members as its chair.

The election law requires the county board to meet at certain times for particular purposes: for example, to appoint and train precinct officials; to consider absentee ballot applications; to count absentee ballots; and to canvass the results of an election and declare the results. Other meetings are held as needed.

The statutes setting out the powers and structure of the county boards are found at G.S. 163-30 through -36.

Like other governmental bodies, boards of elections are subject to the open meetings law. They may hold closed sessions to investigate election irregularities. The open meetings law is found at G.S. 143-318.9 through -318.18.

### Duties

The county boards of elections conduct all elections.[11] Their duties fall into two categories. The first type consists of administrative duties. The board employs a director to manage the office, chooses other office employees, appoints precinct officials, registers voters, determines precinct boundaries, establishes voting places in the precincts, orders voting equipment, advertises elections, accepts candidates' filings, prepares and prints ballots, issues absentee ballots, supervises the counting of votes, and arranges for the many other activities that are part of registering voters and holding elections. The second type consists of policy-making or quasi-judicial (that is, courtlike) duties. The board hears challenges to voters' registration, determines the sufficiency of petitions, declares election results, hears protests about election irregularities and complaints about election officials, and issues certificates of election (which enable winning candidates to take office). In all of its duties, the county board is subject to the state board's rules and supervision, but most responsibility for seeing that elections are conducted properly rests at the county level. The powers and duties of county boards of elections are outlined at G.S. 163-33.

### Directors of Elections

Each county board has a director of elections. The county elections board chooses the person it would like to be the director and forwards that recommendation to the state board's executive director, who makes the formal appointment. The county director has day-to-day responsibility for supervising board employees, ordering supplies, estimating expenses, maintaining records, and attending to the dozens of other tasks that are associated with conducting elections.

---

11. Except city elections in Morganton. *See* note 1.

© 2007 UNC–Chapel Hill School of Government. Do not duplicate.

In fact, only a few specific duties are spelled out in the statutes, and it is up to the county board to assign duties and responsibilities to its director. The board may delegate to the director as much of its work as it wishes, other than its policy-making and quasi-judicial duties. It may not, for example, delegate its responsibility for hearing challenges to voters' registration.

The county board may not dismiss the director on its own. A majority of the board may recommend dismissal to the state board's executive director. The director must be told the reasons for a dismissal recommendation and must have an opportunity to answer those allegations. The executive director makes a decision on dismissal, which is final unless the state board chooses to consider the matter. If the state board does take the matter up, it holds a hearing and then makes a decision on the dismissal.

In counties with full-time voter registration (which is nearly all counties), the director is to be paid a salary recommended by the board of elections and approved by the county board of commissioners. The salary is to be "commensurate with the salary paid to directors in counties similarly situated and similar in population and number of registered voters." In counties where the elections office is open only part time, the director may be paid on an hourly basis. In any event, the director is to be granted the same vacation leave, sick leave, and petty leave as granted to all other county employees.

The chief statute governing the role of the director is G.S. 163-35.

## Other Employees

In addition to a director, the county board of elections may approve the employment of a deputy county director and other office employees as needed. The statutes are clear that the board is responsible for hiring and firing these employees, but the law governing other aspects of employment, such as pay, working hours, and job classification, is not so clear. Because all funds for the board of elections are appropriated by the county commissioners, they effectively can control the number of employees, their pay, and other conditions of employment, if they wish to do so. In some counties, board of elections employees have been brought under the personnel ordinance; except for hiring and firing, they are listed in the county's job classifications and treated like all other employees. In other counties, personnel considerations related to election employees are negotiated between the county commissioners and the board of elections each budget period. In still other counties, the board of elections and the board of commissioners have entered into a memorandum of agreement spelling out the extent to which the personnel ordinance, the grievance procedure, the pay plan, and so on will apply to elections board employees. That agreement is, of course, subject to amendment by the parties.

The limited statutory guidance on status of elections board employees is found at G.S. 163-33(10), which provides that the county board has the power to "appoint and remove the board's clerk, assistant clerks, and other employees."

## Precinct and Registration Officials

The county board of elections divides the county into precincts and establishes a voting place for each precinct. On election day, each precinct is staffed by a chief judge and two judges of election. Depending on the size of the precinct, the elections board may also appoint precinct assistants to assist the chief judge and judges.

