# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEPHEN LAROQUE, et al. | |
| Plaintiffs, | |
| v. | Civil Action No. 10-0561 (JDB) |
| ERIC H. HOLDER, Jr., in his official capacity as Attorney General of the United States, | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs, five private citizens and a private membership association, filed this action challenging the constitutionality of Section 5 of the Voting Rights Act ("Section 5"), <u>see</u> 42 U.S.C. § 1973c, both facially and as applied to the Attorney General's refusal under Section 5 to "preclear" a proposed amendment to the Kinston, North Carolina city charter. The amendment, adopted by Kinston voters in a November 2008 referendum, would have replaced the city's current electoral system -- in which candidates for mayor or city council must either be winners of party primaries or unaffiliated persons who obtain a sufficient number of signatures -- with a nonpartisan system, in which anyone may run for local political office and no candidate is affiliated with any political party on the ballot. <u>See</u> Compl. ¶¶ 1, 14-15. Pursuant to Section 5, Kinston submitted its proposed voting change to the Attorney General, who interposed an objection to the change on the ground that the "elimination of party affiliation on the ballot will likely reduce the ability of blacks to elect candidates of choice." <u>See</u> <u>id.</u> ¶ 19. On November 16, 2009, the Kinston City Council voted not to seek administrative reconsideration of the Attorney

General's objection or a declaratory judgment from this Court authorizing the proposed electoral change.  See Def.'s Mem. in Supp. of Def.'s Mot. to Dismiss ("Def.'s Mem.") [Docket Entry 11], Ex. 1, Kinston City Council Meeting Minutes, at 19.  Plaintiffs filed this action on April 7, 2010, arguing that Section 5 unconstitutionally exceeds Congress's enforcement authority under the Fourteenth and Fifteenth Amendments and that Section 5, as amended in 2006, violates the nondiscrimination guarantees of the Fifth, Fourteenth and Fifteenth Amendments.  See id. ¶¶ 1, 33-34, 36.  Now before the Court is defendant's motion to dismiss, which argues that plaintiffs lack standing and that there is no cause of action for private persons to challenge the constitutionality of Section 5 as applied to the Attorney General's objection to a jurisdiction's proposed electoral change.  See Def.'s Mem. at 1.  For the reasons explained below, the Court will grant defendant's motion to dismiss.[1]

## BACKGROUND

The Voting Rights Act of 1965 "was designed by Congress to banish the blight of racial discrimination in voting."  South Carolina v. Katzenbach, 383 U.S. 301, 308 (1966).  To effectuate this purpose, Section 5 prohibits certain covered jurisdictions, where voting discrimination has historically been the "most flagrant," see id. at 315, from making any changes to their voting practices or procedures unless those changes are first "submitted to and approved by a three-judge Federal District Court in Washington, D.C., or the Attorney General."  See Nw.

---

[1] On December 16, 2010, in order to avoid unnecessary work by counsel on briefs due December 21, the Court issued an Order granting defendant's motion and dismissing the case.  See Order [Docket Entry 41] at 1.  This Memorandum Opinion explains the basis for that Order.  A parallel challenge to the constitutionality of Section 5, brought by a covered jurisdiction, remains pending before this Court.  See Shelby Cnty. v. Holder, 1:10-cv-00651 (JDB) (D.D.C. filed Apr. 27, 2010).  A hearing on the merits of that challenge is set for February 2, 2011.

Austin Mun. Utility Dist. No. One v. Holder, 557 U.S. ----, 129 S. Ct. 2504, 2509 (2009); 42 U.S.C. §§ 1973b-1973c. So-called "preclearance" under Section 5 will only be granted if the covered jurisdiction can demonstrate that its proposed voting change "neither 'has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color.'" Nw. Austin, 129 S. Ct. at 2509 (quoting 42 U.S.C. § 1973c(a)); see also Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, 478 (1997) (explaining that the covered jurisdiction bears the burden of proving that its proposed voting change is nondiscriminatory). Section 5 thereby "'shift[s] the advantage of time and inertia from the perpetrators of the evil to its victim,' by 'freezing election procedures in covered areas unless the changes [to those procedures] can be shown to be nondiscriminatory.'" Beer v. United States, 425 U.S. 130, 140 (1976) (quoting H.R. REP. No. 94-196, at 57-58 (1975)). Although Section 5 "was expected to be in effect for only five years," Congress has re-authorized Section 5 on four occasions -- in 1970 (for 5 years), 1975 (for 7 years), 1982 (for 25 years), and 2006 (for 25 years). See Nw. Austin, 129 S. Ct. at 2510. The first three re-authorizations have been upheld against constitutional challenge, as the Supreme Court found in each instance that "circumstances continued to justify the provisions." See id. (citing Georgia v. United States, 411 U.S. 526 (1973); City of Rome v. United States, 446 U.S. 156 (1980); Lopez v. Monterey Cnty., 525 U.S. 266 (1999)).

　　　If a jurisdiction covered by Section 5 chooses to submit its proposed voting change to the Attorney General for preclearance, and the Attorney General interposes an objection to the change, the submitting-jurisdiction "may at any time request the Attorney General to reconsider an objection," see 28 C.F.R. § 51.45(a), or it may institute a declaratory judgment action before a three-judge panel of the U.S. District Court for the District of Columbia, seeking "*de novo*

consideration of whether the method of election violates rights protected by the Voting Rights Act or the Constitution," see Cnty. Council of Sumter Cnty. v. United States, 555 F. Supp. 694, 706-07 (D.D.C. 1983); City of Rome v. United States, 450 F. Supp. 378, 381-82 (D.D.C. 1978) (explaining that "even if . . . the Attorney General objects to certain proposed electoral changes, the applicant-jurisdiction can always seek . . . a declaratory judgment from a three-judge court in this District . . . "); 28 C.F.R. § 51.11 (noting that "[s]ubmission to the Attorney General does not affect the right of the submitting authority to bring an action in the U.S. District Court for the District of Columbia for a declaratory judgment").  If the submitting-jurisdiction does not pursue either course, the Attorney General's objection serves to nullify the jurisdiction's proposed change to its voting practice or procedure, and the change thus cannot be lawfully enforced. See 28 C.F.R. § 51.10 (stating that "[i]t is unlawful to enforce a change affecting voting without obtaining preclearance under section 5").

The present action stems from an attempt by voters in the city of Kinston, North Carolina to alter the partisan nature of Kinston's local election system.  See Compl. ¶ 1.  Currently, a prospective candidate for political office in Kinston must either be the winner of a party primary or an unaffiliated candidate who obtains a sufficient number of signatures "to gain access to the ballot."  See id.  In November 2008, Kinston voters -- by an almost 2 to 1 margin -- passed a referendum that would have amended the Kinston city charter to allow for nonpartisan elections, under which any individual would be allowed to run for local political office and no candidate would be affiliated with any political party on the ballot.  See id. ¶¶ 1, 14-15.

Kinston is a political subdivision of Lenoir County, North Carolina, which is a covered jurisdiction, and hence Kinston, too, is subject to the provisions of Section 5.  See Compl. ¶ 16;

28 C.F.R. pt. 51, 30 Fed. Reg. 9897 (Aug. 7, 1965) (Section 5 coverage determination for Lenoir

County, North Carolina); 28 C.F.R. § 51.6 (noting that "all political subunits within a covered

jurisdiction . . . are subject to the requirement of section 5").  Rather than seek "bail out" under

Section 4(a) of the Voting Rights Act,[2] or a declaratory judgment from a three-judge panel of

this Court authorizing its proposed electoral change, Kinston submitted the proposed change to

the Attorney General for preclearance.  See Compl. ¶ 16.  On August 17, 2009, the Attorney

General issued a letter objecting to Kinston's proposed system of nonpartisan elections, on the

ground that "the elimination of party affiliation on the ballot will likely reduce the ability of

blacks to elect candidates of choice."  See id. ¶ 19.  As the Attorney General explained,

"statistical analysis supports the conclusion that given a change to a nonpartisan election, black

preferred candidates will receive fewer white cross over votes" because nonpartisan elections

prevent "either [an] appeal to [Democratic] party loyalty or the ability to vote a straight ticket"

for all Democratic candidates.  See id.  Because "black-preferred candidates" tend to be

Democratic, and because "the city's electorate is overwhelmingly Democratic," the Attorney

General concluded that Kinston's proposed voting change would negatively impact Democratic

candidates, and thereby have a racially discriminatory effect.  See id.  On November 16, 2009,

---

[2] If a covered jurisdiction -- or one of its political subdivisions -- wishes to avoid the requirements of Section 5, it may seek "bail out" pursuant to Section 4(a) of the Voting Rights Act.  See Nw. Austin, 129 S. Ct. at 2509, 2516 (explaining that "all political subdivisions . . . are eligible to file a bailout suit"); 42 U.S.C. § 1973b(a).  In order to successfully "bail out" of the requirements imposed by Section 5, a jurisdiction must obtain "a declaratory judgment from a three-judge District Court in Washington, D.C.," confirming that "for the previous ten years it has not used any forbidden voting test, has not been subject to any valid objection under § 5, and has not been found liable for other voting rights violations."  Nw. Austin, 129 S. Ct. at 2509.  The jurisdiction must also demonstrate "that it has 'engaged in constructive efforts to eliminate intimidation and harassment of voters,' and similar measures."  Id. (quoting 42 U.S.C. §1973b(a)(1)(A)-(F)).

the Kinston City Council voted not to seek administrative reconsideration of the Attorney General's objection or a *de novo* review by this Court of Kinston's proposed change to nonpartisan elections.  See Def.'s Mem., Ex. 1, Kinston City Council Meeting Minutes, at 19.

Plaintiffs filed this suit against the Attorney General on April 7, 2010, arguing that the Attorney General's "denial of Section 5 preclearance . . . completely nullified all of Plaintiffs' efforts in support of the referendum" and "infringed their right under North Carolina law to participate in the electoral, political, and law-making process through citizen-referenda."  Compl. ¶ 29.  Plaintiffs further allege that Section 5 "particularly as implemented by the Attorney General, denies Plaintiffs equal, race-neutral treatment, and an equal opportunity to political and electoral participation, by subjecting them to a racial classification and by intentionally providing minority voters and their preferred candidates a preferential advantage in elections."  Id. ¶ 30.

Plaintiffs are five Kinston residents who are registered voters there, as well as a private membership association, the Kinston Citizens for Non-Partisan Voting ("KCNV"), which is "dedicated to eliminating the use of partisan affiliation in Kinston municipal elections."  Id. ¶¶ 2-7.  The five citizen-plaintiffs all allege that they either campaigned or voted for the November 2008 referendum.  See id. ¶¶ 2-6.  Two of the five also maintain that they intend to run for election to the Kinston City Council in November 2011.  Id. ¶¶ 3-4.  As a registered Republican voter and a registered unaffiliated voter, respectively, these two prospective candidates for office in a predominantly Democratic jurisdiction allege that they have "a direct interest" in running "on a ballot where [they] [are] unaffiliated with any party, against opponents similarly unaffiliated, and without the preliminary need to either run in a party primary or obtain sufficient

signatures to obtain access to the ballot as a candidate." <u>Id.</u> ¶¶ 3-4, 19.

In their complaint, plaintiffs seek both declaratory and injunctive relief.  First, they request declarations that Section 5 unconstitutionally exceeds Congress's enforcement authority under the Fourteenth and Fifteenth Amendments, <u>see id.</u> ¶¶ 31-34; <u>id.</u> at p. 12, Request for Relief (1), and that Section 5, as amended in 2006, violates the Fifth, Fourteenth and Fifteenth Amendments both generally and "particularly as applied by the Attorney General . . . in his specific refusal to permit Kinston's change to nonpartisan elections," <u>id.</u> ¶¶ 35-36; <u>id.</u> at p. 12, Request for Relief (2).  Second, plaintiffs request injunctions prohibiting all future enforcement of Section 5 against Kinston, <u>id.</u> at p. 12, Request for Relief (4), and preventing the Attorney General from enforcing Section 5 against Kinston's proposed change to nonpartisan elections, <u>id.</u> at p. 12,  Request for Relief (3).

