IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
No. 1:10-CV-00561-JDB

_____
                                                    )
STEPHEN LAROQUE, ANTHONY              )
CUOMO, JOHN NIX, KLAY                       )
NORTHROP, LEE RAYNOR, and                )
KINSTON CITIZENS FOR NON-               )
PARTISAN VOTING,                               )
                              *Plaintiffs*,          )          Civil Action No.:
                                                    )          1:10-CV-561-JDB
              *v.*                                   )
                                                    )
ERIC HOLDER, JR.                               )
ATTORNEY GENERAL OF THE                 )
UNITED STATES,                                 )
                                                    )
                              *Defendant*.          )
                                                    )
              *and*                                 )
                                                    )
JOSEPH M. TYSON, et al.,                     )
                                                    )
       *Defendant-Intervenors*              )
_____)

**DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS' STATEMENT OF
MATERIAL FACTS**

       Pursuant to Fed. R. Civ. P. 56 and Local Civil Rule 7.1(h), Defendant-Intervenors

Joseph M. Tyson, W.J. Best, Sr., A. Offord Carmichael, Jr., George Graham, Julian

Pridgen, William A. Cooke and the North Carolina State Conference of Branches of the

National Association for the Advancement of Colored People file the following response to

Plaintiffs' Statement of Material Facts submitted in support of their Motion for Summary

Judgment [Doc. 23].  Defendant-Intervenors do not address or concede the legal relevance

or probativeness, as to the constitutional issues presented in this case, of the assertions

contained in Plaintiffs' Statement of Material Facts.

1

¶1.  In November of 2008, voters in the City of Kinston, North Carolina, adopted a referendum that would have amended the city charter to provide for nonpartisan municipal elections.

**RESPONSE**:  Not disputed.

¶2.  Nonpartisan elections are used by 532 out of the 541 cities in North Carolina.

**RESPONSE**:  Not disputed, but Defendant-Intervenors note that two of the cities that still use partisan elections, Charlotte and Winston-Salem, are two of the largest cities in the state, together encompassing a tenth of the state's population.  Thus, the number of cities using one method or the other is not indicative of the number of citizens who still participate in partisan municipal elections.  *See* Robert P. Joyce, Elections, 2007, at 4, *in* County and Municipal Government in North Carolina (David M. Lawrence, ed., UNC-Chapel Hill Sch. of Gov., 2007), http::www.sog.unc.edu/pubs/cmg/ (Plaintiffs' Exhibit D).

¶3. The Kinston referendum received roughly 64% of the vote.

**RESPONSE**:  The referendum received 63.84%, or 4977 of the 7796 votes cast.

¶4. Kinston's electorate is "overwhelmingly Democratic."

**RESPONSE:** Not disputed.

¶5. Proponents of the referendum argued that a nonpartisan elections would open the political system to a broader range of views.

**RESPONSE**: Defendant-Intervenors do not dispute that proponents of the referendum wrote the letters to the editor submitted as Exhibits F and G in support of Plaintiffs' Motion for Summary Judgment.

¶6. Blacks constituted approximately 64.6% of Kinston's registered voters at the time of the referendum.

**RESPONSE**: Not disputed.

¶7. The referendum passed in 5 of the 7 precincts in Kinston where blacks were a majority of voters.

**RESPONSE**: Defendant-Intervenors dispute that this can in any way be used as the basis of an inference that Black voters cohesively supported the referendum.  In 2 of the 5 precincts where Black voters constituted a majority of registered voters and the referendum passed, Black voters constituted only a bare majority of registered voters (Kinston 3 precinct, where Black voters constituted 56.81% of registered voters in 2009, and Kinston 5 precinct, where Black voters constituted 51.32% of registered voters in 2009) (*see* Plaintiffs Exhibit I).  Moreover, in the 5 majority Black registration precincts where the referendum passed, turnout was extremely low.  (Kinston 1 precinct turnout rate was 30.74%, Kinston 2 precinct turnout rate was 44.22%, Kinston 3 precinct turnout rate was 50.73%, Kinston 5 precinct turnout rate was 39.78%, Kinston 6 precinct turnout rate was 36.64%) (*see* Plaintiffs Exhibit H).  Finally, in 3 out of the 5 majority Black registration precincts where the referendum passed, the number of White registered voters either exceeded the number of votes cast in favor of the referendum or was nearly that high.  (Kinston 3 precinct had 558 White registered voters and cast 444 votes in favor of the referendum; Kinston 5 precinct had 653 White registered voters and cast 489 votes in favor of the referendum; Kinston 7 precinct had 345 White registered voters and cast 403 votes in favor of the referendum.) (*see* Plaintiffs Exhibits H and I).

