IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
No. 1:10-CV-00561-JDB

_____       )
                                        )
STEPHEN LAROQUE, ANTHONY                )
CUOMO, JOHN NIX, KLAY                    )
NORTHROP, LEE RAYNOR, and               )
KINSTON CITIZENS FOR NON-               )
PARTISAN VOTING,                        )
                     *Plaintiffs*,      )       Civil Action No.:
                                        )       1:10-CV-561-JDB
            *v.*                        )
                                        )
ERIC HOLDER, JR.                        )
ATTORNEY GENERAL OF THE                 )
UNITED STATES,                          )
                                        )
                     *Defendant.*       )
                                        )
            *and*                       )
                                        )
JOSEPH M. TYSON, et al.,                )
                                        )
     *Defendant-Intervenors*            )
_____       )

## DEFENDANT-INTERVENORS' CROSS-MOTION FOR SUMMARY JUDGMENT

Defendant-Intervenors Joseph M. Tyson, W.J. Best, Sr., A. Offord Carmichael, Jr.,

George Graham, Julian Pridgen, William A. Cooke and the North Carolina State

Conference of Branches of the National Association for the Advancement of Colored People

respectfully move the Court pursuant to Rule 56 of the Federal Rules of Civil Procedure

and Local Rule 7 for an Order granting them summary judgment that Section 5 of the

Voting Rights Act, 42 U.S.C. §1973(c), as reauthorized and amended in 2006, is

constitutional.  Defendant-Intervenors contend there is no genuine disputed issue as to any

material fact and they are thus entitled to judgment as a matter of law.

In support of their Motion, Defendant-Intervenors are filing a Memorandum of

Points and Authorities in Opposition to Plaintiffs' Motion for Summary Judgment and in

Support of Defendant-Intervenors' Cross-Motion for Summary Judgment, as well as a

Statement of Material Facts as to Which There is No Genuine Issue and a Proposed Order.

Defendant-Intervenors are also attaching Exhibits A and B, and the 6 Declarations by

individual Intervenors, North Carolina NAACP members and residents of Kinston, North

Carolina.  Finally, Defendant-Intervenors are filing a Response to Plaintiffs' Statement of

Material Facts.

This 1st day of August, 2011.

Respectfully submitted,

_____

J. Gerald Hebert
D.C. Bar #447676
Attorney at Law
191 Somerville Street, #405
Alexandria, VA 22304
Telephone: 703-628-4673
E-mail: hebert@voterlaw.com

Anita S. Earls
D.C. Bar #473453
N.C. Bar #15597
Allison J. Riggs
N.C. Bar #40028
Southern Coalition for Social Justice
115 Market Street, Ste. 470
Durham, North Carolina 27701
Telephone: 919-323-3380 ext. 115
Facsimile: 919-323-3942
E-mail: anita@southerncoalition.org
        allison@southerncoalition.org

Laughlin McDonald
American Civil Liberties Union
    Foundations, Inc.
230 Peachtree Street, NW
Suite 1440

Atlanta, GA 30303-1227
Telephone: 404-523-2721
Facsimile: 404-653-0331
E-mail:  lmcdonald@aclu.org

Arthur Barry Spitzer
American Civil Liberties Union
1400 20th Street, NW, Ste. 119
Washington, D.C. 20036
Telephone: 202-457-0800 x113
Email: artspitzer@aol.com

Attorneys for Defendant-Intervenors

## CERTIFICATE OF SERVICE

I hereby certify that on this day, August 1, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Michael A. Carvin
D.C. Bar No. 366784
Noel J. Francisco
D.C. Bar No. 464752
Hashim M. Mooppan
D.C. Bar No. 981758
David J. Strandness
D.C. Bar No. 987194
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113

Michael E. Rosman
D.C. Bar No. 454002
Michelle A. Scott
D.C. Bar No. 489097
Center for Individual Rights
1233 20th Street, N.W., Suite 300
Washington, D.C. 20036
    *Counsel for Plaintiffs*

Richard Dellheim (lead counsel)
Attorney, Voting Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
    *Counsel for Defendants*

                    /s/   J. Gerald Hebert
                    J. Gerald Hebert
                    *Counsel for Defendant-Intervenors*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
No. 1:10-CV-00561-JDB

_____   )
                                          )
STEPHEN LAROQUE, ANTHONY                  )
CUOMO, JOHN NIX, KLAY                      )
NORTHROP, LEE RAYNOR, and                 )
KINSTON CITIZENS FOR NON-                 )
PARTISAN VOTING,                          )
                    *Plaintiffs*,         )      Civil Action No.:
                                          )      1:10-CV-00561-JDB
            *v.*                          )
                                          )
ERIC HOLDER, JR.                          )
ATTORNEY GENERAL OF THE                   )
UNITED STATES,                            )
                                          )
                    *Defendant.*          )
                                          )
            *and*                         )
                                          )
JOSEPH M. TYSON, et al.,                  )
                                          )
    *Defendant-Intervenors*               )
_____   )


**CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF
DEFENDANT-INTERVENORS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................ii

INTRODUCTION...................................................................................1

I.   CONGRESS' REAUTHORIZATION OF SECTION 5 OF THE VOTING RIGHTS
     ACT IS CONSTITUTIONAL...........................................................................2

     A.   The Evidence before Congress Justified Congress' Determination that Section
          5 Is Still Needed to Protect Against Voting Discrimination.........................3

          1.   Evidence of Continued Violations of Minority Voting Rights...........4

          2.   Evidence of Continued Racially Polarized Voting.........................5

          3.   Evidence of Inadequacy of Section 2 Alone..................................7

          4.   Evidence of Deterrent Effect of Section 5, Requests for More
               Information, and Enforcement Acts............................................8

          5.   Evidence on the Issuance of Objections Under Section 5.................9

          6.   Evidence from Federal Observers................................................11

          7.   Evidence Supporting Retention of Coverage Formula....................12

     B.   Supreme Court Decisions Upholding the Constitutionality of Section 5
          Restrict this Court's Review.......................................................14

II.  CONGRESS' 2006 AMENDMENTS TO THE VOTING RIGHTS ACT WERE
     CONSTITUTIONAL.....................................................................................27

III. SECTION 5 OF THE VOTING RIGHTS ACT DOES NOT CREATE AN
     UNCONSTITUTIONAL RACIAL QUOTA......................................................30

CONCLUSION......................................................................................31

# TABLE OF AUTHORITIES

<u>CASES</u>

*Alta Irrigation District (CA) v. Holder*, No. 1:11-cv-757 (D.D.C. July 15, 2011)................23

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)....................................................2

*Bedford County, VA, v. Holder*, No. 1:11-cv-0499 (D.D.C. July 27, 2011)........................23

*Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001)..............25

*Busbee v. Smith*, 549 F. Supp. 494 (D.D.C. 1982)...........................................................7

*City of Bedford, VA v. Holder*, No. 1:11-cv-0473 (D.D.C. June 8, 2011)...........................23

*City of Boerne v. Flores*, 521 U.S. 507 (1997)..........................................................23,25

*City of Kings Mountain v. Holder*, No. 1:10-cv-01153 (D.D.C. October 22, 2010)...........23

*City of Manassas Park, VA v. Holder*, No. 1:11-cv-0749 (D.D.C. June 20, 2011................23

*City of Port Arthur v. United States*, 459 U.S. 159 (1982).............................................7

*\*City of Rome v. United States*, 446 U.S. 156 (1980)...........................................*passim*

*City of Sandy Springs v. Holder*, No. 1:10-cv-01502 (D.D.C. October 26, 2010)................23

*County Council of Sumter County, S.C. v. United States*, 555 F. Supp. 694
    (D.D.C. 1983)...........................................................................................21

*Eldred v. Ashcroft*, 537 U.S. 186 (2003).....................................................................3

*Florida Prepaid Postsecondary Education Expense Board v. College Savings
    Bank*, 527 U.S. 627 (1999)........................................................................25

*Fullilove v. Klutznick*, 448 U.S. 448 (1980)................................................................17

*Georgia v. United States*, 411 U.S. 526 (1973)...........................................................17

*\*Georgia v. Ashcroft*, 539 U.S. 461 (2003).....................................................26,28-29

*Giles v. Ashcroft*, 193 F. Supp. 2d 258 (D.D.C. 2002)..................................................22

*Janis v. Nelson*, 2009 WL 5216902 *8 (D.S.D.)...........................................................24

*Jefferson County (Texas) Drainage District No. 7 v. Holder*, No. 1:11-cv-011461
    (D.D.C. June 6, 2011)...............................................................................23

*Katzenbach v. Morgan*, 383 U.S. 641 (1966)................................................................25

*Lopez v. Monterey County*, 525 U.S. 526 (1999).....................................................21-22

*LULAC v. Perry*, 548 U.S. 399 (2006).........................................................................22

*Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721 (2003)........................25

*\*Northwest Austin Municipality Utility District Number One v. Mukasey*,
    573 F. Supp. 2d 221 (D.D.C. 2008)...................................................................*passim*

*\*Northwest Austin Municipality Utility District Number One v. Holder*,
    129 S. Ct. 2504 (2009)......................................................................................*passim*

*Rappahannock County, VA v. Holder*, No. 1:11-cv-01123 (D.D.C. July 7, 2011).............23

*Reno v. Bossier Parish School Board*, 528 U.S. 320 (*Bossier II*)(2000).......................26-27

*Rogers v. Lodge*, 458 U.S. 613 (1982).........................................................................20

*Shaw v. Reno*, 509 U.S. 630 (1993).......................................................................29-30

*\*South Carolina v. Katzenbach*, 383 U.S. 301 (1966)..........................................*passim*

*The Civil Rights Cases*, 109 U.S. 3 (1883)....................................................................25

*Thornburg v. Gingles*, 478 U.S. 30 (1986)......................................................................6

*United States v. Blaine County*, 363 F.3d 897 (9th Cir. 2004)........................................19

*United States v. Morrison*, 529 U.S. 598 (2000)............................................................25

*United States Dept. of Labor v. Triplett*, 494 U.S. 715 (1990)..........................................2

*Washington State Grange v. Washington State Republican Party*,
    128 S. Ct. 1184 (2008)...................................................................................1

**STATUTES**

42 U.S.C. § 1973(a)..................................................................................................13,18

42 U.S.C. § 1973(b)..................................................................................................21,30

*42 U.S.C. § 1973(c)...................................................................................................1,26

Fannie Lou Hamer, Rosa Parks, and Coretta Scot King Voting Rights Act
    Reauthorization and Amendments of 2006, Public Law 109-246, 120
    Stat. 577...........................................................................................................3-4,28

Pub. L. No. 91-285, 84 Stat. 314 (1970)............................................................16

Pub. L. No. 94-73, 89 Stat. 400 (1975)............................................................18

Pub. L. No. 97-205, 96 Stat. 131 (1982)............................................................20

