IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEPHEN LAROQUE, ANTHONY CUOMO, JOHN NIX, KLAY NORTHRUP, LEE RAYNOR, and KINSTON CITIZENS FOR NONPARTISAN VOTING,<br><br>Plaintiffs<br><br>v.<br><br>ERIC H. HOLDER, JR., in his official capacity as Attorney General Of The United States,<br><br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 1:10-0561 (JDB)<br>    Judge John D. Bates |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

RONALD C. MACHEN, JR.
United States Attorney
District of Columbia

THOMAS E. PEREZ
Assistant Attorney General

SAMUEL R. BAGENSTOS
JULIE A. FERNANDES
Deputy Assistant Attorneys General

T. CHRISTIAN HERREN, JR.
DIANA K. FLYNN
RICHARD DELLHEIM (lead counsel)
LINDA F. THOME
ERNEST A. MCFARLAND
JARED M. SLADE
JUSTIN WEINSTEIN-TULL
   Civil Rights Division
   U.S. Department of Justice
   950 Pennsylvania Avenue, N.W.
   NWB- Room 7264
   Washington, D.C. 20530
   Telephone: (202) 305-1734
   Facsimile: (202) 307-3961

Plaintiffs brought this action alleging a facial challenge to the constitutionality of Section 5 of the Voting Rights Act, as reauthorized and amended in 2006.  Plaintiffs allege that Congress exceeded its authority under the Fourteenth and Fifteenth Amendments when it reauthorized Section 5 in 2006.  And they allege that Section 5, as amended in 2006, violates the nondiscrimination mandates of the Fifth, Fourteenth, and Fifteenth Amendments.  Pursuant to Rule 56(b), Defendant Eric H. Holder, Jr. ("Attorney General") respectfully moves this Court for an order granting summary judgment to him as to both of Plaintiffs' claims.

A moving party is entitled to summary judgment where, as here, "the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2); Local Civ. R. 7(h); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-250 (1986); *Arrington v. United States,* 473 F.3d 329, 333 (D.C. Cir. 2006).  Because there is no genuine triable issue as to any material fact before this Court, the Attorney General is entitled to judgment as a matter of law.

In support of this motion, the Attorney General submits a Memorandum of Law and attaches a Statement of Uncontested Material Facts, with accompanying exhibits.

Date:  August 1, 2011

Respectfully submitted,

RONALD C. MACHEN, JR.
United States Attorney
District of Columbia

THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

SAMUEL R. BAGENSTOS
JULIE A. FERNANDES
Deputy Assistant Attorneys General

/s/*Richard Dellheim*
T. CHRISTIAN HERREN, JR.
DIANA K. FLYNN
RICHARD DELLHEIM (lead counsel)
LINDA F. THOME
ERNEST A. MCFARLAND
JARED M. SLADE
JUSTIN WEINSTEIN-TULL
  Civil Rights Division
  U.S. Department of Justice
  950 Pennsylvania Avenue, N.W.
  NWB- Room 7264
  Washington, D.C. 20530
  Telephone: (202) 305-1734
  Facsimile: (202) 307-3961

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEPHEN LAROQUE, ANTHONY CUOMO, JOHN NIX, KLAY NORTHRUP, LEE RAYNOR, and KINSTON CITIZENS FOR NONPARTISAN VOTING,<br><br>Plaintiffs<br><br>v.<br><br>ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States,<br><br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      Civil Action No. 1:10-0561 (JDB)<br>      Judge John D. Bates |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

RONALD C. MACHEN, JR.
 United States Attorney
 District of Columbia

THOMAS E. PEREZ
 Assistant Attorney General

SAMUEL R. BAGENSTOS
JULIE A. FERNANDES
 Deputy Assistant Attorneys General

T. CHRISTIAN HERREN, JR.
DIANA K. FLYNN
RICHARD DELLHEIM (lead counsel)
LINDA F. THOME
ERNEST A. MCFARLAND
JARED M. SLADE
JUSTIN WEINSTEIN-TULL
 Civil Rights Division
 U.S. Department of Justice
 950 Pennsylvania Avenue, N.W.
 NWB-Room 7264
 Washington, D.C. 20530
 Telephone: (202) 305-1734
 Facsimile: (202) 307-3961

## TABLE OF CONTENTS

PAGE

BACKGROUND ....................................................................................................1

    **A.**    **The Voting Rights Act** ......................................................1

    **B.**    **Plaintiff**s ..................................................................................8

ARGUMENT .......................................................................................................9

   **I**    **SECTION 5 OF THE VOTING RIGHTS ACT REMAINS A VALID EXERCISE OF CONGRESS'S AUTHORITY TO ENFORCE THE FOURTEENTH AND FIFTEENTH AMENDMENTS** ...................11

    **A.**    **The 2006 Reauthorization Is Subject To Rational Basis Review** ........11

    **B.**    **Congress Rationally Concluded That Reauthorization Of Section 5 Was Appropriate** ....................................................12

    **C.**    **Congress's Decision To Continue Covering The Jurisdictions That Section 5 Had Previously Covered Was Rational In Theory And Practice** ................................................16

  **II**    **PLAINTIFFS' CHALLENGES TO THE 2006 AMENDMENTS TO SECTION 5 MUST FAIL** ....................................................17

    **A.**    **The 2006 Amendments** .......................................................17

    **B.**    **Plaintiffs Lack Standing To Challenge The Constitutionality Of The 2006 Amendments** ..............................................21

        **1.**    **The 2006 Amendments Did Not Cause Plaintiffs' Alleged Injuries** ................................................22

        **2.**    **A Ruling Invalidating Section 5(b)-(d) Would Not Redress Plaintiffs' Alleged Injuries** ............................25

            *a.*    *Subsections (b)-(d) Are Severable From Section 5(a)* ....................................................26

            *b.*    *Because Subsection (a) Is Severable From Subsections (b)-(d), Plaintiffs Have No Avenue For Relief* ....................................................29

    **C.**    **The Challenge To The 2006 Amendments Is Not Ripe For Review** ..............................................................31

    **D.**    **The 2006 Amendments To Section 5 Do Not Violate The Constitution On Their Face** ..............................................33

**TABLE OF CONTENTS (continued):**                           **PAGE**

        1.    **The Amendment To Section 5's Purpose Prong Is Valid Enforcement Legislation And Does Not Violate Equal Protection** .................................................................................34

        2.    **The Amendment To Section 5's Retrogression Prong Is Valid Enforcement Legislation And Does Not Violate Equal Protection** ..........................................................................38

**CONCLUSION** ...........................................................................................44

# TABLE OF AUTHORITIES

**CASES:**                                                                                      **PAGE**

*Abbott Labs.* v. *Gardner*, 387 U.S. 136 (1967)............................................................................31

*Alaska Airlines, Inc.* v. *Brock*, 480 U.S. 678 (1987).......................................................26-27, 29

*Allen* v. *State Bd. of Elections*, 393 U.S. 544 (1969)....................................................................15

*Allen* v. *Wright*, 468 U.S. 737 (1984) .........................................................................................21

*America's Cmty. Bankers* v. *FDIC*, 200 F.3d 822 (D.C. Cir. 2000)...........................................30

*Ayotte* v. *Planned Parenthood of N. New Eng.*, 546 U.S. 320 (2006)....................................26, 29

*Beer* v. *United States*, 425 U.S. 130 (1976)........................................................................... *passim*

*Bismullah* v. *Gates*, 551 F.3d 1068 (D.C. Cir. 2009) ..............................................................26, 28

*Board of Trs. of the Univ. of Ala.* v. *Garrett*, 531 U.S. 356 (2001)...............................................13

*Brockett* v. *Spokane Arcades, Inc.*, 472 U.S. 491 (1985) ..............................................................26

*Bush* v. *Vera*, 517 U.S. 952 (1996) ...............................................................................................42

*Champlin Refining Co.* v. *Corporation Comm'n of Okla.*, 286 U.S. 210 (1932) ....................26-27

*City of Boerne* v. *Flores*, 521 U.S. 507 (1997) .......................................................................11, 13

*City of Mobile* v. *Bolden*, 446 U.S. 55 (1980) .............................................................................35

*City of Richmond* v. *United States*, 422 U.S. 358 (1975) .........................................................39-40

*City of Rome* v. *United States*, 446 U.S. 156 (1980) ............................................................. *passim*

*Consumer Energy Council* v. *Federal Energy Regulatory Comm'n*,
    673 F.2d 425 (D.C. Cir. 1982).......................................................................................26-27

*County Council of Sumter Cnty.* v. *United States*, 555 F. Supp. 694 (D.D.C. 1983) .............31, 38

*DaimlerChrysler Corp.* v. *Cuno*, 547 U.S. 332 (2006)................................................................21

*Free Enter. Fund* v. *Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138 (2010) ...................26

*Georgia* v. *Ashcroft*, 539 U.S. 461 (2003) .........................................................................17-18, 42

**CASES (continued):**                                               **PAGE**

*Georgia* v. *United States*, 411 U.S. 526 (1973) ............................................................5

*Gingles* v. *Edmisten*, 590 F. Supp. 345 (1984), rev'd in part on different grounds,
    *Thornburgh* v. *Gingles*, 478 U.S. 30 (1986) ......................................................15

*INS* v. *Chadha*, 462 U.S. 919 (1983) ..........................................................................26

*Kimel* v. *Florida Bd. of Regents*, 528 U.S. 62 (2000) ..................................................13

*LaRoque* v. *Holder*, No. 10-5433,
    2011 U.S. App. LEXIS 13907 (D.C. Cir. July 8, 2011) ........................................ 21-22

*Lopez* v. *Monterey Cnty.*, 525 U.S. 266 (1999) ......................................................5, 11

*Lujan* v. *Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................. 21-22

*LULAC* v. *Perry*, 548 U.S. 399 (2006) ................................................................. 41-42

*Miller* v. *Johnson*, 515 U.S. 900 (1995) ......................................................................36

*Minnesota* v. *Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999) ................................29

*Morris* v. *Gressette*, 432 U.S. 491 (1977) ......................................................... 23, 30-31

*New Haven* v. *United States*, 809 F.2d 900 (D.C. Cir. 1987) ........................................27

*Northwest Austin Mun. Util. Dist. No. One* v. *Holder*, 129 S. Ct. 2504 (2009) ..........................2, 9

*Northwest Austin Mun. Util. Dist. No. One* v. *Mukasey*,
    573 F. Supp. 2d 221 (D.D.C. 2008) ....................................................................9, 13

*Perkins* v. *Matthews*, 400 U.S. 379 (1971) ..........................................................15, 29

*Randall* v. *Sorrell*, 538 U.S. 230 (2006) ......................................................................28

*Reno* v. *Bossier Parish Sch. Bd.*, 520 U.S. 471 (1997) ............................................13, 18

*Reno* v. *Bossier Parish Sch. Bd.*, 528 U.S. 320 (2000) .......................................... *passim*

*Shaw* v. *Hunt*, 517 U.S. 899 (1996) ............................................................................36

*Simon* v. *Eastern Ky. Welfare Rights Org.*, 426 U.S. 26 (1976) ...................................22

*South Carolina* v. *Katzenbach*, 383 U.S. 301 (1966) ........................................... *passim*

**CASES (continued):**                                                                    **PAGE**

*Tennessee* v. *Lane*, 541 U.S. 509 (2004) ...........................................................................35, 38

*Texas* v. *United States*, 523 U.S. 296 (1998) ..................................................... 31-32

*Thornburgh* v. *Gingles*, 478 U.S. 30 (1986) .................................................................38

*Tilton* v. *Richardson*, 403 U.S. 672 (1971) ..................................................................37

*United States Ecology, Inc.* v. *United States Dep't of Interior*,
    231 F.3d 20 (D.C. Cir. 2000) ...............................................................................21

*United States* v. *Booker*, 543 U.S. 220 (2005) ....................................................26, 29

*United States* v. *Georgia*, 546 U.S. 151 (2006) ...........................................................35

*United States* v. *Hays*, 515 U.S. 737 (1995) ........................................................22, 25

*United States* v. *Raines*, 362 U.S. 17 (1960) .......................................................38, 43

*United States* v. *Salerno*, 481 U.S. 739 (1987) ..................................................... 33-34

