**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————

| | |
|---|---|
| STEPHEN LAROQUE, ANTHONY CUOMO, JOHN NIX, KLAY NORTHRUP, and KINSTON CITIZENS FOR NON-PARTISAN VOTING, )<br><br>Plaintiffs, )<br><br>v. )<br><br>ERIC H. HOLDER, JR. ATTORNEY GENERAL OF THE UNITED STATES )<br><br>Defendant, )<br><br>and )<br><br>JOSEPH M. TYSON, et al., )<br><br>Defendant-Intervenors. ) | Civ. No.: 1:10-CV-00561-JDB |

———————————————————

**CONSOLIDATED REPLY MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
DEFENDANT'S AND INTERVENORS' MOTIONS FOR SUMMARY JUDGMENT AND
INTERVENORS' RENEWED MOTION TO DISMISS**

Michael A. Carvin (D.C. Bar No. 366784)
Noel J. Francisco (D.C. Bar No. 464752)
Hashim M. Mooppan (D.C. Bar No. 981758)
David J. Strandness (D.C. Bar No. 987194)
JONES DAY
51 Louisiana Ave. NW
Washington D.C.  20001
(202) 879-3939

Michael E. Rosman (D.C. Bar No. 454002)
Michelle A. Scott (D.C. Bar No. 489097)
CENTER FOR INDIVIDUAL RIGHTS
1233 20th St. NW, Suite 300
Washington D.C.  20036
(202) 833-8400

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................iii

GLOSSARY OF ABBREVIATIONS FOR RELATED DOCUMENTS................................viii

INTRODUCTION .............................................................................................................1

ARGUMENT.....................................................................................................................4

I.  THE 2006 VERSION OF SECTION 5 MUST SATISFY THE CONGRUENCE AND PROPORTIONALITY TEST TO BE UPHELD AS VALID ENFORCEMENT LEGISLATION UNDER THE RECONSTRUCTION AMENDMENTS ....................................4

II.  THE 2006 VERSION OF SECTION 5 EXCEEDS CONGRESS' ENFORCEMENT POWERS BECAUSE THE PRECLEARANCE REQUIREMENT FOR COVERED JURISDICTIONS IS NOT EVEN RATIONALLY RELATED TO REDRESSING UNCONSTITUTIONAL DISCRIMINATION ........................................................................7

    A.  Section 5 Is Not Valid Enforcement Legislation Unless It Targets Unconstitutional Discrimination That Defies Redress Under Section 2............................8

    B.  Section 5's Preclearance Requirement Fails Even To Rationally Target Unconstitutional Discrimination That Defies Redress Under Section 2.........................10

        1.  Section 5 Is Not Needed To Supplement Section 2 In The Covered Jurisdictions .................................................................................................10

        2.  Section 5 Is No More Needed To Supplement Section 2 In The Covered Jurisdictions Than In The Non-Covered Jurisdictions......................................18

III.  THE 2006 VERSION OF SECTION 5 EXCEEDS CONGRESS' ENFORCEMENT POWERS BECAUSE THE AMENDED PRECLEARANCE STANDARD IS NOT EVEN RATIONALLY RELATED TO REDRESSING UNCONSTITUTIONAL DISCRIMINATION ..........................................................................................................22

    A.  The "Ability To Elect" Mandate Imposes A Quota Floor On A Minority Group's Expected Electoral Chances.............................................................................23

    B.  The "Discriminatory Purpose" Objection Imposes Burdensome Duties On Covered Jurisdictions That Render Them Susceptible To Coercive Pressure To Increase A Minority Group's Expected Electoral Chances ...........................................29

    C.  Any 2006 Expansion Of The 1965 Preclearance Standard Would Be Unconstitutional Given The Dramatic Improvements In The Covered Jurisdictions ...............................................................................................................33

IV.  PLAINTIFFS' EQUAL PROTECTION CHALLENGE TO THE 2006 VERSION OF SECTION 5 IS MERITORIOUS AND JUSTICIABLE .............................................................34

    A.  Plaintiffs Have Standing To Bring Their Equal Protection Challenge To The 2006 Amendments .........................................................................................................35

        1.  The 2006 Amended Preclearance Standards May Be Challenged As Discriminatory Barriers That Deny Plaintiffs Equal Treatment, Regardless Of Whether Kinston's Referendum Would Be Precleared Under The Pre-2006 Standard ..........................................................................35

2.      The 2006 Amended Preclearance Standards Are Not Severable From The 2006 Reauthorization Of The Preclearance Requirement, And So Their Facial Invalidation Will Revive Kinston's Referendum ..................................... 39

B.      Plaintiffs' Equal Protection Challenge To The 2006 Amendments Is Ripe .................... 44

CONCLUSION ................................................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abbott Labs. v. Gardner,*
387 U.S. 136 (1967) .................................................................................................. 4, 44

*Adarand Constructors, Inc. v. Pena,*
515 U.S. 200 (1995) ...................................................................................................... 5

*Alaska Airlines, Inc. v. Brock,*
480 U.S. 678 (1987) ......................................................................................... 40, 42, 44

*Bartlett v. Strickland,*
129 S. Ct. 1231 (2009) ................................................................................................ 27

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ...................................................................................................... 5

\* *City of Boerne v. Flores,*
521 U.S. 507 (1997) ............................................................................................. *passim*

*City of Mobile v. Bolden,*
446 U.S. 55 (1980) .................................................................................................. 7, 18

*City of New Haven v. United States,*
809 F.2d 900 (D.C. Cir. 1987).............................................................................. 42, 44

*City of Richmond v. United States,*
422 U.S. 358 (1975) .................................................................................................... 25

\* *City of Rome v. United States,*
446 U.S. 156 (1980) ............................................................................................. *passim*

*City of Rome v. United States,*
450 F. Supp. 378 (D.D.C. 1978)................................................................................. 39

*Cooper Indus., Inc. v. Aviall Servs., Inc.,*
543 U.S. 157 (2004) ...................................................................................................... 7

*Davis v. United States,*
131 S. Ct. 2419 (2011) ................................................................................................ 40

*Florida v. U.S. Dep't of Health & Human Servs.,*
Nos. 11-11021 & 11-11067, --- F.3d ----, 2011 WL 3519178 (11th Cir. Aug. 12, 2011)................... 43

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
130 S. Ct. 3138 (2010) ("*FEF*")........................................................................... 41, 42

\* *Georgia v. Ashcroft,*
539 U.S. 461 (2003) ............................................................................................. *passim*

*Goosby v. Town Bd.*,
   180 F.3d 476 (2d Cir. 1999) ............................................................................ 17

*Hopwood v. State of Texas*,
   236 F.3d 256 (5th Cir. 2000) .............................................................. 36, 37, 38

*INS v. Chadha*,
   462 U.S. 919 (1983) .................................................................................. 40, 41

*Johnson v. De Grandy*,
   512 U.S. 997 (1994) .................................................................................. 14, 16

*Kimel v. Fla. Bd. of Regents*,
   528 U.S. 62 (2000) ........................................................................................... 8

\* *LaRoque v. Holder*,
   No. 10-5433, --- F.3d ----, 2011 WL 2652441 (D.C. Cir. July 8, 2011) ...................... *passim*

*LaShawn A. v. Barry*,
   87 F.3d 1389 (D.C. Cir. 1996) (en banc) ..................................................... 3, 34

*League of United Latin Am. Citizens v. Perry*,
   548 U.S. 399 (2006) ("*LULAC*") ................................................................ 26, 28

*Lopez v. Monterey Cnty.*,
   525 U.S. 266 (1999) .......................................................................................... 9

\**Miller v. Johnson*,
   515 U.S. 900 (1995) .................................................................................. *passim*

*Morris v. Gressette*,
   432 U.S. 491 (1977) ........................................................................................ 39

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
   429 U.S. 274 (1977) ........................................................................................ 38

\* *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*,
   508 U.S. 656 (1993) .......................................................................... 4, 36, 37, 38

*Nev. Dep't of Human Res. v. Hibbs*,
   538 U.S. 721 (2003) .......................................................................................... 6

\* *Nw. Austin Mun. Util. Dist. No. 1 v. Holder*,
   129 S. Ct. 2504 (2009) .............................................................................. *passim*

*Pollock v. Farmers' Loan & Trust Co.*,
   158 U.S. 601 (1895) ........................................................................................ 41

*Regents of the Univ. of Cal. v. Baake*,
   438 U.S. 265 (1978) ........................................................................................ 36

*Reno v. ACLU,*
    521 U.S. 844 (1997) ........................................................................ 43

\* *Reno v. Bossier Parish Sch. Bd.,*
    520 U.S. 471 (1997) ("*Bossier I*") ................................................ *passim*

\* *Reno v. Bossier Parish School Board,*
    528 U.S. 320 (2000) ("*Bossier II*") ............................................... *passim*

*Rivers v. Roadway Express, Inc.,*
    511 U.S. 298 (1994) ........................................................................ 33

*Sabri v. United States,*
    541 U.S. 600 (2004) ........................................................................ 34

*Shaw v. Reno,*
    509 U.S. 630 (1993) ....................................................... 14, 26, 27, 37

*Shelby Cnty. v. Holder,*
    270 F.R.D. 16 (D.D.C. 2010) ................................................... 13, 22

\* *South Carolina v. Katzenbach,*
    383 U.S. 301 (1966) ..................................................................... *passim*

*Steel Co. v. Citizens for a Better Environment,*
    523 U.S. 83 (1998) .................................................................... 40, 41

*Tennessee v. Lane,*
    541 U.S. 509 (2004) ........................................................................ 34

*Texas v. United States,*
    523 U.S. 296 (1998) .................................................................... 44, 45

*Thornburg v. Gingles,*
    478 U.S. 30 (1986) ........................................................................ 17

*United States v. Hays,*
    515 U.S. 737 (1995) .............................................................. 36, 37, 38

*United States v. Jackson,*
    390 U.S. 570 (1968) ........................................................................ 43

*United States v. Stevens,*
    130 S. Ct. 1577 (2010) .................................................................... 44

*Webster v. Doe,*
    486 U.S. 592 (1988) ........................................................................ 39

*Williams v. Standard Oil Co.,*
    278 U.S. 235 (1929) ........................................................................ 41

CONSTITUTIONAL AND STATUTORY PROVISIONS

42 U.S.C. § 1973 note, Findings. ................................................................ 33, 42

42 U.S.C. § 1973c ........................................................................................ *passim*

42 U.S.C. § 1973c(a) .................................................................................... 42

42 U.S.C. § 1973c(b) .................................................................................... *passim*

42 U.S.C. § 1973c(c) .................................................................................... 2

42 U.S.C. § 1973c(d) .................................................................... 35, 37, 38, 42

42 U.S.C. § 1973p ........................................................................................ 43

RULES AND REGULATORY AUTHORITIES

28 C.F.R. § 51.59(b) .................................................................................... 32

76 Fed. Reg. 7470 (Feb. 9, 2011) ...................................................... 25, 26, 31

LEGISLATIVE AUTHORITIES

* H.R. Rep. No. 109-478 (2006) ................................................................ *passim*

S. Rep. No. 109-295 (2006) ................................................................... 20, 43

*Continuing Need for Section 203's Provisions for Limited English Proficient Boters, Hearing Before the S. Comm. on the Judiciary*, 109th Cong. (2006) ............................... 13

*The Continuing Need for Section Pre-Clearance, Hearing Before the S. Comm. on the Judiciary*, 109th Cong. (2006) ("*Continuing Need*") ............................... 16, 20, 21

*To Examine the Impact and Effectiveness of the Voting Rights Act, Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. (2005) ("*Examine the Impact*") ................................................................................. 15, 20

OTHER AUTHORITIES

Charles S. Bullock III & Ronald Keith Gaddie, *Impact of Using Non-Hispanic White Data* (American Enterprise Institute, 2006) ............................................... 13

Ellen Katz et al., *Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982* (Voting Rights Initiative, Univ. of Mich. Law Sch., 2005) ("*Documenting Discrimination*") ............................................. 15, 20

Nathaniel Persily, *The Promise and Pitfalls of the New Voting Rights Act*, 117 Yale L.J. 174 (2007) ....................................................................................... 19, 22

### GLOSSARY OF ABBREVIATIONS FOR RELATED DOCUMENTS

*LaRoque v. Holder*, No. 10-561 (D.D.C.):

| | | |
|---|---|---|
| Complaint | = | Doc. # 1 (4/7/10) |
| Pltfs. SJ Br. | = | Doc. # 23 (8/18/10) |
| DOJ Objection | = | Doc. # 23-6 (8/18/10) |
| Inter. R.MTD | = | Doc. # 52 (8/1/11) |
| Inter. SJ Br. | = | Doc. # 54 (Memorandum) (8/1/11) |
| Govt. SJ Br. | = | Doc. # 55 (Memorandum) (8/1/11) |

*Shelby Cnty. v. Holder*, No. 10-651 (D.D.C):

| | | |
|---|---|---|
| Shelby SJ Br. | = | Doc. # 5 (Memorandum) (6/8/10) |
| Govt. Shelby SJ Br. | = | Doc. # 54-1 (11/15/10) |
| Shelby SJ Reply Br. | = | Doc. # 65 (12/13/10) |
| Govt. Shelby SJ Reply Br. | = | Doc. # 67 (1/14/11) |
| Shelby Supp. Br. | = | Doc. # 74 (2/16/11) |
| Govt. Shelby Supp. Br. | = | Doc. # 75 (2/16/11) |
| Shelby SJ Tr. | = | Doc. # 76 (2/17/11) |

*LaRoque v. Holder*, No. 10-5433 (D.C. Cir.):

| | | |
|---|---|---|
| Pltfs. App. Br. | = | Doc. # 1291812 (2/4/11) |

## INTRODUCTION

When Section 5 was reauthorized and amended in 2006, its new "preclearance requirements and [old] coverage formula raise[d] serious constitutional questions" whether "Congress [had] exceeded its … enforcement power[s]" under the Reconstruction Amendments. *Nw. Austin Mun. Util. Dist. No. 1 v. Holder*, 129 S. Ct. 2504, 2512-13 (2009). Indeed, as Plaintiffs' opening brief powerfully demonstrated and the Defendants have failed to refute, the new Section 5 "imposes current burdens" that cannot constitutionally "be justified by current needs." *Id.* at 2512.

*First*, the new Section 5's unmodified reauthorization of the old preclearance procedure is unconstitutional due to the dramatic changes in the covered jurisdictions. "Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one." *City of Boerne v. Flores*, 521 U.S. 507, 530 (1997). The old Section 5 was "justif[ied] [as a] legislative measure[] not otherwise appropriate" due to the "exceptional conditions" in the covered jurisdictions that rendered "case-by-case litigation … inadequate to combat widespread and persistent discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 328, 334-35 (1966). Yet, as Plaintiffs illustrated in Part II of their opening brief, Section 5 no longer bears any rational relationship to redressing the type of entrenched unconstitutional discrimination that defies redress under ordinary Section 2 litigation and necessitates an extraordinary preclearance remedy notwithstanding the serious federalism costs entailed. In short, "conditions … have unquestionably improved" in the covered jurisdictions that were originally targeted more than three decades ago, *Nw. Austin*, 129 S. Ct. at 2511, and whatever lingering "evil[s]" now exist are "no longer … concentrated" there, *id.* at 2512, which renders Section 5's "coverage formula … [ir]rational in both practice and theory," *South Carolina*, 383 U.S. at 330.

