IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
No. 1:10-CV-00561-JDB

| | |
|---|---|
| STEPHEN LAROQUE, ANTHONY CUOMO, JOHN NIX, KLAY NORTHROP, LEE RAYNOR, and KINSTON CITIZENS FOR NON-PARTISAN VOTING, <br><br> *Plaintiff*s, <br><br> v. <br><br> ERIC HOLDER, JR. ATTORNEY GENERAL OF THE UNITED STATES, <br><br> *Defendant.* <br><br> and <br><br> JOSEPH M. TYSON, et al., <br><br> *Defendant-Intervenors* | Civil Action No.: 1:10-CV-561-JDB |

**RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT-INTERVENORS' CROSS MOTION FOR SUMMARY JUDGMENT**

Defendant-Intervenors Joseph M. Tyson, W.J. Best, Sr., A. Offord Carmichael, Jr., George Graham, Julian Pridgen, William A. Cooke and the North Carolina State Conference of Branches of the National Association for the Advancement of Colored People respectfully submit this response in opposition to Plaintiffs' Motion for Summary Judgment and in support of Defendant-Intervenors' Motion for Summary Judgment and Renewed Motion to Dismiss.

I.    Introduction

A major defect in Plaintiffs' Summary Judgment and Reply Briefs is their staunch disregard for the admittedly "voluminous Congressional record" and the justification it created for the 2006 reauthorization of Section 5 of the Voting Rights Act of 1965. Pl. Reply Br. 1. Regardless of Plaintiffs' vehement and legally unsound urgings to the contrary, this Court, and all courts, are bound to respect Congress' constitutional authority to enact laws to implement the Fifteenth Amendment. *See Northwest Austin Municipal Utility District Number One v. Holder*, 129 S.Ct. 2504, 2513 (2009) ("[t]he Fifteenth Amendment empowers 'Congress,' not the Court, to determine in the First instance what legislation is needed to enforce it"); *United States Dept. of Labor v. Triplett*, 494 U.S. 715, 721 (1990) (noting "the heavy presumption of constitutionality to which a 'carefully considered decision of a coequal and representative branch of Government' is entitled"). And as the Fifteenth Amendment expressly provides: "The Congress shall have power to enforce this article by appropriate legislation." *Id.*, Section 2. In cases such as this, "[t]he business of the courts is to review the Congressional assessment not for soundness but simply for the rationality." *United States v. Morrison*, 529 U.S. 598, 628 (2000) (Souter, J., dissenting).

Massive amounts of evidence justifying the reauthorization of the Voting Rights Act in 2006 were presented to Congress and to this Court in briefing in this case and in *Shelby v. Holder*, No. 10-651 (D.D.C.). The evidence demonstrates that Congress engaged in a thoughtful and thorough examination of the current voting rights obstacles facing minority voters, and acted in a manner consistent with its enforcement responsibilities under the Fifteenth Amendment. The end result was a flexible law targeted at areas where the risk for voting rights violations was demonstrably the highest.

II. <u>Under Either the *Boerne* or *Katzenbach* Line of Cases, Section 5 Withstands Constitutional Scrutiny</u>

As detailed in Defendant-Intervenors Motion for Summary Judgment brief, the rational basis test applied in *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), is the appropriate test to apply to this facial challenge to the constitutionality of Section 5 of the Voting Rights Act. Def. Int. Br. 25-26. In what remains as good and applicable law, the United States Supreme Court held that, "[t]he language and purpose of the Fifteenth Amendment, the prior decisions construing its several provisions, and the general doctrines of constitutional interpretation, all point to one fundamental principle. As against the reserved powers of the States, Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." *Katzenbach*, 383 at 324.

Congress compiled, as Plaintiffs admit, a "voluminous" record of continuing patterns of racial discrimination in voting in jurisdictions covered by Section 5. Pl. Reply Br. 1. The 16,000 pages of evidence documenting this continuing pattern easily satisfy the rational basis requirement, and this Court's inquiry must end at that point. The Congressional attention to the evidence presented during the legislative process is owed deference by reviewing courts, and more than amply justifies the reauthorization of one of the most important pieces of civil rights legislation of all time.

