IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEPHEN LAROQUE,<br>ANTHONY CUOMO, JOHN NIX,<br>KLAY NORTHRUP, LEE RAYNOR,<br>and KINSTON CITIZENS FOR<br>NONPARTISAN VOTING,<br><br>        Plaintiffs<br><br>    v.<br><br>ERIC H. HOLDER, JR., in his official capacity as<br>Attorney General of the United States,<br><br>        Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 1:10-0561 (JDB)<br>    Judge John D. Bates |

**ATTORNEY GENERAL'S CONSOLIDATED REPLY MEMORANDUM IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

RONALD C. MACHEN, JR.
  United States Attorney
District of Columbia

THOMAS E. PEREZ
  Assistant Attorney General

T. CHRISTIAN HERREN, JR.
DIANA K. FLYNN
RICHARD DELLHEIM (lead counsel)
LINDA F. THOME
ERNEST A. MCFARLAND
JARED M. SLADE
JUSTIN WEINSTEIN-TULL
  Civil Rights Division
  U.S. Department of Justice
  950 Pennsylvania Avenue, N.W.
  NWB-Room 7264
  Washington, D.C. 20530
  Telephone: (202) 305-1734
  Facsimile: (202) 307-3961

# TABLE OF CONTENTS

**PAGE**

ARGUMENT

I.  SECTION 5 OF THE VOTING RIGHTS ACT
    REMAINS A VALID EXERCISE OF CONGRESS'S
    AUTHORITY TO ENFORCE THE FOURTEENTH
    AND FIFTEENTH AMENDMENTS ..................................................................1

    A.  The 2006 Reauthorization Is Subject
        To Rational Basis Review.............................................................................1

    B.  Congress Rationally Concluded That Reauthorization
        Of Section 5 Was Appropriate......................................................................2

II. PLAINTIFFS' CHALLENGES TO THE 2006
    AMENDMENTS MUST FAIL ......................................................................7

    A.  Plaintiffs Lack Standing To Assert Claim Two............................................7

        1.  Plaintiffs Have Not Suffered Injury In Fact....................................7

        2.  A Ruling Striking Down The Amendments
            Will Not Redress Plaintiffs' Injury Because
            Sections 5(b)-(d) Are Severable From Section 5 ...........................13

    B.  The Challenge To The 2006 Amendments Is
        Not Ripe For Review ...................................................................................20

    C.  The 2006 Amendments Do Not Violate The
        Constitution On Their Face.........................................................................21

        1.  Sections 5(b) And (d)....................................................................21

        2.  Section 5(c) ...................................................................................24

CONCLUSION...............................................................................................................25

**TABLE OF AUTHORITIES**

**CASES:**                                                                                    **PAGE**

*Abbott Labs.* v. *Gardner*, 387 U.S. 136 (1967)...............................................................20

*Advantage Media, L.L.C.* v. *City of Eden Prairie*, 456 F.3d 793 (8th Cir. 2006) ...................14-15

*Alaska Airlines, Inc.* v. *Brock*, 480 U.S. 678 (1987)........................................................16

*Albemarle Paper Co.* v. *Moody*, 422 U.S. 405 (1975)........................................................3

*Allen* v. *Wright*, 468 U.S. 737 (1984) ........................................................................7

*Ayotte* v. *Planned Parenthood of N. New Eng.*, 546 U.S. 320 (2006)...........................................21

*Beer* v. *United States*, 425 U.S. 130 (1976)...................................................12, 17, 24

*Bismullah* v. *Gates*, 551 F.3d 1068 (D.C. Cir. 2009) .........................................................16

*Cache Valley Elec. Co.* v. *Utah DOT*, 149 F.3d 1119 (10th Cir. 1998) .......................................14

*City of Boerne* v. *Flores*, 521 U.S. 507 (1997) ..............................................................1

*City of Littleton* v. *Z.J. Gifts D-4, LLC*, 541 U.S. 774 (2004) ............................................9

*City of New Haven* v. *United States*, 809 F.2d 900 (D.C. Cir. 1987) ....................................16, 18

*City of Rome* v. *United States*, 446 U.S. 156 (1980) ......................................................1-4

*Contractors Ass'n of E. Pa., Inc.* v. *City of Philadelphia*,
    6 F.3d 990 (3d Cir. 1993) ...............................................................................14

*DaimlerChrysler Corp.* v. *Cuno*, 547 U.S. 332 (2006)........................................................7

*Davis* v. *United States*, 131 S. Ct. 2419 (2011) ...........................................................14

*FW/PBS, Inc.* v. *City of Dallas*, 493 U.S. 215 (1990),
    overruled in part on other grounds by
    *City of Littleton* v. *Z.J. Gifts D-4, LLC*, 541 U.S. 774 (2004) .........................................8

*Florida* v. *HHS,* Nos. 11-11021, 11-11067,
    2011 U.S. App. LEXIS 16806 (11th Cir. Aug. 12, 2011) .........................................16-18

*Franks* v. *Bowman Transp. Co.*, 424 U.S. 747 (1976) ......................................................3

**CASES (continued):**                                                   **PAGE**

*Georgia* v. *Ashcroft*, 539 U.S. 461 (2003) ................................................................12

*Giles* v. *Ashcroft*, 193 F. Supp. 2d 258 (D.D.C. 2002) ...................................11

*Gottlieb* v. *FEC*, 143 F.3d 618 (D.C. Cir. 1998) .........................................10

*INS* v. *Chadha*, 462 U.S. 919 (1983) .........................................................13

*Johnson* v. *DeGrandy*, 512 U.S. 997 (1994).................................................5

*Kardules* v. *City of Columbus*, 95 F.3d 1335 (6th Cir. 1996)..................... 10-11

*Koog* v. *United States*, 79 F.3d 452 (5th Cir. 1996),
    cert. denied, 521 U.S. 1118 (1997) ....................................................16

*LaRoque* v. *Holder*, No. 10-5433,
    2011 U.S. App. LEXIS 13907 (D.C. Cir. July 8, 2011) ...........................7, 14, 19

*LaShawn A.* v. *Barry*, 87 F.3d 1389 (D.C. Cir. 1996) ...................................20

*Leavitt* v. *Jane L.*, 518 U.S. 137 (1996).................................................. 15-16

*Lopez* v. *Monterey Cnty.*, 525 U.S. 266 (1999) ...........................................1

*Lujan* v. *Defenders of Wildlife*, 504 U.S. 555 (1992) ....................................8

*Marable* v. *Walker*, 704 F.2d 1219 (11th Cir. 1983) .....................................3

*Miller* v. *Johnson*, 515 U.S. 900 (1995) ............................................. 17, 21-23

*Morris* v. *Gressette*, 432 U.S. 491 (1977)...................................................18

*Morse* v. *Republican Party*, 517 U.S. 186 (1996) ........................................17

*National Fed'n of the Blind of Tex., Inc.* v. *Abbott*, No. 10-10236,
    2011 WL 2750704 (5th Cir. July 15, 2011)...............................................14

*Northeast Fla. Chapter of the Associated General Contractors of Am.*
    v. *City of Jacksonville*, 508 U.S. 656 (1993) ............................................9

*Pollock* v. *Farmers' Loan & Trust Co.*, 158 U.S. 601 (1895).....................................18

*Public Citizen* v. *Clerk, United States District Court*,
    451 F. Supp. 2d 109 (D.D.C. 2006) .....................................................14

**CASES (continued):**                                                                              **PAGE**

*Public Citizen* v. *United States District Court*,
    486 F.3d 1342 (D.C. Cir.), cert. denied, 552 U.S. 1076 (2007)........................................15

*Reno* v. *American Civil Liberties Union*, 521 U.S. 844 (1997).............................................16, 18

