| | |
|---|---|
| **STEPHEN LAROQUE, et al.** | |
| **Plaintiffs,** | |
| **v.** | Civil Action No. 10-0561 (JDB) |
| **ERIC H. HOLDER, Jr., in his official capacity as Attorney General of the United States,** | |
| **Defendant.** | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs, four private citizens and a private membership association, bring a facial challenge to the constitutionality of Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c, and the 2006 amendments to Section 5, 42 U.S.C. § 1973c(b)-(d).  Section 5, as amended, prevents certain "covered" jurisdictions from implementing any change to voting practices or procedures unless and until the jurisdiction demonstrates to federal authorities that the change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color."  42 U.S.C. § 1973c(a).

Plaintiffs are residents of Kinston, North Carolina.  In November 2008, Kinston voters adopted a referendum that would have replaced the city's current partisan electoral system with a nonpartisan system, in which anyone could run for local office and no candidate would be affiliated with any political party on the ballot.  <u>See</u> Compl. ¶¶ 1, 14-15.  Because Kinston is a covered jurisdiction under Section 5, it submitted its proposed voting change to the Attorney General for "preclearance" (<u>i.e.</u>, approval) under Section 5.  The Attorney General declined to

preclear the referendum on the ground that "elimination of party affiliation on the ballot will likely reduce the ability of blacks to elect candidates of choice." Id. ¶ 19. Kinston did not seek administrative reconsideration of the Attorney General's objection, nor did it seek a declaratory judgment from this Court authorizing the proposed electoral change. In April 2010, however, plaintiffs, proponents of the nonpartisan-election referendum, filed this action. Plaintiffs argue that Section 5, as reauthorized and as amended in 2006, exceeds Congress's enforcement authority under the Fourteenth and Fifteenth Amendments (Count I) and that the 2006 amendments to Section 5 violate the nondiscrimination guarantees of the Fifth, Fourteenth and Fifteenth Amendments (Count II). See id. ¶¶ 1, 33-34, 36-37.

On December 20, 2010, this Court granted defendant's Motion to Dismiss [Docket Entry 11] on the ground that plaintiffs lacked standing to bring their claims. See LaRoque v. Holder, 755 F. Supp. 2d 156 (D.D.C. 2010) ("LaRoque I"). On July 8, 2011, the D.C. Circuit reversed, concluding that plaintiffs had standing to bring Count I and directing this Court to consider the merits of that claim. LaRoque v. Holder, 650 F.3d 777, 793, 796 (D.C. Cir. 2011) ("LaRoque II"). The D.C. Circuit also directed this Court to consider whether plaintiffs had standing to bring Count II, and, if so, to resolve the merits of that claim. Id. at 795-96. Shortly after the D.C. Circuit's decision, this Court decided another challenge to Section 5 brought by Shelby County, Alabama, in an opinion that involved some of the same issues raised here. Shelby Cnty., Ala. v. Holder, --- F. Supp. 2d ---, No. 10-651, 2011 WL 4375001 (D.D.C. Sept. 21, 2011). This Court concluded in Shelby County that Congress did not exceed its enforcement powers in reauthorizing Section 5's preclearance procedure in 2006. That decision resolves part of plaintiffs' Count I claim here.

Two of plaintiffs' remaining contentions, however, raise significant issues that have not been addressed in any other decision on Section 5 and the Voting Rights Act. These claims revolve around three amendments to Section 5 that Congress enacted in 2006. 42 U.S.C. § 1973c(b)-(d). The three amendments made two substantive changes to the standard applied in deciding whether a voting practice or procedure should be precleared under Section 5. Plaintiffs contend that the 2006 amendments exceed Congress's enforcement powers under the Fourteenth and Fifteenth Amendments -- an argument no other challenger to the reauthorization of Section 5 has raised. Plaintiffs also contend that the amendments violate the equal protection component of the Due Process Clause of the Fifth Amendment, the federal government's equivalent of the Equal Protection Clause of the Fourteenth Amendment. This appears to be the first facial challenge to a portion of Section 5 under equal protection principles. It is perhaps startling that plaintiffs claim that Section 5, a law "[p]raised by some as the centerpiece of the most effective civil rights legislation ever enacted," is actually racially discriminatory. See Shelby County, 2011 WL 4375001, at *1. Nonetheless, plaintiffs argue that Congress, in its effort to counteract years of discrimination against minority voters, has overreached and harmed the interests of white voters like plaintiffs.

These two challenges call for different analyses and implicate different sets of caselaw, but both, at bottom, ask how urgent the need for Congressional legislation was in 2006 and how well Congress crafted the challenged legislation. Guided by the abundant Congressional record and the Supreme Court's caselaw on Congress's enforcement powers and equal protection principles, this Court concludes that the 2006 amendments to Section 5 are a careful solution to a vitally important problem. It therefore holds that the amendments do not violate the Constitution

and that plaintiffs' facial challenges must be denied.

## BACKGROUND

### I.  History of the Voting Rights Act

The history of the Voting Rights Act, and of Section 5 in particular, was discussed at length in this Court's opinion in Shelby County.  2011 WL 4375001, at *2-15.  That history need not be repeated in full here, but a few important points bear emphasis.  The Voting Rights Act ("the Act" or "the VRA") "was designed by Congress to banish the blight of racial discrimination in voting."  South Carolina v. Katzenbach, 383 U.S. 301, 308 (1966).  The Act's core prohibition against racial discrimination in voting is contained in Section 2, which provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."  42 U.S.C. § 1973.  Section 2 and many other provisions of the Voting Rights Act are permanent and apply nationwide.

In addition to the permanent, nationwide provisions, Sections 4(b) and 5 of Act impose additional requirements on certain "covered" jurisdictions.  Section 4(b) determines which jurisdictions qualify as "covered."  42 U.S.C. § 1973b(b).  Section 5 provides that a covered jurisdiction cannot make any changes to its voting qualifications, standards, practices, or procedures unless those changes are first "submitted to and approved by a three-judge Federal District Court in Washington, D.C., or the Attorney General."  Nw. Austin Mun. Util. Dist. No. One v. Holder, 129 S. Ct. 2504, 2509 (2009) ("Nw. Austin II"); see 42 U.S.C. § 1973c(a).  "Preclearance" under Section 5 will only be granted if a jurisdiction can show that its proposed

voting change "neither 'has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color.'" <u>Nw. Austin II</u>, 129 S. Ct. at 2509 (quoting 42 U.S.C. § 1973c(a)). Section 5 "shift[s] the advantage of time and inertia from the perpetrators of the evil to its victims," <u>Katzenbach</u>, 383 U.S. at 328, by requiring covered jurisdictions to show that changes are not discriminatory <u>before</u> they are enacted.

Section 5 was originally scheduled to sunset after five years, but Congress reauthorized it in 1970 (for five years), 1975 (for seven years), 1982 (for twenty-five years), and 2006 (for twenty-five years). <u>Nw. Austin II</u>, 129 S. Ct. at 2510. During the 2006 reauthorization, Congress enacted three amendments to Section 5 that made two substantive changes to the scope of the preclearance provision. Because of the importance of those changes to this litigation, the portion of the <u>Shelby County</u> opinion describing the 2006 amendments is repeated in full here.

In the amendment codified at 42 U.S.C. § 1973c(c), Congress clarified its intent with respect to the meaning of the word "purpose" in Section 5 in response to the Supreme Court's decision in <u>Reno v. Bossier Parish School Board</u>, 528 U.S. 320 (2000) ("<u>Bossier II</u>"). Section 5, by its terms, only allows a voting change to be precleared if the change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color." <u>See</u> 42 U.S.C. § 1973c(a). Prior to <u>Bossier II</u>, this provision was interpreted to bar preclearance of voting changes that either (1) were enacted with a discriminatory purpose; <u>or</u> (2) had a discriminatory, <u>retrogressive</u> effect -- <u>i.e.</u>, changes that worsened the position of minority voters relative to the status quo. <u>See</u> <u>Bossier II</u>, 528 U.S. at 324 (explaining that a redistricting plan only has a prohibited discriminatory "effect" under Section 5 if it is retrogressive); <u>Beer v. United States</u>, 425 U.S. 130, 141 (1976) (noting that "the purpose of s[ection] 5 has always been

to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise").  In <u>Bossier II</u>, however, the Supreme Court -- for the first time -- held that the "purpose" prong of Section 5 only prohibits electoral changes that are enacted with a discriminatory <u>and</u> retrogressive purpose.  <u>See</u> 528 U.S. at 341.  In other words, after <u>Bossier II</u>, a redistricting plan that was passed for purely discriminatory reasons (such as to purposefully avoid the creation of a new majority-minority district), but that was not intended to make minority voters any worse off than they had been under the preexisting plan (which, say, had no majority-minority districts), would not run afoul of Section 5's "purpose" prong.  <u>See</u> <u>id.</u> (holding that Section 5 "does not prohibit preclearance of a redistricting plan with a discriminatory but nonretrogressive purpose").

    <u>Bossier II</u> thus had the effect of reading the "purpose" prong "almost entirely out of Section 5."  <u>See</u> House Hearing, 109th Cong. 12 (Nov. 1, 2005) (prepared statement of Mark A. Posner).[1]  As was the case prior to <u>Bossier II</u>, if a jurisdiction enacted an electoral change that reduced the ability of minority voters to elect candidates of their choice, the change would be denied preclearance under Section 5's "effects" prong (because it would have a retrogressive effect).  Under <u>Bossier II</u>, then, the "purpose" prong would only serve as an independent bar to discriminatory voting changes where a jurisdiction "intend[ed] to cause retrogression, but then, somehow, messe[d] up and enact[ed] a voting change that [did] not actually cause retrogression to occur (the so-called 'incompetent retrogressor')."  <u>Id.</u>

_____

    [1] For readability, the Court will use this short form for the many legislative hearings cited throughout this opinion.  An appendix to the opinion provides the full citation for each hearing, along with information on where to find electronic copies of the hearings.

In 2006, the House Judiciary Committee explained that <u>Bossier II</u>'s limitation of the "purpose" prong had been inconsistent with Congress's intent that Section 5 prevent not only purposefully retrogressive discriminatory voting changes, but also those "[v]oting changes that 'purposefully' keep minority groups 'in their place.'" <u>See</u> H.R. Rep. No. 109-478, at 68. Accordingly, as part of the 2006 Amendments, Congress restored the pre-<u>Bossier II</u> "purpose" standard by adding a provision to the statute that defined "purpose" in Section 5 to mean "<u>any</u> discriminatory purpose." <u>See</u> Pub. L. No. 109-246, § 5(c), 120 Stat. 577, 581 (2006); 42 U.S.C. § 1973c(c) (emphasis added).

In a similar vein, Congress also responded to the Supreme Court's decision in <u>Georgia v. Ashcroft</u>, 539 U.S. 461 (2003), which had altered the preexisting standard for determining whether a voting change had a prohibited retrogressive effect under Section 5's "effects" prong. Prior to <u>Georgia v. Ashcroft</u>, the standard for assessing whether an electoral change violated the Section 5 "effects" test was "'whether the ability of minority groups to participate in the political process and to elect their choices to office is . . . diminished . . . by the change affecting voting.'" <u>Beer</u>, 425 U.S. at 141(quoting H.R. Rep. No. 94-196, at 60) (emphasis omitted). In <u>Georgia v. Ashcroft</u>, however, the Court endorsed a less rigid, "totality of the circumstances" analysis for examining retrogressive effects, explaining that "any assessment of the retrogression of a minority group's effective exercise of the electoral franchise depends on an examination of all the relevant circumstances, such as the ability of minority voters to elect their candidate of choice, the extent of the minority group's opportunity to participate in the political process, and the feasibility of creating a nonretrogressive plan." 539 U.S. at 479. In reauthorizing the Act in 2006, Congress expressed concern that the <u>Georgia v. Ashcroft</u> framework had introduced

"substantial uncertainty" into the administration of a statute that was "specifically intended to block persistent and shifting efforts to limit the effectiveness of minority political participation." See H.R. Rep. No. 109-478, at 70 (internal quotation marks and citation omitted).  Hence, in an attempt to restore the simpler, "ability to elect" analysis articulated in Beer, see id. at 71, Congress added new language to the Act, stating that all voting changes that diminish the ability of minorities "to elect their preferred candidates of choice" should be denied preclearance under Section 5.  See Pub. L. No. 109-246, §§ 5(b), (d), 120 Stat. at 581; 42 U.S.C. §§ 1973c(b), (d).

## II.  Challenges to Section 5

Section 4(b)'s coverage formula and Section 5's preclearance regime have been repeatedly upheld against constitutional challenges.  Katzenbach, 383 U.S. at 337 (upholding Section 5 after 1965 authorization); City of Rome v. United States, 446 U.S. 156, 183 (1980) (upholding Section 5 after 1975 reauthorization); Lopez v. Monterey Cnty., 525 U.S. 266, 282-83 (1999) (upholding Section 5 after 1982 reauthorization in narrow as-applied challenge).  The 2006 reauthorization drew another set of constitutional challenges.  Only days after the reauthorization, a municipal utility district in Texas brought suit seeking to bail out of the Act's requirements or to challenge Section 5 on its face as "an unconstitutional overextension of Congress's enforcement power to remedy past violations of the Fifteenth Amendment."  See Nw. Mun. Util. Dist. No. One v. Holder, 573 F. Supp. 2d 221, 230 (D.D.C. 2008) ("Nw. Austin I"), rev'd and remanded, Nw. Austin II, 129 S. Ct. 2504 (2009) (internal quotation marks and citation omitted); see also LaRoque I, 755 F. Supp. 2d at 161 n.2 (describing procedure by which a jurisdiction may "bail out" of Section 5 and terminate its obligation to seek preclearance for election changes).  A three-judge panel of this court found that the utility district was not eligible

for bailout and that Section 5 was constitutional.  Nw. Austin I, 573 F. Supp. 2d at 283.  The utility district appealed, and the Supreme Court reversed.  Nw. Austin II, 129 S. Ct. at 2517.

The Supreme Court avoided the constitutional question by finding that the utility district was statutorily eligible for bailout.  Id.  Although the Court therefore did not decide the constitutional question, it noted that "the Act imposes current burdens and must be justified by current needs."  Id. at 2512.  In light of the unquestioned improvement in minority voter registration and turnout since the Act's passage in 1965, the Court warned that "[t]he Act's preclearance requirements and its coverage formula raise serious constitutional questions."  Id. at 2513.

Ten months after the Supreme Court's decision in Northwest Austin, Shelby County, Alabama filed a lawsuit challenging Section 5 on its face as beyond Congress's powers to enforce the Fourteenth and Fifteenth Amendments.  2011 WL 4375001, at *16-18.  This Court upheld the constitutionality of Section 5, see id. at *80, and that decision is currently on appeal to the D.C. Circuit.

### III.  Kinston, North Carolina

The plaintiffs in this case filed their complaint on April 7, 2010, a few weeks before Shelby County was filed.  See Compl. at 13.  As described in this Court's previous opinion in this case, see LaRoque I, 755 F. Supp. 2d at 156, the present action stems from an attempt by voters in the city of Kinston, North Carolina to alter the partisan nature of Kinston's local election system.  See Compl. ¶ 1.  Currently, a prospective candidate for political office in Kinston must either be the winner of a party primary or an unaffiliated candidate who obtains a sufficient number of signatures to have his or her name placed on the ballot.  See id.  In

November 2008, Kinston voters -- by an almost 2 to 1 margin -- passed a referendum that would have amended the Kinston city charter to allow for nonpartisan elections, under which any individual would be allowed to run for local political office and no candidate would be affiliated with any political party on the ballot.  See id. ¶¶ 1, 14-15.

Kinston is a political subdivision of Lenoir County, North Carolina, which is a covered jurisdiction, and hence Kinston, too, is subject to the provisions of Section 5.  See Compl. ¶ 16; 28 C.F.R. pt. 51, 30 Fed. Reg. 9897 (Aug. 7, 1965) (Section 5 coverage determination for Lenoir County, North Carolina); 28 C.F.R. § 51.6 (noting that "all political subunits within a covered jurisdiction . . . are subject to the requirement of section 5").  Rather than seek bailout under Section 4(a) of the Voting Rights Act, or a declaratory judgment from a three-judge panel of this Court authorizing its proposed electoral change, Kinston submitted the proposed change to the Attorney General for preclearance.  See Compl. ¶ 16.  On August 17, 2009, the Attorney General issued a letter objecting to Kinston's proposed system of nonpartisan elections, on the ground that the "elimination of party affiliation on the ballot will likely reduce the ability of blacks to elect candidates of choice."  Def.'s Mem. in Opp. to Plfs.' Mot. for Summ. J. ("Def.'s Opp.") [Docket Entry 55], Statement of Facts, Ex. 2, at 2 (objection letter).  As the Attorney General explained, minority-preferred candidates in Kinston tend to be Democrats.  Id.  Statistical analysis showed that such minority-preferred candidates needed a small amount of white crossover voting to be elected, but that most white voters -- even Democrats -- would vote for a white Republican over a black Democrat.  Id.  Some white Democrats, however, "maintain[ed] strong party allegiance and w[ould] continue to vote along party lines, regardless of the race of the candidate," often by voting a straight Democratic ticket.  Id.  The Attorney General found

that switching to a nonpartisan election system would eliminate minority-preferred candidates' ability to "appeal to [Democratic] party loyalty" and to benefit from straight-ticket voting. Id. Hence, "[r]emoving the partisan cue in municipal elections will, in all likelihood, eliminate the single factor that allows black candidates to be elected to office." Id. The Attorney General therefore refused to preclear the referendum. Id. at 3. On November 16, 2009, the Kinston City Council voted not to seek administrative reconsideration of the Attorney General's objection or a de novo review by this Court of Kinston's proposed change to nonpartisan elections. See Def.'s Mem. in Supp. of Mot. to Dismiss [Docket 11], Ex. 1, Kinston City Council Meeting Minutes, at 19.

Plaintiffs then filed this suit against the Attorney General. Plaintiffs are four[2] Kinston residents who are registered voters there, as well as a private membership association, the Kinston Citizens for Non-Partisan Voting ("KCNV"), which is "dedicated to eliminating the use of partisan affiliation in Kinston municipal elections." Compl. ¶¶ 2-7. The citizen-plaintiffs all allege that they either campaigned or voted for the November 2008 referendum. See id. ¶¶ 2-6. Two of the five claimed that they intended to run for election to the Kinston City Council in November 2011; one of those later dropped out of the race. Id. ¶¶ 3-4; Plfs.' Notice of Filing at 1 [Docket Entry 57]. The remaining candidate, John Nix, alleges that as a registered Republican voter running for office in a predominantly Democratic jurisdiction he has "a direct interest" in running "on a ballot where he is unaffiliated with any party, against opponents similarly unaffiliated, and without the preliminary need to either run in a party primary or obtain sufficient signatures to obtain access to the ballot as a candidate." Compl. ¶ 3. All plaintiffs allege that the

_____

[2] The complaint lists five citizen plaintiffs, but plaintiff Lee Raynor died on February 20, 2011. Plfs.' Notice of Filing at 1 [Docket Entry 57].

Attorney General's "denial of Section 5 preclearance . . . completely nullified all of Plaintiffs' efforts in support of the referendum." Id. ¶ 29. Plaintiffs further allege that Congress exceeded its enforcement power in reauthorizing Section 5; that Congress exceeded its enforcement power in enacting the amendments to Section 5 in 2006; and that the 2006 amendments violate the equal protection component of the Due Process Clause of the Fifth Amendment. Id. ¶¶ 1, 33-34, 36-37. Although plaintiffs' complaint clearly raised as-applied claims, they insisted during the first motions hearing in this case that they were raising only facial challenges to the statute. See LaRoque I, 755 F. Supp. 2d at 162-63; see also LaRoque II, 650 F.3d at 783.