The board of elections appoints the chief judge and two judges from names submitted by the county political-party chairs, to serve two-year terms. No more than two of these three officials may belong to the same party. For many years the law has required that these officials be residents of the precinct in which they will work. On occasion, however, party chairs and boards of elections have had difficulty locating and recruiting residents willing to serve in some precincts. The law (G.S. 163-41) now provides that when necessity dictates, the board of elections may appoint residents of the county who are not residents of the precinct to serve as chief judge and judge. A similar provision applies to precinct assistants.

The chief judge and judges must work together all day at the polls, from opening to closing through the reporting of the vote count to the elections board. The board of elections may, if it chooses, allow split shifts for precinct assistants.

The election law sets certain minimum wages for precinct officials for working at the polls and for attending the instructional meeting before each election. Otherwise, pay for precinct officials is at the discretion of the board of elections and the county commissioners. In practice, the pay varies from county to county, with the minimum pay being the state minimum wage ($5.15 per hour in 2006). Precinct and registration officials may not accept payment for election-related services from anyone other than the board of elections.

© 2007 UNC–Chapel Hill School of Government. Do not duplicate.

### County Boards Conducting City Elections

County boards of elections conduct city elections as they do federal, state, and county elections.[12] Cities must provide reimbursement to the county board for the costs involved. The city council and the county elections board are directed by statute to agree on a formula for determining how much the city is to reimburse the county. If the two boards cannot agree on the amount due, the dispute is resolved by the State Board of Elections. G.S. 163-285 sets these rules.

### County Board Budget

County boards of elections are subject to the Local Government Budget and Fiscal Control Act (found at G.S. 159-7 through -38). The elections board is directed by statute to "prepare and submit . . . a budget estimating the cost of elections for the ensuing fiscal year" [G.S. 163-33(11)]. Almost all county board funds come by appropriation from the county commissioners. A small amount comes from the state for help with the expenses of statewide referendums and expenses related to the statewide voter registration computer system. Sometimes civic groups and businesses wish to help pay for voter registration drives. They may do so only by donating money to the county general fund; the commissioners may then appropriate that amount to the board of elections. Election officials may not accept funds directly from anyone other than the county.

Many expenses of the elections board are controlled by state law or regulation, including the minimum pay for board members and precinct officials. The kinds of records that must be maintained, the specifications for certain supplies, the number of notices that must be published, the quantity of ballots that may be printed, the hours of operation for the polls, the days the elections board office must be open, the kinds of voting booths that may be used, the forms that must be available in the board office and at the polling place, and various other matters that affect the board's budget—all are set by statute or by regulations of the State Board of Elections. The state board determines what kinds of voting machines may be selected by the counties; the county commissioners decide whether to purchase them; and the county board of elections chooses a particular kind.

Most of the elections board's expenses—the costs of maintaining an office and conducting the regularly scheduled elections of public officials—are predictable. Still, not all expenses can be anticipated. When it prepares its budget, the elections board may not know that citizens will petition for a liquor election, that the decision in a voting-rights lawsuit will require a change in election dates, or that the legislature will raise the pay for precinct officials. These expenses, which may be substantial, may be matters over which the elections board has no control and may require a supplemental appropriation by the county commissioners.

## Campaign Finance Regulation

North Carolina law sets limits on who may contribute to candidates for office and to political committees. In general, no one (other than the candidate and certain family members and the state executive committees of recognized political parties) may contribute more than $4,000 per election to any candidate or committee, contributions over $100 may not be in cash, businesses may not make contributions, and contributions may not be anonymous. The law also sets requirements regarding expenditures by candidates and committees. Expenditures over $50 may not be in cash and all expenditures must show their purpose.

For the enforcement of these regulations, and to inform the voters about the sources of support for candidates, candidates and committees must make regular reports of contributions and expenditures. In races for federal offices, reports are filed with the Federal Elections Commission; for state, legislative, and judicial offices, they are filed with the state board; and for county and city offices, they are filed with the county board of elections.

---

12. Again, except for Morganton.

© 2007 UNC–Chapel Hill School of Government. Do not duplicate.