Presently before the Court is defendant's motion to dismiss plaintiffs' complaint on the dual grounds that plaintiffs lack standing and that there is no right of action for private persons to challenge the constitutionality of Section 5 as applied to the Attorney General's decision to object to a covered jurisdiction's proposed voting change.  <u>See</u> Def.'s Mem. at 1, 6.  On December 3, 2010, this Court held a hearing on defendant's motion to dismiss, and heard more than two hours of argument from counsel for the parties.[3]  At that hearing, plaintiffs' counsel

---

[3]  The Court also heard argument from counsel for defendant-intervenors Joseph M. Tyson et al., who have filed their own motion to dismiss.  <u>See</u> Def.-Intervs.' Mot. to Dismiss [Docket Entry 25].  Defendant-intervenors include six African-American residents of Kinston, who are all registered voters there, as well as the North Carolina State Conference of Branches of the NAACP.  <u>See</u> Mot. to Intervene [Docket Entry 13] at 1, 3.  On August 25, 2010, the Court granted defendant-intervenors' motion for permissive intervention under Federal Rule of Civil Procedure 24(b)(1), <u>see</u> Order [Docket Entry 24] at 1, and defendant-intervenors filed their motion to dismiss the same day.

retreated from the position taken in their pleadings -- that plaintiffs are challenging Section 5 both facially and as applied to the Attorney General's decision to object to Kinston's proposed voting change -- and instead stated that their suit presents "a facial and only a facial challenge" to Section 5. <u>See</u> Mot. Hr'g Tr. [Docket Entry 40] 97:10-11, Dec. 3, 2010. Plaintiffs' counsel represented to the Court that plaintiffs do not seek (and have never sought) to bring an "as applied" challenge to Section 5 based on the Attorney General's specific refusal to preclear Kinston's proposed change to nonpartisan elections. <u>See id.</u> 45:25-46:1 ("we are not asserting that there is anything uniquely unconstitutional about the application [of Section 5] to Kinston"); <u>id.</u> 68:19-21 ("we are not challenging the Attorney General's objection" to Kinston's proposed electoral change); <u>but see</u> Compl. ¶ 30 ("Section 5, particularly as implemented by the Attorney General, denies plaintiffs equal, race-neutral treatment"); <u>id.</u> ¶ 36 ("Section 5 . . . violates the nondiscrimination requirements of the Fifth, Fourteenth, and Fifteenth Amendments, particularly as enforced by the Attorney General"); <u>id.</u> at p. 12, Request for Relief (2) (asking for a declaration that "Section 5 . . . violates the Fifth, Fourteenth and Fifteenth Amendments . . . particularly <u>as applied</u> by the Attorney General . . . <u>in his specific refusal</u> to permit Kinston's change to nonpartisan elections") (emphasis added). Rather, plaintiffs' counsel explained, the complaint only references the Attorney General's application of Section 5 to Kinston as "a particularly good illustrative example of the unconstitutionality" of Section 5 -- a statute which, plaintiffs contend, is "unconstitutional in all its applications." <u>See</u> Mot. Hr'g Tr. 45:18-24.

     Plaintiffs' counsel further argued -- again, despite several statements in the complaint to the contrary -- that plaintiffs' injuries do not flow from the Attorney General's objection to Kinston's proposed electoral change, but only "from the fact that Congress reauthorized Section

5" in 2006.  Id. 46:4-12; see also id. 46:22-24 ("our injury does not flow from the Attorney General, it flows from Congress's decision to re-authorize the statute"); id. 68:19-21 ("What the Attorney General said, what the Attorney General did are irrelevant to our case."); but see Compl. ¶ 1 (noting that plaintiffs' efforts in support of the referendum "have been completely nullified because the Attorney General denied preclearance"); id. ¶ 29 (arguing that "[t]he denial of Section 5 preclearance has completely nullified all of Plaintiffs' efforts in support of the referendum").  According to plaintiffs, then, their suit could have been brought irrespective of the Attorney General's decision to object to Kinston's proposed electoral change, because plaintiffs' harm derives not from the Attorney General's objection, but from the operation of the Section 5 statutory scheme as a whole.  See Mot. Hr'g Tr. 69:10-13 ("We are challenging Section 5, and it's Section 5 that causes our injury . . . we don't think you need to review the Attorney General['s] [objection] in any way, shape, or form").  Indeed, plaintiffs argue, "[w]e would be bringing the same exact claim if Kinston had never sought preclearance in the first place."  Id. 46:10-12; see also id. 48:4-5 ("We could have sued [the] day . . . Kinston voters enact[ed] the referendum."); id. 68:21-23 ("we would be bringing this case if Kinston never went to the Attorney General in the first place"); id. 86:8-11 ("Again, even if there had been no request for preclearance from the Attorney General, we would be making the same facial challenge, that Congress exceeded its authority and violated the equal protection clause by enacting Section 5.").

During the motions hearing, defendant's counsel aptly described plaintiffs' attempt to re-formulate their challenges to Section 5, remarking that "the target moves."  See id. 73:16.  This Court will not endeavor to assess the merits of such a "moving target."  Plaintiffs may, of course,

abandon their previously-articulated as-applied challenge to Section 5. But plaintiffs may not base their claims on hypothetical factual scenarios, nor may they set forth novel bases for their alleged harms, absent the filing of an amended complaint. And absent amendment, the complaint filed on April 7, 2010 continues to frame plaintiffs' claims. This Court will therefore only address the re-characterizations expressed by plaintiffs' counsel at the motions hearing insofar as those arguments seek to clarify -- rather than to fundamentally alter -- the claims set forth in plaintiffs' complaint.

## STANDARD OF REVIEW

Defendant's first basis for dismissal -- that plaintiffs lack standing -- must be evaluated under Rule 12(b)(1) of the Federal Rules of Civil Procedure, whereas defendant's second basis for dismissal -- that plaintiffs lack a cause of action -- comes under Rule 12(b)(6). See Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987) (stating that "the defect of standing is a defect in subject matter jurisdiction"); Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89, 92 (1998) (explaining that the absence of a valid cause of action "does not implicate subject-matter jurisdiction" and that any analysis of a plaintiff's alleged cause of action must be conducted after "resolving a dispute concerning the existence of an Article III case or controversy"). "[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see Leatherman v. Tarrant Cnty. Narcotics and Coordination Unit, 507 U.S. 163, 164 (1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 968 (D.C. Cir. 1979). In other words, the factual allegations in the complaint must be presumed true, and the plaintiff must be given every

favorable inference that may be drawn from the allegations of fact.  Scheuer, 416 U.S. at 236;

Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).  At the same time,

however, the Court need not accept as true "a legal conclusion couched as a factual allegation,"

nor need it accept inferences unsupported by the facts set forth in the complaint.  Trudeau v. Fed.

Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265,

286 (1986)).

　　　Under Rule 12(b)(1), those seeking to invoke the jurisdiction of a federal court --

plaintiffs in this case -- bear the burden of establishing that the court has jurisdiction to hear their

claims.  See U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000); Grand

Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) (explaining

that a court has an "affirmative obligation to ensure that it is acting within the scope of its

jurisdictional authority"); Pitney Bowes, Inc. v. U.S. Postal Serv., 27 F. Supp. 2d 15, 19 (D.D.C.

1998).  Since the elements necessary to establish jurisdiction are "not mere pleading

requirements but rather an indispensable part of the plaintiff's case, each element must be

supported in the same way as any other matter on which the plaintiff bears the burden of proof;

i.e., with the manner and degree of evidence required at successive stages of the litigation."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  Although courts examining a Rule

12(b)(1) motion to dismiss -- such as for lack of standing -- will "construe the complaint in favor

of the complaining party," see Warth v. Seldin, 422 U.S. 490, 501 (1975), the "'plaintiff's factual

allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in

resolving a 12(b)(6) motion for failure to state a claim," Grand Lodge, 185 F. Supp. 2d at 13-14

(quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d

ed. 1987)).  Thus, a court may consider material other than the allegations of the complaint in

determining whether it has jurisdiction to hear the case, so long as the court accepts the factual

allegations in the complaint as true.  See Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249,

1253-54 (D.C. Cir. 2005); EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 n.3

(D.C. Cir. 1997); Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992).

   To survive a motion to dismiss under Rule 12(b)(6), a complaint need only contain "'a

short and plain statement of the claim showing that the pleader is entitled to relief,'" such that the

defendant has "'fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell

Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47

(1957)); accord Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam).  Although "detailed

factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, a plaintiff

must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a

cause of action" in order to provide the "grounds" of "entitle[ment] to relief."  Twombly, 550

U.S. at 555-56; see also Papasan, 478 U.S. at 286.  Instead, "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft

v. Iqbal, --- U.S. ----, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570);

Atherton v. Dist. of Columbia Office of the Mayor, 567 F.3d 672, 681 (D.C. Cir. 2009).  A

complaint is considered plausible on its face "when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  Iqbal, 129 S. Ct. at 1949.  This amounts to a "two-pronged approach," under which a

court first identifies the factual allegations that are entitled to an assumption of truth and then

determines "whether they plausibly give rise to an entitlement to relief."  Id. at 1950-51.

## **DISCUSSION**

Before turning to defendant's two grounds for dismissal, it is necessary to understand the relationship between them. "Both the question of standing and the question of the legal sufficiency of the action focus on the nature of the plaintiff's injury and the nature of the invasion of his alleged right." Dohaish v. Tooley, 670 F.2d 934, 936 (10th Cir. 1982). The two concepts, however, are fundamentally distinct. Whereas "*standing* is a question of whether a plaintiff is sufficiently adversary to a defendant to create an Art. III case or controversy . . . *cause of action* is a question of whether a particular plaintiff is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court." Davis v. Passman, 442 U.S. 228, 239 n.18 (1979) (emphasis in original). To have Article III standing, a plaintiff must have "'personally . . . suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant'"; on the other hand, whether a plaintiff "has asserted a cause of action . . . depends not on the quality or extent of her injury, but on whether the class of litigants of which [plaintiff] is a member may use the courts to enforce the right at issue." Id. (quoting Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 99 (1979)).

Here, plaintiffs -- five private persons and a private membership association -- maintain that they are proper members of the class of litigants that may invoke the power of the Court to challenge the constitutionality of Section 5, a statute that does not regulate the conduct of private persons, but only of covered states and their political subdivisions. See 42 U.S.C. § 1973c. Plaintiffs concede -- as they must -- that "the text of Section 5 does not create a *statutory* cause of action for private individuals to seek review of the Attorney General's statutory decisions applying the Section 5 preclearance standard." See Pls.' Opp. to Def.'s Mot. to Dismiss ("Pls.'

-13-

Opp.") [Docket Entry 12], at 37 (emphasis in original); see also 42 U.S.C. § 1973c. Nor does

Section 5 create an implied cause of action for private persons to challenge its constitutionality.

See City of Rome v. United States, 472 F. Supp. 221, 236 (D.D.C. 1979) (expressing "doubt[s]"

that a three-judge court convened under Section 5 has statutory jurisdiction to hear constitutional

challenges to Section 5 raised by private parties), *aff'd on other grounds*, 446 U.S. 156 (1980).