¶8. The Justice Department denied preclearance for Kinston's nonpartisan-electiosn referendum in a letter dated August 17, 2009.

**RESPONSE:** Not disputed.

¶9.  The Justice Department's sole basis for objecting was "that the elimination of party affiliation on the ballot will likely reduce the ability of blacks to elect candidates of choice."

**RESPONSE**:  The letter of objection dated August 17, 2009, in which the Justice Department sets forth the bases for the objection to the proposed change to nonpartisan elections, speaks for itself.

¶10.  It reasoned that, "given a change [to] non-partisan elections, black preferred candidates will receive fewer white cross-over votes," because they could no longer depend on 'either [an] appeal to [Democratic] party loyalty or the ability [of Democratic voters] to vote a straight [party-line] ticket."

**RESPONSE**:  The letter of objection dated August 17, 2009, in which the Justice Department sets forth the bases for the objection to the proposed change to nonpartisan elections, speaks for itself.

¶11.  The legislative record reveals that, when Congress originally enacted Section 5 as part of the Voting Rights Act of 1965, "unconstitutional discrimination was rampant" in covered jurisdictions.

**RESPONSE**: Not disputed.

¶12.  The legislative record reveals that, in 1965, the average registration rate for black voters was only 29.3% in the seven original covered jurisdictions.

**RESPONSE**:  Not disputed.

¶13.  The legislative record reveals that, in 1965, "registration of voting-age whites range roughly 50 percentage points or more ahead of [black registration]" in several covered States.

**RESPONSE**: Not disputed.

¶14.  The legislative record reveals that, in North Carolina in 1965, 46.8% of eligible non-whites were registered to vote, whereas 96.8% of whites were registered.

**RESPONSE**: Not disputed.

¶15. The legislative record reveals that, when Congress extended and expanded Section 5 in 2006, "[b]latantly discriminatory evasions of federal decrees [had become] rare."

RESPONSE: Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions. Moreover, in the Congressional Purposes and Findings section of the reauthorization, Congress explicitly noted that "[p]resent day discrimination experienced by racial and language minority voters is contained in evidence, including the objections interposed by the Department of Justice in covered jurisdictions, the section 2 litigation to prevent dilutive techniques from adversely affecting minority voters; the enforcement actions filed to protection language minorities; and the tens of thousands of Federal observers dispatched to monitor polls in jurisdictions covered by the Voting Rights Act of 1965. Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments of 2006, Public Law 109-246, 120 Stat. 577, Section 2(b)(5).

¶16. The legislative record reveals that, in 2004, the voter registration rate among blacks in covered jurisdictions was over 68.1% …[citation omitted] and "[v]oter turnout and registration rates [between blacks and whites in covered jurisdictions]…approach[ed] parity."

RESPONSE: Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions.

¶17.  The legislative record reveals that in five covered States, registration and turnout was higher for blacks than whites in 2004, and in Louisiana and South Carolina, the gap between black and white voters was lower than the national average.

**RESPONSE**:  Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions.

¶18.  The legislative record reveals that in North Carolina in 2004, black registration was higher than white registration (70.4% versus 69.4%), and black turnout was higher than white turnout (63.1% versus 58.1%).

**RESPONSE**:  Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions, including North Carolina.

¶19.  The legislative record reveals that "minority candidates [now] hold office at unprecedented levels."