## LEGISLATIVE MATERIALS

\*H.R. Rep. No. 109-478 (2006)...............................................................*passim*

H.R. Rep. No. 397, 91st Cong., 2nd Sess. (1970).............................................16

H.R. Rep. No. 227 (1981).......................................................................19-20

H.R. Rep. No. 655, 102nd Cong., 2nd Sess. (1992)...........................................20

Joint Views of Ten Members of the Judiciary Committee, 91st Cong., 2nd Sess. at
    116 Congr. Rec. S5521 (daily ed. March 2, 1970)...................................16

Sen. Rep. No. 295 (1975)......................................................................17-18

Sen. Rep. No. 417 (1982)..................................................................6,19-21

Voting Rights Act: Section 5 – Preclearance Standards, Hearing Before the
    Subcommittee on the Constitution of the House Committee on the
    Judiciary, 109th Congress, 1st Sess. (November 1, 2005)................................9, 27-28

Voting Rights Act: Evidence of Continued Need, Hearing Before the
    Subcommittee on the Constitution of the House Committee on the
    Judiciary, 109th Congress, 2nd Sess., Vol. I (March 8, 2006)........................9,10,14

Voting Rights Act: Evidence of Continued Need, Hearing Before the
    Subcommittee on the Constitution of the House Committee on the
    Judiciary, 109th Congress, 2nd Sess., Vol. II (2006)....................................8

Voting Rights Act: Section 5 of the Act – History, Scope and Purpose,
    Hearing Before the Subcommittee on the Constitution of the House
    Committee on the Judiciary, 109th Congress, 1st Sess., Vol. I (October 25,
    2005).............................................................................................10

## OTHER AUTHORITIES

*Voting Rights Act Reauthorization of 2006: Perspectives on Democracy,*
    *Participation, and Power* (Ana Henderson ed., 2007)..........................................8

*Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act,*
    27 Fed. Reg. 76 (February 9, 2011)...............................................................31

# INTRODUCTION

In their action challenging the constitutionality of Section 5 of the Voting Rights Act, Plaintiffs make two central claims: the first is that Congress exceeded its authority under the Fourteenth and Fifteenth Amendments when it reauthorized and extended Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, in 2006, and the second is that the 2006 amendments to Section 5 violate "the nondiscrimination requirements of the Fifth, Fourteenth and Fifteenth Amendments."  Compl. ¶¶ 33, 36.  Plaintiffs claim to be advancing a solely facial challenge to the constitutionality of the Act, despite their focus on the specific impact that the objection had in Kinston.  However, plead as a facial challenge, Plaintiffs must demonstrate that Section 5 is "unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 128 S.Ct. 1184, 1190 (2008).  Plaintiffs cannot establish such a case.

In November of 2008, voters in Kinston, NC, passed a referendum to amend the city charter to change from partisan to nonpartisan the method of electing local officials. Compl. ¶¶ 1, 14-15.  Kinston is a jurisdiction covered under Section 5 of the Voting Rights Act, and, as such, the city submitted the proposed change in election method to the Attorney General for review under the law.  *Id.* at ¶¶ 11, 16.  On August 17, 2009, the United States Department of Justice interposed an objection to the submitted plan to move to non-partisan municipal elections.  The Attorney General noted that despite comprising a majority of the city's registered voters, African American voters actually comprised a minority of the electorate in three out of the four past general municipal elections.  *See* Letter from Loretta King, Acting Attorney General, Civil Rights Divisions, U.S. Dep't of Justice, to James P. Cauley III, Kinston City Attorney at 1 (Aug. 17, 2009), http://www.justice.gov/crt/voting/sec_5/pdfs/1_081709.pdf (Plaintiffs' Exhibit E).  The Attorney General referenced the confirmation of numerous elected city and county officials

1

that in Kinston, a majority of white Democrats support white Republicans over Black Democrats. *Id.* at 2. Given this existence of racially polarized voting in the jurisdiction, the Attorney General objected to the proposed change because the small number of straight-ticket or party-loyal crossover voters enabled African Americans to elect candidates of their choosing. *Id. See also*, Declarations of Joseph M. Tyson, Sr., George Graham, Julian Pridgen, Courtney M. Patterson, William A. Cooke, and Linda Joyce Lanier. The Kinston City Council voted not to pursue administrative reconsideration of the objection or a declaratory judgment from this Court allowing the proposed change. See Certified Copy of Minutes from Kinston City Council Meeting of November 16, 2009, at 19 (Doc. 11-2).

Congress' decision to reauthorize and extend Section 5 of the Voting Rights Act was a valid action under its power to enforce the Reconstruction Amendments' prohibition on racial discrimination. Plaintiffs have failed to meet their burden of establishing that the law and its amendments are unconstitutional in every application. Because there is no genuine issue as to any material fact and Defendants and Defendant-Intervenors are entitled to judgment as a matter of law, Defendant-Intervenors respectfully move this Court to grant summary judgment in their favor. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

## I.   CONGRESS' REAUTHORIZATION OF SECTION 5 OF THE VOTING RIGHTS ACT IS CONSTITUTIONAL

Congress' determination that racial and language minorities remained subject to racial discrimination in voting is amply supported by the legislative history and is entitled to deference by the courts. *United States Dept. of Labor v. Triplett*, 494 U.S. 715, 721 (1990) (noting "the heavy presumption of constitutionality to which a 'carefully considered decision of a coequal and representative branch of Government' is entitled"); *Northwest Austin Municipal Utility District Number One v. Holder*, 129 S.Ct. 2504, 2513 (2009) ("[t]he

2

Fifteenth Amendment empowers 'Congress,' not the Court, to determine in the First instance what legislation is needed to enforce it"); *Eldred v. Ashcroft*, 537 U.S. 186, 208 (2003) (courts evaluating whether a statutory time period is rational "are not at liberty to second-guess congressional determinations and policy judgments of this order").

### A.   The Evidence before Congress Justified Congress' Determination that Section 5 Is Still Needed to Protect Against Voting Discrimination

Congress' decision to reauthorize the Voting Rights Act in 2006 and extend it for an additional 25 years was supported by an extensive legislative record highlighting contemporary voting discrimination in the South and other covered jurisdictions.  In 2005 and 2006, Congress held a total of 21 hearings, accepted testimony from more than 90 witnesses, and complied a massive record totaling more than 16,000 pages of evidence.  *See* Exhibit A, Joint Statement of Material Facts, at 3.  After extensive deliberations, the United States House of Representatives voted 390-33 to reauthorize, and the United States Senate voted unanimously for the same.  Fannie Lou Hamer, Rosa Parks, and Coretta Scot King Voting Rights Act Reauthorization and Amendments of 2006, Public Law 109-246, 120 Stat. 577.

The evidence upon which Congress relied included: more than 420 Section 5 objection letters from the Attorney General blocking voting changes that appeared to be intentionally discriminatory; requests by the Department of Justice (DOJ) for more information (RMIs) in order to evaluate Section 5 submissions that resulted in the modification of more than 800 proposed voting changes or their withdrawal from consideration; Section 5 enforcement actions that blocked implementation of an extraordinary array of devices that would otherwise have diluted minority voting strength; the continued filing of cases under Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, in

covered jurisdictions, many of which resulted in findings of intentional discrimination; efforts by DOJ to implement the minority language provisions of the Act; Federal observers dispatched to observe elections in covered jurisdictions; the deterrent effect of Section 5 that prevented covered jurisdictions from adopting discriminatory voting changes; and the continued evidence of racially polarized voting in each of the jurisdictions covered by Section 5.  *See* Exhibits A and B, Joint Statement of Material Facts, at 22-129.   The legislative history plainly refutes Plaintiffs' contention that "[t]here is no support in the congressional record" to justify the extension of Section 5.  Plaintiffs' Memorandum at 18.

### 1.    Evidence of Continued Violations of Minority Voting Rights

During the process of reauthorizing the Voting Rights Act, Congress found substantial evidence of the continuing violation of minority voting rights.  In its official findings, Congress noted that submitted evidence "reveal[ed] that 40 years has not been sufficient amount of time to eliminate the vestiges of discrimination following nearly 100 years of disregard for the dictates of the 15th amendment to ensure that the right of all citizens to vote is protected as guaranteed by the Constitution....[and that] [t]he record complied by Congress demonstrates that, without the continuation of the Voting Rights Act of 1965 protections, racial and language minorities will be deprived of the opportunity to exercise their right to vote, or will have their votes diluted, undermining the significant gains made by minorities in the last 40 years."  Pub. L. No. 109-246, §2(b)(7), (9), 120 Stat. 577, 478.

The continuing violation of minority voting rights was particularly appreciable in the filing of Section 2 litigation in covered jurisdictions.  *See* Exhibit A, Joint Statement of Material Facts, at 100-107.  Congress noted that 653 successful Section 2 cases had been filed in Section 5 covered jurisdictions since 1982.  *Id.*   The types of persistent

discriminatory practices in covered jurisdictions that supported the continuing need for Section 5 included vote suppression, discriminatory redistricting, discriminatory polling place changes, discriminatory methods of election, and discriminatory annexations. *Id.* at 16.

### 2.   Evidence of Continued Racially Polarized Voting

Written and oral testimony presented to Congress indicated a strong continued presence of racially polarized voting infecting the electoral process in areas covered under Section 5 of the Voting Rights Act.  Congress received testimony on the strong presence of racially polarized voting in South Dakota, Texas, Virginia, South Carolina, Florida, Georgia, Louisiana, Mississippi, New York, North Carolina, Alabama, and California. *See* Exhibit A, Joint Statement of Material Facts, at 97-99  The House Judiciary Committee said racially polarized voting was the "clearest and strongest evidence the Committee has before it of the continued resistance within covered jurisdictions to fully accept minority citizens and their preferred candidates into the electoral process." H. R. Rep. No. 478, at 34 (2006).  And as the House Report noted, "[e]very statewide election [in North Carolina] since 1988 where voters were presented with a biracial field of candidates has been marked by racially polarized voting." *Id.* at 33.

Furthermore, the Committee noted that "[t]estimony presented indicated that 'the degree of racially polarized voting in the South is increasing, not decreasing…[and is] in certain ways re-creating the segregated system of the Old South, albeit a de facto system with minimal violence rather than the de jure system of late." *See* Exhibit A, Joint Statement of Material Facts, at 95.  A report entitled *Voting Rights in North Carolina 1982-2006* was submitted to Congress, and that report concluded: "Racial bloc voting still persists throughout the state with sufficient force normally to prevent the candidate of choice of

black voters from being elected in both local and statewide elections.  The choices of black voters and the hopes of black candidates continue to be frustrated by persistent racially polarized voting." *See* Exhibit A, Joint Statement of Material Facts, at 98.