*Valley Forge Christian Coll.* v. *Americans United for Separation of Church & State,
Inc.*, 454 U.S. 464 (1982) ..................................................................................21

*Village of Arlington Heights* v. *Metropolitan Housing Development Corporation*,
    429 U.S. 252 (1977) ...............................................................................19, 34, 36

*Washington State Grange* v. *Washington State Republican Party*,
    552 U.S. 442 (2008) ............................................................... 33-34, 38, 43

*Washington* v. *Davis*, 426 U.S. 229 (1976) ................................................................35

**STATUTES:**

Voting Rights Act of 1965, 42 U.S.C. 1973 *et seq.* ....................................................1
    42 U.S.C. 1973a(c)..............................................................................16
    42 U.S.C. 1973b(a) ..............................................................................5
    42 U.S.C. 1973b(f).............................................................................27
    42 U.S.C. 1973c ...............................................................................3, 8
    42 U.S.C. 1973c(a)...................................................................... *passim*
    42 U.S.C. 1973c(b) & (d)..................................................................28
    42 U.S.C. 1973c(b) ............................................................................42
    42 U.S.C. 1973c(c).......................................................................28, 34
    42 U.S.C. 1973p.................................................................................26

**STATUTES (continued):**                                                                                                    **PAGE**

Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437 ......................................................2
         § 4(a), 79 Stat. 438 .........................................................................................................4
         § 4(b), 79 Stat. 438 .........................................................................................................3
         79 Stat. 439 ...................................................................................................................18

Voting Rights Act Amendments of 1970, Pub. L. No. 91-285, 84 Stat. 315 ...............................4
         Tit. I, 84 Stat. 315 ..........................................................................................................4

Voting Rights Act Amendments of 1975, Pub. L. No. 94-73, 89 Stat. 400 .................................4
         Tit. II, 89 Stat. 401 .........................................................................................................5
         Tit. II, 89 Stat. 401-402 ..................................................................................................5

Voting Rights Act Amendments of 1982, Pub. L. No. 97-205, 96 Stat. 131 ...............................4
         § 2(b)(2), 96 Stat. 131 .....................................................................................................5
         § 2(b)(4), 96 Stat. 131-133 ..............................................................................................5

Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act
         Reauthorization and Amendments Act of 2006,
         Pub. L. No. 109-246, 120 Stat. 577
                  § 2(b), 120 Stat. 577-578 .......................................................................................7
                  § 2(b)(6), 120 Stat. 578 .......................................................................................19
                  § 2(b)(9), 120 Stat. 578 .........................................................................................9
                  §§ 4-5, 120 Stat. 580-581 .....................................................................................3
                  § 5, 120 Stat. 580-581 .....................................................................................8, 20

**REGULATIONS:**

28 C.F.R. 51.23 ...........................................................................................................................29

28 C.F.R. 51.45(a) .......................................................................................................................30

*Guidance Concerning Redistricting and Retrogression Under Section 5 of the Voting*
         *Rights Act*, 66 Fed. Reg. 5412 (Jan. 18, 2001) ...........................................................36, 40

*Revision of Procedures for the Administration of Section 5 of the Voting Rights Act of*
         *1965*, 52 Fed. Reg. 486 (Jan. 6, 1987) ...............................................................................40

*Revision of Procedures for the Administration of Section 5 of the Voting Rights Act of*
         *1965*, 76 Fed. Reg. 21,239 (April 15, 2011) (28 C.F.R. 51.54, 51.57).............................37

40 Fed. Reg. 43,746 (Sept. 23, 1975) ...........................................................................................5

**LEGISLATIVE HISTORY:**                                                    **PAGE**

H.R. Rep. No. 439, 89th Cong., 1st Sess. (1965) ........................................................ 3-4

H.R. Rep. No. 478, 109th Cong., 2d Sess. (2006) ............................................... *passim*

S. Rep. No. 295, 94th Cong., 1st Sess. (1975).............................................................41

This is a facial challenge to the constitutionality of Section 5 of the Voting Rights Act, as reauthorized and amended in 2006.[1]  Plaintiffs allege that Congress exceeded its authority under the Fourteenth and Fifteenth Amendments when it reauthorized Section 5 in 2006.  And they allege that Section 5, as amended in 2006, violates the nondiscrimination mandates of the Fifth, Fourteenth, and Fifteenth Amendments.

Both parties have moved for summary judgment.  Because plaintiffs' first claim is similar to the claims of the plaintiff in *Shelby County* v. *Holder*, No. 1:10-cv-00651-JDB (D.D.C.), we have attached as Attachments 1, 2, and 3 to this Memorandum the Attorney General's Memoranda Of Law In Opposition To Plaintiff's Motion For Summary Judgment And In Support Of Defendant's Motion For Summary Judgment in the *Shelby County* case.  For the reasons set forth therein and *infra*, Section 5 is constitutional and the Attorney General's cross motion for summary judgment should be granted.

## BACKGROUND

### A.    The Voting Rights Act

1.  Congress enacted the Voting Rights Act of 1965 (VRA), 42 U.S.C. 1973 *et seq*., "to banish the blight of racial discrimination in voting, which ha[d] infected the electoral process in parts of our country for nearly a century."  *South Carolina* v. *Katzenbach*, 383 U.S. 301, 308 (1966).  The Fifteenth Amendment, which prohibits racial discrimination in voting, was ratified in 1870.  *South Carolina*, 383 U.S. at 310.  "The first century of congressional enforcement of

---

[1]  Plaintiffs have unequivocally disavowed any intention to assert an as-applied challenge, including any intention to challenge the Attorney General's objection to the proposed voting change in Kinston.  See *e.g.*, Motion Hearing Tr. Dec. 3, 2010, at 68 ("Because we are bringing a facial challenge to the statute, we are not challenging the Attorney General's objection."); *id.* at 87 (representing to the court that plaintiffs are "willing to be held" to their statement that they "are bringing a facial and only a facial challenge").

the Amendment, however, can only be regarded as a failure." *Northwest Austin Mun. Util. Dist. No. One* v. *Holder*, 129 S. Ct. 2504, 2508 (2009) (*Northwest Austin II*).  Initial federal enforcement of the Amendment was short-lived, and in 1894, most of the federal enforcement provisions were repealed. *South Carolina*, 383 U.S. at 310.  Beginning in 1890, Alabama, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Virginia began systematically disenfranchising black citizens by adopting literacy tests applicable to black citizens, while using alternate devices such as the grandfather clause, property qualifications, and good character tests to enable illiterate whites to vote. *Id.* at 310-311.

Over the following decades, the Supreme Court struck down a variety of techniques "designed to deprive Negroes of the right to vote," including the grandfather clause, procedural roadblocks, the white primary, improper voter challenges, racial gerrymandering, and discriminatory application of tests. *South Carolina*, 383 U.S. at 311-312 (citations omitted). Congress enacted voting rights legislation in 1957, 1960, and 1964. *Id.* at 313.  But "these new laws," the Court explained in *South Carolina*, did "little to cure the problem of voting discrimination." *Id*. at 314.  Voting rights litigation was "unusually onerous" and "exceedingly slow." *Ibid.*  And, even when litigation was successful, voting officials "merely switched to discriminatory devices not covered by the federal decrees," "enacted difficult new tests," or "defied and evaded court orders." *Ibid.*

In 1965, Congress enacted the VRA to address the deficiencies in earlier legislation designed to enforce the Fifteenth Amendment.  Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437 (1965 Act).  The VRA includes both temporary provisions, applicable only to certain "covered jurisdictions," and other provisions applicable to the nation as a whole.  This case concerns one of the temporary provisions of the VRA – Section 5, 42 U.S.C. 1973c, as it

was reauthorized and amended in 2006. Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L. No. 109-246, §§ 4-5, 120 Stat. 580-581; 42 U.S.C. 1973c (2006 Reauthorization).

Section 4(b) of the VRA contains the coverage formula that defines the jurisdictions covered by Section 5 and the other temporary provisions. Congress designed this formula to capture States for which the legislative record demonstrated "evidence of actual voting discrimination," and where "federal courts ha[d] repeatedly found substantial voting discrimination." *South Carolina*, 383 U.S. at 329-330. Evidence before Congress in 1965 revealed that the worst records of discrimination existed in certain southern States that "share[d] two characteristics: * * * the use of tests and devices for voter registration, and a voting rate in the 1964 presidential election at least 12 points below the national average." *South Carolina*, 383 U.S. at 330; see H.R. Rep. No. 439, 89th Cong., 1st Sess. 13-14 (1965) (1965 House Report). Thus, as originally enacted, Section 4(b) included any jurisdiction that: (1) maintained a test or device on November 1, 1964; and (2) had registration or turnout rates below 50% of the voting age population in November 1964. 1965 Act, § 4(b), 79 Stat. 438. The original formula covered *e.g.*, Alabama, Georgia, Louisiana, Mississippi, South Carolina, and Virginia, and 40 counties in North Carolina. 28 C.F.R. Pt. 51 App.

Section 5 provides that "[w]henever" a covered jurisdiction "enact[s] or seek[s] to administer any * * * standard, practice, or procedure with respect to voting different from that in force or effect" on its coverage date, it must first obtain administrative preclearance from the Attorney General or judicial preclearance from a three-judge panel of this court. 42 U.S.C. 1973c. In either case, preclearance may be granted only if the jurisdiction demonstrates that the

proposed change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color" or membership in a language minority group. *Ibid.*

Covered jurisdictions may seek to terminate their coverage under the special provisions, including the requirement to comply with Section 5, by bringing a declaratory judgment action in this court. See 1965 Act, § 4(a), 79 Stat. 438. As originally enacted, this "bailout" mechanism was available only to covered States and to jurisdictions, such as counties, "with respect to which such [coverage] determinations have been made as a separate unit." *Ibid.* The purpose of the provision was to remedy any overbreadth in the coverage formula by enabling jurisdictions that had not discriminated to escape coverage. 1965 House Report 15; *South Carolina*, 383 U.S. at 331. To terminate coverage, such a jurisdiction originally was required to prove it had not used a prohibited test or device "for the purpose or with the effect of denying or abridging the right to vote on account of race or color" during the previous five years. *Ibid.*

The Supreme Court upheld the constitutionality of Sections 4(b) and 5 of the 1965 Act in *South Carolina*, 383 U.S. at 323-335, finding that these and other temporary provisions of the Act were valid exercises of Congress's authority under Section 2 of the Fifteenth Amendment.

2. Congress reauthorized Section 5 in 1970 for five years, in 1975 for seven years, and in 1982 for 25 years. Voting Rights Act Amendments of 1970, Pub. L. No. 91-285, 84 Stat. 315 (1970 Reauthorization); Voting Rights Act Amendments of 1975, Pub. L. No. 94-73, 89 Stat. 400 (1975 Reauthorization); Voting Rights Act Amendments of 1982, Pub. L. No. 97-205, 96 Stat. 131 (1982 Reauthorization).[2] The Supreme Court reaffirmed the constitutionality of

---

[2] The 1970 Reauthorization amended the coverage formula in Section 4(b) to include jurisdictions that maintained a prohibited test or device on November 1, 1968, and had voter registration or turnout of less than 50% of eligible residents in the Presidential election of 1968. Tit. I, 84 Stat. 315. The 1975 Reauthorization amended the coverage formula to include

(continued…)

Section 5 after each reauthorization.  *Georgia* v. *United States*, 411 U.S. 526, 535 (1973); *City of Rome* v. *United States*, 446 U.S. 156, 172-182 (1980); *Lopez* v. *Monterey Cnty.*, 525 U.S. 266, 282-285 (1999).