The Defendants' rejoinder to this argument is largely non-responsive. They provide no legal justification for imposing the extraordinary preclearance burden on a jurisdiction if ordinary voting-rights litigation would currently suffice there, much less doing so selectively based on a jurisdiction's historical misdeeds. Likewise, notwithstanding their repeated factual invocation of the voluminous Congressional record, they do not even attempt to prove that the 2006 Congress properly targeted Section 5 coverage at

1

those jurisdictions where entrenched unconstitutional discrimination would evade remedy under Section 2, and they even fail to prove that the covered jurisdictions have cognizably greater discrimination at all.

*Second*, the new Section 5's amended preclearance standard is unconstitutional due to the dramatic changes to that standard.  By intentionally overruling the Supreme Court's carefully crafted narrowing constructions in *Georgia v. Ashcroft*, 539 U.S. 461 (2003), and *Reno v. Bossier Parish School Board*, 528 U.S. 320 (2000) ("*Bossier II*"), the 2006 Congress "exacerbate[d] the 'substantial' federalism costs that the preclearance procedure already exacts," *id.* at 336, and rendered "considerations of race" "the predominant factor" in electoral decisionmaking in the covered jurisdictions, *Nw. Austin*, 129 S. Ct. at 2512 (citing *Ashcroft*, 539 U.S. at 491-92 (Kennedy, J., concurring)).   Specifically, as Plaintiffs explained in Part III of their opening brief, the new Section 5's preclearance standard unduly "restrict[s] the authority of the States to allocate their political power as they see fit."  *Boerne*, 521 U.S. at 527. Equally important, it is "fundamentally flaw[ed]," because it "direct[s]" "the Department of Justice"  to employ minority-group electoral preferences under the "ability to elect" prong (42 U.S.C. § 1973c(b)), and because the Department, at a minimum, is "permitted … to encourage" the use of such preferences under the "discriminatory purpose" prong (42 U.S.C. § 1973c(c)).  *Ashcroft*, 539 U.S. at 491 (Kennedy, J., concurring).  Accordingly, the new preclearance standard is "so out of proportion to [the] supposed remedial or preventive object" of preempting voting changes that "have a significant likelihood of being unconstitutional" that it can only be understood "to attempt a substantive change in constitutional protections" for minorities in the covered jurisdictions.  *Boerne*, 521 U.S. at 532.

The Defendants' rejoinder to this argument is again largely non-responsive.  The Defendants do not even attempt to justify the 2006 Congress' irrational decision to expand the preclearance obligations of covered jurisdictions to a level that not even the 1965 Congress thought was necessary at the height of Southern defiance of the Constitution.   Similarly, Defendants do not even acknowledge, much less distinguish, the Supreme Court's repeated admonitions about the serious constitutional problems caused by these precise amendments to the preclearance standard.  Although the Defendants do at least try to contest Plaintiffs' description of the specific scope and effect of the 2006 amendments, their conclusory

assertions cannot be reconciled with the amendments' text and history.

In sum, the 2006 reauthorization of Section 5 has the precise defects with putative "enforcement" legislation that were identified in *Boerne*.  Pltfs. SJ Br. 8-9, 17, 23, 43.  The "legislative record lacks examples of modern instances" of significant unconstitutional discrimination, much less examples that defy redress under Section 2 or that materially distinguish the covered jurisdictions.  *Boerne*, 521 U.S. at 530.  Congress thus has adopted a "[s]trong measure[]" that is an  "unwarranted response" to whatever "lesser [harm]" now exists.  *Id.*  Moreover, Congress has "criticized the Court's reasoning" in narrowly construing Section 5, *id.* at 515, and Congress' responsive amendments to Section 5 have crossed "the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law," which is a key "distinction [that] exists and must be observed," *id.* at 519-20.  "Simply put," the 2006 version of Section 5 "is not designed to identify and counteract state laws likely to be unconstitutional because of their treatment of [race]."  *Id.* at 534-35.

Finally, the Defendants raise a variety of justiciability defenses to Plaintiffs' alternative claim that the 2006 amendments to the preclearance standard affirmatively violate the Constitution's Equal Protection guarantees, but those defenses are largely irrelevant.  Under the law of this case as established by the D.C. Circuit, this Court must adjudicate the merits of Plaintiffs' *enumerated-powers* challenge to the 2006 amendments, regardless of whether they have standing to mount an *Equal Protection* challenge.  The D.C. Circuit "reverse[d] and remand[ed]" on the enumerated-power claim with the direct mandate "for the district court to consider the merits of that claim," *LaRoque v. Holder*, No. 10-5433, --- F.3d ----, 2011 WL 2652441, at *1, 15 (D.C. Cir. July 8, 2011), and so, of course, this Court must do so.  *LaShawn A. v. Barry*, 87 F.3d 1389, 1393-94 & n.3 (D.C. Cir. 1996) (en banc).

In any event, the Defendants' justiciability defenses to Plaintiffs' Equal Protection claim are meritless.  The Defendants fixate on whether Kinston's nonpartisan-elections referendum would be revived if *only* the 2006 amendments were invalidated.  But Plaintiffs have standing to challenge the racially preferential 2006 amendments *regardless* of whether the referendum would have been denied preclearance under a nonpreferential scheme.  Plaintiffs are no different than a black employment

applicant who has standing to challenge a public employer's rule against hiring more than 10% minorities, without ever proving (or even alleging) that he would receive the job under nondiscriminatory criteria. That is because the equal-protection injury here is being "deni[ed] … *equal treatment*" by a discriminatory "barrier" that "makes it more difficult" for non-minorities in Kinston "to obtain" electoral changes, which is an injury that can be redressed *whether or not* Plaintiffs "would have obtained the benefit [of such changes] but for the barrier" created by the 2006 amendments.  *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (emphasis added). Anyway, to the extent that it matters, facially invalidating the 2006 amendments to the preclearance standard *would* revive Kinston's referendum, because those amendments are nonseverable from the reauthorization of the pre-2006 preclearance requirement itself.  Lastly, Plaintiffs' Equal Protection challenge to the 2006 amendments is indisputably ripe, because that "purely legal" question is already "fit[] … for judicial decision," and it would be a "hardship" to Plaintiffs if the injuries described above were not immediately redressed.  *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967).

## ARGUMENT

I.   **THE 2006 VERSION OF SECTION 5 MUST SATISFY THE CONGRUENCE AND PROPORTIONALITY TEST TO BE UPHELD AS VALID ENFORCEMENT LEGISLATION UNDER THE RECONSTRUCTION AMENDMENTS**

For the reasons given in Plaintiffs' opening brief and this brief, the 2006 version of Section 5 exceeds Congress' enforcement powers under the Reconstruction Amendments, *regardless* of whether it is reviewed under *Boerne*'s "congruence and proportionality" test or *South Carolina*'s supposedly more deferential "rationality" test.  *See Nw. Austin*, 129 S. Ct. at 2512-13 (Section 5's "preclearance requirements and its coverage formula raise serious constitutional questions under either test").  That said, the *Boerne* test applies, Pltfs. SJ Br. 8-13, and the Defendants' contrary arguments are legally erroneous.

A.   The Government's primary argument is that *Boerne* is inapplicable to measures that purport to enforce the Reconstruction Amendments' "core prohibition on race discrimination."  Govt. SJ Br. 11-12 & n.4.  The Government contends that rigorous judicial scrutiny is unwarranted in this context, because Congress is less likely to cross "the line between enforcement of a constitutional right and its

substantive redefinition."  Govt. Shelby SJ Br. 13-16.  In particular, since "classifications based on race … are presumed to be unconstitutional," federal race-discrimination "enforcement" laws supposedly "target[]" state "practices" that are likely unconstitutional.  *Id.*

This reasoning, however, is irreconcilable with *Boerne* and based on an obvious logical fallacy. Just like racial discrimination, the Fourteenth Amendment contains a "core prohibition" against state laws that *intentionally* discriminate against *religion*, which likewise are presumptively unconstitutional. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).  Thus, under the Government's logic, "[i]t follows that Congress ha[d] substantial authority to enact legislation aimed at preventing or remedying discrimination based on [religion]," Govt. Shelby SJ Br. 13, and so the question in *Boerne* should only have been whether it was *rational* for Congress to impose a "compelling interest" test on all neutral laws that burden religion, as a means of defeating any such laws that had been motivated by an "unconstitutional object," 521 U.S. at 529.  Instead, of course, the Supreme Court held that, notwithstanding the fact that *some* state laws burdening religion are presumptively unconstitutional, "congruence and proportionality" review remains necessary for *all* federal religious-discrimination "enforcement" laws, in order to preserve "the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law."  *Id.* at 519-20; *see also id.* at 532-35.  That is no less true for federal race-discrimination "enforcement" laws.

The obvious rationale underlying the *Boerne* test is that even "core" constitutional prohibitions, like the one against race discrimination, are susceptible to improper Congressional expansion under the guise of "enforcement," because federal race-discrimination laws cover a set of state practices that is much larger than the *narrow subset* of practices that are presumptively unconstitutional.  Specifically, federal laws regulating state racial discrimination extend well beyond "racial *classifications*" subject to "strict scrutiny," *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995) (emphasis added):  they also proscribe some *facially race-neutral* state practices with racially adverse effects, even though such practices are unconstitutional *only* if motivated by a discriminatory purpose, *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481-82 (1997) ("*Bossier I*").  Section 5, in particular, is not remotely limited to

presumptively unconstitutional election changes. Rather, it initially "suspend[s] *all* changes to state election law—however innocuous—until they have been precleared by federal authorities," *Nw. Austin*, 129 S. Ct. at 2511; moreover, the amended preclearance standard effectively preempts countless election practices that are not even arguably unconstitutional, but which merely have an adverse effect on racial minorities when compared to the prior practice or the preferred alternative of federal authorities, Pltfs. SJ. Br. 25-44. Federal race-discrimination laws like Section 5 thus pose the precise risk of constitutional expansion that *Boerne* feared and must be reviewed under the test that *Boerne* expounded. *Id.* 8-10.

In sum, no matter how "core" the constitutional right or how frequently the States violate it, the "congruence and proportionality" test must be applied to a federal law purporting to "enforce" that right. Although the involvement of a "core" right that has been frequently violated will make it "easier" for Congress to *satisfy* the test, *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 736 (2003); *South Carolina*, 383 U.S. at 308-15, 328, 334-35, it plainly does not justify altering or abandoning the test.

B. The Government's backup argument is that precedent requires treating Section 5 as Fifteenth Amendment legislation governed by *South Carolina*, rather than Fourteenth Amendment legislation governed by *Boerne*. Govt. SJ Br. 11 n.4. Notably, other than its "race-is-different" argument, the Government identifies no rational basis for distinguishing between the Amendments' "virtually identical" enforcement provisions. Pltfs. SJ Br. 11-12. Yet it still insists that the Supreme Court's cases upholding Section 5 have solely described it as a Fifteenth Amendment law, Govt. SJ Br. 11 n.4, whereas *Boerne* and its progeny are all limited to Fourteenth Amendment laws, Govt. Shelby SJ Br. 14-17.

But, prior to *Boerne*, the Court never had cause to decide whether Section 5 could be upheld *exclusively* as Fifteenth Amendment legislation, without additional support from the Fourteenth Amendment: precisely because the two Amendments' enforcement provisions are "virtually identical," there was no reason to think that Fourteenth Amendment enforcement was more constrained, and so it was irrelevant whether the Fourteenth Amendment was necessary. Pltfs. SJ Br. 11-12. Accordingly, Section 5's dependence on the Fourteenth Amendment was a "[q]uestion[] which merely lurk[ed] in the record, neither brought to the attention of the court nor ruled upon," and thus is "not to be considered as

having been so decided as to constitute precedent[].” *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004).  By contrast, the Supreme Court has repeatedly suggested that the Fifteenth Amendment does *not* extend to vote dilution—leaving the Fourteenth Amendment as the only possible support for Section 5’s coverage of vote dilution—and those carefully considered statements are binding here, which means that this Court must apply *Boerne*’s Fourteenth Amendment test.  Pltfs. SJ Br. 11.[1]

     C.     Finally, mere “rationality” review is now patently inappropriate, because the new Section 5, unlike the old version, impairs the rights of non-minorities by conferring electoral preferences on minorities.  Pltfs. SJ Br. 12-13, 37-42.  The Government’s sole response is that not even the old Section 5 was “race-neutral,” given that it protected “racial minorities,” but not non-minorities, from voting discrimination.  Govt. SJ Br. 12.  Notwithstanding the Government’s transparent semantic gamesmanship, there is an obvious difference between laws that prohibit only certain groups from being subjected to discriminatory treatment and laws that require preferential treatment for certain groups.  Neither type of law is *blind* to race, but only the latter *harms* individuals because of their race.  Pltfs. SJ Br. 31-32 (citing Section 2 cases distinguishing between “equal opportunity” and “electoral advantage”).  Under the Government’s bizarre logic, a law that explicitly requires quotas is subject to the same review as the old Section 5, because both laws are not “race-neutral.”  In short, given Section 5’s newly preferential nature, it must be subjected, at the very least, to “congruence and proportionality” review.

**II.     THE 2006 VERSION OF SECTION 5 EXCEEDS CONGRESS’ ENFORCEMENT POWERS BECAUSE THE PRECLEARANCE REQUIREMENT FOR COVERED JURISDICTIONS IS NOT EVEN RATIONALLY RELATED TO REDRESSING UNCONSTITUTIONAL DISCRIMINATION**

     Plaintiffs’ opening brief demonstrated that Section 5’s extraordinary preclearance regime is justified only as a supplemental remedy targeted at jurisdictions where discrimination is so uniquely

---

[1] This Court has suggested that, because the Fifteenth Amendment protects the “right … to vote” from being “denied *or abridged* … on account of race,” U.S. Const., amend. 15, § 1 (emphasis added), it necessarily prohibits minority vote dilution.  Shelby SJ Tr. 16.  But that is not correct.  “Abridgment,” like “denial,” pertains *only* to the right *to cast a vote*, not to the effective weight of that vote.  Specifically, the right to cast a vote is “abridg[ed]” when, rather than “den[ying]” the vote outright, States instead impose a practical “hindrance” on minority voting, like inconveniently located polling places.  *City of Mobile v. Bolden*, 446 U.S. 55, 65 (1980) (plurality opinion).

entrenched that it defies redress under ordinary Section 2 litigation.  Pltfs. SJ Br. 14-17.  And Plaintiffs further demonstrated that, on the legislative record before the 2006 Congress, the covered jurisdictions no longer present such exceptional conditions, either on their own terms or by comparison to the non-covered jurisdictions.  *Id.* 17-25.  The Defendants' contrary arguments are legally and factually flawed.