Even should this Court apply the slightly more exacting congruence and proportionality test set forth in *City of Boerne v. Flores*, 521 U.S. 507 (1997), the 2006 extension of Section 5 would also withstand constitutional scrutiny. *Boerne,* and the line of cases citing it, not only upheld Congressional enactments implementing the non-discrimination provisions of the Constitution, but affirmed the constitutionality of Section 5. *See Boerne*, 521 U.S. at 532 (Section 5 was an "appropriate" measure "'adapted to the mischief and wrong which the [Fourteenth] [A]mendment was intended to provide

3

against'"); *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 639-40 (1999) (noting the constitutionality "of Congress' various voting rights measures" passed pursuant to the Fourteenth and Fifteenth Amendments);; *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721, 737-38 (2003) (upholding the Family Medical Leave Act under the *Boerne* test and citing with approval court decisions rejecting challenges to the Voting Rights Act "as valid exercises of Congress' § 5 power [under the Fourteenth Amendment]"); ); *Tennessee v. Lane*, 541 U.S. 509 (2004) (upholding Title II of the Americans with Disabilities Act under the *Boerne* test); *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 373 (2001) (citing the Voting Rights Act as a preeminent example of appropriate legislation enacted to enforce the race discrimination provisions of the Civil War Amendments in the area of voting); *Johnson v. State Tech. Ctr.*, 24 F. Supp. 2d 833 (W.D. Tenn. 1998) (holding that the Congress did not exceed its remedial powers when it enacted the ADA and Rehabilitation Act).

Under the congruence and proportionality test, the key step is examining the evil which the challenged act sought to address. The purpose of the Voting Rights Act was not to unfairly advantage minority citizens, but to continue eliminating deeply-ingrained forms of voting discrimination that had plagued minority citizens for decades and continue to do so. In its findings, Congress noted the presence of "second generation barriers constructed to prevent minority voters from fully participating in the electoral process." 42 U.S.C. § 1973 note, Findings (2). Congress cited as evidence of continued discrimination:

> …the hundreds of objections interposed, requests for more information submitted followed by voting changes withdrawn from consideration by jurisdictions covered by the Voting Rights Act of 1965, and section 5 enforcement actions undertaken by the Department of Justice in covered jurisdictions since 1982 that prevented election practices, such as annexation, at-large voting, and the use of multi-member districts, from being enacted to dilute minority voting strength; the number of requests for declaratory judgments denied by the

> United States District Court for the District of Columbia; [and]
> the continued filing of Section 2 cases that originated in
> covered jurisdictions.

42 U.S.C. § 1973 note, Findings (4)(A)-(C). All of these instances cited in the findings were presented in detail before Congress during the 21 hearings it held on the reauthorization.

That Section 5 had successes did not, and does not, obviate the need for its continued existence—it would not have made much sense for Congress to keep in place a tool that did not work. But some success also does not mean that the struggle is over or the underlying problem is solved. To the contrary, Congress made extensive findings of fact concerning the current evils sought to be addressed prior to the reauthorization. Those Congressional findings are entitled to great deference, even under the *Boerne* standard. In *Boerne*, the Court recognized that it was Congress' job in the first instance to 'determine whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment,' and its conclusions were entitled to much deference." *Boerne,* 521 U.S. at 536 (quoting *Katzenbach v. Morgan*, 384 U.S. 641, 651 (1966)). The record in this litigation and related litigation, including reams of pages of Material Facts offered by the Intervenors in this case and the Intervenors in the *Shelby* case, establishes beyond a doubt that Congress had before it evidence proving that Section 5's protections were still needed.

### III. The Congressional Record Showed Ample Justification for Reauthorization

Defendants and Defendant-Intervenors have done a thorough job documenting the breadth and detail of the Congressional record and findings supporting the reauthorization. Plaintiffs offer only snippets of misleading evidence in their attacks on the evidence in certain areas, including the adequacy of Section 2 alone, registration and turnout rates, minority elected officials, preclearance objections, Section 2 violations, and racially

polarized voting. See Pl. Reply Br. 10-17. Defendants and Defendants Intervenors have presented evidence that directly rebuts each and every one of those claims.