*Scott* v. *Pasadena Unified Sch. District*, 306 F.3d 646 (9th Cir. 2002),
    cert. denied, 538 U.S. 1031 (2003) .............................................................................. 9-10

*Shaw* v. *Reno*, 509 U.S. 630 (1993)..............................................................................11, 22

*Shelby County* v. *Holder*, 270 F.R.D. 16 (D.D.C. 2010) ...........................................................4

*South Carolina* v. *Katzenbach*, 383 U.S. 301 (1966) ......................................................... *passim*

*Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83 (1998) .........................................................14

*Stoianoff* v. *Montana*, 695 F.2d 1214 (9th Cir. 1983)...............................................................10

*Thornburg* v. *Gingles*, 478 U.S. 30 (1986) ..............................................................................5

*United States Ecology, Inc.* v. *United States DOI*, 231 F.3d 20 (D.C. Cir. 2000)........................18

*United States* v. *Hays*, 515 U.S. 737 (1995) .......................................................................8, 11

*United States* v. *Jackson*, 390 U.S. 570 (1968) ........................................................................16

*United States* v. *Salerno*, 481 U.S. 739 (1987)........................................................................23

*United States* v. *West Peachtree Tenth Corp.*, 437 F.2d 221 (5th Cir. 1971)...............................3

*Village of Arlington Heights* v. *Metropolitan Hous. Dev. Corp.*,
    429 U.S. 252 (1977).........................................................................................................24

*Warth* v. *Seldin*, 422 U.S. 490 (1975)...................................................................................7

*Washington State Grange* v. *Washington State Republican Party*, 552 U.S. 442 (2008) ............23

*Williams* v. *Standard Oil Co.*, 278 U.S. 235 (1929) ................................................................18

**STATUTES:**

42 U.S.C. 1973................................................................................................................2

**STATUTES (continued):**                                                      **PAGE**

42 U.S.C. 1973a(c) ........................................................................................6

42 U.S.C. 1973b(a)(1) ................................................................................. 6

42 U.S.C. 1973c(a) ..................................................................................... 17

Pub. L. No. 89-110, 79 Stat. 439 ...............................................................24

Pub. L. No. 97-205, § 3, 96 Stat. 134 ........................................................5

Pub. L. No. 109-246, § 2.............................................................................17

 **RULE:**

Fed. R. Civ. P. 56(e) ...................................................................................8

**LEGISLATIVE HISTORY:**

H.R. Rep. No. 196, 94th Cong., 1st Sess. (1975) ......................................2, 4

H.R. Rep. No. 478, 109th Cong., 2d Sess. (2006) ......................................21

**MISCELLANEOUS:**

Attorney General's *Guidance Concerning Redistricting Under Section 5
    of the Voting Rights Act*, 76 Fed. Reg. 7470 (Feb. 9, 2011) ...................... 22-25

*Revision of Voting Rights Procedures,* 76 Fed. Reg. 21239 (April 15, 2011)..............................25

**GLOSSARY OF ABBREVIATIONS FOR RELATED DOCUMENTS**

*LaRoque* v. *Holder*, No. 10-561 (D.D.C.):

| | | |
|---|---|---|
| Compl. | = | Doc. # 1 (04/07/10) |
| Mem. in Opp'n to Mot. to Dismiss | = | Doc. #12 (07/01/10) |
| Pl. Mem. | = | Doc. #23 (08/18/10) |
| Pl.'s Mem. Opp'n to Mot. to Stay | = | Doc. #30 (09/08/10) |
| Motion Hearing Tr. | = | Doc. #40 (12/10/10) |
| AG Mem. | = | Doc. #55 (08/01/11) |
|     Attachment 1 | = | *Shelby County* AG Mem. |
|     Attachment 2 | = | *Shelby County* AG Reply Mem. |
|     Attachment 3 | = | *Shelby County* AG Supp. Mem. |
| Pl. Reply Mem. | = | Doc. # 58 (08/15/11) |

*LaRoque* v. *Holder*, No.  10-5433 (D.C. Cir.):

| | | |
|---|---|---|
| Appellants' Reply Br. | = | Doc. #1298812 (03/17/11) |

I.    **SECTION 5 OF THE VOTING RIGHTS ACT REMAINS A VALID EXERCISE OF CONGRESS'S AUTHORITY TO ENFORCE THE FOURTEENTH AND FIFTEENTH AMENDMENTS**

A.    **The 2006 Reauthorization Is Subject To Rational Basis Review**

Plaintiffs' contention that the 2006 Reauthorization of Section 5 is subject to congruence and proportionality analysis (Pl. Reply Mem. 4-7) is foreclosed by binding precedent.  In *South Carolina* v. *Katzenbach*, 383 U.S. 301, 324 (1966), the Supreme Court set forth "one fundamental principle" for adjudging Congress's exercise of its enforcement authority under the Fifteenth Amendment:  "As against the reserved powers of the States, Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." *Ibid.*  The Court adhered to this standard in *City of Rome* v. *United States*, 446 U.S. 156, 177 (1980); and relied upon its decisions in *South Carolina* and *City of Rome* to reaffirm the constitutionality of Section 5 in *Lopez* v. *Monterey County*, 525 U.S. 266, 282-283 (1999) – two years after the decision in *City of Boerne* v. *Flores*, 521 U.S. 507 (1997) – without any mention of congruence and proportionality analysis.

Moreover, as explained previously, the Court applies the same rational basis review to federal statutes enacted to enforce the prohibitions on race discrimination in the Thirteenth and Fourteenth Amendments.  Att. 1 at 12-14; Att. 2 at 1-2.  Therefore, plaintiffs' contention that Section 5 must also be justified as valid legislation under the Fourteenth Amendment (Pl. Reply Mem. 6-7) is irrelevant.  Nor does the addition of the 2006 Amendments change the standard of review.  See AG Mem. 12.  Thus, the correct question in this case is not whether Congress assembled a record of unconstitutional voting discrimination in the covered jurisdictions, see *e.g.*, Pl. Reply Mem. 11, 15-17.  Rather, the question is whether Congress had a rational basis for concluding that the preclearance requirements of Section 5 remain an appropriate means of

protecting minority voting rights in the covered jurisdictions.  In any event, Congress had

abundant evidence of intentional discrimination before it when it enacted the 2006

Reauthorization.  Att. 1 at 27-31, 37, 39-40, 44-49.

> ### B.    Congress Rationally Concluded That Reauthorization Of Section 5 Was Appropriate

As we have demonstrated previously (AG Mem. 12-17; Att. 1 at 20-75; Att. 2 at 12-35;

Att. 3) Congress rationally concluded that reauthorization of Section 5 was an appropriate means

of protecting minority voting rights, and its decision to continue the application of Section 5 to

the covered jurisdictions was rational.  There simply is no support for plaintiffs' contention (Pl.

Reply Mem. 8-10) that Section 5 can be justified *only* to redress unconstitutional discrimination

that cannot be remedied by Section 2 of the Voting Rights Act (VRA), 42 U.S.C. 1973.  First, the

Court never made such a broad assertion in upholding the statute previously.  In *City of Rome*,

the Court noted its recognition in *South Carolina* that Congress had enacted Section 5 after

finding that "[c]ase-by-case adjudication had proved too ponderous a method to remedy voting

discrimination," and that jurisdictions often simply circumvented court orders.  446 U.S. at 174

(citing *South Carolina*, 383 U.S. at 309, 314).  But that was not the Court's only rationale for

upholding the 1975 Reauthorization in *City of Rome*.  In particular, the Court relied upon

Congress's finding that Section 5 "has become widely recognized as a means of promoting and

preserving minority political gains in covered jurisdictions."  *Id.* at 181 (quoting H.R. Rep. No.

196, 94th Cong., 1st Sess. 8 (1975) (1975 House Report)).