Six African-American Kinston residents, along with the North Carolina State Conference of Branches of the National Association for the Advancement of Colored People, joined the case in August 2010 as intervenors in support of the Attorney General. See Order Granting Tyson, et al.'s Mot. to Intervene [Docket Entry 24]. On December 16, 2010, this Court granted the government's Motion to Dismiss, and on December 20, 2010, the Court issued a memorandum order explaining that plaintiffs lacked standing to bring this challenge. [Docket Entries 41, 42.] The Court made separate findings as to the referendum proponents, prospective candidates, and voters. First, the Court found that the weight of caselaw holds that referendum proponents do not suffer a concrete injury that confers standing to sue when a later action allegedly nullifies the effect of their ballot initiative. LaRoque I, 759 F. Supp. 2d at 169-73. Second, the Court found that whether the two proposed candidates would actually run was too speculative to support standing. Id. at 173-75. It further found that the prospective candidates had no legally protected interest in a nonpartisan electoral system because they did not allege that partisan electoral systems were illegal. Id. at 175-80. Third, the Court found that the voters had alleged too

general an injury to their associational rights to support standing, and that they were not prevented from supporting the candidates of their choice. Id. at 180-82. Finally, the Court found that holding Section 5 unconstitutional would not revive the Kinston referendum, and that plaintiffs' claims were therefore not redressable. Id. at 182-83.

Plaintiffs appealed and the D.C. Circuit reversed. Treating plaintiffs' claims as purely facial, the D.C. Circuit addressed only whether Nix, the prospective candidate, had standing. 650 F.3d at 783. As relevant here, the D.C. Circuit examined the record and found that it was not unduly speculative that Nix would run for office. Id. at 788-89. The D.C. Circuit further found that the passage of the referendum had granted Nix a legally protected interest in a nonpartisan election system. Id. at 786. Finally, the court explained that if Section 5 were unconstitutional, the Attorney General's actions pursuit to it would be ultra vires and void. Id. at 790-91. The Attorney General's objection to the referendum would therefore be void, and the referendum would go into effect as if the objection had never happened. Id. Hence, the D.C. Circuit concluded that Nix had standing to pursue the Count I claim that the reauthorization of Section 5 exceeded Congress's enforcement powers. Id. at 792.

The D.C. Circuit declined, however, to decide whether any plaintiff had standing to bring Count II. Id. at 793-96. The court explained that Count II raised complex standing questions that had not been fully briefed in either the district court or the court of appeals. Id. In particular, Count II challenged only the amendments to Section 5, and it was unclear whether a finding that the amendments were unconstitutional would revive the referendum. Id. at 794-95. The court of appeals further questioned whether, given that plaintiffs' equal protection challenge was only facial, plaintiffs had "met the requirement that litigants claiming injury from a racial

classification establish that they 'personally [have been] denied equal treatment by the challenged discriminatory conduct.'" Id. at 795 (quoting United States v. Hays, 515 U.S. 737, 743-44 (1995)).  The court stated that

> [w]ithout meaningful briefing on these issues, we are hesitant to decide plaintiffs' count-two standing. Of course, we could ask for additional briefing. But that would take time, and as plaintiffs' repeated requests for us to expedite this litigation so that it can be resolved before the November 2011 election indicate, time is of the essence. Given this, and given that plaintiffs themselves characterize count two as a fallback position, see Oral Arg. Tr. at 13:2-4, 15:11-15 (characterizing count two as an "alternative claim[]" that plaintiffs brought in case they lose on count one), we are reluctant to consume precious time resolving plaintiffs' standing to bring count two -- time the district court could instead devote to considering the merits of plaintiffs' principal argument, asserted in count one, that Congress's 2006 reauthorization of section 5 exceeded its Fourteenth and Fifteenth Amendment enforcement powers.

650 F.3d at 796.  Accordingly, the D.C. Circuit remanded to this Court to consider the merits of Count I and whether plaintiffs had standing to pursue Count II.  Id.

## DISCUSSION

## I.  OVERVIEW

Before addressing the merits of plaintiffs' claims, the Court must address one unusual and important issue that has arisen in this case.  When this Court originally granted defendant's Motion to Dismiss, the Court read plaintiffs' complaint as arguing that Congress had exceeded its enforcement powers in reauthorizing Section 5 (Count I), and that the 2006 amendments to Section 5 violated equal protection principles (Count II).  That is, the Court saw Count I as identical to the facial challenge raised in Shelby County and Northwest Austin, whereas Count II raised a facial challenge to the amendments under a novel equal protection theory.  The D.C. Circuit's decision indicates that the court of appeals understood plaintiffs' claims the same way. The D.C. Circuit summarized plaintiffs' claims as follows: "Count one of plaintiffs' complaint

contends that section 5, as reauthorized in 2006, exceeds Congress's Fourteenth and Fifteenth Amendment enforcement powers. Count two contends that amendments made to section 5 in 2006 erect a facially unconstitutional racial-preference scheme." LaRoque II, 650 F.3d at 780.[3] The D.C. Circuit's discussion of redressability further suggests that it read Count I as a challenge to all of Section 5 and Count II as a challenge to the amendments.  In evaluating whether plaintiffs had standing to bring Count II, the D.C. Circuit observed that it was unclear "what would happen to the Kinston referendum and the Attorney General's decision to refuse preclearance" if plaintiffs succeeded in having the amendments -- but not the general preclearance regime -- declared unconstitutional. Id. at 794.  By contrast, the D.C. Circuit apparently assumed that all of Section 5 would be struck down if plaintiffs succeeded on their Count I challenge.  Compare id. at 791 with id. at 794-95.

      After the remand, however, plaintiffs emphasized that their Count I claim actually had two subparts.  See Mot. Hr'g Tr. [Docket Entry 66] 5:7-20, Oct. 26, 2011.  The first part -- which, for the moment, the Court will refer to as Count I-A -- claims that the reauthorization of Section 5's preclearance regime exceeded Congress's enforcement authority under the Fourteenth and Fifteenth Amendments.  Compl. ¶¶ 33-34.  Count I-A is therefore similar to the claim raised in Northwest Austin and Shelby County.  But a second part, or Count I-B, claims that the enactment of the 2006 amendments exceeded Congress's enforcement authority even if the general preclearance regime is constitutional.  Compl. ¶ 34.  This claim was not raised in either

_____

      [3] See also id. at 783 ("Count one alleges that in reauthorizing Section 5, Congress exceeded its power to enforce the Fourteenth and Fifteenth amendments because the statute 'is not a rational, congruent, or proportional means to enforce [those Amendments'] nondiscrimination requirements.' Count two contends that as a result of the amendments Congress made to section 5 in 2006, the section 'violates the nondiscrimination requirements of the Fifth, Fourteenth, and Fifteenth Amendments.'" (quoting Compl. ¶¶ 34, 36)).

Northwest Austin or Shelby County, and was not identified by either this Court or the D.C. Circuit in the prior decisions in this case. Finally, Count II claims that the 2006 amendments to Section 5 violate the equal protection component of the Due Process Clause of the Fifth Amendment, the federal government's equivalent of the Equal Protection Clause. Compl. ¶¶ 36-37.

The Court has reviewed plaintiffs' complaint, summary judgment motion, and opposition to the government's summary judgment motion. [Docket Entries 1, 23, 59]. The Court concludes that plaintiffs have in fact raised their two-part claim in Count I throughout this litigation (although they have not always been particularly clear about the nature of the claim), despite the fact that this Court and the D.C. Circuit did not focus on Count I-B. The existence of Count I-B, however, leaves this Court in an odd position in two ways.

First, this Court, along with the three-judge court that decided Northwest Austin, has already spent hundreds of pages opining that the reauthorization of the amended Section 5 was within Congress's enforcement powers. Although neither the Northwest Austin opinion nor the Shelby County opinion focused on the amendments to Section 5, both of those opinions implicitly found that the amendments -- an integral part of Section 5 as enacted in 2006 -- represented a congruent and proportional, or rational, response to the problem of discrimination in voting. This Court will not revisit its conclusion in Shelby County that long-standing, state-sponsored, intentional discrimination in voting justified the reauthorization of Section 5's general preclearance procedure. Count I-A is therefore denied for the same reasons given in Shelby County. But the Court will not rely on its past implicit finding that the 2006 amendments represent a congruent and proportional response to the problem of voting discrimination. This

16

Court therefore must decide whether specific evidence in the record before Congress justified the enactment of the 2006 amendments.

The second odd effect of this revised understanding of plaintiffs' claims is that the Court must reconsider the issue of Count I standing. Count I-B raises distinct standing issues from Count I-A; indeed, for standing purposes, Count I-B is more like Count II than Count I-A. Although the D.C. Circuit's opinion directed this Court to address the merits of Count I, the D.C. Circuit apparently did not envision a Count I decision addressing the constitutionality of only the amendments. And finding only the amendments unconstitutional under Count I would raise quite different standing issues from finding all of Section 5 unconstitutional, as the D.C. Circuit pointed out in its discussion of Count II. See LaRoque II, 650 F.3d at 794-95. Hence, although the D.C. Circuit's mandate directs this Court to consider the merits of Count I, the opinion as a whole leads this Court to believe that it must first address whether plaintiffs have standing on the aspect of their Count I claim that challenges only the amendments.

This opinion will therefore proceed as follows. The Court will begin by discussing whether plaintiffs have standing to bring Count I-B, their claim that the enactment of the amendments to Section 5 in 2006 exceeded Congress's enforcement powers. The Court will also consider whether Count I-B is unripe or moot. The Court will then address the merits of Count I-B, determining whether the amendments are proper enforcement legislation under the three-part test laid out in City of Boerne v. Flores, 521 U.S. 507, 520 (1997). Finally, the Court will turn to Count II, plaintiffs' claim that the amendments violate the equal protection principles of the Fifth Amendment. The Court will first consider whether plaintiffs have standing to bring the claim, then whether the claim succeeds on the merits.

## II. COUNT I

### A.  <u>Standing</u>

Article III of the U.S. Constitution "limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies,'" <u>Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.</u>, 454 U.S. 464, 471 (1982), and the doctrine of standing serves to identify those "'Cases' and 'Controversies' that are of the justiciable sort referred to in Article III," <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992).  "As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." <u>Warth v. Seldin</u>, 422 U.S. 490, 498-99 (1975) (quoting <u>Baker v. Carr</u>, 369 U.S. 186, 204 (1962)); <u>see also</u> <u>Sierra Club v. Morton</u>, 405 U.S. 727, 731-32 (1972).

To establish the "irreducible constitutional minimum of standing," a plaintiff must allege (1) an "injury in fact," defined as "an invasion of a legally protected interest which is (a) concrete and particularized," and (b) "actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of"; and (3) a likelihood "that the injury will be redressed by a favorable decision." <u>Lujan</u>, 504 U.S. at 560-61 (internal quotation marks and citations omitted).   In order for an injury to be "concrete and particularized," it must "affect the plaintiff in a personal and individual way," so a plaintiff must do more than raise "a generally available grievance about government -- claiming only harm to his and every citizen's interest in proper application of the Constitution and laws." <u>Id.</u> at 561 n.1, 573.

The injury, causation, and redressability requirements will be discussed in turn. Following the lead of the court of appeals, this Court will primarily address whether candidate John Nix has standing to bring this claim.  LaRoque II, 650 F.3d at 792.

*1. Injury*

The D.C. Circuit found that Nix was injured by the operation of Section 5's general preclearance procedure -- and the resultant suspension of the nonpartisan-election referendum -- in two ways.  First, in a system of nonpartisan elections, Nix "could get his name on the general-election ballot more cheaply and easily."  LaRoque II, 650 F.3d at 783.  Under Kinston's current regime, he must either win a partisan primary or collect signatures from 4% of qualified voters to be placed on the ballot; under a nonpartisan regime, he would only need to file a candidacy notice and pay a filing fee.  Id. at 783-84.  Second, Nix's chances of winning the election would "substantially improve" if the referendum were precleared and nonpartisan elections went into effect, because "Democratic candidates would lose the benefit of party-line straight-ticket voting and other strategic advantages stemming from their overwhelming registered-voter advantage." Id. at 784 (internal quotation marks and citation omitted).  As the D.C. Circuit explained, Nix has a legally protected interest in such competitive advantages because the nonpartisan election regime would have been enacted in Kinston but for Section 5, "which he claims is unconstitutional and thus void."  Id. at 786.

The Court finds that Nix's injury is identical whether the challenge is to the amendments or to the preclearance procedure in general.  In either case, Nix alleges that the suspension of the referendum denied him competitive advantages to which he had a legally protected right.  The questions of causation and redressability are more complex in a challenge to only the

amendments, but the question of injury is not.

*2. Causation*

The causation question is more difficult. In plaintiffs' general challenge to Section 5, it was clear that the operation of the preclearance regime had caused the suspension of the referendum, and hence had caused Nix's injury. In the challenge to the amendments, however, defendant makes several arguments as to why the amendments did not cause the suspension of the referendum, and hence did not cause Nix's competitive injuries.

Defendant argues first that the Department of Justice did not rely at all on subsection (c) -- the subsection that provides that "[t]he term 'purpose' in subsections (a) and (b) of this section shall include any discriminatory purpose" -- in refusing to preclear the referendum. Def.'s Opp. at 24. The Attorney General's objection letter, which focuses entirely on retrogressive effect and never mentions discriminatory purpose, supports defendant's arguments. See Def.'s Opp., Statement of Facts, Ex. 2 (objection letter). There is no indication in the record that the Department of Justice has ever claimed that a racially discriminatory purpose motivated the referendum; indeed, the objection letter concedes that "the motivating factor for this change may be partisan." Id. Nor have plaintiffs offered any reason to believe that the Attorney General relied on subsection (c) in denying preclearance to the referendum. Accordingly, the Court agrees with the government that subsection (c) did not cause plaintiffs' injuries, and plaintiffs therefore do not have standing to challenge that provision.

Subsections (b) and (d), however, govern the "effects" prong of Section 5, and the Attorney General denied preclearance because of the referendum's retrogressive effects. See Def.'s Opp., Statement of Facts, Ex. 2 (objection letter). The government nonetheless contends

that subsections (b) and (d) did not cause plaintiffs' injuries because their application is limited to the districting context. Def.'s Opp. at 24-25. Based on the text of the statute, the Court disagrees. Subsection (b) provides that: "Any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting that has the purpose of or will have the effect of diminishing the ability of any citizens of the United States on account of race or color . . . to elect their preferred candidates of choice denies or abridges the right to vote within the meaning of subsection (a) of this section." 42 U.S.C. § 1973c(b). Subsection (d) explains that "[t]he purpose of subsection (b) of this section is to protect the ability of such citizens to elect their preferred candidates of choice." 42 U.S.C. § 1973c(d). Hence, by their terms, both subsections apply to "[a]ny voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting," and nothing in the text limits their application to districting.

The fact that subsections (b) and (d) were meant to overrule Ashcroft, a case about a districting plan, does not mean that their application is limited to districting. Indeed, although the specific considerations outlined in Ashcroft apply most naturally in the districting context, its broader holding -- that a totality of the circumstances test rather than a singular focus on minorities' ability to elect governs preclearance of voting changes -- could be and was applied to other types of voting procedure changes, including one quite similar to the referendum at issue here. In 2004, the Charleston County Legislative Delegation to the South Carolina General Assembly attempted to change the nonpartisan elections for the Board of Trustees of the Charleston County School District to partisan elections. See Letter from R. Alexander Acosta, Assistant Attorney General, to C. Havird Jones, Jr., Senior Assistant Attorney General (Feb. 26, 2004). The Attorney General denied preclearance, finding that the change would diminish

minorities' ability to elect their candidates of choice.  Id. at 2.  In doing so, he specifically noted

that he was applying a "totality of the circumstances" test under Ashcroft, and he considered,

among other things, whether minority-preferred elected officials supported the change.  Id. at 1-

2.  Hence, Ashcroft's broad holding did apply to changes like those at issue here, and the

amendments partially overruling it do as well.  Indeed, a comparison of the objection letter in

this case and the objection letter in the Charleston County School District case strongly suggests

that the Attorney General applied a different standard here than he did there.  Compare id. with

Def.'s Opp., Statement of Facts, Ex. 2 (objection letter).

This does not end the causation inquiry, however, because the question remains whether

the Attorney General would have come to the same ultimate conclusion under the

Ashcroft standard.  If so, the amendments did not cause plaintiffs' injury.  Neither party has made

any serious effort to answer or analyze that question.  Under the Supreme Court's decision in

Federal Election Commission v. Akins, 524 U.S. 11 (1998), however, the Court believes that

plaintiffs succeed on the causation prong.  In Akins, plaintiffs challenged the Federal Election

Commission's ("FEC") determination that the American Israel Public Affairs Committee

("AIPAC") did not have to follow certain registration and disclosure rules under the Federal

Election Campaign Act ("FECA") because AIPAC's "major purpose" was not nominating or

electing political candidates.  Id. at 14-18.  Plaintiffs sued the FEC, arguing that the "major

purpose" test misinterpreted FECA.  The Supreme Court agreed that plaintiffs' inability to obtain

information that would otherwise have been disclosed was a concrete, particularized injury.  Id.

at 20-21.  The FEC argued, however, that plaintiffs did not have standing because FEC's alleged

misinterpretation of FECA might not have caused their injury, given that the FEC could have --

and, under the evidence in the record, likely would have -- exercised its discretion to exempt

AIPAC from the FECA's requirements.  See id. at 25.  The Supreme Court nonetheless held that

plaintiffs had standing.  It explained:

> [W]e cannot know that the FEC would have exercised its prosecutorial discretion
> in this way. Agencies often have discretion about whether or not to take a
> particular action. Yet those adversely affected by a discretionary agency decision
> generally have standing to complain that the agency based its decision upon an
> improper legal ground.  If a reviewing court agrees that the agency misinterpreted
> the law, it will set aside the agency's action and remand the case -- even though
> the agency (like a new jury after a mistrial) might later, in the exercise of its
> lawful discretion, reach the same result for a different reason.  Thus respondents'
> "injury in fact" is "fairly traceable" to the FEC's decision not to issue its
> complaint, even though the FEC might reach the same result exercising its
> discretionary powers lawfully.

Id. at 25 (internal citations omitted).

Here, too, plaintiffs claim that the Attorney General employed the wrong legal standard -

- namely, the allegedly unconstitutional preclearance standard in subsections (b) and (d) rather

than the test laid out in Ashcroft.  The fact that the Attorney General could have reached the

same result under the correct standard, as the FEC could have "reach[ed] the same result

exercising its discretionary powers lawfully," does not negate causation under Akins.  This case

is not exactly like Akins – among other things, the Attorney General's "discretion" to make

preclearance decisions is not as broad as the FEC's authority was under FECA – but the Court

sees no reason that those differences dictate a different result here.  Accordingly, under Akins,

the Court holds that plaintiffs have established that subsections (b) and (d) caused their injury.

*3. Redressability*

Plaintiffs offer various arguments for why their injury -- the postponement of the

referendum -- will be redressed if this Court finds the 2006 amendments unconstitutional.  Their

primary argument is that subsections (b), (c), and (d) cannot be severed from subsection (a), which contains the core preclearance provision.  Consol. Reply Mem. in Supp. of Plfs.' Mot. for Summ. J. & in Opp. to Def.'s and Intervenors' Mot. for Summ. J. & Intervenors' Renewed Mot. to Dismiss ("Plfs.' Opp.") [Docket Entry 59] at 39-44.  Hence, according to plaintiffs' theory, finding that the amendments are unconstitutional would mean that all of Section 5 must be struck as unconstitutional.  Id.  And, as the D.C. Circuit explained, striking Section 5 as unconstitutional would revive the referendum.  This is so because if "Section 5 is unconstitutional, the Attorney General's actions pursuant to that unconstitutional statute would be void."  LaRoque II, 650 F.3d at 791.

Contrary to plaintiffs' argument, the Court agrees with the government that the amendments are severable from subsection (a)'s general preclearance provision.  When possible, courts sever unconstitutional portions of a statute rather than striking the whole statute.  Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 130 S. Ct. 3138, 3161 (2010).  Severance is possible when the remaining portion of the statue is "(1) constitutionally valid, (2) capable of functioning independently, and (3) 'consistent with Congress' basic objectives in enacting the statute.'"  Def.'s Opp. at 26 (quoting United States v. Booker, 543 U.S. 220, 258-259 (2005)).  "The presence of a severability clause, which expressly sets forth congressional intent that a statute stand in the event one of its provisions is struck down, makes it extremely difficult for a party to demonstrate inseverability."  Consumer Energy Council v. Fed. Energy Regulatory Comm'n, 673 F.2d 425, 441 (D.C. Cir. 1982).