At the county level, therefore, the responsibility falls on the county elections board to maintain a list of candidates and committees, to send notifications that required report filing dates are coming up, to receive the reports and review them for apparent compliance, to make the reports available for public inspection, and to send reminders if reports are late.

A candidate may file with the county board a certification that the campaign will not receive or spend more than $3,000. So long as the campaign stays under that limit, the reporting requirement is waived.

If a candidate or committee fails to file a report, or if a filed report appears to show a violation of the campaign finance regulations, then the county board of elections is to report the matter to the state board, which may impose civil penalties or refer criminal matters to the appropriate district attorney for possible prosecution.

## The Role of Federal Law in North Carolina Elections

Three federal statutes passed by Congress and one provision of the U.S.Constitution have had major impacts on the administration of elections in North Carolina and promise to continue to do so for years to come. The statutes are the National Voter Registration Act of 1993 (NVRA),[13] the Voting Rights Act of 1965,[14] and the Help America Vote Act of 2002 (HAVA).[15] The constitutional provision is the Equal Protection Clause found in the Fourteenth Amendment. The remaining sections of this article discuss these impacts.

### Changes in Voter Registration

North Carolina's voter registration system is described earlier. A citizen wishing to apply to register may mail an application form to the elections board office, may bring it in or have someone else bring it in, or may fill out an application at a driver's license office, public assistance office, or employment security office. On the application form, the citizen attests that he or she meets the eligibility requirements for registering. There is no check of identity or administration of an oath. Making a false attestation is a felony.

This system was adopted by the General Assembly in 1994 in response to the passage of the NVRA in 1993. Before this system was adopted, most registration applications were taken by an elections official—elections board members, staff employees, precinct officials, and sworn officials called "special registration commissioners"—who interviewed the applicant in person, required proof of identity, and administered an oath to the applicant. Congress's purpose in passing the NVRA was to make it easier and less intimidating for citizens to register to vote. It required that states adopt the registration practices just described for federal elections. States could, if they chose, have different requirements for registering for state and local elections. The legislature in North Carolina determined that it would be cumbersome, confusing, and expensive to have different systems for federal and for state and local elections, and thus amended the registration statutes to make the registration procedure applicable to all elections.

Until 2003, the voter registration records maintained by each county were the official voter registration records for the state. Changes made by county elections boards to registration records were reported to the state board, and the computerized data maintained by the state board was in effect an accumulation of the 100 county record sets. HAVA, passed largely in response to election difficulties in Florida in the 2000 presidential election, required that each state have a "single, uniform, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level." In 2003, the General Assembly made the state board's computerized data "the official voter registration list for the conduct of all elections in the State." County election boards remain responsible for processing voter registration applications and changes to voter registration information, but they input that information directly to the state system. The paper records maintained at the county office serve as back-up.

---

13. 42 U.S.C. § 1973gg.

14. 42 U.S.C. § 1973.

15. 42 U.S.C. §§ 15301-15545.

© 2007 UNC–Chapel Hill School of Government. Do not duplicate.

**Table 23-1.** *The Forty North Carolina Counties Subject to the Preclearance Requirement*

| | | | | |
|---|---|---|---|---|
| Anson | Beaufort | Bertie | Bladen | Camden |
| Caswell | Chowan | Cleveland | Craven | Cumberland |
| Edgecombe | Franklin | Gaston | Gates | Granville |
| Greene | Guilford | Halifax | Harnett | Hertford |
| Hoke | Jackson | Lee | Lenoir | Martin |
| Nash | Northampton | Onslow | Pasquotank | Perquimans |
| Person | Pitt | Robeson | Rockingham | Scotland |
| Union | Vance | Washington | Wayne | Wilson |

### "Preclearance" of Election Changes

The Voting Rights Act has two chief operating provisions: Section 2 and Section 5. Section 2 prohibits all forms of racial discrimination in the election process everywhere in the United States. It is discussed in the following paragraphs. Section 5, on the other hand, applies only to certain governmental units that had especially low rates of voter registration at the time the Voting Rights Act was passed. In effect, those jurisdictions were presumed to be discriminating. To prevent the introduction of new election procedures that adversely affect minority voting, governmental units subject to Section 5 must obtain approval from the U.S. Department of Justice before making any change in election procedure. The approval procedure is commonly referred to as *preclearance*.