Rather, as this Court has already observed, there are only three causes of action that have been

held to "arise under" Section 5. See LaRoque v. Holder, 2010 WL 3719928, at *1 (D.D.C. May

12, 2010). Namely, (1) a covered jurisdiction may seek a declaratory judgment under Section 5

authorizing a proposed change to its voting practices or procedures; (2) the Attorney General

may seek an injunction under Section 5 to prohibit a covered jurisdiction from enforcing a new

voting practice or procedure if that jurisdiction has failed to obtain the required federal

preclearance for its proposed change; and (3) a private citizen may seek declaratory and

injunctive relief under Section 5 if "a state requirement is covered by § 5, but has not been

subjected to the required federal scrutiny." Id. (quoting Allen v. State Bd. of Elections, 393 U.S.

544, 561 (1969)).[4] Recognizing that their claims do not fall within any of these three categories,

plaintiffs assert that they have an implied cause of action to challenge the constitutionality of

---

[4] Section 5 also makes clear that "[n]either an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object . . . shall bar a subsequent action to enjoin enforcement of such [voting] qualification, prerequisite, practice, or procedure." 42 U.S.C. § 1973c(a). In other words, even if a voting practice or procedure passes muster under Section 5, private persons may still sue to enjoin its enforcement once the practice or procedure goes into effect. See, e.g., Charles H. Wesley Educ. Found., Inc. v. Cox, 408 F.3d 1349, 1355 n.6 (11th Cir. 2005) (explaining that "preclearance has no bearing on the legitimacy of a given rule, procedure or action with regard to other federal election laws"); Clark v. Calhoun Cnty., 21 F.3d 92, 93-94 (5th Cir. 1994) (entertaining constitutional and statutory challenges by black voters to a county redistricting plan, even though the plan had been "precleared" under Section 5).

-14-

Section 5, which derives not from the text of the statute but directly from the U.S. Constitution. See Pls.' Opp. at 36-37.

Plaintiffs are correct insofar as alleged infringements of "substantive constitutional rights generate [implied] causes of action for injunctive relief." See Richard H. Fallon, Jr., As-Applied and Facial Challenges and Third-Party Standing, 113 HARV. L. REV. 1321, 1362 n.212 (2000). But "[i]n order to raise a constitutional objection to a statute, a litigant must always assert that the statute's application to her case violates the Constitution." Id. at 1327 (emphasis added).  In other words, any judicial determinations as to whether "statutes are facially invalid properly occur only as logical outgrowths of rulings on whether statutes may be applied to particular litigants on particular facts." Id. at 1328.  It is undoubtedly for this reason that plaintiffs initially raised both a facial and an as-applied challenge to Section 5, based on the Attorney General's specific refusal to preclear Kinston's proposed change to nonpartisan elections.  See Compl. ¶¶ 35-36; id. at p. 12, Request for Relief (2).  By arguing that Section 5 "cannot be applied to [plaintiffs] because its application would violate [their] personal constitutional rights," plaintiffs were also able to challenge Section 5 on its face, as unconstitutional in all its applications. See Fallon, 113 HARV. L. REV. at 1321.

At the motions hearing, however, plaintiffs abandoned their as-applied challenge to Section 5, arguing that this Court need not engage in any review of the Attorney General's objection to Kinston's proposed electoral change because plaintiffs' injuries derive solely from the operation of the Section 5 statutory scheme as a whole.  See, e.g., Mot. Hr'g Tr. 69:10-13 ("We are challenging Section 5, and it's Section 5 that causes our injury . . . we don't think you need to review the Attorney General['s] [objection] in any way, shape, or form").  Plaintiffs, in

all likelihood, chose to forego their as-applied challenge because of its perceived futility, in light of the Supreme Court's unequivocal statement that "Congress intended to preclude all judicial review of the Attorney General's exercise of discretion" under Section 5.  Morris v. Gresette, 432 U.S. 491, 507 n.24 (1977).  After Morris, it is clear that private parties have no cause of action to challenge the Attorney General's application of Section 5 to a particular jurisdiction's proposed voting change.  See, e.g., Reaves v. Dep't of Justice, 355 F. Supp. 2d 510, 514 (D.D.C. 2005) (explaining that "the Attorney General's decision whether or not to object to a proposed voting change under Section 5 . . . [is] discretionary and unreviewable").  But plaintiffs' abandonment of their as-applied challenge also raises serious doubts as to whether their facial challenge may proceed.

This Court lacks "jurisdiction to pronounce any statute, either of a state or of the United States, void, because irreconcilable with the constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies."  United States v. Raines, 362 U.S. 17, 21 (1960) (internal quotation marks and citations omitted).  Rather than have this Court assess the merits of an "actual controversy," plaintiffs now ask the Court to (1) declare Section 5 facially invalid in all its applications but (2) refrain from any assessment of the Attorney General's particular application of Section 5 to Kinston, since such an inquiry is impermissible under Morris and its progeny.  See Mot. Hr'g Tr. 68:19-21, 69:13-14 ("What the Attorney General said, what the Attorney General did, are irrelevant to our case . . . [s]o the whole Morris line of cases is pretty much irrelevant").  In so doing, plaintiffs fail to recognize that they lack standing to challenge the constitutionality of Section 5 unless they themselves have been directly harmed by application of the statute.  See Members of City Council of City of Los Angeles v. Taxpayers for

Vincent, 466 U.S. 789, 797 (1984) (noting "the general rule that constitutional adjudication requires a review of the application of a statute to the conduct of the party before the Court"); Clements v. Fashing, 457 U.S. 957, 966 n.3 (1982) (explaining that "[a] litigant has standing to challenge the constitutionality of a statute only insofar as it adversely affects his own rights"). And the only application of Section 5 that allegedly caused direct harm to plaintiffs is the Attorney General's preclearance determination regarding Kinston's proposed system of nonpartisan elections.

Plaintiffs' standing and their purported "implied private right of action" to challenge the constitutionality of Section 5 are thus inextricably intertwined.  In order for plaintiffs' facial challenge to prevail, they must show "not only that the statute is invalid, but that [they] [have] sustained or [are] immediately in danger of sustaining some direct injury as a result of its enforcement, and not merely that [they] suffer[] in some indefinite way in common with people generally."  Massachusetts v. Mellon, 262 U.S. 447, 488 (1923); see also Allen v. Wright, 468 U.S. 737, 754 (1984) (explaining that a plaintiff's "asserted right to have the Government act in accordance with the law is not sufficient, standing alone, to confer jurisdiction on a federal court"); Whitmore v. Arkansas, 495 U.S. 149, 160 (1990) (quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 217 (1974) (noting that an "allegation [that] raises only the 'generalized interest of all citizens in constitutional governance' . . . is an inadequate basis on which to grant . . . standing to proceed")).  Again, plaintiffs' only "direct injury" here stems from the Attorney General's particular application of Section 5 to Kinston; if the Attorney General had not objected to Kinston's proposed electoral change, plaintiffs would be no different from any other members of the public asserting a "generalized interest of all citizens in constitutional

governance" -- which is clearly too "abstract" an injury to confer standing under Article III. See Schlesinger, 418 U.S. at 217. Thus, even accepting that plaintiffs now wish to bring "a facial and only a facial challenge" to Section 5, see Mot. Hr'g Tr. 97:10-11, this Court still must examine the manner in which Section 5 has been applied to Kinston in order to determine whether plaintiffs have suffered a sufficiently "concrete and particularized" injury to establish Article III standing. See Lujan, 504 U.S. at 560. Despite plaintiffs' arguments to the contrary, then, plaintiffs' claims do require examination of the Attorney General's specific refusal to preclear Kinston's proposed electoral change, as it is only this refusal by the Attorney General which (even arguably) accords plaintiffs standing to bring their facial challenge to Section 5.

Hence, "[w]hether the question is framed as one of standing or as whether [plaintiffs] ha[ve] a cause of action, the essential inquiry is whether the plaintiffs ought to be able to invoke the constitutional guarantees in question." Cardenas v. Smith, 733 F.2d 909, 916 (D.C. Cir. 1984). The "essential inquiry" here is whether five private persons and a private membership organization ought to be able to challenge the constitutionality of Section 5 -- a statute that does not apply to individual voters or candidates for local political office, but instead regulates the conduct of covered jurisdictions. See 42 U.S.C. § 1973(c). Plaintiffs' only alleged injury stems from the application of Section 5 to Kinston, and yet Kinston itself has specifically decided not to challenge the Attorney General's denial of preclearance under Section 5. See Def.'s Mem., Ex. 1, Kinston City Council Meeting Minutes, at 19. To be sure, "various circuits have recognized situations in which a private individual has standing to defend . . . a law or regulation even though the government has acquiesced in a . . . determination of [its] invalidity." Schulz v. Williams, 44 F.3d 48, 52 (2nd Cir. 1994) (citing Didrickson v. U.S. Dep't of Interior, 982 F.2d

1332 (9th Cir. 1992); Yniguez v. Arizona, 939 F.2d 727 (9th Cir. 1991)).  But all these courts have stressed that when -- as is the case here -- "a plaintiff's asserted injury arises from the . . . allegedly unlawful regulation . . . of *someone else*," standing is "'substantially more difficult to establish.'"  Lujan, 504 U.S. at 562 (quoting Allen, 468 U.S. at 758).  This Court concludes, then, as explained below, that whether for lack of standing or for lack of a cause of action, plaintiffs' facial challenge to the constitutionality of Section 5, based on Section 5's application to Kinston, must be dismissed.

## I. **Standing**

Article III of the U.S. Constitution "limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies,'" Valley Forge Christian Coll. v. Am. United for Separation of Church and State, Inc., 454 U.S. 464, 471 (1982), and the doctrine of standing serves to identify those "'Cases' and 'Controversies' that are of the justiciable sort referred to in Article III," Lujan, 504 U.S. at 560.  "As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf."  Warth, 422 U.S. at 498-99 (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)); see also Sierra Club v. Morton, 405 U.S. 727, 731-32 (1972).

Standing doctrine encompasses "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise."  Warth, 422 U.S. at 498.  To establish the "irreducible constitutional minimum of standing," a plaintiff must allege (1) an "injury in fact," defined as "an invasion of a legally protected interest which is (a) concrete and particularized," and (b) "actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between

the injury and the conduct complained of"; and (3) a likelihood "that the injury will be redressed by a favorable decision." Lujan, 504 U.S. at 560-61 (internal quotation marks and citations omitted). In order for an injury to be "concrete and particularized," it must "affect the plaintiff in a personal and individual way." Id. at 561 n.1. Consequently, a plaintiff does not state "an Article III case or controversy" if he does no more than raise a "generally available grievance about government - claiming only harm to his and every citizen's interest in proper application of the Constitution and laws." Id. at 573.

Here, plaintiffs have not established the requisite standing to challenge the constitutionality of Section 5 as proponents of the November 2008 nonpartisan election referendum. Although they claim that the doctrine of "legislative standing" supports their entitlement to a kind of quasi-legislative standing as referendum-proponents, this Circuit has never held that the doctrine of "legislative standing" can apply to non-legislators, and the Supreme Court has cast "grave doubt" on the propriety of any such extension of the doctrine. See Arizonans for Official English v. Arizona, 520 U.S. 43, 65-66 (1997). With respect to plaintiffs' claims that they have standing either as potential candidates in the 2011 Kinston elections or as voters in those elections, this Court is not convinced that any of the plaintiffs have alleged an injury that is sufficiently "concrete and particularized" and "actual or imminent" to confer standing under Article III. But even if one (or more) of the plaintiffs did allege a constitutional injury in fact, they would still lack standing, as they have failed to show how their alleged injuries are "likely to be redressed by the requested relief." See Allen, 468 U.S. at 751.