**RESPONSE**:  Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions. The statement also ignores the fact that the vast majority of black elected officials were elected from majority black districts created as a result of enforcement of the Voting Rights Act.  The House Judiciary Committee found that generall "[t]he only chance minority candidates have to be successful are in districts in which minority voters control the

elections." H.R. Rep. No. 109-478, at 34. Moreover, the House Judiciary also made findings regarding the lack of parity between minority population and minority elected officials, noting that "[a]s in 1982, the number of African Americans elected to State legislatures failed to reflect the number of African Americans in the general population. For example, in States such as Alabama, Georgia, Louisiana, Mississippi, South Carolina and North Carolina, where African Americans make up 35 percent of the population, African Americans only made up 20.7 percent of the total number of State legislators." H.R. Rep. No. 109-478, at 33.

¶20. The legislative record reveals that, in the originally covered States, the number of minorities serving in elected office has increased over 1,000% since 1965.

**RESPONSE**: Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions. The statement also ignores the fact that the vast majority of black elected officials were elected from majority black districts created as a result of enforcement of the Voting Rights Act and minority representation was still not close to proportional to minority population.

¶21. The legislative record reveals that, while there were only 40 black elected officials in North Carolina in 1969, the State elected almost 500 black officers in 2001.

**RESPONSE**: Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions, including North Carolina. The statement also ignores the fact that the vast majority of black elected officials were elected from majority black districts created as a result of

enforcement of the Voting Rights Act.  Finally, the numbers cited do not reflect the disparity between the African American population and the number of African American elected officials.

¶22.  The legislative record reveals that only 753 objections nationwide were interposed between 1982 and 2005.

**RESPONSE**:  Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions. The statement also ignores the deterrent effect of Section 5, the fact that many of the objections were based upon a finding of purposeful discrimination, the impact of *Bossier II* on Section 5 objections, and the effect of requests for more information.

¶23.  The legislative record reveals that these 753 objections amount to only .70% of the total number of submissions filed.

**RESPONSE**:  Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions. The statement also ignores the deterrent effect of Section 5, the fact that many of the objections were based upon a finding of purposeful discrimination, the impact of *Bossier II* on Section 5 objections, and the effect of requests for more information.

¶24.  The legislative record reveals that many of these objections were based on interpretations of Section 5 that were subsequently rejected by the Supreme Court.

**RESPONSE**:  Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in

connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions. The statement also ignores the fact that Congress amended Section 5 in 2006 to restore the original and proper standards for preclearance.

¶25.  The legislative record reveals that the rate of objections has dramatically decreased.

**RESPONSE**:  Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions. The statement also ignores the deterrent effect of Section 5, the fact that many of the objections were based upon a finding of purposeful discrimination, the impact of *Bossier II* on Section 5 objections, the effect of requests for more information, and that there were more objections between August 1982 and 2004 (626) than between 1965 and the 1982 reauthorization (490), and nine of the covered states received more objections after 1982 than before.

¶26.  The legislative record reveals that the objection rate for submissions filed between 1965 and 1970 was over 25 times higher than the objection rate for submissions filed between 1996 and 2005.

**RESPONSE**:  Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions. The statement also ignores the deterrent effect of Section 5, the fact that many of the objections were based upon a finding of purposeful discrimination, the impact of *Bossier II*

on Section 5 objections, the effect of requests for more information, and that there were more objections between August 1982 and 2004 (626) than between 1965 and the 1982 reauthorization (490), and nine of the covered states received more objections after 1982 than before.

¶27.  The legislative record reveals that the absolute number of objections has diminished over the past three decades.

**RESPONSE**:  Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions. The statement also ignores the deterrent effect of Section 5, the fact that many of the objections were based upon a finding of purposeful discrimination, the impact of *Bossier II* on Section 5 objections, the effect of requests for more information, and that there were more objections between August 1982 and 2004 (626) than between 1965 and the 1982 reauthorization (490), and nine of the covered states received more objections after 1982 than before.

¶28.  The legislative record reveals that, nationwide, 399 objections were interposed during the 1980's, 366 during the 1990's, and only 44 during the 2000's.  In North Carolina, 34 objections were interposed during the 1980's, 13 during the 1990's, and only 4 during the 2000's.