Racially polarized voting is also one of the factors identified in the Senate Report that accompanied the 1982 amendment and extension of the Voting Rights Act as probative of vote dilution under Section 2.  *See* Sen. Rep. No. 417, at 28-9 (1982) (listing the "Senate factors").  As the Court explained in *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986), "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."  By the same token, in assessing the impact of a voting change under Section 5, it is equally appropriate, and necessary, to take into account the conditions under which the change would be implemented and how it would interact with social and historical conditions, including racially polarized voting.

Racially polarized voting is sadly still commonplace in Kinston, North Carolina.  *See* Declarations of Joseph M. Tyson, Sr., George Graham, Julian Pridgen, Courtney M. Patterson, William A. Cooke, and Linda Joyce Lanier.  Like many cities in the South, Kinston is very segregated.  Declaration of Joseph M. Tyson, Sr., at 2.  White voters vote for white candidates and are very hesitant to support African American candidates.  In fact, White Democratic candidates are chastised for association with an African American President.  Declaration of George Graham at 2.  Racial appeals in electoral campaigns are also present in Kinston.  In the November 2010 election, a White Republican running against a White Democrat for an open state senate seat representing Kinston made equating his opponent with President Obama a campaign strategy.  He produced campaign posters on which his white opponent's skin was darkened to make him look African American and more like President Obama.  This same candidate also drove around town

with mannequins dressed like candidates hanging from nooses from the back of the vehicle. Declaration of Julian Pridgen at 2.

Racially polarized voting may not be evidence of discriminatory "state action" as Plaintiffs contend, Plaintiffs' Memorandum at 21, but in determining if a proposed voting change violates Section 5 it is appropriate for the courts and the Department of Justice to take into account the effect the change would have in the context of racially polarized voting. In *City of Rome v. United States*, 446 U.S. 156, 183 (1980), for example, the Court affirmed the denial of preclearance to various voting changes after concluding the lower court correctly held "that the electoral changes . . . when combined with the presence of racial bloc voting and Rome's majority white population and at-large electoral system, would dilute Negro voting strength." Other decisions are to the same effect. *See City of Port Arthur v. United States*, 459 U.S. 159, 163 (1982) (affirming a denial of preclearance on the grounds, *inter alia*, of "severe racial bloc voting" in the jurisdiction); *Busbee v. Smith*, 549 F.Supp. 494, 499 (D. D.C. 1982) (denying preclearance to Georgia's 1980 congressional redistricting after finding, *inter alia*, "racially polarized voting"). In denying preclearance to a change under Section 5, neither the court nor the Attorney General bans racially polarized voting. They are only prohibiting the implementation of a voting change that would have the purpose or effect of abridging minority voting strength.

### 3.   Evidence of Inadequacy of Section 2 Alone

Based on evidence presented to it, the House Judiciary Committee concluded that case-by-case litigation under Section 2 of the Voting Rights Act was, by itself, inadequate to address discriminatory voting changes in jurisdictions covered under Section 5. H.R. Rep. No. 109-478, at 57. Numerous voting rights practitioners testified as to the problems with Section 2 as a sole remedy: Section 2 lawsuits put the burden on the victims, they allow the

7

discriminatory change to go into effect, and they are time-consuming and expensive to litigate.  *See* Exhibit A, Joint Statement of Material Facts, at 123-26.  Moreover, in the time it takes to mount a Section 2 lawsuit, candidates can be elected under an illegal voting scheme and hold office, gaining the advantage of incumbency.  *Id.* at 124-25.  For example, for each of the 169 objections that were issued in the past 40 years in the state of Mississippi, there clearly did not exist the legal, financial and human resources to bring a Section 2 lawsuit in lieu of those objections.  *Id.* at 125.  This same problem exists today.

4.     **Evidence of Deterrent Effect of Section 5, Requests for More Information, and Enforcement Acts**

There was extensive evidence before Congress that Section 5 has a strong deterrent effect against racially discriminatory changes to voting practices or procedures.  Congress described preclearance as a "vital prophylactic tool," and that "the existence of Section 5 deterred covered jurisdictions from even attempting to enact discriminatory voting changes."  H.R. Rep. No. 478, at 21 (2006).  Congress found that "[a]s important as the number of objections that have been interposed to protect minority voters against discriminatory changes is the number of voting changes that have never gone forward as a result of Section 5."  *Id.* at 24.

Aside from objections, the record also showed that requests by the Department of Justice for more information (RMIs) in order to evaluate Section 5 submissions resulted in the modification of more than 800 proposed voting changes or their withdrawal from consideration.  H.R. Rep. No. 478, at 40-1 & n.92 (2006).  In North Carolina alone the State withdrew more than 10 submissions as a result of the MIRs since 1982, including five since 2000.  *Id.* at 41.  A study included in the legislative history found that MIRs advanced two

significant goals.[1]   First, since RMIs "are issued at far higher rates than are letters of objection . . . they have the potential to affect a wider range and larger number of changes, relative to objections, submitted to the DOJ for review."   House Hearing, Evidence of Continued Need, Vol.  II, at 2555 (2006).  Second, "the impact of MIRs that were likely to serve as deterrents to the pursuit of procedures and practices that could have a discriminatory effect on African Americans and language minorities demonstrates that MIRs double the number of changes that did not have legal standing to be implemented under Section 5."  *Id.*

Section 5 enforcement actions also blocked implementation of an extraordinary array of devices that would otherwise have diluted minority voting strength.  From 1982 to 2004, plaintiffs succeeded in 105 Section 5 enforcement actions against jurisdictions that had failed to comply with Section 5.  Three of these successful actions were filed in North Carolina.  House Hearing, Evidence of Continued Need, Vol.  I, at 250 tbl. 4 (2006) (data compiled by the National Commission on the Voting Rights Act).  *See also Northwest Austin Municipal Utility District Number One v. Mukasey*, 573 F. Supp. 2d 221, 257 (D.D.C. 2008), *rev'd and remanded on other grounds sub nom. Northwest Austin*, 129 S. Ct. at 2516-17.

### 5.   Evidence on the Issuance of Objections under Section 5

The evidence presented to Congress on the issuance of objections under Section 5 was compelling evidence that Section 5 is still necessary to protect minority voting rights.  The evidence showed that since 1982, the Department of Justice objected to more than 700 voting changes that were determined to be discriminatory, thus preventing them from

---

[1]*See* Luis Ricardo Fraga and Maria Lizet Ocampo, "More Information Requests and the Deterrent Effect of Section 5 of the Voting Rights Act," in *Voting Rights Act Reauthorization of 2006: Perspectives on Democracy, Participation, and Power*, at 46, 61 tbl. 3.1, 64 (Ana Henderson ed., 2007), reprinted in House Hearing, Evidence of Continued Need, Vol.  II, at 2537-75 (2006).

being enforced by the covered jurisdictions.  H.R. Rep. 478, at 21  (2006).  From 1980 to 2000, the Attorney General issued objection letters blocking 421 voting changes that appeared to be intentionally discriminatory.  Voting Rights Act: Section 5 - Preclearance Standards, Hearing Before the Subcommittee on the Constitution of the House Committee on the Judiciary, 109th Cong., 1st Sess., at 180 tbl. 2 (November 1, 2005) ("House Hearing, Preclearance Standards") (Peyton McCrary, et al.).  As recently as the 1990s, 43% of all objections were based on intent alone, while another 31% were based on a combination of intent and effect.  *Id.*  *See also Northwest Austin*, 573 F.Supp.2d at 252.

There were also more objections between August 1982 and 2004 (626) than between 1965 and the 1982 reauthorization (490), and nine of the covered states received more objections after 1982 than before.  Voting Rights Act: Evidence of Continued Need: Hearing Before the Subcommittee on the Constitution of the Committee on the Judiciary, House of Representatives, 109th Cong., 2d Sess., Vol. 1, at 172, 259 (March 8, 2006) ("House Hearing, Evidence of Continued Need") (report of National Commission on the Voting Rights Act).  Congress found that "such objections did not encompass minor inadvertent changes.  The changes sought by covered jurisdictions were calculated decisions to keep minority voters from fully participating in the political process."  H.R. Rep. 478, at 21 (2006).

Recent voting changes blocked by the statute included state restrictions on registration and voting, discriminatory annexations, voter purges, adoption of at-large elections, bilingual election procedures, high school diploma requirements for holding office, consolidations, anti-single shot provisions, majority vote requirements, re-registration procedures, redistricting, numbered post requirements, abolition of elected offices, residency requirements, staggered terms, deannexations, the elimination or relocation of polling places, and dual registration requirements.  H.R. Rep. 478, at 36 (2006); Voting

Rights Act: Section 5 of the Act-History, Scope, and Purpose, Hearing before the Subcommittee on the Judiciary, House of Representatives, 109th Cong., 1st Sess., Vol. I, at 10104-224 (October 25, 2005) ("House Hearing, History, Scope, and Purpose") (complete list of Section 5 objections through October 17, 2005).

In addition to objections by DOJ, during the post-1982 period 25 requests for judicial preclearance of voting changes were either denied by the District of Columbia Court because the submitting jurisdiction failed to carry its burden of proof of no discriminatory purpose or effect, or were withdrawn.  House Hearing, Evidence of Continued Need, Vol.1, at 197, 270 (2006) (report of National Commission on the Voting Rights Act).  These judicial preclearance actions further document the need for Section 5 and the important role it continues to play.

One of Plaintiffs' repeated arguments is that Section 5 prohibits nothing but purposeful discrimination or "backsliding."  Plaintiffs' Memorandum at 14-17.  The identical argument was rejected in *City of Rome*, 446 U.S. at 177, where the Court held "the Act's ban on electoral changes that are discriminatory in effect is an appropriate method of promoting the purposes of the Fifteenth Amendment, even if it is assumed that § 1 of the Amendment prohibits only intentional discrimination in voting."  And although acts of intentional discrimination are not required, the legislative history discussed in detail above, including Section 5 objections and findings in Section 2 litigation, document the existence of continued intentional discrimination in the covered jurisdiction.

### 6.    Evidence from Federal Observers

The continuing need for Section 5 was also evident from "the tens of thousands of Federal observers that have been dispatched to observe elections in covered jurisdictions." 120 Stat. 577, sec. 2(b)(4)&(5).  Since 1982 the Attorney General has assigned between 300

and 600 observers each year.  H.R. Rep. No. 478, at 44 (2006).  Congress found that federal observers were certified by the Attorney General "only when there is a reasonable belief that minority citizens are at risk of being disenfranchised," often through "harassment and intimidation inside polling locations."  *Id.*  Five of the six states originally covered by Section 5 - Louisiana, Georgia, Alabama, South Carolina, and Mississippi - accounted for about 66% of all the observer coverages since 1982.  *Id.* at 24-5.  As Congress found, "[o]bserves have played a critical role preventing and deterring 14th and 15th amendment violations by communicating to the Department of Justice any allegedly discriminatory conduct for further investigation."  H.R. Rep. No. 478, at 25 (2006).