In 1982, Congress amended the bailout provision of the VRA, substantially expanding the opportunity for covered jurisdictions to terminate coverage to include "any political subdivision of [a covered] State" even if the coverage determination had not been made "with respect to such subdivision as a separate unit."  1982 Reauthorization, § 2(b)(2), 96 Stat. 131. The 1982 Reauthorization also changed the substantive requirements for bailout.  Under the revised bailout provision, which is currently in effect, jurisdictions may terminate coverage by demonstrating that they have fully complied with Section 5 and other voting rights provisions during the previous ten years.  1982 Reauthorization, § 2(b)(4), 96 Stat. 131-133; see 42 U.S.C. 1973b(a).  As of the date of this filing, bailout has been granted by the court, with the consent of the Attorney General, in 18 cases since the current bailout provision went into effect in 1984, including five cases in the two years since the decision in *Northwest Austin* significantly expanded the jurisdictions eligible to bailout.  See Defendant's Statement of Undisputed Material Facts (Def. SMF) ¶¶ 32, 34-35.  Consent decrees providing for bailout in four additional cases have been filed and are awaiting court approval.  Def. SMF ¶ 36.  The Attorney General is

_____

(…continued)
jurisdictions that maintained a prohibited test or device on November 1, 1972, and had voter registration or turnout of less than 50% of voting age residents in the Presidential election of 1972.  Tit. II, 89 Stat. 401.  The 1975 reauthorization also expanded the definition of "test or device" to include a practice of providing voting materials only in English in jurisdictions in which at least 5% of the voting age population were members of a single-language minority.  Tit. II, 89 Stat. 401-402; see 40 Fed. Reg. 43,746 (Sept. 23, 1975).

currently reviewing the informal bailout requests of numerous additional jurisdictions.  Def. SMF ¶ 40.

3.  In 2006, Congress again reauthorized Section 5 for 25 years, finding that although progress had been made, Section 5 review is still necessary to overcome nearly 100 years of voting discrimination perpetrated in defiance of the Fifteenth Amendment.  Congress made the following statutory findings:

(1) Significant progress has been made in eliminating first generation barriers experienced by minority voters, including increased numbers of registered minority voters, minority voter turnout, and minority representation in Congress, State legislatures, and local elected offices.  This progress is the direct result of the Voting Rights Act of 1965.

(2) However, vestiges of discrimination in voting continue to exist as demonstrated by second generation barriers constructed to prevent minority voters from fully participating in the electoral process.

(3) The continued evidence of racially polarized voting in each of the jurisdictions covered by the expiring provisions of the Voting Rights Act of 1965 demonstrates that racial and language minorities remain politically vulnerable, warranting the continued protection of the Voting Rights Act of 1965.

(4) Evidence of continued discrimination includes—

(A) the hundreds of objections interposed, requests for more information submitted followed by voting changes withdrawn from consideration by jurisdictions covered by the Voting Rights Act of 1965, and section 5 enforcement actions undertaken by the Department of Justice in covered jurisdictions since 1982 that prevented election practices, such as annexation, at-large voting, and the use of multimember districts, from being enacted to dilute minority voting strength;

(B) the number of requests for declaratory judgments denied by the United States District Court for the District of Columbia;

(C) the continued filing of section 2 cases that originated in covered jurisdictions; and

(D) the litigation pursued by the Department of Justice since 1982 to enforce sections 4(e), (f)(4), and 203 of such Act to ensure that all language minority citizens have full access to the political process.

(5) The evidence clearly shows the continued need for Federal oversight in jurisdictions covered by the Voting Rights Act of 1965 since 1982, as demonstrated in the counties certified by the Attorney General for Federal examiner and observer coverage and the tens of thousands of Federal observers that have been dispatched to observe elections in covered jurisdictions.

(6)  The effectiveness of the Voting Rights Act of 1965 has been significantly weakened by the United States Supreme Court decisions in Reno v. Bossier Parish II and Georgia v. Ashcroft, which have misconstrued Congress' original intent in enacting the Voting Rights Act of 1965 and narrowed the protections afforded by section 5 of such Act.

(7) Despite the progress made by minorities under the Voting Rights Act of 1965, the evidence before Congress reveals that 40 years has not been a sufficient amount of time to eliminate the vestiges of discrimination following nearly 100 years of disregard for the dictates of the 15th amendment and to ensure that the right of all citizens to vote is protected as guaranteed by the Constitution.

(8) Present day discrimination experienced by racial and language minority voters is contained in evidence, including the objections interposed by the Department of Justice in covered jurisdictions; the section 2 litigation filed to prevent dilutive techniques from adversely affecting minority voters; the enforcement actions filed to protect language minorities; and the tens of thousands of Federal observers dispatched to monitor polls in jurisdictions covered by the Voting Rights Act of 1965.

(9) The record compiled by Congress demonstrates that, without the continuation of the Voting Rights Act of 1965 protections, racial and language minority citizens will be deprived of the opportunity to exercise their right to vote, or will have their votes diluted, undermining the significant gains made by minorities in the last 40 years.

2006 Reauthorization, § 2(b), 120 Stat. 577-578.

Congress also amended Section 5 by adding three new subsections:

(b) Any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting that has the purpose of or will have the effect of diminishing the ability of any citizens of the United States on account of race or color, or in contravention of the guarantees set

forth in section 4(f)(2), to elect their preferred candidates of choice denies
or abridges the right to vote within the meaning of subsection (a) of this
section.

(c) The term 'purpose' in subsections (a) and (b) of this section shall
include any discriminatory purpose.

(d) The purpose of subsection (b) of this section is to protect the ability of
such citizens to elect their preferred candidates of choice.

2006 Reauthorization, § 5, 120 Stat. 580-581; see 42 U.S.C. 1973c (b)-(d) .

## B.      Plaintiffs

Plaintiffs are proponents of a 2008 referendum that would have changed the method of
electing the mayor and city council of the City of Kinston, North Carolina from partisan to
nonpartisan elections.  Complaint ¶¶ 2-7, 14.  The individual plaintiffs are registered voters and
residents of Kinston, one of whom is running as a candidate for elective office in the City.
Complaint ¶¶ 2-6.  The organizational plaintiff, Kinston Citizens for Nonpartisan Voting,
consists of registered Kinston voters and prospective candidates who supported the referendum.
Complaint ¶ 7.

The City of Kinston, in Lenoir County, North Carolina, has been subject to Section 5
since 1965, when Lenoir County was designated for coverage.  Def. SMF ¶ 1-2.  In February
2009, Kinston submitted to the Department of Justice for Section 5 review a proposed change
from partisan to nonpartisan elections for municipal offices that had been adopted by the City's
electorate by referendum in November 2008.  Def. SMF ¶ 3.  On August 17, 2009, the
Department interposed an objection to the proposed change to nonpartisan elections.  Def. SMF ¶
2 & Exh. 2.  The City of Kinston did not exercise its right to seek a *de novo* statutory declaratory
judgment from this court to overcome the Department's objection, nor did it seek reconsideration
from the Attorney General.  Def. SMF ¶ 5; see 42 U.S.C. 1973c(a).

8

## ARGUMENT

As the Supreme Court emphasized in *Northwest Austin Municipal Utility District Number One* v. *Holder*, 129 S. Ct. 2504, 2513 (2009) (*Northwest Austin II*), "[t]he Fifteenth Amendment empowers 'Congress,' not the Court, to determine in the first instance what legislation is needed to enforce it."  See *South Carolina* v. *Katzenbach*, 383 U.S. 301, 326 (1966) ("Congress [is] to be chiefly responsible for implementing the rights created by" the Fifteenth Amendment).  In 2006, Congress "amassed a sizable record in support of its decision to extend the preclearance requirements."  *Northwest Austin II*, 129 S. Ct. at 2513.  Based on that record, Congress correctly concluded that, without the preclearance requirement for covered jurisdictions, "racial and language minority citizens will be deprived of the opportunity to exercise their right to vote, or will have their votes diluted, undermining the significant gains made by minorities in the last 40 years."  2006 Reauthorization, § 2(b)(9), 120 Stat. 578; see *Northwest Austin Mun. Util. Dist. No. One* v. *Mukasey*, 573 F. Supp. 2d 221, 265-268 (D.D.C. 2008) (*Northwest Austin I*) (Congress rationally determined that reauthorization was appropriate); *id.* at 268-278 (finding reauthorization congruent and proportional response to evidence of continued voting discrimination).

When Congress reauthorized Section 5 in 2006, it chose to continue covering the jurisdictions that it had already subjected to the preclearance requirement and that had not bailed out.  Congress acted based on findings that voting discrimination continued to exist in those specific jurisdictions and that Section 5 preclearance remained necessary to protect minority voting rights there.  That determination alone was sufficient.  Having lawfully covered a set of jurisdictions in 1965, and having lawfully extended the preclearance requirement in those jurisdictions in 1970, 1975, and 1982, Congress was entitled in 2006 to ask simply whether those

jurisdictions, to the extent they had not bailed out, had sufficiently eliminated the pattern of discrimination that justified their coverage in the first place.  But Congress did more than simply ask whether the *covered jurisdictions* had purged their violations.  Congress also considered comparative evidence establishing that voting discrimination was more prevalent in those jurisdictions than in the non-covered jurisdictions.  See Att. 1 at 5-6, 68-69; Att. 2 at 30-32.

Plaintiffs challenge not only Congress's decision to extend Section 5 but also its decision to amend the statute.  But plaintiffs' challenges to the 2006 Amendments are not properly presented here.  Because the Attorney General's objection to the Kinston nonpartisan vote plan did not rest on those Amendments, it did not cause the plaintiffs' alleged injuries.  And because the Amendments, which appear in Subsections 5(b) through (d), are severable from the basic preclearance requirement, which appears in Subsection 5(a) and was applied in the Kinston objection, a ruling invalidating the Amendments would not redress the plaintiffs' alleged injuries.  Moreover, plaintiffs' challenge to the 2006 Amendments rests on speculations about how the Attorney General will apply those Amendments in the future; it is not ripe for review. In any event, the Amendments are constitutional, and plaintiffs have certainly not met their burden to show that those Amendments are unconstitutional in all of their applications.  The change to Section 5's purpose prong, the new Subsection 5(c), simply incorporates the Supreme Court's own standard for determining what discriminatory purpose violates equal protection. Accordingly, it directly enforces the Constitution and cannot itself violate equal protection.  The change to Section 5's retrogression prong, the new Subsections 5(b) and (d), simply resolves a particular question regarding the definition of retrogression in the context of districting.  It does not purport to overturn the principle, long established in the Supreme Court's cases, that even a retrogressive change must be precleared if the alternative would violate the Constitution.

# I

## SECTION 5 OF THE VOTING RIGHTS ACT REMAINS A VALID EXERCISE OF CONGRESS'S AUTHORITY TO ENFORCE THE FOURTEENTH AND FIFTEENTH AMENDMENTS

For the reasons set forth in Attachment 1 at 9-75, Attachment 2 at 1-35, and Attachment 3 at 1-15, the 2006 Reauthorization of Section 5 is well within Congress's authority under the Fourteenth and Fifteenth Amendments. The Attorney General is entitled to judgment as a matter of law on plaintiffs' first claim for relief. Plaintiffs' contentions to the contrary are unavailing.

### A.     The 2006 Reauthorization Is Subject To Rational Basis Review

Plaintiffs contend, first, that Section 5 must be subjected to the congruence and proportionality test set forth in *City of Boerne* v. *Flores*, 521 U.S. 507, 520 (1997). Pl. Mem. 8-13.[3] For the reasons set forth in Attachment 1 at 12-20, and Attachment 2 at 1-12, Section 5 is subject to rational basis review. Section 5 enforces the core prohibition on race discrimination found in both the Fourteenth and Fifteenth Amendments, and it protects a citizen's most fundamental right – the right to vote.[4] As the Court held in *South Carolina* v. *Katzenbach*, 383

---

[3]  Citations to "Pl. Mem. __" refer to Plaintiffs' Memorandum Of Points And Authorities In Support Of  Plaintiffs' Motion For Summary Judgment.

[4]  Plaintiffs contend that Congress's authority for Section 5 must be found in the Fourteenth as well as the Fifteenth Amendment. Pl. Mem. 11. But the Supreme Court has squarely upheld Section 5 and the other temporary provisions of the Voting Rights Act as valid Fifteenth Amendment legislation, and those holdings are binding on this court. See *South Carolina* v. *Katzenbach*, 383 U.S. 301, 324-337 (1966); *City of Rome* v. *United States*, 446 U.S. 156, 173 (1980 ) ("Congress passed the Act under the authority accorded it by the Fifteenth Amendment. * * * We hold that, even if § 1 of the Amendment prohibits only purposeful discrimination, the prior decisions of this Court foreclose any argument that Congress may not, pursuant to § 2, outlaw voting practices that are discriminatory in effect."); see *id.* at 174-175; *Lopez* v. *Monterey Cnty.*, 525 U.S. 266, 269 (1999) ("Congress enacted the Voting Rights Act under its authority to enforce the Fifteenth Amendment's proscription against voting discrimination."); see *id.* at 282-283. Notably, while plaintiffs contend that Congress's authority under the Fifteenth Amendment is limited to electoral practices affecting the right to cast a

(continued…)

U.S. 301, 324 (1966), "As against the reserved powers of the States, Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting."