A.   **Section 5 Is Not Valid Enforcement Legislation Unless It Targets Unconstitutional Discrimination That Defies Redress Under Section 2**

The Government claims that "plaintiffs cite no authority" for their contention that "the sole justification for the preclearance requirement in Section 5 is to prevent retrogressive voting changes that cannot be remedied through litigation under Section 2."  Govt. SJ Br. 13.  In reality, however, the Government just willfully ignores the wealth of authority that supports the fundamental, common-sense proposition that an extraordinary prophylactic remedy like Section 5 is an inappropriate "enforcement" measure when an ordinary remedy like Section 2 is working well.

To begin with, *South Carolina* emphasized that Section 5 was "justif[ied] [as a] legislative measure[] not otherwise appropriate" due to the "exceptional conditions" that had forced the 1965 Congress to act—namely, "case-by-case litigation was inadequate to combat widespread and persistent discrimination in voting" in the covered jurisdictions due to "the obstructionist tactics invariably encountered in [such] lawsuits."  383 U.S. at 328, 334-35; *see also City of Rome v. United States*, 446 U.S. 156, 181-82 (1980) (emphasizing those jurisdictions' "unremitting and ingenious defiance of the Constitution").  And *Boerne* forcefully admonished that "[s]trong measures appropriate to address one harm may be an unwarranted response to another, lesser one."  521 U.S. at 530; *see also Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 88 (2000) ("[P]owerful remedies" are permissible for "[d]ifficult and intractable problems.").  Thus, if Section 2, particularly with its expanded "results" test, is now effective legislation that renders "case-by-case litigation" more than "[]adequate" both to eliminate even subtle discrimination and to effectively foreclose jurisdictions from shifting to new discriminatory practices (*South Carolina*, 383 U.S. at 328), then Section 5 is indisputably unnecessary to serve its traditional purpose and inherently unnecessary for any other cognizable enforcement purpose.  Yet the Supreme Court has specifically

instructed that Congress cannot justify Section 5's "current burdens" absent a "current need[]" for its extraordinary preclearance requirement. *Nw. Austin*, 129 S. Ct. at 2512.

By contrast, the Government cites no case to support its breathtaking position that, even if Section 2 is sufficient to redress intentional discrimination in the covered jurisdictions, Congress can *gratuitously* impose Section 5's preclearance regime on those jurisdictions, in contravention of basic principles of federalism and jurisprudence. Pltfs. SJ Br. 14. To the contrary, the Government implicitly concedes Plaintiffs' hypothetical concerning public employment and housing: namely, that Congress could not justify a preclearance regime for public employment or housing, because the prophylactic remedies in Title VII and Title VIII are more than sufficient to redress any unconstitutional employment practices by state and local governments. *Id.* 14-15. Tellingly, however, Section 5 is *more* objectionable than that hypothetical, since interfering with *elections* presents a far greater "intrusion into sensitive areas of state and local policymaking." *Lopez v. Monterey Cnty.*, 525 U.S. 266, 282 (1999).

Furthermore, even the Government must admit that the Supreme Court has stressed that Section 2 is the nationwide remedy for racial voting discrimination, whereas Section 5 was designed to "prevent[] nothing but backsliding" in the covered jurisdictions. Govt. SJ Br. 13; *see also* Pltfs. SJ Br. 16-17. To be sure, the Government insists that the Court's focus on "the differences between the two provisions" was merely descriptive. Govt. SJ Br. 13-14. But, to the contrary, there is an obvious normative reason why the 1965 Congress gave the provisions different substantive scopes and why the Court preserved those differences against all attempts to erase them: Section 5 can be constitutionally justified only if it targets the types of entrenched discrimination that defy redress under Section 2. Pltfs. SJ Br. 14-17, 25-26.

Finally, the Government knocks down a straw-man when it objects that "the Court has never limited the application of Section 5 to protect only those gains achieved through litigation." Govt. SJ Br. 14. Plaintiffs never so argued. Rather, they argued that Section 5 "'*supplement[ed]* and protect[ed] the nondiscrimination gains achieved by Section 2.'" Pltfs. SJ Br. 16 (emphasis added). And, to repeat, the old Section 5 served that limited supplemental role by preventing backsliding in those jurisdictions where discrimination was so entrenched that it was likely to defy redress under Section 2.

**B.**   **Section 5's Preclearance Requirement Fails Even To Rationally Target Unconstitutional Discrimination That Defies Redress Under Section 2**

The Government does not even remotely show that, based on the 2006 legislative record, the covered jurisdictions currently pose an especially meaningful threat of engaging in entrenched unconstitutional discrimination that will evade Section 2, or even unconstitutional discrimination at all.

**1.**   **Section 5 Is Not Needed To Supplement Section 2 In The Covered Jurisdictions**

a.   Although the Government initially claims that "Section 2 alone is inadequate to protect minority voting rights," Govt. SJ Br. 14, the only thing "inadequate" is the Government's support for that claim.  The Government defends its bold assertion with the banal observation that Section 2 is "an after-the-fact remedy" that takes "time" to litigate, "places a heavy financial burden" on plaintiffs, and "leaves the burden of proof" on them.  Govt. Shelby SJ Br. 55-57; *see also id.* 53-55 (Section 5 provides "strong deterrence").  But Congress obviously did not take the Government's view that these generally shared attributes of civil litigation render "Section 2 alone … an inadequate remedy to address discrimination in voting" (*id.* 55), because otherwise it would have extended Section 5 *nationwide*, rather than callously leaving minorities in non-covered jurisdictions with a remedy that was not "sufficient by itself" (*id.*).

More importantly, the real reason why "case-by-case litigation was inadequate" when Section 2 was originally enacted was the dire combination of "widespread and persistent discrimination in voting" *and* "the obstructionist tactics invariably encountered in [such] lawsuits," including "the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees."  *South Carolina*, 383 U.S. at 328, 335.  Furthermore, those already exceptional burdens were exacerbated by the fact that anti-discrimination plaintiffs at the time—before the 1982 enactment of Section 2's "results" test—faced the "inordinately difficult" task of proving discriminatory intent.  Pltfs. SJ Br. 18.  Absent such unusual circumstances, a preclearance regime cannot be justified, as the Government believes, simply by observing that this extraordinary regime is easier for plaintiffs because it eliminates the typical litigation burdens from normal anti-discrimination laws.  If that retort were constitutionally sufficient to impose a prophylactic

preclearance duty *on top of* a prophylactic "effects" claim, then Congress could do so in every discrimination context—such as public employment or housing—which cannot be correct and which the Government is not even willing to suggest. *See supra* at 9 (citing Pltfs. SJ Br. 14).

Finally, the Government makes a half-hearted effort to "document[] specific instances in which Section 5 was essential to preserve … gains achieved through litigation" from being undone. Govt. SJ Br. 14. But the three (dubious) anecdotes that it has uncovered only underscore the *almost complete absence* of the "insidious and pervasive evil which had been perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution." *South Carolina*, 383 U.S. at 309.

b.     Having failed to show that Section 2 is ineffective, the Government tries to negate Plaintiffs' showing that the "current statistical evidence" in the legislative record "confirms that the emergency that prompted the enactment of § 5 has long since passed." *Nw. Austin*, 129 S. Ct. at 2525 (Thomas, J., concurring in the judgment in part and dissenting in part). Yet the Government fails again.

Before getting into the specifics, though, it warrants flagging at the outset the Government's two fundamental errors that pervade its briefs. *First*, the Government almost exclusively describes the legislative record using the generic term "discrimination," which enables it to conflate *intentional* discrimination with mere discriminatory *effects*. *E.g.*, Govt. Shelby SJ Br. 20 ("This extensive record of voting discrimination, including intentional discrimination …"). But, of course, only the former type of "discriminatory" practice is *unconstitutional*. *Bossier I*, 520 U.S. at 481-82. And thus any "Congress[ional] concern" "with the incidental burdens imposed" on minorities by a practice that has a "discriminatory" effect—without sufficient regard to its "object or purpose"—would "attempt a substantive change in constitutional protections." *Boerne*, 521 U.S. at 531-32; *cf. Rome*, 446 U.S. at 177 ("Congress could rationally have concluded that … electoral changes by jurisdictions with a demonstrable history of intentional racial discrimination in voting create the risk of purposeful discrimination"); *but see* Govt. Shelby SJ Br. 53 (extolling Section 5's "ability to nudge public officials to act in a positive way and to be more inclusive as they go about reaching a consensus in th[e] decision-making process"). Consequently, it is revealing that the analysis of "discriminatory purpose" objections is the *only* section in

the Government's lengthy briefs that focuses on documented existence of *intentional* discrimination. Govt. Shelby SJ Br. 27-31; *cf. id.* 44-47 (anecdotal evidence of "vote suppression"). Not only is this lone category of evidence completely unreliable, *see infra* at 15, but its lack of companions should put this Court on immediate notice that Congress had insufficient evidence of *unconstitutional* discrimination (let alone such discrimination needing redress by Section 5 rather than Section 2).

*Second*, the Government also repeatedly treats vote-denial evidence and vote-dilution evidence as constitutionally equivalent. *E.g.*, Govt. Shelby SJ Br. 57-58. To the contrary, however, the "[s]trong measure[]" of Section 5 preclearance rather than Section 2 litigation is obviously more "appropriate" when "the evil presented" is vote denial. *Boerne*, 521 U.S. at 530. Generally speaking, the magnitude of "harm" is "lesser" for vote dilution, *id.*: an unconstitutional vote-dilution injury is partial and contingent (minorities still exercise their right to vote and are harmed only if racially polarized voting occurs), whereas an unconstitutional vote-denial injury is total and conclusive (minorities lose their vote entirely). Accordingly, compared to vote-denial evidence, the "lesser" "evil presented" by vote-dilution evidence makes the "remedial measure[]" of preclearance more likely to be "an unwarranted response." *Id.*[2]

Plaintiffs now turn to the specific categories of evidence that the 2006 Congress considered.

**Turnout and Registration**: Plaintiffs' opening brief demonstrated that the *Northwest Austin* Court correctly described the legislative record as establishing that "[v]oter turnout and registration rates [now] approach parity" between blacks and whites. Pltfs. SJ Br. 19-20 (quoting 129 S. Ct. at 2511 (citing H.R. Rep. No. 109-478, at 12-18 (2006))). The Government primarily deems that conclusion irrelevant, reasoning that Section 5 applies not just to voting "barriers," but to "dilutive techniques." Govt. SJ Br. 14-15. That response is misguided for the reasons just discussed, and it is particularly inapt in the context of turnout and registration, which the Supreme Court has *always* emphasized when analyzing Section 5's

---

[2] That said, Plaintiffs do not dispute that the widespread existence of successful vote dilution may carry a sufficient risk of harmful intentional discrimination to warrant Section 5 preclearance (or that vote dilution is restricted under Section 5 once jurisdictions are properly subject to preclearance). Govt. Shelby SJ Br. 59-60 (citing *Rome*, 446 U.S. at 160, 181). But the Government does not come close to showing that current vote-dilution schemes are as constitutionally deleterious as the old vote-denial schemes that originally justified Section 5's preclearance remedy.

constitutionality. *South Carolina*, 383 U.S. at 313; *Rome*, 446 U.S. at 180; *Nw. Austin*, 129 S. Ct. at 2511. Unsurprisingly, then, the Government does briefly attempt to undermine the turnout and registration data. Relying on census data cited by the district court in *Northwest Austin*, the Government alleges that Congress erroneously conflated whites and Hispanics, which had the effect of reducing the numbers for whites and thereby narrowing the gap between whites and blacks. Govt. Shelby SJ Br. 43. However, even after the issue was flagged below, the *Supreme Court* in *Northwest Austin* deemed it appropriate to rely on the data actually used by Congress: "Today, the registration gap between white and black voters is in single digits in the covered States; in some of those States, blacks now register and vote at higher rates than whites." 129 S. Ct. at 2511 (citing H.R. Rep. No. 109-478, at 12-13). And that is entirely consistent with this Court's decision that "the constitutionality of [Section 5] must rise or fall on the record that Congress created." *Shelby Cnty. v. Holder*, 270 F.R.D. 16, 21 (D.D.C. 2010). Plus, in any event, separating Hispanics from whites had no material effect on the data for most of the covered States. *See Continuing Need for Section 203's Provisions for Limited English Proficient Voters, Hearing Before the S. Comm. on the Judiciary*, 109th Cong. (2006) at 147-48 (submission of Charles S. Bullock III & Ronald Keith Gaddie, *Impact of Using Non-Hispanic White Data* (American Enterprise Institute, 2006)).[3]

**Minority Elected Officials**: Plaintiffs' opening brief demonstrated that the *Northwest Austin* Court correctly described the legislative record as establishing that "[m]inority candidates hold office at unprecedented levels." Pltfs. SJ Br. 20 (quoting 129 S. Ct. at 2511 (citing H.R. Rep. No. 109-478, at 12-18)). The Government's rejoinder is that "most minority legislators … were elected from majority-minority districts," which were "largely created as a result of the VRA" and "remain necessary to enable minority voters to elect candidates of choice." Govt. SJ Br. 15. But *Section 5* is not a cognizable factor in the creation or retention of any *constitutionally permissible* majority-minority district. As for the creation of majority-minority districts, *Section 2* requires the creation of naturally forming majority-minority districts in carefully limited circumstances, Pltfs. SJ Br. 31-33, but Section 5 *never* requires the

---

[3] The Government also emphasizes certain disparities in Virginia, Texas, and Florida, Govt. Shelby SJ Br. 43, but they are legally inconsequential, Shelby SJ Reply Br. 45-46.

creation of majority-minority districts given its general *retrogression* limitation, *Bossier I*, 520 U.S. at 478-80.  (Unless, of course, the Justice Department were to require the creation of such districts using its newly granted "discriminatory purpose" objection, in violation of both *Miller v. Johnson*, 515 U.S. 900, 924-27 (1995), and the Government's representations here, Govt. SJ Br. 36.)  As for the preservation of majority-minority districts, *Section 2* would foreclose any attempt to eliminate a constitutionally permissible majority-minority district, because that would constitute a discriminatory "result."  *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994).  Thus, the only significant majority-minority districts left for Section 5 to preserve are racially gerrymandered ones that violate *Miller* and *Shaw v. Reno*, 509 U.S. 630 (1993).  (And the Government even claims that it would not apply Section 5 in that context, though that promise is illusory and contrary to the plain text of the new "ability to elect" mandate.  *See infra* at 26-27.) In short, the Government's invocation of majority-minority districts is simply a red herring to distract this Court from the enormous strides that have been made with respect to minority elected officials.[4]

**Preclearance Objections:**   Plaintiffs' opening brief demonstrated that the legislative record establishes that the percentage of Section 5 objections is miniscule and the rate of objections has drastically decreased.  Pltfs. SJ Br. 20.  The Government does not dispute the "reduction," but claims that Plaintiffs' "figures do not reflect the complete picture," because the preclearance process stymies electoral changes in several ways other than formal objections.  Govt. SJ Br. 15 (citing Govt. Shelby SJ Br. 35-38).  That is factually accurate, but the Government is simply boasting about practical burdens that bear no relationship whatsoever to suspending *unconstitutional* changes (let alone ones that would defy redress under Section 2).  Shelby SJ Reply Br. 60-62.  The Government also observes that the Supreme Court in *Rome* implicitly rejected the argument that there had been a large decrease in the objection rate.  Govt. Shelby SJ Br. 61.  But *Rome* did not even discuss that decrease because it was plainly immaterial given the dispositive factors for the Court:  just "[t]en years" after Section 5's enactment, Congress sought a mere "7-year extension," which it had concluded "was necessary to preserve the 'limited and

---

[4] The Government also quibbles about the number and status of elected positions held by minorities, Govt. Shelby SJ Br. 52-53, but its complaints are misguided, Shelby SJ Reply Br. 46-47.

fragile' achievements of the Act," as demonstrated by the "modest and spotty" "political progress" for minorities thus far. *Rome*, 446 U.S. at 181-82. Here, however, the extended decline in objections is only further confirmation that Section 5's achievements are here to stay.