During the reauthorization hearings, numerous experienced voting rights practitioners testified that Section 2 alone could not correct discriminatory voting practices in covered jurisdictions. See Def. Int. Br. 7-8. Even if there existed the legal, financial and human resources to bring a Section 2 lawsuit in place of every Section 5 objection in covered jurisdictions—which there most certainly are not—that is only part of the problem. Voting rights is a unique area in which once discriminatory practices have been put into place, the damage has been done and remedies that are later devised by a reviewing court may not be able to undo that damage. *Id.* Section 5 thus protects voting rights in a way that Section 2 generally cannot.

The House Judiciary Committee explicitly found that disparities in registration and turnout between white and language minority citizens continue to be particularly significant in covered jurisdictions. See Def. Inter. Br. Exhibit A, Joint Statement of Material Facts, 115. Congress received written testimony from Professor Nathan Persily that in most of the covered Southern states, black turnout continues to lag behind the turnout of non-Hispanic whites. *Id.* Professor Persily pointed out the flaws in reports submitted to the House that suggested otherwise. He documented how those reports included Hispanic turnout rates (normally quite low) with white turnout rates, thus lowering the overall white turnout rate and making it appear that the black turnout rate was on par with the white turnout rate. *Id.* This is not evidence of a problem solved.

Reports to Congress during the reauthorization noted that because of racially polarized voting in covered jurisdictions, the only chance the overwhelming majority of minority candidates have to be elected to office are in majority-minority districts. See Def. Inter. Br. Exhibit A, Joint Statement of Material Facts, 111-114. Plaintiffs assert that

Section 5 creates a floor for minority electoral success, but Congress heard testimony that, in fact, racially polarized voting created "an election ceiling." *Id.* at 111. Congress also heard that blacks generally are able to win statewide office only after first being appointed to a vacancy. *Id.* The House Judiciary Committee found that the "number of language minority officials elected to office has failed to keep pace with population growth among the minority communities." *Id.* at 112. This is not evidence of a problem solved.

Since 1982, The Department of Justice has objected to more than 700 voting changes that it found to be discriminatory and thus blocked enforcement of those discriminatory practices in covered jurisdictions. See Def. Int. Br. 9-10. The number of objections in covered jurisdictions has actually increased, with 624 objections being issued between August 1982 and 2004, while only 490 objections were issued between 1965 and the 1982 reauthorization. *Id.* This is not evidence of a problem solved.

During the reauthorization process, Congress noted that 653 successful Section 2 cases had been filed in Section 5 covered jurisdictions since 1982 alone. These cases involved vote suppression, discriminatory redistricting, discriminatory polling place changes, discriminatory methods of election, and discriminatory annexations. See Def. Int. Br. 4-5. This is not evidence or a problem solved.

Defendant-Intervenors demonstrated that Congress was presented with testimony on the increasing, not decreasing, degree of racially polarized voting in the South. See Def. Int. Br. 5. Defendant-Intervenors also explained the relevance of this information, using the Supreme Court's own direction that the presence of racially polarized voting can be probative of vote dilution. Id. at 5-7. This is not evidence of a problem solved.

The point in reiterating all of the evidence discussed in Defendants' and Defendant-Intervenors Summary Judgment Briefs is not to be repetitive, but to emphasize that the facts that Plaintiffs' choose to emphasize in their brief do not reflect a whole or accurate

portrayal of the testimony presented to Congress.  Plaintiffs attempt to paint a picture that we live in a post-racial society where civil rights legislation is no longer necessary and is even counter-productive for race relations.  This is far from being the case, and the evidence presented to Congress during the 2005 and 2006 reauthorization process proved that beyond any reasonable doubt.  While Section 5 has worked and has allowed gains to be made that would not have been possible without its existence, there remains stark continuing need in covered jurisdictions for the protections of the Act.

Jurisdictions in which there have been dramatic changes and improvements in minority voting rights have either been granted bailout or are eligible for bailout.  As of 2009, there had been 109 bailouts from Section 5 coverage, and a significant number are currently pending.  See Def. Int. Br. 23.  Section 5 is thus a flexible piece of legislation that can correct for any over-inclusiveness.  But while some jurisdictions have bailed out, this is not the trend for the whole of the covered jurisdictions, and the evidence presented to Congress supports that conclusion.