In any event, in 2006, Congress learned that Section 2 litigation remains "ponderous,"

such that even when plaintiffs successfully challenge a discriminatory voting practice, the

practice generally remains in place for a period of years before and during litigation, and often

including more than one election cycle.  Att. 1 at 55-56.  And once an election is held under a discriminatory procedure, voters generally cannot be made whole for the deprivation of federal voting rights that they may have suffered in that election as can those denied a job or housing.  For this reason, plaintiffs' comparison of remedies for discriminatory voting practices to remedies for housing or employment discrimination is misplaced.  See Pl. Reply Mem. 9, 11.  Unlike those subject to discriminatory voting practices, plaintiffs denied a job or housing may be made whole through back pay, damages, and equitable remedies, even if such relief is available only after some delay.  See, *e.g.*, *Albemarle Paper Co.* v. *Moody*, 422 U.S. 405, 418-422 (1975) (back pay); *Franks* v. *Bowman Transp. Co.*, 424 U.S. 747, 763-770 (1976) (retroactive seniority); *Marable* v. *Walker*, 704 F.2d 1219, 1220-1221 (11th Cir. 1983) (compensatory damages and injunctive relief); *United States* v. *West Peachtree Tenth Corp.*, 437 F.2d 221, 228 (5th Cir. 1971) (federal courts are authorized "to eliminate the present effects of past discrimination").

For similar reasons, plaintiffs are wrong in contending that Section 2 is adequate to protect existing districts in which minority voters can elect candidates of choice.   Pl. Reply Mem. 14.  As the events surrounding the City of Calera's recent effort to abolish its only such city council district illustrates, Section 5 is sometimes the only rapid means of preventing such backsliding from gains achieved through Section 2 litigation.  See Att. 1 at 7-9, 32-34.

Plaintiffs' attempt to discount the importance of vote dilution evidence before Congress (Pl. Reply Mem. 12) is belied by the Supreme Court's early recognition that Section 5 applies equally to all kinds of discriminatory voting practices, as well as Congress's and the Court's reliance on evidence of vote dilution in reauthorizing and upholding Section 5 in the past.  AG Mem. 14-15; Att. 1 at 57-60.  In *City of Rome*, the Court emphasized the importance of such

3

evidence, quoting approvingly from the House Report on the 1975 Reauthorization.  446 U.S. at

181 (quoting 1975 House Report 10-11):

> As registration and voting of minority citizens increases [sic], other measures may be
> resorted to which would dilute increasing minority voting strength.
>
> The Committee is convinced that it is largely Section 5 which has contributed to the
> gains thus far achieved in minority political participation, and it is likewise Secton [sic]
> 5 which serves to insure that that progress not be destroyed through new procedures and
> techniques.  Now is not the time to remove those preclearance protections from such
> limited and fragile success.

Indeed, each of the Supreme Court cases upholding previous reauthorizations of Section 5

involved dilutive mechanisms.  Att. 1 at 60.

Plaintiffs erroneously contend that the data on Section 2 cases fail to demonstrate the

existence of relevant voting discrimination in the covered jurisdictions.  Pl. Reply Mem. 15-17,

20-22.  As we have explained (AG Mem. 16-17) analysis of outcomes in Section 2 cases from

throughout the United States indicates that voting discrimination not only is widespread in the

covered jurisdictions, but also is much more common in the covered than in the non-covered

jurisdictions.  When unreported settlements are included, 81% of successful Section 2 cases

nationwide originated in covered jurisdictions.[1]  Because Section 2 does not require a finding of

intentional discrimination, comparisons between the numbers of cases in which such a finding

---

[1]  While plaintiffs dismiss this statistic as derived from "declarations concocted during the course
of this litigation," they do not contest its accuracy.  Pl. Reply Mem. 22.  There is no merit to
plaintiffs' contention that this Court may not consider these declarations.  See Att. 2 at 27-29.
This Court's statement that the constitutionality of Section 5 depends on the record that was
before Congress was merely *dicta* in a ruling that discovery was not necessary in *Shelby County*,
and that did not conclusively resolve the question whether courts may consider evidence outside
the legislative record in determining whether Congress rationally concluded that legislation is
appropriate.  See *Shelby County* v. *Holder*, 270 F.R.D. 16, 19-21 (D.D.C. 2010).

was made in the covered versus the non-covered jurisdictions (see Pl. Reply Mem. 20) are much less meaningful than the numbers of cases in which minority plaintiffs were successful.

Moreover, successfully-prosecuted Section 2 cases are indicative of the existence of *intentional* discrimination because, as plaintiffs themselves have said, the standard for proving a violation of Section 2 is designed to identify "facially neutral practices that are likely to be intentionally discriminatory."  Pl. Mem. 31.  Plaintiffs now seek to discount the significance of their own statement by arguing that most of these Section 2 cases are irrelevant because they were decided "before the Court finished – or had even seriously started – its project of 'structur[ing] … the statute's totality of the circumstances test.'"  Pl. Reply Mem. 16 (quoting *Johnson* v. *DeGrandy*, 512 U.S. 997, 1010 (1994)) (quotation marks omitted).  Of course, the totality of the circumstances test was adopted, not by the Court in 1994 as plaintiffs imply, but by Congress when it amended Section 2 in 1982.  See Pub. L. No. 97-205, § 3, 96 Stat. 134 (1982).  Further, as the full quotation from *DeGrandy* makes clear, it was the Court's decision in *Thornburg* v. *Gingles*, 478 U.S. 30, 46-51 (1986), that established the principles for application of the totality of the circumstances test.  See *DeGrandy*, 512 U.S. at 1010 ("*Gingles* provided some structure to the statute's 'totality of the circumstances' test in a case challenging multi-member legislative districts.")  Thus, the Court's "project" of interpreting the "totality of the circumstances" test began, not in 1994, as plaintiffs contend, but in 1986.  Indeed, it was *Gingles* that identified most of the factors that plaintiffs say are important to "Section 2's focus [on] practices that reflect a high potential for intentional discrimination."  Pl. Mem. 32; see *Gingles*, 478 U.S. at 50 (minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"); see also Att. 2 at 24-27.

5

Plaintiffs also seek to discount the importance of the Katz study, which found that 56% of the *reported* Section 2 cases in which minority plaintiffs were successful occurred in the covered jurisdictions.  Plaintiffs contend that this concentration is to be expected because, according to plaintiffs, about half of the minority population lives in these jurisdictions.  Pl. Reply Mem. 21. But plaintiffs' figure is incorrect.  Census data show that only 40% of non-Hispanic blacks and 33% of all minorities lived within the covered jurisdictions in 2000.  Att. 2 at 31.  Thus, even if the minority population is taken into account, the reported Section 2 cases remain disproportionately concentrated in the covered jurisdictions.

Finally, contrary to plaintiffs' arguments (Pl. Reply Mem. 18-22) Congress's decision to continue applying the Section 5 preclearance requirement to the covered jurisdictions was rational in both theory and practice.  To be sure, the application of Section 5 to those jurisdictions must be and is justified by current needs.  As we have demonstrated at length, Congress rationally concluded that Section 5 preclearance remains necessary in the covered jurisdictions.  AG Mem. 12-17; Att. 1 at 20-75; Att. 2 at 12-40; Att. 3 at 9-13.  It is that current need, in combination with those jurisdictions' long history of voting discrimination, that makes their continued coverage appropriate.  Att. 3 at 4-9.  Further, the existence of the bailout and bail-in provisions of the statute, 42 U.S.C. 1973a(c); 1973b(a)(1), cure any over- or under-inclusiveness in the scope of coverage.  Att. 1 at 69-74; Att. 2 at 33-34; Att. 3 at 14-15.  Contrary to plaintiffs' contention, these provisions do not "foist[] the duty on courts *to rewrite the statute*."  Pl. Reply Mem. 19.  Rather, they provide a statutory basis for releasing covered jurisdictions from the preclearance requirement and for imposing a preclearance obligation on non-covered jurisdictions found to have engaged in voting discrimination.  Notably, the Court

specifically relied upon both the bail-in and the original bailout provisions in upholding Section

5 in *South Carolina*, 383 U.S. at 330-333.