All three conditions are met here.  Subsection (a) is constitutionally valid and capable of functioning without the 2006 amendments.  Other than one purely stylistic change, subsection

(a) is the version of Section 5 that was in effect before the 2006 amendments, and that version was upheld against numerous constitutional challenges. See Katzenbach, 383 U.S. at 337; City of Rome, 446 U.S. at 183; Lopez, 525 U.S. at 282-83; see generally Shelby County, 2011 WL 4375001.

The presence of a severability clause demonstrates that severing the amendments would be "consistent with Congress' basic objectives in enacting the statute." The Voting Rights Act's severability clause provides that

> [i]f any provision of [the Voting Rights Act] or the application thereof to any person or circumstances is held invalid, the remainder of [the Voting Rights Act] and the application of the provision to other persons not similarly situated or to other circumstances shall not be affected thereby.

42 U.S.C. § 1973p. Accordingly, it was Congress's considered judgment that Section 5 without the Bossier II and Ashcroft "fixes" was better than no Section 5 at all. Plaintiffs argue that the severability clause has been part of the Voting Rights Act since 1965, and thus cannot speak to the 2006 Congress's intent. But this Court must presume that Congress was aware of the clause when it reauthorized and amended Section 5, and that it affirmatively intended the severability clause to apply to the amendments. See Koog v. United States, 79 F.3d 452, 463 n.12 (5th Cir. 1996); see also Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 686 n.8 (1987) (noting that severability clause applies to later provisions that amend a law). Moreover, nothing in the legislative history suggests a reason to question this presumption. Certainly, several members of Congress made clear that they thought the Bossier II and Ashcroft fixes were important, but there was no serious discussion of whether failing to reauthorize Section 5 at all was preferable to reauthorizing Section 5 as construed by those cases. See Leavitt v. Jane L., 518 U.S. 137, 143-144 (1996) (statements indicating that Congress preferred complete statute do not

undermine case for severability because "[t]his mode of analysis, if carried out in every case, would operate to defeat every claim of severability").

The Court therefore concludes that each of the amendments is severable from subsection (a), the general preclearance procedure. Hence, the Court rejects plaintiffs' primary redressability argument. The question then is whether there is any other reason that finding subsections (b) and (d) unconstitutional would redress plaintiffs' injury. The Court finds that there is such a reason.

First, the D.C. Circuit's opinion makes clear that the Attorney General's objection would be nullified if the amendments were struck down as unconstitutional. The D.C. Circuit explained that if all of Section 5 is unconstitutional, the Attorney General's actions pursuant to it would be void. LaRoque II, 650 F.3d at 791. Similarly, if the amendments are unconstitutional, the Attorney General's actions pursuant to them would be void. Although subsection (a) contains the actual preclearance procedure, the Attorney General's actions were indeed made "pursuant to" subsections (b) and (d) in addition to subsection (a), because subsections (b) and (d) now define the key terms in subsection (a).

The question then is what would happen to the Kinston referendum if the Attorney General's original objection were nullified, but Section 5's general preclearance procedure remained in place. Because the D.C. Circuit considered only the situation where Section 5 was struck down in its entirety, it did not provide guidance on this issue. Moreover, because this is a novel situation, neither party has identified any case on point. As a matter of logic, however, it would seem that the referendum would have to be precleared under the pre-2006 version of Section 5 before it could go into effect. Cf. Ashcroft, 539 U.S. at 490 (remanding to district

court to reconsider whether districting plan could be precleared in light of standard laid out by Supreme Court). Any other course of action would lead to the anomalous result that the Kinston referendum -- unlike every other election law -- could go into effect without ever being precleared. Moreover, contrary to the government's view, the Court does not believe that Kinston would be able to make a discretionary decision not to seek such reconsideration of the referendum. See United States' Resp. to Plfs.' Br. Regarding Suggestion of Mootness at 3-4 [Docket Entry 69]. Preclearance of the Kinston referendum under the pre-2006 version of Section 5 would not be "reconsideration" as that term is usually used in this context. Rather, it would be a routine action to seek preclearance of an election change that had not yet been through the (proper) process.

Assuming that the referendum would have to be precleared under the pre-2006 standard, the final question is whether it would, in fact, be precleared under that standard. If it is clear that the referendum would not be precleared under any standard, plaintiffs' claims are not redressable and they have no standing to challenge the 2006 amendments. As with the causation prong, neither party has analyzed this issue in any detail. But, again as with the causation prong, the Court finds this question governed by Akins. After explaining that causation was not defeated simply because an agency that "based its decision upon an improper legal ground" could reach the same decision on a proper legal ground, the Supreme Court disposed of the "redressability" prong in a single sentence: "For similar reasons, the courts in this case can redress respondents' injury in fact." 524 U.S. at 25 (internal quotation marks omitted). Here, as in Akins, the injury is redressable because the Attorney General will have to reconsider preclearance of the referendum under the Ashcroft standard if plaintiffs succeed, even though the Attorney General "might later,

in the exercise of [his] lawful discretion, reach the same result for a different reason." Id.; see also Townes v. Jarvis, 577 F.3d 543, 546-48 (4th Cir. 2009) (relying on Akins to find that habeas petitioner could challenge Parole Board's decision that allegedly violated Due Process and Equal Protection Clauses, even though Board might deny parole even applying proper standard).

The Court therefore finds that Nix has standing to challenge subsections (b) and (d), but not subsection (c).[4] For the same reasons given in its first opinion in this case, see LaRoque I, 755 F. Supp. 2d at 168-73, 180-82, the Court concludes that referendum proponents do not have standing; that the voters' allegation that their associational rights are burdened is too generalized to support standing; and that the voters are not precluded from supporting their candidates of choice. KCNV, however, does have standing to challenge subsections (b) and (d), because it has established that one of its "members would otherwise have standing to sue in [his] own right" and "the interests at stake are germane to the organization's purpose." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181 (2000).

### 4. Effect in this case

Finding that the plaintiffs do not have standing as to subsection (c), of course, means that

---

[4] Plaintiffs might also have standing to challenge the amendments as part of their challenge to the general preclearance regime (Count I-A), for which they have standing. LaRoque II, 650 F.3d at 792. That is, plaintiffs could argue that the enactment of the general preclearance regime exceeds Congress's enforcement power, and that the amendments are simply an aspect of Congress's overreach in reauthorizing Section 5. This formulation of their argument is academic as to subsections (b) and (d), but could change the outcome in subsection (c). As the Court reads plaintiffs' papers, however, their argument is that even if the general preclearance mechanism is constitutional, the substantive standard laid out in subsections (b) through (d) is unconstitutional. See generally Plfs.' Opp. (devoting separate sections to Count I-A, Count I-B, and Count II); Plfs.' Notice of Filing, Ex. 1, at 2 [Docket Entry 36] (letter to Court describing claims). Because plaintiffs are challenging the constitutionality of the amendments separately from the entire preclearance standard, they must establish standing for that challenge. See U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).

this Court does not have jurisdiction to find that amendment constitutional or unconstitutional on the merits. See Lujan, 504 U.S. at 559-60. However, as the D.C. Circuit explained, time is of the essence in this case, and plaintiffs have already been through one appeal and remand. LaRoque II, 650 F.3d at 795. Solely in order to obviate any possible need for another remand, and in the unusual circumstances of this case, this Court will explain how it would rule on the merits of subsection (c) if plaintiffs could establish standing on that claim. Should the D.C. Circuit disagree with this Court's conclusion on standing, it will then be able to address the merits immediately.

**B. Ripeness**

The Court declines the government's invitation to find that plaintiffs' challenge is not ripe for review. This case is not like Texas v. United States, 523 U.S. 296 (1998), upon which the government relies. There, the state of Texas made certain changes to its educational system that had the potential to affect voting. Id. at 298-99. The Department of Justice found that the specific changes at issue did not affect voting and did not require preclearance, but that "under certain foreseeable circumstances their implementation may" require preclearance. Id. at 299. Texas sought a declaratory judgment that Section 5 did not apply. Id. The Supreme Court found that Texas's claim was not ripe because a long sequence of events had to occur before the preclearance issue could arise, and it might never arise. Id. at 300. Moreover, Texas had asked the Court to hold that it was impossible for the educational changes to affect voting, and the Court explained that "[w]e do not have sufficient confidence in our powers of imagination to affirm such a negative." Id. at 301. Moreover, because Texas was currently implementing the educational changes without any impediment, the Court found that Texas would suffer no

hardship by deferring review until it was clear that review would be necessary.  Id. at 301-02.

Here, in contrast, the Attorney General has already objected to the referendum and thereby harmed Nix's interests.  This is not a case about events that might never happen.  Moreover, although the parties admittedly disagree about how the statute will be applied, the Court finds that there is sufficient information to construe the statute and make a judgment as to its facial validly.  That other parties could later bring as-applied claims does not mean this facial challenge is not ripe.

## C.  Mootness

Plaintiffs' complaint alleged that Nix planned to run for Kinston city council in November 2011.  That election occurred during the course of this litigation.  Nix lost, coming in fourth out of six candidates running for three seats.  Plfs.' Br. Regarding Suggestion of Mootness at 1 [Docket Entry 67].  Plaintiffs have, however, submitted a copy of Nix's campaign website, in which he promises to run again in the next election in November 2013.  Id., Ex. C.  Plaintiffs and the government agree that the case is therefore not moot.  Because election litigation frequently outlasts election cycles, Nix's injury is of the type that is "capable of repetition, yet evading review."  LaRouche v. Fowler, 152 F.3d 974, 978-79 (D.C. Cir. 1997); see also LaRoque II, 650 F.3d at 788.  Nix is likely -- indeed, nearly certain -- to suffer the same injury in his 2013 run for Kinston city council.  See LaRouche, 152 F.3d at 978-79.  Accordingly, the Court finds that this action is not moot.

## D.  Merits

1.  *Standard of Review*

The parties dispute whether the claim that Congress exceeded its enforcement power in

enacting the amended Section 5 should be reviewed under the rationality standard set forth in Katzenbach, 383 U.S. at 324, or under the more rigorous test laid out in City of Boerne v. Flores, 521 U.S. 507, 520 (1997). This Court considered the identical issue in Shelby County. See 2011 WL 4375001, at *21-34. For the reasons given there, the Court will review plaintiffs' claims under Boerne's "congruence and proportionality" test.

2.   *The Scope of the Constitutional Right At Issue*

In determining whether the 2006 amendments are within Congress's enforcement power, the first step under Boerne is "to identify with some precision the scope of the constitutional right at issue." See Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 365 (2001); see also Tennessee v. Lane, 541 U.S. 509, 522 (2004). Where a statute is designed to protect a fundamental right or to prevent discrimination based on a suspect classification, it is "easier for Congress to show a pattern of state constitutional violations," as required at the second step of the Boerne analysis. See Nev. Dep't of Human Res. v. Hibbs, 538 U.S. 721, 736 (2003). In other words, Congress is more likely to be able to identify unconstitutional state action justifying remedial, prophylactic enforcement legislation when it seeks to protect against discrimination based on a classification like gender, "which triggers heightened scrutiny," see Hibbs, 538 U.S. at 736, than when it seeks to protect against discrimination based on a trait such as disability, which "incurs only the minimum 'rational-basis' review," see Garrett, 531 U.S. at 366. This is because "the heightened level of constitutional scrutiny" that accompanies a suspect classification or a fundamental right means that "the historical problems" identified by Congress with respect to that class or right are more likely to amount to constitutional violations, and a history of constitutional violations is a necessary predicate for the enactment of remedial

31

enforcement legislation under the Reconstruction Amendments.  See Mark A. Posner, Time is Still On its Side: Why Congressional Reauthorization of Section 5 of the Voting Rights Act Represents a Congruent and Proportional Response to Our Nation's History of Discrimination in Voting, 10 N.Y.U. J. LEGIS. & PUB. POL'Y 51, 87 (2006).  Hence, "the Court gives Congress significant leeway to craft broad remedial prohibitions when fundamental rights or protected classes are at stake."  Nw. Austin I, 573 F. Supp. 2d at 270.

The amendments to Section 5 protect two fundamental rights.  First, they seek to protect the right to vote -- a "fundamental political right, because [it is] preservative of all rights," Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886).  Second, they protect against discrimination based on race, "the classification of which we have been the most suspect," see M.L.B. v. S.L.J., 519 U.S. 102, 135 (1996) (Thomas, J., dissenting).  Because Section 5 protects two of the most crucial constitutional rights, Congress's enforcement powers are at its peak when it legislates to ensure that voting is free from racial discrimination.  See Nathaniel Persily, The Promise and Pitfalls of the New Voting Rights Act, 117 YALE L.J. 174, 176 (2007) (hereinafter Persily, Promise and Pitfalls) (explaining that Congress "acted at the apex of its power to enforce the guarantees of the post-Civil War Amendments" when it enacted the Voting Rights Act).  Just as in Hibbs and Lane, then, it is "easier for Congress to show a pattern of state constitutional violations" justifying the need for Section 5 than when Congress seeks to enforce rights subject to lesser levels of constitutional review, since "racial classifications and restrictions on the right to vote - like gender discrimination (Hibbs) and access to the courts (Lane) - are 'presumptively invalid.'"  Nw. Austin I, 573 F. Supp. 2d at 270 (quoting Hibbs, 538 U.S. at 736).

  3.  *Evidence of Unconstitutional Discrimination in the Legislative Record and the Congruence and Proportionality of Section 5*

Given this definition of "the constitutional right at issue," <u>Garrett</u>, 531 U.S. at 365, the next question is whether Congress identified "a history and pattern" of unconstitutional, state-sponsored voting discrimination that justified the 2006 amendments to Section 5. <u>Id.</u> at 368. If the Court finds that Congress has identified such a pattern, it must then consider whether the challenged law is congruent and proportional to the identified violations. <u>Boerne</u>, 521 U.S. at 520, 530-32. In answering these second and third <u>Boerne</u> inquiries, the Court will consider subsection (c) and subsections (b) and (d) separately. Before doing so, however, one general argument plaintiffs press throughout their briefs must be addressed.

           1. <u>The expansion of the preclearance standard</u>

Plaintiffs vehemently argue that the amendments cannot be a congruent and proportional response to discrimination in voting, regardless of the evidence Congress amassed during the 2006 reauthorization, because "any 2006 expansion of the 1965 preclearance standard would be unconstitutional given the dramatic improvements in the covered jurisdictions." Plfs.' Opp. at 33. Under their argument, there is a bright-line rule that any expansion of Section 5 is now per se unconstitutional under <u>Boerne</u>.

The Court rejects this simplistic argument for several reasons. First, even if the amendments are an expansion of Section 5's preclearance standard, that does not ipso facto make them unconstitutional. Congress has previously expanded substantive provisions of the Voting Rights Act, even in the face of unquestionably improved voting conditions, without thereby rendering the VRA unconstitutional. In 1982, for instance, Congress significantly expanded the VRA by providing that acts related to voting that were discriminatory in effect, as well as those that were discriminatory in purpose, violated Section 2 of the Act. Presumably employing

<u>Katzenbach</u>'s rationality review, the Supreme Court summarily affirmed that the post-1982 Section 2 was constitutional.  <u>Miss. Republican Exec. Comm. v. Brooks</u>, 469 U.S. 1002, 1003 (1984).

Plaintiffs' bright-line argument does not make sense even as a theoretical matter. Congress has amassed substantial evidence of discrimination in voting; it therefore has a range of options for remedial legislation that would be congruent and proportional to the problem.  In evaluating the 2006 reauthorization, the question before this Court is whether the legislative response Congress chose is within that range, not where it falls in the range relative to past legislation.  <u>See</u> <u>Boerne</u>, 521 U.S. at 530-32.  So long as current needs justify the current legislation, <u>see</u> <u>Nw. Austin II</u>, 129 S. Ct. at 2512, it does not matter whether Congress is legislating more or less assertively than it has in the past.  This is particularly true because Section 5 now responds primarily to "second generation" voting problems, rather than to the "first generation" problem of outright denials of the vote.  House Hearing, 109th Cong. 1134 (Oct. 18, 2005) (Chandler Davidson and Bernard Grofman, eds., <u>Quiet Revolution in the South: The Impact of the Voting Rights Act 1965-1990</u> 14 (Princeton University Press 1994)). Congress could reasonably decide that a different preclearance standard is necessary to respond to a different set of problems, and that decision would be acceptable so long as the remedy is congruent and proportional to the problem.  <u>Boerne</u>, 521 U.S. at 530-32.

Theoretical arguments aside, it is not at all clear that the 2006 amendments actually represent an expansion to Section 5's preclearance standard.  As this Court explained in the <u>Shelby County</u> decision, "[i]n <u>Bossier II</u> . . . the Supreme Court -- for the first time -- held that the 'purpose' prong of Section 5 only prohibits electoral changes that are enacted with a

discriminatory <u>and</u> retrogressive purpose."  2011 WL 4375001, at *10.  Congress added

subsection (c) to Section 5 in order to "restore[] the pre-<u>Bossier II</u> 'purpose' standard."  <u>Id.</u> at

*11.  Similarly, "the Supreme Court's decision in <u>Georgia v. Ashcroft</u>, 539 U.S. 461 (2003) . . .

had altered the preexisting standard for determining whether a voting change had a prohibited

retrogressive effect under Section 5's 'effects' prong."  <u>Id.</u>  Congress therefore added subsections

(b) and (d) "in an attempt to restore the simpler, 'ability to elect' analysis articulated in" prior

caselaw.  <u>Id.</u>  This Court's understanding of the amendments as restorative was echoed by many

witnesses during the 2005 and 2006 hearings.  <u>See, e.g.</u>, Senate Hearing, 109th Cong. 182 (May

9, 2006) (responses of Theodore M. Shaw to questions of Sens. Specter, Cornyn, Leahy,

Kennedy, and Schumer); Senate Hearing, 109th Cong. 149 (May 9, 2006) (responses of Laughlin

McDonald to questions of Sens. Specter, Kennedy, Schumer and Cornyn); <u>see also</u> House

Hearing, 109th Cong. 59 (Nov. 1, 2005) (statement of Rep. John Conyers).  While there was a

less universal consensus that the <u>Ashcroft</u> "fix" was a simple return to the status quo ante than

there was for the <u>Bossier II</u> "fix," <u>see</u> <u>infra</u> at 63-64, there was also no consensus that the

<u>Ashcroft</u> "fix" represented an expansion -- rather than a simple change -- to the preclearance

standard.  <u>Id.</u>

    In response to this record evidence, plaintiffs argue that "'[a] judicial construction of a

statute is an authoritative statement of what the statute meant before as well as after the decision

of the case giving rise to that construction.'" Plfs.' Opp. at 33 (quoting <u>Rivers v. Roadway</u>

<u>Express, Inc.</u>, 511 U.S. 298, 312-13 (1994)).  Plaintiffs contend that the Supreme Court's

decisions in <u>Bossier II</u> and <u>Ashcroft</u> necessarily establish what section 5 always meant, and that

it is therefore impossible to read the 2006 amendments as anything other than an expansion to

Section 5's preclearance standard.

The general rule is, of course, that "statutes operate only prospectively, while judicial decisions operate retrospectively."  United States v. Sec. Indus. Bank, 459 U.S. 70, 79 (1982). Hence, a judicial decision establishes what a statute meant as well as what it means.  But in this context, the Court does not believe that this general rule determines the constitutionality of the 2006 amendments to Section 5.  Rivers explained that Congress could legislatively overrule a decision of the Supreme Court if Congress believed the decision to be in error.  511 U.S. at 313. Further, the Supreme Court explained, Congress "may even, within broad constitutional bounds, make such a change retroactive and thereby undo what it perceives to be the undesirable past consequences of a misinterpretation of its work product."  Id.  That is, Congress has the power to legislatively overrule the Supreme Court's determination of what the statute meant as well as the Court's determination of what the statute means.