Most southern states are covered statewide by Section 5, but only forty North Carolina counties are subject to it. Any change in elections procedures in any of those forty counties must be precleared. Examples include a switch to or from an at-large election system, any change in the term of office for an elected position, municipal annexations, moving of polling places or precinct lines, new office hours for the board of elections, and conversion from paper ballots to voting machines. Because any statewide election law or procedure change obviously affects those forty counties, all such changes must be precleared before they can become effective.

The Justice Department reviews each such change to determine whether it places African Americans or other minorities in a worse position. Few changes are objected to, but the most likely ones to be challenged are annexations, alterations in district lines, and changes in the method of election (from district to at-large elections, for example). An objection from the Justice Department may be the start of negotiations between the governmental unit and federal officials to alter the proposed change to make it acceptable. If a change is made without Justice Department approval or without ever having been submitted for preclearance, the department is likely to go to court to stop its implementation. A local government may seek preclearance from the federal district court for the District of Columbia rather than from the Justice Department, but that option is seldom used because it takes longer and is more expensive.

See Table 23-1 for the forty North Carolina counties subject to the preclearance requirement. The preclearance requirement also applies to all cities and other governmental units, such as school boards, within these counties.

The responsibility for submitting changes for preclearance is set by state law (G.S. 120-30.9A through -30.9I). The State Board of Elections is responsible for submitting statewide changes that affect all governmental units in the state, while county and city attorneys are responsible for those that apply only to their jurisdictions. Changes concerning school boards are to be submitted by the board attorneys. Once the Justice Department makes its final decision on a local preclearance request, the notification letter must be filed by the local attorney with the North Carolina Office of Administrative Hearings for publication in the *North Carolina Register*.

### Shift from At-Large to District Elections

Section 2 of the Voting Rights Act prohibits all states, counties, cities, and other political units from setting voting qualifications or using election procedures that deny or abridge the voting rights of minorities. A person who believes that any governmental unit has such a qualification or procedure may sue in federal court to have it invalidated under Section 2.

The most common subject matter for these lawsuits is a challenge to the methods of conducting elections that make it harder for African Americans to be elected—especially the use of at-large elections. The two issues at the heart of such a Section 2 lawsuit are the extent to which African Americans have been elected to office under the election system being challenged and whether voting is polarized along racial lines. If, for example, 30 percent of a county's population consists of African Americans but none of them have ever been elected to the five-member

© 2007 UNC–Chapel Hill School of Government. Do not duplicate.

board of commissioners, that is strong evidence that the method of election is discriminatory. If, in addition, statistical analysis shows that whites seldom vote for black candidates in that county—and this is generally the case in North Carolina—then the court will need to consider requiring an election method that provides African Americans with an opportunity to elect candidates on their own without depending on white support. The leading Supreme Court decision setting out these Section 2 requirements involved North Carolina's multimember districts for electing members of the General Assembly, *Thornburg v. Gingles*.[16]

Traditionally in North Carolina, most city councils and boards of commissioners have been elected at large; that is, all voters in the city or county vote for all seats. In places that have significant African-American populations but a sparse record of electing African Americans to the board, Section 2 lawsuits—or the threat of Section 2 lawsuits—have been used to force a conversion to a different method of election. The courts' usual remedy is to require the city or county to switch to a system in which it is divided into several districts, and only the voters of each district vote for the seat representing that area. By creating districts with predominantly black populations, the court can give African Americans a much better opportunity to elect candidates of their own choosing than they would have with an at-large election system.

## Additional Resources

Joyce, Robert P. *The Precinct Manual 2006*. Chapel Hill, N.C.: Institute of Government, University of North Carolina at Chapel Hill, 2006.

Lawrence, David M. "Initiative, Referendum, and Recall in North Carolina," *Popular Government* 63 (Fall 1997): 8–18.

———. "Removing Local Elected Officials from Office in North Carolina," *Wake Forest Law Review* 16 (1980): 547–61.

**Robert P. Joyce** is a School of Government faculty member whose areas of specialization include the law related to elections.

---

16. 478 U.S. 30 (1986).

© 2007 UNC–Chapel Hill School of Government. Do not duplicate.