A.      Injury as Proponents of the Referendum

Plaintiffs contend that they have been injured as proponents of the November 2008

referendum because their successful efforts to sponsor, promote and pass the referendum were "completely nullified" by the Attorney General's denial of preclearance under Section 5. <u>See</u> Compl. ¶¶ 1-2, 5-6, 29. According to plaintiffs, "[t]his injury is cognizable under the doctrine of legislative standing," first recognized by the Supreme Court in <u>Coleman v. Miller</u>, 307 U.S. 433 (1939). <u>See</u> Pls.' Opp. at 16. However, plaintiffs -- who are citizen-supporters of a referendum, and not elected officials -- cannot be accorded quasi-legislative standing to bring claims asserting violations of their rights "to politically associate" and "to participate in the electoral, political and law-making process through citizen referenda." <u>See</u> Compl. ¶ 29.

In <u>Coleman</u>, the Supreme Court examined whether state senators had standing to challenge the authority of the Kansas Lieutenant Governor to break a legislative tie by casting a deciding vote in favor of a resolution ratifying the proposed Child Labor Amendment to the U.S. Constitution. <u>See</u> 307 U.S. at 436-38. After the Lieutenant Governor cast his deciding vote, which resulted in the resolution's passage, the state senators who had voted against the resolution filed suit, seeking a writ of mandamus to compel state officials "to erase an endorsement on the resolution to the effect that it had been adopted" and "to restrain . . . the Secretary of State of Kansas from authenticating it and delivering it to the Governor." <u>Id.</u> at 436. The Kansas Supreme Court found that the senators had standing to sue, and the Supreme Court affirmed, on the ground that the senators had "a plain, adequate, and direct interest in maintaining the effectiveness of their votes." <u>Id.</u> at 438. As the Court explained, the senators "have claimed a right and privilege under the Constitution to have their votes [be] given effect," and the alleged infringement of this right was found sufficient to create an Article III injury in fact. <u>Id.</u>

Relying on <u>Coleman</u> and its endorsement of a legislator's interest in maintaining the

effectiveness of his vote, the D.C. Circuit has, on several occasions, found that legislators have standing to "seek judicial relief from allegedly illegal executive actions that impair[] the exercise of their power as legislators." See Chenoweth v. Clinton, 181 F.3d 112, 114 (D.C. Cir. 1999). For example, in Moore v. U.S. House of Representatives, 733 F.2d 946 (D.C. Cir. 1984), the court held that the injury suffered by members of Congress -- who were allegedly denied "an opportunity to debate and vote on" the origination of the Tax Equity and Fiscal Responsibility Act "in a manner defined by the Constitution" -- was sufficiently "specific and concrete" to confer standing under Article III. Id. at 951-52. Similarly, in Kennedy v. Sampson, 511 F.2d 430 (D.C. Cir. 1974), the court concluded that an individual U.S. Senator had standing to challenge the President's purported use of a pocket veto to nullify legislation that both the House and Senate had approved. Id. at 434-36. Because the Senator had an "essential interest" in maintaining "the effectiveness of his vote" in favor of the legislation, the court found that the "purposes of the standing doctrine" would be served by allowing the Senator to challenge "conduct by officials of the executive branch [that allegedly] amounted to an illegal nullification . . . of [his] exercise of his power." Id. at 436; see also Goldwater v. Carter, 617 F.2d 697, 702 (D.C. Cir.) (en banc), *vacated on other grounds*, 444 U.S. 996 (1979) (finding that U.S. Senators suffered an injury in fact based on the President's unilateral termination of a mutual defense treaty with China because the action "deprived the Senate of the opportunity . . . to vote whether to prevent the termination of this treaty" -- a right to which plaintiffs claimed they were constitutionally entitled).

Since the D.C. Circuit decisions in Moore, Kennedy, and Goldwater, however, the Supreme Court has clarified and narrowed its holding in Coleman. See Raines v. Byrd, 521 U.S.

811, 821-24 (1997). In Raines, the Court denied standing to specific, individual congressmen seeking to challenge the Line Item Veto Act as an unconstitutional diminution of their legislative power. See 521 U.S. at 815. In so doing, the Court explained that Coleman stands -- "at most" -- for the proposition that "legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative act goes into effect (or does not go into effect) on the ground that their votes have been completely nullified." Id. at 823. Once thus framed, it became clear that the claims raised by the plaintiffs in Raines were fundamentally distinct from those asserted in Coleman, since the plaintiffs in Raines "ha[d] not alleged that they voted for a specific bill, that there were sufficient votes to pass the bill, and that the bill was nonetheless defeated." Id. at 824. Instead, the congressmen's votes against the Line Item Veto Act "were given full effect. They simply lost that vote." Id. Thus, in contrast to the "personal injury" in Coleman, the alleged "institutional injury" in Raines was "wholly abstract and widely dispersed" and therefore not "sufficiently concrete" to support Article III standing. Id. at 829-30.

The D.C. Circuit has expressed some uncertainty as to the precise effect of Raines on Moore and Kennedy. See Chenoweth, 181 F.3d at 116-17 (noting that "Raines notwithstanding, Moore and Kennedy may remain good law" and suggesting that Kennedy "may survive as a peculiar application of the narrow rule announced in Coleman v. Miller"). But this Court need not plumb the nuances of that issue here. Suffice it to say that if plaintiffs were, in fact, legislators -- rather than citizen-supporters of a referendum -- they would have a colorable argument that they satisfy the Coleman standard for "legislative standing" as articulated by the Supreme Court in Raines. Plaintiffs have alleged that they voted "for a specific bill" (the November 2008 referendum which sought to alter the partisan nature of Kinston's electoral

system), that there were "sufficient votes to pass the bill" (the referendum passed by almost a 2 to 1 margin), and that "the bill was nonetheless deemed defeated" through operation of the Attorney General's objection. See Raines, 521 U.S. at 824; see also Compl. ¶¶ 1-6, 14-15, 27, 29. Plaintiffs therefore have stated a plausible claim that -- if they were legislators -- their suit would fall within the ambit of Coleman, since their votes "would have been sufficient to . . . enact . . . a specific legislative Act," but were instead "completely nullified" by the Attorney General's refusal to preclear Kinston's proposed electoral change. See Raines, 521 U.S. at 823.[5]

     Nevertheless, plaintiffs cite only one case in which a court has ever found that an individual citizen -- as opposed to a state or federal legislator -- had some form of legislative standing to challenge government action that allegedly nullified a citizen-sponsored ballot initiative. See Pls.' Opp. at 18 (citing Yniguez, 939 F.2d at 731-34, rev'd sub nom. Arizonans for Official English, 520 U.S. at 48-49). In Yniguez, a provision of the Arizona Constitution

---

[5] Defendant argues that in order to establish "legislative standing," plaintiffs would need to allege not only that they voted for the referendum that was passed by a majority of Kinston voters, but also that plaintiffs' "individual votes sufficed to ensure passage of the referendum." See Def.'s Reply to Pls.' Opp. to Def.'s Mot. to Dismiss ("Def.'s Reply") [Docket Entry 14], at 9-10 (emphasis added). This same argument was made -- and rejected -- in Kennedy, see 511 F.2d at 436, and neither Raines nor any other decision cited by defendant has expressly called into question that aspect of Kennedy. There, the federal defendants alleged that the individual U.S. Senator's vote in favor of the vetoed legislation had "no legal significance independent of the other votes in favor of the bill." See 511 F.2d at 434. Thus, the defendants argued, any injury to the plaintiff "occasioned by the President's action [in exercising his pocket veto] . . . is 'derivative' in nature," and only the Senate or Congress acting as a whole "has sustained the 'direct' injury necessary to confer standing." Id. at 434. Rejecting this argument, the court held that "an individual legislator has standing to protect the effectiveness of his vote with or without the concurrence of the other members of the majority." Id. at 435. Because the individual Senator was "'among the injured,'" and because he alleged conduct by the defendants which "amounted to an illegal nullification . . . of his power" to cast an effective vote in favor of particular legislation, the court found that the Senator had stated a sufficient Article III injury in fact. Id. at 436. Just as in Kennedy, plaintiffs here are "among the injured" majority, as their votes in favor of Kinston's November 2008 referendum were allegedly rendered ineffective by the Attorney General's denial of preclearance under Section 5.

declaring English to be the state's official language ("Article XXVIII") was invalidated by a district court, and the organization that had sponsored the initiative (Arizonans for Official English, or "AOE") and its President moved to intervene to appeal the district court's decision, after the state decided not to pursue an appeal.  <u>See</u> 939 F.2d at 729-30.  The Ninth Circuit, citing <u>Coleman</u> and analogizing to the law of legislative standing, held that AOE and its president had suffered an injury in fact sufficient to confer standing under Article III.  <u>See id.</u> at 732-34.  As the court explained, "[t]he official sponsors of a ballot initiative have a strong interest in the vitality of a provision of the state constitution which they proposed and for which they vigorously campaigned," and "[t]he district court's decision striking down Article XXVIII essentially nullified the considerable efforts AOE made to have the initiative placed on the ballot and to obtain its passage."  <u>Id.</u> at 733.

There is good reason to question whether <u>Yniguez</u> supports plaintiffs' assertion of Article III standing as proponents of the Kinston nonpartisan election referendum.  The Ninth Circuit's decision in <u>Yniguez</u> was vacated and remanded by the Supreme Court, with directions that the action be dismissed by the district court.  <u>See</u> <u>Arizonans for Official English</u>, 520 U.S. at 48-49.  Although the Supreme Court's reversal was not based on standing grounds, the Court nonetheless expressed "grave doubts whether AOE and [its president] have standing under Article III to pursue appellate review" based on their "quasi-legislative interest in defending the constitutionality of the measure they successfully sponsored."  <u>See id.</u> at 65-66.  The Court pointed out that "AOE and its members . . . are not elected representatives" and that "no Arizona law appoint[s] initiative sponsors as agents of the people of Arizona to defend, in lieu of public officials, the constitutionality of initiatives made law of the State. "  <u>Id.</u> at 65.  Nor, as the Court

explained, has the Supreme Court "ever identified initiative proponents as Article-III-qualified defenders of the measures they advocated."  Id.[6]

Aside from the Ninth Circuit's decision in Yniguez -- which is of limited utility given the Supreme Court's "grave doubts" as to its validity -- there is no federal circuit decision holding that a citizen proponent of a ballot initiative or referendum suffers an Article III injury in fact when his support of that initiative is somehow "nullified."  Both the Eighth and Sixth Circuits have rejected such claims.  In Nolles v. State Comm. for the Reorg. of Sch. Dists., 524 F.3d 892, 898 (8th Cir. 2008), the court examined allegations by registered voters in Nebraska -- who had supported a referendum seeking to repeal a state law -- that the implementation of the state law prior to their vote on the referendum served to "render[] their vote in the referendum election ineffective, resulting in a fundamentally unfair election process in violation of their right to substantive due process."  Id. at 898.  The Eighth Circuit rejected this argument, on the ground that plaintiffs were "attempting to bring a generalized grievance shared in common by all the voters in Nebraska who voted to repeal [the state law]."  Id. at 900.  Because the plaintiffs had failed to assert "a personalized injury," the court found that they "lack[ed] standing to assert a violation of substantive due process."  Id.; see also Providence Baptist Church v. Hillandale Comm., Ltd., 425 F.3d 309, 318 (6th Cir. 2005) (holding that a committee that had circulated referendum petitions opposing re-zoning ordinances did not state a sufficiently "'personal stake' [so] as to permit a finding that [the] Committee has standing to challenge the [entry of a] consent

------

[6] Indeed, in Don't Bankrupt Wash. Comm. v. Continental Ill. Nat'l Bank and Trust Co. of Chi., 460 U.S. 1077 (1983), the Supreme Court summarily dismissed for lack of standing an initiative proponent's appeal from a Ninth Circuit decision striking down the initiative as unconstitutional.  In one sentence, the Court simply stated that "[t]he appeal is dismissed for want of jurisdiction it appearing appellant lacks standing to bring this appeal."  Id.

judgment" between a church and the city regarding the constitutionality of re-zoning ordinances as applied to church property).