**RESPONSE**:  Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions, including North Carolina.  The statement also ignores the deterrent effect of Section 5, the

fact that many of the objections were based upon a finding of purposeful discrimination, the impact of *Bossier II* on Section 5 objections, the effect of requests for more information, and that there were more objections between August 1982 and 2004 (626) than between 1965 and the 1982 reauthorization (490), and nine of the covered states received more objections after 1982 than before.  .

¶29.  The legislative record reveals only six published cases between 1982 and 2006 that ended in a court ruling or consent decree finding that a covered jurisdiction had committed unconstitutional discrimination against minority voters, and an equal number of cases involving such discrimination against white voters.

**RESPONSE**: Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions. The statement also ignores the fact that Congress found that 653 successful Section 2 cases had been filed in Section 5 covered jurisdictions since 1982.

¶30.  The legislative record reveals that, if Section 5 coverage in 2006 had been based on an application of the Section 5 coverage formula to data from the elections in 2000 and 2004, all of the States previously covered in full would no longer be covered and Hawaii would be the only state entirely covered.

**RESPONSE**:  Defendant-Intervenors dispute that this statement fully and accurately captures the reasons that jurisdictions are covered under Section 5 of the Voting Rights Act.  Defendant-Intervenors aver that the jurisdictions currently covered are covered because Congress carefully reviewed the record in 2006 and found, based on 2006 conditions, that Section 5 remained necessary to remedy and deter discrimination in those covered jurisdictions.

11

¶31.  The legislative record reveals that, if Section 5 coverage in 2006 had been based on an application of the Section 5 coverage formula to data from the elections in 2000 and 2004, a substantially different set of counties and townships would be covered (and not covered).

**RESPONSE**:  Defendant-Intervenors dispute that this statement fully and accurately captures the reasons that jurisdictions are covered under Section 5 of the Voting Rights Act.  Defendant-Intervenors aver that the jurisdictions currently covered are covered because Congress carefully reviewed the record in 2006 and found, based on 2006 conditions, that Section 5 remained necessary to remedy and deter discrimination in those covered jurisdictions.

¶32.  The legislative record "suggests that there is more similarity than difference" between covered and non-covered jurisdictions.

**RESPONSE**:  Defendant-Intervenors dispute that this statement fully and accurately captures the reasons that jurisdictions are covered under Section 5 of the Voting Rights Act.  Defendant-Intervenors aver that the jurisdictions currently covered are covered because Congress carefully reviewed the record in 2006 and found, based on 2006 conditions, that Section 5 remained necessary to remedy and deter discrimination in those covered jurisdictions.

¶33.  The legislative record reveals that, in 2004, the black registration rate was actually higher in covered jurisdictions than non-covered jurisdictions (68.1% versus 62.2%).

**RESPONSE**:  Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions.

¶34.  The legislative record reveals that, in 2004, the average black turnout rates were identical in covered and non-covered jurisdictions (60%).

**RESPONSE**:  Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions.

¶35.  The legislative record reveals that, in North Carolina in 2004, black registration was higher than the national average (70.4% versus 64.3%).

**RESPONSE**:  Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions, including North Carolina.

¶36.  The legislative record reveals that, in North Carolina in 2004, black turnout was higher than the national average (63.1% versus 56.1%).

**RESPONSE**:  Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions, including North Carolina.

¶37.  The legislative record reveals that, in 2004, "the racial gap in voter registration and turnout [was] lower in the States originally covered by § 5 than it is nationwide."

**RESPONSE**:  Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in

connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions.

¶38.  The legislative record reveals that, in North Carolina in 2004, black registration rates were 1% higher than white registration rates, whereas, nationwide, whites registered at a rate 3.6% higher than blacks.

**RESPONSE**:  Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions, including North Carolina.

¶39.  The legislative record reveals that, in North Carolina in 2004, black turnout was 5% higher than white turnout in North Carolina, whereas, nationwide, whites voted at a rate 4.2% higher than blacks.

**RESPONSE**:  Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions, including North Carolina.

¶40.  The legislative record reveals that the percentage of black elected officials was higher in covered than in non-covered States in 2000, even when the former's higher black population was taken into consideration.

**RESPONSE**:  Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions.

The statement also ignores the facts that voting remains racially polarized in the covered jurisdictions, and that the vast majority of black elected officials were elected from majority black districts created as a result of enforcement of the Voting Rights.