### 7.   Evidence Supporting Retention of Coverage Formula

When Congress reauthorized Section 5 of the Voting Rights Act, it opted to continue employing the coverage formula set forth in Section 4(b).  Congress' decision to do so was justified because the evidence before it during the legislative process indicated that the jurisdictions under the existing coverage formula were still the ones where the risk of voting discrimination was the greatest.

Congress was presented with evidence that a disproportionate number of successful Section 2 lawsuits originate in covered jurisdictions.  *See* Exhibit A, Joint Statement of Material Facts, at 100-01, 134-137.  Evidence also pointed to more prevalent polarized voting in those covered jurisdictions.  *Id.* at 94-100. On top of all that, hundreds of retrogressive voting changes in covered jurisdictions were foiled by Section 5 objections.  *See* Exhibit A, Joint Statement of Material Facts, at 33-67.  These factors all justified Congress determination that the coverage formula was still relevant and applicable.  Congress based its decision to retain the previous coverage formula on a "basis in practical

experience," which is all the Supreme Court has required for the coverage formula to withstand constitutional scrutiny. *South Carolina v. Katzenbach*, 383 U.S. 301, 331 (1966).

Plaintiffs challenge the coverage formula on the ground that covered and uncovered jurisdictions "so far as current data is concerned, are materially indistinguishable." Plaintiffs' Memorandum at 22.  As noted above, there was ample evidence found by Congress justifying the continued application of Section 5 to the covered jurisdictions.  But even assuming some uncovered jurisdictions have similar records of continuing discrimination in voting, Plaintiffs fails to note that Section 3(c) of the Voting Rights Act, 42 U.S.C. § 1973a(c), allows them to be subjected to Section 5 based upon a court finding that they have violated the Fourteenth or Fifteenth Amendment.  Courts may "retain jurisdiction for such period as [they] may deem appropriate" and order that during that time no voting changes take effect unless either approved by the court or unopposed by the Attorney General.  *Id.*  The judicial "bail-in" provision, known as the pocket trigger, addresses Section 5's potential different treatment of covered and uncovered jurisdictions.

Likewise, the bailout procedures allow for correction of any over-inclusiveness within the coverage formula.  A jurisdiction that no longer wishes to be subjected to the preclearance requirements of Section 5 is permitted to bail-out from coverage upon a showing that it has used no test or device in the last 10 years, that there have been no final judgments or settlements establishing discrimination on the basis of race, that there have been no federal observers assigned to the jurisdiction, and that the jurisdiction has timely submitted all voting changes to the Department of Justice or the D.C. Court without objection.  Section 4(a) of the Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437 (codified as amended at 42 U.S.C.. §§ 1971, 1973 through 1973bb-1).  Congress received testimony in 2006 that no jurisdiction that, since 1982, sought bailout has been denied. *See* Attachment B, Joint Statement of Material Facts, at 121.

Plaintiffs also argue that Section 5 is no longer needed because of the increase in minority elected officials.  Plaintiffs' Memorandum at 20.  But as Congress found, "gains by minority candidates remain uneven, both geographically and by level of office."  H.R. Rep. No. 478, at 33 (2006).  Plaintiffs also fail to note that the overwhelming majority of minority officials have been elected from majority black districts.  As Congress found, in 2000 only 8% of African Americans were elected from majority white districts.  *Id.* at 34.  Language minorities fared no better.  As of 2000, no Native Americans or Hispanics had been elected to office from a majority white district.  *Id.*  According to the report of the National Commission on the Voting Rights Act, which is included in the legislative history, the continuing underrepresentation of black elected officials was the result of two factors: "strong anti-black attitudes that continue to find expression in virtually every aspect of American life, and racially polarized attitudes on a host of policy questions that loom large in the American political universe."  House Hearing, Evidence of Continued Need, Vol. I, at 159 (2006).

In conclusion, many of Plaintiffs' arguments, *e.g.*, that the need for Section 5 "has vanished" and that there "is no support in the congressional record" for preclearance, Plaintiffs' Memorandum at 17-8, are rhetorical flourishes that ignore or deny the facts in the legislative history.  As the Court concluded in *Northwest Austin*, 129 S.Ct. at 2513, "Congress amassed a sizable record in support of its decision to extend the preclearance requirements."  Congress correctly concluded based on the abundant evidence before it that the continuation of Section 5 was warranted.

**B.      Supreme Court Decisions Upholding the Constitutionality of Section 5 Restrict this Court's Review**

In the decades since the Voting Rights Act was originally enacted, the Supreme Court has repeatedly and unequivocally upheld the constitutionality of Section 5 of the Act. After its original enactment, and after each reauthorization, plaintiffs challenging the Act made essentially the same arguments that Plaintiffs in the instant action now make—that is, that Section 5 had outlived its usefulness, is no longer appropriate, violates the concepts of federalism, and is burdensome and costly. *See* Plaintiffs Memorandum at 1-2. In considering each of these challenges, the Supreme Court has rejected those arguments.

Shortly after the enactment of the Voting Rights Act, South Carolina and five other states, all covered jurisdictions, challenged the constitutionality of Section 5 and other provisions of the Act. *South Carolina v. Katzenbach*, 383 U.S. at 307-08. The Supreme Court upheld Section 5, described as the "heart" of the Voting Rights Act, as a valid exercise of Congress in enforcing the Fifteenth Amendment. *Id.* at 337.

In *Katzenbach*, the Court recognized that racial discrimination in voting was a "blight" that "infected the electoral process in parts of our country for nearly a century." *Id.* at 308. The case-by-case, piecemeal approach to solving this problem embodied in the Civil Rights Acts of 1957, 1960, and 1964 had not been successful. *Id.* at 313. Congress determined that this "insidious and pervasive evil" and "unremitting and ingenious defiance of the Constitution" required a more aggressive approach, and thus adopted "sterner and more elaborate measures." *Id.* at 309.

The Court noted approvingly Congress' thorough exploration of the problem of racial discrimination, noting that Congress conducted 9 days of hearings and heard from 67 witnesses. *Id.* at 308. By comparison, Congress conducted 21 days of hearings and heard from 90 witnesses when considering reauthorization of the Act in 2006. See Exhibit A, Joint Statement of Material Facts, at 3. Reauthorization in the instant case, as in the original enactment, rested on a sound legislative record.

When considering the evidence before Congress, the Court in *Katzenbach* applied a "rational means" test and held that Section 5 was "an appropriate means for carrying out Congress' constitutional responsibilities and [is] consonant with all other provisions of the Constitution." *Katzenbach*, 383 U.S. at 308.  In discussing the *Katzenbach* challenge to the coverage formula, the Court noted that Section 4(b) of the Voting Rights Act was not a mathematical formula by was designed "to describe these areas…relevant to the problem of voting discrimination." *Id.* at 329.  Plaintiffs' objection to the coverage formula in the instant case likewise fails because of its presupposition that mathematical precision is required. *See* Plaintiffs' Memorandum at 21.

In 1969 and 1970, Congress held 14 days of hearings in the House and Senate and examined the record of progress under Section 5 and the other provisions of the Voting Rights Act.  As the Senate Judiciary Committee reported: "If it had not been for Section 5 of the present Act, there is no telling to what extent the states and communities covered might have legislated and manipulated to continue their historical practice of excluding Negroes from the Southern political process."  Joint Views of Ten Members of the Judiciary Committee, 91st Cong., 2d Sess., at 116 Cong. Rec. S5521 (daily ed. March 2, 1970).

Citing the continued depressed levels of black voter registration and the significant noncompliance with Section 5 by the covered jurisdictions, and relying upon its enforcement powers under both the Fourteenth and Fifteenth Amendments, Congress extended the special coverage provisions for another five years.  Pub. L. No. 91-285, 84 Stat. 314 (1970). In doing so it concluded that extension "is essential . . . in order to safeguard the gains in Negro voter registration thus far achieved, and to prevent future infringements of voting rights based on race or color." H.R. Rep. No. 397, 91st Cong., 2d Sess. (1970), reprinted in 1970 USCCAN 3277, 3281.  Congress also made the suspension of tests or devices for voting

effective nationwide, and revised the coverage formula to include the 1968 presidential election.

In 1972, the U.S. Attorney General sued the State of Georgia for failing to implement a new legislative reapportionment to replace a plan that had been objected to under Section 5. The state argued that Section 5 was not applicable to its plan, but if so the statute was unconstitutional. The Supreme Court disagreed, and held that "for the reasons stated at length in *South Carolina v. Katzenbach* . . . we reaffirm that the Act is a permissible exercise of congressional power under § 2 of the Fifteenth Amendment." *Georgia v. United States*, 411 U.S. 526, 535 (1973).

Against a backdrop of continuing opposition to Section 5 and the adoption of new discriminatory voting practices, Congress in 1975 again considered legislation to extend and expand the coverage of the Voting Rights Act. It conducted 20 days of hearings in the House and Senate and concluded there had been widespread discrimination in the covered jurisdictions. According to the Senate report:

> The recent objections entered by the Attorney General of the United States to Section 5 submissions clearly bespeak the continuing need for this preclearance mechanism. As registration and voting of minority citizens increases, other measures may be resorted to which would dilute increasing minority voting strength. Such other measures may include switching to at-large elections, annexations of predominantly white areas, or the adoption of discriminatory redistricting plans.

S. Rep. No. 295, at 16-17 (1975).

Congress concluded that progress under the act "has been modest and spotty in so far as the continuing and significance deficiencies yet existing in minority registration and political participation." It noted that "[t]his past experience [of evading Section 5] ought not be ignored in terms of assessing the future need for the Act." It was "imperative," it said, that Section 5 protection apply to the redistricting that would take place after the 1980 census. S. Rep. No. 295, at 15-18 (1975). *Accord Fullilove v. Klutznick,* 448 U.S. 448, 502-

17

03 (1980) (Congress may properly consider "information and expertise that Congress acquires in the consideration and enactment of earlier legislation") (Powell, J., concurring).

The record before Congress was "filled with examples of the barriers to registration and voting that language minority citizens encounter in the electoral process."  In addition to disparate treatment in voting, Congress found language minority citizens have been the targets of discrimination in education, housing, the administration of justice, and employment, all of which contributed to a depressed level of political participation.  S.Rep. No. 295, at 25, 28-30 (1975).

Accordingly, Congress passed legislation in 1975 that made the nationwide ban on tests for voting permanent, extended Section 5 for an additional seven years, and broadened the reach of the statute by including the 1972 presidential elections in the coverage formula.  Pub. L. No. 94-73, 89 Stat. 400 (1975).  It also extended coverage to language minorities, defined as American Indians, Asian Americans, Alaskan natives, and those of Spanish heritage.   42 U.S.C. § 1973aa-1a(e).  The term "test or device" was amended to include English language registration procedures or elections where a single linguistic minority comprised more than 5% of the voting age population of the jurisdiction. S. Rep. No. 295, at 47 (1975).