Plaintiffs erroneously contend (Pl. Mem. 12-13) that rational basis review is no longer applicable to Section 5 because the 2006 Amendments have transformed the statute so that it is no longer race neutral.  As explained below, pp. 34-43, *infra,* the Amendments will not have the draconian effect that plaintiffs predict.  In any event, it has been clear since at least 1976 – long before the enactment of the 2006 Amendments and four years before the Court applied rational basis review to uphold Section 5 in *City of Rome* v. *United States*, 446 U.S. 156, 172-182 (1980), that Section 5 is not race-neutral.  See *Beer* v. *United States*, 425 U.S. 130, 141 (1976) (the "effect" prong of the preclearance standard precludes only changes that "would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise").  Thus, the 2006 Amendments provide no basis from departing from Supreme Court precedent requiring the application of rational basis review to Section 5.

Moreover, even measured against the congruence and proportionality standard, the 2006 Reauthorization is appropriate legislation.  See Att. 1 at 20.

**B.      Congress Rationally Concluded That Reauthorization Of Section 5 Was Appropriate**

The 2006 Reauthorization of Section 5 was appropriate legislation authorized by Congress's authority to enforce the Fourteenth and Fifteenth Amendments.  In 2006, Congress

_____

(…continued)

ballot, see Pl. Mem. 11, neither *City of Rome* and *Lopez* involved such practices, but rather involved dilutive mechanisms.  See *City of Rome*, 446 U.S. at 160; *Lopez*, 446 U.S. at 271-273. In any event, the Attorney General's argument that Section 5 is subject to rational basis review does not depend solely on Congress's authority under the Fifteenth Amendment.  As explained in Attachment 1 at 11-20, rational basis review applies to legislation enacted to enforce the prohibition on race discrimination in the Fourteenth Amendment as well as in the Fifteenth Amendment.

went to extraordinary lengths to carefully consider the various conflicting considerations associated with reauthorizing Section 5.  In so doing, Congress appropriately enforced core constitutional protections against racial discrimination in voting.  Congress looked in 2006 to the same evidentiary sources relied upon by previous Congresses and found to be adequate by the Supreme Court.  The 2006 Congress found that the same types and patterns of discriminatory behavior found by previous Congresses continue today.  This extensive record of voting discrimination, including intentional discrimination, stands in stark contrast to the very minimal records of discrimination that the Court found inadequate to support legislation in other cases. See *Boerne*, 521 U.S. at 530; *Kimel* v. *Florida Bd. of Regents*, 528 U.S. 62, 89 (2000); *Board of Trustees of the Univ. of Ala.* v. *Garrett*, 531 U.S. 356, 368 (2001).  Thus, the 2006 Reauthorization not only satisfies the rational basis test, but also meets the congruence and proportionality test.  See *Northwest Austin Mun. Util. Dist. No. One* v. *Mukasey*, 573 F. Supp. 2d 221, 268-279 (D.D.C. 2008) (*Northwest Austin I*); Att. 1 at 20-65; Att. 2 at 12-29; Att. 3.

Plaintiffs contend that the sole justification for the preclearance requirement in Section 5 is to prevent retrogressive voting changes that cannot be remedied through litigation under Section 2 of the VRA, 42 U.S.C. 1973.  See Pl. Mem. 14-17.  The passages plaintiffs cite in support of this proposition explain the differences between the two provisions.  See *e.g.*, *Reno* v. *Bossier Parish Sch. Bd.*, 528 U.S. 320, 335 (2000) (*Bossier Parish II*) ("in vote-dilution cases § 5 prevents nothing but backsliding"); *Reno* v. *Bossier Parish Sch. Bd.*, 520 U.S. 471, 479 (1997) (*Bossier Parish I*) ("Section 2, on the other hand, was designed as a means of eradicating voting practices that 'minimize or cancel out the voting strength and political effectiveness of minority groups.'") (citation omitted).  But plaintiffs cite no authority that supports their bald assertion that the *sole* function of Section 5 is to "supplement and protect the nondiscrimination gains

13

achieved by Section 2." Pl. Mem. 16. Indeed, while the Court has made it clear that the effects

prong of the Section 5 preclearance standard was designed to prevent "a retrogression in the

position of racial minorities with respect to their effective exercise of the electoral franchise,"

*Beer*, 425 U.S. at 141, the Court has never limited the application of Section 5 to protect only

those gains achieved through litigation. See, *e.g.*, *City of Rome* 446 U.S. at 183-187 (affirming

denial of preclearance to voting changes adopted in 1966 that would have reduced the ability of

black voters to elect their candidates of choice when compared to pre-1966 voting procedures).

In any event, the legislative record documents specific instances in which Section 5 was essential

to preserve the gains achieved through litigation. Att. 1 at 33-34, 41-42. That record also

establishes that Section 2 alone is inadequate to protect minority voting rights, Att. 1 at 55-57,

and that the mere existence of the preclearance requirement deters election officials in covered

jurisdictions from taking discriminatory actions, Att. 1 at 53-55.

      Plaintiffs next contend that Section 5 is not justified by current needs. Pl. Mem. 17-21.

As set forth in Attachment 1 at 23-57, and Attachment 3 at 9-13, the legislative record compiled

by Congress when it reauthorized Section 5 in 2006 includes abundant evidence of the continued

need for preclearance, including evidence of intentional voting discrimination by the covered

jurisdictions, and intimidation and harassment by election officials during the 1982 to 2006

period, see Att. 1 at 27-31, 37, 39-40, 44-49. Congress relied on the same types of evidence and

the same patterns of discrimination in 2006 as it did when it reauthorized Section 5 in 1970,

1975, and 1982. And the Supreme Court relied on the same types of evidence and patterns of

discrimination when it upheld those reauthorizations. See Att. 1 at 20-23.

      Plaintiffs point to improvements in the registration and turnout of minority voters as

evidence that Section 5 is no longer needed. Pl. Mem. 19-20. But the Supreme Court long ago

rejected the contention that the sole purpose of Section 5 was to prohibit barriers to registration

and turnout, holding that Section 5 was intended to prevent all manner of voting procedures that

have the purpose or effect of restricting minority voting rights, including dilutive techniques and

other means of minimizing the effectiveness of minority voters.  *Allen* v. *State Bd. of Elections*,

393 U.S. 544, 563-571 (1969); *Perkins* v. *Matthews*, 400 U.S. 379, 387-395 (1971).  Indeed,

some of the jurisdictions now covered by Section 5 have a history of using dilutive techniques

beginning long before enactment of the VRA.  See Att. 1 at 57-60; see also *Gingles* v. *Edmisten*,

590 F. Supp. 345, 360 (1984) (describing "voting mechanisms designed to minimize or cancel

the potential voting strength of black citizens" employed by North Carolina, including the 1955

enactment of an anti-single shot voting law that had "the intended effect of fragmenting a black

minority's total vote between two or more candidates in a multi-seat election and preventing its

concentration on one candidate"), rev'd in part on different grounds, *Thornburgh* v. *Gingles*, 478

U.S. 30  (1986).

Nor does the increase in numbers of minority elected officials indicate that Section 5 is

no longer needed.  See Pl. Mem. 20.  As explained in Attachment 1 at 49-53, Congress heard

evidence that most minority legislators, at both the state and federal level, were elected from

majority-minority districts, and that, because of racial bloc voting, such districts – largely created

as a result of the VRA – remain necessary to enable minority voters to elect candidates of their

choice.  Finally, while there has been a reduction in the rate of Section 5 objections in recent

years (see Pl. Mem. 20), those figures do not reflect the complete picture.  Many discriminatory

voting changes were withdrawn during the preclearance process after the Department of Justice

requested more information or were blocked by declaratory judgment actions.  See Att. 1 at 35-

38 (more than 1100 voting changes were denied either judicial or administrative preclearance;

200 submissions were withdrawn; and more than 855 submissions were affected by requests for more information).  Moreover, many more discriminatory changes were prevented by Section 5's deterrent effect.  Att. 1 at 53-55.

**C.  Congress's Decision To Continue Covering The Jurisdictions That Section 5 Had Previously Covered Was Rational In Theory And Practice**

Plaintiffs next contend that the coverage formula in Section 4(b) is irrational.  Pl. Mem. 21-25.  As explained in Attachment 1 at 65-75, and Attachment 3, Congress's decision to reauthorize the application of Section 5 to the covered jurisdictions was appropriate Fifteenth Amendment legislation, "rational in both practice and theory."  *South Carolina*, 383 U.S. at 330. In crafting the coverage formula in 1965, Congress defined the geographic reach of Section 5 by using objective criteria that it knew would capture the jurisdictions it had found to be the most egregious discriminators.  In 2006, Congress found that voting discrimination was still occurring in the covered jurisdictions.  See pp. 6-7, *supra*.  And evidence before Congress demonstrated that voting discrimination was more prevalent in the covered than in the non-covered jurisdictions.  See Att. 1 at 5-6, 68-69; Att. 2 at 30-32; Att. 3 at 9-13; see Def. SMF ¶¶ 44-51 & Exh. 3.  Moreover, the bailout provision provides ample opportunity for jurisdictions to terminate coverage when they are able to demonstrate that the need for Section 5 review no longer exists.  See Att. 1 at 69-74; Att. 2 at 33-34; Att. 3 at 14-15; see Def. SMF ¶¶ 17-40. And the "bail-in" provision in Section 3(c) enables courts to subject jurisdictions found to have violated the voting guarantees of the Fourteenth or Fifteenth Amendment to the same preclearance requirements required by Section 5.  42 U.S.C. 1973a(c); see Att. 2 at 32.  The coverage formula therefore remains valid.

Plaintiffs' contention that there is no meaningful difference between jurisdictions covered by Section 5 and the rest of the country, Pl. Mem. 21-25, is contradicted by the legislative record.

As measured by outcomes in Section 2 cases, voting discrimination was much more common in the covered than in the non-covered States.  See Att. 1 at 40-41, 68-69; Att. 2 at 30-32; Att. 3 at 12-13; Def. SMF ¶¶ 44-51 & Exh. 3.  Because the Section 5 preclearance process blocks many discriminatory voting changes in the covered jurisdictions, one would expect there to be proportionally *fewer* Section 2 cases in the covered than in the non-covered jurisdictions.  Instead, even when only reported decisions are considered, covered jurisdictions were subject to more than twice their proportional share of successful plaintiffs' Section 2 lawsuits.  As plaintiffs acknowledge, Pl. Mem. 31, the standard for proving a violation of Section 2 is designed to "identify facially neutral practices that are likely to be intentionally discriminatory."  Thus, these judicial findings of Section 2 violations are reliable evidence that intentional voting discrimination is much more common in the covered jurisdictions.  And, when unreported cases involving settlements are included, the differential between covered and non-covered jurisdictions is even more pronounced:  81% of the successful Section 2 actions nationwide were in covered jurisdictions.  Att. 1 at 68; see also Att. 2 at 31-32; Att. 3 at 12-13; Def. SMF ¶¶ 51.

## II

## PLAINTIFFS' CHALLENGES TO THE 2006 AMENDMENTS TO SECTION 5 MUST FAIL

### A.    The 2006 Amendments

Because Congress enacted the 2006 Amendments in response to two Supreme Court decisions, *Reno* v. *Bossier Parish School Board*,  528 U.S. 320 (2000) (*Bossier Parish II*); and *Georgia* v. *Ashcroft*, 539 U.S. 461 (2003), we begin with a review of those decisions and their impact on the preclearance standard.  As enacted in 1965, Section 5 bars the implementation of a change in "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting" by a covered jurisdiction unless the jurisdiction demonstrates that the

change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color."  1965 Act, 79 Stat. 439.