As noted at the outset, the Government also specially emphasizes the large number of "discriminatory purpose" objections that the Justice Department made before *Bossier II* foreclosed the practice, thereby implying that each such objection prevented a constitutional violation. Govt. Shelby SJ Br. 27. That, however, is utterly disingenuous. The reality is that the Department deployed such objections, *not* to prevent constitutional violations, but *to create them*, by "accept[ing] nothing less than abject surrender to its" well-known "policy of maximizing majority-black districts." *Miller*, 515 U.S. at 917, 924, 925 & n.*, 926-27; *see also* Pltfs. SJ Br. 28-30. In sum, given the Department's malfeasance, the number of "discriminatory purpose" objections is a hopelessly unreliable guide for determining the extent of entrenched discrimination in the covered jurisdictions. *See also* Shelby SJ Reply Br. 58 (giving further reasons why objections are not reliable findings of discriminatory purpose).[5]

**Section 2 Violations:** Plaintiffs' opening brief demonstrated that Congress identified from the legislative record only *six* reported Section 2 cases between 1982 and 2006 that ended with a determination of *unconstitutional* discrimination against minorities, which was precisely the same number as found such discrimination against *whites*. Pltfs. SJ Br. 20-21; *see also To Examine the Impact and Effectiveness of the Voting Rights Act, Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. (2005) ("*Examine The Impact*") at 986-87 (submitting Ellen Katz et al., *Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982* (Voting Rights Initiative, Univ. of Mich. Law Sch., 2005) ("*Documenting Discrimination*") at 20-21 (identifying eight reported cases finding intentional discrimination in covered jurisdictions)). But the Government responds that focusing on *reported* decisions is misleading, because the Report of the

---

[5] The Government similarly emphasizes the large number of election observers that the Justice Department has sent to the covered jurisdictions, even though the Department's deployment criterion requires merely "a reasonable belief" of a "risk" of minority "disenfranchise[ment]." Govt. Shelby SJ Br. 38-40.

National Commission on the VRA studied both reported and unreported cases during the same time-frame, and it found 653 cases with "outcomes favorable to minority voters," including "many" that "did involve … findings" of "intentional discrimination." Govt. Shelby SJ Br. 40-41, 62-63. Far from "many" cases of intentional discrimination against minorities, however, Professor Pildes testified without contradiction that the Report revealed "11 [cases] in covered States" containing "findings of intentional discrimination." *The Continuing Need for Section 5 Pre-Clearance, Hearing Before the S. Comm. on the Judiciary*, 109th Cong. (2006) ("*Continuing Need*") at 10 (statement of Richard H. Pildes); *see also* Shelby SJ Reply Br. 63 (explaining that the Report's overall figure of "favorable" outcomes is not probative given its inclusion of "settlements").   Likewise, although the Government characterizes the study of reported cases as "includ[ing] widespread judicial findings of serious voting discrimination by whites against minorities," Govt. Shelby SJ Br. 41, the Government is plainly using the phrase "voting discrimination" to cover *unintentional* acts with adverse effects, *see supra* at 11-12, since the Government does not dispute Congress' identification of only six cases finding unconstitutional discrimination

Recognizing the dearth of cases finding *unconstitutional* discrimination, the Government tries to pad its statistics.   The Government argues that *all* the Section 2 cases "are reliable evidence [of] intentional voting discrimination," because "the standard for proving a violation of Section 2 is designed to 'identify facially neutral practices that are likely to be intentionally discriminatory.'" Govt. SJ Br. 17 (quoting Pltfs. SJ Br. 31).   That is too clever by half.   The very next page of Plaintiffs' opening brief reveals that four of the six critical Supreme Court cases that "help[ed] to target Section 2 at facially neutral practices that are likely to be intentionally discriminatory" were decided *after 1994* (including two after 2005).   Pltfs. SJ Br. 32.   Thus, most of the Section 2 cases in the legislative record were decided before the Court finished—or had even seriously started—its project of "structur[ing] … the statute's 'totality of the circumstances' test."   *De Grandy*, 512 U.S. at 1010.   It is thus rank speculation for the Government to suggest that all the Section 2 cases are indicative of unconstitutional discrimination.

Most fundamentally, however, even if the Government were right, that would prove Plaintiffs' point.   Once it is recalled that Section 5 can be constitutionally justified only as a supplemental means for

redressing entrenched unconstitutional discrimination that defies relief under Section 2, *see supra* at Part II.A, then the very existence of hundreds of successful Section 2 cases in the covered jurisdictions confirms the adequacy of Section 2 as a remedy.  To repeat, the Government cannot provide any rational justification for Section 5's extraordinary remedy if Section 2's ordinary remedy is properly functioning.

**Racially Polarized Voting:**  Plaintiffs' opening brief explained that racially polarized voting is not evidence of *state* discrimination, because it constitutes the voluntary actions of *private* individuals. Pltfs. SJ Br. 21.  Moreover, this Court should be aware that, somewhat counterintuitively, racially polarized voting is not even evidence of *private* discrimination.  Rather than describing "voting patterns that are in some way *caused by race*," "the legal concept of racially polarized voting … means simply that the race of voters correlates with the selection of a certain candidate or candidates," but "the *reasons* black and white voters vote differently *have no relevance*."  *Thornburg v. Gingles*, 478 U.S. 30, 62-63 (1986) (plurality opinion) (latter emphases added); *see also Goosby v. Town Bd.*, 180 F.3d 476, 492-93 (2d Cir. 1999) (citing cases).  For example, because it is irrelevant to racially polarized voting that "the divergent patterns are not attributable to race but to partisan affiliation," *Goosby*, 180 F.3d at 493, racially polarized voting may be found simply where white voters predominantly vote for a white Republican and black voters predominantly vote for a white Democrat.  But such "racially polarized voting" does not reflect discrimination—let alone *unconstitutional* discrimination—on the part of the jurisdiction, the voters, the candidates, or anyone else.  Nevertheless, the Government emphasizes that "racially polarized voting is a necessary element of vote dilution" and is widespread "throughout [the] covered jurisdictions." Govt. Shelby SJ Br. 49-53.  It thus speaks volumes that Congress' "clearest and strongest evidence" of the continued need for Section 5 (H.R. Rep. No. 109-478, at 34) is a practice (1) where no one need ever have discriminated, (2) simply because it is a necessary condition (3) to "second generation" vote-dilutive practices (4) that themselves need not be unconstitutional, (5) let alone beyond the effective reach of Section 2.  If imposing the extraordinary burden of Section 5 preclearance in response to *that* "evil presented" is not "an unwarranted response," then nothing is.  *Boerne*, 521 U.S. at 530.

2.  **Section 5 Is No More Needed To Supplement Section 2 In The Covered Jurisdictions Than In The Non-Covered Jurisdictions**

Because Section 5 applies only to certain covered jurisdictions, its "departure from the fundamental principle of equal sovereignty requires a showing that [its] disparate geographic coverage is sufficiently related to the problem that it targets." *Nw. Austin*, 129 S. Ct. at 2509.  At the very least, that means that Section 5's coverage formula must be "rational in both practice and theory." *South Carolina*, 383 U.S. at 330.  But the Government cannot satisfy either prong of that standard.

a.  Plaintiffs' opening brief demonstrated that Section 5's scope of coverage was not rational in theory because the 2006 Congress did not even attempt to identify those jurisdictions with the worst current amounts of unconstitutional discrimination, but rather simply retained a coverage formula based upon election data that was designated in 1964, 1968, and 1972 to target the worst offenders at those times.  Pltfs. SJ Br. 21-23.  The Government, however, responds that Congress reasonably did so, given that the covered jurisdictions "had a long history of racial discrimination in voting" back when they were originally selected for coverage, and "voting discrimination was still occurring" there in 2006.  Govt. SJ Br. 16; Govt. Shelby Supp. Br. 5.  That response is fundamentally misguided.

That the covered jurisdictions were persistent discriminators *over thirty years ago* is legally irrelevant, because Section 5's "current burdens" must be justified by "current needs." *Nw. Austin*, 129 S. Ct. at 2512.  In *Boerne*, the major reason that the "legislative record" was constitutionally insufficient— "[i]n contrast to the record which confronted Congress and the Judiciary in the voting rights cases"—was that it "lack[ed] examples of *modern* instances" of the relevant unconstitutional practice.  521 U.S. at 530 (emphasis added).  "[P]ast discrimination" is not an "original sin" that taints subsequent generations. *Mobile*, 446 U.S. at 74 (plurality opinion).  Indeed, the 1965 Congress itself created Section 5 as a "temporary provision[] … expected to be in effect for only five years." *Nw. Austin*, 129 S. Ct. at 2510.

Nor is Congress' improper fixation on ancient history saved by the Government's assertion (Govt. SJ Br. 16) that "voting discrimination [is] still occurring in the covered jurisdictions."  As a threshold matter, the Government does not even limit the term "voting discrimination" to *unconstitutional*

discrimination.  *See supra* at 11-12.  More importantly, even if narrowed to intentional discrimination, the amount of such discrimination is unquestionably far less than when the Supreme Court upheld Section 5 in *South Carolina* and *Rome*, *see supra* at Part II.B.1, and the mere lingering presence in the covered jurisdictions of some lesser, undefined amount of unconstitutional conduct cannot justify *selectively limiting coverage* to them as a punishment for their past.  Indeed, even in a counter-factual world where discrimination in all the covered jurisdictions remained just as bad as in 1965, Congress still would have no justification for refusing to inquire whether *any new jurisdictions* had sunk to such lows.  After all, whether current levels of discrimination in a jurisdiction are sufficiently bad that Section 2 is inadequate and Section 5 is necessary has nothing to do with the amount of discrimination that existed there more than three decades ago.  In short, there simply is no rational theory to support the Government's conclusory assertion that, "absent [a] longstanding history and pattern" of discrimination, "recent discrimination" in amounts equal to or greater than in the covered jurisdictions does not "necessarily call for application of [the preclearance] requirement to newly identified jurisdictions."  Govt. Shelby Supp. Br. 6.  Rather, the only conceivable reason for sticking to the covered jurisdictions is the absence of "politically feasible alternatives" due to the "disrupt[ion] [of] settled expectations," which the Supreme Court has strongly suggested is constitutionally inadequate.  *Nw. Austin*, 129 S. Ct. at 2512 (quoting Nathaniel Persily, *The Promise and Pitfalls of the New Voting Rights Act*, 117 Yale L.J. 174, 208 (2007)).

Finally, the Government essentially defends the theoretical irrationality of Congress' decision to retain the old coverage formula by highlighting the fact that, in certain limited circumstances, courts have the power to "bail[-]out" covered jurisdictions and "bail-in" non-covered jurisdictions.  Govt. SJ Br. 16; Govt. Shelby Supp. Br. 8-9.  But Congress cannot exercise *its* constitutional obligation to justify the "*statute's* disparate geographic coverage" (*Nw. Austin*, 129 S. Ct. at 2512 (emphasis added)) by essentially foisting the duty on courts *to rewrite the statute*.  Just as Congress could not arbitrarily impose Section 5's preclearance burden on *only* jurisdictions east of the Mississippi River and then defend that irrational choice as having fortuitously selected the right jurisdictions, Pltfs. SJ Br. 21-22, nor could Congress arbitrarily impose Section 5 on only jurisdictions east of the Mississippi and then defend that

irrational choice based on the fact that courts had the authority to redraw the map. In any event, the limited statutory scope of the "bail-out" and "bail-in" provisions render them constitutionally inadequate to excuse the coverage formula's theoretical irrationality.  Shelby SJ Br. 42; Shelby SJ Reply Br. 31-33.

      b.      Plaintiffs' opening brief demonstrated that a *de novo* review of the legislative record establishes that the scope of Section 5's theoretically irrational coverage formula is, unsurprisingly, also irrational in practice:  the covered and non-covered jurisdictions are materially indistinguishable with respect to the types of discrimination evidence that the 2006 Congress considered.  Pltfs. SJ Br. 23-25. Notably, the Supreme Court strongly hinted that it foresaw this outcome, pointedly observing that even "supporters of extending § 5" acknowledged that "the evidence that is in the record suggests that there is more similarity than difference," while identifying *no contrary view*.  *Nw. Austin*, 129 S. Ct. at 2512 (quoting *Continuing Need* at 10 (statement of Richard H. Pildes)).  Even more tellingly, the Government does not meaningfully dispute Plaintiffs' assertions for any category of evidence other than Section 2 lawsuits.  Govt. SJ Br. 16-17 (citing Govt. Shelby SJ Br. 40-41, 68-69; Govt. Shelby SJ Reply Br. 3-32; Govt. Shelby Supp. Br. 12-13).  And the Government is plainly wrong about Section 2 cases.

      With respect to the most relevant type of Section 2 cases—*i.e.*, those finding *unconstitutional* discrimination—Congress identified in the legislative record an *identical* (and identically *limited*) amount of cases in covered and non-covered jurisdictions (six each).  S. Rep. No. 109-295, at 13, 65, 76 (2006); *see also Examine The Impact* at 986-87 (submitting *Documenting Discrimination* at 20-21 (similarly identifying eight reported cases finding intentional discrimination in covered jurisdictions, compared to *fourteen* in non-covered)).  Nor can the Government improve its position by complaining that these inquiries, unlike the Report of the National Commission on the VRA, were limited to *reported* decisions, *see supra* at 15-16, because that Report likewise revealed *more* cases finding intentional discrimination in *non-covered* jurisdictions than in covered ones.  *Continuing Need* at 10 (statement of Richard H. Pildes) ("13 in non-covered States, 11 in covered States").  The Government has no defense of the similarity among the jurisdictions on this critical fact, other than its erroneous suggestion that the mere finding of liability in *any* Section 2 case strongly suggests that intentional discrimination exists.  *See supra* at 16.