IV. <u>The 2006 Amendments Were Justifiable Corrections Rather than Dramatic Expansions to the Application of Section 5</u>

Plaintiffs' disregard for explicit Congressional findings and intent is obvious in their assertion that the 2006 Amendments to the Voting Rights Act constitute a so-called dramatic expansion of the application of Section 5.  Two Supreme Court decisions from the early 2000s changed how Section 5 was applied.  The Court's decisions in *Reno v. Bossier Parish School Board*, 528 U.S. 320 (*Bossier II*) (2000) and *Georgia v. Ashcroft*, 539 U.S. 461 (2003), were contrary to Congress' original intent in enacting the Voting Rights Act of 1965.  42 U.S.C. § 1973 note, Findings (6).  In the Reauthorization of 2006, Congress explicitly corrected those misinterpretations and definitively clarified Congress' intent.  Moreover, it

is clear that this correction does not constitute an expansion but simply a return to what had been the application of Section 5 during the prior years.

In regards to the "discriminatory purpose" prong, Congress heard that the decline in objections in the 2000s was not because of any dramatic improvement in conditions in covered jurisdictions, but rather an inability of the Department of Justice to apply the law as it had previously done and as Congress had intended. Even just prior to the *Bossier II* decision, intent comprised the sole or a significant part of the justification for objections interposed. Even into the 1990s, 43% of objections were based solely on intent, and another 31% were based on a combination of intent and effect. *Northwest Austin Municipality Utility District Number One v. Mukasey*, 573 F. Supp. 2d 221, 252 (D.D.C. 2008). Congress thus amended Section 5 to provide that a voting change violated Section 5 if it was enacted with "any discriminatory purpose." Indeed, Congress would be remiss in its duties under the Fifteenth Amendment were it to allow jurisdictions to enact changes in voting laws that were purposefully discriminatory. See Def. Inter. Br. 28.

In regards to the "ability to elect" prong, Defendant-Intervenors detailed, and Plaintiffs ignored, the flexible ways in which Section 5 is applied to changing demographics and the multiple factors the Department of Justice takes into consideration when analyzing potential retrogression. See Def. Inter. Br. 30-31. The law is applied in a manner that is far from being a rigid racial quota. For example, as cited in Defendant-Intervenors' Summary Judgment Brief, the Department of Justice has promulgated detailed guidance for the application of Section 5 to the redistricting process, and there, a number of factors including equal population and traditional redistricting criteria can be prioritized over maintaining raw numbers in minority opportunity districts. See Def. Inter. Br. 31.

Even more significantly, Congress made a specific finding that continued racially polarized voting in covered jurisdictions creates a ceiling on minority electoral success. *See*

*supra*, p 6. The "ability to elect" standard is directly targeted at preventing that ceiling from crumbling down on minority voters in light of continued and pervasive racially polarized voting. Following Congress' and Plaintiffs' building analogy, the "ability to elect" standard is not a floor, but rather a carefully designed support beam intended to prevent constitutionally problematic barriers to minority participation in the political process.

V.     Plaintiffs Fail to Establish Standing to Bring Their Second Claim

In remanding Plaintiffs' second claim for further consideration, the Court of Appeals for the District of Columbia Circuit, in its opinion from earlier this year, specifically questioned whether finding the 2006 Amendments unconstitutional would have any effect in redressing Plaintiffs' claim because the preemption provision was not part of the 2006 Amendments. D.C. Cir. Op. 29. Defendant-Intervenors fully briefed this issue in its Renewed Motion to Dismiss, and highlighted for the Court the cases where courts have found in severability a limit to standing that serves an important role—that is, limits unnecessary constitutional adjudication and sharpens the legal issues facing the court. *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006) (citing *Contractors Ass'n of Eastern Pennsylvania, Inc. v. City of Philadelphia*, 6 F.3d 990, 996-98 (3rd Cir. 1993)). *See also* Def. Interv. R. MTD 5.

In their Reply Brief, Plaintiffs disregard basic elements of standing in their dogged commitment to avoid addressing weaknesses in their own position. Plaintiffs do not have standing to bring their second claim if a favorable ruling on that claim would not afford them relief. The Court of Appeals plainly outlined Plaintiffs' second claim:

> Significantly, Plaintiffs do not contest the constitutionality of the pre-2006 preclearance standards articulated in *Georgia v. Ashcroft* and *Bossier Parish*. Instead, they challenge only Congress' "substantive expansion of the preclearance standard"

10

Case 1:10-cv-00561-JDB   Document 60   Filed 08/25/11   Page 11 of 13

>through the addition of subsections (b)-(d). Appellants'
>Opening Br. 8 (emphasis in original removed).