## II.   PLAINTIFFS' CHALLENGES TO THE 2006 AMENDMENTS MUST FAIL

### A.   Plaintiffs Lack Standing To Assert Claim Two

Plaintiffs lack standing to bring their Equal Protection challenge because the harm they

allege is too impersonal, generalized, and speculative.  Under plaintiffs' theory, all non-minority

residents of Section 5-covered jurisdictions have standing to challenge the 2006 Amendments,

whether or not those Amendments have been applied to prevent a voting change in their

jurisdiction.  That theory plainly violates basic standing principles.[2]  See *Warth* v. *Seldin*, 422

U.S. 490, 499 (1975).  Moreover, plaintiffs cannot show that the Amendments caused their

injury or that it would be redressed by a finding that the Amendments are unconstitutional.

### 1.   Plaintiffs Have Not Suffered Injury In Fact

Plaintiffs claim that the Attorney General overlooked their Equal Protection injury in his

standing analysis.  But plaintiffs' theory of their injury has shifted throughout this litigation –

and it continues to do so.  In their complaint, plaintiffs alleged that "Section 5, *particularly as*

*implemented by the Attorney General*, denies plaintiffs equal, race-neutral treatment."  Compl. ¶

30, Apr. 7, 2010, ECF No. 1 (emphasis added).  They later disavowed their as-applied challenge.

Transforming their injury theory, they subsequently argued that their injury arose when "Section

---

[2]  Plaintiffs inaccurately describe the Attorney General's "justiciability defense" to Claim Two as "essentially moot" because this Court must decide the merits of their Claim One regardless.  Pl. Reply Mem. 34.  Yet, plaintiffs' Claim Two is separate from Claim One, and they "must demonstrate standing for each claim [they] seek to press."  *DaimlerChrysler Corp.* v. *Cuno*, 547 U.S. 332, 352 (2006) (citing *Allen* v. *Wright*, 468 U.S. 737, 752 (1984)).  Plaintiffs' standing to bring Claim Two, therefore, is not moot, as the D.C. Circuit recognized by remanding for additional briefing on that issue.  *LaRoque* v. *Holder (LaRoque II)*, No. 10-5433, 2011 U.S. App. LEXIS 13907, at *41-49 (D.C. Cir. July 8, 2011).

5 'postpon[ed] the implementation of [the] validly enacted [referendum]' in furtherance of

Congress' minority-preferring regime, *regardless of why the Attorney General subsequently*

*declined to 'end' that suspension*."  Appellants' Reply Br. 30, No. 10-5433 (Mar. 17, 2011)

(emphasis added).  Plaintiffs now claim that the referendum postponement is their Claim One

injury, and only one part of their more general Claim Two injury.

In the context of Claim Two, plaintiffs contend that the Amendments caused electoral

harm by denying them "an equal opportunity to political and electoral participation," Compl. ¶

30, by imposing a "barrier that made it more difficult for members of their racial group to obtain

a benefit."  Appellants' Reply Br. 30 (quotation marks and alterations omitted).  Plaintiffs also

allege that the 2006 Amendments subject them to a "racial classification," Compl. ¶ 30, "that

creates 'representational harms' wherein 'elected officials are more likely to believe that their

primary obligation is to represent only the members of that group, rather than their constituency

as a whole.'"  Mem. in Opp'n to Mot. to Dismiss 22, July 1, 2010, ECF No. 12 (quoting *United*

*States* v. *Hays*, 515 U.S. 737, 744 (1995)).

These bare allegations must fail – especially at this stage of the litigation.  Whereas

"general factual allegations of injury" may suffice at the pleading stage, they are insufficient at

the summary judgment stage, when plaintiffs "can no longer rest on such 'mere allegations,' but

must 'set forth' by affidavit or other evidence 'specific facts.'"  *Lujan* v. *Defenders of Wildlife*,

504 U.S. 555, 561 (1992) (citing Fed. R. Civ. P. 56(e)).  Yet the record contains no evidence of

concrete, personal injury resulting from the 2006 Amendments on their face.  Standing "cannot

be inferred argumentatively from averments in the pleadings, but rather must affirmatively

appear in the record."  *FW/PBS, Inc.* v. *City of Dallas*, 493 U.S. 215, 231 (1990) (internal

quotation marks and citation omitted), overruled in part on other grounds by *City of Littleton* v. *Z.J. Gifts D-4, LLC*, 541 U.S. 774 (2004).  Claim Two must, therefore, be dismissed.

Plaintiffs inaptly cite a set of affirmative action cases for the proposition that plaintiffs need not show that the Attorney General would not have objected to the Kinston referendum, absent the 2006 Amendments.  See Pl. Reply Mem. 36.  Indeed, the Supreme Court has held that, under certain circumstances, "injury in fact" in an equal protection case is "not the ultimate inability to obtain the [desired] benefit," but rather, "the denial of equal treatment resulting from the imposition of [a] barrier" that "makes it more difficult for members of one group to obtain a benefit than it is for members of another group."  *Northeast Fla. Chapter of the Associated Gen. Contractors of Am.* v. *City of Jacksonville*, 508 U.S. 656, 666 (1993).  But those affirmative action cases are inapposite because plaintiffs cannot establish that they were subject to any "barrier" that "makes it more difficult" for white Kinston residents to obtain a "benefit" than it is for members of other racial groups.  In addition, plaintiffs' alleged injuries from the so-called "barrier" are far too speculative, especially at this late stage, to justify standing.

Unlike here, the plaintiffs in the affirmative action cases cited were all personally subject to racial classification schemes.  This case is closer to *Scott* v. *Pasadena Unified School District*, 306 F.3d 646 (9th Cir. 2002), cert. denied, 538 U.S. 1031 (2003), than it is to *Jacksonville*.  In *Scott*, students challenged a school district admission policy that took race into account in some circumstances.  The court found that the students lacked standing because they had failed to "demonstrate" that they were subject to "any racial or gender classification" or that "any plaintiff would suffer a barrier to her application."  *Id.* at 657.

As in *Scott*, plaintiffs here cannot establish that Congress erected a "barrier" to white persons in Section 5 covered jurisdictions, let alone in Kinston.  "The mere existence of a statute,

9

which may or may not ever be applied to plaintiffs, is not sufficient to create a case or

controversy within the meaning of Article III." *Scott*, 306 F.3d at 656 (quoting *Stoianoff* v.

*Montana*, 695 F.2d 1214, 1223 (9th Cir. 1983)).  Precisely as in *Scott*, plaintiffs here have

"misconstrued" *Jacksonville* "to mean that the hypothetical existence of a racial or gender barrier

is enough, without a plaintiff's showing that she has been, or is genuinely threatened with the

likelihood of being, subjected to such a barrier." *Id.* at 657.

Even if plaintiffs could establish that they were subject to a "barrier," which they cannot,

plaintiffs' alleged injuries are too tenuous, too speculative, and too untethered from the 2006

Amendments to establish injury.  In the affirmative action cases, plaintiffs alleged that they were

denied an equal opportunity to compete for tangible and concrete benefits – a business contract

or the ability to enroll in school.  Here, plaintiffs' alleged injury is far more speculative.  They

allege that the 2006 Amendments *per se*, and unfastened from the Attorney General's application

of them, deny them "an equal opportunity to political and electoral participation."  Compl. ¶ 30.