Here, Congress made quite clear that it disagreed with the Supreme Court's determination of what Section 5 meant, although it chose not to throw state and local election systems into chaos by making the amendments apply retroactively.  In the findings accompanying the reauthorized Section 5, Congress found that "[t]he effectiveness of the Voting Rights Act of 1965 has been significantly weakened by the United States Supreme Court in Reno v. Bossier Parish II and Georgia v. Ashcroft, which have misconstrued Congress' original intent in enacting the Voting Rights Act of 1965 and narrowed the protections accorded by section 5 of such act." Pub. L. 109-246, § 2(b)(6), 120 Stat. at 578; see also H.R. Rep. No. 109-478, at 2. The amendments in subsections (b) through (d) were enacted "to (1) restore the original purpose to Section 5 with respect to intentionally discriminatory voting changes; and (2) clarify the types of

conduct that Section 5 was intended to prevent." H.R. Rep. No. 109-478, at 65. The authoritative determination of whether those amendments are constitutional is, of course, reserved to the courts. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803). But as a matter of statutory construction, Congress made clear that the amendments represented a restoration of the proper Section 5 standard, not an expansion.

Moreover, this Court would be hesitant to invalidate the amendments in the context of the Boerne analysis solely on the basis of the rule cited in Rivers. Under Boerne, the Court not only reviews the law Congress has enacted and whether Congress had rational reasons for doing so, but also undertakes an in-depth analysis of how Congress arrived at its legislative conclusions. Boerne, 521 U.S. at 530-32; see also Lane, 541 U.S. at 558-59 (2004) (Scalia, J., dissenting) ("Under [Boerne], the courts . . . must regularly check Congress's homework to make sure that it has identified sufficient constitutional violations to make its remedy congruent and proportional."). Such oversight of a co-equal branch is a delicate task. See id. at 558. Given that virtually everyone who testified before Congress described Bossier II and Ashcroft as a change from prior law -- at least as that law had been applied by courts and the Department of Justice -- this Court is reluctant to play "gotcha" with Congress and invalidate the amendments on the ground that they could technically represent an expansion of the statute.

2. Subsection (c)

As previously explained, the second step of the Boerne analysis is to determine whether Congress identified "a history and pattern" of unconstitutional, state-sponsored voting discrimination that justified the 2006 amendments to Section 5. See Garrett, 531 U.S. at 368. The bulk of the opinion in Shelby County -- some seventy pages -- was devoted to reviewing what direct and circumstantial evidence of purposeful discrimination Congress had amassed.

37

2011 WL 4375001, at *36-64. The Court will incorporate that discussion by reference rather than repeating it here.

The specific issue raised by plaintiffs' challenge to subsection (c) is whether, given those findings, the amendment is a congruent and proportional response to the pattern of identified unconstitutional behavior. To answer that question, the Court will focus on the evidence Congress amassed regarding why the amendment was necessary, i.e., why the Bossier II standard could not respond to the problem of state-sponsored voting discrimination. Hence, keeping in mind the findings of purposeful discrimination discussed in Shelby County, the Court will turn to Congressional record evidence specific to the Bossier II amendment in subsection (c).

Congress heard the testimony of numerous witnesses on the need to overrule Bossier II. As Debo Adegbile of the NAACP Legal Defense Fund explained, "in a very complex area of law[,] the problem with Bossier Parish II is very understandable to everybody, whether they be a lawyer or not, a representative or not. The problem is that the Voting Rights Act was clearly intended to stop discrimination in voting. It was most certainly intended to stop intentional discrimination in voting, and it was a long history of intentional discrimination that gave rise to the Voting Rights Act." House Hearing, 109th Cong. 38 (May 4, 2006) (statement of Debo P. Adegbile). Yet, under Bossier II, voting changes that purposefully discriminated on the basis of race had to be precleared. See Bossier II, 528 U.S. at 341 (holding that Section 5 "does not prohibit preclearance of a redistricting plan with a discriminatory but nonretrogressive purpose"). Drew Days, a law professor and voting rights practitioner, testified that the Bossier II standard "permit[ted] absurd results" and was "basically at war with the spirit of Section 5 in that it places a burden on those that the Act was designed to protect." Senate Hearing, 109th Cong. 57 (May 17, 2006) (responses of Drew S. Days III to questions of Sens. Cornyn, Coburn,

Kennedy, Leahy, and Schumer).

Several witnesses explained that forcing minority voters to go to the time and expense of Section 2 litigation in cases where there appeared to be <u>intentional</u> discrimination was highly impractical for two reasons. First, neither the "small and underfinanced" voting rights bar nor the minority communities were in a position to bear the expense of frequent litigation under Section 2. Senate Hearing, 109th Cong. 95 (May 16, 2006) (responses of Pamela S. Karlan to questions of Sens. Leahy, Kennedy, Kohl, Cornyn, and Coburn). Second, in the time it took to litigate a section 2 case, candidates who benefitted from the intentionally discriminatory voting procedures would already be incumbents and would have all the crucial advantages of incumbency in later elections. <u>See, e.g.</u>, House Hearing, 109th Cong. 97 (Mar. 8, 2006) (statement of Joe Rogers); House Hearing, 109th Cong. 60 (Nov. 9, 2005) (statement of Rep. Tyrone L. Brooks of Georgia General Assembly). Hence, moving a large number of voting rights issues from Section 5 to Section 2 ran counter to the goal of "shift[ing] the advantage of time and inertia from the perpetrators of the evil to its victims." <u>Katzenbach</u>, 383 U.S. at 328.

Congress also heard evidence that <u>Bossier II</u>, left uncorrected, would indeed force preclearance of a large number of questionable practices that could only be remedied by time-consuming, burdensome Section 2 litigation. Richard Valelly, a co-author of Peyton McCrary, Christopher Seaman & Richard Valelly, <u>The End of Preclearance As We Knew It: How the Supreme Court Transformed Section 5 of the Voting Rights Act</u>, 11 MICH. J. RACE & L. 275 (2006) (hereinafter "<u>End of Preclearance</u>"), testified before the House about the study. House Hearing, 109th Cong. 877-922 (Oct. 18, 2005) (statement of Richard M. Valelly). According to the <u>End of Preclearance</u> study, 43% of all Section 5 objections in the 1990s were based solely on discriminatory intent, while another 31% of objections were based at least in part on

discriminatory intent.  See End of Preclearance 297 tbl. 2.  Hence, "the intent prong was

involved in a remarkable 74 percent of all objections in that decade."  Id. at 298.  Purpose-based

objections were particularly prevalent in the redistricting context, where nearly 90% of the

Justice Department's objections to post-1990 redistricting plans were based at least in part on

discriminatory intent.  Id. at 298 tbl. 3; see also House Hearing, 109th Cong. 13-16 (Nov. 1,

2005) (Posner prepared statement).

     According to the End of Preclearance study, these numbers changed remarkably after the

Supreme Court decided Bossier II.  From the time of the Supreme Court's decision in January

2000 until the end of June 2004, the Department of Justice issued 43 total objections to voting

changes, compared to 250 objections in the equivalent period during the 1990s.  End of

Preclearance 313-14 & n.198.  Strikingly, only two of those objections were based solely on

intent; 13 were based on both intent and purpose.  Id.  Hence, from 1990-2000, 43% of

objections were based solely on purpose and 74% were based in part on purpose.  In the four and

a half years after Bossier II, however, 4.7% of objections were based solely on purpose and

30.2% were based in part on purpose.  As one of the study authors summarized, the effect of

Bossier II was "sort of like dropping off a cliff."  House Hearing, 109th Cong. 879 (Oct. 18,

2005) (Valelly statement).

     There are, of course, at least two readings of this information.  One reading is that the

Department of Justice had successfully blocked many voting changes that were intended to

discriminate against minorities in the 1990s, but that Bossier II prevented it from doing so in the

2000s, thus allowing those changes to go into practice.  Alternatively, some of the Supreme

Court's opinions have made clear that some members of the Court believe that the Department of

Justice inappropriately relied on the purpose prong to force redistricting jurisdictions to draw the maximum possible number of majority-minority districts. See Miller v. Johnson, 515 U.S. 900, 924-25 (1995); see also Shaw v. Hunt, 517 U.S. 899, 911-13 (1996) ("Shaw II"). Hence, another reading of the End of Preclearance data is that the Department of Justice was indeed relying too heavily on the purpose prong and Bossier II had the salutary effect of forcing it to cease doing so.

Congress heard considerable testimony on this question. One witness explained that he would address it because "if the Department badly handled this authority in the past, one could ask whether it is appropriate to again give the Department that authority in the future." House Hearing, 109th Cong. 882 (Oct. 18, 2005) (Posner statement). After analysis of objections interposed by the Department in the 1990s, he concluded that the Department of Justice had generally followed the standard laid out in Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252 (1977), in interposing objections based on discriminatory purpose. Id. at 883; see also House Hearing, 109 Cong. 17-18 (Nov. 1, 2005) (Posner prepared statement). Another witness agreed that the Justice Department had properly used the "objective and workable standard" of Arlington Heights in deciding whether to preclear voting changes under the purpose prong. Senate Hearing, 109 Cong. 174-75, 182 (May 9, 2006) (Shaw responses). This Court agrees with those assessments. Although reasonable people could differ on the correctness of some of the objections interposed by the Department in the 1980s and 1990s, the Court finds that Congress amassed sufficient evidence in 2005 and 2006 to support the conclusion that the Justice Department had largely used the purpose prong correctly before Bossier II, and that Bossier II had forced preclearance of many intentionally discriminatory

voting procedures that could only be remedied by time-consuming, expensive Section 2 litigation.  See H.R. Rep. No. 109-478, at 66-68.

Congress also heard testimony about discriminatory voting changes that would have been precleared had the Department of Justice followed the Bossier II standards since the inception of Section 5.  The End of Preclearance authors pointed out that under the Bossier II standard, Section 5 would have been virtually useless when it was "'needed most,'" because in some places "'historical discrimination had left the number of black voters at close to zero.'"  House Hearing, 109th Cong. 149 (Nov. 1, 2005) (draft of End of Preclearance) (quoting Bossier II, 528 U.S. at 374 (Breyer, J., dissenting)); see also Senate Hearing, 109th Cong. 94 (May 16, 2006) (Karlan responses) (elaborating on the point).  As one witness explained, "[t]he Bossier II rule actually rewards the most intransigent perpetrators of discrimination, who after decades of exclusion of minority voters and candidates, may now be able to keep the political process closed on the ground that they have not abandoned their discriminatory ways.  In these circumstances, under the reasoning of Bossier II, would-be violators are not diminishing political power or access but merely maintaining an exclusionary status quo.  This scenario may aptly be characterized as perversely paying dividends for past discrimination."  House Hearing, 109th Cong. 43 (May 4, 2006) (Adegbile prepared statement).

The record also contained evidence of specific discriminatory changes that would have gone into effect under the Bossier II standard.  For instance, several witnesses pointed out that Bossier II would have required preclearance of the infamous proposed 1981 congressional redistricting in Georgia.  As described in Shelby County, 2011 WL 4375001, at *51, Georgia began its congressional redistricting process after the 1980 census showed that the state's ten

existing districts -- all of which were majority-white with the exception of the Fifth District --

had become severely malapportioned.  Under the leadership of Joe Mack Wilson, Chair of the

House Reapportionment Committee, Georgia created a redistricting plan that maintained its nine

majority-white districts, and split the large, contiguous black population of the Atlanta

metropolitan area between the Fourth and Fifth Districts, thereby ensuring that blacks would still

comprise a majority of the Fifth District, but would only constitute 46% of the registered voters

there.  See Busbee v. Smith, 549 F. Supp. 494, 498-99 (D.D.C. 1982).  Because Georgia's plan

increased the percentage of blacks in the Fifth District, however, it was not retrogressive, and

therefore "technically . . . [did] not have a discriminatory effect, as that term has been construed

under the Voting Rights Act."  Id. at 516.

A three-judge court in this district nonetheless denied preclearance to the plan based on

its conclusion that the plan had been "the product of purposeful racial discrimination."  See id. at

516-18.  In reaching this determination, the court made an express finding that "Representative

Joe Mack Wilson is a racist."  Id. at 500.  The court cited Wilson's now-infamous statement that

he did not want to draw "nigger districts," id. at 501, as well as testimony from other Georgia

legislators, who conceded that they, too, had intentionally sought to "keep the Fifth District 'as

white as possible . . . but just within the limits . . . to satisfy the Voting Rights Act . . . .'"  Id. at

515 (internal citation omitted).  As one state legislator explained, "'the motivation of the House

leadership' in creating the Fifth District . . . was to 'increase [the percentage of the black

population] just enough to say they had increased it [and] so that it would look like they had

increased it, but they knew they had not increased it enough to elect a black."  Id. (internal

citation omitted).  Another state senator admitted that he had felt obliged to vote for the plan

because he "'[didn't] want to have to go home and explain why I . . . was the leader in getting a black elected to the United States Congress.'"  Id. at 514 (internal citation omitted).  These "[o]vert racial statements," together with Georgia's history of racial discrimination in voting, and the absence of any legitimate non-racial reasons for the redistricting plan, convinced the three-judge court that the plan had been enacted with a discriminatory purpose, and hence had "'no legitimacy at all under our Constitution or under [Section 5].'"  Id. at 517 (quoting City of Richmond v. United States, 422 U.S. 358, 378-79 (1975)).  Representative John Lewis was ultimately elected from the effective majority-minority district preserved by the litigation.  See House Hearing, 109th Cong. 20 (Nov. 1, 2005) (statement of Brenda Wright).  Under Bossier II, however, this discriminatory plan could only have been contested through Section 2 litigation.

Similarly, without the proposed amendment, the Justice Department would have had to preclear Bladen County, North Carolina's 1987 attempt to change its method of election for its board of county commissioners from at-large elections to three double-member and one at-large district.  Although the Justice Department found that the change would not have a retrogressive effect, it nonetheless denied preclearance to the change based on its inability to conclude "that the proposed election system is free from discriminatory purpose."  2 House Hearing, Scope, 109th Cong. 1761 (Oct. 25, 2005) (appendix to statement of Bradley J. Schlozman, Copies of Objection Letters, by State, from 1980 to October 17, 2006) (hereinafter, "Schlozman Appendix").  According to the Justice Department, the evidence presented by the county demonstrated that "the responsible public officials [had] desired to adopt a plan which would maintain white political control to the maximum extent possible and thereby minimize the opportunity for effective political participation by black citizens."  Id. at 1762.  Indeed, the

Justice Department explained, "it appears that the board undertook extraordinary measures to adopt an election plan which minimizes minority voting strength." Id.

Finally, Congress heard direct evidence that some jurisdictions were looking to capitalize on Bossier II and other cases to the disadvantage of minority voters. The testimony of Kent Willis, the director of the American Civil Liberties Union in Virginia, provided a particularly striking confirmation of this point. See House Hearing, 109th Cong. 894 (Oct. 18, 2005) (statement of Kent Willis). Willis explained that he had attended a 2002 redistricting meeting in Fredricksburg, Virginia, where he lived. Id. The city had "long had one African-American majority district in its system," and African-Americans had historically been elected from that district. Id. Willis testified that the discussion at the 2002 meeting "was entirely about how do we eliminate this district. And the instruction[] to the city attorney was, look at the recent Supreme Court case, you know, look at the cases that are taking place in the mid-'90s and early 2000, and tell us if there is a way we can eliminate the African-American majority district." Id.

To summarize, Congress collected extensive evidence of purposefully discriminatory voting changes that could or clearly would go into effect in the absence of the amendment in subsection (c). It also heard testimony that leaving Bossier II intact would shift a great deal of voting rights litigation from Section 5 to Section 2, and that such a shift would be a practical disaster for minority voting rights. To correct these several problems, Congress amended section 5 to specify that "[t]he term 'purpose' in subsections (a) and (b) of this section shall include any discriminatory purpose." 42 U.S.C. § 1973c(c).

In light of the record before Congress, as well as the Supreme Court's caselaw defining and clarifying Congress's Fourteenth and Fifteenth Amendment enforcement powers, the Court

concludes that Congress did not exceed its enforcement powers in enacting subsection (c). The Supreme Court's decision in United States v. Georgia, 546 U.S. 151 (2006) illustrates why. There, the plaintiff, a disabled inmate in a Georgia state jail, claimed that he was confined to a cell so small that he could not move his wheelchair and that he had to sit in his own bodily waste because prison officials refused to help him use the inaccessible toilets and showers. Id. at 156. He argued that this treatment violated the Americans with Disabilities Act, 42 U.S.C.A. § 12131 et seq. ("ADA"), and that Title II of the ADA abrogated Georgia's sovereign immunity. Id. The Eleventh Circuit concluded that the ADA's attempted abrogation of Georgia's sovereign immunity was invalid. Id. The Supreme Court reversed. Id. at 160. It first noted that if the plaintiff's allegations were true, his treatment likely constituted an independent Fourteenth Amendment violation (i.e., an Eighth Amendment violation incorporated against the states through the Fourteenth Amendment) as well as a violation of the ADA. Id. at 157. The Court then explained that, "[w]hile the Members of this Court have disagreed regarding the scope of Congress's 'prophylactic' enforcement powers under § 5 of the Fourteenth Amendment, no one doubts that § 5 grants Congress the power to 'enforce . . . the provisions' of the Amendment by creating private remedies against the States for actual violations of those provisions." Id. at 158 (internal citations omitted). Because the plaintiff claimed actual violations of the Fourteenth Amendment, Congress had broad remedial powers, including the usually disfavored power of abrogating a state's sovereign immunity. Id. at 158-59.

Here, subsection (c) forbids purposeful discrimination. By definition, purposeful discrimination by state actors on the basis of race violates the Constitution. U.S. CONST., amend. XIV; Washington v. Davis, 426 U.S. 229, 239-41 (1976). Hence, the amendment to Section 5 in

subsection (c) forbids only conduct that constitutes an <u>actual</u> Fourteenth Amendment violation, so Congress's enforcement powers are at their broadest.  <u>See</u> <u>Georgia</u>, 546 U.S. at 158-59. Subsection (c) differs in just one way from a straightforward ban on unconstitutional conduct: instead of putting the onus on the alleged victim to prove discrimination, the burden is shifted to the state actor to prove the absence of discrimination.  The Supreme Court has previously approved this burden-shifting procedure, <u>see</u> <u>Katzenbach</u>, 383 U.S. at 334-35, and such burden-shifting seems far less intrusive than the abrogation of sovereign immunity approved in <u>Georgia</u>. <u>See</u> 546 U.S. at 158-59.  Given the substantial evidence that Congress amassed for the necessity of an amendment to Section 5, and the narrowness of the amendment Congress chose, the Court finds that subsection (c) lies comfortably within Congress's enforcement powers.

In reality, the core of plaintiffs' challenge to subsection (c) is not about Congress's enforcement powers, but about the fear that the Department of Justice will use the purpose prong to extract its preferred results in the redistricting context.  Plfs.' Mem. in Supp. of Mot. for Summ. J. ("Plfs.' MSJ") at 28-30, 41-42; Plfs.' Opp. at 29-32.  The witnesses who testified against the <u>Bossier II</u> "fix" were motivated by the same concern.  <u>See</u> Senate Hearing, 109th Cong. 11 (July 13, 2006) (statement of Michael Carvin); <u>id.</u> at 14 (statement of Abigail Thernstrom); House Hearing, 109th Cong. 29-31 (Nov. 1, 2005) (statement of Roger Clegg). The government argues in response that the Supreme Court's opinions in <u>Miller</u> and <u>Shaw II</u> made clear that it may not so employ the purpose prong, and points to its regulations that underscore the point.  <u>See</u> <u>Miller</u>, 515 U.S. at 924-25; <u>Shaw II</u>, 517 U.S. at 911-13; <u>see also</u> 28 C.F.R. § 51.54 (providing that Justice Department must use factors set forth in <u>Village of Arlington Heights v. Metropolitan Housing Development Corp.</u>, 429 U.S. 252 (1977), in

determining whether a voting change was motivated by discriminatory purpose); 28 C.F.R. §
51.59(b) (providing that "[a] jurisdiction's failure to adopt the maximum possible number of
majority-minority districts may not be the sole basis for determining that a jurisdiction was
motivated by a discriminatory purpose").  Moreover, the government argues, neither plaintiffs
nor the Congressional witnesses identified any instance of the Department of Justice's improper
reliance on the purpose prong since Miller.  Def.'s Opp. at 36-37.  While it is true that the
Supreme Court implicitly criticized the Justice Department for such behavior in 2000 in Bossier
II, see 528 U.S. at 324, the objection that was the basis for that case was originally made in 1993,
two years before Miller.