Given the lack of case law supporting plaintiffs' claim to a citizen version of legislative standing, the Supreme Court's substantial narrowing of "legislative standing" in Raines, and the Supreme Court's expression of "grave doubts" as to the theoretical existence of "quasi-legislative" standing in Arizonans for Official English, this Court concludes that plaintiffs have not stated an Article III injury in fact as proponents of the Kinston referendum.

B.     Injury as Potential Candidates for Office in 2011

Perhaps recognizing the novel nature of their argument in support of quasi-legislative standing, plaintiffs place the most emphasis on their second basis for standing: the alleged harm suffered by the two prospective candidate-plaintiffs as a result of the continued operation of Kinston's partisan electoral system.  See Mot. Hr'g Tr. 50:22-23 ("I certainly think our candidates' argument is our easiest and best argument for standing.").  Specifically, plaintiffs John Nix and Klay Northup maintain that they intend to run for the Kinston City Council in November 2011, and that, as a registered Republican voter and a registered unaffiliated voter in a predominantly Democratic jurisdiction, they have a "direct interest" in running on a ballot where they are "unaffiliated with any party, against opponents similarly unaffiliated, and without the preliminary need to either run in a party primary or obtain sufficient signatures to obtain access to the ballot as a candidate."  See Compl. ¶¶ 3-4, 19.  Because the Attorney General refused to preclear Kinston's nonpartisan election scheme, Nix and Northup claim that they now will be "force[d] to associate with a political party or disassociate from all of them, thus burdening their freedom of political association."  Id. ¶ 28.  Nix and Northup further allege that

they will be forced to "anticipate and respond to a broader range of competitive tactics" and that their "chances for election" will thus be harmed, since party affiliation will be "a factor in voter's choices."  Id.

Plaintiffs' claim to candidate standing is flawed in several respects.  To begin with, an Article III injury in fact must be "actual or imminent, not conjectural or hypothetical."  See Lujan, 504 U.S. at 560; see also City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983) (explaining that "[t]he plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical"); Navegar, Inc. v. United States, 103 F.3d 994, 998 (D.C. Cir. 1997) (holding that a litigant only has standing based on a threatened future injury if she can demonstrate that the injury "is credible and immediate, and not merely abstract or speculative").  Here, plaintiffs' complaint states that Nix and Northup intend to run for election to the Kinston City Council in November 2011 -- slightly less than a year from now, and more than a year and a half from the filing of the complaint -- but it does not specify any preparations undertaken by Nix and Northup in anticipation of a run for local political office.  Indeed, the complaint contains no more than the bare allegation that Nix and Northup plan to seek election to the Kinston City Council in November 2011.  See Compl. ¶¶ 3-4.

It is true that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e]' that general allegations embrace those specific facts that are necessary to support the claim.'"  Lujan, 504 U.S. at 561 (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 889 (1990)).  But even "[o]n a

motion to dismiss for lack of standing . . . the court is not obliged to accept allegations of future injury which are overly generalized, conclusory, or speculative." Stevens v. Harper, 213 F.R.D. 358, 370 (E.D. Cal. 2002); see also Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 44 (1976) (explaining that "unadorned speculation will not suffice to invoke the federal judicial power").

At the motions hearing, plaintiffs' counsel, seeking to cure the "imminence" problem with respect to Nix and Northup's standing, urged this Court to examine the affidavits later submitted by Nix and Northup with plaintiffs' motion for summary judgment. See Mot. Hr'g Tr. 41:10-12. The affidavits referenced by plaintiffs' counsel do set forth more specific facts tending to show an intent to seek election to the Kinston City Council. See Pls.' Mot. for Summ. J. [Docket Entry 23], Ex. 13, Decl. of John Nix ("Nix Decl."), Ex. 14, Decl. of Klay Northup ("Northup Decl."). For example, the affidavits mention a press conference held by Nix and Northup to announce their candidacies, describe the door-to-door visits that Nix and Northup are currently conducting to garner support for their political campaigns, and provide an overview of their efforts to form campaign committees, appoint campaign treasurers, and open campaign bank accounts. See Nix Decl. ¶¶ 7-9; see also Northup Decl. ¶¶ 7-9.

Significantly, however, "'[t]he existence of federal jurisdiction . . . depends on the facts *as they exist when the complaint is filed*.'" Lujan, 504 U.S. 571 n.4 (emphasis in original) (quoting Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 830 (1989)); see also Natural Law Party of U.S. v. FEC, 111 F. Supp. 2d 33, 40 (D.D.C. 2000) (explaining that "[s]tanding is determined at the time the complaint is filed"). The post-complaint affidavits filed by Nix and Northup, then, are relevant only to the extent that they describe actions taken by the two prospective candidates prior to -- or contemporaneous with -- the filing of the April 7, 2010

complaint.  Yet all the campaign activities described in the two affidavits took place on or after April 7, 2010.  <u>See, e.g.</u>, Nix Decl. ¶¶ 7-9, 12-15; Northup Decl. ¶¶ 7-9, 12-15.  These activities thus cannot be considered under <u>Lujan</u> in assessing whether Nix and Northup have asserted injuries that are certainly impending.  Consequently, if this Court were to hold that these putative candidates' threatened injuries were sufficiently "actual or imminent" to confer standing, it would be holding that any individual can meet the imminence criterion for an Article III injury in fact simply by alleging that he intends to run for political office at some point within the next year and a half.

　　　To be sure, courts have recognized that, in certain circumstances, threatened future harms to prospective candidates can be sufficiently imminent to confer standing under Article III.  <u>See, e.g.</u>, <u>Jenness v. Fortson</u>, 403 U.S. 431, 432 n. 3 (1971) (permitting prospective candidates to challenge Georgia election law where candidates were nominees of the Georgia Socialist Workers Party, without discussing standing); <u>Becker v. FEC</u>, 230 F.3d 381, 383-84 (1st Cir. 2000) (holding that Ralph Nader, as the Green Party nominee for the 2000 presidential election, had standing to challenge FEC regulations allowing nonprofit organizations to accept corporate funds to be used in staging presidential debates); <u>Thorsted v. Gregoire</u>, 841 F. Supp. 1068, 1072-73 (W.D. Wash. 1994) (finding that prospective candidate's alleged injury was sufficiently imminent to support standing where prospective candidate was a current congressman who intended to seek re-election when his term expired in four years), *aff'd on other grounds sub nom.* <u>Thorsted v. Munro</u>, 75 F.3d 454 (9th Cir. 1996); <u>but see</u> <u>McConnell v. FEC</u>, 540 U.S. 93, 226 (2003) (noting that U.S. Senator's alleged injury was "too remote temporally to satisfy Article III standing" where Senator brought suit challenging a statute in 2003, but would not be

affected by the challenged statute until "45 days before the Republican Party primary election in 2008").  However, plaintiffs cite no case in which a court has ever found standing based on an alleged injury to a prospective candidate who avows that he intends to run for political office at some point in the future, but has never before held office, is not then a party nominee, and has not -- at least at the time of the complaint -- taken any preparations whatsoever in support of his candidacy.  Nor has the Court located such a case.

This Court thus has serious concerns regarding the speculative nature of Nix and Northup's alleged injuries, which seem to be "too remote temporally to satisfy Article III standing."  See McConnell, 540 U.S. at 226.  Moreover, even if Nix and Northup have alleged injuries that are sufficiently "actual or imminent" for purposes of Article III, the Court still has doubts as to whether they have alleged invasions of "legally protected interest[s]," as required to establish a constitutional injury in fact.  See Lujan, 504 U.S. at 561.

Plaintiffs base their candidate-standing claim on two conceptually distinct (albeit related) injuries.  First, they argue that Kinston's partisan elections system -- which, as a result of the Attorney General's denial of preclearance, remains in effect -- imposes ballot access restrictions that "directly increase[] the burdens and costs for candidates like Nix and Northup to be placed on the ballot."  Compl. ¶ 28.  As compared to Kinston's proposed nonpartisan system of elections -- under which any candidate could seek political office and no candidate would be affiliated with any political party on the ballot -- the current partisan electoral system directly injures Nix and Northup, the argument goes, because they now must either win a party primary or gather a sufficient number of signatures in order for their names to appear on the ballot.  Id. ¶¶ 1, 3-4, 28. Second, Nix and Northup contend that they are also indirectly injured by the benefit that the

partisan election system allegedly confers on their party-affiliated opponents, since Nix and Northup, as unaffiliated candidates, must "respond to a broader range of competitive tactics" now that party affiliation will be "a factor in voter's choices." Id. ¶ 28. Although the former injury (based on alleged impediments to Nix and Northup's ability to have their names appear on the ballot) may be sufficient for purposes of Article III, the latter injury (based on plaintiffs' alleged competitive political disadvantage vis-a-vis their partisan opponents) is not.

Courts have found that plaintiff-candidates for political office can establish injury in fact under a theory of "competitor standing" in circumstances "where a defendant's actions benefitted a plaintiff's competitors, and thereby caused the plaintiff's subsequent disadvantage." Fulani v. Brady, 935 F.2d 1324, 1328 (D.C. Cir. 1991), cert. denied, 502 U.S. 1048 (1992). For example, in Becker v. FEC, the First Circuit found that Ralph Nader suffered a legally cognizable competitive injury by virtue of FEC regulations that allowed corporate sponsorship of presidential debates. 230 F.3d at 386-87. As a result of Nader's "principled stand against accepting corporate contributions," he claimed that if he were invited to participate in the 2000 corporate-sponsored debates, he would be forced to decline the invitation. Id. at 385. Thus, Nader alleged, the FEC regulations permitting corporate sponsorship of the debates "create[d] the potential injury of having to cede to his opponents the advantage of free television exposure" and "forced him presently to conduct his campaign and make advertising expenditures on the assumption that no such exposure would be available to him." Id. The First Circuit -- while recognizing that the question was a "close" one -- held that Nader had suffered an Article III injury in fact, since, "at the time he brought suit, corporate sponsorship of the debates loomed as a potential stumbling block in the path of his campaign, which forced him to make significant

adjustments to his campaign strategy and use of funds." Id.

In Shays v. FEC, 414 F.3d 76 (D.C. Cir. 2005), the D.C. Circuit also recognized the validity of competitor standing in the context of political campaigns. There, two congressmen challenged FEC rules interpreting the Bipartisan Campaign Finance Reform Act ("BCRA"), arguing that the FEC rules "effectively permit[ted] conduct that BCRA bans." Id. at 82. Specifically, the plaintiffs argued that the FEC rules "illegal[ly] structur[ed] . . . [the] competitive environment" in which the plaintiffs were forced to seek reelection, because the rules permitted the plaintiffs' competitors to "exploit[] illegal FEC safe harbors" and thereby forced the plaintiffs to "anticipate and respond to a broader range of competitive tactics than federal law would otherwise allow." Id. at 85-86. The congressmen's asserted injury -- "having to defend their office in illegally constituted reelection fights" -- was sufficient to give rise to Article III standing, the court found, because the BCRA "specifically protects the interest in fair reelection contests that [the congressmen] assert." Id. at 88-89. Other courts have similarly held that allegedly unlawful campaign finance regulations may be challenged by candidates for political office where those regulations "impact . . . the strategy and conduct of an office-seeker's political campaign." Vote Choice, Inc. v. DiStefano, 4 F.3d 26, 37 (1st Cir. 1993) (holding that candidate had standing to challenge state laws regulating the financing of state and local election campaigns on the grounds that "the coerced choice between public and private financing . . . constitutes an injury of a kind sufficient to confer standing"); see also Common Cause v. Bolger, 512 F. Supp. 26, 30-31 (D.D.C. 1980) (finding that congressional candidates had standing to challenge constitutionality of a federal franking statute, which allegedly served to grant subsidies worth more than $50,000 to incumbent candidates).