¶41.   The legislative record reveals that, in North Carolina, blacks were 20% of the voting population and held 8.56% of elected offices in 2000.  In contrast, blacks were 11.4% of the voting population nationwide and held only 1.76% of elected offices.

**RESPONSE**:  Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions. The statement also ignores the facts that voting remains racially polarized in the covered jurisdictions, and that the vast majority of black elected officials were elected from majority black districts created as a result of enforcement of the Voting Rights.  Finally, this statement does illustrate that in North Carolina, there is still a huge disparity between the black population and the number of black elected officials.

¶42.   The legislative record reveals that there were slightly more Section 2 cases with judicial findings of liability in non-covered jurisdictions compared to covered jurisdictions between 1982 and 2006 (40 versus 39), and an identical number of Section 2 cases finding unconstitutional discrimination against minority voters (6 versus 6).

**RESPONSE**:  Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions. The statement also ignores the fact that Congress found that 653 successful Section 2 cases had been filed in Section 5 covered jurisdictions since 1982.

¶43.  The legislative record reveals only two reported cases in North Carolina, between 1982 and 2006, finding violations of Section 2.  Both originated in non-covered counties.

**RESPONSE**:  Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions, including North Carolina.  The statement also blatantly ignores the fact that there were unreported cases finding and remedying violations of Section 2 in covered counties in North Carolina, and at these cases were all presented to Congress in the report entitled, "Voting Rights in North Carolina, 1982-2006."

¶44.  The legislative record reveals that, between 1982 and 2005, there were more Section 2 cases finding legally significant levels of racially polarized voting in non-covered jurisdictions (47) than in covered ones (44).

**RESPONSE**:  Defendant-Intervenors dispute this statement to the extent that it does not reflect Congress' findings and the totality of evidence submitted to Congress in connection with the 2006 reauthorization of Section 5 of the Voting Rights Act and the continuing need for, and appropriateness of, applying Section 5 to covered jurisdictions. The statement also ignores the facts that Congress found that 653 successful Section 2 cases had been filed in Section 5 covered jurisdictions since 1982, and that Congress found voting in the covered jurisdictions was racially polarized.


This 1st day of August, 2011.

Respectfully submitted,

    /s/ J. Gerald Hebert
J. Gerald Hebert
D.C. Bar #447676
Attorney at Law
191 Somerville Street, #405
Alexandria, VA 22304
Telephone: 703-628-4673
E-mail: hebert@voterlaw.com

Anita S. Earls
D.C. Bar #473453
N.C. Bar #15597
Allison J. Riggs
N.C. Bar #40028
Southern Coalition for Social Justice
115 Market Street, Ste. 470
Durham, North Carolina 27701
Telephone: 919-323-3380 ext. 115
Facsimile: 919-323-3942
E-mail: anita@southerncoalition.org
        allison@southerncoalition.org

Laughlin McDonald
American Civil Liberties Union
    Foundations, Inc.
230 Peachtree Street, NW
Suite 1440
Atlanta, GA 30303-1227
Telephone: 404-523-2721
Facsimile: 404-653-0331
E-mail:  lmcdonald@aclu.org

Arthur Barry Spitzer
American Civil Liberties Union
1400 20th Street, NW, Ste. 119
Washington, D.C. 20036
Telephone: 202-457-0800 x113
Email: artspitzer@aol.com

Attorneys for Defendant-Intervenors

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, August 1, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Michael A. Carvin
D.C. Bar No. 366784
Noel J. Francisco
D.C. Bar No. 464752
Hashim M. Mooppan
D.C. Bar No. 981758
David J. Strandness
D.C. Bar No. 987194
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113

Michael E. Rosman
D.C. Bar No. 454002
Michelle A. Scott
D.C. Bar No. 489097
Center for Individual Rights
1233 20th Street, N.W., Suite 300
Washington, D.C. 20036
    *Counsel for Plaintiffs*

Richard Dellheim (lead counsel)
Attorney, Voting Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
    *Counsel for Defendants*

                          /s/   J. Gerald Hebert
                          J. Gerald Hebert
                          *Counsel for Defendant-Intervenors*