After the 1975 extension, the City of Rome, Georgia, filed an action to bail out from Section 5 coverage and further argued, as do the Plaintiffs in this case, Plaintiffs' Memorandum at 17-8, that the statute violated principles of federalism or states' rights, and that even if the preclearance requirements were constitutional when enacted in 1965, "they had outlived their usefulness by 1975." *City of Rome*, 446 U.S. at 180. <u>*Cf.*</u> Plaintiffs' Memorandum at 25 ("there is no 'current need[]'" for Section 5).  The Supreme Court rejected the federalism argument, noting that the Fourteenth and Fifteenth Amendments "were specifically designed as an expansion of federal power and an intrusion on state

18

sovereignty." *Id.* at 179.  As for the argument that Section 5 had outlived its usefulness, the Court noted that black voter registration "had improved dramatically since 1965," and "the number of Negro elected officials had increased since 1965." *Id.* at 180.  Nonetheless, it upheld the extension of Section 5 as "plainly a constitutional method of enforcing the Fifteenth Amendment." *Id.* at 182.  In doing so, it applied the "rational means" standard articulated in *Katzenbach*, and relied upon Congress's conclusions that Section 5 "has become widely recognized as a means of promoting and preserving minority political gains in covered jurisdictions," that "recent objections entered by the Attorney General . . . to Section 5 submissions clearly bespeak the continuing need for this preclearance mechanism," and that Section 5 "serves to insure that that progress not be destroyed through new procedures and techniques." *Id.* at 176-77, 181.  The Court concluded that "Congress' considered determination that at least another 7 years of statutory remedies were necessary to counter the perpetuation of 95 years of pervasive voting discrimination is both unsurprising and unassailable." *Id.* at 182.

In 1981-1982, Congress once again examined the record of voting rights to determine the continued need for Section 5.  The Senate report concluded: "There is virtual unanimity among those who have studied the record that Section 5 preclearance should be extended." S. Rep. No 417, 97th Cong., 2d Sess., at 9 (1982).  The testimony and evidence before the Senate was extensive and nationwide.  Congress acted based upon voluminous evidence, and listened "to over 100 witnesses and at least 27 days of testimony in the Senate alone." *United States v. Blaine County*, 363 F.3d 897, 908 (9th Cir. 2004).  The Senate report concluded that:

> The extent of objections under Section 5 has remained substantial. . . . All too
> often, the background of rejected submissions--the failure to choose
> unobjectionable alternatives, the absence of an innocent explanation for the
> proposed change, the departure from past practices as minority voting

strength reaches new levels, and in some instances, direct indications of racial considerations--serves to underline the continuing need for Section 5.

S.Rep. No. 417, at 10 (1982).

More than 500 Section 5 objections had been interposed since 1975. H.Rep. No. 227, at 11 (1981). The most frequently objected to changes from 1975-1980 were annexations, at-large elections, majority vote requirements, numbered posts, and redistricting plans, all of which have a recognized potential for diluting minority voting strength.[2] Congress also found a pattern of noncompliance with Section 5, including the failure or refusal of jurisdictions to submit voting changes for preclearance, and continuing to implement changes after they had been objected to. S.Rep. No. 417, at 13-14 (1982).

Both the House and Senate hearing records also documented examples of blatant, direct efforts to exclude minorities from political participation, including: "physical violence and intimidation of voters and candidates, discriminatory manipulation of voters, reregistration requirements and purging of voters, changing the location of polling places and insistence on retaining inconvenient voting and registration hours." S.Rep. No. 417, at 10 n.22 (1982) (citing H.R. Rep. No. 227, at 11-21 (1981)).

In 1982, Congress extended Section 5 for 25 years, the longest extension in the Act's history. Pub. L. No. 97-205, 96 Stat. 131 (1982). It acknowledged that progress had been made in minority political participation, but concluded that "racial and language minority discrimination affecting the right to vote persists throughout the jurisdictions covered by the Section 5 preclearance requirement," and that "[w]ithout the preclearance of new laws, many of the advances of the past decade could be wiped out overnight with new schemes and devices." S. Rep. No. 417, at 10 (1982). The minority language provisions were also

---

[2]*See, e.g.*, *City of Rome*, 446 U.S. at 183-84 (a majority vote requirement can "significantly" decrease the electoral opportunities of a racial group); *Rogers v. Lodge*, 458 U.S. 613, 627 (1982) (invalidating at-large elections and finding that a numbered post provision disadvantages minorities because it "prevents a cohesive political group from concentrating on a single candidate").

extended for ten years.  In 1992, Congress extended the minority language provisions for an additional 15 years.  H. Rep. No. 655, 102nd Cong., 2d Sess., at 3 (1992).

Congress also altered the bailout formula so that jurisdictions down to the county level could bail out independently.  One of the main purposes of the new bailout was to provide local jurisdictions with an incentive to change their voting practices by eliminating structural and other barriers to minority political participation.  To bail out a jurisdiction must show that it has not used a discriminatory test or device within the preceding ten years, has fully complied with the Voting Rights Act, and has engaged in constructive efforts to facilitate equal access to the electoral process.  42 U.S.C. § 1973b(a); S. Rep. No. 417, at 43-62 (1982).

All challenges to the 1982 reauthorization and extension were rejected.  After the 1982 extension of Section 5, Sumter County, South Carolina, filed another challenge to the constitutionality of the statute.  It contended, as the Plaintiffs do in this case, Plaintiffs' Memorandum at 1-2, 21-22, that the 1982 extension was unconstitutional because the coverage formula was outdated.  The county pointed out that as of May 28, 1982, more than half of the age eligible population in South Carolina and Sumter County was registered, facts which it said "distinguish the 1982 extension as applied to them from the circumstances relied upon in *South Carolina v. Katzenbach*, *supra*, to uphold the 1965 Act." *County Council of Sumter County, S.C. v. United States*, 555 F. Supp. 694, 707 (D. D.C. 1983).  The three-judge court, applying the "appropriate" means standard of *Katzenbach* and *City of Rome*, rejected the argument concluding that Section 5 "had a much larger purpose than to increase voter registration in a county like Sumter to more than 50 percent." 555 F.Supp. at 707-08.  In support of its conclusion, the court noted "Congress held hearings, produced extensive reports, and held lengthy debates before deciding to extend the Act in 1982." *Id.* at 707 n.13.

In 1999, the Supreme Court rejected yet another challenge to the constitutionality of Section 5, this time by the State of California.  The state argued "§ 5 could not withstand constitutional scrutiny if it were interpreted to apply to voting measures enacted by States that have not been designated as historical wrongdoers in the voting rights sphere." *Lopez v. Monterey County*, 525 U.S. 266, 282 (1999).  The Court disagreed:

> Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into legislative spheres of autonomy previously reserved to the States.

*Id.* at 282-83.  The Court, reaffirming its ruling in *Katzenbach*, further held "once a jurisdiction has been designated, the Act may guard against both discriminatory animus and the potentially harmful *effect* of neutral laws in that jurisdiction." *Id.* at 283.

*Giles v. Ashcroft*, 193 F.Supp.2d 258 (D. D.C. 2002), was yet another challenge to the constitutionality of Section 5.  The plaintiff, making essentially the same arguments as the Plaintiffs in this case, Plaintiffs' Memorandum at 17-8, argued that Mississippi "no longer requires coverage under Section 5 because the vestiges of racism . . . no longer exist in the modern Mississippi today," and the "[c]onditions of the 1960s not only represent a different time and a different climate of public opinion but also were the result of the attitudes and represent actions of a different generation."  193 F.Supp.2d at 261.  The court rejected the claim as "entirely baseless," and held that "[t]he Supreme Court's previous decisions upholding the Voting Rights Act in effect foreclosed such challenges to Section 5." *Id.* at 263.[3]

---

[3]A month before the extension of Section 5 the Court decided *LULAC   v. Perry*, 548 U.S. 399 (2006), which found a Texas redistricting plan diluted minority voting strength in violation of Section 2 of the Voting Rights Act.  In reaching its decision, all eight justices who addressed the issue agreed states had a "compelling state interest" in complying with the preclearance requirement. *Id.* at 475 n.12, 485 n.2, 518.

A constitutional challenge to the 2006 reauthorization was mounted before the proverbial ink had dried on the legislation.  Within days of the law's passage, the Northwest Austin Municipal Utility District located within the city of Austin, TX, filed suit in the District Court for the District of Columbia arguing that it was eligible to bail out from Section 5 coverage, or, in the alternative, that Section 5 was unconstitutional.  The three-judge court held that the district was not eligible to bail out and that the reauthorization and extension of Section 5 was constitutional under the rational basis test set forth in Katzenbach, as well as under the stricter congruence and proportionality test applied in *City of Boerne v. Flores*, 521 U.S. 506 (1997).  *Northwest Austin*, 573 F. Supp. 2d at 233-34, 245, 278-79.  On appeal, the United States Supreme Court reversed and remanded.  The Court held that the district, even though it did not register voters, was eligible to bail out and that, consequently, the Court would "avoid the unnecessary resolution of constitutional questions" relating to Section 5.  *Northwest Austin*, 129 S. Ct. at 2508.

As of November 3, 2009, 109 jurisdictions were currently bailed out from Section 5 coverage.  *See* http://www.justice.gov/crt/voting/misc/sec_4.php.  Sandy Springs, Georgia, and Kings Mountain, North Carolina, more recently joined this group and bailed out from Section 5 with DOJ consent.  *City of Kings Mountain v. Holder*, No. 1:10-cv-01153 (D.D.C. October 22, 2010) (consent decree allowing bailout); *The City of Sandy Springs v. Holder*, No. 1:10-cv-01502 (D.D.C. October 26, 2010) (consent judgment and decree granting bailout).  Most recently, several other jurisdictions have bailed out or are nearing the end of the bailout process: *Alta Irrigation District (CA) v. Holder*, No. 1:11-cv-757 (D.D.C. July 15, 2011); *Jefferson County (Texas) Drainage District No. 7 v. Holder*, No. 1:11-cv-011461 (D.D.C. June 6, 2011); *Bedford County, VA, v. Holder*, No. 1:11-cv-0499 (D.D.C. July 27, 2011) (joint motion to approve bailout); *City of Bedford, VA v. Holder*, No. 1:11-cv-0473

(D.D.C. June 8, 2011)(joint motion to approve bailout); *Rappahannock County, VA v. Holder*, No. 1:11-cv-01123 (D.D.C. July 7, 2011)(joint motion to approve bailout); and *City of Manassas Park, VA v. Holder*, No. 1:11-cv-0749 (D.D.C. June 20, 2011)(joint motion to approve bailout).  The decision in *Northwest Austin* expanding eligibility for bailout, as well as the increased number of bailouts, further undercuts the argument that Section 5 is unduly burdensome or that the coverage formula is unfair.