The Supreme Court long ago established that the "effect" prong of the preclearance standard precludes only changes that "would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise."  *Beer* v. *United States*, 425 U.S. 130, 141 (1976).  In *Bossier Parish II*, the Court held for the first time[5] that, in the context of a claim of intentional vote dilution, the "purpose" prong of the preclearance standard is similarly limited to voting changes with a retrogressive purpose.  528 U.S. at 328. "[*N*]*o matter how unconstitutional it may be*," the Court later explained, "a plan that is not retrogressive should be precleared under § 5."  *Ashcroft*, 539 U.S. at 477 (quoting *Bossier Parish II*, 528 U.S. at 336) (emphasis in the original).

In *Ashcroft*, the Court examined the meaning of the term "effective exercise of the electoral franchise," used in *Beer*.  539 U.S. at 479; see *Beer*, 425 U.S. at 141.  While the Court recognized that "the comparative ability of a minority group to elect a candidate of its choice" is an "important" factor in determining whether a plan is retrogressive, "it cannot be dispositive or exclusive."  *Id.* at 480.  Thus, the Court held, a State may choose to create districts in which a minority group constitutes a sufficient majority that its ability to elect its candidates of choice is "virtually guarantee[d]."  *Id.* at 480-481 (internal quotation marks omitted).  Or the State may choose to create a larger number of districts in which minority voters have a substantial, but smaller representation, and thus will have only the possibility of electing the candidates of their choice, or perhaps only of influencing the outcome of the election, with or without a coalition

---

[5]  The Court had explicitly left the question open in *Reno* v. *Bossier Parish School Board*, 520 U.S. 471, 486 (1997) (*Bossier Parish I*).

with other groups.  *Id.* at 481-482.  "Section 5," the Court held, "gives States the flexibility to choose one theory of effective representation over the other."  *Id.* at 482.

Congress concluded that the decisions in *Bossier Parish II* and *Ashcroft* "misconstrued Congress' original intent in enacting the Voting Rights Act of 1965," "narrowed the protections afforded by section 5," and "significantly weakened" the Act's effectiveness.  2006 Reauthorization, § 2(b)(6), 120 Stat. 578.  With regard to the Court's holding in *Bossier Parish II*, the House Report explained that "[t]hrough the 'purpose' requirement, Congress sought to prevent covered jurisdictions from enacting and enforcing voting changes made with a clear racial animus, regardless of the measurable impact of such discriminatory changes."  H.R. Rep. No. 478, 109th Cong., 2d Sess. 66 (2006) (2006 House Report).  "Voting changes that 'purposefully' keep minority groups 'in their place,'" the House Report declared, "have no role in our electoral process and are precisely the types of changes Section 5 is intended to bar.  To allow otherwise would be contrary to the protections afforded by the 14th and 15th amendment[s] and the VRA."  2006 House Report 68.  Thus, Congress amended Section 5 to clarify "that any voting change motivated by any discriminatory purpose is prohibited under Section 5."  *Ibid.*  The Report went on to state that the existence of discriminatory intent should be determined based upon the familiar factors set forth in *Village of Arlington Heights* v. *Metropolitan Housing Development Corporation*, 429 U.S. 252, 266-268 (1977).  2006 House Report 68.

The House Report also concluded that the Court's decision in *Ashcroft* "turns Section 5 on its head" by directing courts to "defer to the political decisions of States rather than the genuine choice of minority voters regarding who is or is not their candidate of choice."  2006 House Report 69.  The Court's "'new' analysis," the House Report stated, "would allow the

minority community's own choice of preferred candidates to be trumped by political deals struck

by State legislators purporting to give 'influence' to the minority community while removing

that community's ability to elect candidates.  Permitting these trade-offs is inconsistent with the

original and current purpose of Section 5." 2006 House Report 69.  The retrogression standard

applied before the *Ashcroft* ruling, the House Report explained, was responsible for the electoral

gains made by minority communities since enactment of the VRA, and the *Ashcroft* standard put

those gains at risk:

> [L]eaving the *Georgia* [v. *Ashcroft*] standard in place would encourage States to
> spread minority voters under the guise of 'influence' and would effectively shut
> minority voters out of the political process.  In essence, the Committee heard that
> Section 5, if left uncorrected, would now allow States to turn black and other
> minority voters into second class voters who can influence elections of white
> candidates, but who cannot elect their preferred candidates, including candidates
> of their own race. This is clearly not the outcome that Congress intended the
> Voting Rights Act and Section 5 to have on minority voters.

2006 House Report 70 (footnote and internal quotation marks omitted).

Congress responded to the decisions in *Bossier Parish II* and *Ashcroft* by adding three

provisions to Section 5:

> (b) Any voting qualification or prerequisite to voting, or standard, practice, or
> procedure with respect to voting that has the purpose of or will have the effect of
> diminishing the ability of any citizens of the United States on account of race or
> color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this
> title, to elect their preferred candidates of choice denies or abridges the right to
> vote within the meaning of subsection (a) of this section.

> (c) The term "purpose" in subsections (a) and (b) of this section shall include any
> discriminatory purpose.

> (d) The purpose of subsection (b) of this section is to protect the ability of such
> citizens to elect their preferred candidates of choice.

2006 Reauthorization, § 5, 120 Stat. 580-581.

**B.      Plaintiffs Lack Standing To Challenge The Constitutionality Of The 2006 Amendments**

Plaintiffs must establish this Court's jurisdiction to hear their claims. See *United States Ecology, Inc.* v. *United States Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000). Because each element of standing – injury, causation, and redressibility – is "indispensable" to the plaintiffs' case, each "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Standing requirements must be "strictly construed" in constitutional challenges to federal laws. *Valley Forge Christian Coll.* v. *Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473-475 (1982). Furthermore, plaintiffs "must demonstrate standing for each claim [they] seek to press." *DaimlerChrysler Corp.* v. *Cuno*, 547 U.S. 332, 352 (2006) (citing *Allen* v. *Wright*, 468 U.S. 737, 752 (1984)). Thus, standing to assert one claim does not confer standing to assert a second, and the absence of any one element is fatal to that second claim. See *Lujan*, 504 U.S. at 560-561.

The D.C. Circuit raised a number of questions about plaintiffs' standing to challenge the 2006 Amendments to Section 5, which added new Subsections 5(b) through (d). That court, for example, questioned plaintiffs' ability to satisfy the causation and redressability prongs of the Supreme Court's standing analysis. It observed that

> Section 5's preemptive provision appears in subsection (a), not subsections (b)-(d), thus presenting the following questions: even were we to declare subsections (b)-(d) unconstitutional, would we sever and strike down only those subsections, leaving subsection (a) untouched? And if so, what would happen to the Kinston referendum and the Attorney General's decision to refuse preclearance, given that the preemption and the preclearance decision both occurred under a statutory scheme that included the allegedly defective subsections (b)-(d)?"

*LaRoque* v. *Holder (LaRoque II)*, No. 10-5433, 2011 U.S. App. LEXIS 13907, at *45 (D.C. Cir. July 8, 2011).  The Court also questioned whether plaintiffs, who "are bringing only a facial challenge," "have * * * met the requirement that litigants claiming injury from a racial classification establish that they 'personally [have been] denied equal treatment by the challenged discriminatory conduct.'"  *Id.* at *47 (quoting *United States* v. *Hays*, 515 U.S. 737, 743-744 (1995)).  As we explain below, plaintiffs lack standing to bring their Equal Protection challenge because the 2006 Amendments on their face caused no harm and, in any event, plaintiffs' alleged injuries would not be redressed by striking the Amendments down. Accordingly, this Court lacks jurisdiction over that claim.[6]

## 1.    The 2006 Amendments Did Not Cause Plaintiffs' Alleged Injuries

Even if plaintiffs established sufficient injury to assert their Equal Protection claim, the 2006 Amendments did not cause the harms alleged.  To satisfy the causation requirement, plaintiffs must establish "a causal connection between the injury and the conduct complained of -- the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'"  *Lujan*, 504 U.S. at 560-561 (quoting *Simon* v. *Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)).

Significantly, plaintiffs do not challenge on Equal Protection grounds the constitutionality of the pre-2006 preclearance standards articulated in *Georgia* v. *Ashcroft* and *Bossier Parish II.  LaRoque II*, 2011 U.S. App. LEXIS 13907, at *44.  To have standing to challenge the 2006 Amendments, plaintiffs must show that those Amendments themselves, and

---

[6] The United States incorporates and reiterates the standing arguments it asserted with respect to Plaintiffs' Claim Two in earlier briefing.  See Mem. in Supp. of Def.'s Mot. To Dismiss 9-10, June 14, 2011, ECF No. 11; Def.'s Reply to Pl.'s Opp'n To Mot. To Dismiss 11-13, July 12, 2010, ECF No. 14.

not the preclearance requirement as it existed before 2006, specifically caused their alleged injuries.  Plaintiffs cannot do so.

Plaintiffs say their "nondiscrimination rights were violated when Section 5 'postpon[ed] the implementation of [the] validly enacted [referendum]' in furtherance of Congress' minority-preferring regime, regardless of why the Attorney General subsequently declined to 'end' that suspension."  Appellants' Reply Br. 30, *Laroque* v. *Holder*, No. 10-5433 (D.C. Cir. Mar. 17, 2011) (Appellants' Reply Br.).  Thus, they tie their alleged injury solely to the postponement of the implementation of the referendum.  Moreover, to conclude that the Attorney General objected to the referendum because he determined that it violated the 2006 Amendments "requires review of the Attorney General's objection – something plaintiffs disclaim any intention of seeking."  *Laroque II*, 2011 U.S. App. LEXIS 13907, at 47; cf. *Morris* v. *Gressette*, 432 U.S. 491, 501-07 & n.24 (1977) (holding that "Congress intended to preclude all judicial review of the Attorney General's exercise of discretion or failure to act" under Section 5).

In any event, it simply cannot be true that an individual injured by Section 5's prohibition on implementing a new, unprecleared election law has standing to challenge the 2006 Amendments "regardless of why the Attorney General subsequently decided to 'end' that suspension."  See Appellants' Reply Br. 30.  If it were, then individuals could challenge the 2006 Amendments even when those Amendments had absolutely no impact on them.  For example, such a plaintiff could challenge the 2006 Amendments even if the voting change at issue drew an objection because it violated Section 5 under the pre-2006 standards (such as a change that was adopted with the purpose to cause retrogression, see *Bossier Parish II*, 528 U.S. at 328).  Indeed, such a plaintiff could challenge the 2006 Amendments even if the jurisdiction in which she lived never submitted the voting change at issue for preclearance.  Just as here, Section 5 will have

"postpone[ed] the implementation of [the] validly enacted [voting change]" in each of these cases. Appellants' Reply Br. 30. But the 2006 Amendments will have had absolutely nothing to do with it. It is the operation of Subsection 5(a) – which contains Section 5's "preemptive provision" – that has caused the injury in these cases, not the operation of Subsections 5(b) through (d) – which contain the Amendments. See *Laroque II*, 2011 U.S. App. LEXIS 13907, at *45 ("[S]ection 5's preemptive provision appears in subsection (a), not subsections (b)-(d)"). Because plaintiffs' alleged injuries, on plaintiffs' own argument, flow directly from Section 5's "preemptive provision," and *not* from the Attorney General's objection or the standards he applied, plaintiffs fail to establish injuries "fairly traceable" to the 2006 Amendments.

Turning to the facts of this case, plaintiffs cannot establish that the 2006 Amendments played any role in the Attorney General's objection to the proposed voting change in Kinston. There is no plausible argument that the 2006 Amendment to the purpose standard, incorporated in Section 5(c), caused plaintiffs' injury. The Attorney General's objection to the City's proposed change to nonpartisan elections was based solely on a finding of discriminatory effect, not discriminatory purpose. See Def. SMF ¶ 4; Exh. 2 ("I cannot conclude that the city has sustained its burden of showing that the proposed changes do not have a retrogressive effect."). Plaintiffs similarly fail to establish causation with respect to Sections 5(b) and (d). Congress adopted those sections to overturn the *Ashcroft* test for determining whether voting changes are retrogressive in the redistricting context. In particular, Congress sought to preclude covered jurisdictions from eliminating existing gains achieved by minority voters by reducing the number of districts from which those voters have the ability to elect their candidates of choice, and replacing them with districts in which those voters can only influence the election's outcome. See pp. 19-20, *supra*. But the Kinston objection did not involve a districting plan at all.