Moreover, the Government fares no better when considering Section 2 cases more generally. Notably, the legislative record does not contain a covered/non-covered comparison of *all* Section 2 cases, because the National Commission Report did not even bother investigating unreported cases in non-covered jurisdictions. Shelby Supp. Br. 11 n.5; *Continuing Need* at 202 (testimony of Richard H. Pildes at 5 n.13). Instead, the Government invokes Professor Katz's comparison of reported Section 2 cases, which found that 56% of "cases with outcomes favorable to minority voters" occurred in covered jurisdictions. Govt. Shelby SJ Br. 68. But, even setting aside the serious flaws with that study's definition of "favorable outcomes" (Shelby SJ Reply Br. 29), a mere 56-44 disparity cannot possibly justify the selective imposition on covered jurisdictions of the extraordinary Section 5 obligation.

No doubt recognizing that this disparity is legally inconsequential, the Government tries to inflate it by observing that the covered jurisdictions only contain around a quarter of the nation's population, which supposedly means they were "subject to more than twice their proportional share" of these cases. Govt. Shelby SJ Br. 68. But, among the many reasons that this argument is wrong, perhaps the simplest is this: as Professor Pildes explained in his Senate testimony—which was cited by the Supreme Court in *Northwest Austin*, 129 S. Ct. at 2512—"legally the right denominator would have to be *the minority population in different jurisdictions*," and, as a rough approximation, "about half of African-Americans live … in covered areas," which "suggest[s] something that is more general in the United States." *Continuing Need* at 13-14 (emphasis added); *see also id.* at 157 (submission of Ronald Keith Gaddie at 4 n.1) ("The nine Southern states that are Section 5-covered … contain 43.9% of all citizen [voting-age-population] blacks in the United States."). The Government similarly attempts to magnify the trivial difference among Section 2 cases by speculating that the disparity would be more pronounced if "the Section 5 preclearance process" were not already "block[ing] many discriminatory voting changes in the covered jurisdictions." Govt. SJ Br. 17. But Section 5 and Section 2 have different standards, *Bossier I*, 520 U.S. at 477-80, and, regardless, the Government cannot defend Section 5's coverage formula based on rank speculation about its effectiveness, particularly when such speculation is needed to bolster the Government's *only* record evidence that Section 5 is fortuitously rational in practice.

In any event, passing an *aggregate* comparison between the covered and non-covered jurisdictions cannot possibly save Section 5—though failing such a comparison certainly dooms it—because the "historic tradition that all the States enjoy 'equal sovereignty'" (*Nw. Austin*, 129 S. Ct. at 2512) requires at least that Section 5's coverage formula be assessed on a state-by-state basis (if not a jurisdiction-by-jurisdiction basis). Yet Section 5 plainly flunks such an assessment, Shelby Supp. Br. 13-14, and the Government does not even argue otherwise. Thus, as Professor Persily observed in an article cited by the Supreme Court in *Northwest Austin* (129 S. Ct. at 2512), "the coverage formula for section 5 is both overinclusive and underinclusive of jurisdictions of concern with respect to their record of minority voting rights violations," leaving it "difficult to defend a formula which, for example, covers counties in Michigan and New Hampshire, but does not cover the counties in Ohio and Florida with the most notorious voting rights violations in recent elections." Persily, *supra*, at 208 (footnote omitted).

Finally, perhaps the most telling evidence of the indefensibility of the real-world scope of Section 5 coverage is the Government's heavy reliance on what it euphemistically describes as "[a] more comprehensive study conducted since the 2006 Reauthorization," but which is actually nothing more than its own employee's declarations concocted during the course of this litigation. Govt. SJ Br. 17 (citing Govt. Shelby SJ Br. 68; Govt. Shelby SJ Reply Br. 31-32; Govt. Shelby Supp. Br. 12-13). That the Government persists in this transparent effort to bolster an inadequate legislative record, notwithstanding this Court's unambiguous ruling that "the constitutionality of [Section 5] must rise or fall on the record that Congress created" (*Shelby Cnty.*, 270 F.R.D. at 21), should tell this Court all that it needs to know.

## III. THE 2006 VERSION OF SECTION 5 EXCEEDS CONGRESS' ENFORCEMENT POWERS BECAUSE THE AMENDED PRECLEARANCE STANDARD IS NOT EVEN RATIONALLY RELATED TO REDRESSING UNCONSTITUTIONAL DISCRIMINATION

Plaintiffs' opening brief demonstrated that the Supreme Court has repeatedly warned that the 2006 amended preclearance standard raises serious constitutional concerns. As for the "ability to elect" prong:  that "dispositive [and] exclusive" mandate (*Ashcroft*, 539 U.S. at 480) makes race "the predominant factor" in electoral decisionmaking, *Nw. Austin*, 129 S. Ct. at 2512 (citing *Ashcroft*, 539 U.S.

at 491-92 (Kennedy, J., concurring)), because it deprives covered jurisdictions of flexibility in preserving equal opportunity for minorities and instead imposes a rigid quota floor on the expected electoral chances of minorities.  Pltfs. SJ Br. 33-41.  As for the "discriminatory purpose" prong:  that basis for objection "exacerbate[s] the 'substantial' federalism costs that the preclearance procedure already exacts, … perhaps to the extent of raising concerns about § 5's constitutionality," *Bossier II*, 528 U.S. at 336 (citing *Miller*, 515 U.S. at 926-27), because it saddles covered jurisdictions with the onerous duty to justify their rejection of hypothetical, non-retrogressive alternatives, thereby enabling the Justice Department to coerce those jurisdictions into increasing the expected electoral chances of minorities.  Pltfs. SJ Br. 26-30, 41-42.  In sum, rather than serving the limited supplemental role of remedying unconstitutional discrimination that defies redress under Section 2, the new Section 5 itself suffers from the "fundamental flaw" of a "scheme in which the Department of Justice is permitted or directed to encourage or ratify a course of unconstitutional conduct."  *Ashcroft*, 539 U.S. at 491 (Kennedy, J., concurring) (cited in *Nw. Austin*, 129 S. Ct. at 2512).  Thus, the amended standard "underscore[s]" that Section 5's "preclearance requirements" now "raise serious constitutional questions" about whether the 2006 "Congress exceeded its … enforcement power[s]."  *Nw. Austin*, 129 S. Ct. at 2512-13; *see also* Pltfs. SJ Br. 42-43.

Notably, the Defendants ignore *every single one* of these repeated warnings by the Supreme Court about the new preclearance standard.  Instead, they simply accuse Plaintiffs of speculatively mischaracterizing the scope and burden of the new standard.  It is the Defendants, however, who are falsely describing the new Section 5, for they know that the true version is constitutionally indefensible.  Moreover, regardless of the precise contours of the 2006 amendments, the Defendants do not even attempt to explain how *any expansion* of the 1965 preclearance standard can be justified, given the *indisputable reduction* in the specific evils that Section 5 was designed to target.

A.    **The "Ability To Elect" Mandate Imposes A Quota Floor On A Minority Group's Expected Electoral Chances**

At the outset, the Government erroneously suggests that Plaintiffs are arguing that *all* "discriminatory-effects provisions" must be "strictly construed."  Govt. SJ Br. 38.  Instead, however,

Plaintiffs made two simple points.  *First*, they observed that, because "effects" provisions require more than the Constitution compels, the scope of such provisions must be carefully considered, in order to ensure that Congress is truly "enforcing" the Constitution's ban on intentional discrimination rather than substantively expanding the constitutional rights of minorities in ways that affirmatively impair the rights of non-minorities.  Pltfs. SJ Br. 30-31.  *Second*, they emphasized that special vigilance is required where the "effects" ban does not simply eliminate *barriers* for *all* races, but instead preferentially mandates for minority voters a certain proportion of electoral benefits that are limited.  After all, there is no difference between a law that mandates that minorities are guaranteed a certain number of "minority-electable" districts and a law that holds that an electoral plan with fewer than the mandated number of "minority-electable" districts has a discriminatory "effect":  both laws plainly impose quota floors.  *Id.* 31.

Notably, the Government does not deny that:  (1) overly broad "effects" provisions can cross these two constitutional lines; (2) accordingly, the Supreme Court has repeatedly construed Section 2's "results" test to protect equal opportunity without conferring electoral advantages, *id.* 31-33; or (3) *Ashcroft* consciously modeled the old Section 5 on the precedents fleshing out Section 2's "totality of the circumstances" standard, thereby avoiding preferential treatment for minorities while simultaneously preserving covered jurisdictions' flexibility when intentional discrimination was not implicated, *id.* 33-37.  The Government nonetheless defends Congress' willful decision to overrule *Ashcroft* by flatly prohibiting "[a]ny voting [change]" that "diminish[es] the ability" of minorities "to elect their preferred candidates of choice."  42 U.S.C. § 1973c(b); H.R. Rep. No. 109-478, at 93-94.  The Government insists that this "ability to elect" mandate is not, as Plaintiffs contend (Pltfs. SJ Br. 38-41), a facial quota-preference for minorities.  But the Government's contrary arguments are manifestly erroneous.

1.      The Government emphasizes that § 1973c(b) does not preserve minorities' "electoral *success*," but only their "*ability* … to elect," which the Government claims is significant because "ability does not invariably lead to success."  Govt. SJ Br. 41-42 (emphases added).  Although it is true that § 1973c(b) does not require "success" by *overturning election results* to install a minority-preferred candidate who received fewer votes than the victorious non-minority candidate, that hardly redeems this

quota scheme.  A law prohibiting an employer from making fewer *job offers* to minority applicants than it did the prior year does not guarantee the "successful" result that the amount of minorities *hired* will be the same as the last year—because some minorities may decline the racially preferential offer and thus fail to take advantage of their "ability" to obtain the job—but that law is still a quota.  Similarly, § 1973c(b) is a quota that prevents any reduction in minorities' "ability to elect" their preferred candidates, even though minority voters ultimately may not exercise their race-based advantage, by declining to turn out to vote.  In short, § 1973c(b)'s quota is simply tied to an election's *ex ante* rules rather than its *ex post* results— *i.e.*, no electoral practices may be changed that are *expected* to diminish minority success.

2.      The Government argues that, although § 1973c(b) overruled *Ashcroft*'s "totality of the circumstances" approach, the "ability to elect" mandate does not impose an "utterly inflexible" quota-preference for minorities.  *Id.* 39.  The Government reasons that § 1973c(b) left intact pre-*Ashcroft* precedent and practice that permitted the preclearance of "a retrogressive change … in certain circumstances."  *Id.*  But the Government's four examples of "circumstances" that purportedly allow "retrogression" instead vividly confirm that the "ability to elect" mandate, in overruling *Ashcroft*, effectively eliminated the flexibility that was constitutionally critical to preserving covered jurisdictions' autonomy and preventing Section 5 from becoming a naked racial preference.

*First*, the Government observes that *City of Richmond v. United States*, 422 U.S. 358 (1975), allows certain retrogressive *annexations*.  Govt. SJ Br. 39-40.  But it fails to mention that *Richmond*'s *sui generis* "exception to normal retrogressive-effect principles" was only "justified by the peculiar circumstances presented in annexation cases."  *Bossier II*, 528 U.S. at 330-31 (emphasis omitted).

*Second*, the Government notes that it will allow retrogression of "electable" districts if "necessitate[d]" by "compliance with the one person, one vote standard."  Govt. SJ Br. 40; *see also* 76 Fed. Reg. 7470, 7472 (Feb. 9, 2011).  But the "ability to elect" mandate is a rigid quota even if it stops just short of requiring the preservation of minority-preference districts or practices that are *independently* unconstitutional.  To analogize, a law that *guaranteed* public housing for *only* minorities would still be a quota even if the law would not be followed when the requisite housing could be obtained only by

violating the Takings Clause.   Likewise, § 1973c(b) inflexibly preempts "[a]ny voting [change]" that "diminish[es] the ability" of minorities "to elect their preferred candidates of choice," subject only to the trivial qualifier that the less-retrogressive alternative must itself be constitutional.

*Third*, the Government contends that "a retrogressive redistricting plan must nonetheless be precleared if the only alternative is a plan that subordinates traditional districting principles *and* violates the principles articulated in *Shaw* and *Miller*."  Govt. SJ Br. 40 (emphasis added).   But this putative *Shaw* "exception" is illusory in practice.   As just noted, the Government's brief reflects a clear distinction between "subordinating traditional districting principles" to preserve "electable" minority districts and plans that actually "violate *Shaw* and *Miller*."   This distinction is confirmed by the Justice Department's "guidance," which unambiguously states that, apart from the "one-person, one-vote" principle, Section 5 may "require … depart[ing] from" traditional districting principles—such as political "boundaries," "compactness," "incumbents," and "partisan balance"—to "avoid retrogression."   76 Fed. Reg. at 7462. But, of course, "subordinat[ing] [these] traditional race-neutral districting principles" for the "predominant"—indeed, sole—"motiv[e]" of preserving racially-identifiable districts is a quintessential *Shaw* violation.   *Miller*, 515 U.S. at 916.   Accordingly, the Government's *Shaw* caveat is meaningless and in no ways lessens § 1973c(b)'s compulsion to violate neutral districting principles on racially preferential grounds.   Put differently, although the Department quite clearly does require subordinating traditional principles to avoid retrogression, it simply believes that this is not a *Shaw* violation:  the Department maintains that *compliance with Section 5* precludes a *Shaw* violation, because such compliance is a "compelling government interest" that *justifies* subordinating traditional principles to race.   Brief for the United States at 28-29, *Miller v. Johnson*, 515 U.S. 900 (1995), 1995 WL 89331;  *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 485 n.2 (2006) ("*LULAC*") (Souter, J., dissenting).   In short, this Court should not be misled into believing that the Department's policy is to refrain from requiring the preservation of "ability to elect" districts that would require abandoning race-neutral districting principles.   Consistent with § 1973c(b)'s plain text, the Department manifestly does interpret the new Section 5 to require such preferential action; doing so satisfies its misleading *Shaw* caveat because it

believes such subordination is permissible under *Shaw* precisely *because* it is required by Section 5.