D.C. Cir. Op. 29.  Once again, Plaintiffs seek to re-characterize their challenge late in the game.  Plaintiffs themselves characterized their second claim as an alternative claim that they brought in case they lost on their first claim.  See Oral Arg. Tr. At 13:2-4, 15:11-15.  Thus, whether the 2006 Amendments are severable, and whether Plaintiffs satisfy the redressability requirement of standing, is dispositive.  See Pl. Reply Br. 41.

Contrary to Plaintiffs' assertions, there is a severability clause included as a part of the Voting Rights Act.  Chapter 42, Chapter 20, Subchapter I-A "Enforcement of Voting Rights" contains that separability (severability) clause.  The clause plainly indicates that if any part of the Act [42 U.S.C. §§ 1973 et. seq.] is found unconstitutional, the remainder of the Voting Rights Act of 1965 will not be affected by such determination.  42 U.S.C. § 1973p. Any discussion of what Congress would have wanted should a portion of the law be struck down is rendered moot by the presence of this clause.  Congress explicitly indicated its intent to keep in place the bulk of the law by authorizing reviewing courts to sever potentially invalid portions.

Subsection (a), the pre-2006 provision of Section 5, is severable from Subsections (b)-(d), the 2006 amendments.  Thus, even if Subsections (b)-(d) were struck down, no mechanism exists to remedy the harms Plaintiffs allege were caused by those sections.  If Subsection (a) remains intact, all voting changes in covered jurisdictions would still be subject to Subsection 5 preclearance.

## VI. <u>Conclusion</u>

For all the foregoing reasons, Defendant-Intervenors respectfully request that this Court deny Plaintiffs' Motion for Summary Judgment and grant Defendant-Intervenors' Cross Motion for Summary Judgment.

11

This, the 25th day of August, 2011.

                          Respectfully submitted,

                          ___/s/ J. Gerald Hebert_____
                          J. Gerald Hebert
                          D.C. Bar #447676
                          Attorney at Law
                          191 Somerville Street, #405
                          Alexandria, VA 22304
                          Telephone: 703-628-4673
                          E-mail: hebert@voterlaw.com

                          Anita S. Earls
                          D.C. Bar #473453
                          N.C. Bar #15597
                          Allison J. Riggs
                          N.C. Bar #40028
                          Southern Coalition for Social Justice
                          115 Market Street, Ste. 470
                          Durham, North Carolina 27701
                          Telephone: 919-323-3380 ext. 115
                          Facsimile: 919-323-3942
                          E-mail: anita@southerncoalition.org
                                   allison@southerncoalition.org

                          Laughlin McDonald
                          American Civil Liberties Union
                             Foundations, Inc.
                          230 Peachtree Street, NW
                          Suite 1440
                          Atlanta, GA 30303-1227
                          Telephone: 404-523-2721
                          Facsimile: 404-653-0331
                          E-mail:  lmcdonald@aclu.org

                          Arthur Barry Spitzer
                          American Civil Liberties Union
                          1400 20th Street, NW, Ste. 119
                          Washington, D.C. 20036
                          Telephone: 202-457-0800 x113
                          Email: artspitzer@aol.com

                          Attorneys for Defendant-Intervenors

CERTIFICATE OF SERVICE

I hereby certify that on this day, August 25, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Michael A. Carvin
D.C. Bar No. 366784
Noel J. Francisco
D.C. Bar No. 464752
Hashim M. Mooppan
D.C. Bar No. 981758
David J. Strandness
D.C. Bar No. 987194
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113

Michael E. Rosman
D.C. Bar No. 454002
Michelle A. Scott
D.C. Bar No. 489097
Center for Individual Rights
1233 20th Street, N.W., Suite 300
Washington, D.C. 20036
    *Counsel for Plaintiffs*

Richard Dellheim (lead counsel)
Attorney, Voting Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
    *Counsel for Defendants*

/s/   J. Gerald Hebert_____
J. Gerald Hebert
*Counsel for Defendant-Intervenors*