Yet they provide no competent evidence of any actual or imminent electoral harm suffered by

"members of their racial group," *i.e.*, white persons in Kinston.  Nor do they provide evidence of

what "barriers" the 2006 Amendments themselves erected, what "benefit" the Amendments

themselves denied, and how the Amendments themselves cause elected officials to prefer one

racial group of voters over another.  They adduce no facts to support their contentions or

demonstrate their personal harm.  They do not even allege that postponing the referendum's

implementation makes it more difficult for white voters to elect their candidate of choice, or that

candidate Nix is or would be a preferred candidate of white voters.  Voters' "supposed injury to

their 'ability to influence the political process'" may not "rest[] on gross speculation." *Gottlieb*

v. *FEC*, 143 F.3d 618, 621 (D.C. Cir. 1998) (quoting *Kardules* v. *City of Columbus*, 95 F.3d

1335, 1348-1353 (6th Cir. 1996)).  Yet plaintiffs' allegations "rest[] on a series of hypothetical

occurrences," *ibid.*, concerning Kinston's electorate; the views, future actions, and racial

identities of city council candidates yet to be elected; the future electoral preferences of Kinston

voters in general; and how those preferences may affect Nix in particular.

Plaintiffs' alleged "representational harms" suffer the same defect.  While the Supreme

Court has recognized that certain racial classifications may cause representational injury in the

limited context of redistricting, see generally *Shaw* v. *Reno*, 509 U.S. 630 (1993), this case, of

course, does not concern redistricting:  Kinston elects candidates on an at-large basis.  Plaintiffs

moreover fail "to demonstrate that [they], personally, ha[ve] been injured by that kind of racial

classification," *Hays*, 515 U.S. at 744.  They aver no facts to support their view that elected

officials under Kinston's current election method have in the past or will in the future treat white

persons differently from black persons.  Accordingly, plaintiffs' speculation is nothing more than

"a generalized grievance against governmental conduct of which [they do] not approve." *Id.* at

745; see also *Giles* v. *Ashcroft*, 193 F. Supp. 2d 258, 263-264 (D.D.C. 2002) (finding that "vague

injuries" like "negative stereotypes, diminished economic opportunities, [and] perceptions of

continuing racism" allegedly arising from Section 5 are "not the type of personalized injury

required to establish standing" but rather "could be experienced by most citizens of Mississippi,"

not the plaintiff specifically).

Plaintiffs attempt to show causation by citing the "ability to elect" language in the

Kinston objection letter as evidence that the Attorney General applied Section 5(b)'s standard to

the Kinston Referendum.  Pl. Reply Mem. 38-40.[3]  Their attempt must fail.  First, citing the

---

[3]  Plaintiffs appear to concede that Section 5(c) played no role in the objection.

objection letter to justify standing flatly contradicts plaintiffs' prior declarations of the objection letter's utter irrelevance: "What the Attorney General said, what the Attorney General did are irrelevant to our case." Motion Hearing Tr. Dec. 3, 2010, at 68. When this Court asked whether "the Attorney General's objection is relevant" "to assess the injury that the various plaintiffs assert for Article III purposes," plaintiffs responded, "[i]t is not, because all the Attorney General's objection is relevant to is the fact that he didn't remove the injury." *Id.* at 68-69.

Moreover, even if plaintiffs had not previously declared the objection letter's utter irrelevance to their standing, that letter does not help them. Its language has long been a part of the Section 5 preclearance standard, see *Beer* v. *United States*, 425 U.S. 130, 141 (1976), and is hardly evidence that the Attorney General applied the Section 5(b) standard to the Kinston referendum. The *Ashcroft* Court itself recognized that "the comparative ability of a minority group to elect a candidate of its choice" is an important factor, *Georgia* v. *Ashcroft*, 539 U.S. 461, 480 (2003), and the Attorney General has used that language in many pre-2006 objection letters. Tellingly, the Attorney General used the "ability to elect" language in a post-*Ashcroft*, pre-2006 letter objecting to a redistricting plan for the City of Plaquemine in Iberville Parish, Louisiana. That letter, issued before the 2006 Amendments that plaintiffs here challenge as imposing a "barrier," cites minorities' ability to elect their candidates of choice as the basis for the objection. Objection Letter, Dec. 12, 2003 (Ex. 1, hereto). The "ability to elect" language, therefore, does not indicate the Attorney General applied a new and racially discriminatory scheme arising from the 2006 Amendments. Put simply, plaintiffs have failed to establish, from either the face of the Amendments or the Objection Letter, that the 2006 Amendments erected any "barrier" or subjected them to a racial classification.

12

**2.      A Ruling Striking Down The Amendments Will Not Redress Plaintiffs'
Injury Because Sections 5(b)-(d) Are Severable From Section 5**

Plaintiffs lack standing to bring their second claim of injury – that the suspension of the

referendum violated their Equal Protection rights – because a ruling that the Amendments are

unconstitutional would not redress that injury.  See AG Mem. 25-31.  Plaintiffs attack the

Attorney General's redressability arguments in two ways.  First, they assert that severability is a

"merits" determination and thus should not be decided in the standing context.  Pl. Reply Mem.

40-41.  Second, they argue that the amendments are not severable from the remainder of Section

5.  Pl. Reply Mem. 41-44.  Plaintiffs are incorrect on both counts.

First, *INS* v. *Chadha*, 462 U.S. 919, 929, 931-936 & n.7 (1983), forecloses plaintiffs'

argument that severability is solely a merits question that follows a standing determination.  In

*Chadha*, the Court explicitly addressed the statute's severability in the context of standing:

"Before we address the important question of the constitutionality of the one-House veto

provision of § 244(c)(2), we *first* consider several *challenges to the authority of this Court* to

resolve the issue raised."  462 U.S. at 929 (emphasis added).  In its section on standing,

immediately following its severability section, the Court stated that "[i]f the veto provision

violates the Constitution, *and is severable*, the deportation order against Chadha will be

canceled.  Chadha *therefore has standing* to challenge the order of the Executive mandated by

the House veto."  *Id.* at 936 (emphasis added).  The Court could not have been clearer:

severability may be a threshold issue when, as here, its determination relates directly to a party's

standing and thus the court's jurisdiction.

At least two courts of appeals have recognized that the *Chadha* Court's determination on

severability was directly linked to standing.  In *Advantage Media, L.L.C.* v. *City of Eden Prairie*,

13

456 F.3d 793, 801 (8th Cir. 2006), for instance, the Eighth Circuit cited *Chadha* to reject the very

argument asserted here.  456 F.3d at 801 ("Advantage also argues that even if severance might

be appropriate, the severability of a statutory provision goes to the merits and should not factor

into a standing determination.  We disagree.").  The court explained that "severance of particular

statutory provisions to limit standing promotes important goals, notably the avoidance of

unnecessary constitutional adjudication and the sharpening of legal issues facing the court."

*Ibid.* (citations omitted).  See also *National Fed'n of the Blind of Tex., Inc.* v. *Abbott*, No. 10-

10236, 2011 WL 2750704, at *6 (5th Cir. July 15, 2011) (recognizing that "courts may avert a

constitutional or jurisdictional question by ordering the issues for decision to make severability

itself a threshold question") (citation omitted).

Other courts have similarly addressed severability in the context of standing.  See *Cache

Valley Elec. Co.* v. *Utah DOT*, 149 F.3d 1119, 1123-1124 (10th Cir. 1998); *Contractors Ass'n of

E. Pa., Inc.* v. *City of Philadelphia*, 6 F.3d 990, 996-998 (3d Cir. 1993); cf. *LaRoque II*, 2011

U.S. App. LEXIS 13907, at *44-46 (citing *Advantage Media* and remanding questions of

severability and standing for district court's consideration);[4] but see *Public Citizen* v. *Clerk,

United States Dist. Court*, 451 F. Supp. 2d 109, 114 n.10 (D.D.C. 2006) (Bates, J.) (declining

amicus request to decide severability in the context of redressability).[5]

---

[4]  The cases plaintiffs cite are inapposite.  Neither *Steel Co.* v. *Citizens for a Better Environment*,
523 U.S. 83 (1998), nor *Davis* v. *United States*, 131 S. Ct. 2419 (2011), concerned severability.
Thus, neither overrules *Chadha* and neither compels a result contrary to that found in the courts
of appeals' decisions.  The issue of standing was not addressed in *Alaska Airlines, Inc.* v. *Brock*,
480 U.S. 678 (1987).