    Whatever the merits of this concern, it is not the proper subject of a facial challenge to
subsection (c), and plaintiffs have made clear that they have disavowed their as-applied
challenge.  "In determining whether a law is facially invalid, we must be careful not to go
beyond the statute's facial requirements and speculate about hypothetical or imaginary cases."
Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449-50 (2008) (internal
quotation marks omitted); see also United States v. Raines, 362 U.S. 17, 22 (1960) ("The delicate
power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference
to hypothetical cases thus imagined.").  Moreover, "facial challenges threaten to short circuit the
democratic process by preventing laws embodying the will of the people from being
implemented in a manner consistent with the Constitution. We must keep in mind that a ruling of
unconstitutionality frustrates the intent of the elected representatives of the people."  Wash. State
Grange, 552 U.S. at 451 (internal citations and quotation marks omitted).  That is particularly so
where, as here, Congress has clearly undertaken its legislative task with great care.  See Shelby

<u>County</u>, 2011 WL 4375001, at *80.

If the Department of Justice employs subsection (c) to block unobjectionable voting procedures, the affected jurisdiction will be entitled to bring an as-applied challenge to the statute in a <u>de novo</u> proceeding in this district. <u>LaRoque II</u>, 650 F.3d at 783 (citing <u>City of Rome v. United States</u>, 450 F. Supp. 378, 380-82 & n.3 (D.D.C. 1978)). But given the lack of any current indication of such practices, this Court will not invalidate subsection (c) based on speculation.

### 3. <u>Subsections (b) and (d)</u>

The challenge to subsections (b) and (d) revolves around the standard to be applied in deciding whether to preclear districting and other changes that have the potential to dilute minority votes. It is therefore appropriate to repeat some of <u>Shelby County</u>'s findings about intentionally discriminatory vote dilution.

The Congressional record contained significant evidence of intentionally dilutive actions in the districting context. For instance, Congress heard testimony about an episode in which Mississippi state legislators opposed a redistricting plan that would have given African-Americans an increased opportunity to elect representatives of their choice, referring to the plan "on the House floor as the 'black plan' and privately as 'the n-plan.'" S. Rep. No. 109-295, at 14. Congress also heard that during one round of redistricting, Georgia's Chair of its House Reapportionment Committee told his colleagues in the Georgia legislature that he was uncertain as to the outcome of the state's redistricting process, "because the Justice Department is trying to make us draw nigger districts and I don't want to draw nigger districts." <u>See Busbee</u>, 549 F. Supp. at 501; <u>see also</u> H.R. Rep. No. 109-478, at 67; House Hearing, 109th Cong. 54 (Nov. 9,

2005) (prepared statement of Laughlin McDonald).

Congress was also provided information that, in 2002, the Justice Department objected to a redistricting plan proposed by the city of Albany, Georgia, based on the determination that Albany had not "carried its burden of showing that its proposed plan was not designed with the intent to limit and retrogress the increased black voting strength." See 1 House Hearing, Scope, 109th Cong. 846 (Oct. 25, 2005) (Schlozman Appendix). The Justice Department examined Albany's history of redistricting with respect to Ward 4, which, it found, revealed an "intent to maintain Ward 4 as a district that remains at the . . . level of 70 percent white, thus eliminating any ability of black voters to elect a candidate of choice in this district." Id. After the black population in Ward 4 doubled from 20% to 40% during the 1980s, Albany adopted a redistricting plan that reduced the Ward's population to 30% black. Then, after the black population in Ward 4 increased from 30% to almost 51% during the 1990s, the city sought preclearance for another redistricting plan that would have reduced the population in Ward 4 to 30% black. Id. at 846-47. The Justice Department objected to the proposed plan, noting that "implicit" in the plan was "an intent to limit black political strength in the city to no more than four districts." Id. at 847.

Another intent-based objection was lodged against the 2001 redistricting plan proposed by Milden, Louisiana, in which the city "explicitly decided to eliminate one of the three existing majority minority districts," even though "it was not compelled to redraw the district," and had been "presented with an alternative that met all of its legitimate criteria while maintaining the minority community's electoral ability." Id. at 1150-52. The Justice Department interposed yet another intent-based objection to a redistricting plan submitted by Sumter County, South

50

Carolina, that same year, after the county council "explicitly decided to . . . eliminate one of the four existing majority minority districts" despite the fact that the district's elimination had been "easily avoidable."  See 2 House Hearing, Scope, 109th Cong. 2082-84 (Oct. 25, 2005) (Schlozman Appendix).  In explaining the basis of its objection, the Justice Department noted that the county had not been forced to redraw the district and that it had rejected an alternative, non-retrogressive plan.  Id. at 2083-84.  Under the circumstances, the Justice Department was unable to conclude "that the action in question was not motivated by a discriminatory intent to retrogress."  Id. at 2084.

The record revealed many more similar instances.  See, e.g., 1 House Hearing, Scope, 109th Cong. 433 (Oct. 25, 2005) (Schlozman Appendix) (objecting to 1998 redistricting plan by Tallapoosa County, Alabama, because "the history of the instant redistricting process and its results raise serious concerns that the county . . . purposely impaired the ability of black voters to elect a candidate of choice"); id. at 412 (objecting to Greensboro, Alabama's 1993 redistricting plan on the ground that "the opportunity for black voters to elect a representative of their choice . . . appears to have been constrained deliberately"); id. at 1410 (objecting to Mississippi's 1991 statewide legislative redistricting plan where it appeared "that the proposed plan is calculated not to provide black voters in the Delta with the equal opportunity for representation required by the Voting Rights Act"); id. at 830 (objecting to 2000 redistricting plan for Webster County, Georgia's board of education, where the plan was created shortly after the county had elected its first majority-black board, and the county's proffered reasons for the plan appeared to be "merely pretexts for intentionally decreasing the opportunity of minority voters to participate in the electoral process"); id. at 1611 (objecting to 1997 redistricting plan by Grenada, Mississippi,

based on "substantial direct and circumstantial evidence of discriminatory purpose"); id. at 1516 (refusing to withdraw objection to Greenville, Mississippi's 1991 redistricting plan, which "appeared to have been motivated by a desire on the part of white city councilmembers to retain white control of the city's governing body," and explaining that since the plan's proposal, "white city officials [have] continue[d] to engage in race-based decisionmaking and to design schemes the purpose of which is to avoid black control of city government").

    In addition to these examples, the legislative record included judicial decisions denying preclearance that relied on evidence of intentional discrimination.  The 1990 redistricting in Georgia -- in which Joe Mack Wilson, Chair of the state's House Reapportionment Committee, stated he did not want to draw "nigger districts" -- has already been discussed.  In a more recent declaratory judgment action, the Louisiana House of Representatives sought preclearance for its 2001 statewide redistricting plan, which eliminated a majority-black district in Orleans Parish, and failed to create a comparable district anywhere else in the state.  See Nw. Austin I, 573 F. Supp. 2d at 256; Senate Hearing, 109th Cong. 28 (May 16, 2006) (responses of Theodore S. Arrington to questions of Sens. Cornyn, Coburn, Leahy, Kennedy, and Kohl); Senate Hearing, 109th Cong. 152 (May 9, 2006) (Shaw responses); Senate Hearing, 109th Cong. 42-44 (June 21, 2006) (responses of Debo Adegbile to questions of Sens. Kennedy, Leahy, Cornyn, and Coburn). In the course of defending their plan, Louisiana officials admitted that they had intentionally "'obliterated'" the majority-black district in order to achieve what they characterized as "proportional" representation for white voters in Orleans Parish.  See Def.'s Br. in Supp. of Mot. for Summ. J., La. House of Reps. v. Ashcroft, Civ. A. No. 02-62 (D.D.C. Jan. 17, 2003); see also Senate Hearing, 109th Cong. 43 (June 21, 2006) (Adegbile responses).  But in selectively

applying the theory of "proportional representation" to advantage only white voters in a particular area of the state, Louisiana officials ignored the fact that it was the black population in Orleans Parish, not the white population, that had increased during the preceding decade.  See Senate Hearing, 109th Cong. 28 (May 16, 2006) (Arrington responses).  Moreover, the state made no attempt to remedy blacks' statewide under-representation in proportion to their percentage of the population, despite its avowed desire to achieve proportional representation for white voters in a particular area of the state.  See Def.'s Br. in Supp. of Mot. for Summ. J., La. House of Reps. v. Ashcroft, Civ. A. No. 02-62 (D.D.C. Jan. 17, 2003); Senate Hearing, 109th Cong. 43 (June 21, 2006) (Adegbile responses); Nw. Austin I, 573 F. Supp. 2d at 256.

The Congressional record also contained many examples of changes to voting procedures outside the districting context that the Department of Justice found to be motivated by unconstitutional discriminatory purpose.  For instance, an intent-based objection was interposed in response to Wilson County, North Carolina's 1986 change to its system for electing county commissioners, in light of the Justice Department's determination that the county's method of election had been purposefully "designed and intended to limit the number of commissioners black voters would be able to elect."  2 House Hearing, Scope, 109th Cong. 1731 (Schlozman Appendix).  In the context of annexations, the Justice Department issued an objection in 1990 to the decision by Monroe, Louisiana, to annex certain wards for the Monroe City Court, explaining that the annexations would have reduced the black percentage of the City Court's jurisdiction from 48.4% to 39.2%.  1 House Hearing, Scope, 109th Cong. 927 (Oct. 25, 2005) (Schlozman Appendix).  The Justice Department also expressed concern regarding the timing of the annexations, noting that one of the annexed wards "had been eligible to be added to the City

Court jurisdiction since at least 1970," but that there had been "little or no interest in implementing this change until immediately prior to the 1984 City Court primary election, which we understand was marked by the presence of the first black candidate for the City Court." See id. 927-28; see also H.R. Rep. No. 109-478, at 23. Similarly, the Justice Department in 1997 objected to the annexations proposed by the city of Webster, Texas, where "the city's annexation choices appear[ed] to have been tainted, if only in part, by an invidious racial purpose." 2 House Hearing, Scope, 109th Cong. 2492 (Oct. 25, 2005) (Schlozman Appendix).

The Congressional record was thus replete with evidence of intentionally discriminatory vote dilution, particularly in the districting context. Keeping that evidence in mind, the Court will now turn to consideration of the evidence Congress gathered about the possible consequences of the Supreme Court's opinion in Georgia v. Ashcroft. But to begin with, a brief review of the caselaw interpreting the "effects" prong of Section 5 is useful.

Section 5(a) provides that no change to voting procedures can be precleared if it "will have the effect of denying or abridging the right to vote on account of race or color[.]" 42 U.S.C. § 1973c(a). The Supreme Court first addressed the meaning of "the effect of denying or abridging the right to vote on account of race or color" in Beer v. United States, 425 U.S. 130 (1976). According to Beer, the purpose of Section 5 was to "insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." Id. at 141. The Beer Court added that "an ameliorative new legislative apportionment cannot violate § 5 unless the new apportionment itself so discriminates on the basis of race or color as to violate the Constitution." Id. Under Beer, then, the effects prong of Section 5 was solely concerned with retrogression,

i.e., changes in voting practices or procedures that made the situation of minority voters worse.

The Beer standard was not so pellucid that it eliminated any possible questions about the interpretation and application of the effects prong, but nonetheless, the Supreme Court did not address the meaning of that prong again until Georgia v. Ashcroft, 539 U.S. 461 (2003). There, the Court considered in depth what it meant to make the situation of minority voters worse. Ashcroft arose as a result of the 2000 redistricting in Georgia. Id. at 469. The Court explained that "a substantial majority of black voters in Georgia vote Democratic, [and] all elected black representatives in the General Assembly are Democrats." Id. In the 2000 round of redistricting, "[t]he goal of the Democratic leadership -- black and white -- was to maintain the number of majority-minority districts and also increase the number of Democratic Senate seats." Id. To do so, the Democratic leadership agreed to a plan "unpacking" certain majority-minority districts with very high concentrations of black voters. Id. at 469-71. Thus, the concentration of black voters was reduced in some districts, and black voters -- a "substantial majority" of whom reliably voted Democratic -- were spread to other districts to increase Democratic candidates' chances of success. Id.

Instead of seeking administrative preclearance from the Attorney General, Georgia instituted an action seeking judicial preclearance. Id. at 471. A three-judge panel denied preclearance on the grounds that the plan would "diminish African American voting strength in" the unpacked districts, and that Georgia had "failed to present any . . . evidence" that the retrogression in those districts "will be offset by gains in other districts." Georgia v. Ashcroft, 195 F. Supp. 2d 25, 88 (D.D.C. 2002). Georgia appealed directly to the Supreme Court. See Ashcroft, 539 U.S. at 475.

The Supreme Court's task was to divine whether the districting plan, based on a complex mix of partisanship, incumbency protection, and compliance with the Voting Rights Act, "'would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise.'" 539 U.S. at 462 (quoting Beer, 425 U.S. at 141). In answering that question, the Supreme Court set out a lengthy "totality of the circumstances" test that courts evaluating retrogression should consider. 539 U.S. at 480-84. The Court emphasized that "the ability of a minority group to elect a candidate of its choice remains an integral feature in any § 5 analysis." Id. at 484. But, the Court said, it "cannot be dispositive." Id. at 480. Rather,

> [i]n order to maximize the electoral success of a minority group, a State may choose to create a certain number of "safe" districts, in which it is highly likely that minority voters will be able to elect the candidate of their choice. Alternatively, a State may choose to create a greater number of districts in which it is likely -- although perhaps not quite as likely as under the benchmark plan -- that minority voters will be able to elect candidates of their choice.
>     Section 5 does not dictate that a State must pick one of these methods of redistricting over another. Either option will present the minority group with its own array of electoral risks and benefits, and presents hard choices about what would truly maximize minority electoral success.

Id. (internal quotation marks and citations omitted). In addition to the choice between fewer completely "safe" districts and more less safe districts, the Court wrote that the analysis should include whether a plan added or subtracted "influence districts" -- districts "where minority voters may not be able to elect a candidate of choice but can play a substantial, if not decisive, role in the electoral process." Id. at 482. Finally, the Court added two additional considerations to its totality of the circumstances test: "the comparative position of legislative leadership, influence, and power for representatives of the benchmark majority-minority districts" and whether minority-preferred representatives supported the plan. Id. at 483-84 (internal quotation marks and citations omitted).

Congress reacted to Ashcroft in 2006 by adding subsections (b) and (d) to Section 5.

Those amendments provide that

> (b) Any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting that has the purpose of or will have the effect of diminishing the ability of any citizens of the United States on account of race or color, or in contravention of the guarantees set forth in section 1973b (f)(2) of this title, to elect their preferred candidates of choice denies or abridges the right to vote within the meaning of subsection (a) of this section.
> . . .
> (d) The purpose of subsection (b) of this section is to protect the ability of such citizens to elect their preferred candidates of choice.

42 U.S.C. § 1973c(b), (d). Hence, instead of allowing courts and the Department of Justice to take into account a wide variety of potential indicators of minority voting effectiveness in conducting the preclearance analysis, Congress clarified that Section 5 is focused on minorities' ability "to elect their preferred candidates of choice." In the House Report accompanying the bill, Congress explained that the amendments were meant to return to the analysis articulated in Beer. See H.R. Rep. No. 109-478, at 71.

Unlike the debate over the Bossier II fix, which nearly all witnesses agreed was necessary and appropriate, the Ashcroft fix was the subject of extended debate. A consistent theme, however, was that the standard laid out in Ashcroft was impossibly challenging to administer, particularly within the 60-day period in which the Department of Justice must make preclearance decisions. Witnesses called it "an unworkable standard," Senate Hearing, 109th Cong. 8 (May 16, 2006) (Arrington statement), "subjective, abstract, and impressionistic," House Hearing, 109th Cong. 49 (Nov. 9, 2005) (McDonald statement), "amorphous [and] easily manipulable . . . an open invitation to mischief . . . [and] poorly defined and virtually impossible to meaningfully administer." Senate Hearing, 109th Cong. 39 (May 17, 2006) (Days responses).

Robert Kengle, the former Deputy Chief of the Voting Section of the Justice Department's Civil Rights Division, testified that Ashcroft had "introduced factors into the retrogression analysis that make the Section 5 process more complicated and burdensome for everybody, not just for the Department of Justice but for the jurisdictions that have to comply with it as well." House Hearing, 109th Cong. 889 (Oct. 18, 2005) (statement of Robert A. Kengle). Kengle also worried that Ashcroft would make preclearance decisions "less predictable and more open to subjective judgments, individual preconceptions and even political biases." Id. A hearing in the House opened with the question, "Georgia v. Ashcroft: can it be made workable?" House Hearing, 109th Cong. 2 (Nov. 9, 2005) (Rep. Conyers statement).

Witnesses were particularly concerned about the introduction of "influence" districts into the Section 5 calculus. "Influence" districts, as previously explained, are those where "minority voters may not be able to elect a candidate of choice but can play a substantial, if not decisive, role in the electoral process." Ashcroft, 539 U.S. at 482.[5] Congressional witnesses testified that a key problem with the Ashcroft opinion was the lack of a standard that would allow courts and

---

[5] Influence districts contrast with majority-minority, crossover, and opportunity districts. The meaning of those terms is subject to considerable debate. Persily, Promise and Pitfalls 235-37, 241-42. As used in this opinion, majority-minority districts are those where a minority group is able to elect its "preferred candidates of choice" without crossover voting from either white voters or voters of a different minority group. See id. at 241-42 (discussing conceptual issues in defining majority-minority districts). "Crossover" districts, sometimes called coalition districts, are those where minority voters can elect their candidates of choice with certain "crossover" votes from white or other voters who support the minority group's candidates of choice. See Bartlett v. Strickland, 129 S. Ct. 1231, 1242-43 (2009) (discussing different types of districts). "Crossover" districts are different than influence districts because the minority voters are sufficiently numerous that they can choose the candidate, presumably because they form a majority of voters in the primary elections, rather than choosing among white voters' candidates of choice. See id. at 1242; see also Persily, Promise and Pitfalls 236, 242-43. Finally, this Court will use "opportunity district" as an all-purpose term for those jurisdictions where minority voters can elect their candidates of choice. Both majority-minority districts and crossover districts are opportunity districts.

the Justice Department to determine which districts were "influence" districts.  Theodore Shaw explained that "[w]e don't know what 'influence districts' really mean[s]."  He asked:

> How is influence effectively measured within DOJ's sixty-day administrative window?  Does one look to roll call votes?  Do those votes need to be on issues that have a discernible race element or just a discernible position preferred by minority group members?  Is it enough if candidates for office campaign in minority communities?  Must influence be consistently in evidence or is occasional influence sufficient?

House Hearing, 109th Cong. 13, 25 (Nov. 9, 2005) (statements of Theodore M. Shaw).  Another witness cited a study showing that a group's influence on a given legislator does not linearly increase with the group's size, as one might expect, but rather has a "curvi-linear relationship" to the group's size.  House Hearing, 109th Cong. 57 (Nov. 9, 2005) (McDonald statement).  Moreover, as Representative Feeney pointed out, all of these problems were compounded by the fact that what constituted an influence district would "change from candidate to candidate and cycle to cycle and geographic area to geographic area."  House Hearing, 109th Cong. 84 (Oct. 25, 2005) (statement of Rep. Tom Feeney).