Like the congressmen in Shays, Nix and Northup claim that the Attorney General's nullification of Kinston's November 2008 referendum "alters the competitive environment in which Plaintiffs Nix and Northup will run" by preserving an election system that benefits Nix and Northup's partisan opponents. See Compl. ¶ 28. But in order to establish standing based on such a competitive injury, Nix and Northup would need to show not only that they "personally compete[] in the same arena with the same party to whom the government has bestowed . . . [a] benefit," but also that this benefit is "assertedly illegal." See Gottlieb v. FEC, 143 F.3d 618, 622 (D.C. Cir. 1998). Unlike the FEC regulations permitting corporate sponsorship of presidential debates (at issue in Becker) or the FEC regulations interpreting the BCRA (at issue in Shays), there is no allegation here that Kinston's partisan election system -- which also contains a provision enabling persons to run as unaffiliated candidates -- is unlawful. In Becker, Nader was forced, according to him, to decide whether to "compromise his corporate watchdog platform or los[e] . . . an important avenue for communication" while his opponents benefitted "directly from allegedly illegal corporate sponsorship." Becker, 230 F.3d at 398 (Torruella, C.J., concurring). The congressmen in Shays were similarly forced to either accept a competitive disadvantage in the upcoming elections or "protect their interest in election to Congress . . . by violating that lawmaking body's own dictates." See Shays, 414 F.3d at 89.

In this case, however, the two candidate-plaintiffs need not make any such "Hobbesian choice," see Becker, 230 F.3d at 398 (Torruella, C.J., concurring). Rather, Nix and Northup -- like all other candidates for political office in Kinston -- remain free to run as unaffiliated candidates by gathering signatures from 4% of all registered voters, or to run as affiliated candidates by obtaining 40% of the vote in a party primary. See Compl. ¶ 28. Plaintiffs have

not alleged that being presented with such a choice is unlawful, and indeed, the Supreme Court's

decision in <u>Jenness</u> would seem to foreclose any such claim.  <u>See</u> <u>Jenness</u>, 403 U.S. at 440-41

(upholding the constitutionality of a Georgia election law that required candidates seeking to

have their names printed on the ballot to either win party primaries or gather signatures of 5% of

the total eligible electorate, on the ground that neither of these "two alternative paths . . . can be

assumed to be inherently more burdensome than the other").  Thus, while it is possible -- albeit

entirely speculative -- that Nix and Northup's chances for election will be less than those of their

partisan opponents if plaintiffs choose to run as unaffiliated candidates, this "injury" is

insufficient to establish competitor standing, absent an allegation that the government has

somehow bestowed an "assertedly illegal benefit" on plaintiffs' opponents.

Plaintiffs' claimed competitive injuries are more akin to those alleged in <u>McConnell v.</u>

<u>FEC</u> than to those at issue in either <u>Becker</u> or <u>Shays</u>.  In <u>McConnell</u>, prospective candidates

claimed that they were harmed by operation of the BCRA because they did "not wish to solicit or

accept large campaign contributions as permitted by the BCRA," since they "believe[d] such

contributions create[d] the appearance of unequal access and influence."  540 U.S. at 228

(internal quotation marks and citations omitted).  Plaintiffs argued that BCRA's increased hard-

money limits allowed "plaintiffs-candidates' opponents to raise more money" than them, and

consequently, the plaintiffs argued, their "ability to compete or participate in the electoral

process [wa]s diminished."  <u>Id.</u>  Rejecting this argument in support of competitor standing, the

Supreme Court concluded that the candidates' "alleged inability to compete stems not from the

operation of [the statute], but from their own personal 'wish' not to solicit or accept large

contributions, i.e., their personal choice."  <u>Id.</u>  Such a self-inflicted injury, the Court held, did not

constitute an injury in fact that was fairly traceable to the operation of the challenged statute. Id.

So, too, here, the candidate-plaintiffs' only competitive injury, to the extent they have one, derives solely from their own personal choice to run as unaffiliated candidates for local political office. Nix and Northup may seek placement on the ballot by running as unaffiliated candidates who have collected a sufficient number of signatures, or they may attempt to win a party primary. To the extent that they choose the former approach while their opponents choose the latter, plaintiffs' competitors have not received any kind of an unfair benefit that is fairly traceable to an allegedly unlawful system of partisan elections. Stated differently, with respect to their claim of competitive injury, Nix and Northup have failed to allege the invasion of any interest that is legally protected. While the plaintiffs in Shays had a clear statutory interest in "fair reelection contests" -- provided to them by the BCRA -- plaintiffs here have alleged no such legally protected interest in a purely nonpartisan system of local elections.[7]

Nix and Northup do, however, have a legally protected interest in being free from allegedly unlawful ballot access restrictions that deprive them of the opportunity to run for office or to appear on the ballot. The Supreme Court has often affirmed this principle, either expressly, see, e.g., Storer v. Brown, 415 U.S. 724, 738 (1974) (holding that independent candidates for President and Vice President had "ample standing" to challenge ballot access signature

---

[7] Although it is true that standing "in no way depends on the merits of the plaintiff's contention that particular conduct is illegal," Warth, 422 U.S. at 500 (internal citation omitted), it is also true that in order to establish standing, a plaintiff must allege an invasion of a "legally protected," see Lujan, 504 U.S. at 560, or "judicially cognizable," see Bennett v. Spear, 520 U.S. 154, 167 (1997), interest, defined as one "recognized at common law or specifically recognized as such by the Congress." Sargeant v. Dixon, 130 F.3d 1067, 1069 (D.C. Cir. 1997). Plaintiffs have not alleged that they have a legally protected interest in running for political office free from competition by party-affiliated candidates, and Jenness makes clear that no such interest exists.

requirements), or impliedly, by entertaining prospective candidates' challenges to ballot access restrictions without even discussing standing, see, e.g., Jenness, 403 U.S. at 432 (assessing prospective candidates' challenge to Georgia's signature requirements for nonparty candidates to have their names printed on the ballot with no mention of the plaintiffs' standing).

Following the Supreme Court's lead, lower courts have also held that prospective candidates have standing to challenge mandatory filing fees and signature requirements that allegedly impose undue burdens on their access to the ballot. See, e.g., Belitskus v. Pizzingrilli, 343 F.3d 632, 640-41 (3d Cir. 2003) (holding that "a significant impact of . . . a [mandatory filing] fee on an indigent candidate's ability to meet personal living expenses and on the candidate's campaign strategy and allocation of resources is sufficient to satisfy the requirements of Article III"); Fulani v. Krivanek, 973 F.2d 1539, 1544 (11th Cir. 1992) (permitting, without discussing standing, minority-party candidate for President to challenge ballot access statute, which allegedly caused candidate "to shoulder an undue burden on . . . finances in order to gain a place on the ballot"); Bergland v. Harris, 767 F.2d 1551, 1555-56 (11th Cir. 1985) (finding that individuals seeking access to the ballot had standing to challenge Georgia's signature requirements and filing deadlines for nominating petitions, where plaintiffs were "unable to comply with election law provisions restricting ballot access").

Courts have similarly permitted prospective candidates to challenge ballot access requirements that allegedly impair their rights to "expressively associate." See Krislov v. Rednour, 226 F.3d 851, 857-58 (7th Cir. 2000) (finding that candidates in an Illinois primary election had standing to challenge law requiring persons who circulate nominating petitions to be registered voters in the political subdivision where the candidate is seeking office, since the state

law impaired the candidates' rights to "expressively associate with non-registered or non-resident citizens who were willing to circulate petitions on their behalf"); Kansas Judicial Review v. Stout, 519 F.3d 1107, 1115 n. 7 (10th Cir. 2008) (holding that candidates for elective judgeship had standing to challenge provisions of Kansas Code of Judicial Conduct which limited their ability to engage in campaign-related activities).

But in all these cases, the prospective candidates alleged that they suffered an injury as a result of the operation of allegedly unlawful ballot access requirements, which they were either unable to satisfy, or unable to satisfy without sustaining a significant burden. By contrast, Nix and Northup do not allege that they have suffered an injury that is fairly traceable to unlawful ballot access requirements. Rather, they only challenge the legality of the procedures (namely, Section 5) which enabled lawful ballot access requirements to remain in effect. While it may take more effort for plaintiffs to run for City Council under Kinston's partisan system of elections than it would for them to run under an entirely nonpartisan system, there is no allegation that Kinston's partisan system of elections imposes requirements that are inherently unlawful, or that operate so as to unlawfully exclude Nix and Northup from the ballot. And absent such allegations, this Court has serious doubts as to whether plaintiffs have established the invasion of any interest that is "legally protected" -- a prerequisite for an Article III injury in fact.[8] Ultimately, however, the Court need not resolve this issue, in light of its conclusion that

_____

[8] As for Nix and Northup's contention that they are "injured" because the perpetuation of Kinston's partisan electoral system forces them "to associate with a political party or disassociate from all of them, thus burdening their freedom of political association," Compl. ¶ 28, there is simply no legally cognizable harm that a candidate suffers from being presented with the choice of either associating with a political party by entering a party primary or gathering a reasonable number of signatures to run for office as an unaffiliated candidate. See Jenness, 403 U.S. at 440 (holding that it is not "inherently more burdensome for a candidate to gather the signatures of

plaintiffs' alleged injuries -- whether or not they constitute Article III injuries in fact -- are not redressable by the requested relief.

      C.    <u>Injury as Voters in 2011 Local Elections</u>

Plaintiffs also allege that they have suffered injuries as voters in the upcoming 2011 Kinston City Council election because "the partisan election scheme perpetuated by Section 5 will, relative to nonpartisan elections, impose additional burdens and costs on candidates they support in running for, and being elected to, the relevant political offices." Compl. ¶ 29. Plaintiffs further claim that "[p]artisan primaries and general elections also burden their right to politically associate, or refrain from associating, with others." <u>Id.</u>

The Supreme Court has recognized that "[t]he impact of candidate eligibility requirements on voters implicates basic constitutional rights." <u>Anderson v. Celebrezze</u>, 460 U.S. 780, 786 (1983); <u>see also</u> <u>Baker</u>, 369 U.S. at 208 (noting that "[a] citizen's right to vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution"). Indeed, the "primary concern" in evaluating ballot access restrictions is "not the interest of [the] candidate . . . but rather, the interests of the voters who chose to associate together to express their support for [the candidate] and the views he espoused." <u>Anderson</u>, 460 U.S. at 806. Although "a voter does not have a fundamental right to vote for any particular candidate . . . each voter does have a right to choose among candidates placed on the ballot without unconstitutional exclusions or restrictions." <u>Thorsted v. Gregoire</u>, 841 F. Supp. at 1073 (internal quotation marks and citations omitted).