While the Supreme Court commented that "the Act's preclearance requirements and its coverage formula raise serious constitutional questions, 129 S. Ct. at 2513, the Court also said that "[i]t may be that…conditions continue to warrant preclearance under the Act." *Id.* at 2511-12.  Moreover, the Court noted that, "[t]he Fifteenth Amendment empowers 'Congress,' not the Court, to determine in the first instance what legislation is needed to enforce it.  Congress amassed a sizable record in support of its decision to extend the preclearance requirements, a record the District Court determined 'document[ed] contemporary racial discrimination in covered states." *Id.* at 2513 (internal citations omitted).

The State of South Dakota also challenged the constitutionality of the 2006 extension of Section 5 after it was sued for failure to preclear a statewide redistricting plan. Repeating the arguments made in prior cases, the state claimed Section 5 as applied to Shannon County was now outdated and that the county was experiencing high voter registration rates and above national average voter turnout rates.  In rejecting these arguments, the court relied upon prior Supreme Court decisions upholding the constitutionality of Section 5 and concluded that: "South Dakota's history of discriminating against Native Americans and the risk that such discrimination will increase in the absence of the preclearance requirement set forth in Section 5 of the Voting Rights Act compels the court to reject state defendants' argument that Section 5 of the Voting Rights

24

Act is unconstitutional as applied to Shannon County." *Janis v. Nelson*, 2009 WL 5216902 *8 (D.S.D.).

Plaintiffs claim that in determining the constitutionality of Section 5 "this Court must apply the *Boerne* test." Plaintiffs' Memorandum at 11. But Plaintiffs do not cite a single case in which the Supreme Court has applied the congruence and proportionality test of *Boerne*, as opposed to the rational basis standard of *Katzenbach*, to Section 5 or any other provision of the Voting Rights Act. In any event, the *Boerne* line of cases all strongly support the constitutionality of Section 5.

In *City of Boerne* the Court held Section 5 was an "appropriate" measure "adapted to the mischief and wrong that the [Fourteenth] [A]mendment was intended to provide against'." 521 U.S. at 532 (quoting *The Civil Rights Cases*, 109 U.S. 3, 13 (1883)). In *Florida Prepaid Postsecondary Education Board v. College Savings Bank*, 527 U.S. 627, 639 (1999), the Court noted the constitutionality "of Congress' various voting rights measures" passed pursuant to the Fourteenth and Fifteenth Amendments, which it described as tailored to "remedying or preventing" discrimination based upon race. In *United States v. Morrison*, 529 U.S. 598 (2000), the Court cited as examples of the proper exercise of congressional power under the Fourteenth and Fifteenth Amendments the various voting rights laws found to be constitutional in *Katzenbach v. Morgan*, 383 U.S. 641, 658 (1966), and *South Carolina v. Katzenbach*. In *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 373 (2001), the Court underscored the constitutionality of the Voting Rights Act and singled it out as a preeminent example of appropriate legislation enacted to enforce the race discrimination provisions of the Civil War Amendments in the area of voting. In *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721, 738 (2003), the Court cited with approval various decisions which rejected challenges to provisions of the Voting Rights Act "as valid exercises of Congress' § 5 power [under the Fourteenth

Amendment].”  In sum, none of the recent federalism decisions of the Court cast doubt on the constitutionality of Section 5 of the Voting Rights Act.  To the extent they discuss legislation enacted by Congress pursuant to the enforcement provisions of the Fourteenth and Fifteenth Amendments to redress the problem of racial discrimination in voting, they do so to affirm its constitutionality.

Plaintiffs further argue that the rational basis standard of *Katzenbach* is not applicable to the 2006 amendments to Section 5 because they “injure[] *non-minorities*,” are “a mandate for race-based preferences” and “*coerce increases* in minority electoral success.” Plaintiffs’ Memorandum at 12 (emphasis in original).   These claims are more fully responded to in Section III , infra p 29, but far from injuring non-minorities or mandating racial preferences or coercing increases in minority electoral   success, Section 5 merely prohibits the implementation of new election practices or procedures that have “the purpose or will have the effect of diminishing the ability” of minorities to elect candidates of their choice.  42 U.S.C. § 1973c(b).

Through the life of the Voting Rights Act, federal courts, including the highest Court of the land, have repeatedly and consistently upheld Section 5 as an authorized method for Congress to enforce the Fifteenth Amendment, and have respected the legislative prerogative of Congress in developing and assessing whether the record of voting rights problems in covered jurisdictions continue to warrant the Acts protections.  Moreover, this District Court has already considered a facial challenge to the constitutionality of Section 5, as reauthorized and amended in 2006, and ruled that the law was constitutional. *Northwest Austin*, 573 F. Supp. 2d at 223-24.  That facial challenge was entirely the same as this one—nothing in Section 5 has changed since that time.  This district court has already ruled on this issue.  This Court’s review is constrained by these past appellate analyses and bound by its own earlier ruling.

26

II.    CONGRESS' 2006 AMENDMENTS TO THE VOTING RIGHTS ACT WERE
       CONSTITUTIONAL

When Congress reauthorized and extended Section 5 in 2006, it also took the
opportunity to correct Supreme Court misinterpretations of the intended scope and
application of the Act.  Specifically, Congress amended Section 5 in response to the decision
in *Reno v. Bossier Parish School Board*, 528 U.S. 320 (*Bossier II*) (2000), by providing that
the term "purpose" as used in the statute "shall include any discriminatory purpose."  42
U.S.C. § 1973c(c).   In response to *Georgia v. Ashcroft*, 539 U.S. 461 (2003), Congress
amended Section 5 to provide that the statute's purpose "is to protect the ability of such
[racial or language minority] citizens to elect their preferred candidates of choice."   42
U.S.C. § 1973c(d).

The justifications for these "fixes" undermine Plaintiffs' arguments that Section 5 is
no longer necessary.  Plaintiffs claim that the decline in the number of Section 5 objections
indicates that the federal preclearance process is not justified by the record.   Plaintiffs
Memorandum at 20.  This plainly ignores the impact that the *Bossier II* decision had on
Section 5 objections.   Although there were in fact a significant number of Section 5
objections after 1982, *Bossier II* had the effect of allowing preclearance of changes that
would have been objected to under the preexisting standard.

*Bossier II* held that the purpose prong of Section 5 "covers only retrogressive
dilution."  *Id.* at 328.  Thus, a voting change adopted with an admittedly discriminatory
purpose would not be objectionable under Section 5 unless it was adopted with the purpose
of making minority voters worse off than they were under the preexisting system.   The
legislative history contains a comprehensive study of Section 5 objections, one of whose

authors, Peyton McCrary, is an employee of the Voting Section of the Department of Justice.  The "principal finding" of the study was:

> by the 1990s, the purpose prong of Section 5 had become the dominate legal basis for objections.  Almost half (45 percent) of all objections were based on purpose alone.   If we include objections based both on purpose and retrogressive effect, and those based both on purpose and Section 2, the Department's finding of discriminatory purpose was present in 78 percent of all decisions to interpose objections in the decade preceding *Bossier II.*

McCrary, Seaman & Valelly "The End of Preclearance As We Knew It:  How the Supreme Court Transformed Section 5 of the Voting Rights Act" (November 1, 2005), at 79, reprinted in Voting Rights Act: Section 5·Preclearance Standards: Hearing Before the Subcommittee on the Constitution of the House Committee on the Judiciary, 109th Cong., 1st Sess., at 96-181 (November 1, 2005) ("House Hearing, Preclearance Standards").

The report further concluded that "a purpose finding was present in an astonishing 89 percent of all redistricting objections in that decade." *Id.*  The decline in objections over the past decade can be laid in large measure to the limitation on objections imposed by *Bossier II*, rather than a decline in discriminatory behavior by covered jurisdictions or a decline in the need for Section 5.  In response to *Bossier II*, the 2006 amendments provide that the term purpose "shall include any discriminatory purpose."  120 Stat. 580, sec. 5(3)(c).  Congress concluded that the amendment was necessary to restore the orginal meaning and purpose of Section 5: "Voting changes that 'purposefully' keep minority groups 'in their place' have no role in our electoral process and are precisely the types of changes Section 5 is intended to bar.  To allow otherwise would be contrary to the protections afforded by the 14th and 15th amendment and the VRA.  Thus, by clarifying that any voting change motivated by any discriminatory purpose is prohibited under Section 5, the Committee seeks to ensure that the 'purpose' prong remains a vital element to ensuring that Section 5 remains effective."  H.R. Rep. No. 109-478, at 68.

In *Georgia v. Ashcroft*, the Supreme Court found that a jurisdiction could trade majority-minority districts for influence districts without creating retrogression in violation of Section 5. 539 U.S. at 479-81. The House Judiciary Committee stated that this decision "construed Section 5 to narrow its reach, significantly restricting the scope of the 'effect' prong and weakening Section 5's protection of minority groups from voting changes that diminish their ability to elect their preferred candidates of choice." H.R. Rep. No. 109-478, at 68. The Committee further noted that this was "inconsistent with the original and current purpose of Section 5." *Id.* at 69. The Committee concluded that "the gains made by minority communities in districts represented by elected officials of the minority communities' choice would be jeopardized if the retrogression standard, as altered by the Supreme Court in *Georgia*, remains uncorrected." *Id.* at 70. Leaving the "*Georgia* standard in place would encourage States to spread minority voters under the guise of 'influence' and would effectively shut minority voters out of the political process…This is *clearly not* the outcome that Congress intended the Voting Rights Act and Section 5 to have on minority voters." *Id.*

Thus, Congress was merely returning to a previously employed and upheld interpretation of Section 5—an interpretation upheld by the Supreme Court in the face of challenges after the 1970, 1975, and 1982 reauthorizations and extensions. Even further, Congress received testimony specifically highlighting why the *Georgia* interpretation was vague, difficult to apply, and would result in harm to the ability of minority communities to effectively participate in the political process. *See* Exhibit A, Joint Statement of Material Facts, at 143-44. As with the reauthorization and the extension, Congress' decision to amend Section 5 to correct the Supreme Court's interpretation was well-justified by the legislative record.

### III.     SECTION 5 OF THE VOTING RIGHTS ACT, AS AMENDED IN 2006, DOES NOT CREATE AN UNCONSTITUTIONAL RACIAL QUOTA

As a fallback position, Plaintiffs assert that the 2006 amendments to the Voting Rights Act violate the equal protection guarantees of the Fifth and Fourteenth Amendments. Plaintiffs' allegation that Section 5, as amended, creates a rigid racial quota is unfounded for several reasons.