Accordingly, the requirement that States maintain opportunity-to-elect districts instead of creating influence districts – the sole focus of Section 5(b) and (d) – did not cause plaintiffs' injury.

Plaintiffs cannot establish that the 2006 Amendments to Section 5 on their face caused the harms they allege.  To the extent that plaintiffs contend that those Amendments are themselves discriminatory (Pl. Mem. 37-42, 44-45), they have not been personally denied equal treatment by those Amendments and thus lack standing.  See *Hays*, 515 U.S. at 743-744 ("[E]ven if a governmental actor is discriminating on the basis of race, the resulting injury accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct.") (internal quotation marks omitted).  Plaintiffs' argument is nothing more than "a generalized grievance against government conduct of which [they do] not approve."  *Id.* at 745.

### 2.      A Ruling Invalidating Section 5(b)-(d) Would Not Redress Plaintiffs' Alleged Injuries

Even an order striking the 2006 Amendments as unconstitutional would not provide the relief the plaintiffs seek, i.e., implementation of the Kinston referendum.  That is because the 2006 Amendments (Subsections (b)-(d)) are severable from Section 5.  And invalidating the Amendments would leave intact Section 5(a) – the statutory vehicle through which the referendum was preempted.  Any finding that Subsections (b)-(d) are unconstitutional would neither obviate the Attorney General's objection nor resurrect the discriminatory voting change.  That change would remain preempted by virtue of Section 5(a) and the objection interposed pursuant to it under the pre-2006 standards.  Moreover, plaintiffs have no other recourse as they may not seek reconsideration of the Attorney General's objection or *de novo* review in this Court.

a.    *Subsections (b)-(d) Are Severable From Section 5(a)*

Courts are hesitant to strike down an entire statute when one provision is

unconstitutional.  See *Free Enter. Fund* v. *Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138,

3161 (2010) (citing *Champlin Refining Co.* v. *Corporation Comm'n of Okla.*, 286 U.S. 210, 234,

(1932)).  The "normal rule is that partial, rather than facial, invalidation is the required course."

*Ibid.* (quoting *Brockett* v. *Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985) (internal quotation

marks omitted)).  Thus, when statutes contain a constitutional defect, courts generally "try to

limit the solution to the problem, [by] severing any problematic portions while leaving the

remainder intact."  *Ibid.* (quoting *Ayotte* v. *Planned Parenthood of N. New Eng.*, 546 U.S. 320,

328-329 (2006)).

Unconstitutional provisions of a statute may be severed when what remains is: (1)

constitutionally valid, (2) capable of functioning independently, and (3) "consistent with

Congress' basic objectives in enacting the statute."  *United States* v. *Booker*, 543 U.S. 220, 258-

259 (2005).  See also *Bismullah* v. *Gates*, 551 F.3d 1068, 1071 (D.C. Cir. 2009).  An explicit

severability clause strongly favors severing unconstitutional provisions while preserving the

remainder.  See *Alaska Airlines, Inc.* v. *Brock*, 480 U.S. 678, 686 (1987); *Consumer Energy

Council* v. *Federal Energy Regulatory Comm'n*, 673 F.2d 425, 441 (D.C. Cir. 1982).

The Amendments to Section 5 are severable.  First, the statute's severability clause is

decisive evidence of Congress's intent to preserve the Act even if segments are found to be

unconstitutional:  "If any provision of [this Act] or the application thereof to any person or

circumstances is held invalid, the remainder of [the Act] and the application of the provision to

other persons not similarly situated or to other circumstances shall not be affected thereby."  42

26

U.S.C. 1973p.  Such provisions erect a strong presumption of severability.  See *Alaska Airlines*, 480 U.S. at 686 (citing *INS* v. *Chadha*, 462 U.S. 919, 932 (1983); *Champlin Refining Co.* v. *Corporation Comm'n of Oklahoma*, 286 U.S. at 235).  That presumption cannot be overcome absent "strong evidence that Congress intended otherwise." *Alaska Airlines*, 480 U.S. at 686.[7] No such evidence exists.

Second, as explained above, pp. 11-17, *supra*, Section 5, including Subsection (a), is constitutional and, importantly, plaintiffs do not allege that Section 5(a) violates their Equal Protection rights.  Their Equal Protection claim targets the 2006 Amendments only.  See *Laroque II*, 2011 U.S. App. LEXIS 13907, at *44 ("Significantly, plaintiffs do not contest the constitutionality of the pre-2006 preclearance standards articulated in *Georgia v. Ashcroft* and *Bossier Parish*.").

Third, Subsection 5(a) is fully capable of operating independently of Subsections (b)-(d), as it has done since the Voting Rights Act's inception.  Subsection (a) itself is the core mechanism by which all voting changes are automatically and indefinitely suspended pending administrative review by the Attorney General or until this Court's *de novo* review.  See 42 U.S.C. 1973c(a); see also *Laroque II*, 2011 U.S. App. LEXIS 13907, at *45 ("[S]ection 5's preemptive provision appears in subsection (a).").  In addition to the automatic prophylactic mechanism, Subsection 5(a) also contains the general standard for determining whether voting changes should be precleared, *i.e.*, when it "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, or [membership of a language

---

[7]   See also *New Haven* v. *United States*, 809 F.2d 900, 905 n.15 (D.C. Cir. 1987) (stating that severability clauses are "ordinarily given great weight"); *Consumer Energy Council* v. *Federal Energy Regulatory Comm'n,* 673 F.2d at 441(noting that severability clause "makes it extremely difficult for a party to demonstrate inseverability").

minority group].” 42 U.S.C. 1973c(a); 42 U.S.C. 1973b(f).  While the 2006 Amendments seek

to guide the manner in which Subsection (a)’s general standard is applied, they do not alter that

subsection.  For instance, Subsection (c) defines how Subsection (a)’s general standard should be

applied in situations involving intentional discrimination.  42 U.S.C. 1973c(c).  Subsections (b)

and (d) define how the general standard in Subsection (a) should be applied in situations

involving the ability to elect a candidate of choice.  42 U.S.C. 1973c(b) & (d).  Striking down

Subsections (b)-(d) would leave in place Subsection (a)’s preemptive mechanism, as well as the

preclearance standard that applied prior to the 2006 Amendments.  Indeed, Subsection (a)

virtually mirrors pre-amendment Section 5, which contained no subsections.[8]  Plaintiffs’ second

claim does not challenge the constitutionality of Section 5’s pre-amendment standards.[9]  See

*Laroque II*, 2011 U.S. App. LEXIS 13907, at *44.  These standards have operated independently

since the statute’s inception; they may continue to do so absent Subsections (b)-(d).

Finally, Section 5(a) is not merely consistent with Congress’s basic objectives in enacting

the statute, it manifests Congress’s determination to “banish the blight of racial discrimination in

voting[.]”  *South Carolina* v. *Katzenbach*, 383 U.S. 301, 308 (1966).  The presumption in favor

of severability, therefore, can be overcome only if “Congress would not still have passed the

---

[8]  The only change to the language from the pre-2006 Section 5 to amended Subsection (a) is a change from “does not have the purpose and will not have the effect” to “neither has the purpose nor will have the effect.”  This change is not relevant to the standards contained in Subsections (b)-(d).

[9]  This is not a case where severing Subsections (b)-(d) would require the court to “write words into the statute, * * * or to leave gaping loopholes, * * * or to foresee which of many different possible ways the legislature might respond to the constitutional objections [of the amendments].”  *Randall* v. *Sorrell*, 538 U.S. 230, 508 (2006) (plurality).  Rather, the Court has already previously filled in those gaps and interpreted the statute prior to the amendments being enacted.  Thus if the amendments were struck down, the District Court and the Attorney General would be able to apply the pre-2006 standard repeatedly approved by the Supreme Court.

valid sections had it known about the constitutional invalidity of the other portion of the statute."
*Bismullah*, 551 F.3d at 1071-1072 (quoting *Booker*, 543 U.S. at 246) (internal quotation marks
omitted); *Ayotte*, 546 U.S. at 329-330 ("Would the legislature have preferred what is left of its
statute to no statute at all?").[10]   The existence of the severability clause precludes any assumption
that Congress would not have reauthorized Section 5 in 2006 without the Amendments.

>    b.    *Because Subsection (a) Is Severable From Subsections (b)-(d), Plaintiffs*
>           *Have No Avenue For Relief*

Because Subsection (a) (the pre-2006 provision) is severable from Subsections (b)-(d)
(the Amendments), no mechanism exists to remedy the harms plaintiffs allege were caused by
the 2006 Amendments.  If Subsection (a) remains intact, all voting changes in covered
jurisdictions would still be subject to Subsection (a)'s preemption and preclearance mechanism.
In other words, striking Subsections (b) and (d) will not result in the implementation of the pre-
empted Kinston referendum.  These private plaintiffs would not be able to seek administrative
reconsideration from the Attorney General, nor seek *de novo* review of the voting change from
this Court.

Subsection 5(a) provides two avenues to obtain a determination that a voting change does
not abridge or deny the right to vote – administrative review of the voting change by the
Attorney General or *de novo* review of the voting change in this Court at the instance of the
covered jurisdiction.  42 U.S.C. 1973c(a); see also *Perkins*, 400 U.S. at 385.  Subsection (a)
applies to covered jurisdictions only.  42 U.S.C. 1973c(a); 28 C.F.R. 51.23.  Thus, even if

---

[10]   See generally *Booker*, 543 U.S. at 258-259; *Minnesota* v. *Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999); *Alaska Airlines*, 480 U.S. at 684 ("Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.") (citation omitted).

subsections (b)-(d) were struck down, Section 5(a) affords plaintiffs no opportunity to remove the Attorney General's objection.  They cannot seek this Court's *de novo* review of the voting change, nor can they seek the Attorney General's reconsideration of his objection.  42 U.S.C. 1973c(a); 28 C.F.R. 51.45(a).  In any event, plaintiffs have disavowed any intention to seek review of the Attorney General's objection in this litigation.

Speculation by the plaintiffs that Kinston would apply for *de novo* review or seek reconsideration is insufficient to show that the injury is "likely" to be redressed, particularly in light of Kinston's decision not to pursue either course.  See Def. SMF ¶ 5.  Such speculation about Kinston's actions is compounded by the fact that relief could only be afforded if the voting change were entitled to preclearance under the pre-amendment Section 5 standard.  As previously noted, plaintiffs do not assert the Attorney General would have precleared the Kinston submission under the pre-amendment standard.  Any reconsideration by the Attorney General would result in the plaintiffs' desired relief only if the Attorney General would have made a different determination under the pre-amendment standard.  Otherwise the objection would remain regardless of the constitutionality of subsections (b)-(d) and regardless of Kinston seeking reconsideration. Therefore, it is "not likely," but "merely speculative" that a finding by this Court that the Amendments are invalid will redress plaintiffs alleged injury.  *America's Cmty. Bankers* v. *FDIC*, 200 F.3d 822, 827 (D.C. Cir. 2000).

Finally, if this Court were to strike down the 2006 Amendments, while leaving Section 5(a) intact, the Court would lack jurisdiction to overturn the Attorney General's objection.  As noted, subsection (a) would remain in place and with it the Attorney General's objection made pursuant to it.  The Attorney General's administrative determinations under Section 5 are not subject to judicial review.  See *Morris*, 432 U.S. at 501-507 & n.24.  This is so even where

plaintiffs have alleged that the Attorney General misinterpreted his authority under Section 5, see

*Morris*, 432 U.S. at 497-507, or alleged that the Attorney General's exercise of discretion

violated plaintiffs' constitutional rights, see *County Council of Sumter Cnty.* v. *United States*,

555 F. Supp. 694, 700, 706 (D.D.C. 1983); *City of Rome* v. *United States*, 450 F. Supp. 378, 382

n.3 (D.D.C. 1987), aff'd 446 U.S. 156 (1980).  Of course, in this case, plaintiffs are not

challenging the Attorney General's application of Section 5 to the Kinston submission.

Thus, because the Court cannot overturn the Attorney General's objection and because

plaintiffs have no avenue to seek the Attorney General's reconsideration or this Court's *de novo*

review, there is no avenue for relief.  Consequently, plaintiffs cannot show that their alleged

injury caused by the Amendments is likely to be redressed with a finding that subsections (b)-(d)

are unconstitutional.