*Fourth*, the Government denies Plaintiffs' assertion that § 1973c(b) requires preserving "every existing majority-minority district" and "every existing 'coalition' or 'influence' district in the covered jurisdictions."  Govt. SJ Br. 42 (quoting Pltfs. SJ Br. 39).  In particular, the Government reasons that, "*[i]f racially polarized voting comes to play less of a role in elections in covered jurisdictions, minorities in existing districts in which they currently have the ability to elect their candidates of choice will be able to retain their current ability to do so with progressively smaller percentages of the population.*"  *Id.* (emphasis added).  That "response," however, not only fails to disprove Plaintiffs' point, but it underscores the seriousness of the constitutional problem with the "ability to elect" standard.  Critically, the Government *agrees* that § 1973c(b) requires selecting whatever minority percentage is needed for a district so that minorities may "retain" a "current ability" to elect their preferred candidates.  But the fact that the raw population percentages required may diminish over time due to reduced racial bloc voting in no way alters the fact that the statute imposes a quota floor on the number of "minority-electable" districts—just as it plainly would be a racial quota to require that colleges set their SAT cut-offs for minorities at whatever score was needed to maintain the current minority-admission rates, even though the threshold score could change over time depending on relative minority performance.  Indeed, § 1973c(b)'s quota floor is *exacerbated* by the fact that the necessary "ability to elect" racial percentage decreases as nonminority racial bloc voting declines, because that means there will be increasingly more "minority-electable" districts that must be retained.  Specifically, districts with relatively small minority populations that currently lack the "ability to elect"—say, between 15% and 35%—will *become* "minority-electable" districts as minorities receive increasing support from non-minorities. This, of course, "would unnecessarily infuse race into virtually every redistricting."  *Bartlett v. Strickland*, 129 S. Ct. 1231, 1247 (2009) (plurality opinion) (holding that Section 2 does not require creating districts where a sub-50% minority population can win only with predictable majority support).  Consequently, it is a perverse constitutional defect, rather than the saving grace that the Government bizarrely suggests, that the "ability to elect" standard will require *increasing* minority preferences in response to an increased

willingness by non-minorities to vote for minorities' preferred candidates.[6]

In sum, none of the so-called "exceptions" identified by the Government in any way suggests that § 1973c(b) imposes anything other than an unyielding quota floor. Even more telling, the Government does not deny that, apart from these "exceptions," § 1973c(b) trumps wholly legitimate justifications for diminishing a minority group's "ability to elect" its preferred candidates, such as traditional districting principles, important public policies, the minority group's own wishes, or even the over-representation of the minority group. Pltfs. SJ Br. 40-41 And perhaps most revealingly of all, the Government does not deny that the "ability to elect" mandate would require preserving the "influence" district in *LULAC*, notwithstanding Justice Kennedy's admonition that doing so would "rais[e] serious constitutional questions," by "unnecessarily infus[ing] race into virtually every redistricting." *Id.* 39-40.

Indeed, the Government has no choice but to admit that § 1973c(b) has this blunderbuss effect. The *only* reason that the old Section 5 allowed consideration of such legitimate justifications was that its retrogression standard required "an examination of all the relevant circumstances," rather than "focus[ing] solely on the comparative ability of a minority group to elect a candidate of its choice." *Ashcroft*, 539 U.S. at 479-80. Yet "dispositive [and] exclusive" consideration of the "ability to elect" (*id.* at 480) is precisely what Congress intended when it enacted § 1973c(b) as its vehicle for "explicitly *reject[ing]* all that logically follows from [*Ashcroft*]." Pltfs. SJ Br. 40 (quoting H.R. Rep. No. 109-478, at 71). Consequently, no matter what the Justice Department claims, Congress purposely foreclosed consideration of legitimate justifications like "feasibility." § 1973c(b) contains no *statutory exception* to its "ability to elect" mandate, and it must be adjudged as such.

3.     The Government finally contends that Plaintiffs' challenge to the "ability to elect" mandate "rests … on speculation that the statute will be applied in an unconstitutional manner in the future," which "is not a proper basis for a facial challenge." Govt. SJ Br. 43. But, as demonstrated by the

---

[6] The Government's additional observation that retrogression is analyzed on a "statewide" basis is wholly irrelevant. Govt. SJ Br. 42. Although that allows the "loss" of a minority-preference district in one place to be "offset" by the "gain" of such a district elsewhere, *id.*, it still requires preserving the overall number of minority-preference districts.

foregoing, Plaintiffs are arguing that, *on its face*, § 1973c(b)'s ban on "diminishing the ability" of minorities "to elect their preferred candidates of choice" is a minority quota-preference that makes race "the predominant factor"—indeed, the "dispositive [and] exclusive" factor, *Ashcroft*, 539 U.S. at 480—in *literally every* electoral change in the covered jurisdictions. *Nw. Austin*, 129 S. Ct. at 2512 (citing *Ashcroft*, 539 U.S. at 491-92 (Kennedy, J., concurring)). Ironically, the only speculation here is *by the Government*, who is baldly asserting that, somehow and somewhere, the "ability to elect" mandate might not be applied as the quota floor that it so obviously is on its face. Such unfounded hypothesis obviously cannot defeat a facial challenge. And that is particularly true here: the Supreme Court has repeatedly rejected the Justice Department's interpretation of Section 5, *Bossier I*, 520 U.S. at 483; *Bossier II*, 528 U.S. at 333-36; *Ashcroft*, 539 U.S. at 479-80, 487; it would make even less sense for this Court to accept the Department's speculation that it will atextually apply the "ability to elect" quota in a *less* race-preferential matter than § 1973c(b)'s unambiguous text dictates, given the Department's infamous history of *increasing* minority preferences, Pltfs. SJ Br. 28-30. Consequently, this defect in Section 5's amended "preclearance requirements" "underscore[s]" the "federalism concern[]" that the 2006 "Congress exceeded its … enforcement power[s]." *Nw. Austin*, 129 S. Ct. at 2512-13.

**B.      The "Discriminatory Purpose" Objection Imposes Burdensome Duties On Covered Jurisdictions That Render Them Susceptible To Coercive Pressure To Increase A Minority Group's Expected Electoral Chances**

The Government's defense of "discriminatory purpose" objections is quite simple: such objections "impose on covered jurisdictions no substantive requirements beyond those that the Constitution itself imposes," and merely "shift[] the burden of proof" in comparison to "ordinary litigation to enforce the Constitution." Govt. SJ Br. 35. But, as the Supreme Court has emphasized, that simplistic description obscures a more complex and problematic reality: "discriminatory purpose" objections "exacerbate the 'substantial' federalism costs that the preclearance procedure already exacts, … perhaps to the extent of raising concerns about § 5's constitutionality." *Bossier II*, 528 U.S. at 336.

1.      Abandoning the old Section 5's *retrogression* limitation drastically curtails the *local autonomy* of covered jurisdictions when making electoral changes, because they are no longer free to

choose *any* non-retrogressive alternative to a prior regime that *they themselves* had enacted, but rather must consider hypothetical *ameliorative* alternatives preferred by *federal* authorities, on pain of drawing a "discriminatory purpose" objection.   Pltfs. SJ Br. 26-27.   Yet there is no legitimate "enforcement" justification for this increased federal intrusion.   The Reconstruction Amendments and Section 2 already effectively preclude purposefully discriminatory voting changes, and subjecting ameliorative changes to preclearance does not further Section 5's "limited" supplementary role (*Ashcroft*, 539 U.S. at 477) of preventing "backsliding" in recalcitrant jurisdictions, *Bossier II*, 528 U.S. at 335.   Although requiring preclearance of *retrogressive* changes served the permissible enforcement purpose of precluding changes to the *status quo* that actually *worsened* the already deplorable situation in the South, precluding *ameliorative* changes that are easily reachable under Section 2's "results" test is "an unwarranted response to [the] lesser" "evil presented" by jurisdictions that simply have not *improved* the electoral chances of minorities to the satisfaction of the Justice Department.   *Boerne*, 521 U.S. at 530.   Notably, the Government simply ignores this fundamental objection, no doubt because it erroneously insists that Section 5 need not be limited to redressing unconstitutional discrimination in jurisdictions where Section 2 is inadequate.   *See supra* at Part II.A.

2.   The costs of increased federal oversight are exacerbated by the increased difficulty of *disproving* discriminatory intent concerning a *non-retrogressive* change to federal authorities.   Pltfs. SJ Br. 27-28.   Rather than a relatively simple retrogression comparison between the jurisdiction's preferred change and the status quo "benchmark," covered jurisdictions now have the "demonstrably greater burden" of "proving the *absence* of discriminatory purpose" (*Bossier I*, 520 U.S. at 480, 484) behind their selection of one plan over some other "hypothetical, undiluted plan."   *Bossier II*, 528 U.S. at 336.   Indeed, by leaving *Bossier I* untouched, the 2006 Congress ratified the conclusion there that disproving a Section 2 "results" violation would significantly complicate the already burdensome Section 5 process.   *Bossier I*, 520 U.S. at 480.   Yet disproving discriminatory purpose requires jurisdictions not only to engage in the "complex undertaking" of analyzing whether the enacted practice has a greater discriminatory "result" than alternative practices (*Bossier II*, 528 U.S. at 332), but also the additional burden of demonstrating

that those alternatives were rejected for reasons unrelated to any alleged racial result.  The Government thus seriously errs in blithely equating the burden-shift in *retrogression* cases (Govt. SJ Br. 35) with the far more "complex undertaking" in *non-retrogression* cases.

3.       The difficulty of disproving discriminatory intent to federal authorities plainly enables the Justice Department, as a practical matter, to "implicit[ly] command that States engage in presumptively unconstitutional race-based" decisionmaking—*i.e.*, to prioritize ameliorative changes that increase a minority group's expected electoral chances.  *Miller*, 515 U.S. at 927; *see also* Pltfs. SJ Br. 28-30.  Tellingly, *Bossier II* cited *Miller* as its support for the proposition that authorizing "discriminatory purpose" objections would "rais[e] concerns about § 5's constitutionality."  528 U.S. at 336.

The Government, however, insists that there is no serious problem with its enforcement practices, either looking backward or looking forward.  Although that claim is legally irrelevant for reasons discussed below, it warrants emphasis that the claim is also factually erroneous.  "[A]s to history," the Justice Department characterizes its past transgressions as "a limited number of instances" of wrongdoing before the Court had "first set forth the standards for unconstitutional racial gerrymandering."  Govt. SJ Br. 36.  But that history is revisionist.  Courts at the time both recognized and documented that the "Department [had] adopt[ed]" a "policy of maximizing majority-black districts" and would "accept nothing less than abject surrender to its maximization agenda."  *Miller*, 515 U.S. at 917, 924, 925 & n.*, 926-27.  Perhaps recognizing the futility of defending the past, the Government also vigorously proclaims that it will never again "violate the ruling[] in *Miller*" when issuing "discriminatory purpose" objections.  Govt SJ Br. 36-37.  But that assertion is belied by the Justice Department's own "guidance," which merely states:  "The *single fact* that a jurisdiction's proposed redistricting plan does not contain the *maximum* possible number of districts in which minority group members … have the ability to elect candidates of choice … does not *mandate* that the Attorney General interpose an objection based on . . . discriminatory purpose."  76 Fed. Reg. at 7471 (emphasis added).  Thus, the Department *may* object based on the single fact of failure to maximize (although that result is not "mandated"); in any event, the Department can easily add some additional fact authorizing (or mandating) a "discriminatory purpose"

objection for non-maximization—*e.g.*, that minority legislators supported the maximization plan—and it can always object to the failure *to increase* just short of full maximization.[7]

More importantly though, as a legal matter, even if the Government faithfully follows *Miller*, the "discriminatory purpose" prong would still be plagued with the "fundamental flaw" of a "scheme in which the Department of Justice *is permitted … to encourage* … a course of unconstitutional conduct." *Ashcroft*, 539 U.S. at 491 (Kennedy, J., concurring) (emphasis added; cited in *Nw. Austin*, 129 S. Ct. at 2512). As noted above, *Bossier II* itself cited *Miller* when "raising concerns about § 5's constitutionality" if "discriminatory purpose" objections were allowed, 528 U.S. at 336, even though *Miller* had been on the books for nearly five years and the Justice Department claims to "ha[ve] consistently applied it," Govt. SJ Br. 36. In short, *Miller*'s theoretical effect on the Department should provide no more solace to this Court about Section 5's "discriminatory purpose" prong than it did to the Supreme Court in *Bossier II*.

4.      Finally, the foregoing points collectively demonstrate that the Government seriously mischaracterizes Plaintiffs' "facial challenge" as impermissibly "presum[ing]" that the Justice Department "will apply the new purpose prong unconstitutionally." *Id.* 37. Wholly apart from the risk of the Department's future malfeasance, the "discriminatory purpose" prong *facially burdens* the local autonomy of covered jurisdictions in an unnecessary and undue manner. *See supra* at 29-31. Furthermore, whether or not the Attorney General will act improperly, the "discriminatory purpose" prong *facially contains* the "fundamental flaw" of a "scheme in which," *as a practical matter*, "the Department of Justice *is permitted … to encourage* … a course of unconstitutional conduct." *Ashcroft*, 539 U.S. at 491 (Kennedy, J., concurring) (emphasis added; cited in *Nw. Austin*, 129 S. Ct. at 2512); *see also Bossier II*, 528 U.S. at 336 (citing *Miller*, 915 U.S. at 926-27). Consequently, these defects in Section 5's amended "preclearance requirements" "underscore[]" the "federalism concern[]" that the 2006 "Congress exceeded its … enforcement power[s]." *Nw. Austin*, 129 S. Ct. at 2512-13.

---

[7] *See also* 28 C.F.R. § 51.59(b) ("A jurisdiction's failure to adopt the *maximum* possible number of *majority-minority* districts *may* not be the *sole* basis for [objecting due to] discriminatory purpose." (emphases added)).

### C.   Any 2006 Expansion Of The 1965 Preclearance Standard Would Be Unconstitutional Given The Dramatic Improvements In The Covered Jurisdictions

Ultimately, the amended Section 5 exceeds Congress' enforcement powers *even assuming* that the Government's narrow and innocuous characterization of the 2006 amendments is correct. "[C]onditions" in the covered jurisdictions "have unquestionably improved," *Nw. Austin*, 129 S. Ct. at 2511, and therefore *any expansion* of the 1965 preclearance standard would be an "unwarranted response" to whatever lingering "evil [was] presented" in 2006.  *Boerne*, 521 U.S. at 530 (citing *South Carolina*, 383 U.S. at 308).  After all, there is no possible justification for the 2006 Congress to adopt a "[s]trong[er] measure[]" to attack a "lesser" "harm" (*id.*) than the "unremitting and ingenious defiance of the Constitution" that had confronted the 1965 Congress (*South Carolina*, 383 U.S. at 309).

The Government tries to evade this basic objection by suggesting that the 2006 Congress did not really expand Section 5 *at all*, but merely *corrected* "the decisions in *Bossier Parish II* and *Ashcroft*," which had "misconstrued Congress' original intent in enacting the Voting Rights Act of 1965."  Govt. SJ Br. 19 (quoting 42 U.S.C. § 1973 note, Findings (6)).  But that rejoinder runs afoul of the bedrock principle that "[a] judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction."  *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 312-13 (1994).  In other words, as far as the judiciary is concerned, the 2006 Congress adopted a tougher preclearance standard than the 1965 Congress had deemed necessary at the height of Southern intransigence.  Even worse, given the Justice Department enforcement practices that were rejected in *Ashcroft* and *Bossier II* (Pltfs. SJ Br. 28-29, 33-37), Congress' vehement objections to the effect of those decisions on minority electoral success (Govt. SJ Br. 19-20) strongly suggests a reprise of *Boerne*:  Congress was "attempt[ing] a substantive change in constitutional protections" due to its "concern … with the incidental burdens" facing minorities, rather than truly targeting voting practices with "a significant likelihood of being unconstitutional."  *Boerne*, 521 U.S. at 531-32.  To repeat, these defects in Section 5's amended "preclearance requirements" "underscore[]" the "federalism concern[]" that the 2006 "Congress exceeded its … enforcement power[s]."  *Nw. Austin*, 129 S. Ct. at 2512-13.