[5]  Although *Public Citizen* declined to decide severability in the standing context, it did so
without citing *Chadha* or authority interpreting *Chadha*.  See 451 F. Supp. 2d at 114 n.10.  Nor
did it have the benefit of the D.C. Circuit's comments in *LaRoque II*.  The D.C. Circuit affirmed

(continued . . . )

Plaintiffs nonetheless argue that the *Chadha* Court's severability determination was not related to its standing analysis.  Pl. Reply Mem. 41-44.  They are incorrect.  Moreover, they simply ignore the cases interpreting *Chadha,* cases which similarly and conclusively foreclose their "severability/merits" argument.

Second, the Amendments are clearly severable from the remainder of Section 5.  In arguing to the contrary, plaintiffs focus on whether Congress would prefer Section 5 with the amendments rather than Section 5 without the amendments.  See Pl. Reply Mem. 42-43.  But that is the wrong question.  As the Supreme Court recognized, "[t]his mode of analysis, if carried out in every case, would operate to defeat every claim of severability."  *Leavitt* v. *Jane L.*, 518 U.S. 137, 143-144 (1996).  Indeed,

> [e]very legislature that adopts, in a single enactment, provision A plus provision B intends (A + B); and that enactment, which reads (A + B), is invariably a unified expression of that intent, so that taking away A from (A + B), leaving only B, will invariably clearly undermine the legislative purpose to enact (A + B). * * * The relevant question * * * is not whether the legislature would prefer (A + B) to B. * * * [It] is whether the legislature would prefer not to have B if it could not have A as well.

*Ibid*.  Thus, the Supreme Court rejected the Tenth Circuit's determination "that a legislature bent on banning almost all abortions would prefer, if it could not have that desire, to ban no abortions at all rather than merely some."  *Ibid.*

That Congress would prefer Section 5(a) to no Section 5 at all is clear.  Congress crafted a severability clause that is robust evidence of its intent to preserve Section 5, and plaintiffs, by

---

(. . . continued)
the district court's decision in *Public Citizen*, but declined to reach the standing/severability issues addressed in the district court's footnote.  See *Public Citizen* v. *United States Dist. Court*, 486 F.3d 1342, 1346-1349 (D.C. Cir.), cert. denied, 552 U.S. 1076 (2007).

asking the wrong question, have not presented persuasive evidence to the contrary.[6]  See *Alaska Airlines*, 480 U.S. 678, 686 (1987); *City of New Haven* v. *United States*, 809 F.2d 900, 905 n.15 (D.C. Cir. 1987).

Plaintiffs posit that a severability determination rarely turns on the presence or absence of such a clause.  Pl. Reply Mem. 43-44 (quoting *United States* v. *Jackson*, 390 U.S. 570, 585 n.27 (1968); *Florida* v. *HHS*, Nos. 11-11021, 11-11067, 2011 U.S. App. LEXIS 16806, at *268 (11th Cir. Aug. 12, 2011)).  Of course, severability ultimately turns on whether the remaining provisions can operate independently and whether Congress would have still passed the statute had it known about the constitutional defect of a portion of the statute.  See *Bismullah* v. *Gates*, 551 F.3d 1068, 1071-1072 (D.C. Cir. 2009).  Nevertheless, an express clause creates a strong presumption of severability, see *Alaska Airlines*, 480 U.S. at 686, and "aid[s]" the Court's determination, *Reno* v. *American Civil Liberties Union*, 521 U.S. 844, 884 n.49 (1997).  See also *Leavitt*, 518 U.S. at 143-144 (relying on severability clause to extinguish any doubt concerning whether legislature would have preferred a statute prohibiting some abortions to one prohibiting no abortions).

Plaintiffs have not eroded that presumption, nor can they.  Section 5's structure, purpose, and its repeated reauthorizations reflect Congress's preference for Section 5(a) standing alone to no Section 5 at all.  Congress crafted the Voting Rights Act "to rid the country of racial

---

[6] Plaintiffs argue that the severability clause here is not persuasive because it was originally inserted in the VRA in 1965.  Pl. Reply Mem. 43.  They are incorrect.  See *Koog* v. *United States*, 79 F.3d 452, 463 (5th Cir. 1996) ("We can only assume that Congress was fully aware of [the severability clause] when it chose to insert the [amendment], and that Congress intended the severability provision to apply equally to the [amending] provisions."), cert. denied, 521 U.S. 1118 (1997).

discrimination in voting," and "Section 5 was intended to play an important role in achieving that goal." *Beer* v. *United States*, 425 U.S. 130, 141 (1976) (quoting *South Carolina*, 383 U.S. at 315).  Both the overarching purpose of the Voting Rights Act – "to rid the country of racial discrimination in voting," *id.* at 140 (citations omitted) – and the basic purpose of Section 5 – "to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise," *id.* at 141 – are furthered by subsection (a).  See 42 U.S.C. 1973c(a); see also 2006 Reauthorization, Pub. L. No. 109-246, § 2 ("The purpose of this Act is to ensure that the right of all citizens to vote * * * is preserved and protected as guaranteed by the Constitution.").

Moreover, subsection (a)'s preemptive mechanism, which "shift[s] the advantage of time and inertia from the perpetrators of the evil to its victim, by freezing election procedures in the covered areas unless the changes can be shown to be nondiscriminatory," *Miller* v. *Johnson*, 515 U.S. 900, 926 (1995) (citation omitted), furthers Congress's intent to prevent jurisdictions from "passing new discriminatory voting laws as soon as the old ones had been struck down," *ibid.* (quoting *Beer*, 425 U.S. at 140).  That preemptive mechanism also furthers Congress's goal of avoiding the burden and inefficiency of case-by-case litigation.  See *Morse* v. *Republican Party*, 517 U.S. 186, 225-226 (1996).  Without subsection (a), citizens would face costly, burdensome, and lengthy litigation to enjoin voting-related discrimination, something Congress recognized and intended Section 5 to prevent.  See also pp. 2-3, *supra*.

"In the overwhelming majority of cases, the Supreme Court has opted to sever the constitutionally defective provision from the remainder of the statute."  *Florida* v. *HHS*, 2011 U.S. App. LEXIS 16806, at *264-265 (citations omitted).  Severance is proper here because

preserving Section 5(a) aligns squarely with Congress's intent to eliminate voting-related

discrimination and any doubt as to that intent is dispelled by the express severability clause.[7]

Because the amendments to Section 5 are severable, any redressability is speculative in

light of the fact that possible relief is dependent on the uncertain choices of an independent third

party, the City of Kinston.  See AG Mem. 29-31; see also *United States Ecology, Inc.* v. *United

States DOI*, 231 F.3d 20, 24-25 (D.C. Cir. 2000) ("When redress depends on the cooperation of a

third party, it becomes the burden of the [appellant] to adduce facts showing that those choices

have been or will be made in such manner as to produce causation and permit redressability of

injury.") (internal quotation marks and citation omitted).  Plaintiffs have not asserted or provided

any evidence that Kinston will act in a manner that could lead to redress of their harm, and thus

have not shown that it is likely their alleged injury will be remedied by a finding that the

amendments are unconstitutional.