Several witnesses also testified that they were troubled by the fact that the Ashcroft opinion gave no guidance as to when and whether majority-minority districts or other opportunity districts could be traded for influence districts, and how many influence districts would make up for the loss of an opportunity district.  Senate Hearing, 109th Cong. 168 (May 9, 2006) (Shaw responses); Senate Hearing, 109th Cong. 116-17 (May 16, 2006) (responses of Richard H. Pildes to questions of Sens. Specter, Cornyn, Coburn, and Kohl); Senate Hearing, 109th Cong. 58-59 (May 17, 2006) (Days responses); House Hearing, 109th Cong. 139-40 & n.10 (Nov. 9, 2005) (Kengle prepared statement); House Hearing, 109th Cong. 49-50 (May 4, 2006) (Adegbile prepared statement).  The lack of clarity about how to define influence districts,

along with the uncertainty about when influence districts could be traded for opportunity districts, combined to create what several witnesses saw as the most significant problem with Ashcroft: the opinion might allow jurisdictions to substantially dilute minority voting strength under the guise of creating more influence districts. In the most extreme scenario, a jurisdiction could carve up every opportunity district into a series of influence districts where minorities might actually have no influence at all. Such a result would give official legal cover to the blatant voting discrimination that Section 5 was designed to prevent, and would judicially sanction a return to the days of districts designed to spread minority voters as widely as possible. Cf. Senate Hearing, 109th Cong. 84 (May 17, 2006) (responses of Armand Derfner to questions of Sens. Cornyn, Coburn, Leahy, Kennedy, and Schumer) ("In this century, Mississippi's congressional district lines had been traditionally drawn from south to north, which meant that the [largely black] Mississippi Delta was one congressional district. . . . [A]s soon as blacks started voting, and especially with the Voting Rights Act, . . . [Mississippi changed] the historic pattern so that the new congressional lines went from east to west, thus fragmenting the black population in the Delta.").

Even in less extreme scenarios, a jurisdiction could substantially dilute the voting power of minorities through substitution of influence districts for opportunity districts. See Senate Hearing, 109th Cong. 168-69 (May 9, 2006) (Shaw responses) (Ashcroft allows "jurisdictions to cloak intentional discrimination under [its] intangible framework"); House Hearing, 109th Cong. 50 (Nov. 9, 2005) (McDonald statement) ("The minority influence theory, moreover, is frequently nothing more than a guise for diluting minority voting strength."); Senate Hearing, 109th Cong. 12 (May 17, 2006) (statement of Nathaniel Persily) ("The risk of Georgia v.

Ashcroft is that . . . under the cloak of influence districts, a jurisdiction would then break up a cohesive minority community into much smaller districts in which they really had no influence at all.").  Professor Richard Pildes, who "agree[d] with the Court on the Georgia facts" and did not support the "fix," noted that even supporters of the Ashcroft decision were "sometimes worried about the possible implications of the decision down the road," and thought that the hearings should clarify that a jurisdiction could not trade every opportunity district for influence districts.  Senate Hearing, 109th Cong. 116-17 (May 16, 2006) (Pildes responses).

Congress also heard testimony about Ashcroft's holding that states are free to choose among the various ways of ensuring that minorities have an equal opportunity to participate politically -- in other words, that states may choose between majority-minority districts, influence districts, crossover districts, and other types of participation.  Robert Kengle, who agreed with parts of the Ashcroft decision and the theoretical importance of influence districts, testified that he was "quite uncomfortable with the notion that 'the State may choose . . . to risk having fewer minority representatives,' which strikes me as letting the fox guard the henhouse." House Hearing, 109th Cong. 135, 139 (Nov. 9, 2005) (Kengle prepared statement) (quoting Ashcroft, 539 U.S. at 464).  The House Report reflected a specific Congressional finding that, given the record before Congress, covered jurisdictions should not be allowed unfettered discretion to choose among theories of representation.  H.R. Rep. 109-478, at 70.

One final concern expressed by several witnesses was that consideration of influence districts would inject undue partisanship into the Voting Rights Act.  Ashcroft itself, of course, grew out of an attempt to maximize Democratic strength while complying with the Act.  As one witness bluntly summarized:

> [T]o the extent that I can imagine what measures would be used to determine whether substantive representation or influence has been enhanced to prevent retrogression, these measures amount to simply helping Democratic Party candidates. In virtually every state legislature, in the Congress, and in many local jurisdictions, minority representatives -- especially African Americans -- are strongly allied with the Democratic Party. Helping Democratic Party candidates would be argued to be equivalent to increasing minority voter influence and helping minority substantive representation. In other words, influence districts, if seen as a replacement for opportunities for minority voters to elect representatives of their choice, would become simply a rationale for creating Democratic Party gerrymanders.

Senate Hearing, 109th Cong. 33 (May 16, 2006) (Arrington responses).  But this was problematic, because, as Theodore Shaw pointed out, "a sustained identity between minority and partisan interests" cannot always be assumed given that "partisan links [may] weaken and shift, as they historically have done."  House Hearing, 109th Cong. 26 (Nov. 9, 2005) (Shaw prepared statement).

More broadly, Congress heard testimony that the Ashcroft standard too often subsumed the goals of minority voters in favor of the goals of individual legislators and their political parties.  For instance, the fact that minority legislators supported a given redistricting plan might mean that it protected their own districts, not that it was the best plan for minority voters.  House Hearing, 109th Cong. 22 (Oct. 25, 2005) (prepared statement of Robert Hunter). Asking judges or Justice Department attorneys to assess whether a given legislator had a sufficiently important leadership position -- and was likely to retain that leadership position after an election -- was seen as unrealistic.  Id. at 25.  Indeed, one of the Justice Department's rare attempts to apply the Ashcroft standard before it was overturned was laid out in a 73-page memo that was later leaked, and voting rights scholars were highly critical of the Justice Department's efforts.  See, e.g., Abigail Thernstrom, Section 5 of the Voting Rights Act: By Now, a Murky Mess, 5 GEO. J.L. &

PUB. POL'Y 41, 59-61 (2007) ("Throughout the memo, the career attorneys attempted to read political tealeaves, predicting the race or political sympathies of candidates who would be elected from various districts under the new plan.  It was a practice invited by the Ashcroft Court, but . . . attorneys in Washington were (inevitably) not very good at it.").  Summarizing the problem, Robert Kengle testified:

> Finally, in my view the Ashcroft decision makes its greatest departure from the Supreme Court's other voting rights jurisprudence by introducing explicit partisan calculations into the Section 5 review process.  Creating influence and coalition districts with partisan allies may in fact be the best way to maximize minority voting strength in particular cases, and I think minority citizens and legislators should be allowed considerable latitude to do so.
>
> But to embody partisan calculations and tradeoffs into the Voting Rights Act itself has not been well thought out and provides a means and motive not only to politicize enforcement of Section 5, but also to undermine confidence that the Act will be enforced in a way that transcends party politics.

House Hearing, 109th Cong. 143 (Nov. 9, 2005) (Kengle prepared statement).  Condensing all of these concerns, voting rights practitioner Debo Adegbile speculated that under the Ashcroft test, the Section 5 analysis would become so complex that "the statute will start to collapse of its own weight."  House Hearing, 109th Cong. 58 (May 4, 2006) (Adegbile prepared statement).

To summarize, Congress gathered extensive evidence that discriminatory and dilutive techniques remained a significant problem, and that the Ashcroft standard did not remedy -- and could easily worsen -- the problem.  Congress therefore chose to overrule Ashcroft with the amendments codified at 42 U.S.C. §§ 1973c(b) and (d).  A striking feature of the Ashcroft "fix," however, was the widespread uncertainty about what it meant.  As one law professor put it, "Congress did not so much reverse Ashcroft as remand it to the courts with equivocal instructions."  J. Morgan Kousser, The Strange, Ironic Career of Section 5 of the Voting Rights Act, 1965-2007, 86 TEX. L. REV. 667, 755 (2008).  One of the effects of the amendments is

undisputed: they made clear that influence districts could not be substituted for opportunity districts.  Persily, Promise and Pitfalls 235-37, 247.  What the amendments did not resolve, however, was whether crossover districts were protected from retrogression and what sort of tradeoffs between majority-minority and crossover districts were appropriate.  Some witnesses concluded that the Ashcroft fix was a simple return to the status quo ante, i.e., the Beer test, while others disagreed.  Senate Hearing, 109th Cong. 149 (May 9, 2006) (responses of Laughlin McDonald to questions of Sens. Specter, Kennedy, Schumer and Cornyn); Senate Hearing, 109th Cong. 168-69 (May 9, 2006) (Shaw responses).  But as Nathaniel Persily has explained, "[t]he problem is that there is disagreement about what the standard under Beer was."  Persily, Promise and Pitfalls 234.

The text of Beer certainly does not answer questions about crossover districts and tradeoffs, and the Supreme Court had never attempted to clarify the issue until Ashcroft.  Nor does the text of the amendments obviously answer that question.  The House and Senate reports vividly illustrate the amendments' ambiguity.  The House report provides that "[v]oting changes that leave a minority group less able to elect a preferred candidate of choice, either directly or when coalesced with other voters, cannot be precleared under Section 5."  H.R. Rep. No. 109-478, at 71.  Hence, according to the House report, crossover districts as well as majority-minority districts are protected under the amendments.  The Senate report presents a truly bizarre situation.  The Senate unanimously voted to renew Section 5 on July 20, 2006.  S. Rep. 109-295, at 54-55.  A draft Senate report had been circulated, but instead of accepting it, the Republican members of the Senate Judiciary Committee produced their own report six days after the passage of the bill, over the vehement protests of the Democratic members of the Committee.  Id.

According to that Report, subsections (b) and (d) were intended <u>only</u> "to protect naturally occurring majority-minority districts," not crossover districts. <u>Id.</u> at 19. Moreover, the Republican Senate Report specifically stated that "coalition or influence districts" could never be substituted for naturally occurring majority-minority districts. <u>Id.</u> Although this Court will not rely on a one-party, <u>post hoc</u> report as evidence of what the amendments actually mean, the report does reflect disagreement among members of Congress as to their meaning.

In the context of this facial challenge, then, the Court must construe the amendments, bearing in mind that they should not be found unconstitutional unless there is no plausible constitutional construction. <u>See</u> <u>Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council</u>, 485 U.S. 568, 575 (1988); David L. Franklin, <u>Facial Challenges, Legislative Purpose, and the Commerce Clause</u>, 92 Iowa L. Rev. 41, 58 (2006) (a facial challenge asserts that a statute is "invalid on its face as written and authoritatively construed, when measured against the applicable substantive constitutional doctrine"). The key interpretive question, as previously explained, is whether the amendments permit the Section 5 analysis to include crossover districts and whether they permit any tradeoffs between crossover and majority-minority districts. Looking solely to the text of the amendments, the Court believes that they permit both. Subsection (b) provides that "Any [voting procedure] . . . that has the purpose of or will have the effect of diminishing the ability of any citizens of the United States on account of race or color . . . to elect their preferred candidates of choice denies or abridges the right to vote." 42 U.S.C. § 1973c(b). Subsection (d) further clarifies that "[t]he purpose of subsection (b) of this section is to protect the ability of such citizens to elect their preferred candidates of choice." 42 U.S.C. § 1973c(d). Nothing in the phrase "elect their preferred candidates of choice"

specifies that voters must do so only from majority-minority districts.[6]

Influence districts do not fit within the terms of the amendments because voters who only "influence" an election are not able to choose, and then elect, the candidates who best represent them. Instead, they can only choose between candidates preferred by other groups. In any event, the legislative history makes overwhelmingly clear that influence districts are no longer a factor in the Section 5 analysis under the amendments. See H.R. Rep. No. 109-478, at 70. In crossover districts, however, minority voters form a sufficiently large percentage of the registered voter population to select a "preferred candidate of choice" in the primary, and to elect that preferred candidate -- with crossover voting from those who are not part of the minority group -- in the general election. See Persily, Promise and Pitfalls 236 (citing Bernard Grofman, Lisa Handley & David Lubin, Drawing Effective Minority Districts: A Conceptual Framework and Some Empirical Evidence, 79 N.C. L. REV. 1383, 1407-09 (2001)). Hence, the Court finds that crossover districts fit within the statutory scheme. Moreover, the Court sees nothing in the text of the amendments that would prevent a certain amount of tradeoff between majority-minority districts and crossover districts, assuming that minority voters indeed have the ability to elect preferred candidates of their choice in the crossover districts.

But the amendments did more than just remove influence districts from the preclearance analysis: they also affirmed that minorities' "ability to elect," not the "totality of the

---

[6] This Court recognizes that this interpretation conflicts with the three-justice plurality's reading of a similar phrase in the Section 2 context in Bartlett, 129 S. Ct. at 1243-45, although the four justices in dissent agreed with this Court's reading. Id. at 1250. The plurality's opinion, however, was based on administrative and constitutional concerns rather than the text of the statute. Id. at 1244-45, 1247-48. Moreover, the plurality explicitly held that its conclusion did not apply in the Section 5 context. Id. at 1249; see also id. at 1258 (Souter, J., dissenting) (discussing Section 2 and Section 5).

circumstances," is the critical issue in the preclearance of any proposed voting change. Hence, courts and the Justice Department can no longer consider many of the factors that the <u>Ashcroft</u> Court identified as relevant to the totality of the circumstances test. Specifically, the preclearance analysis can no longer consider minority-preferred politicians' views of the proposed change, nor can it consider whether the position or power of a particular minority-preferred politician could substitute in some way for the ability to elect. More generally, any factor that is not related to minorities' "ability to elect" is off the table. This principle is not limitless, of course: courts and the Justice Department are required to consider certain constitutional mandates, including compliance with the one person one vote principle and equal protection principles, and caselaw and history have established that the preclearance analysis includes consideration of population growth and decline. <u>Infra</u> at 89-90. But the universe of rationales that can justify a change to voting procedures is now considerably smaller than it was under <u>Ashcroft</u>.

The third and final question under <u>Boerne</u> is whether the amendments, so construed, are a congruent and proportional response to the pattern of unconstitutional behavior that Congress identified and the problems that Congress found infected the <u>Ashcroft</u> standard. It is important to keep in mind that plaintiffs' challenge here is only to the amendments; the Court has already found that the general preclearance procedure is a congruent and proportional remedy to the unconstitutional behavior Congress identified. <u>Shelby County</u>, 2011 WL 4375001, at *80.

In this step of the <u>Boerne</u> analysis, the critical issue is whether Congress is <u>enforcing</u> the guarantees of the Fourteenth and Fifteenth Amendments, rather than attempting substantively to redefine those Amendments. <u>Boerne</u>, 521 U.S. at 519-20. That is, the question is whether the

law can "be understood as responsive to, or designed to prevent, unconstitutional behavior." Id. at 532. Courts must afford Congress "wide latitude" in deciding what legislation will enforce, rather than define, a constitutional guarantee. Id. at 519-20. In conducting the third step of the Boerne analysis, the Supreme Court has been particularly cognizant of the federalism costs of the challenged law. In Boerne itself, for instance, the Court found that RFRA exceeded Congress's enforcement power in part because it was "a considerable congressional intrusion into the States' traditional prerogatives and general authority to regulate for the health and welfare of their citizens," and imposed "a heavy litigation burden on the states." Id. at 534.

To discern whether subsections (b) and (d) can "be understood as responsive to, or designed to prevent" intentional voting discrimination, it is important to keep in mind two foundational points about voting, and about districting in particular. First, "voting is more than an atomistic exercise." Bush v. Vera, 517 U.S. 952, 1048-49 (Souter, J., dissenting). Voting districts are explicitly designed to protect certain communities of interest, whether partisan, issue-oriented, or any of a number of other characteristics. See Miller, 515 U.S. at 916 ("traditional districting principles" include "respect for political subdivisions [and] communities defined by actual shared interests"); see also Pamela S. Karlan & Daryl J. Levinson, Why Voting is Different, 84 CAL. L. REV. 1201, 1204-08, 1271-19 (1996) (hereinafter Karlan & Levinson, Why Voting is Different). If voting and representation were perceived as a purely "atomistic exercise," districting could be reduced to no more than drawing districts of equal size. But, as the thousands of pages of opinions addressing redistricting issues show, "traditional districting principles" are aimed at much more than numerical equivalence. See Shaw v. Reno, 509 U.S. 630, 647 (1993) ("Shaw I").

The second foundational point is why racial groups are sometimes considered "communities of interest" that can be gathered into districts. Groups defined in part by race are considered communities of interests if, and only if, empirical evidence demonstrates that group members' voting behavior is similar. In other words, saying that members of a given racial group in a certain area currently vote alike is not a stereotype when it is a descriptive fact. Karlan & Levinson, Why Voting is Different 1204-08, 1217-18. The government may never, of course, engage in "the offensive and demeaning assumption that voters of a particular race, because of their race, think alike, share the same political interests, and will prefer the same candidates at the polls." Miller, 515 U.S. at 911-12 (internal quotation marks and citation omitted). Nor may the government assume that minority groups that have voted alike in one election will do so for all time. But when evidence demonstrates members of a racial minority in a given place have found an "efficacious political identity," League of United Latin American Citizens v. Perry, 548 U.S. 399, 435 (2006) ("LULAC"), an absolute mandate of federal government colorblindness is perverse: it allows less colorblind State officials to intentionally fragment the minority group into several districts (or pack them into one district) to avoid the election of candidates who represent the group's political identity. Cf. Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 788 (2007) (hereinafter "Parents Involved") (Kennedy, J., concurring) ("And, as an aspiration, Justice Harlan's axiom [that our Constitution is color-blind] must command our assent. In the real world, it is regrettable to say, it cannot be a universal constitutional principle.").

The record before Congress demonstrated, first, that certain racial groups in covered jurisdictions had found "efficacious political identit[ies]." LULAC, 548 U.S. at 435. Second, it

demonstrated extensive intentional attempts to fragment or pack potentially cohesive racial minorities to ensure that they could not elect representatives attuned to those political interests. Without evidence of both of those points, Congress would not have been entitled to create a remedy as sweeping and race-conscious as the preclearance procedure. But given that record evidence, Congress had the ability under its Fourteenth and Fifteenth Amendment enforcement authority to design legislation to "respon[d] to . . . or . . . prevent [that] unconstitutional behavior." Boerne, 521 U.S. at 532.

The unconstitutional behavior Congress was trying to prevent was intentional vote dilution aimed at making minority votes less effective. The legislation Congress designed directly responds to that problem by refusing preclearance to any voting change that "diminish[es] the ability" of such groups "to elect their preferred candidates of choice." 42 U.S.C. § 1973c(b). The legislation is thus precisely congruent to the problem, because it forbids the entire category of behavior Congress found to be problematic. But because it also forbids some constitutional behavior -- voting changes that reduce minority voting effectiveness, but not for intentionally discriminatory reasons -- the Court must consider whether it is proportional to the problem.

In judging whether subsections (b) and (d) are a proportional response to the problem, the Court emphasizes again that proportionality of the Ashcroft standard is not at issue. But, as this Court has construed the statute, the differences between the standards in subsections (b) and (d) and in Ashcroft are relatively limited. In the districting context, the key difference is that influence districts are no longer part of the Section 5 calculus. But Congress heard considerable testimony that including consideration of influence districts in the Section 5 analysis would have

had deeply problematic results.  Allowing tradeoffs between opportunity districts and influence districts would have created a means to cloak intentional discrimination -- that is, intentional fragmentation of politically cohesive groups -- under the guise of creating influence districts. Moreover, as discussed below, Congress had reason to be concerned that keeping influence districts as part of the Section 5 analysis would leave Section 5 vulnerable to an equal protection challenge.