Thus, courts have found that a voter suffers an Article III injury in fact when a candidate

---

5% of the total eligible electorate than it is to win the votes of a majority in a party primary").

whom he supports "is prevented from appearing on a ballot altogether, as when the state charges a prohibitively high filing fee to run in a primary election . . . or when the filing deadline is set unrealistically early." Gottlieb v. FEC, 143 F.3d 618, 622 (D.C. Cir. 1998) (internal citations omitted); see also Miller v. Moore, 169 F.3d 1119, 1123 (8th Cir. 1999) (quoting McLain v. Meier, 851 F.2d 1045, 1045 (8th Cir. 1988) (explaining that a voter "has standing to challenge a state law regulating elections when that law 'would restrict his ability to vote for the candidate of his choice or dilute the effect of his vote if his chosen candidate were not fairly presented to the voting public'"); Burdick v. Takushi, 937 F.2d 415, 417 (9th Cir. 1991) (allowing litigant to challenge the absence of a provision for write-in voting on the ground that the litigant had demonstrated a threat to his "rights as a voter to freedom of expression and association"). Voters have also been accorded standing to challenge alleged impairments of their rights to vote, where those impairments result "from dilution by a false tally, or by a refusal to count votes from arbitrarily selected precincts, or by a stuffing of the ballot box." Baker, 369 U.S. at 208; see also Judge v. Quinn, 612 F.3d 537, 545 (7th Cir. 2010) (according voters standing to challenge Illinois Governor's failure to call a special election to fill vacant Illinois U.S. Senate seat, since alleged curtailment of the plaintiffs' voting rights was "sufficiently concrete to count as an 'injury in fact'").

By the same token, however, not all alleged impairments of citizens' rights to vote -- or alleged impairments of citizens' rights to cast effective votes for their preferred candidates -- are sufficiently concrete and particularized to confer standing under Article III. See, e.g., Crist v. Comm'n on Presidential Debates, 262 F.3d 193, 195-96 (2d Cir. 2001) (holding that voter lacked standing to challenge on First Amendment grounds a non-profit organization's policy of limiting

participation in presidential debates to candidates who had demonstrated a particular level of popularity, since the voter's asserted injury was "abstract and widely shared"); Miyazawa v. City of Cincinnati, 45 F.3d 126, 127 (6th Cir. 1995) (holding that a voter lacked standing to challenge an amendment to city council charter imposing term limits on city council members, because the voter had done no more than assert "a general complaint that an unidentified candidate that she may want to vote for may not be eligible to run for that office"); Robinson v. Bowen, 567 F. Supp. 2d 1144, 1146 (N.D. Cal. 2008) (finding that elector pledged to a third-party candidate lacked standing to challenge Senator John McCain's qualifications as a presidential candidate, since "[n]either plaintiff nor general election voters favoring the same candidate as plaintiff have in any way been prevented from supporting their preferred candidate").

Here, plaintiffs' argument in support of voter standing "sweeps too broadly." See Becker, 230 F.3d at 390. To the extent that plaintiffs allege their rights to political association are somehow burdened by Kinston's partisan electoral system, this injury "'is not only widely shared, but is also of an abstract and indefinite nature,' comparable to 'the common concern for obedience to the law,'" and is thus "not a sufficiently concrete, personalized injury to establish standing." Becker, 230 F.3d at 389-90 (quoting FEC v. Akins, 524 U.S. 11, 23 (1998)). Presumably, plaintiffs share this alleged injury in common with all voters in jurisdictions with partisan electoral systems. Such "widely shared grievances" are precisely the types of suits prohibited by Article III. See Akins, 524 U.S. at 23 (explaining that "where large numbers of Americans suffer alike, the political process, rather than the judicial process, may provide the more appropriate remedy for a widely shared grievance"). Moreover, plaintiffs simply have not suffered any impairment of their right to politically associate, since Kinston's partisan electoral

scheme in no way prevents plaintiffs from choosing not to associate with a political party. Under Kinston's current partisan electoral system, plaintiffs may vote for a candidate who has won a party primary, but they are also free to vote for an unaffiliated candidate of their choice.

Plaintiffs' second voter standing claim -- that they "suffer derivatively" from the harms inflicted on their preferred candidates -- also fails at the outset. Even if Nix and Northup have suffered a judicially cognizable injury -- which, for the reasons explained above, this Court doubts -- plaintiffs still would not have established any correlative injury from the harm inflicted upon their preferred candidates, since such a derivative injury will only be found where voters are "impede[d] . . . from supporting the candidate of their choice." Gottlieb, 143 F.3d at 622; see also Becker, 230 F.3d at 390 (explaining that regardless of any injury that the FEC regulations caused Nader, his supporters had not alleged a "derivative" injury under Article III, as they "remain[ed] fully able to advocate for his candidacy and to cast their votes in his favor"). Here, plaintiffs are unimpeded from supporting Nix, Northup, and their other preferred candidates, whether or not the candidates themselves are somehow "harmed" by being forced to win a party primary or obtain a sufficient number of signatures to run as an unaffiliated candidate. For there is no allegation that Nix and Northup are unable to have their names appear on the ballot. Finally, plaintiffs' mere allegation that their preferred candidates now have "less chance of being elected . . . is hardly a restriction on voters' rights and by itself is not a legally cognizable injury sufficient for standing." Becker, 230 F.3d at 390.

D.      Causation and Redressability

Even if plaintiffs did allege an Article III injury in fact -- whether as proponents of the nonpartisan election referendum, as candidates in the Kinston 2011 elections, or as voters in

those elections -- they still cannot be accorded standing unless they establish that their injury is "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." <u>Allen</u>, 468 U.S. at 751. Although plaintiffs can meet the first of these requirements, they cannot show that "it is likely, as opposed to merely speculative, that a favorable decision by this court will redress the injury suffered." <u>Am.'s Cmty. Bankers v. FDIC</u>, 200 F.3d 822, 827 (D.C. Cir. 2000).

Defendant's argument that plaintiffs have failed to demonstrate a "causal connection between the assertedly unlawful conduct and the alleged injury," <u>Allen</u>, 468 U.S. at 753 n. 19, is unpersuasive. All of plaintiffs' alleged injuries stem directly from the operation of Section 5, and from the Attorney General's specific refusal to grant preclearance to Kinston's proposed change to nonpartisan elections. <u>See</u> Compl. ¶¶ 1, 27-31. As plaintiffs make clear in their complaint, "[b]ut for Section 5's presumptive invalidation of the change to nonpartisan elections and the Attorney General's refusal to eliminate that barrier by preclearing the change, Kinston would now have such nonpartisan elections." <u>Id.</u> ¶ 27. Defendants are correct that Kinston could have attempted to cure plaintiffs' alleged injury -- by seeking administrative reconsideration of the Attorney General's objection or <i>de novo</i> review by this Court of Kinston's proposed change to nonpartisan elections. <u>See</u> Def.'s Mem. at 14. But the mere fact that Kinston was empowered -- and chose not -- to pursue actions that might have remedied plaintiffs' alleged injury does not mean that it is somehow Kinston alone, and not the Attorney General, who <u>caused</u> plaintiffs' injury. It cannot be disputed that the Attorney General's refusal to grant preclearance to Kinston's proposed change to nonpartisan elections was a "but for" cause of plaintiffs' alleged injury. Although Kinston may have perpetuated plaintiffs' alleged injury -- by failing to take

actions <u>after</u> the Attorney General interposed his objection -- it is sufficient for purposes of Article III that plaintiffs' injury is "fairly traceable" to defendant's conduct.  <u>See, e.g.,</u> <u>Connecticut v. Am. Elec. Power Co., Inc.</u>, 582 F.3d 309, 346 (2d Cir. 2009) (explaining that "tort-like causation is not required by Article III") (internal quotation marks and citations omitted).

On the other hand, plaintiffs have failed to meet the "redressability" requirement of Article III.  According to plaintiffs, a favorable decision from this Court will serve to redress their alleged injury, because "once Section 5 is invalidated, Kinston officials will have no choice but to implement the nonpartisan-elections referendum."  <u>See</u> Pls.' Opp. at 29.  But Kinston's nonpartisan referendum has not been held in abeyance as a result of the Attorney General's objection; it has been nullified.  And even if this Court were to grant plaintiffs' requested relief by facially invalidating Section 5 in all its applications, it is far from clear whether such relief would serve to "resurrect" Kinston's referendum and thereby redress plaintiffs' alleged injury.  Under the statutory scheme created by Section 5, voting practices or procedures subject to Section 5 preclearance are nullified once the Attorney General interposes an objection, and they remain nullified absent withdrawal of the Attorney General's objection, reconsideration by the Attorney General, or <i>de novo</i> review by this Court.  <u>See</u> C.F.R. § 51.10 (stating that "[i]t is unlawful to enforce a change affecting voting without obtaining preclearance under section 5").  It seems implausible that an order from this Court facially invalidating Section 5 would somehow automatically resurrect <u>all</u> prior referendums that have <u>ever</u> been invalidated under Section 5 since its initial enactment in 1965.  And given that plaintiffs no longer seek to have this Court invalidate Section 5 as applied to the Attorney General's specific refusal to preclear

Kinston's proposed voting change, see Mot. Hr'g Tr. id. 68:19-21 ("we are not challenging the Attorney General's objection" to Kinston's proposed electoral change), it appears as though, in the face of an order facially invalidating Section 5, Kinston's November 2008 nonpartisan election referendum would remain nullified, and would need to be re-passed by Kinston voters in order to have any legal effect.  If that is the case, this Court cannot simply infer on the basis of the referendum's prior passage in November 2008 that, if it were to be resurrected, the referendum would be re-passed by Kinston voters in 2011.  Thus, even if plaintiffs could establish that they suffered an injury in fact, they cannot establish "redressability" as required by Article III.

      E.     <u>Associational Standing</u>

The sixth and final plaintiff in this case is a private membership association, KCNV. <u>See</u> Compl. ¶ 7.  KCNV is an organization "dedicated to eliminating the use of partisan affiliation in Kinston municipal elections," and its members include "Kinston voters who supported and voted for the nonpartisan-elections referendum and prospective candidates for Kinston municipal elections."  <u>Id</u>.  Each of the five citizen-plaintiffs in this case are also members of KCNV.  <u>Id.</u>

Under the doctrine of "associational standing," an organization like KCNV will only be accorded standing if "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 181 (2000) (citing <u>Hunt v. Wash. State Apple Adver. Comm'n</u>, 432 U.S. 333, 343 (1977)); <u>see also</u> <u>Arizonans for Official</u>

English, 520 U.S. at 65-66 (explaining that "[a]n association has standing to sue . . . only if its members would have standing in their own right").  Because none of the citizen-plaintiffs (KCNV's members) have established standing to sue in their own right, KCNV also lacks standing.

## II.    Cause of Action

We return now to where the discussion started -- the relationship in this case between plaintiffs' lack of standing and their ability to state a viable cause of action.  Whether or not plaintiffs have established standing, their claims still must be dismissed because they constitute impermissible challenges to the Attorney General's unreviewable exercise of discretion under Section 5.  The Supreme Court has unequivocally stated that "Congress intended to preclude all judicial review of the Attorney General's exercise of discretion or failure to act" under Section 5. Morris v. Gresette, 432 U.S. 491, 507 n.24 (1977); see also Briscoe v. Bell, 432 U.S. 404, 412 (1977) (explaining that there is "no authority to review the Attorney General's failure to object, under s 5 of the Act, to a change in the voting laws of a covered jurisdiction").  Courts have accordingly dismissed claims by individual voters seeking to challenge (1) the Attorney General's withdrawal of a previously-lodged objection to a proposed voting change, see Harris v. Bell, 562 F.2d 772, 774 (D.C. Cir. 1977); (2) his decision to preclear a proposed voting change, see Reaves, 355 F. Supp. 2d at 514; and (most importantly) (3) his refusal to preclear a proposed voting change, see Cnty. Council of Sumter Cnty. v. United States, 555 F. Supp. 694, 706 (D.D.C. 1983); City of Rome, 450 F. Supp. at 381-82.  Hence, to the extent that any of plaintiffs' claims constitutes a challenge to the Attorney General's refusal to grant preclearance to Kinston's proposed change to nonpartisan elections, that claim is not judicially cognizable.  See Sumter

Cnty., 555 F. Supp. at 707 (holding that "[p]laintiffs are not entitled to any declaratory judgment about the effect on them of defendant['s] refusal to grant Section 5 preclearance"); City of Rome, 450 F. Supp. at 381 (dismissing challenge to the Attorney General's interposal of an objection to certain proposed electoral changes).