First, Section 5 as a whole is simply a law enforcing the Fifteenth Amendment—itself a racially-conscious provision. Moreover, the non-discrimination requirements of the Fifteenth Amendment are applicable country-wide, not merely in covered jurisdictions. The Supreme Court has even recognized that "race consciousness does not lead inevitably to impermissible race discrimination." *Shaw v. Reno*, 509 U.S. 630, 646 (1993)

Racial considerations in the field of voting rights are notably distinct from those in hiring or school admissions: in the latter, it could be argued that racial classifications that benefit minorities disadvantage white candidates not hired or admitted. But with voting rights, the Voting Rights Act simply guarantees that every person can cast a vote and every vote is weighted equally. *Shaw v. Reno*, 509 U.S. at 682-82 (Souter, J., dissenting). The claim that Section 5 creates some kind of racial quota is inconsistent with the reality of the law's application.

Section 5 of the Voting Rights creates no numerical set-asides and establishes no quota for the number of minority officials elected. Moreover, the well-established application of Section 5 clearly illustrates its flexible nature. Jurisdictions are permitted to bail-out from coverage upon a showing that they have used no test or device in the last 10 years, that there have been no final judgments or settlements establishing discrimination on the basis of race, that there have been no federal observers assigned to the jurisdiction,

and that the jurisdiction has timely submitted all voting changes to the Department of Justice or the D.C. Court without objection.  Section 4(a) of the Voting Rights Act of 1965 (codified as amended at 42 U.S.C. §§ 1971, 1973 through 1973bb-1).  In the *Northwest Austin* challenge, the district court noted that "according to the Attorney General, no bailout applications have been denied since 1984." 573 F. Supp. 2d at 228.

In the arena of redistricting, the regulations promulgated by the Department of Justice for the application of Section 5 reaffirm that it does not create a set quota system. These regulations describe how situations of unavoidable retrogression may exist because of demographic changes, and such situations will not warrant an objection from the Department of Justice.  Specifically, the Department of Justice notes that, "[t]here may be circumstances...that, because of shifts in population or other significant changes since the last redistricting (e.g., residential segregation and demographic distribution of the population within the jurisdiction, the physical geography of the jurisdiction, the jurisdiction's historical redistricting practices, political boundaries, such as cities or counties, and/or state redistricting requirements), retrogression is unavoidable." *Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act*, 27 Fed. Reg. 76 (February 9, 2011). This reality—the flexibility with which the Department of Justice applies Section 5—is a dramatic departure from the picture painted by Plaintiffs, and it bears no resemblance to cases in which the Supreme Court has found rigid racial quotas to be in violation of the Equal Protection guarantees of the Fifth and Fourteenth Amendments.

## CONCLUSION

Defendant-Intervenors respectfully request that this Court grant summary judgment in favor of Defendants and Defendant-Intervenors and deny Plaintiffs' motion for summary judgment.

This 1st day of August, 2011.

Respectfully submitted,

_____/s/ J. Gerald Hebert_____
J. Gerald Hebert
D.C. Bar #447676
Attorney at Law
191 Somerville Street, #405
Alexandria, VA 22304
Telephone: 703-628-4673
E-mail: hebert@voterlaw.com

Anita S. Earls
D.C. Bar #473453
N.C. Bar #15597
Allison J. Riggs
N.C. Bar #40028
Southern Coalition for Social Justice
115 Market Street, Ste. 470
Durham, North Carolina 27701
Telephone: 919-323-3380 ext. 115
Facsimile: 919-323-3942
E-mail: anita@southerncoalition.org
            allison@southerncoalition.org

Laughlin McDonald
American Civil Liberties Union
    Foundations, Inc.
230 Peachtree Street, NW
Suite 1440
Atlanta, GA 30303-1227
Telephone: 404-523-2721
Facsimile: 404-653-0331
E-mail:  lmcdonald@aclu.org

Arthur Barry Spitzer
American Civil Liberties Union

32

1400 20th Street, NW, Ste. 119
Washington, D.C. 20036
Telephone: 202-457-0800 x113
Email: artspitzer@aol.com

Attorneys for Defendant-Intervenors

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
No. 1:10-CV-00561-JDB

_____
                                                    )
STEPHEN LAROQUE, ANTHONY        )
CUOMO, JOHN NIX, KLAY              )
NORTHROP, LEE RAYNOR, and         )
KINSTON CITIZENS FOR NON-         )
PARTISAN VOTING,                      )
                          *Plaintiffs*,          )          Civil Action No.:
                                                    )          1:10-CV-561-JDB
            *v.*                                    )
                                                    )
ERIC HOLDER, JR.                        )
ATTORNEY GENERAL OF THE        )
UNITED STATES,                          )
                                                    )
                          *Defendant.*           )
                                                    )
            *and*                                  )
                                                    )
JOSEPH M. TYSON, et al.,              )
                                                    )
            *Defendant-Intervenors*         )
_____)

**DEFENDANT-INTERVENORS' STATEMENT OF MATERIAL FACTS AS TO WHICH
THERE IS NO GENUINE ISSUE**

In support of their accompanying Motion for Summary Judgment, and pursuant to

Local Civil Rule 7(h), Defendant-Intervenors Joseph M. Tyson, W.J. Best, Sr., A. Offord

Carmichael, Jr., George Graham, Julian Pridgen, William A. Cooke and the North Carolina

State Conference of Branches of the National Association for the Advancement of Colored

People hereby file the following Statement of Material Facts as to Which There is No

Genuine Issue.  Exhibits A and B, and the 6 Declarations from individual Intervenors and

residents of Lenoir County, are attached as part of this Statement and in support of

Defendant-Intervenors' Cross Motion for Summary Judgment.  Exhibit A is the Joint

Statement of Material Facts as to Which There Is No Genuine Issue (Doc. # 57) filed by the

Defendant-Intervenors in *Shelby County, Alabama v. Holder, et al*., Civil Action No. 1:10-

CV-651, also before this Court.  That Joint Statement aptly summarized the determinations

and findings of fact made by Congress during its consideration of the 2006 reauthorization

of Section 5 of the Voting Rights Act.  Defendant-Intervenors in the present action fully

adopt by reference this attachment as a part of their Statement of Material Facts as to

Which There Is No Genuine Issue, and supplement their Statement as follows:

1. Like other Deep South states, North Carolina has a long history of racial discrimination that has touched the right to vote.

2. While North Carolina is perceived to be "one of the few Southern states that has been moderate in race relations, it has been "most effective in belittling the voting strength of a sizable black population." William R. Keech and Michael P. Sistrom, *North Carolina*, *in* QUIET REVOLUTION IN THE SOUTH 155 (Changler Davidson & Bernard Grofman, eds., 1994).

3. Like other Southern states, North Carolina adopted a new Constitution in 1898 that was aimed at enshrining "white supremacy" in its politial process. Kousser, SOUTHERN POLITICS, *supra*, at 187. The goal, simply put, was to disenfranchise African American voters permanently. Kousser, SOUTHERN POLITICS, *supra*, at 189-190.  The disenfranchising devices included the re-registration of voters, moving state elections to August, requiring voters to pass a literacy test and instituting a poll tax as a requirement to vote. Keech & Sistrom, *supra*, at158.  To ensure that illiterate white voters were not disenfranchised along with African-American voters the literacy test was tied

to a Grandfather Clause. Michael Perman, STRUGGLE FOR MASTERY: DISFRANCHISEMENT IN THE SOUTH 1888-1908 164-165 (2001). The effect of these new requirements fell disproportionately on African American voters who, as a result, essentially stopped voting.

4.       Because the electoral laws in North Carolina worked to bar African-American participation in the political process, elected leaders stopped addressing the needs of African-American communities. *See, e.g.* . Morgan Kousser, *Progressivism–For Middle-Class Whites Only: North Carolina Education 1880-1910*, 46 J. So. Hist. 169 (1980) [hereinafter Kousser, *Progressivism*] , Indeed, "North Carolina suppressed black political activity thoroughly during the period of the 'nadir' of race relations in the first half of the twentieth century and only slowly, grudgingly, and partially liberalized thereafter." Morgan Kousser, Shaw v. Reno *and the Real World of Redistricting and Representation* 26. Rutgers L.J. 625, 671 (1995) [hereinafter Kousser, Shaw].

5.       The passage of the Voting Rights Act of 1965 prevented North Carolina state and local jurisdictions from enacting election laws similar to those laws which so effectively marginalized or eliminated the African American vote in the early twentieth century. As a result, minority voters in the state slowly gained the ability to participate in the political process. More specifically, the VRA has allowed minority voters to register and remain on the voting rolls, prevented jurisdictions from changing the method of elections that would retrogress minority voting strength, and prevented the enactment of redistricting plans that retrogress minority voting strength.

3

6.      Notwithstanding the increased level of political participation for black voters

following passage of the Voting Rights Act, racial discrimination persisted

throughout the state.  As the three-judge court in *Gingles v. Edmisten*

recognized in 1984, "the State of North Carolina had officially and effectively

discriminated against black citizens in matters touching their exercise of the

voting franchise."  590 F. Supp. 345, 359 (1984).

7.      Overall, in North Carolina more African Americans were registered to vote

than in other southern states subject to the VRA's preclearance provisions. In

the years immediately after the passage of the VRA, an increasing number of

African American voters were able to register. Ten Years After, *supra*, at 41.

However, the gap between white and African American registrations rates

stubbornly persisted well after the passage of the VRA. Ten Years After,

*supra*, at 43 (estimating the white registration rate to be 15.9% [more?] than

the African–American registration rate).

*8.*     One reason the gap in registration rates persisted is that African American

voters still faced a heroic task in registering to vote. In some counties, voters

had to travel far distances to the single place where voter registration was

conducted.  *Id.* at 74.  In addition, "[o]lder blacks in rural northeastern counties

[were] still afraid to register or vote. . . ." *Id.* at 196. In some covered

jurisdictions in North Carolina, African Americans "believe[d] they must be

cautious about participating too actively in politics." *Id*. Finally, even where

African American voters were able to register to vote, they would be purged

from the voting rolls simply for nonvoting. *Id.* at 84. Despite these difficulties,

as early as 1975, the VRA had made minority voters an important segment of the electorate.

9.      However, many jurisdictions continued to search for ways to circumvent the protections of the VRA. For instance, several covered jurisdictions in the 1970s attempted to enact changes to electoral laws without seeking preclearance. *Id.* at 306. In 1971 Halifax County instituted a residence requirement for county elections. *Id* at 309. In 1966 and 1968, Vance County instituted residency requirements and staggered terms for county elected offices. *Id.* at 309-10. The changes proposed in these laws mirror some pre-VRA attempts to dilute the ability of African–American voters to influence elections without actually barring African–Americans from voting.