Because plaintiffs cannot establish their standing to challenge the constitutionality of the

2006 Amendments, this Court lacks jurisdiction over that claim.

**C.      The Challenge To The 2006 Amendments Is Not Ripe For Review**

Determining whether a claim is ripe for review requires a court to "evaluate both the

fitness of the issues for judicial decision and the hardship to the parties of withholding court

consideration."  *Texas* v. *United States*, 523 U.S. 296, 300-301 (1998) (quoting *Abbott Labs.* v.

*Gardner*, 387 U.S. 136, 149 (1967)).  Plaintiffs' claim that the 2006 Amendments are

unconstitutional is not ripe for review.

First, in its present posture, this claim is not fit for decision. As the Court explained in

*Texas*, 523 U.S. at 301 (citation omitted):

> The operation of the statute is better grasped when viewed in light of a particular
> application.  Here, as is often true, "[d]etermination of the scope ... of legislation
> in advance of its immediate adverse effect in the context of a concrete case

involves too remote and abstract an inquiry for the proper exercise of the judicial
function."

The issue in *Texas* was whether particular provisions of state law were subject to Section 5

preclearance.  See *id.* at 297-300.  But the Court's reasoning is no less applicable to plaintiffs'

contention here that the 2006 Amendments violate the Constitution.  It is apparent that plaintiffs

and the Attorney General have quite different views as to the import of the Amendments.

According to plaintiffs, Section 5(c) will authorize the Attorney General "to coerce covered

jurisdictions to increase future minority electoral success" in violation of Equal Protection.  Pl.

Mem. 44; see also Complaint ¶¶ 26, 36-37.  As explained below, however, Section 5(c), in the

Attorney General's view, merely denies preclearance to jurisdictions that are intentionally

discriminating, in violation of the Constitution.  See pp. 34-38, *infra*.  Similarly, plaintiffs

contend that Section 5(b) will result in "more race-based decision making than [Section 5] ever

did before" and that "every majority-minority district in the covered jurisdictions must be

preserved until 2031."  Pl. Mem. 39.  As explained below, however, in the Attorney General's

view, Section 5(b) is merely designed to protect the gains achieved by minority voters, and will

not require covered jurisdictions to disregard traditional districting principles, maximize minority

electoral success, or maintain every majority-minority district, in violation of the constitution.

See pp. 38-43, *infra*.  Seeking to resolve this "remote and abstract" dispute is not a "proper

exercise of the judicial function."  *Texas*, 523 U.S. at 301 (citation omitted).  Rather, plaintiffs'

challenge to the 2006 Amendments is best left to "a particular application" of the Amendments.

*Ibid.*  Because plaintiffs have disavowed such an as-applied challenge in this case, Claim Two is

not fit for decision.

Similarly, withholding judicial review of the Amendments at this time will not result in

harm to the plaintiffs.  See *Texas*, 523 U.S. at 300-301.  As explained above, plaintiffs have not

32

alleged facts demonstrating that the application of the 2006 Amendments has caused them any injury.  See pp. 22-25, *supra*.  If, in the future, the Department misapplies the Amendments and demands that a jurisdiction violate the Constitution, the jurisdiction can obtain complete relief by seeking judicial preclearance in this Court.  42 U.S.C. 1973c(a).  If such a jurisdiction were to choose to submit to such an improper demand, a private party could sue the jurisdiction for the constitutional violation – just as private plaintiffs successfully sued Georgia and North Carolina in the 1990's round of redistricting.

The challenge to the constitutionality of the 2006 Amendments is thus not ripe for review.

**D.      The 2006 Amendments To Section 5 Do Not Violate The Constitution On Their Face**

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid," *United States* v. *Salerno*, 481 U.S. 739, 745 (1987), or at a minimum, that the provision lacks "a plainly legitimate sweep."  *Washington State Grange* v. *Washington State Republican Party*, 552 U.S. 442, 449 (2008) (citation and internal quotation marks omitted).  "The fact that [a statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid."  *Salerno*, 481 U.S. at 745. Moreover, courts adjudicating a facial challenge to a statute "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Washington State Grange*, 552 U.S. at 450.

Thus, because plaintiffs have limited their claims to a facial challenge to the 2006 Amendments, they cannot rely upon allegations about the manner in which the Attorney General has applied Section 5 in the past, the way in which it was applied to the Kinston referendum, or

how they speculate the Attorney General will apply Section 5 in the future. In short, they cannot

prevail by showing that Section 5 "might operate unconstitutionally under some conceivable set

of circumstances." *Salerno*, 481 U.S. at 745. Rather, they must demonstrate that the "facial

requirements" of the 2006 Amendments are unconstitutional. *Washington State Grange*, 552

U.S. at 450.

### 1.  The Amendment To Section 5's Purpose Prong Is Valid Enforcement Legislation And Does Not Violate Equal Protection

Section 5(c), which amended Section 5's purpose prong, provides that Section 5

preclearance should be denied to a voting change that was motivated by "any discriminatory

purpose." The language of this provision is not facially race-conscious, let alone

unconstitutional. It simply incorporates the Supreme Court's own standard for identifying

unconstitutional racial discrimination. Indeed, by its terms, this provision would require the

Attorney General, or a court in a declaratory judgment action, to deny preclearance if a particular

voting change was adopted with a purpose to discriminate against white voters.

In *Bossier II*, the Supreme Court held that a voting change must be precleared – even if it

reflected purposeful discrimination on the basis of race and was thus unconstitutional – so long

as the covered jurisdiction did not intend to make things worse for minority voters than before

the change. As plaintiffs themselves point out, to satisfy *Bossier II*'s purpose test, a jurisdiction

"had the discrete and relatively 'trivial' task of confirming it was not an 'incompetent

retrogressor' that had haplessly adopted a change that did not backslide from the status quo." Pl.

Mem. 27 (quoting *Bossier II*, 528 U.S. at 331-332).

The 2006 Amendments overturned the Court's statutory interpretation of Section 5 in

*Bossier II*. As amended, the statute now provides that "any discriminatory purpose" behind a

voting change, and not just a retrogressive purpose, requires the denial of preclearance. 42

U.S.C. 1973c(c).  "Discriminatory purpose," of course, is the Supreme Court's test for

identifying unconstitutional discrimination.  See *Village of Arlington Heights* v. *Metropolitan*

*Hous. Dev. Corp.*, 429 U.S. 252, 266-268 (1977); *Washington* v. *Davis*, 426 U.S. 229, 242

(1976); *City of Mobile* v. *Bolden*, 446 U.S. 55, 61-64 (1980).  In other words, to obtain

preclearance under the amended purpose prong, a covered jurisdiction must no longer merely

show that "it was not an 'incompetent retrogressor,'" but also that it did not violate the

Constitution.

Because the amended purpose prong authorizes denial of preclearance only when the

covered jurisdiction violates the Constitution by engaging in intentional discrimination, it clearly

has "a rational relationship to preventing or remedying intentional discrimination," Pl. Mem. 25,

and is valid legislation to enforce the Fourteenth and Fifteenth Amendments.  See *United States*

v. *Georgia*, 546 U.S. 151, 158 (2006) (Congress may provide remedies for actual constitutional

violations).  The amended purpose prong imposes on covered jurisdictions no substantive

requirements beyond those that the Constitution itself imposes.  The only difference between

administration of the amended purpose prong and ordinary litigation to enforce the Constitution

is procedural:  Section 5 shifts the burden of proof to the submitting jurisdiction.  But shifting the

burden of proof to jurisdictions with a significant history of discrimination is appropriate in light

of Congress's "wide berth in devising appropriate remedial and preventative measures for

unconstitutional actions."  *Tennessee* v. *Lane*, 541 U.S. 509, 520 (2004).  See *City of Rome* v.

*United States*, 446 U.S. 156, 181-182 (1980) (holding that shifting the burden of proof to

covered jurisdictions properly responds to their history of discrimination).

Plaintiffs nonetheless assert that Congress's decision to incorporate the Supreme Court's

own standard for unconstitutional discrimination exceeds Congress's authority and violates

Equal Protection because it will "unleash[] the Justice Department to once again *coerce* covered jurisdictions into *increasing*, or even *maximizing*, minority electoral success."  Pl. Mem. 41. Plaintiffs can point to nothing in the amended purpose prong that purports to authorize or even permit the Attorney General to engage in such coercion.  Instead, they simply assert that, before *Bossier II* was decided in 2000, "the Justice Department frequently objected on 'discriminatory purpose' grounds in order to compel the adoption of racially gerrymandered changes."  Pl. Mem. 29.

Even as to history, plaintiffs cannot support the charge that the Attorney General employed Section 5's purpose prong to demand unconstitutional racial gerrymandering "until *Bossier II* foreclosed that practice by holding that Section 5 was limited to retrogression." Pl. Mem. 28.  This contention relies upon a limited number of instances in which redistricting plans subject to Section 5 review in the immediate wake of the 1990 Census were ruled to be unconstitutional racial gerrymanders.  Not coincidentally, the cases arising from the 1990's round of redistricting in Georgia and North Carolina were the cases in which the Supreme Court first set forth the standards for unconstitutional racial gerrymandering.  See *Miller* v. *Johnson*, 515 U.S. 900 (1995); *Shaw* v. *Hunt*, 517 U.S. 899 (1996).  The Court made it clear in *Miller* and *Shaw* – several years before the 2000 decision in *Bossier II* – that when a jurisdiction adheres to traditional districting principles, its failure to create additional majority-minority districts does not constitute intentional discrimination and does not violate Section 5.  See *Miller*, 515 U.S. at 924; *Shaw*, 517 U.S. at 911-913.  The Attorney General acknowledges that principle and has consistently applied it, since the decisions in *Miller* and *Shaw*, in enforcing Section 5.  See *e.g.*, *Guidance Concerning Redistricting and Retrogression Under Section 5 of the Voting Rights Act*, 66 Fed. Reg. 5412, 5413 (Jan. 18, 2001).  In applying the purpose prong, the Department of

Justice utilizes the familiar *Arlington Heights* factors for determining whether official action was motivated by a discriminatory purpose. *Arlington Heights*, 429 U.S. at 266-268; see 2006 House Report 68; see also *Revision of Procedures for the Administration of Section 5 of the Voting Rights Act of 1965*, 76 Fed. Reg. 21,239, 21,248-21,249 (April 15, 2011) (28 C.F.R. 51.54, 51.57).

Plaintiffs point to no evidence that the Attorney General has applied Section 5's purpose prong to demand that a covered jurisdiction violate the rulings in *Miller* or *Shaw*. And nothing in the new Section 5(c) purports to alter those rulings. Because this provision does nothing more than prohibit preclearance of intentionally discriminatory voting changes, its enactment is well within Congress's authority to enforce the Fourteenth and Fifteenth Amendments and does not itself violate the Constitution – certainly not on its face.

Plaintiffs nonetheless contend, based upon objections interposed by the Attorney General in the early 1990's, that the amended purpose provision will authorize the Attorney General "to coerce covered jurisdictions to increase future minority electoral success" in violation of Equal Protection. Pl. Mem. 44; see also Complaint ¶¶ 26, 36-37. They thus ask this Court to declare the new Section 5(c) of the Voting Rights Act facially unconstitutional because the Department of Justice was found to have incorrectly applied its predecessor provision nearly 20 years ago and allegedly might misapply the new provision at some point in the future. Plaintiffs' speculation that the Attorney General might misapply Section 5(c) in the future provides no basis for declaring that provision facially unconstitutional. On a facial challenge, it would be improper for this Court to presume that a coordinate branch of government will apply the new purpose prong unconstitutionally and in a manner inconsistent with its plain text. See *Tilton* v. *Richardson*, 403 U.S. 672, 679 (1971) ("A possibility always exists, of course, that the legitimate

37

objectives of any law or legislative program may be subverted by conscious design or lax

enforcement.  There is nothing new in this argument.  But judicial concern about these

possibilities cannot, standing alone, warrant striking down a statute as unconstitutional.");  see

*Washington State Grange*, 552 U.S. at 450 (citing *United States* v. *Raines*, 362 U.S. 17, 22,

(1960) ("The delicate power of pronouncing an Act of Congress unconstitutional is not to be

exercised with reference to hypothetical cases thus imagined.")).  To do so would be to "short

circuit the democratic process by preventing [a] law[] embodying the will of the people from

being implemented in a manner consistent with the Constitution."  *Washington State Grange*,

552 U.S. at 451; see also *Sumter Cnty*., 565 F. Supp. at 706 (court has no authority "to anticipate

or rule on" Attorney General's future application of the statute).