IV.   **PLAINTIFFS' EQUAL PROTECTION CHALLENGE TO THE 2006 VERSION OF SECTION 5 IS MERITORIOUS AND JUSTICIABLE**

For the reasons discussed in the preceding Part, the 2006 amendments to Section 5's preclearance standard not only exceed Congress' enforcement powers under the Reconstruction Amendments, but affirmatively violate the Constitution's Equal Protection guarantees.  Indeed, the Defendants do not even attempt to defend the merits of the 2006 amendments under strict scrutiny, if those amendments have the scope and effect described above.  Lacking any merits defense, the Government instead argues that Plaintiffs' Equal Protection challenge to the 2006 amendments is not justiciable.  Govt. SJ Br. 22-33.

At the outset, it is important to emphasize the limited scope of the Government's non-justiciability defense, which covers *only* Plaintiffs' *Equal Protection challenge* to the 2006 amendments in Count 2 (Complaint ¶ 36), *not* Plaintiffs' *enumerated-powers challenge* to the 2006 amendments as part of Count 1 (Complaint ¶ 34).  Govt. SJ Br. 22 & n.6, 31-32.  The Government no doubt recognizes that it is *foreclosed* from contesting the justiciability of Plaintiffs' enumerated-powers challenge to the 2006 amendments.  The D.C. Circuit "reverse[d] and remand[ed] for the district court *to consider the merits of* th[e] claim" "pursue[d] [in] count one."  *LaRoque*, 2011 WL 2652441, at *1, 15 (emphasis added); *see also* Pltfs. App. Br. 8-9 (citing Complaint ¶ 34).  And this Court is bound by that conclusive determination that merits "jurisdiction[]" exists, both under "the mandate rule" and "the law-of-the-case doctrine."  *LaShawn A.*, 87 F.3d at 1393-94 & n.3.[8]

Thus, the Government's justiciability defense to Plaintiffs' Equal Protection claim is essentially moot, because this Court must nevertheless "consider the merits of" Plaintiffs' closely related argument that the racially preferential nature of the 2006 amendments caused Congress to exceed its enforcement

---

[8] Moreover, the D.C. Circuit was plainly correct, because the *entire 2006 reauthorization* is invalid if the 2006 amendments exceed Congress' enforcement powers.  It is well settled that *Boerne* authorizes such "facial attacks alleging overbreadth" for putative "legislation under § 5 of the Fourteenth Amendment," *Sabri v. United States*, 541 U.S. 600, 609-10 (2004), because "[t]he answer to the question *Boerne* asks—whether a piece of legislation attempts substantively to redefine a constitutional guarantee—logically focuses on *the manner in which the legislation operates* to enforce that particular guarantee," *Tennessee v. Lane*, 541 U.S. 509, 530 n.18 (2004) (emphasis added).  *See also Nw. Austin*, 129 S. Ct. at 2512-13 (noting, in a facial pre-enforcement challenge, that the allegedly excessive racial focus of the "preclearance requirements" "underscored" the "federalism concern[]" that the 2006 "Congress exceeded its … enforcement power[s]").  Plus, at a minimum, the 2006 amendments are nonseverable from the 2006 reauthorization itself.  *See infra* at Part IV.A.2.

powers when reauthorizing Section 5 in 2006.  Pltfs. SJ Br. 1-2, 13, 25-44; *supra* at Part III.A-B.  And, as we now show, the Government's justiciability defense is also meritless even on its own limited terms.

### A.    Plaintiffs Have Standing To Bring Their Equal Protection Challenge To The 2006 Amendments

In attacking Plaintiffs' standing to challenge the 2006 amendments to the preclearance standard (42 U.S.C. § 1973c(b)-(d)), the Government argues that Plaintiffs cannot demonstrate either that the 2006 amendments caused the suspension of Kinston's referendum or that invalidation of the 2006 amendments will revive the referendum, because the referendum would still need to be precleared under the reauthorized pre-2006 standard (42 U.S.C. § 1973c(a)).  Govt. SJ Br. 22-31.  There are two separate and independent flaws with the Government's argument.  *First*, Plaintiffs' Equal Protection injury from the 2006 amendments is *not* the suspension of the referendum, but rather *the denial of equal treatment* that exists because election changes supported by Plaintiffs and other non-minorities in Kinston cannot become law without satisfying those amendments' *minority-preferences*.  That equal-treatment injury is caused by § 1973c(b)-(d) and will be redressed by facially invalidating those provisions, *regardless* of whether the referendum would be precleared under § 1973c(a).  *Second*, in any event, if Plaintiff's Equal Protection challenge to the 2006 amendments succeeds, the referendum will be revived, because Plaintiffs' requested relief for their claim is the *facial invalidation of Section 5*, on the ground that the 2006 amendments are nonseverable from the 2006 reauthorization itself.  Notably, Plaintiffs' mere request for that remedy is sufficient to support their standing to litigate the merits of their Equal Protection claim; in any event, that remedial request is also legally appropriate.

### 1.    The 2006 Amended Preclearance Standards May Be Challenged As Discriminatory Barriers That Deny Plaintiffs Equal Treatment, Regardless Of Whether Kinston's Referendum Would Be Precleared Under The Pre-2006 Standard

a.    The Government's entire standing argument rests on the premise that Plaintiffs' Equal Protection "injury" is "the postponement of the implementation of the referendum."  Govt. SJ Br. 23.  But that premise is false.  As Plaintiffs explained in their Complaint, the injury-in-fact supporting their *Equal Protection claim* is not the denial of the referendum's benefits, but rather the "deni[al] [of] equal, race-

neutral treatment[] … [in] political and electoral participation":  the 2006 amendments are causing that injury by "intentionally providing minority voters and their preferred candidates a preferential advantage in elections" as well as "by subjecting [Plaintiffs] to a racial classification."  Complaint ¶ 30.  Simply put, Plaintiffs' Equal Protection injury is that *no* electoral change that non-minorities desire can become law in Kinston—including, but not limited to, the nonpartisan-elections referendum—unless the change can overcome the discriminatory preclearance barrier created by the 2006 amendments' minority-preferences.

Such racially-preferential barriers create a well-established Equal Protection injury.  The "'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier," which "makes it more difficult for members of one group to obtain a benefit than it is for members of another group."  *Jacksonville*, 508 U.S. at 666.  Also, because the barrier "reli[es] on racial criteria" "solely to effectuate the perceived common interests of one racial group," it is a "racial classification" that "denie[s] equal treatment."  *United States v. Hays*, 515 U.S. 737, 744-45 (1995).

Of critical importance here, it is also well established that a plaintiff "seeking to challenge the barrier *need not allege that he would have obtained the benefit but for the barrier* in order to establish standing," because the injury "is the denial of equal treatment resulting from the imposition of the barrier, *not the ultimate inability to obtain the benefit.*"  *Jacksonville*, 508 U.S. at 666 (emphases added); *see also Hays*, 515 U.S. at 745 (residents challenging racially gerrymandered districts need not allege that they would have resided in different districts absent the gerrymander).  In other words, whether there is an *independent nondiscriminatory barrier* to obtaining the ultimate benefit that the plaintiff desires is not a question of "standing," but "merely one of relief."  *Regents of the Univ. of Cal. v. Baake*, 438 U.S. 265, 280 n.14 (1978).  Specifically, although the plaintiff is typically entitled to an injunction against future use of the discriminatory barrier, the availability of "make-whole" relief—such as securing the benefit itself and/or damages for its deprivation—will be affected by whether the plaintiff would have received the benefit absent discrimination.  *Hopwood v. State of Texas*, 236 F.3d 256, 276, 281-82 (5th Cir. 2000).

b.    Accordingly, assuming that the 2006 amendments facially violate Equal Protection principles by creating race-based electoral preferences for minorities—as this Court must assume when

determining Plaintiffs' standing, *LaRoque*, 2011 WL 2652441, at *6—Plaintiffs plainly may sue to enjoin that discriminatory barrier erected against the enactment of laws that they support.  Because eliminating the discriminatory standards in § 1973c(b)-(d) would end Section 5's denial of equal treatment for non-minorities in Kinston, it is completely irrelevant to Plaintiffs' standing whether the nonpartisan-elections referendum would be precleared under the (previously) nondiscriminatory standard in § 1973c(a).  Just as students who are subject to an unconstitutional affirmative-action program can obtain an injunction against its future use even if they would not have been accepted under a race-neutral policy, *Hopwood*, 236 F.3d at 276, 281-82, so too can Plaintiffs here obtain an injunction against Section 5's discriminatory preclearance standards without regard to whether the nondiscriminatory preclearance standard would have preempted the referendum.  Indeed, *wholly apart from the referendum*, Plaintiffs have standing as non-minority voters in Kinston who seek to ensure that beneficial local laws need not run the gauntlet of unconstitutional minority-preferences contained in the 2006 amendments to Section 5.

The Government thus gets matters precisely backwards when it cites *Hays* in arguing that Plaintiffs' facial challenge to the 2006 amendments is "a generalized grievance."  Govt. SJ Br. 25. Plaintiffs bear no resemblance to the unsuccessful *Hays* plaintiffs who challenged "a racially gerrymandered district" that they "d[id] not live in," but Plaintiffs are directly analogous to the successful *Shaw* "plaintiff[s] [who] reside[d] in [such a] district" and therefore "ha[d] been denied equal treatment because of the legislature's reliance on racial criteria."  *Hays*, 515 U.S. at 745.  To repeat, the 2006 amendments "erect[] a barrier that makes it more difficult for" Plaintiffs and other non-minorities in Kinston *personally* "to obtain [the] benefit" of enacting their preferred changes to Kinston's electoral practices, including the nonpartisan-elections referendum. *Jacksonville*, 508 U.S. at 666.

Furthermore, Plaintiffs' standing under *Jacksonville* and *Hays* is underscored by the fact that the Attorney General's objection to Kinston's referendum was actually based on the discriminatory "ability to elect" mandate in § 1973c(b).  In particular, the Attorney General's "dispositive [and] exclusive" ground for objecting (*Ashcroft*, 539 U.S. at 480) was Kinston's non-compliance with the "ability to elect" mandate:  "the elimination of party affiliation on the ballot will likely reduce the ability of blacks to elect

candidates of choice."  DOJ Objection 2.  Although the Government now belatedly claims that the "sole focus" of 1973c(b) is "districting plans" (thus implying that it did not affect denial of the referendum here), Govt. SJ Br. 25, that claim is squarely foreclosed by the statute's plain language and the Government's own concessions. § 1973c(b) clearly is not limited to the districting context, because its "ability … to elect" mandate applies to "[a]ny voting … practice."  Indeed, the Government contradicts itself just a few pages later, admitting that "[§ 1973c(b)] define[s] how the general standard in [§ 1973c(a)] should be applied in *situations involving the ability to elect a candidate of choice*," which obviously are not limited to districting.  Govt SJ Br. 28 (emphasis added).  Most damning of all, a few pages after that, the Government concedes that it is "speculative" whether "the Attorney General would have made a different determination under the pre-amendment standard," *id.* 30:  that *necessarily means* that the "effects"-based objection letter was *not* applying the pre-amendment standard in § 1973c(a), and so it could *only* have been applying the "ability to elect" mandate in § 1973c(b).  In sum, although by no means necessary to support Plaintiffs' standing under *Jacksonville* and *Hays*, it is certainly sufficient that the Attorney General was applying the 2006 amendments when he objected to the referendum.

   c. Finally, even where it is relevant whether discriminatory treatment was the "but for" cause of the loss of a benefit—and, to repeat, it is relevant *only* to the scope of relief, not standing, *see supra* at 36—the burden of proof is on *the defendant* to show "that it would have reached the same … decision[] even in the absence of unconstitutional conduct."  *Hopwood*, 236 F.3d at 261, 263 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 286-87 (1977)).  Yet the Government has failed to meet its burden.  It concedes that it is "speculative" whether "the Attorney General would have made a different determination under the pre-amendment standard [in § 1973c(a)]," Govt SJ Br. 30, and it does not attempt the Sisyphean task of proving that an objection based solely on "reduc[ing] the ability of blacks to elect" (DOJ Objection 2) would have come out the same way absent a congressional command against practices that diminish minorities' "ability to elect."  Consequently, although an injunction against § 1973c(b)-(d) is *sufficient* to redress Plaintiffs' Equal Protection injury, an order vacating the Attorney General's § 1973c(b) objection is valid *additional relief* that would restore the status quo, by setting aside

the Attorney General's application of a *facially unconstitutional* preclearance standard.

The Government, however, argues that vacating the administrative objection would be the type of "as-applied challenge" that Plaintiffs have disavowed and that is barred by *Morris v. Gressette*, 432 U.S. 491 (1977), and its progeny. Govt. SJ Br. 1 n.1, 30-31. That is fundamentally wrong, as demonstrated by the D.C. Circuit's earlier opinion in this very case. "[N]either law nor logic requires [Plaintiffs] to challenge the Attorney General's failure to alleviate the statutorily imposed injury in order to challenge Congress' infliction of that injury in the first place." *LaRoque*, 2011 WL 2652441, at *12 (quoting Pltfs. App. Br. 45-46). Accordingly, an order vacating the objection would not be based on any "as-applied" claim that the Attorney General "misinterpreted his authority under Section 5" or improperly "exercise[d] [his] discretion" under Section 5 (Govt. SJ Br. 31), and Plaintiffs bring no such claim. Rather, vacatur would simply be relief for Plaintiffs' *facial* challenge to the 2006 amendments: "if … [§ 1973c(b)] is unconstitutional, the Attorney General's actions pursuant to that unconstitutional statute would be void." *LaRoque*, 2011 WL 2652441, at *11. And regardless, as the D.C. Circuit also emphasized, although *Morris* and its progeny have held that Section 5 implicitly precludes judicial "review [of] the propriety of an Attorney General objection," they have done so *only* in circumstances where the plaintiff could still "obtain a *de novo* judicial evaluation of whether … [Section 5's] requirements were constitutional." *Id.* at *4; *see also* Pltfs. App. Br. 3-5, 50-53; *Webster v. Doe*, 486 U.S. 592, 603 (1988) ("Congress[ional] inten[t] to preclude judicial review of constitutional claims … must be clear," because denying a plaintiff "any judicial forum for a colorable constitutional claim" would raise a "serious constitutional question."). The *Morris* line thus provides no support for "totally depriv[ing] [P]laintiffs of judicial redress" (*City of Rome v. United States*, 450 F. Supp. 378, 382 & n.3 (D.D.C. 1978)), but Plaintiffs would suffer precisely that deprivation if *Morris* eliminated their standing to sue.