Plaintiffs mistakenly rely on *LaRoque II* for the proposition that if this Court invalidated

the Amendments, *Morris* v. *Gressette*, 432 U.S. 491 (1977), would not prevent this Court from

voiding the objection.  Pl. Reply Mem. 39.  *LaRoque II* did state that "[n]either law nor logic

---

[7] Plaintiffs cite three cases where the Supreme Court found nonseverability.  Two, *Williams* v. *Standard Oil Co.*, 278 U.S. 235 (1929), and *Pollock* v. *Farmers' Loan & Trust Co.*, 158 U.S. 601 (1895), were decided more than 75 years ago, "before modern severability law had even been established."  *Florida* v. *HHS*, 2011 U.S. App. LEXIS 16806, at *265 n.136.  The third, *Reno* v. *ACLU*, 521 U.S. at 884 n.49, is clearly distinguishable.  In *Reno*, after determining that one portion of the statute was severable, the Court held that it could not sever other portions because to do so would require "rewrit[ing the] * * * law to conform it to constitutional requirements." 521 U.S. at 884-885 (internal quotations and citations omitted).  That is not the case here. Plaintiffs' reliance on *City of New Haven*, 809 F.2d at 905-906, is equally unavailing.  There, the entire purpose of the legislative effort was to "assert *control* over presidential impoundments," and severing the legislative veto would leave the President with the exact control that Congress was trying to limit in enacting the overall legislative scheme in the first place.  *Id.* at 907.

require[d] [plaintiffs] to challenge the Attorney General's failure to alleviate the statutorily imposed injury [] in order to challenge Congress' infliction of that injury in the first place," and that if "section 5 is unconstitutional, the Attorney General's actions pursuant to that unconstitutional statute would be void." *LaRoque II*, 2011 U.S. App. LEXIS 13907, at *34, *41. But those statements were made in the context of discussing what would happen if the court were to find the reauthorization itself unconstitutional (plaintiffs' Claim One), at which point Section 5(a)'s suspension of the voting change would no longer be in place.  That result would not require a review of the Attorney General's determination, but would happen automatically.  The same reasoning does not apply to the Amendments if they are severable because Section 5(a) would still suspend the voting change and voiding the objection would require a review of the Attorney General's determination.

This Court need not decide whether *Morris* and its progeny would bar any such review of the Attorney General's objection in this case.  Plaintiffs have chosen not to bring such an as-applied challenge and specifically do not seek review of the Attorney General's objection. Indeed, they opposed discovery in this case on the ground that "any facts or discovery concerning Kinston would be irrelevant."  Pl.'s Mem. Opp'n to Mot. to Stay 2, Sept. 8, 2010, ECF No. 30.  This Court thus lacks any factual basis upon which to determine whether the objection was based on the Amendments.  And even if such review is not precluded by *Morris*, absent that factual basis, an opinion striking down the 2006 Amendments would leave the Attorney General's objection undisturbed.

In short, plaintiffs lack redress for any alleged Equal Protection injury arising from the referendum's suspension.  Because the possibility of redress hinges on the Amendments' severability, severability is a threshold issue.  And in fact the Amendments are severable, as

Section 5's severability clause, structure, purpose, and repeated reauthorizations amply demonstrate.  Thus, even if the 2006 Amendments were struck down, Section 5(a) would continue the referendum's suspension, leaving plaintiffs' alleged injuries unredressed.  Plaintiffs lack standing to bring Claim Two.

### B.   The Challenge To The 2006 Amendments Is Not Ripe For Review

As explained in our opening brief, plaintiffs' claims relating to the 2006 Amendments are not ripe for review.  AG Mem. 31-33.  Moreover, lack of ripeness requires dismissal of both the claim that the Amendments are not appropriate enforcement legislation and the claim that the Amendments violate Equal Protection.  Plaintiffs contend that the law of the case doctrine and the mandate rule preclude this Court from ruling on the question of the ripeness of any part of Claim One.  Pl. Reply Mem. 34 (citing *LaShawn A.* v. *Barry*, 87 F.3d 1389, 1393-1394 & n.3 (D.C. Cir. 1996) (en banc)).  But *LaShawn* is inapposite.  The question of ripeness has not previously been raised by any party, let alone resolved by any court in this litigation.  Thus, there simply is no law of the case on the ripeness of either Claim One or Claim Two.  For the same reason, the mandate rule does not prevent this Court from considering this jurisdictional issue. *Id.* at 1393 n.3.

Contrary to plaintiffs' contention, the issues presented by the Amendments are not "purely legal."  Pl. Reply Mem. 44 (quoting *Abbott Labs.* v. *Gardner*, 387 U.S. 136, 149 (1967)). The Amendments have not yet been construed by any court.  Their meaning is hotly contested by the parties in this case.  See AG Mem. 32.  Moreover, determining whether the application of either the amended purpose prong or the amended effects prong has caused the kind of unconstitutional result that plaintiffs predict will involve fact-bound issues highly specific to the facts and circumstances of the jurisdiction and the particular voting changes involved.  See

20

*Miller* v. *Johnson*, 515 U.S. 900, 915-916 (1995) (describing the complex, fact-based inquiry a court must conduct in assessing whether a redistricting plan is unconstitutionally race-based); *see also* AG Mem. 33-43; Part C, *infra*.  Because plaintiffs have disavowed any such as-applied challenge in this case, their claims concerning the Amendments are not ripe for review.

### C.   The 2006 Amendments Do Not Violate The Constitution On Their Face[8]

Plaintiffs contend that the 2006 Amendments are not appropriate enforcement legislation because they have increased the burden on jurisdictions seeking preclearance.  Pl. Reply Mem. 2.  But, even if the Court's holdings in *Bossier II* and *Ashcroft* reflected Congress's original intent in enacting Section 5 (*see* Pl. Reply Mem. 33), it is undisputed that the standards set forth in those decisions departed from the preclearance standard long enforced by the Attorney General and the lower courts.  *See* H.R. Rep. No. 478, 109th Cong., 2d Sess. 65 (2006) (finding that the Court had "interpreted Section 5 [in *Bossier II* and *Ashcroft*] to allow preclearance of voting changes that would have previously drawn objections").  Congress also found that the longstanding interpretation of Section 5 that predated these decisions had been essential to the protection of minority voting rights and that the standards articulated by the Court threatened the progress that had been made since 1965.  *Id.* at 65-71.  Thus, Congress rationally concluded that the Amendments were appropriate enforcement legislation.

### 1.   Sections 5(b) And (d)

Plaintiffs continue to contend that the Sections 5(b) and (d) will impose a quota and require jurisdictions to violate the principles of *Miller* v. *Johnson*, 515 U.S. 900 (1995); and

---

[8]  Because the Amendments are severable from the rest of Section 5 (*see* pp. 15-18, *supra*), if this Court concludes that one or more of the Amendments is unconstitutional on either ground, the proper remedy would be to sever the offending portion of the statute, "while leaving the remainder intact."  *Ayotte* v. *Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329 (2006).

*Shaw* v. *Reno*, 509 U.S. 630 (1993). In support of this contention, plaintiffs selectively quote from the Attorney General's *Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act*, 76 Fed. Reg. 7470 (Feb. 9, 2011) (*Redistricting Guidance*). See Pl. Reply Mem. 26. An examination of the *Redistricting Guidance* itself makes clear that plaintiffs are simply wrong. First, plaintiffs omit the clear statement in the Guidance that "preventing retrogression under Section 5 does not require jurisdictions to violate *Shaw* v. *Reno* and related cases." 76 Fed. Reg. at 7472. Next, plaintiffs selectively quote from a passage explaining the circumstances in which it might be necessary for a jurisdiction to depart from existing redistricting principles. See Pl. Reply Mem. 26 ("Section 5 may 'require … depart[ing] from' traditional districting principles – such as political 'boundaries,' 'compactness,' 'incumbents,' and 'partisan balance' – to 'avoid retrogression.'"). As the complete passage from the *Redistricting Guidance* indicates, however, any such departures are more limited and conditional than plaintiffs suggest:

> [C]ompliance with Section 5 of the Voting Rights Act may require the jurisdiction to depart from *strict* adherence to certain of its redistricting criteria. For example, criteria *that require the jurisdiction to make the least possible change* to existing district boundaries, to follow county, city, or precinct boundaries, protect incumbents, preserve partisan balance, or *in some cases*, require a certain level of compactness of district boundaries *may* need to give way *to some degree* to avoid retrogression.