The amendments also eliminated consideration of the amorphous "totality of the circumstances" factors, including consideration of minority-preferred legislators' views of the proposed voting changes and consideration of the position of particular minority-preferred politicians.  But Congress heard testimony that integrating such factors into Section 5 would result in a statute that was impossible for the Department of Justice to administer effectively within its sixty-day window.  Moreover, Congress heard testimony that the results of the preclearance process would be increasingly partisan, subjective, and unpredictable, driving up costs for both the federal government and the affected jurisdictions.  This subjectivity and unpredictability was compounded by the fact that a "totality of the circumstances" test could include unspecified factors even beyond those mentioned in <u>Ashcroft</u>.  Given the record evidence, it is quite understandable that Congress concluded that a totality of the circumstances test could "undermine confidence that the Act will be enforced in a way that transcends party politics," House Hearing, 109th Cong. 143 (Nov. 9, 2005) (Kengle prepared statement), and could cause Section 5 to "collapse of its own weight."  House Hearing, 109th Cong. 58 (May 4, 2006) (Adegbile statement).

The standard laid out in subsections (b) and (d) also has several important limitations. See Boerne, 521 U.S. at 533 ("limitations" including "termination dates, geographic restrictions, or egregious predicates . . . tend to ensure Congress' means are proportionate to ends legitimate under § 5"). First, like the rest of Section 5, the amendments are temporally and geographically limited: they will expire after twenty-five years (that is, two redistricting cycles), and they apply only in certain jurisdictions. Shelby County, 2011 WL 4375001, at *72-74. In the vote dilution context, they also have an elegant, self-executing limitation. As this Court has previously explained, a group defined by race can be considered a community of interest for voting purposes only when empirical evidence, rather than stereotypes, demonstrates that members of the minority group vote alike. This critical fact is built in to the "ability to elect" test because, as racially polarized voting decreases, the number of districts affected by Section 5 decreases as well. As racially polarized voting decreases, majority-minority districts can frequently be replaced with crossover districts. See Bartlett, 129 S. Ct. at 1254-55 (Souter, J., dissenting). If racially polarized voting disappeared entirely -- such that there is no correlation between race and voting -- it would be virtually impossible for a districting plan to be retrogressive under Section 5. Persily, Promise and Pitfalls 243. Hence, should racially polarized voting substantially diminish before twenty-five years have passed -- and with it, the ability (and motivation) for legislators to draw dilutive districts -- Section 5 will play a dramatically smaller role in state voting procedures even before it officially expires.

The final consideration under Boerne is the federalism costs the amendments in subsections (b) and (d) exact, both in terms of "congressional intrusion into the States' traditional prerogatives" and pragmatic costs, such as litigation costs. 521 U.S. at 534. This Court

recognizes, of course, that the Voting Rights Act as a whole represents a considerable "intrusion into the States' traditional prerogatives."  But, as explained in <u>Shelby County</u>, that intrusion is justified by the persistent, purposeful discrimination aimed at minorities attempting to exercise their core constitutional voting rights.  2011 WL 4375001, at *80.   Hence, the only question here is whether the amendments represent an intrusion beyond that imposed by the general preclearance regime.

In one sense, the federalism costs are greater under subsections (b) and (d) than they were under <u>Ashcroft</u> because states have less latitude to choose among theories of representation and political participation.  But, as this Court has construed the statute, Congress narrowed the states' latitude only as much as necessary to accomplish its goal.  States may still draw either crossover or majority-minority districts, and some tradeoff between them is appropriate.  <u>See</u> <u>Bartlett</u>, 129 S. Ct. at 1254-55 (Souter, J., dissenting) (recognizing in Section 2 context that "crossover districts ha[ve] the value of giving States greater flexibility to draw districting plans with a fair number of minority-opportunity districts").  Moreover, because influence districts are no longer protected from retrogression, states have substantially more freedom to redraw district lines in districts that do not qualify as opportunity districts.  In terms of pragmatic costs, subsections (b) and (d) almost certainly work in the states' favor.  The complexity of the test outlined in <u>Ashcroft</u> would likely have led to very difficult preclearance decisions and extraordinarily complex litigation.  By returning to a test that is substantially closer to the familiar <u>Beer</u> test, Congress reduced the complexity and costs of the preclearance process.

The amendments in subsections (b) and (d) sweep broadly, and they admittedly capture a certain amount of behavior that is constitutional.  But, as the Court has previously found, the

retrogression principle itself is justified by the evidence of persistent, intentional discrimination that Congress amassed. The amendments' modification to the <u>Beer</u> and <u>Ashcroft</u> tests was necessary to avoid giving cover to intentional discrimination and to prevent an administrability nightmare that would itself harm covered jurisdictions. Accordingly, the Court concludes that subsections (b) and (d)'s modifications to the <u>Beer</u> and <u>Ashcroft</u> tests represent a congruent and proportional response to the problem of intentionally discriminatory dilutive techniques. Hence, they survive plaintiffs' constitutional challenge.

### III.  COUNT II

### A.  <u>Standing</u>

The Court now turns to Count II of plaintiffs' complaint, which is similar to Count I's challenge to the amendments in several ways. Both counts assert that the amendments are unconstitutional, but they rest on different theories: Count I claims that the amendments exceed Congress's enforcement powers, while Count II claims that they violate equal protection principles.[7]  Accordingly, the standing analysis for the two claims is in some respects similar. For the same reasons discussed in part II.A, the Court finds that plaintiffs have standing to bring their challenge to subsections (b) and (d). Nix was injured because a referendum from which he would have benefitted was suspended due to the operation of an allegedly unconstitutional law. Under <u>Akins</u>, he has shown causation and redressability as to subsections (b) and (d). However,

---

[7]  Specifically, plaintiffs claim that the amendments violate the equal protection component of the Due Process Clause of the Fifth Amendment, which is substantively identical to the Equal Protection Clause of the Fourteenth Amendment. <u>Adarand Constructors, Inc. v. Pena</u>, 515 U.S. 200, 227 (1995). The Fifth Amendment applies against the federal government, while the Fourteenth Amendment applies against the states.

for the reasons given in part II.A, Nix does not have standing to bring an equal protection challenge to subsection (c).

The D.C. Circuit directed this Court to consider several questions about plaintiffs' Count II standing on remand. See LaRoque II, 650 F.3d at 794-96. The Court has addressed most of those issues in the discussion of Count I, but one additional point must be addressed here. The D.C. Circuit asked whether, given that plaintiffs' equal protection challenge is only facial, plaintiffs have "met the requirement that litigants claiming injury from a racial classification establish that they 'personally [have been] denied equal treatment by the challenged discriminatory conduct.'" Id. at 795 (quoting United States v. Hays, 515 U.S. 737, 743-44 (1995)). This Court does not believe that Hays presents an obstacle for plaintiffs here. Explaining why requires reviewing one branch of the Supreme Court's equal protection jurisprudence.

The Hays plaintiffs brought a claim under Shaw I, 509 U.S. at 652, which allows voters who live in districts allegedly drawn with excessive attention to race to bring an equal protection challenge. A Shaw claim is not a vote dilution claim, but rather the "analytically distinct claim" that a voter experiences a stigmatic harm when she is placed into a district because of her race. Id.; see also Miller, 515 U.S. at 911-913. The plaintiffs in Hays attempted to bring a Shaw challenge to the creation of a district in which they did not live. 515 U.S. at 739. The Supreme Court found that they did not have standing. The Court explained that the Shaw I plaintiffs had standing because they had suffered a particularized stigmatic injury, but that the Hays plaintiffs had not suffered any such stigmatic injury because they did not allege that they themselves had been placed into a particular district because of their race. Id. at 744-45.

Like the plaintiffs in <u>Hays</u>, the plaintiffs here have not been personally subjected to a racial classification; hence, they cannot claim a stigmatic equal protection injury under <u>Shaw</u>. But that does not defeat standing, because this Court's conclusion that plaintiffs have standing to bring this challenge rests on an entirely different conception of their injury. Plaintiffs' injury is not that they are subjected to a racial classification that creates either concrete or stigmatic harms, but that a law that allegedly violates equal protection principles denied them the benefit of the nonpartisan voting referendum. While this is not a "personal[] deni[al] [of] equal treatment," <u>Hays</u>, 515 U.S. at 744 (internal quotation marks and citation omitted), as would be required for a plaintiff bringing a <u>Shaw</u> claim, it is a concrete, particularized injury, and that is what is required under the Supreme Court's standing jurisprudence. <u>See</u> <u>Lujan</u>, 504 U.S. at 560.

Plaintiffs have also offered another, wholly different standing analysis for Count II. Because plaintiffs' alternative argument would establish standing to bring their subsection (c) claim, which they do not otherwise have, the Court must consider that argument as well. Citing <u>Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville</u>, 508 U.S. 656 (1993), plaintiffs argue that their injury-in-fact is "<u>the denial of equal treatment</u> that exists because election changes supported by Plaintiffs and other non-minorities in Kinston cannot become law without satisfying those amendments' <u>minority-preferences</u>." Plfs.' Opp. at 35. Or, as they phrase it elsewhere in their briefs, "<u>wholly apart from the referendum</u>, Plaintiffs have standing as non-minority voters in Kinston who seek to ensure that beneficial local laws need not run the gauntlet of unconstitutional minority-preferences contained in the 2006 amendments to Section 5." Plfs.' Opp. at 37.

In Jacksonville, the plaintiff brought a Fourteenth Amendment challenge to a city ordinance that required that 5% of the amount spent on city contracts be set aside for businesses with at least 51% female or minority ownership. 508 U.S. at 658, 661. The plaintiff was an organization of business owners, most of whose businesses did not qualify for the 5% set-aside. Id. at 658. The Eleventh Circuit concluded that the organization lacked standing because it could not point to specific contracts its members would have been awarded in the absence of the set-aside program. Id. at 660. The Supreme Court disagreed:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

Id. at 666. The Supreme Court identified the core equal protection injury as "the inability to compete on an equal footing in the bidding process, not the loss of a contract." Id. Here, plaintiffs allege that the 2006 amendments to Section 5 function as a "discriminatory barrier" that prevents them from competing equally with minorities in the advancement of "beneficial local laws" like the referendum. Plfs.' Opp. at 37. They contend that it is therefore irrelevant whether they would have obtained the benefit -- enactment of the referendum -- but for the discriminatory barrier.

But one difference between this case and Jacksonville is immediately apparent. In Jacksonville, it was "more difficult for members of one group to obtain a benefit than it [wa]s for members of another group." Id. at 666. That is, a white business owner in Jacksonville could compete for only 95% of the city contract dollars, while a minority business owner could

compete for 100% of those dollars.  Id. at 658-61.  Therefore, white business owners were treated differently than were black business owners in Jacksonville solely because of the color of their skin.  That is not at all true here, because white supporters of the nonpartisan referendum are in exactly the same position as black supporters of the referendum.  The Justice Department's preclearance letter focused solely on the referendum's ultimate effects, not on whether white or black citizens proposed and supported it.[8]  Plaintiffs do not claim that the Justice Department relied on their race at any point in the decision whether to preclear the referendum; indeed, all indications are that the Attorney General would have made the same decision if plaintiffs were minorities.  A black Republican or nonpartisan candidate who stood to benefit from the referendum would be precisely as frustrated as Nix is.

Plaintiffs' argument that white voters have standing to challenge the amendments because the Voting Rights Act was meant to benefit minorities is unpersuasive.  See Mot. Hr'g Tr. [Docket Entry 66] 22:18-23, 23:3-11, Oct. 26, 2011.  The Supreme Court made clear in Shaw I that both white voters and minority voters could bring a claim of a racial classification injury caused by the operation of the Voting Rights Act.  Shaw I, 509 U.S. at 652 (holding that "white voters . . . or voters of any other race" could bring claim of stigmatic equal protection injury).  Whether the Voting Rights Act and Section 5 were intended to benefit white or minority voters was irrelevant.  That question is similarly irrelevant here.

---

[8]  Ironically, that statement might not be true if the Ashcroft standard were still in place.  When the Justice Department applied Ashcroft to evaluate the switch from nonpartisan to partisan elections in the Charleston County School Board, the Department did consider how black representatives and other community members viewed the proposed change.  See Letter from R. Alexander Acosta, Assistant Attorney General, to C. Havird Jones, Jr., Senior Assistant Attorney General (Feb. 26, 2004).

Unlike the Jacksonville plaintiff, the plaintiffs here have not shown that the government classified them based on the color of their skin.  Jacksonville, 508 U.S. at 666; see also Townes, 577 F.3d at 546, 548, 550-51 (allowing black habeas petitioner to rely on Jacksonville for standing because he alleged that white inmate had been treated differently).  And unlike the Shaw I plaintiffs, they do not claim any stigmatic injury.  Shaw I, 509 U.S. at 652.  The only concrete way in which the amendments injured plaintiffs was in suspending the referendum, and, as explained, only subsections (b) and (d) caused that injury.  The Court therefore concludes again that plaintiffs lack standing to bring their challenge to subsection (c).  Nonetheless, for the reasons explained earlier, the Court will proceed to set forth how it would analyze plaintiffs' Count II claim as to subsection (c) if plaintiffs had standing to pursue that claim.

## B.  Standard of Review

The baseline standard of review in racial classification cases is well established: racial classifications, whether employed by the federal government or a state or local government, are reviewed under strict scrutiny.  Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227 (1995).  Although there are two reasons that principle might not apply here, the Court concludes that it should apply strict scrutiny to plaintiffs' claims.

The first reason that strict scrutiny might not apply is that the amendments to Section 5 are, on their face, race-neutral.  They provide only that no voting changes that "ha[ve] the purpose of or will have the effect of diminishing the ability of any citizens of the United States on account of race or color . . . to elect their preferred candidates of choice" can be precleared.  42 U.S.C. § 1973c(b).  Unlike, say, a set-aside for businesses owned by minorities, the amendments make no textual distinction between white and minority voters.  Still, it is clear

beyond peradventure that the purpose of Section 5 and the 2006 amendments is to protect

minority voting rights, and that they are applied to do so.  See Def.'s Opp. at 12 ("In any event, it

has been clear since at least 1976 . . . that Section 5 is not race-neutral.").  Laws "neutral on their

face but 'unexplainable on grounds other than race'" are analyzed under strict scrutiny.  Miller,

515 U.S. at 905 (quoting Arlington Heights, 429 U.S. at 266).  That principle governs here.

The second reason strict scrutiny might not apply is that, as the Supreme Court has

recognized, voting regulations -- particularly in the context of districting -- are different than

other government actions.  While most government actions should be wholly colorblind, a

legislature "always is aware of race when it draws district lines, just as it is aware of age,

economic status, religious and political persuasion, and a variety of other demographic factors."

Shaw I, 509 U.S. at 646.  Hence, districting based in part on governmental "aware[ness] of race"

is not always reviewed under strict scrutiny.  See id.  The Supreme Court's caselaw on how far

this principle extends is extremely fractured.  Some members of the Court have endorsed the

proposition that intentional creation of majority-minority districts is a form of mere racial

awareness, not racial classification, while others have disagreed or refused to take a position on

that question.  See Vera, 517 U.S. at 958 (plurality opinion) (intentional creation of majority-

minority districts can be mere racial awareness that does not require strict scrutiny); id. at 996

(Kennedy, J., concurring) (declining to take a position); id. at 999 (Thomas and Scalia, JJ.,

concurring in judgment) (finding that strict scrutiny applies to all intentional creation of

majority-minority districts); id. at 1003-04 (Stevens, Ginsburg, and Breyer, JJ., dissenting)

(finding that strict scrutiny did not apply to majority-minority districts before the Court); id. at

1045-46 (Souter, Ginsburg, and Breyer, JJ., dissenting) (rejecting <u>Shaw I</u>'s strict scrutiny framework).

It might be possible to describe Section 5 and the 2006 amendments as mere federal "awareness" of how race functions in the context of voting laws.  If intentional creation of majority-minority districts is sometimes a function of racial awareness rather than racial classification, then Section 5 -- a law that creates certain rules and limitations for districting and other voting regulations -- may be as well.  As explained, the Supreme Court's caselaw on when strict scrutiny applies to state action in drawing districts is severely splintered, and it is unclear whether it would apply at all in the context of the federal government's enactment of Section 5.  Because translating the <u>Shaw</u>/<u>Vera</u> caselaw into this context is so unwieldy, the Court will presume that the usual equal protection principles apply rather than the unique exception in the districting context.  Accordingly, the Court will apply strict scrutiny to plaintiffs' equal protection challenge.  Hence, the government must show that the use of race in the 2006 amendments is "narrowly tailored" to achieve a "compelling" government interest.  <u>Parents Involved</u>, 551 U.S. at 720 (internal quotation marks and citations omitted).

## C. <u>Merits</u>

*1. Subsection (c)*

The constitutionality of subsection (c) is largely resolved by the Court's discussion of subsection (c) with respect to Count I.  As explained there, all that Congress has forbidden in subsection (c) is purposefully discriminatory actions that dilute the voting power of minorities.  As this simply repeats the prohibition of the Fourteenth Amendment, it cannot also <u>violate</u> the Equal Protection component of the Fifth Amendment.  <u>Washington v. Davis</u>, 426 U.S. 229, 239-

41 (1976) (explaining that intentional discrimination by government actors violates the Equal Protection Clause of the Fourteenth Amendment); Adarand, 515 U.S. at 224 (explaining that "[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment") (internal quotation marks and citation omitted).

Here, as in Count I, plaintiffs' real concern is that the Department of Justice will use subsection (c) as a sword rather than a shield. But the Supreme Court made clear in Miller and Shaw II that doing so would be unlawful. Miller, 515 U.S. at 924-25; Shaw II, 517 U.S. at 911-13. Plaintiffs have pointed to no evidence that the Department of Justice has employed the "purpose" prong inappropriately after the 1990s round of districting, and the Court will not presume that the Department will violate the law. See Tilton v. Richardson, 403 U.S. 672, 679 (1971). If that presumption proves wrong, an as-applied challenge may be brought in the appropriate case.

### 2. Subsections (b) and (d)

There are two reasons that the amendments in subsections (b) and (d) could raise equal protection concerns. First, there is the possibility that the amendments function as a "facial quota-preference for minorities," as plaintiffs put it. Plfs.' Opp. at 24. As the Supreme Court has explained in other contexts, quotas and rigid minority-preference schemes violate the Equal Protection Clause. See, e.g., Gratz v. Bollinger, 539 U.S. 244, 258, 269 n.18, 271-72 (2003) (citing Regents of Univ. of Cal. v. Bakke, 438 U.S. 265 (1978)).

More abstractly, there is the possibility that subsections (b) and (d) mandate excessive governmental race consciousness in violation of equal protection principles. A plurality of the Supreme Court raised this possibility in a discussion of the necessary prerequisites for bringing a

Section 2 claim in <u>LULAC</u>, where plaintiffs brought a Section 2 claim in response to a redistricting plan that, among other things, redrew what had been an African-American influence district. 548 U.S. at 445-46. Writing for three members of the Court, Justice Kennedy explained that the fact "[t]hat African-Americans had influence in the district does not suffice to state a § 2 claim in these cases. . . . If § 2 were interpreted to protect this kind of influence, it would unnecessarily infuse race into virtually every redistricting, raising serious constitutional questions." <u>Id.</u> (citing <u>Ashcroft</u>, 539 U.S. at 491 (Kennedy, J., concurring)). Justice Kennedy had expressed similar concerns in his separate concurrence in <u>Ashcroft</u>:

> As is evident from the Court's accurate description of the facts in this case, race was a predominant factor in drawing the lines of Georgia's State Senate redistricting map. If the Court's statement of facts had been written as the preface to consideration of a challenge brought under the Equal Protection Clause or under § 2 of the Voting Rights Act of 1965, a reader of the opinion would have had sound reason to conclude that the challenge would succeed. Race cannot be the predominant factor in redistricting under our decision in <u>Miller v. Johnson</u>, 515 U.S. 900 (1995). Yet considerations of race that would doom a redistricting plan under the Fourteenth Amendment or § 2 seem to be what save it under § 5.

<u>Ashcroft</u>, 539 U.S. at 491 (Kennedy, J., concurring). Although neither Justice Kennedy's concurrence nor the plurality decision in <u>LULAC</u> spelled out the details of the equal protection issue, the concern appears to be that excessive consideration of race by the federal government may cause the sort of stigmatic harms discussed in <u>Shaw I</u> and <u>Miller</u>.