Recognizing this fatal deficiency in their suit, plaintiffs sought to abandon their as-applied challenge to Section 5 at the motions hearing, repeatedly emphasizing that their challenge was "a facial and only a facial challenge." Mot. Hr'g Tr. 97:10-11. They also belatedly attempted to characterize their injuries as stemming not from the Attorney General's specific objection to Kinston's proposed electoral change, but only "from the fact that Congress reauthorized Section 5" in 2006. Id. 46:4-12; see also id. 46:22-24 ("our injury does not flow from the Attorney General, it flows from Congress's decision to re-authorize the statute"); id. 68:19-21 ("What the Attorney General said, what the Attorney General did are irrelevant to our case."). Plaintiffs continually stress that they "are not asking this Court to 'review' the Attorney General's *objection*" and that this Court "need not engage in such 'review' in order to afford Plaintiffs full relief." See Pls.' Opp. to Def.-Intervenors' Mot. to Dismiss ("Pls.' Opp. to Def.-Intervenors") [Docket Entry 26], at 1 (emphasis in original); see also Mot. Hr'g Tr. 69:11-13 ("we don't think you need to review the Attorney General['s] [objection] in any way, shape, or form"); id. 46:10-12 ("We would be bringing the same exact claim if Kinston had never sought preclearance in the first place."); id. 48:4-5 ("We could have sued [the] day . . . Kinston voters enact[ed] the referendum."); id. 68:21-23 ("we would be bringing this case if Kinston never went to the Attorney General in the first place"); id. 86:8-11 ("Again, even if there had been no request for preclearance from the Attorney General, we would be making the same facial

challenge, that Congress exceeded its authority and violated the equal protection clause by enacting Section 5."). They further argue that even if "'challenging' or 'reviewing' the Attorney General's objection decision is *necessary* to redress Plaintiffs' constitutional claims . . . that can clearly be done as part of the bedrock cause of action possessed by individual citizens to seek injunctive and declaratory relief against unconstitutional enforcement of federal law by federal officials." Pls.' Opp. at 39 (emphasis in original); see also Pls.' Opp. to Def.-Intervenors at 2.

Plaintiffs are mistaken. This Court may not entertain any challenge to the Attorney General's decision to interpose an objection to a proposed voting change under Section 5 -- whatever the context in which such a challenge arises -- in light of the Supreme Court's clear instruction that "the Attorney General's decision whether or not to object to a proposed voting change under Section 5 . . . [is] discretionary and unreviewable." Reaves, 355 F. Supp. 2d at 514 (citing Morris, 432 U.S. at 504-07). In other words, it does not matter whether plaintiffs raise their challenge directly or, as they seem to concede in opposing defendant-intervenors' motion to dismiss, only as part of a cause of action seeking injunctive and declaratory relief against unconstitutional enforcement of Section 5; in either case, judicial review of the Attorney General's decision to deny preclearance is prohibited. Consequently, this Court must closely examine plaintiffs' claims to determine whether they present "unreviewable" challenges to the Attorney General's exercise of discretion under Section 5. If so, they must be dismissed.

In their complaint, plaintiffs purport to bring only two claims. See Compl. ¶¶ 32-37. First, they assert that Section 5, as amended in 2006, unconstitutionally exceeds Congress's enforcement authority under the Fourteenth and Fifteenth Amendments because it is "not a rational, congruent, or proportional means to enforce the Fourteenth and Fifteenth Amendment's

nondiscrimination requirements, and, in fact, violates those nondiscrimination guarantees." Id. ¶¶ 33-34; id. at p. 12, Request for Relief (1). Second, they contend that Section 5, as amended in 2006, violates the nondiscrimination requirements of the Fifth, Fourteenth and Fifteenth Amendments. See id. ¶¶ 35-37. However, "[f]ederal courts lack the authority to review legislative acts merely because they are allegedly unconstitutional. Rather, the courts are limited to considering the constitutionality of a legislative act only when it is said to result in . . . a direct injury to the party challenging the act." See Nolles, 524 F.3d at 898.

Plaintiffs therefore have necessarily premised their two broad constitutional challenges to Section 5 on the personal injuries that they allegedly suffered as a result of the Attorney General's refusal to preclear Kinston's proposed change to nonpartisan elections. Hence, plaintiffs assert that the Attorney General's refusal to preclear Kinston's nonpartisan elections referendum (1) burdens Nix's and Northup's "freedom of political association," Compl. ¶ 28; (2) nullifies and infringes all of the plaintiffs' rights "under North Carolina law to participate in the electoral, political, and law-making process through citizen-referenda," id. ¶ 29; and (3) "denies Plaintiffs equal, race-neutral treatment, and an equal opportunity to political and electoral participation, by subjecting them to a racial classification and by intentionally providing minority voters and their preferred candidates a preferential advantage in elections," id. ¶ 30; id. at p. 12, Request for Relief (2) (alleging that Section 5 "as applied by the Attorney General . . . in his specific refusal to permit Kinston's change to nonpartisan elections . . . violates the Fourteenth and Fifteenth Amendments") (emphasis added). Of course, it is the injuries allegedly flowing from these three claims that would permit plaintiffs to bring their facial constitutional challenge to Section 5, and therefore this Court is without jurisdiction to consider plaintiffs'

facial constitutional challenge unless at least one of these claims is cognizable. But as framed by plaintiffs, all three of these claims -- alleging violations of plaintiffs' political association rights, voting rights, and equal protection rights, respectively -- arise from the Attorney General's denial of preclearance to Kinston's proposed change to partisan elections. Those are precisely the types of claims that courts have refused to entertain under <u>Morris</u> and its progeny.

In <u>Harris v. Bell</u>, black Georgia residents and voters brought suit seeking a declaratory judgment invalidating the Attorney General's decision to withdraw an objection to a county redistricting statute. <u>See</u> 562 F.2d at 773. The plaintiffs alleged both that the Attorney General's withdrawal of his objection "violated the Attorney General's own regulation and exceeded his authority under the Act" and that it constituted "arbitrary and capricious" action within the meaning of the APA. <u>Id.</u> The D.C. Circuit, citing the Supreme Court's decisions in <u>Morris</u> and <u>Briscoe</u>, refused to hear either claim, on the ground that "there is to be no review of the Attorney General's application of the section 5 standards." <u>Id.</u> at 774.

More significantly for our purposes, a three-judge panel in <u>City of Rome</u> dismissed a claim brought by the city together with two private persons (the city manager and chairman of the city commission), that "section 5 was applied by the Attorney General . . . to the City of Rome in an unconstitutional manner." 450 F. Supp. at 380. There, as here, the plaintiffs argued that the Attorney General's decision to interpose an objection to the city's proposed electoral changes was unconstitutional. <u>Id.</u> at 381. The court recognized that the plaintiffs' claim was conceptually distinct from those dismissed in <u>Morris</u>, <u>Briscoe</u>, and <u>Harris</u>, since "Morris involved a challenge to the Attorney General's failure to interpose a timely objection to certain proposed electoral changes; Briscoe involved a state's challenge to the classification as a

jurisdiction subject to the Act's preclearance requirements; and Harris involved a challenge to the Attorney General's withdrawal of a previously interposed objection." Id. at 381. But the court nonetheless held that "[t]he legislative scheme of the Act as a whole . . . compels the conclusion that a decision by the Attorney General to interpose an objection to proposed electoral changes . . . was also not intended to be subject to judicial review." Id. at 381.

In so doing, the court expressly rejected an attempt to distinguish the case from Morris, Briscoe, and Harris on the ground that "here plaintiffs challenge the Attorney General's actions as violative of the Constitution rather than as violative of some statute." Id. at 382 n.3. Characterizing this argument as "wholly untenable," the court explained that Congress "has neither totally insulated the Attorney General's actions from judicial scrutiny nor totally deprived plaintiffs of judicial redress. Congress merely has established an exclusive means of obtaining 'review' of the Attorney General's determination a de novo proceeding in the District Court for the District of Columbia." Id. As the court wrote, "[t]here can be no doubt plaintiffs can obtain full and adequate redress by means of such a de novo proceeding and there can be no doubt that Congress has the power, 'pursuant to its constitutional power under Art. III, s 1, to ordain and establish inferior federal tribunals,' to so limit the forums in which constitutional challenges may be brought." Id.[9]

Indeed, in a subsequent declaratory judgment action under Section 5, the court

---

[9] The "de novo proceeding" referenced by the court in City of Rome was a *de novo* declaratory judgment action under Section 5. See 42 U.S.C. § 1973c(a). Such suits may only be brought by covered states and their political subdivisions, and must be heard by a three-judge panel of the U.S. District Court for the District of Columbia. See id. Here, plaintiffs have sued seeking review of the Attorney General's preclearance determination directly under the U.S. Constitution, since they are not authorized to do so under Section 5.

entertained facial challenges to Section 5 raised by both the city and the private plaintiffs.  See City of Rome, 472 F. Supp. at 235-36, *aff'd*, 446 U.S. 156 (1980).  Because the city was authorized to bring a preclearance declaratory judgment action under Section 5 (and to challenge Section 5 as facially unconstitutional in such an action), the court also entertained the private plaintiffs' constitutional challenges to Section 5, under a theory of "pendent jurisdiction."  See id. at 236 (noting that "we do not perceive in section 5 any congressional intent to preclude our taking jurisdiction . . . over . . . the claims of the private plaintiffs as to whom Congress has not extended the section 5 cause of action") (emphasis added).  Significantly, however, the court could only hear those facial constitutional challenges because the plaintiffs in City of Rome otherwise had a valid basis for invoking the jurisdiction of the federal court: namely, the city's right under Section 5 to bring a declaratory judgment action seeking *de novo* review of its proposed voting change.  By contrast, the private plaintiffs here, who are not acting in concert with the city of Kinston, have no valid basis for invoking this Court's jurisdiction, absent their as-applied challenge to Section 5, which cannot be entertained under Morris and subsequent cases.

This case is thus most similar not to City of Rome but to Cnty. Council of Sumter Cnty. There, two county officials raised a number of claims stemming from the Attorney General's refusal to preclear an at-large method of election for which the officials had voted in a 1978 referendum.  555 F. Supp. at 706.  Just as in this case, the plaintiffs in Sumter Cnty. alleged that the Attorney General's refusal to grant preclearance "effectively denied their rights to vote" in violation of their personal constitutional rights.  Id. at 706.  The court, finding that the officials' constitutional claims were, in essence, seeking to "challeng[e] the failure of the Attorney General

to preclear the at-large method of election for Sumter County," dismissed the claims on the ground that it was not authorized to "sit in judgment here upon whether the Attorney General's refusal to preclear violated rights asserted by plaintiffs." Id.

If there is to be no judgment upon whether the Attorney General's refusal to preclear violated plaintiffs' constitutional rights -- which Morris, Briscoe, Harris, City of Rome, and Sumter Cnty. make abundantly clear -- then this Court cannot hear any of plaintiffs' challenges to the Attorney General's refusal to grant preclearance to Kinston's proposed change to nonpartisan elections. This is true whether plaintiffs style their challenges as alleged violations of their political association rights, their voting rights, or their equal protection rights. Thus, even if one or more of the plaintiffs did have standing to challenge Section 5 based on the statute's application to Kinston, such an as-applied challenge would be prohibited by Morris and its progeny. And absent a cognizable challenge to Section 5 based on its specific application to Kinston, plaintiffs lack standing to raise facial challenges to the constitutionality of Section 5.

## CONCLUSION

For the foregoing reasons, the Court grants defendant's motion to dismiss. A separate Order was filed on December 16, 2010.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated: December 20, 2010