10.     On the state level, legislators attempted to dilute the ability of minority voters to elect candidates of choice as well. In fact, "before 1991, white congressmen openly manipulated redistricting to buttress their positions against candidates who might appeal to black voters."  J. Krousser, Shaw, *supra*, at 674.  During the 1980 redistricting cycle, North Carolina attempted to protect a white incumbent (L.H. Fountain) from challenges by minority candidates of choice. *Id*. To do this, the North Carolina General Assembly enacted the "fishhook district" which curled around Durham and Orange Counties to avoid picking up African–American and white voters who would support an African–American candidate of choice. *Id.* at 679. The Department of Justice (DOJ) interposed an objection to the redistricting plan under Section 5 of the VRA. Shortly after the North Carolina General Assembly remedied the "fishhook

district," Congressman Fountain retired. *Id.* at 684. Kousser notes that DOJ's Section 5 objection to the discriminatory "fishhook district" was critical to the adoption of a district in which minority candidates of choice had an opportunity to win the majority of votes. *Id.* at 683.

11.   Other factors prevented an African–American candidate of choice from being elected during the 1980's. In 1982, Herny M. Michaux came closer to winning election to Congress than any previous candidate in eastern North Carolina in the twentieth century. However, Michaux ultimately lost the run-off to Tim Valentine, by a vote of 53.8-46.2%. Kousser attributes racial appeals, white bloc voting, and the majority-vote requirement of North Carolina's run-off system as the causes of Michaux's loss. *Id.* at 686-87. Valentine defeated another African–American candidate of choice, Kenneth B. Spaulding in 1984 in an election marked by racial polarization.

12.   During the 1990's DOJ again used its authority under Section 5 of the VRA and interposed objections to North Carolina's congressional redistricting plan. As a result, two districts were created which provided African American voters with an effective opportunity to elect their preferred candidates of choice.   As Congressman Mel Watt has noted, "'If you look at the history of the districts in North Carolina, if . . . the Voting Rights Act were not in place, there simply would never have been created the opportunity for African Americans to be elected.'"  Lawyers' Committee for Civil Rights Under Law, *Highlights of Hearings of the National Commission on the Voting Rights Act*, 61 (2005).

13.     In addition, where legal means of defeating minority candidates of choice were

judged to be insufficient, varying forms of voter intimidation have been used

to prevent minority voters from casting ballots. "Voter intimidation is not a

relic of the past, but rather, a strategy used with disturbing frequency in recent

years." Anita S. Earls et al., *Voting Rights in North Carolina: 1982*–2006 17 S.

Cal. Rev. L. Soc. Just. 577, 589 (2008). For instance, in 1990, the Committee

to re-elect U.S. Senator Jesse Helms, who faced a black opponent, mailed

postcards to 125,000 African–American voters with incorrect information

about voting qualifications, leaving many voters confused about whether they

could vote. DOJ sued under the VRA to stop this vote suppression effort and

obtained a consent decree banning the practice in *United States v. North*

*Carolina Republican Party. Id*. at 589-90.

14.     In 1982, Congress assessed the need for extending Section 5 of the Voting

Rights Act.  In the Senate Judiciary Committee's Report, the Committee cited

a case in Robeson County, North Carolina, where the City of Lumberton failed

to submit annexations it made in 1967 and 1970 to the Department of Justice

for Section 5 preclearance approval.  When the Department interposed an

objection after finding that the annexations were driven by a racially

discriminatory purpose, Lumberton refused to comply.  S. Rep. No. 97-417, at

13 (1982).  Eventually, an injunction was entered in 1981 to stop the City from

allowing voters in the annexed areas from voting in city elections.  *Id.*

15.     At the time Congress considered reauthorization of Section 5 of the Voting

Rights Act in 2005 and 2006, only two African-Americans had held statewide

office.  Transcript of Southern Regional Hearing at 52, National Commission
on the Voting Rights Act, March 11, 2005 [hereinafter Southern Regional
Hearing].  Prior to Congressman Mel Watt's election to Congress in 1992, no
African-American had been elected to Congress from North Carolina since
1898, despite the fact that twenty percent of the population was African-
American. Transcript of Mid-Atlantic Regional Hearing at 10, National
Commission on the Voting Rights Act, October 14, 2005 [hereinafter Mid-
Atlantic Regional Hearing].  In fact, Congressman Watt described the situation
as only getting worse, not better.  *Id.* at 35.

16.     In testimony before both Congress and the National Commission on the Voting
Rights Act [hereinafter "the Commission"], a number of witnesses expressed
the belief that minority voters would have less opportunity to participate in the
political process in North Carolina without Section 5 of the Voting Rights Act.
A group of Democratic and Republican election lawyers from the state,
including the former Chairman of the North Carolina State Board of Elections,
unanimously agreed that Section 5 was still needed.  *The Voting Rights Act:*
*The Continuing Need for Section 5 Before the Subcomm. on the Constitution of*
*the H. Comm. on the Judiciary*, 109th Cong. 18 (2005) [hereinafter *Hearings*]
(statement of Robert Hunter, Voting Rights Litigator, Hunter, Higgins, Miles,
Elam and Benjamin, P.L.L.C.).  Robert Hunter, former Chairman of the North
Carolina State Board of Elections, asserted that "political elements . . . would
seek to retrogress or backslide in their obligations to be racially fair in making

redistricting decisions in the absence of reauthorization of section 5." *Id.* at 16.

17.  Referencing the most prevalent form of minimizing or diluting African-American voting strength – at-large election systems at the county and local level – Congressman G.K. Butterfield of North Carolina's 1st Congressional District stated: "I can assure you that if Section 5 is not extended, there will be a rush to change district elections back to at-large election systems." Transcript of Florida Hearing at 16, National Commission on the Voting Rights Act, August 4, 2005 [hereinafter Florida Hearing].

18.  During debate in the House of Representatives, Congressman Bob Etheridge, then representing North Carolina's 2nd Congressional District, quoted Donald Wright, the general counsel to the North Carolina State Board of Elections, as saying, "[T]here continue to be instances in which section 5 prevents discriminatory voting changes from being implemented in North Carolina." 152 CONG. REC. 14,298 (2006) (statement of Congressman Bob Etheridge).

19.  The hearings of the Commission were replete with anecdotal evidence of continued discrimination across the state.  Dr. Richard Engstrom, who served as an expert witness for the state in *Shaw v. Reno*, noted that voting patters in North Carolina were still marked by racial polarization, which he believed to "equal" racial prejudice in the state, especially in the southeast.  Southern Regional Hearing at 31, 37.  Tisha Tillman, Southeast Regional Counsel for MALDEF, recounted an incident in Alamance County, North Carolina, in which the county sheriff obtained the list of all registered Latino voters and

publicly announced that he was going to go to each of their houses and arrest anyone he did not believe to be a United States citizen.  Transcript of Southern Georgia Hearing at 27, National Commission on the Voting Rights Act, August 2, 2005.  Congressman Butterfield cited an on-going situation in Halifax County, North Carolina, where the three white members – two Democrats and one Republican – of the six member board [of ?] opposed the appointment of an African-American commissioner to be chairman, despite the fact that he was the longest-serving.  Florida Hearing at 29.  Congressman Mel Watt, from North Carolina's 12th Congressional District, shared two examples of well-qualified African American candidates losing their seats because of the refusal of white voters to even consider voting for African-American candidates. Mid-Atlantic Regional Hearing at 12.  In one example, Congressman Watt discussed the electoral defeat in a state court of appeals race of a "well-qualified, seasoned African-American lawyer who had been practicing law for years in North Carolina" by a fireman with "no legal background, experience, nothing to commend him for the court except that he was white."  *Id.*

20.    A study by Dr. Kerry Haynie of Duke University demonstrated a significant racial bias in state legislators, such that providing African-Americans with the opportunity to elect candidates of their choice was essential for ensuring their needs were properly represented in state government.  Southern Regional Hearing at 52.  Dr. Haynie found that twice as many African-American members of the state legislature introduced anti-discrimination bills as non-

10

black legislators, and that there was significant racial prejudice among lawmakers and lobbyists against African-American legislators.  Southern Regional Hearing at 52.

21.  Litigation under the Voting Rights Act has been necessary in North Carolina to block erosion of African-Americans' ability to meaningfully participate in the electoral process.  Congressman Butterfield asserted that without Voting Rights Act litigation, most of the African-American local officeholders in his district would not be in office.  Florida Hearing at 16.

22.  Since the Voting Rights Act was passed in 1965, the Department of Justice has interposed 49 objections against various election systems and redistricting schemes implemented by the state of North Carolina and several jurisdictions within the state.  The majority of the objections were attempts by local jurisdictions to implement at-large election systems, residency district requirements within at-large election systems, and majority vote requirements. Of the 49 objections, the Department of Justice made a finding of racial bloc voting or racially-polarized voting in 20 of them, the most recent of which was in 2009 in Lenoir County.  A listing and brief description of these objections is attached as Exhibit C.

23.  Racially polarized voting remains a very present trend in Lenoir County and Kinston, and has demonstrable effects on minority voting rights in those jurisdictions.  *See* Declarations of Joseph M. Tyson, Sr., George Graham, Julian Pridgen, Courtney M. Patterson, William A. Cooke, and Linda Joyce Lanier.

Respectfully submitted,

_____/s/ J. Gerald Hebert_____
J. Gerald Hebert
D.C. Bar #447676
Attorney at Law
191 Somerville Street, #405
Alexandria, VA 22304
Telephone: 703-628-4673
E-mail: hebert@voterlaw.com

Anita S. Earls
D.C. Bar #473453
N.C. Bar #15597
Allison J. Riggs
N.C. Bar #40028
Southern Coalition for Social Justice
115 Market Street, Ste. 470
Durham, North Carolina 27701
Telephone: 919-323-3380 ext. 115
Facsimile: 919-323-3942
E-mail: anita@southerncoalition.org
          allison@southerncoalition.org

Laughlin McDonald
American Civil Liberties Union
   Foundations, Inc.
230 Peachtree Street, NW
Suite 1440
Atlanta, GA 30303-1227
Telephone: 404-523-2721
Facsimile: 404-653-0331
E-mail:  lmcdonald@aclu.org

Arthur Barry Spitzer
American Civil Liberties Union
1400 20th Street, NW, Ste. 119
Washington, D.C. 20036
Telephone: 202-457-0800 x113
Email: artspitzer@aol.com

Attorneys for Defendant-Intervenors

12

## CERTIFICATE OF SERVICE

I hereby certify that on this day, August 1, 2011, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system which will send notification of such filing to

the following:

Michael A. Carvin
D.C. Bar No. 366784
Noel J. Francisco
D.C. Bar No. 464752
Hashim M. Mooppan
D.C. Bar No. 981758
David J. Strandness
D.C. Bar No. 987194
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113

Michael E. Rosman
D.C. Bar No. 454002
Michelle A. Scott
D.C. Bar No. 489097
Center for Individual Rights
1233 20th Street, N.W., Suite 300
Washington, D.C. 20036
    *Counsel for Plaintiffs*

Richard Dellheim (lead counsel)
Attorney, Voting Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
    *Counsel for Defendants*

/s/   J. Gerald Hebert
J. Gerald Hebert
*Counsel for Defendant-Intervenors*

13