### 2.     The Amendment To Section 5's Retrogression Prong Is Valid Enforcement Legislation And Does Not Violate Equal Protection

Plaintiffs also contend that the amended effects prong in Section 5(b) exceeds Congress's

authority and denies equal protection.  Pl. Mem. 30-41, 44-45. They argue that the totality of the

circumstances test adopted by *Ashcroft* is necessary to ensure that Section 5 operates to do

nothing more than "ferret[] out facially neutral laws where 'the risk of purposeful discrimination'

is high but proving that motive would be 'inordinately difficult.'"  Pl. Mem. 30 (citing *City of*

*Rome* 446 U.S. at 177; *Thornburgh* v. *Gingles*, 478 U.S. 30, 44 (1986)).  The Supreme Court,

however, has imposed no requirement that discriminatory-effects provisions be strictly construed

to come within Congress's enforcement power.  See *Lane*, 541 U.S. at 520 ("When Congress

seeks to remedy or prevent unconstitutional discrimination, § 5 authorizes it to enact

prophylactic legislation proscribing practices that are discriminatory in effect, if not in intent, to

carry out the basic objectives of the Equal Protection Clause.").  As the Court wrote in *City of*

*Rome*, "Congress could rationally have concluded that, because electoral changes by

jurisdictions with a demonstrable history of intentional racial discrimination in voting create the risk of purposeful discrimination, it was proper to prohibit changes that have a discriminatory impact." 446 U.S. at 177 (footnote omitted). When the prohibition is limited to changes with a *retrogressive* impact – those that demonstrably undo the gains minority voters have won in the past – there is all the more reason to suspect discriminatory intent. Accordingly, the amended retrogression prong is proper legislation to enforce the Fourteenth and Fifteenth Amendments.

Plaintiffs' contentions that the amended effects prong is insufficiently flexible and does not permit sufficiently broad defenses is also without merit. Although Section 5(b) overturned the *Ashcroft* test for determining whether a change is retrogressive, it did not overturn the established Section 5 case law, which long predates *Ashcroft*, that even a retrogressive change must nonetheless be precleared in certain circumstances. Thus, the statement in the 2006 legislative history expressing an intent to "*reject[ ]* all that logically follows from [that case]," 2006 House Report 71 (quoted in Pl. Mem. 40), is of no moment.

In *Beer*, 425 U.S. at 141, the Supreme Court interpreted the discriminatory-effect provision in the original Section 5 to require "that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." The original Section 5 effects provision, like the 2006 provision, on its face did not appear to permit any "defense or justification" for voting change with such a discriminatory effect. Pl. Mem. 40. But the Supreme Court had already recognized that the statute could not be read as imposing an utterly inflexible prohibition on retrogression. In *City of Richmond* v. *United States*, 422 U.S. 358 (1975), the Court held that an annexation that reduced the black population percentage in a covered city from 52% to 42% did

not violate the effects prohibition, so long as the City's election plan "fairly reflect[ed] the strength of the Negro community as it exist[ed] after the annexation." *Id.* at 370-372.

Similarly, the Attorney General took the position, well before the decision in *Ashcroft*, that the prohibition on retrogression does not "require the reflexive imposition of objections in total disregard of the circumstances involved or the legitimate justifications in support of changes that incidentally may be less favorable to minority voters." *Revision of Procedures for the Administration of Section 5 of the Voting Rights Act of 1965*, 52 Fed. Reg. 486, 488 (Jan. 6, 1987). In particular, the Department of Justice has long recognized that retrogression can be justified when a plan that maintains preexisting minority voting strength would violate the Constitution: "in the redistricting context, there may be instances occasioned by demographic changes in which reductions of minority percentages in single-member districts are unavoidable, even though 'retrogressive,' *i.e.,* districts where compliance with the one person, one vote standard necessitates the reduction of minority voting strength." *Ibid.* Even before *Ashcroft*, the Department publicly explained that a retrogressive redistricting plan must nonetheless be precleared if the only alternative is a plan that subordinates traditional districting principles and violates the principles articulated in *Shaw* and *Miller.* See *Guidance Concerning Redistricting and Retrogression Under Section 5 of the Voting Rights Act*, 66 Fed. Reg. at 5413 (explaining that "preventing retrogression under Section 5 does not require jurisdictions to violate *Shaw* v. *Reno* and related cases"). The 2006 Amendments do not purport to alter these principles.

Plaintiffs contend that the amended effects prong will result in "more race-based decision making than [Section 5] ever did before" and that "every majority-minority district in the

covered jurisdictions must be preserved until 2031." Pl. Mem. 39.[11] But nothing in the language of Section 5(b) requires that it be applied as plaintiffs predict. As it has been since its enactment, a major purpose of Section 5 is "to insure that [the gains thus far achieved in minority political participation] shall not be destroyed through new [discriminatory] procedures and techniques." *Beer*, 425 U.S. at 140-141 (quoting S. Rep. No. 295, 94th Cong., 1st Sess. 19 (1975)). The new Section 5(b) has not changed that purpose. Rather, the addition of this provision simply clarifies, in the wake of *Ashcroft*, that a covered jurisdiction may not destroy existing gains achieved by minority voters by reducing the number of districts from which those voters are able to elect the candidates of their choice and replacing them with districts in which those voters may do nothing more than potentially influence the outcome of an election. As the House Report explained, "Section 5, if left uncorrected [after *Ashcroft*], would now allow States to turn black and other minority voters into second class voters who can influence elections of white candidates, but who cannot elect their preferred candidates, including candidates of their own race." 2006 House Report 70.

Plaintiffs fundamentally misconstrue what the 2006 Amendment changed about prior retrogression law and what it left intact. First, contrary to plaintiffs' assertion, nothing in the amended retrogression provision requires that "minority groups in covered jurisdictions" retain the same "level of electoral success that they possessed in 2006." Pl. Mem. 38. Section 5(b)

---

[11] Of course, the non-retrogression principle of Section 5 has always been race-conscious in that it denies preclearance only to voting changes that "would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer*, 425 U.S. at 141. Plaintiffs, however, do not assert that the retrogression principle itself is unconstitutional. Cf., *LULAC* v. *Perry*, 548 U.S. 399, 517-519 (2006) (Scalia, J., concurring in the judgment in part and dissenting in part) (compliance with non-retrogression mandate is justified to remedy past discrimination). Rather, they contend that the addition of Sections 5(b) and (d) have rendered the retrogression standard unconstitutional, particularly as they speculate it will be applied by the Attorney General. See Complaint ¶¶ 25, 30; Pl. Mem. 12-13. 44-45.

identifies a change as retrogressive if it diminishes minority voters' "ability * * * to elect their preferred candidates of choice."  42 U.S.C. 1973c(b).  But ability does not invariably lead to success.  To guarantee voters' continued "ability" to elect candidates of their choice is not to ensure that they will in fact do so.  The amended retrogression prong thus leaves intact the settled principle that "[n]onretrogression is not a license for the State to do whatever it deems necessary to ensure continued electoral *success*; it merely mandates that the minority's *opportunity* to elect representatives of its choice not be diminished."  *Bush* v. *Vera*, 517 U.S. 952, 983 (1996) (opinion of O'Connor, J.) (plurality).  Thus, the amended retrogression provision does not impose a "quota floor on past minority electoral successes," or impose a "*ceiling on other groups' representation*" in a "*zero-sum game*" as plaintiffs suggest.  Pl. Mem. 31.

Nor, contrary to plaintiffs' assertion, does that provision require the preservation of "every existing majority-minority district" and "every existing 'coalition' or 'influence' district in the covered jurisdictions."  Pl. Mem. 39.  Under the amended statute, a voting change is retrogressive only if it diminishes minority voters' ability to elect their candidates of choice.  If racially polarized voting comes to play less of a role in elections in covered jurisdictions, minorities in existing districts in which they currently have the ability to elect their candidates of choice will be able to retain their current ability to do so with progressively smaller percentages of the population.  Further, as the Attorney General recognized before the Supreme Court's decision in *Ashcroft*, "in examining whether [a] new [districting] plan is retrogressive, the inquiry must encompass the entire statewide plan as a whole."  *Ashcroft*, 539 U.S. at 479.  Thus even if the plan results in a "diminution of a minority group's effective exercise of the electoral franchise in one or two districts," the plan may not violate Section 5 if "the gains in the plan as a whole offset the loss in a particular district."  *Ibid.*; cf. *LULAC* v. *Perry*, 548 U.S. 399, 427-442

42

(2006) (for purpose of Section 2 vote dilution inquiry, State cannot remedy dismantling of *compact* opportunity district through creation of a *noncompact* district elsewhere in the state). Moreover, where "natural demographic shifts" weaken a majority-minority district, so that maintaining such a district would require a jurisdiction to "*abandon* traditional districting principles," Pl. Mem. 40, the amended Section 5 effects provision – like the unamended provision as interpreted in *Beer* and *Richmond* – would not require preservation of the district, even if the failure to do so would diminish minority voters' ability to elect their candidates of choice.  That is because plaintiffs are simply incorrect that the amended effects provision permits no "defense or justification" for a retrogressive change.  Pl. Mem. 40.  The amended effects prohibition changes the definition of retrogression to be applied in certain cases involving districting, not the defenses that have existed since the Supreme Court decided *Richmond* more than 35 years ago.

In any event, because plaintiffs' challenge to the amended retrogression provision rests, like their challenge to the amended purpose provision, on speculation that the statute will be applied in an unconstitutional manner in the future, it is not a proper basis for a facial challenge. *Washington State Grange*, 552 U.S. at 449-450; *Raines*, 362 U.S. at 22.

**CONCLUSION**

The Attorney General's cross motion for summary judgment should be granted and

plaintiffs' motion for summary judgment should be denied.

Date:  August 1, 2011                               Respectfully submitted,

RONALD C. MACHEN, JR.                    THOMAS E. PEREZ
  United States Attorney                        Assistant Attorney General
  District of Columbia

                                              SAMUEL R. BAGENSTOS
                                              JULIE A. FERNANDES
                                                Deputy Assistant Attorneys General

                                             *s/ Linda F. Thome*
                                             T. CHRISTIAN HERREN, JR.
                                             DIANA K. FLYNN
                                           RICHARD DELLHEIM (lead counsel)
                                           LINDA F. THOME
                                           ERNEST A. MCFARLAND
                                           JARED M. SLADE
                                         JUSTIN WEINSTEIN-TULL
                                             Civil Rights Division
                                             U.S. Department of Justice
                                             950 Pennsylvania Avenue, N.W.
                                           NWB-Room 7264
                                           Washington, D.C. 20530
                                           Telephone: (202) 305-1734
                                           Facsimile: (202) 307-3961

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 1, 2011, I served a true and correct copy of the foregoing

via the Court's ECF system, to the following counsel of record:

Michael A. Carvin
D.C. Bar No. 366784
Noel J. Francisco
D.C. Bar No. 464752
Hashim M. Mooppan
D.C. Bar No. 981758
David J. Strandness
D.C. Bar No. 987194
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113

Michael E. Rosman
D.C. Bar No. 454002
Michelle A. Scott
D.C. Bar No. 489097
Center for Individual Rights
1233 20th Street, N.W., Suite 300
Washington, D.C. 20036

Joseph Gerald Hebert
191 Somervelle Street, #405
Alexandria, VA 22304

Arthur Barry Spitzer
American Civil Liberties Union
1400 20th Street, N.W., Suite 119
Washington, DC 20036

Anita Earls
Southern Coalition for Social Justice
115 Market Street
Suite 470
Durham, NC 27701

Laughlin McDonald
American Civil Liberties Union Foundation,
Inc.
230 Peachtree Street, NW
Suite 1440
Atlanta, GA 30303

*/s/ Richard Dellheim*
RICHARD DELLHEIM
Attorney, Voting Section