> **2.    The 2006 Amended Preclearance Standards Are Not Severable From The 2006 Reauthorization Of The Preclearance Requirement, And So Their Facial Invalidation Will Revive Kinston's Referendum**

a.     Even (erroneously) treating the loss of the referendum's benefits as the only relevant Equal Protection injury-in-fact, Plaintiffs have standing to bring their Equal Protection challenge to the

2006 amendments.   The reason why is that Plaintiffs contend that the 2006 amendments *facially* invalidate Section 5 because they are *nonseverable* from the 2006 reauthorization of the preclearance requirement, *see* Complaint Part VII; *see also infra* at 41-44, and that nonseverability contention is sufficient to satisfy Article III.   As for "causation," there is "a fairly traceable connection between the plaintiff's injury and the complained-of conduct" (*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103 (1998)), due to the nonseverability of the 2006 amendments.   *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 682-83 (1987) (plaintiffs challenging the constitutionality of a law's "legislative-veto provision" based on their contention that the legislative-veto was "nonseverable" from "the duty-to-hire provisions" that actually injured them).   Moreover, causation also exists because the 2006 "ability to elect" mandate was the actual ground upon which the Attorney General denied preclearance for the referendum.   *See supra* at 37-38.   As for "redressability," it is indisputable that "the requested relief will redress the alleged injury" (*Steel Co.*, 523 U.S. at 103), because the D.C. Circuit has squarely held that facially invalidating Section 5 will revive the referendum.   *LaRoque*, 2011 WL 2652441, at *11.

The Government, however, rejects the premise that the 2006 amendments are nonseverable. Govt. SJ Br. 26-29.   Even assuming *arguendo* that were true (*but see infra* at 41-44), it still would not defeat Plaintiffs' *standing* to bring their Equal Protection Claim, but only their entitlement on the *merits* to facial invalidation of Section 5.   Redressability is defeated only when "the relief *requested* … would not have remedied th[e] injury in fact," *not* where there is merely legal "uncertainty" about the "existence" or availability of that relief.   *Steel Co.*, 523 U.S. at 96; *see also Alaska Airlines*, 480 U.S. at 683 (concluding that the "legislative-veto" was "severable" and thus *affirming* the D.C. Circuit's denial on the merits, rather than requiring *dismissal* for lack of Article III causation).   In short, as the Supreme Court recently reaffirmed, "weakness on the merits" in "obtaining relief" should not be "confuse[d] … with absence of Article III standing."   *Davis v. United States*, 131 S. Ct. 2419, 2434 n.10 (2011).

Contrary to the Intervenors' suggestion (Inter. R.MTD 5), nothing in *INS v. Chadha*, 462 U.S. 919 (1983), suggests otherwise.   There, in response to an argument that the plaintiff lacked standing to challenge a legislative-veto provision because the veto was nonseverable from the statutory provision that

authorized his requested relief, the Court "*deem[ed] it appropriate* to address questions of severability first." *Id.* at 931 n.7 (emphasis added). But the Court did *not* agree that the severability issue actually affected plaintiff's *standing*. And for good reason. If the effect of severability on relief truly implicated Article III standing, then the Court could not have *chosen* to address severability before the merits: rather, it would have been "bound to … answer" that "jurisdictional objection[]" "as a threshold matter." *Steel Co.*, 523 U.S. at 93-94. Thus, *Chadha*'s severability holding plainly was not a standing decision, but merely a "prudent[ial]" decision to resolve a potentially "dispos[itive]" "statutory argument" before "reach[ing] the constitutional question." *Nw. Austin*, 129 S. Ct. at 2513.

Here, by contrast, whether the 2006 amendments are severable is not even remotely *dispositive*. Regardless of how this Court answers that remedial question, it still will need to address Plaintiffs' enumerated-powers challenge to the racially-preferential 2006 amendments, *see supra* at Part III, as well as Plaintiffs' contention that those discriminatory amendments deprive them of equal treatment regardless of whether Kinston's referendum will be revived, *see supra* at Part IV.A.1. The Government does not cite a single case supporting the proposition that this Court should, let alone must, immediately determine a remedial question about severability simply because it would affect the relief that Plaintiffs receive on their alternative theory of standing for their alternative constitutional claim. Accordingly, this Court should follow the normal practice of deciding merits questions before remedial ones.

b.     In any event, Plaintiffs are clearly correct that the 2006 amended preclearance standards are not severable from the 2006 reauthorization of the preclearance requirement. The standard for nonseverability is well established. After a statute's unconstitutional provisions are stricken, the "remaining provisions" also must be invalidated where "it is evident that the Legislature would not have enacted those provisions … independently of that which is invalid." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3161 (2010) ("*FEF*"). If Congress "would not have been satisfied with what remains," *Williams v. Standard Oil Co.*, 278 U.S. 235, 242 (1929), merely severing the unconstitutional provisions would improperly "substitute, for the law intended by the legislature, one they may never have been willing by itself to enact," *Pollock v. Farmers' Loan & Trust Co.*, 158 U.S. 601,

636 (1895).  In short, courts must ask whether the remaining part of the statute would "function in a *manner* consistent with … the original legislative bargain." *Alaska Airlines*, 480 U.S. at 685; *see also City of New Haven v. United States*, 809 F.2d 900, 905-06 (D.C. Cir. 1987) ("overcom[ing]" "a presumption in favor of severability" based on "strong evidence" in the legislative history that a severed statute would "operate[] in a manner wholly inconsistent with the intent of Congress").

Under that standard, nonseverability is clearly mandated here, because there is *no* "remaining provision" that can possibly function in a "manner consistent with" the intent of the 2006 Congress.  The "remaining provision" here is § 1973c(a), which the Supreme Court interpreted to reach only "retrogressive purpose," *Bossier II*, 528 U.S. at 332, 336, and only "effects" that are retrogressive under a holistic Section 2-like analysis of the "totality of the circumstances," *Ashcroft*, 539 U.S. at 479-80.  *See also* Pltfs. SJ Br. 26-28, 33-37.  But the 2006 Congress believed that both these decisions seriously "misconstrued [§ 1973c(a)'s] original intent" and "significantly weakened" the protections that Congress believed were actually and properly afforded under that provision.  42 U.S.C. § 1973 note, Findings (6). Yet the Government nonetheless argues that this Court should prospectively apply a severed § 1973c(a) to reach only "retrogressive purpose" and "totality" retrogressive effect, despite the fact that the 2006 Congress thought that to be a debilitating and erroneous emasculation of Section 5.

Put differently, unlike every case finding severability, the "remaining" allegedly severable provision was *itself* the focus of Congressional disdain and the very *reason* for the invalidated provisions. Unlike every other such case, there is thus no remaining provision that operates "*independently* of that which is invalid" (*FEF*, 130 S. Ct. at 3161 (emphasis added)) or that could possibly operate in a "manner" in any way "consistent" (*Alaska Airlines*, 480 U.S. at 685) with Congress' explicit condemnation of § 1973c(a), as interpreted in *Ashcroft* and *Bossier II*.  The "invalid" racially preferential aspects of § 1973c(b)-(d) are not at all "independent" of 1973c(a).  Unlike the "duty-to-hire provisions" in *Alaska Airlines*, which were independent of the challenged "legislative-veto provision," 480 U.S. at 682-83, 687-91, § 1973c(b)-(d) were enacted here precisely to undo what Congress perceived as the Supreme Court's distortion of the standard contained in § 1973c(a).  The Government therefore cannot remotely satisfy the

threshold requirement of severability analysis—*i.e.*, identifying a severed "remaining" provision that is *independent* of the "invalid" provisions.

Moreover, in addition to the statutory language and findings, the legislative history makes crystal clear that the 2006 Congress did not think that § 1973c(a), as interpreted in *Ashcroft* and *Bossier II*, operated in a "manner" that served the public interest. To the contrary, Congress opined that *Ashcroft* had "turn[ed] Section 5 on its head," rendered the statute "hopelessly unadministerable," and "ma[de] Federal scrutiny a wasteful formality." H.R. Rep. No. 109-478, at 69-70, 94; *see also* S. Rep. No. 109-295, at 19 ("[*Ashcroft*] standard is functionally unworkable."). Indeed, Congress strongly disavowed any intent of retaining the pre-2006 standard: "leaving the [*Ashcroft*] standard in place *would encourage* States … to turn black and other minority voters into second class voters…. This is *clearly not* the outcome that Congress intended … Section 5 to have on minority voters." H.R. Rep. No. 109-478, at 70 (first emphasis added). Likewise, with respect to *Bossier II*, Congress was explicit that it believed a federal preclearance regime that "allow[ed]" electoral changes with a discriminatory purpose "would be *contrary to* the protections afforded by the 14th and 15th amendment[s]," because such changes "have no role in our electoral process and are precisely the type of changes Section 5 is intended to bar." *Id.* at 68 (emphasis added). Accordingly, retaining the remaining § 1973c(a)—which catches only "incompetent retrogressor[s]" (*id.* at 67) and which does not make minorities' "ability to elect" the "dispositive" factor (*id.* at 71)—would be at war with Congress' view of how Section 5 should operate and how it wished to enforce the Reconstruction Amendments.

In the face of these unequivocal legislative statements, the Government is forced to make the incredible claim that the general severability clause placed in the VRA by the 1965 Congress is somehow "decisive evidence" of the *2006 Congress'* intent. Govt. SJ Br. 26-27 (citing 42 U.S.C. § 1973p). But "a severability clause is … not an inexorable command." *Reno v. ACLU*, 521 U.S. 844, 884 n.49 (1997). To the contrary, as the Government recently argued successfully: "Supreme Court precedent confirms that the 'ultimate determination of severability will rarely turn on the presence or absence of such a clause.' *United States v. Jackson*, 390 U.S. 570, 585 n.27 (1968)." *Florida v. U.S. Dep't of Health & Human*

*Servs.*, Nos. 11-11021 & 11-11067, --- F.3d ----, 2011 WL 3519178, at *77 (11th Cir. Aug. 12, 2011). And, in any event, the 2006 legislative history cited above is more than sufficiently "strong evidence" to rebut whatever "presumption" is created by the 1965 "severability clause." *Alaska Airlines*, 480 U.S. at 686.  Just as in *New Haven*, any "presumption [is] overcome" by the legislative context, which is "strong evidence" that returning to the pre-2006 *Ashcroft* standard would leave Section 5 "operat[ing] in a manner wholly inconsistent with the intent of [the 2006] Congress."  809 F.2d at 905-06.

**B.**     **Plaintiffs' Equal Protection Challenge To The 2006 Amendments Is Ripe**

Finally, the Government argues that Plaintiffs' Equal Protection challenge to the 2006 amendments is "not ripe for review," reasoning that the claim "is not fit for decision" and that the withholding of review will not cause "hardship" to Plaintiffs.  Govt. SJ Br. 31-33 (citing *Texas v. United States*, 523 U.S. 296, 300-01 (1998)).  But this ripeness defense is meritless.

With respect to fitness for review, the "proper[] constr[uction]" of the 2006 amendments is a "purely legal" question that is "appropriate for judicial resolution at this time."  *Abbott Labs.*, 387 U.S. at 149.  Moreover, given the parties' respective legal positions, there is hardly any need for statutory interpretation *at all*.  On the "discriminatory purpose" prong, the Government does not dispute that, as in *Miller*, the Justice Department *could* improperly use such objections as an unconstitutional means of coercing jurisdictions to increase a minority group's expected electoral chances—the Government simply disputes that this inherent feature is a "fundamental flaw" in the statutory "scheme" that renders the "discriminatory purpose" prong *facially* unconstitutional.  *See supra* at 31-32.  As for the "ability to elect" prong, it cannot seriously be disputed that § 1973c(b)'s unambiguous ban on "[a]ny voting [change]" that "diminish[es] the ability" of minorities "to elect their preferred candidates of choice" is a *facial* quota that mandates the preservation of a minority group's expected electoral chances—although the Government offers a few half-hearted exceptions, they are all clearly atextual and illusory.  *See supra* at 24-29.  And the Government obviously cannot create its own ripeness defense simply by ignoring the unambiguous terms of a facially unconstitutional statute and then insisting that the parties disagree about the statute's scope.  *Cf. United States v. Stevens*, 130 S. Ct. 1577, 1591 (2010) ("We would not uphold an

unconstitutional statute merely because the Government promised to use it responsibly.").  Such tactics by a defendant are completely distinguishable from the situation in *Texas*, where the plaintiff itself requested a "remote and abstract" pre-enforcement declaration that certain legal sanctions would *never* be covered by Section 5, regardless of the future factual circumstances in which they were imposed.  523 U.S. at 301.

With respect to Plaintiffs' hardship, the Government simply cross-references its prior argument that the 2006 amendments have not caused Plaintiffs any injury.  Govt. SJ Br. 32-33.  But, as discussed, the 2006 amendments are erecting a discriminatory barrier for Kinston election changes that benefit non-minorities like Plaintiffs, and those amendments also are responsible for the preemption of the nonpartisan-elections referendum that would benefit Plaintiffs.  *See supra* at Part IV.A.  Accordingly, the same flaws in the Government's standing objection will doom this ripeness objection.  Perhaps recognizing the redundancy, the Government additionally suggests that it would be better to wait for a suit brought by an injured jurisdiction.  Govt. SJ Br. 33.  That, however, is just a thinly disguised reprise of the "prudential standing" argument that the D.C. Circuit rejected.  *LaRoque*, 2011 WL 2652441, at *11-12.  Nor is *Texas* even remotely relevant:  there, unlike here, the State's alleged injury from a purported preclearance obligation was wholly "contingen[t]" on future decisions.  523 U.S. at 300-01.

## CONCLUSION

This Court should deny the Defendants' various motions, grant summary judgment to Plaintiffs, declare that the 2006 extension and expansion of Section 5 was unconstitutional, and enjoin the Attorney General from enforcing Section 5.

August 15, 2011                              Respectfully submitted,

                                             /s/ Michael A. Carvin
                                             _____
                                             Michael A. Carvin (D.C. Bar No. 366784)
                                             Noel J. Francisco (D.C. Bar No. 464752)
                                             Hashim M. Mooppan (D.C. Bar No. 981758)
                                             David J. Strandness (D.C. Bar No. 987194)
                                             JONES DAY
                                             51 Louisiana Ave. NW
                                             Washington D.C.  20001
                                             (202) 879-3939

                                             Michael E. Rosman (D.C. Bar No. 454002)
                                             Michelle A. Scott (D.C. Bar No. 489097)
                                             CENTER FOR INDIVIDUAL RIGHTS
                                             1233 20th St. NW, Suite 300
                                             Washington D.C.  20036
                                             (202) 833-8400

                                             *Attorneys for Plaintiffs*