76 Fed. Reg. at 7472 (emphasis added). Of course, this provision must be read in light of the preceding statement that avoiding retrogression will not require jurisdictions to violate *Shaw*. *Ibid.* Moreover, the *Redistricting Guidance* states that "[i]n evaluating alternative or illustrative plans, the Department of Justice relies upon plans that make the *least departure* from a jurisdiction's stated redistricting criteria needed to prevent retrogression." *Ibid.* (emphasis added); see also *ibid.* ("In assessing whether a less retrogressive plan can reasonably be drawn,

the geographic compactness of a jurisdiction's minority population will be a factor in the Department's analysis.").[9]

More fundamentally, to prevail on their facial challenge, plaintiffs must demonstrate that Sections 5(b) and (d) are unconstitutional in all their applications, "that no set of circumstances exists under which the Act would be valid," *United States* v. *Salerno*, 481 U.S. 739, 745 (1987), or, at a minimum, that it lacks a "plainly legitimate sweep," *Washington State Grange* v. *Washington State Republican Party*, 552 U.S. 442, 449 (2008) (citation and internal quotation marks omitted).  They cannot rest their claim upon allegations about how the Attorney General has applied Section 5 in the past, how it was applied to the Kinston referendum, or how they predict it will be applied in the future.  See AG Mem. 33-34.  It would be improper for this Court to assume that the Attorney General will apply the statute unconstitutionally.  AG Mem. 37-38.

Plaintiffs' facial challenge to Sections 5(b) and (d) cannot succeed.  That there may be some instances in which jurisdictions must depart from some traditional districting criteria to avoid retrogression does not mean that the amended retrogression standard is facially unconstitutional.  Moreover, the change in the retrogression standard made by the 2006 Amendments essentially affects the defenses available to jurisdictions seeking to justify a retrogressive change.  Such defenses will necessarily be fact-bound and highly specific to the jurisdictions and the circumstances of the particular voting change.  The possibility that a

---

[9]  Plaintiffs' reliance on an argument made more than 16 years ago in the United States' brief in *Miller* v. *Johnson*, 515 U.S. 900 (1995), proves nothing about the Attorney General's current policies or practices.  See Pl. Reply Mem. 26 (citing Brief for the United States in *Miller* at 28-29, 1995 WL 89331 (Feb. 23, 1995)).  The United States' position in *Miller* did not prevail.  See *Miller*, 515 U.S. at 920-921.  And, as the current *Redistricting Guidance* discussed in the text makes clear, the Attorney General has unequivocally expressed his acceptance of and adherence to the decisions in *Miller* and similar cases.  76 Fed. Reg. at 7470-7472; see also AG Mem. 36.

particular application might thus present constitutional questions is no basis for holding Sections 5(b) or (d) facially unconstitutional.

### 2.    Section 5(c)

Plaintiffs contend that Section 5(c) is inappropriate enforcement legislation and violates Equal Protection because it requires jurisdictions to prove that their conduct is nondiscriminatory and because it will permit the Department of Justice to coerce jurisdictions to engage in unconstitutional decision-making.  Pl. Reply Mem. 29-31.  These contentions are without foundation.  As explained previously, the amended purpose prong does nothing more than prohibit preclearance where a voting change is motivated by a discriminatory purpose, thereby incorporating the standard for unconstitutional voting discrimination into the preclearance standard.  AG Mem. 34-35.  Section 5(c) is therefore appropriate enforcement legislation and fully consistent with the Equal Protection guarantees of the Fifth Amendment.

The Section 5 preclearance standard has always placed the burden of proof upon the jurisdiction seeking preclearance of a voting change to establish that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color."  Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 439; *South Carolina*, 383 U.S. at 335; *Beer*, 425 U.S. at 140-141.  The Court specifically upheld this allocation of the burden of proof in *South Carolina*.  383 U.S. at 335.  Nor will it be unduly difficult for jurisdictions to prove the absence of discriminatory purpose.  As the Department's Section 5 procedures and *Redistricting Guidance* make clear, in making this determination the Department will consider direct evidence of discriminatory purpose, as well as circumstantial evidence of intent, as prescribed in *Village of Arlington Heights* v. *Metropolitan Housing Development Corporation*, 429 U.S. 252, 266-268 (1977).  See *Redistricting Guidance*, 76 Fed. Reg. at 7471;

24

*Revision of Voting Rights Procedures,* 76 Fed. Reg. 21239, 21241, 21248-21249 (April 15, 2011) (28 C.F.R. 51.54, 51.57).

Nor is there any merit to plaintiffs' repeated insistence that the Attorney General will use the amended Section 5(c) to coerce jurisdictions to violate the Court's rulings in *Shaw* or *Miller.* see AG Mem. 36-38.  As explained above (pp. 22-23, *supra*), the Attorney General has stated unequivocally that obtaining Section 5 preclearance will not require jurisdictions to violate these rulings.  And the Department's procedures state that "[a] jurisdiction's failure to adopt the maximum possible number of majority-minority districts may not be the sole basis for determining that a jurisdiction was motivated by a discriminatory purpose."  76 Fed. Reg. 21249 (28 C.F.R. 51.59).

Finally, plaintiff's speculation that Section 5(c) may be misapplied in the future with unconstitutional result simply does not warrant a ruling that this provision is facially unconstitutional.  See AG Mem. 33-34, 37-38.

## CONCLUSION

The Attorney General's cross-motion for summary judgment should be granted and plaintiffs' motion for summary judgment should be denied.

25

Date:  August 25, 2011

RONALD C. MACHEN, JR.
 United States Attorney
 District of Columbia

Respectfully submitted,

THOMAS E. PEREZ
 Assistant Attorney General


 _/s/ Richard Dellheim_ _____
 T. CHRISTIAN HERREN, JR.
 DIANA K. FLYNN
 RICHARD DELLHEIM (lead counsel)
 LINDA F. THOME
 ERNEST A. MCFARLAND
 JARED M. SLADE
 JUSTIN WEINSTEIN-TULL
  Civil Rights Division
  U.S. Department of Justice
  950 Pennsylvania Avenue, N.W.
  NWB-Room 7264
  Washington, D.C. 20530
  Telephone: (202) 305-1734
  Facsimile: (202) 307-3961

CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2011, I served a true and correct copy of the foregoing

via the Court's ECF system, to the following counsel of record:

Michael A. Carvin
D.C. Bar No. 366784
Noel J. Francisco
D.C. Bar No. 464752
Hashim M. Mooppan
D.C. Bar No. 981758
David J. Strandness
D.C. Bar No. 987194
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113

Michael E. Rosman
D.C. Bar No. 454002
Michelle A. Scott
D.C. Bar No. 489097
Center for Individual Rights
1233 20th Street, N.W., Suite 300
Washington, D.C. 20036

Joseph Gerald Hebert
191 Somervelle Street, #405
Alexandria, VA 22304

Arthur Barry Spitzer
American Civil Liberties Union
1400 20th Street, N.W., Suite 119
Washington, DC 20036

Anita Earls
Southern Coalition for Social Justice
115 Market Street
Suite 470
Durham, NC 27701

Laughlin McDonald
American Civil Liberties Union Foundation,
Inc.
230 Peachtree Street, NW
Suite 1440
Atlanta, GA 30303

*/s/ Richard Dellheim*
RICHARD DELLHEIM
Attorney, Voting Section