In evaluating whether subsections (b) and (d) violate equal protection principles, a key point to keep in mind is the narrowness of plaintiffs' challenge. Count II challenges only the 2006 amendments to Section 5. It does not argue that the entire non-retrogression principle is invalid, only that <u>Ashcroft</u>'s refinement of that principle is constitutionally indispensable. <u>See</u> <u>LaRoque II</u>, 650 F.3d at 794 ("Significantly, plaintiffs do not contest the constitutionality of the

pre-2006 preclearance standards articulated in <u>Georgia v. Ashcroft</u> and <u>Bossier Parish</u>.").  That is, plaintiffs contend that the retrogression principle complies with the equal protection component of the Fifth Amendment only if, as <u>Ashcroft</u> decreed, (1) states may trade influence districts for opportunity districts and (2) courts and the Justice Department can take into account other jurisdiction-specific factors, such as minority-preferred legislators' views of proposed voting changes, in making preclearance decisions.  While plaintiffs' briefing on this argument is cursory, <u>see</u> Plfs.' MSJ at 44-45, their argument is presumably that the <u>Ashcroft</u> standard is a narrowly tailored response to the government's compelling interest, but that subsections (b) and (d) are not.

Given that plaintiffs do not challenge the general retrogression principle, they may have conceded that the government indeed has a compelling interest in remedying discrimination in voting.  But even if plaintiffs do not concede that point, the Court would conclude that Congress does in fact have such a compelling interest.  Congress has identified historical and ongoing intentional discrimination that strikes at the heart of two of the most important rights protected by the Constitution -- the right to vote and the right to be free from governmental discrimination based on race.  Congress heard testimony in 2005 and 2006 that intentionally dilutive techniques have been used as long as minorities have been able to vote.  Witness testimony and other record evidence indicated that discriminatory, dilutive efforts are ongoing in covered jurisdictions.  Moreover, Congress received evidence that such efforts would increase in the absence of Section 5's deterrent effect.

The Supreme Court has recognized that "remedying the effects of past intentional discrimination" can be a compelling interest.  <u>Parents Involved</u>, 551 U.S. at 720 (citing <u>Freeman</u>

v. Pitts, 503 U.S. 467, 494 (1992)).  This recognition has been particularly clear in the school

desegregation cases that followed in the wake of Brown v. Board of Education, 347 U.S. 483

(1954), and the Court finds that those cases provide important guidance here.  In Swann v.

Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 25 (1971), the Supreme Court approved

the use of "mathematical ratios" for student body racial composition "as a starting point in the

process of shaping a remedy, rather than an inflexible requirement."  In explaining why limited

use of such ratios was appropriate under the Equal Protection Clause, the Court said:

> Absent a constitutional violation there would be no basis for judicially ordering
> assignment on a racial basis.  All things being equal, with no history of
> discrimination, it might well be desirable to assign pupils to schools nearest their
> homes.  But all things are not equal in a system that has been deliberately
> constructed and maintained to enforce racial segregation.  The remedy for such
> segregation may be administratively awkward, inconvenient, and even bizarre in
> some situations and may impose burdens on some; but all awkwardness and
> inconvenience cannot be avoided in the interim period when remedial adjustments
> are being made to eliminate the dual school systems.

Id. at 28.  The Court also noted that facially "'racially neutral' assignment plans proposed by

school authorities . . . may be inadequate" to remedy the problems caused by past segregation.

Id.  These observations assist the analysis in the voting rights context.

   The Supreme Court has also held that racial classifications can be used to remedy past

discrimination outside the school desegregation context.  In United States v. Paradise, 480 U.S.

149, 163, 166 (1987), for example, every member of the Court agreed that racial classifications

could sometimes be used to remedy past discrimination, and a majority of the Court approved a

rule that a state agency that had systematically excluded blacks from promotion had to award

50% of promotions to qualified black candidates until the agency developed an acceptable

alternative plan.  In Adarand v. Pena, 515 U.S. 200, 237, 243, 269 (1995), seven members of the

Court concluded that racial classifications could be used to remedy past discrimination, and the Court remanded to the lower court to decide whether a particular federal preference program for minority subcontractors was appropriate.

The Supreme Court has, however, limited in several ways the government's ability to use racial classifications even as a remedy. Mere invocation of the word "remedial" cannot justify any use of racial classifications that the government desires. See Parents Involved, 551 U.S. at 720-21. For instance, a school district that has never imposed de jure segregation, or that has achieved unitary status, cannot invoke remedial justifications for classifying students by race. Id. Moreover, as Swann recognized, "there are limits" to the use of racial classifications even to remedy de jure segregation. 402 U.S. at 28. The Swann Court explained that if "we were to read the holding of the District Court [mandating certain actions to desegregate schools] to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse." Id. Justice Kennedy, concurring in Parents Involved, repeated the same points: "The Court has allowed school districts to remedy their prior de jure segregation by classifying individual students based on their race. . . . The remedy, though, was limited in time and limited to the wrong." 551 U.S. at 796 (Kennedy, J., concurring).

The Supreme Court has also ensured that remedial race-conscious measures are closely tied to the harms caused by discrimination by requiring express findings of official discrimination before allowing state and local governments to use race-conscious remedies. See, e.g., City of Richmond v. J.A. Croson Co., 488 U.S. 469, 489 (1989). In the case of such use of race-conscious remedies by the federal government, the Court has "recognized the special

competence of Congress to make findings with respect to the effects of identified past discrimination and its discretionary authority to take appropriate remedial measures." Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265, 302 n.41 (1978); see also Adarand, 515 U.S. at 230-31 (noting that application of strict scrutiny to Congress's use of racial classifications does not preclude some deference to Congress's exercise of its enforcement authority). The Supreme Court has also suggested, however, that Congress is not obliged to make such findings, as state and local governments are, because the Fourteenth and Fifteenth Amendments enlarge its power rather than restricting it. See J.A. Croson Co., 488 U.S. at 490; but see Adarand, 515 U.S. at 224, 226-31; see also id. at 264-65 (Souter, J., dissenting). Justice Scalia, concurring in J.A. Croson Co., elaborated on that point: "[I]t is one thing to permit racially based conduct by the Federal Government -- whose legislative powers on their face were explicitly enhanced by the Fourteenth Amendment -- and quite another to permit it by the precise entities against whose conduct in matters of race that Amendment was specifically directed." Id. at 521-22 (internal citations omitted). Justice Scalia also pointed out that "a sound distinction between federal and state (or local) action based upon race rests not only upon the substance of the Civil War Amendments, but upon social reality and governmental theory," because "[t]he struggle for racial justice has historically been a struggle by the national society against oppression in the individual States . . . . And the struggle retains that character in modern times." Id. at 522.

Even under the limitations the Supreme Court has imposed on the remedial use of race, the Court concludes that Congress has a compelling interest here in remedying prior state- and local government-sponsored racial discrimination -- and, even more importantly, in preventing the ongoing discriminatory efforts Congress identified. Intentional vote dilution, like school

segregation, is one of the most pernicious forms of <u>de jure</u> discrimination against minorities, and Congress is entitled to remedy any "harm that is traceable to" that intentional discrimination. <u>Parents Involved</u>, 551 U.S. at 721.  Identifying the harm "traceable to" discrimination is, of course, more complicated in the voting context than in the <u>de jure</u> school segregation context, as jurisdictions do not generally openly announce voting discrimination in the same way that school segregation was announced.  But Congress compiled an extensive legislative record that tied the remedies to areas of <u>de jure</u> discrimination in voting; it also relied on past legislative records finding intentional discrimination in covered jurisdictions.  In doing so, Congress exercised its "special competence . . . to make findings with respect to the effects of identified past discrimination" and its latitude "to take appropriate remedial measures."  <u>Bakke</u>, 438 U.S. at 302 n.41.

"All things being equal, with no history of discrimination," <u>Swann</u>, 402 U.S. at 28, Congress would have no interest in such supervision of state voting procedures.  "But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation."  <u>Id.</u>  In light of the extensive record compiled by Congress in 2005 and 2006, the Court finds that Congress has a compelling interest in crafting a remedy to address past and ongoing discrimination in voting.

The remaining question is whether the amendments contained in subsections (b) and (d) are sufficiently narrowly tailored to achieving Congress's interests without unnecessary reliance on racial classifications.  It bears repeating that plaintiffs have not challenged <u>Ashcroft</u>'s interpretation of the retrogression standard, so the question before the Court is whether the modification of the <u>Ashcroft</u> standard in subsections (b) and (d) -- eliminating consideration of

influence districts and other factors unrelated to minorities' "ability to elect" -- dooms the amendments on narrow tailoring grounds. The Court finds that it does not. Plaintiffs' primary complaint is that the amendments create an inflexible quota, but the Court is not persuaded that subsections (b) and (d) make the Section 5 analysis less flexible. It is true that states can no longer substitute influence districts for opportunity districts, but there is no longer any concern that influence districts will be protected from retrogression and frozen in place. See LULAC, 548 U.S. at 446; see also, e.g., Senate Hearing, 109th Cong. 56, 101(May 16, 2006) (witnesses agreeing that influence districts need not be protected from retrogression under the new standard); Thernstrom, Section 5 of the Voting Rights Act, 5 Geo. J.L. & Pub. Pol'y at 71.

Even if the amendments do make Section 5 less flexible, they still do not create the facial quota of which plaintiffs complain. As defendant points out, subsections (b) and (d) did not overturn the prior Section 5 caselaw that provided that there could not be an "utterly inflexible prohibition on retrogression." Def.'s Opp. at 39 (citing City of Richmond v. United States, 422 U.S. 358, 370-72 (1975)). Even before Ashcroft, the Department had stated that it did not "require the reflexive imposition of objections in total disregard of the circumstances involved or the legitimate justifications in support of changes that incidentally may be less favorable to minority voters." Revision of Procedures for the Administration of Section 5 of the Voting Rights Act of 1965, 52 Fed. Reg. 486, 488 (Jan. 6, 1987)). In its current regulations, the Justice Department has similarly acknowledged that it must consider "the extent to which a reasonable and legitimate justification for the change exists." 28 C.F.R. § 51.57(a). Recent guidelines issued by the Department state that retrogression may be "unavoidable" due to "shifts in population or other significant changes since the last redistricting (e.g., residential segregation

and demographic distribution of the population within the jurisdiction, the physical geography of the jurisdiction, the jurisdiction's historical redistricting practices, political boundaries, such as cities or counties, and/or state redistricting requirements)."  Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act, 76 Fed. Reg. 7470, at 7472 (Feb. 9, 2011).  In such situations, retrogressive plans may be precleared when the jurisdiction demonstrates that "a less-retrogressive plan cannot reasonably be drawn."  Id.  Finally, retrogressive plans must be precleared when avoiding retrogression would require a district to violate Shaw I and Miller.  Id. Hence, whatever race-consciousness is mandated by subsections (b) and (d) resembles the flexible mathematical ratios approved in Swann more than it resembles an inflexible quota.  See Swann, 402 U.S. at 25.  Certainly, the standard laid out in subsections (b) and (d) is more flexible than the 50% promotion rule approved in Paradise.  See 480 U.S. at 163-64.

Statutes may be invalidated on tailoring grounds when the challengers can suggest a narrower alternative that would be successful in curing the identified problem. See United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 813 (2000).  Other than pointing to the Ashcroft standard, plaintiffs here have not attempted to do so.  But Congress justifiably decided that Ashcroft's interpretation of the effects prong would not remedy the problems of intentional vote dilution that it identified.  As the record before Congress confirmed, Ashcroft gave jurisdictions greater leeway to disguise intentional discrimination and it created significant administrability, subjectivity, and partisanship problems. Hence, Ashcroft -- whether it was more or less narrow than subsections (b) and (d) -- was not "tailored" to achieve Congress's ends.  Plaintiffs' failure to offer hypothetical alternative amendments that would cure the Ashcroft problems but be narrower than (b) and (d) may reflect the difficulty of imagining what such amendments would

be.  As previously explained, the 2006 amendments respond to specific problems in the Ashcroft

holding in a relatively discrete way, so there is not much ground between the Ashcroft standard

that is acceptable to plaintiffs and the amendments that they challenge.  The Court therefore

finds that the 2006 amendments in subsections (b) and (d) are narrowly tailored to respond to the

historical and ongoing problems of voting discrimination identified by Congress.

     As to the second basis for an equal protection challenge -- that race is "infuse[d] . . . into

virtually every redistricting," LULAC, 548 U.S. at 446 -- the amendments are actually an

improvement over the Ashcroft standard.  Under Ashcroft, states might have had to protect

influence districts from retrogression in the same way that opportunity districts were protected.

Section 5's non-retrogression principle would thus have come into play in every influence district

as well as every opportunity district.  Given how many districts could conceivably be defined as

influence districts, race could truly have been infused into "virtually every redistricting."

Moreover, under the Ashcroft standard, the Justice Department would have had to obtain the

views of minority voters and minority-preferred candidates on any proposed election change -- a

considerably broader and more unwieldy undertaking than the purpose or effects test, and one

that would have required an even more racially-inflected view of elections.  See supra note 8

(citing Letter from R. Alexander Acosta, Assistant Attorney General, to C. Havird Jones, Jr.,

Senior Assistant Attorney General (Feb. 26, 2004)).

     For the reasons previously explained, the Court does not believe that an explicitly racial

problem can be resolved with no reference to race.  To that extent, then, race must be infused

into at least some redistricting processes for the duration of the amended Section 5.  Cf. Swann,

402 U.S. at 28 (remedying de jure segregation may be "administratively awkward, inconvenient,

and even bizarre in some situations and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to eliminate" the vestiges of segregation).  But Congress restricted the scope of the racial inquiry when it enacted the 2006 amendments contained in subsection (b) and (d), while at the same time tailoring the amendments to respond as effectively as possible to the problems of racial discrimination in voting.  The Court finds that doing so was not a violation of equal protection.

## CONCLUSION

This Court explained in Shelby County that Congress, the "coequal and representative branch of our Government," has the preeminent constitutional role under the Fourteenth and Fifteenth Amendments in determining the legislation needed to enforce those Amendments' guarantees.  See Shelby County, 2011 WL 4375001, at *80; Walters v. National Ass'n of Radiation Survivors, 473 U.S. 305, 319 (1985); see also Nw. Austin II, 129 S. Ct. at 2513. Congress emphatically determined that the amendments were indeed necessary to enforce the Fourteenth and Fifteenth Amendments' guarantees: the amended Section 5 passed by a vote of 390 to 33 in the House and 98 to 0 in the Senate.  See 152 Cong. Rec. S8012 (daily ed. July 20, 2006); 152 Cong. Rec. H5143-5207 (daily ed. July 13, 2006).  And, as the Court found with respect to the challenge to the reauthorization of the preclearance regime as a whole, Congress carefully and extensively justified its decisions to amend the statute to overturn or modify two Supreme Court decisions interpreting Section 5.  This Court declines to overturn that careful, well-supported judgment.

For the foregoing reasons, the Court will deny plaintiffs' motion for summary judgment, and grant the motions for summary judgment filed by the Attorney General and the defendant-intervenors.  A separate order has been filed on this date.

_____
/s/
JOHN D. BATES
United States District Judge

Dated: <u>December 22, 2011</u>

<u>Appendix</u>

This Appendix lays out the full citations for the House and Senate hearings cited in the opinion, as well as where text versions can be found on the internet. PDFs of most hearings are available at http://www.gpo.gov/fdsys/browse/collection.action?collectionCode=CHRG.

House Hearing (October 18, 2005):
<u>To Examine the Impact and Effectiveness of the Voting Rights Act, Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary</u>, 109th Cong. 1 (Oct. 18, 2005), <u>available at</u>
http://www.gpo.gov/fdsys/pkg/CHRG-109hhrg24033/html/CHRG-109hhrg24033.htm

1 House Hearing, <u>Scope</u> (Oct. 25, 2005):
1 <u>Voting Rights Act: Section 5 of the Act – History, Scope, and Purpose, Hearing before the Subcomm. on the Constitution of the H. Comm. on the Judiciary</u>, 109th Cong. 1 (Oct. 25, 2005) ("1 <u>History, Scope, & Purpose</u>")

2 House Hearing, <u>Scope</u> (Oct. 25, 2005):
2 <u>Voting Rights Act: Section 5 of the Act – History, Scope, and Purpose, Hearing before the Subcomm. on the Constitution of the H. Comm. on the Judiciary</u>, 109th Cong. 1685 (Oct. 25, 2005)

House Hearing (October 25, 2005):
<u>Voting Rights Act: The Continuing Need for Section 5, Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary</u>, 109th Cong 1 (Oct. 25, 2005), <u>available at</u>
http://www.gpo.gov/fdsys/pkg/CHRG-109hhrg24121/html/CHRG-109hhrg24121.htm

House Hearing (November 1, 2005):
<u>Voting Rights Act: Section 5 – Preclearance Standards, Hearing before the Subcomm. on the Constitution of the House Comm. on the Judiciary</u>, 109th Cong. 1 (Nov. 1, 2005), <u>available at</u>
http://www.gpo.gov/fdsys/pkg/CHRG-109hhrg24283/html/CHRG-109hhrg24283.htm

House Hearing (Nov. 9, 2005):
<u>Voting Rights Act: The Judicial Evolution of the Retrogression Standard, Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary</u>, 109th Cong. 1 (Nov. 9, 2005), <u>available at</u>
http://www.gpo.gov/fdsys/pkg/CHRG-109hhrg24504/html/CHRG-109hhrg24504.htm

House Hearing (Mar. 8, 2006):
1 <u>Voting Rights Act: Evidence of Continued Need, Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary</u>, 109th Cong. 1 (Mar. 8, 2006)

House Hearing (May 4, 2006):
Fannie Lou Hamer, Rose Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006 (Part I), Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary, 109th Cong. 1 (May 4, 2006), available at:
http://www.gpo.gov/fdsys/pkg/CHRG-109hhrg27334/html/CHRG-109hhrg27334.htm

Senate Hearing (May 9, 2006):
An Introduction to the Expiring Provisions of the Voting Rights Act and Legal Issues Relating to Reauthorization, Hearing Before the S. Comm. on the Judiciary, 109th Cong. 1 (May 9, 2006), available at
http://www.gpo.gov/fdsys/pkg/CHRG-109shrg28213/html/CHRG-109shrg28213.htm

Senate Hearing (May 10, 2006):
Modern Enforcement of the Voting Rights Act, Hearing Before the S. Comm. on the Judiciary, 109th Cong. 1 (May 10, 2006), available at
http://www.gpo.gov/fdsys/pkg/CHRG-109shrg28342/html/CHRG-109shrg28342.htm

Senate Hearing (May 16, 2006):
The Continuing Need for Section 5 Pre-Clearance, Hearing before the S. Comm. on the Judiciary, 109th Cong. 1 (May 16, 2006), available at
http://www.gpo.gov/fdsys/pkg/CHRG-109shrg28753/html/CHRG-109shrg28753.htm

Senate Hearing (May 17, 2006):
Understanding the Benefits and Costs of Section 5 Pre-Clearance, Hearing Before the S. Comm. on the Judiciary, 109th Cong. 1 (May 17, 2006), available at
http://www.gpo.gov/fdsys/pkg/CHRG-109shrg29625/html/CHRG-109shrg29625.htm

Senate Hearing (June 21, 2006):
Reauthorization of the Act's Temporary Provisions: Policy Perspectives and Views from the Field, Hearing Before the Subcomm. on the Constitution, Civil Rights and Property Rights of the S. Comm. on the Judiciary, 109th Cong. 1 (June 21, 2006), available at
http://www.gpo.gov/fdsys/pkg/CHRG-109shrg31269/html/CHRG-109shrg31269.htm

Senate Hearing (July 13, 2006):
Renewing the Temporary Provisions of the Voting Rights Act: Legislative Options After LULAC v. Perry, Hearing Before the Subcomm. on the Constitution, Civil Rights and Property Rights of the S. Comm. on the Judiciary, 109th Cong. 1 (July 13, 2006), available at
http://www.gpo.gov/fdsys/pkg/CHRG-109shrg33836/html/CHRG-109shrg33836.htm